# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, REKA GYORGY, KYLEE ALONS, KAITLYNN WHEELER, AINSLEY ERZEN, ELLIE EADES, LILY MULLENS, SUSANNA PRICE, CARTER SATTERFIELD, KATE PEARSON, KATIE BLANKINSHIP, JULIANNA MORROW, SWIMMER A, SWIMMER B, TRACK ATHLETE A, AND VOLLEYBALL ATHLETE A,<br><br>          Plaintiffs,<br><br><br>          v.<br><br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, UNIV. SYSTEM OF GEORGIA, GEORGIA TECH, UNIV. OF GEORGIA, UNIV. OF N. GEORGIA, ÁNGEL CABRERA, Georgia Tech President in his individual and official capacities, MEMBERS OF THE BOARD OF REGENTS OF THE UNIV. SYSTEM OF GEORGIA, in their individual and official capacities: DOUG ALDRIDGE, TOM BRADBURY, RICHARD "TIM" EVANS, W. ALLEN GUDENRATH, ERIN HAMES, BÁRBARA RIVERA HOLMES, SAMUEL D. HOLMES, C. THOMAS HOPKINS, JR., MD, JAMES M. HULL, CADE JOINER, PATRICK C. JONES, C. EVERETT KENNEDY, III, SARAH-ELIZABETH LANGFORD, RACHEL B. LITTLE, LOWERY HOUSTON MAY, JOSE R. PEREZ, NEIL L. PRUITT, JR., HAROLD REYNOLDS, SACHIN SHAILENDRA, T. DALLAS SMITH, MAT SWIFT, JAMES K. SYFAN, III, DON L. WATERS, and JOHN DOES 1-50,<br><br>          Defendants. | No. _____<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE, AND CLASS RELIEF AND DEMAND FOR JURY TRIAL

"*I swam the 500 free at NCAA's on March 17, 2022, where I got 17th, which means I didn't make it back to the finals . . . I'm a 5th year senior. . . This is my last college meet ever and I feel frustrated. It feels like that final spot was taken away from me because of the NCAA's decision to let someone who is not a biological female compete. . . It hurts me, my team and other women in the pool*."

***Reka Gyorgy, Virginia Tech Univ. Swimmer, Letter to NCAA, March 20, 2022***

## <u>INTRODUCTION</u>

### The Beginning

1.      Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlyn Wheeler, Lily Mullens, Susanna Price, Carter Satterfield, Kate Pearson, Katie Blankinship, Julianna Morrow and Swimmer A and Swimmer B (both proceeding under a pseudonym to protect them from retribution and reprisal) are like a lot of young girls who grow up in the United States, and indeed around the world, who enjoy a deep connection with swimming that fills their childhood days with purpose and provides them a pathway to grow in confidence toward womanhood. The glistening waters of the pool, routines of practice, relationships with teammates and camaraderie in the locker room became these girls' safe spaces as they grew up.

2.      For Ainsley Erzen, Ellie Eades, Track Athlete A, and Volleyball Athlete A, the field of play was different, but the story the same. For each Plaintiff,

sport has added vibrant color to their days, developed strength in their bodies, confidence in their minds and helped them to cultivate peace in their souls.

3.     Through opportunities received and obstacles overcome in sport, Plaintiffs became leaders and strong women, confirming the vision of the framers of Title IX, who anticipated that given an equal opportunity to succeed through sex-separated sport, women would grow, and society would benefit, from the priceless advantages that women's sport offers.

### The Purpose

4.     Plaintiffs, all current or former, collegiate, female, student-athletes, bring this case to secure for future generations of women the promise of Title IX that is being denied them and other college women by the National Collegiate Athletic Association (the "NCAA" or the "Association") working in concert with its member colleges and universities including those that are part of the University System of Georgia.

### The Problem

5.     Each Plaintiff's story demonstrates the harm being done to women that results from the NCAA's radical departure from Title IX's original meaning.

6.     The NCAA has long acted as if it were the sole arbiter of Title IX's meaning in college sports. It issues and enforces eligibility rules in collegiate sport which undermine the foundational principle of equal treatment for women upon

which Title IX rests, providing an excuse for Title IX covered institutions to violate federal law.

7.      The NCAA and its members are not above the law and must comply with it.

### The Awakening

8.      For most Plaintiffs, the realization that the NCAA was not dedicated to equal opportunity for women came during the 2021-22 women's swimming season.

9.      During her junior year at the University of Kentucky in the 2020-2021 NCAA Women's Swimming Championships Plaintiff Riley Gaines finished seventh in the 200-yard freestyle event (hereafter "200 free"). Riley did not have her best race, and a goal for 2021-2022, Riley's senior year, became standing on the podium of the 200 free at nationals.

10.     Riley swam well at the beginning of her senior season, turning in a great time at the mid-season meet, which all swimmers across the country use to gauge their progress against competitors in their event.

11.     At the University of Kentucky, the swim practice after the mid-year meet is a much-anticipated event; it is then that the head coach hands to each team member sheets of paper listing the nation's top ranked swimmers in each event.

12.     Riley and her teammates at the University of Kentucky were a highly competitive group and eagerly anticipated the information that annually served as motivation to their training over the second half of the season. But on that day in December 2021, as Riley and her teammates received the rankings, they were in for a shock.

13.     In the 200 free Riley was ranked third in the nation behind Isabel Ivey, a swimmer at Cal Berkeley, whom Riley knew from national junior competitions. However, the individual ranked first was a senior swimmer from the University of Pennsylvania ("UPenn") that neither Riley nor any of her teammates had ever heard of.

14.     Incredibly, this unknown swimmer was ranked first in women's freestyle swimming events ranging from the 200 free to the mile – *i.e.*, from the sprints to the distance events. Even prior collegiate legends like Katie Ledecky and Missy Franklin had not exhibited that breadth of dominance before. And no one in the Kentucky swim practice had previously heard of this senior swimmer at UPenn, an Ivy League school not known for its NCAA swimming prominence, the swimmer named Lia Thomas ("Thomas").

15.     The source of Thomas' abrupt rise to dominance atop the NCAA women's swimming world was not discovered until a few days later when a member of the University of Kentucky team found an article mentioning that

4

Thomas had previously competed on the UPenn men's swimming team as Will Thomas.

16.     The secret of Thomas' meteoric ascendance and dominance in NCAA women's swimming was retained male[1] advantage; now the question became, what would the NCAA do about it?

## The Association and Its Practices

17.     The NCAA is an unincorporated, voluntary, association comprised of more than 1,100 member colleges and universities.

18.     Most of the NCAA's members receive federal funding and are covered by Title IX.

19.     The NCAA is the largest scholastic sport rulemaking and enforcement body in the United States.

---

[1] The terms "male" and "female" and "women" and "men" are used in this Complaint in their strict biological sense and as these terms are used in Title IX's sport-specific regulations adopted in chronological proximity to Title IX's passage, without regard for "gender identity." Likewise, "sex" is used herein, as it was meant in Title IX, to refer solely to binary, biological sex. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 818 (11th Cir. 2022) (Lagoa, J., specially concurring); *Black's Law Dictionary* (5th ed. 1979) ("**Sex.** The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 655 (2020) (proceeding on the understanding that the term "sex" as used in the Civil Rights Act of 1964 "referr[ed] only to biological distinctions between male and female"). "Retained male advantage" refers to the retention of sport performance enhancing advantages of being biologically male that persist after testosterone suppression and other "gender affirming hormone treatment" ("GAHT").

20.     The NCAA is also a multi-billion-dollar business venture intended to, among other things, maximize the revenue flowing from college sports and reduce the expenses of members by dictating and expositing the rules under which college sports are played.

21.     Through its ability to obtain compliance with its rules from its members the NCAA has turned college sports in the United States into big business.

22.     For this purpose, colleges and universities cede their control over the regulation of college sports to the NCAA.

23.     Most of the NCAA's revenues derive from the monetization of men's collegiate sports, as exemplified by the NCAA men's basketball tournament trademarked as "March Madness."

24.     Over the last decade-and-a-half the exploitive conduct of the NCAA and the enormous profits that the NCAA and its member institutions derive from the monopolization of men's college sports has come under increasing public scrutiny and legal challenge, leading to the U.S. Supreme Court's unanimous decision in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) on June 21, 2021, and Justice Kavanaugh's pointed admonition in concurrence that "[t]he NCAA is not above the law." *Id.* at 112 (Kavanaugh, J., concurring).

25.    During the same fifteen-year-period, the NCAA has simultaneously imposed a radical anti-woman agenda on college sports, reinterpreting Title IX to define women as a testosterone level, permitting men to compete on women's teams, and destroying female safe spaces in women's locker rooms by authorizing naked men possessing full male genitalia to disrobe in front of non-consenting college women and creating situations in which unwilling female college athletes unwittingly or reluctantly expose their naked or partially clad bodies to males, subjecting women to a loss of their constitutional right to bodily privacy.

26.    Promoting policies that deprive women of equal opportunities and safe spaces in collegiate sport appears to facilitate the NCAA's goal of retaining control of the monetization of college sport.

27.    Through the NCAA's transgender eligibility policies (the "Transgender Eligibility Policies")[2] the NCAA has aligned with the most radical elements of the so-called diversity, equity, and inclusion agenda on college campuses, facilitating the NCAA's effort to shore up its flagging on campus approval ratings in furtherance of the NCAA's relentless drive to monetize collegiate sport, and diverting attention from the financial exploitation of college

---

[2] The NCAA's Transgender Eligibility Policies obtained from the NCAA's website are attached to the Complaint as **Appendix A** (hereafter referred to as "App. A") and Bates labeled NCAA 000001 – NCAA 000147.

athletes by NCAA colleges and universities, all at the expense of female student-athletes.

28.     To minimize dissent from its policies which harm women, the NCAA in coordination with its member institutions, including public colleges and universities, has sought to suppress the speech of female athletes by exerting pressure on them and all who resist to enforce a Code of Silence.

29.     The NCAA seeks to have college athletics departments impose upon all student-athletes what the NCAA calls "*LGBTQ-Inclusive Codes of Conduct*" which "outlin[e] consequences for engaging in homophobic and transphobic behaviors" and proclaim offending "language or conduct will not be tolerated."[3]

30.     The NCAA understands that in some quarters, including on many college campuses, merely standing up for fairness in women's sports will be labeled "transphobic."

31.     Thus, the NCAA's "Sample Team Code of Conduct" is a speech code, calculated to chill student-athletes from expressing personal opinions about transgender eligibility in the female category that are contrary to those imposed by the NCAA.

---

[3] *See* https://www.ncaa.org/sports/2016/12/8/five-ways-to-have-an-lgbtq-inclusive-athletics-department.aspx (accessed Mar. 14, 2024) (App. A, NCAA 000143-44).

**BASIS FOR TITLE IX JURISDICTION OVER THE NCAA**

32.     This is an action under Title IX of the Education Amendments of 1972, (Pub. L. 88-352), codified at 20 U.S.C. § 1681(a) and associated regulations ("Title IX"), and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution to remedy discrimination against women in college athletics.

33.     Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

34.     A regulation adopted thereunder by the Department of Education defines a "recipient" of federal financial assistance as any entity "to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance." 34 C.F.R. § 106.2(i).

35.     This regulation also provides that "[p]rogram or activity" means "all of the operations of" "[a]ny . . . entity that is established by two or more of the entities described in paragraph (h)(1), (2), or (3) of this section; any part of which is extended Federal financial assistance." 34 C.F.R. § 106.2(h)(4).

36.    "A college, university, or other postsecondary institution, or a public system of higher education" is an entity described by 34 C.F.R. § 106.2(h)(1).

37.    A private organization which receives federal financial assistance or "[w]hich is principally engaged in the business of providing education" is an entity described by 34 C.F.R. § 106.2(h)(3).

38.    All, or virtually all, NCAA members are entities described by 34 C.F.R. § 106.2(h)(1) and/or (h)(3).

39.    In *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 469 (1999), the U.S. Supreme Court decided that the NCAA was not covered by the predecessor to 34 C.F.R. § 106.2(i) merely because the Association received dues from recipients of federal funds.

40.    In *NCAA v. Smith*, however, the Court was careful to point out that its decision was "narrow" and addressed only the question of whether *the receipt of dues alone* from colleges and universities created Title IX coverage. *NCAA v. Smith*, 525 U.S. at 469.

41.    Both Smith and the United States as *amicus curiae* argued that the NCAA should be accountable under Title IX as colleges and universities are recipients of federal financial assistance and when "a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is

covered by Title IX regardless whether it is itself a recipient." *NCAA v. Smith*, 525 U.S. at 469-70.

42.     Yet, because this basis for Title IX coverage of the NCAA had *not* been raised below and was only raised for the first time at the Supreme Court by *Smith* and the U.S. government, the Court declined to consider the ceding control argument as a potential ground for Title IX coverage of the NCAA.

43.     Subsequently, courts have applied the ceding control standard to find Title IX coverage over athletic associations and other entities. *See*, *e.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007) (applying the ceding control argument applicable to the University of Georgia Athletic Association); *A. B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357 (D. Haw. 2019) (applying ceding control argument to Oahu Interscholastic Association); *Barrs v. Southern Conference*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010) (collegiate athletic conference that governed, regulated, operated, and controlled intercollegiate athletics of its member schools could be liable under Title IX if member schools delegated and assigned authority to do so to conference); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n,* 80 F.Supp.2d 729, 733–34 (W.D. Mich.2000); *see also Horner v. Kentucky High Sch. Ath. Ass'n*, 43 F.3d 265, 272 (6th Cir.1994) (Kentucky High School Athletic Association

properly sued under Title IX where it had control over interscholastic athletic programs that were receiving federal financial assistance).

44.     Therefore, the instant case presents the opportunity for a decision on the issue expressly left open by the U.S. Supreme Court in *NCAA v. Smith* — Title IX's applicability to the NCAA because colleges and universities which are recipients of federal financial assistance cede control over aspects of college athletics to the NCAA.

45.     It is beyond question that NCAA member educational institutions delegate rulemaking and enforcement authority to the NCAA over college athletic programs and that such programs provide a significant aspect of the student experience at the NCAA's member colleges and universities.

46.     In fact, the NCAA recently took just this position in *NCAA v. Alston*, agreeing that: "the NCAA and its member schools . . .  oversee intercollegiate athletics 'as an integral part of the undergraduate experience.'" *NCAA v. Alston*, 594 U.S. at 94 quoting "Brief for Petitioner [NCAA] in No. 20–512, at 31." *Id*.

47.     In *Alston* the NCAA admitted it engages in a "joint venture" with colleges and universities, conceding thereby that it establishes rules which guide and control important aspects of member institutions' mission related to college athletics. *See NCAA v. Alston*, 594 U.S. at 87-90.

48.     "[F]or a joint venture to exist, *there must be* not only a joint interest in the purpose of the enterprise ... but also an equal right, express or implied, to direct and *control* the conduct of one another[.]" *Taylor v. Texaco, Inc*., 510 F. Supp. 2d 1255, 1262 (N.D. Ga. 2007) (cleaned up; emphasis added). "The element of mutual control is a crucial element of a joint venture." *Id*.

49.     Thus, the NCAA's members covered by Title IX have ceded control over the rules and regulation of collegiate athletics to the NCAA. This makes the Association subject to Title IX.

50.     Should the NCAA contest whether it exercises control over aspects of intercollegiate sport, making it accountable under Title IX, Plaintiffs are entitled to discovery on this question and other factors that make the NCAA subject Title IX.

51.     Furthermore, this case raises the question of whether the NCAA as an unincorporated association established by Title-IX-covered-entities satisfies the definition of 34 C.F.R. § 106.2(h)(4), *see supra* at ¶ 35, thereby imposing Title IX accountability upon the Association for that reason as well.

52.     A third basis for NCAA liability for certain Title IX violations is 42 U.S.C. § 1983 which makes the NCAA liable for violations of Title IX undertaken under color of law, such as the locker room violations described below.

## OVERVIEW OF TITLE IX CLAIMS AGAINST THE NCAA AND GEORGIA PUBLIC UNIVERSITIES

**The Premise of the NCAA's Transgender Eligibility Policies—that Men Can Equally, Fairly, and Lawfully Compete in Women's Sports Through Testosterone Suppression—is Flawed**

53.     The NCAA's Transgender Eligibility Policies on their face and in practice deprive women of equal opportunity in comparison to men in college sports governed by the NCAA.[4]

54.     The sole justification of the Association for its discriminatory Transgender Eligibility Policies, which are *imposed* by the NCAA upon all member colleges and universities in NCAA Divisions I, II and III, is that biological differences between males and females can allegedly be overcome by a program of testosterone suppression in males who identify as transgender.[5]

55.     In 19 out of 25 NCAA women's sports the testosterone threshold for males who want to compete as women is 10 nanomoles per liter (nmol/L) which is five times (5x) greater than the highest level of testosterone any woman produces without doping.

56.     In six NCAA women's sports the threshold is lower than 10 nmol/L. However, in *every* single NCAA women's sport *the NCAA's testosterone threshold*

---

[4] Additional allegations concerning the NCAA's Transgender Eligibility Policies can be found *infra* at ¶¶ 54 – 61; ¶¶ 179 – 316.
[5] Additional allegations concerning the NCAA's testosterone suppression requirement can be found *infra* at ¶¶ 179 – 246.

*applicable to males* who seek to compete against women *is higher than the highest testosterone level women can produce without doping.*

57.     Thus, while there are a handful of sports (*i.e.*, 6 out of 25 NCAA women's sports) in which the NCAA applies a slightly lower testosterone suppression threshold for men seeking to compete as women than the threshold of 10 nmol/L that is most frequently used by the NCAA, every single testosterone threshold applied by the NCAA *is higher than the highest testosterone level women can produce without doping.*

58.     Most importantly, the NCAA Transgender Eligibility Policies *as applied to every single NCAA women's sport* are grounded in <u>the same illegal premise</u>: that <u>testosterone suppression and personal choice alone can make a male eligible to compete on a women's sports team</u>.

59.     The NCAA's testosterone suppression rationale is wrong as a matter of scientific fact and peer-reviewed research. *See infra* at ¶¶ 179 – 246.

60.     Just as importantly, the NCAA's testosterone suppression excuse is wrong as a matter of law.

61.     Title IX cannot be reasonably interpreted to permit males to take females' places in women's sports merely if males are willing to suppress their testosterone level.

**The NCAA Transgender Eligibility Policies Fail to Effectively Accommodate the Physical Abilities of Women and Give Women Equal Competitive Opportunities in Comparison to Men**

62.     Title IX was enacted by Congress to increase women's opportunities, therefore, no policy which authorizes males to take the place of women on women's college sports teams or in women's college sports locker rooms is permissible under Title IX.

63.     Moreover, *the NCAA's Transgender Eligibility Policies* are not sex neutral in operation but *disproportionality burden female athletes* by reducing female competitive opportunities, forcing female athletes to compete against males in sex-separated sports, depriving women of equal opportunities to protect their bodily privacy, and authorizing males to access female safe spaces necessary for women to prepare for athletic competition, including showers, locker rooms and restrooms.

64.     The NCAA and the other Defendants knew or should have known that the NCAA's Transgender Eligibility Policies violate Title IX because they result in the following discriminatory impacts against women ("Discriminatory Impacts"):

   a.     authorize the actual or potential eligibility of males to compete on women's teams or in the women's category of competitions,

   b.     permit males to be awarded points, prizes, awards, medals, trophies, places, rankings, or results in women's competitions,

    c.    deprive women of equal access to separate showers, locker rooms, and associated restroom facilities which protect their right to bodily privacy,

    d.    diminish equal opportunities and resources for women,

    e.    divert opportunities and resources to males,

    f.    subject women to a loss of privacy and emotional harm,

    g.    deprive women of a fair opportunity to prepare to compete in college sports by allowing males to access women's spaces including women's locker rooms, and

    h.    disproportionately impact and suppress the free speech rights of women advocating for their rights, safe spaces and a reasonable and correct application of Title IX and equal protection principles.

65.    Congress recognized when enacting Title IX that men and women are not interchangeable.

66.    Title IX's implementing regulations and guidance require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

67.     One aspect of assessing "equal athletic opportunity for members of both sexes" is ascertaining, **"[w]hether the** selection of sports and **levels of competition effectively accommodate the** interests and **abilities of both sexes**." 34 C.F.R. § 106.41(c)(1) (emphasis added).

68.     On the effective accommodation prong, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally **effectively accommodated**." 44 Fed. Reg. 71,413, 71,414 (1979) (the "Policy Interpretation") (emphasis added). More specifically, the covered institution must accommodate the physical abilities of girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." *Id*. at 71,417-418.

69.     As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added). Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate equal terms. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," *id*. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . .

effect" or that have the effect of denying "equality of athletic opportunity." *Id*. at

71,417.

70.     In 1979, the Department of Education Office for Civil Rights (OCR)

issued a policy interpretation of Title IX and the Regulations to provide more

specific guidance about the statute's application to intercollegiate athletics. Policy

Interpretation, 44 Fed. Reg. 71,413 *et seq*.

71.     The Policy Interpretation was further clarified by OCR through

issuance of OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance:

The Three-Part Test (the "OCR Clarification"). 44 Fed. Reg. at 71,417.

72.     In determining "whether the selection of sports and levels of

competition effectively accommodates the interests and abilities of members of

both sexes," both the 1979 Policy Interpretation and the 1996 OCR Clarification

state that compliance with the effective accommodation prong is assessed by

examining:

> a.  The determination of athletic interests and abilities of students;
>
> b.  The selection of sports offered; and
>
> c.  The levels of competition available, including the opportunity for
>     team competition.

73.     Finally, an overall determination of compliance will be made based

on:

a. Whether the institution's policies are discriminatory in language or effect;

b. Whether substantial and unjustified disparities exist in the program as a whole between male and female students; or

c. Whether substantial disparities exist in individual segments between opportunities afforded to male and female students.

Policy Interpretation, 44 Fed. Reg. 71,418.

74.   As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences women must be affirmatively protected with sex-separated sports teams, competitions, and locker rooms to achieve equality and equal opportunity for women.

75.   Specifically in terms of the requirements for women to have competitive opportunities "which equally reflect their abilities," equal "opportunities to engage in . . . post-season competition," and equal opportunities for public recognition, it is clear that the NCAA's Transgender Eligibility Policies breach Title IX by permitting men to compete against women in women's competitions where a man may rely upon inherent aspects of their maleness, including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX requires to be protected for women and made equally available to them.

76.     That female athletes are harmed by having to compete against males is in no sense surprising or unexpected. "This is because it is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (special concurrence; citing scientific literature).

77.     What is disappointing and unlawful is that the NCAA aggressively applies its radical Transgender Eligibility Policies which diminish women's opportunities despite the clear Title IX imperative to hold separate competitions and separate championships for women where physiological advantages of men preclude mixed (or open) competitions and despite vast scientific and experiential evidence demonstrating the NCAA's policies harm women.

**The NCAA Purports to Interpret Title IX for All Association Members**

78.     The NCAA's discrimination against women through its Transgender Eligibility Policies is driven by its intentional decision to reinterpret the term "sex" in Title IX to force biological women to cede opportunities and equal treatment to those whom the NCAA defines as "transwomen" but which faithful adherence to the plain language of Title IX requires be defined as "males" for purposes of Title IX's application to college sports.

79.    Part of the NCAA's current Transgender Eligibility Policies is an August 2011 guidance document from the NCAA Office of Inclusion entitled *NCAA Inclusion of Transgender Student-Athletes* (the "*NCAA Guidance on Transgender Student Athletes*" or "*NCAA Guidance on TSA*").[6]

80.    The *NCAA Guidance on TSA* states, "[t]he purpose of this resource is to *provide guidance to NCAA athletic programs about how to ensure transgender student-athletes* fair, respectful, and *legal access* to collegiate sports teams *based on current* medical and *legal knowledge*."[7]

81.    The NCAA purports to base its guidance to college and universities on "legal access" for transgender student-athletes upon Title IX.[8]

---

[6] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf (accessed Mar. 14, 2024) (App. A, NCAA 000019).

[7] *Id*. (*NCAA Guidance on TSA*, p. 2) (App. A, NCAA 000016 – 53).

[8] *Id*. (*NCAA Guidance on TSA*, p. 5 (App. A, NCAA 000022; referencing "federal laws, regulations, and legal decisions"), p. 15 (App. A, NCAA 000032; "Colleges and universities often have legal obligations to provide equal opportunity to student-athletes[.]"), p. 16 (App. A, NCAA 000033; "state and federal non-discrimination laws . . . prohibit discrimination based on gender identity and expression"), pp. 16-17 (App. A, NCAA 000033 – 34; recommending as a "best practice" to adopt a " athletics departmental policy addressing the participation of transgender student-athletes that is consistent with school policy and state or federal non-discrimination laws"), p. 28 (App. A, NCAA 000045; identifying Title IX and the Equal Protection Clause of the Fourteenth Amendment as sources of federal law upon which the *NCAA Guidance on TSA* is based).

82.    Thus, through its Transgender Eligibility Policies, the NCAA instructs 1,100+ Association members how these colleges and universities *must* interpret Title IX to comply with NCAA rules.

83.    For instance, the *NCAA Board of Governors Statement on Transgender Participation* issued on April 12, 2021, states "The NCAA Board of Governors firmly and unequivocally supports the opportunity for transgender student-athletes to compete in college sports," and references the NCAA's "*long-standing policy* that provides a more inclusive path for transgender participation in college sports,"[9] including a hyperlink directly to the *NCAA Guidance on TSA*.

84.    Another NCAA resource made available to colleges and universities is entitled "*On The Team: Equal Opportunity for Transgender Student Athletes*" ("*On The Team*").[10]

85.    The *On The Team* document likewise conveys the NCAA's "*guidance to* high school and *collegiate athletic programs about* how to ensure transgender student athletes fair, respectful, and *legal access* to school sports teams."[11]

---

[9] https://www.ncaa.org/news/2021/4/12/ncaa-board-of-governors-statement-on-transgender-participation.aspx (accessed Mar. 14, 2024) (emphasis added).

[10] https://www.nclrights.org/wp-content/uploads/2013/07/TransgenderStudentAthleteReport.pdf (accessed on March 14, 2024) (App. A, NCAA 000054 – 110), accessible through link on NCAA website at: https://www.ncaa.org/sports/2016/12/8/five-ways-to-have-an-lgbtq-inclusive-athletics-department.aspx#TCOC  (accessed March 14, 2024).

[11] *Id*., p. 2 (emphasis added) (App. A, NCAA 000056).

86.     *On The Team* is similar to (and appears to be an earlier version of) the *NCAA Guidance on TSA* and likewise purports to found the NCAA's guidance on interpretation of Title IX.[12]

87.     The NCAA's interpretation of Title IX as requiring a pathway for males who identify as transgender to be included on female teams is in some respects consonant with pending regulatory guidance and rulemaking issued for public comment in 2023 by the Office of the Civil Rights in the Department of Education. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, Proposed Rule by the United States Department of Education to amend 34 CFR Part 106.41(b), 88 Fed. Reg. 22860 (April 13, 2023).

88.     This agency guidance and rulemaking, however, is not faithful to the ordinary meaning of Title IX's language, nor is it a reasonable interpretation of it, nor is it consistent with DOE regulations issued in far closer chronological proximity to the passage of Title IX.

89.     Therefore, such interpretive guidance is not entitled to deference and cannot justify the NCAA's Transgender Eligibility Policies. *See Adams*, 57 F.4th at 817 ("equating 'sex' to 'gender identity' or 'transgender status' would also call

---

[12] *Id.* (*On the Team*, p. 50) (App. A, NCAA 000104).

into question the validity of sex-separated sports teams" contrary to the meaning of Title IX); *cf. Loper Bright Enterprises, Inc. v. Raimondo*, 45 F.4th 359, 365 (D.C. Cir. 2022), cert. granted in part sub nom. *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023); *Relentless, Inc. v. United States Dep't of Com.*, 62 F.4th 621, 628 (1st Cir.), cert. granted in part sub nom. *Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 325 (2023) (both discussing limitations on deference to agency guidance).

90.    The NCAA's misinterpretation of Title IX, which is being imposed nationwide upon collegiate sport, cannot stand.

### In 2022 the Defendants' Title IX Violations Harmed Hundreds of Student-Athletes at the 2022 Women's Swimming and Diving Championships in Atlanta, Georgia

91.    The NCAA serially violated Title IX in 2022 by purposefully adopting and amending policies and taking multiple actions specifically intended to authorize Thomas, a biologically male student-athlete, to compete on the UPenn women's swim team and access women's locker rooms in NCAA competitions in 2021-22.[13]

92.    Georgia Tech University ("George Tech") President Ángel Cabrera, the individual members of the Board of Regents of the University System of Georgia and their agents and employees, including John Does 26-50 in their

---

[13] Allegations regarding the tortuous path followed by the NCAA to ensure Thomas' continuing eligibility can be found *infra* at ¶¶ 318 - 352.

individual and official capacities (the "Georgia Individual Defendants") alongside or acting under the imprimatur of, or with apparent authority from, Georgia Tech and the NCAAA jointly organized the 2022 NCAA Women's Swimming and Diving Championships held at Georgia Tech's McAuley Aquatic Center on the Georgia Tech campus (the "2022 NCAA Championships").

93.   One or more of the Georgia Individual Defendants alongside or acting under the imprimatur of, or with apparent authority from, Georgia Tech participated in the NCAA's Title IX violations in 2022 by supporting, recognizing, facilitating, joining in, and implementing the decisions and actions of the NCAA to implement and enforce its Transgender Eligibility Policies which resulted in Discriminatory Impacts in violation of Title IX and the U.S. Constitution.

94.   Acting in concert, the NCAA and one or more of the Georgia Individual Defendants alongside or acting under the imprimatur of, or with apparent authority from, Georgia Tech, intentionally authorized and enabled Thomas to compete in the 2022 NCAA Championships and to access the women's showers, locker rooms, and restrooms at the 2022 NCAA Championships.

95.   Particularly given the high-profile nature of Thomas' qualification for the 2022 NCAA Championships, the NCAA, one or more of the Georgia Individual Defendants and George Tech knew or should have known the

Discriminatory Impacts and Title IX violations which did occur were likely to occur at the 2022 NCAA Championships.

96.    These purposeful actions by the NCAA in coordination with public colleges and universities and others, including one or more of the Georgia Individual Defendants, upended and undermined the competitive seasons, mental and emotional health and well-being, and academic and athletic experiences of hundreds of female swimmers and their families.

**The NCAA, the Georgia Individual Defendants and Georgia Educational Institutions Are Liable for Applying the NCAA's Incorrect Interpretation of Title IX in Georgia**

97.    Plaintiffs for themselves and a class of female athletes injured by the NCAA's Transgender Eligibility Policies and by the actions of the NCAA and the Georgia Individual Defendants which violated Title IX and the U.S. Constitution seek restoration through injunctive relief, compensatory, and nominal damages, attorneys fees and costs under Title IX and the Equal Protection Clause as well as actual and punitive damages under the Equal Protection Clause along with injunctive relief changing the official and public records of the NCAA and the Georgia Individual Defendants, the Georgia University System and Georgia Tech in relation to Thomas' unlawful eligibility and participation in the 2022 NCAA

Championships where Thomas competed in three swimming event Finals finishing first, tied for fifth, and eighth, and earning 45 points for the UPenn team.[14]

### Plaintiffs are Entitled to Injunctive Relief Enjoining Future Applications of the NCAA's Transgender Eligibility Policies

98.    The NCAA and the Georgia Individual Defendants acting in concert with each other and with the University System of Georgia and its public universities have engaged in a continuing pattern and practice of discrimination against women in violation of Title IX by implementing policies which allow males who identify as transgender to access female locker rooms and take the places of women on women's teams in collegiate athletic competitions in the State of Georgia.

99.    Essentially the same discriminatory, and unlawful NCAA policies are in force today as applied in 2022 when the NCAA Championships were held in Atlanta, Georgia and the current NCAA Transgender Eligibility Policies continue to subject female student-athletes to unequal treatment and discrimination in collegiate athletics as a litany of more recent examples illustrate.

100.    Pursuant to Federal Rule of Civil Procedure 20(a) a group of current student-athletes with remaining college eligibility who have been injured by the

---

[14] Emotional distress and punitive damages are specifically sought for Constitutional violations, recognizing the potential applicability to Title IX remedies of the U.S. Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).

NCAA Transgender Eligibility Policies, who are injured by the NCAA's adoption of the policies and application of the policies to collegiate sport by being threatened with having to compete with males, or who are reasonably likely to be injured by these policies have joined in this action to seek declaratory and injunctive relief regarding the policies.

101.   All Plaintiffs with remaining NCAA eligibility seek an injunction against the NCAA enjoining the NCAA's Transgender Eligibility Policies which adversely impact female athletes in violation of Title IX and enjoining the Georgia Individual Defendants, the University System of Georgia and its universities, Georgia Tech, the University of Georgia, and the University of North Georgia, from implementing any aspects of the NCAA's eligibility policies which violate Title IX in future NCAA sanctioned competitions in the State of Georgia hosted by, organized in whole or in part by, or which take place in any facility owned, operated or controlled by them, including, but not limited to:

     a.     the Southeastern Conference (SEC) Swimming and Diving Championships to be hosted by the University of Georgia on February 18-22, 2025,

     b.     the 2026 NCAA Division I Women's Swimming and Diving Championships to be held at the McAuley Aquatic Center at Georgia Tech University,

c.     the 2026 NCAA Division I, II and III Women's Rowing Championships to be hosted by the University of North Georgia, and

d.     the 2026 NCAA Division 1 Women's Tennis Championships to be hosted by the University of Georgia.

**OVERVIEW OF FOURTEENTH AMENDMENT CLAIMS AGAINST THE INDIVIDUAL MEMBERS OF THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, GEORGIA TECH, PRESIDENT CABRERA AND THE NCAA**

102.   Derived from the Civil Rights Act of 1871, 42 U.S.C. § 1983 imposes civil liability, including legal and equitable remedies, on one:

> who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]

103.   "A state university without question is a state actor." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

104.   The NCAA can be held accountable under 42 U.S.C. § 1983 for actions which violate constitutional rights where it collaborates or participates in a constitutional violation for which a state actor may also be held responsible.

105.   For instance, in *Tarkanian* the U.S. Supreme Court explained that "[s]tate action [may] lie if [a state actor, including a state college or university], by

embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Id.* at 194.

106.   Likewise, liability for constitutional violations by agents or employees of the University System of Georgia, its Board of Regents, Georgia Tech, President Cabrera, and the NCAA may be imposed on the NCAA or its agents where the state actor "delegates . . . authority to the private actor [*e.g.*, the NCAA]" or "provided a mantle of authority that enhanced the power of the [NCAA]." *Id*. at 192.

107.   In *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993), the United States Court of Appeals for the Eleventh Circuit recognized a sex-based "constitutional right to bodily privacy because most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" (citation omitted).

108.   Without notice to female swimmers competing in the 2022 NCAA Championships, the NCAA and the Georgia Individual Defendants and/or one or more other state actors or actors with apparent state authority, acting in concert and under color of law, changed the designation of the locker rooms to be used by the women swimmers at the 2022 NCAA Championships to "unisex" locker rooms

and directed women swimmers and teams that Thomas was entitled to use all designated locker rooms allocated to the women swimmers and teams.

109.   This change was made so that Thomas, a fully grown adult male with full male genitalia, would use the same locker rooms to be used by more than 300 female student-athletes, depriving the female student-athletes of sex-separated women's locker room facilities and bathroom and restroom facilities where their right to bodily privacy could be protected, exposing the women to shock, humiliation, and embarrassment in violation of their constitutional right to bodily privacy.

110.   Not only did the foregoing conduct, described *supra* at ¶¶ 91 – 96, 108 – 09 above and *infra* at ¶¶ 361 – 417 by the NCAA and/or its agents and the Georgia Individual Defendants and/or other state actors or others acting with apparent authority from the state violate Title IX, that conduct also violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by treating women unequally in comparison to men, depriving women of competitive opportunities equal to those afforded men, and violating women's right to bodily privacy, all under color of law.

111.   This conduct by the NCAA and its agents and the Georgia Individual Defendants and/or other state actors or others acting with apparent authority from the state subjected Plaintiffs Gaines, Alons, Wheeler, Swimmer A, Swimmer B,

and a class of similarly situated female swimmers and divers to discriminatory treatment and severe emotional distress for which Plaintiffs and members of the class are entitled to declaratory relief, compensation, punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## JURISDICTION & VENUE

112.   This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1983, 1988.

113.   Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

114.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) as all Defendants reside in the State of Georgia within the meaning of the venue statute.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events complained of herein occurred in this District and Division.

## THE PARTIES

115.   **Swimmer A** resides in the United States and competed in the 2022 NCAA Championships. Swimmer A is moving to proceed under a pseudonym because she is currently enrolled at and attending an NCAA institution and

reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.[15]

116.   **Swimmer B** resides in the United States and also competed in the 2022 NCAA Championships. Swimmer B is moving to proceed under a pseudonym because she is currently employed at an NCAA institution and reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.

117.   Plaintiff **Kylee Alons** is an All-American swimmer who competed at North Carolina State University and in the 2022 NCAA Championships.

118.   Plaintiff **Riley Gaines** is an All-American swimmer who competed at the University of Kentucky and in the 2022 NCAA Championships.

119.   Plaintiff **Reka Gyorgy** is an All-American swimmer who competed at Virginia Tech University and in the 2022 NCAA Championships.

120.   Plaintiff **Kaitlynn Wheeler** is an All-American swimmer who competed at the University of Kentucky and in the 2022 NCAA Championships.

---

[15] **Note regarding pseudonym filings**: After the Clerk's Office has assigned a cause number and given notice of the Court assignment, counsel for Plaintiffs intends to file a motion for Swimmer A, Swimmer B, Track and Field Athlete A and Volleyball Athlete A to proceed under pseudonym and supporting brief (along with other required documents). These filings will include some documents filed under seal. Plaintiffs believe these filings can be most efficiently made after a case number has issued and assignment to a Judge has been accomplished.

121.   Plaintiff **Ainsley Erzen** is a sophomore two-sport athlete in soccer and track and field at the University of Arkansas, a NCAA Division I school where she is an 800-meter runner and a member of Arkansas' 2024 NCAA Division I National Champion Women's Indoor Track and Field Team and a member of Arkansas' 2023 Southeastern Conference Champion Women's Soccer Team. In high school Ainsley was the first runner from the State of Iowa to win a national championship, winning the 800m national championship in 2:06.52.

122.   Plaintiff **Ellie Eades** is a junior NCAA tennis player at the University of Kentucky where she competes on the women's tennis team in NCAA Division I.

123.   Plaintiff **Lillian "Lily" Mullens** is a junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

124.   Plaintiff **Elizabeth "Carter" Satterfield** is a sophomore NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

125.   Plaintiff **Kaitlin "Katie" Blankinship** is a sophomore NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

126.   Plaintiff **Susanna Price** is a junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team and the women's cross country and outdoor track and field teams in NCAA Division III.

127.   Plaintiff **Kate Pearson** is a sophomore NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

128.   Plaintiff **Julianna Morrow** is a sophomore NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

129.   **Track Athlete A** is a junior track and field athlete who competes on a women's track and field team in NCAA Division III. Track Athlete A is moving to proceed under a pseudonym because she is currently enrolled at and attends an NCAA institution and reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.

130.   **Volleyball Athlete A** is a freshman volleyball athlete who competes on a women's volleyball team in NCAA Division II. Volleyball Athlete A is moving to proceed under a pseudonym because she is currently enrolled at and attends an NCAA institution and reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.

131.   Each Plaintiff is female by biological sex.

132.   Each Plaintiff is a current or former women's athlete at a NCAA member college or university who has been harmed by, or is threatened harm by, the NCAA's policies which violate Title IX and Equal Protection by permitting men to compete on women's teams and who has competed on a women's team in collegiate athletics regulated by the NCAA at the NCAA Division I, II or III level.

133.   Each Plaintiff except for Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, and Swimmer B have remaining NCAA eligibility.

134.   Defendant NCAA is an unincorporated association with headquarters and principal place of business in Indianapolis, Indiana at 700 West Washington Street, Indianapolis, Indiana 46202.

135.   The NCAA is subject to Title IX.

136.   NCAA members are primarily institutions which receive federal funds and are subject to Title IX.

137.   The NCAA exists in part to dictate and enforce the rules of college sport for its member institutions.

138.   NCAA members pay dues to the NCAA.

139.   In return for the payment of dues Association members expect the NCAA to regulate intercollegiate athletics in which member colleges and universities participate.

140.   NCAA members agree to comply with, and be governed by, the rules of the NCAA relating intercollegiate athletics, scholarships, their athletic departments, their sports teams and facilities and the actions which the NCAA decides to permit (or restrict) from all students and staff members involved in college athletics.

141.   NCAA members submit to NCAA rules and regulations regarding, among other things:

    a.    how members may recruit student-athletes,

    b.    when members may recruit student-athletes,

    c.    when representatives of members may contact prospective student athletes,

    d.    how members may provide benefits to student-athletes,

    e.    the value of scholarships that may be provided to student-athletes,

    f.    the value of other benefits that may be provided to student-athletes,

    g.    how many scholarships can be given to student-athletes,

    h.    how, when and for how long student-athletes and their teams may practice and train,

i.      the start date, end date and length of season in which student-athletes may play their sport(s),

j.      the grades that must be achieved by student-athletes,

k.      when games may be scheduled between Association members,

l.      when games can be scheduled against non-Association members,

m.      who may coach members' student-athletes,

n.      who may tutor members' student-athletes,

o.      how many classes student-athletes must attend,

p.      what roles non-athlete students can play in the athletic departments of Association members,

q.      what roles supporters of a college or university can play in relation to an Association member's athletic department and student-athletes,

r.      what drugs and medications student-athletes can use without notification to the Association,

s.      the rules under which athletic contests between Association members will be played,

t.      the venues at which national championships among Association members will be played,

u.   the rules for national championships among Association

members,

v.   the distribution of revenues from certain tournaments in which

Association members may participate,

w.   when student athletes may consider transferring to another

Association member,

x.   who is considered a male and who is considered a female for

purposes of playing on member schools' sports teams, and

y.   the NCAA Transgender Eligibility Policies.

142.   NCAA sponsored, regulated and/or organized competitions and

NCAA national championships in which NCAA policies and rules are applied are

frequently hosted by public colleges and universities in the State of Georgia.

143.   For instance, in 2006, 2016 and 2022 the NCAA Division 1 Women's

Swimming and Diving Championships were hosted by Georgia Tech University at

the McAuley Aquatic Center on the Georgia Tech campus in Atlanta, Georgia in

the Northern District of Georgia.[16]

---

[16] https://ramblinwreck.com/sports/genrel/facilities/mcauley-aquatic-center/
(accessed Mar. 14, 2024)

144.   This year the NCAA Division 1 Women's Swimming and Diving Championships will be held March 20-23, 2024, at the Ramsey Center in Athens, Georgia.[17]

145.   In 2026 the NCAA Division I Men's and Women's Swimming and Diving Championships will return to Atlanta to again be hosted by Georgia Tech University at the McAuley Aquatic Center.[18]

146.   Defendant University System of Georgia through its Board of Regents (the Board of Regents) is the unitary governing and management authority which manages, governs, controls, supervises, and oversees the public colleges and universities that comprise the University System of Georgia, including but not limited to the University of Georgia in Athens, Georgia, the Georgia Institute of Technology in Atlanta, Georgia and the University of North Georgia in Dahlonega, Georgia. The headquarters and principal place of business of the University System of Georgia and the Board of Regents is 270 Washington Street, SW, Atlanta, GA 30334. Defendant University System of Georgia is sued solely for injunctive relief under Title IX.

147.   Defendant Georgia Institute of Technology (aka "Georgia Tech University" or "Georgia Tech") is a research university of the University System

---

[17] https://www.ncaa.com/_flysystem/public-s3/files/Host%20Sites%202022-2026_1.pdf  (accessed Mar. 14, 2024)
[18] *Id.*

of Georgia, located in Atlanta, Georgia, which is governed by the Board of Regents of the University System of Georgia. Defendant Georgia Tech is sued solely for injunctive relief under Title IX.

148.   Defendant University of Georgia is a research university of the University System of Georgia, located in Athens, Georgia, which is governed by the Board of Regents of the University System of Georgia. Defendant University of Georgia is sued solely for injunctive relief under Title IX.

149.   Defendant University of North Georgia is a state university of the University System of Georgia, located in Dahlonega, Georgia, which is governed by the Board of Regents of the University System of Georgia. Defendant University of North Georgia is sued solely for injunctive relief under Title IX.

150.   Defendant Ángel Cabrera, the President of Georgia Tech University, is sued in his individual and official capacities.

151.   President Cabrera had the authority to control and direct and was aware of, or should have been aware of, all actions of Georgia Tech and other State Defendants described in this Complaint.

152.   Defendant Doug Aldridge, a member of the Board of Regents of the University System of Georgia since February 8, 2022, is sued in his individual and official capacities.

153.   Defendant Tom Bradbury, a member of the Board of Regents of the University System of Georgia since January 7, 2022, is sued in his individual and official capacities.

154.   Defendant Richard "Tim" Evans, a member of the Board of Regents of the University System of Georgia since January 9, 2022, is sued in his individual and official capacities.

155.   Defendant W. Allen Gudenrath, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in his individual and official capacities.

156.   Defendant Erin Hames, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in her individual and official capacities.

157.   Defendant Samuel D. Holmes, a member of the Board of Regents of the University System of Georgia since July 16, 2019, is sued in his individual and official capacities.

158.   Defendant Bárbara Rivera Holmes, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in her individual and official capacities.

159.   Defendant C. Thomas Hopkins, Jr., MD, a member of the Board of Regents of the University System of Georgia from January 1, 2018 through January 1, 2024, is sued in his individual and official capacities.

160.   Defendant James M. Hull, a member of the Board of Regents of the University System of Georgia since January 8, 2016, is sued in his individual and official capacities.

161.   Defendant Cade Joiner, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in his individual and official capacities.

162.   Defendant Patrick C. Jones, a member of the Board of Regents of the University System of Georgia since June 30, 2022, is sued in his individual and official capacities.

163.   Defendant C. Everett Kennedy, III, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in his individual and official capacities.

164.   Defendant Sarah-Elizabeth Langford, a member of the Board of Regents of the University System of Georgia since February 10, 2017, is sued in her individual and official capacities.

165.   Defendant Rachel B. Little, a member of the of Regents of the University System of Georgia from November 22, 2016, is sued in her individual and official capacities.

166.   Defendant Lowery Houston May, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in her individual and official capacities.

167.   Defendant Jose R. Perez, a member of the Board of Regents of the University System of Georgia since July 16, 2019, is sued in his individual and official capacities.

168.   Defendant Neil L. Pruitt, Jr., a member of the Board of Regents of the University System of Georgia since February 10, 2017, is sued in his individual and official capacities.

169.   Defendant Harold Reynolds, a member of the Board of Regents of the University System of Georgia since January 3, 2020, and current Chair of the Board, is sued in his individual and official capacities.

170.   Defendant Sachin Shailendra, a member of the Board of Regents of the University System of Georgia from January 1, 2021, is sued in his individual and official capacities.

171.   Defendant T. Dallas Smith, a member of the Board of Regents of the University System of Georgia since January 3, 2020, and current Vice Chair of the Board, is sued in his individual and official capacities.

172.   Defendant Mat Swift, a member of the Board of Regents of the University System of Georgia since January 5, 2024, is sued in his individual and official capacities.

173.   Defendant James K. Syfan, III, a member of the Board of Regents of the University System of Georgia since January 9, 2022, is sued in his individual and official capacities.

174.   Defendant Don L. Waters, a member of the Board of Regents of the University System of Georgia from 2013, is sued in his individual and official capacities.

175.   John Does 1-25 are agents of the NCAA who acting under color of law undertook the actions attributed to the NCAA in this Complaint and are therefore liable for the constitutional and Title IX violations described herein pursuant to 42 U.S.C. § 1983. Plaintiffs do not currently know, and cannot without discovery reasonably determine, the names of these individuals.

176.   John Does 26-50 are additional members of the Board of Regents of the University System of Georgia or their agents and/or individual agents or employees of the University System of Georgia and/or agents or employees of one

or more public colleges or universities in Georgia who engaged in the conduct attributed to the Georgia Individual Defendants that are described in this Complaint, including those individuals who directed operations and made decisions in relation to the 2022 NCAA Championships and/or who will do so in relation to other collegiate athletic events described in this Complaint. Each of these individuals is sued in their individual and/or official capacities. Plaintiffs do not currently know, and cannot without discovery reasonably determine, the names of these individuals.

177.   The identified individual members of the Board of Regents of the University System of Georgia in their individual and official capacities, or some of them, at all relevant times had, and currently have, the authority or apparent authority to control and direct, and did knowingly, intentionally and purposefully control and direct, all actions of the University System of Georgia and/or any public college or university in the State of Georgia described in this Complaint.

178.   The identified individual members of the Board of Regents of the University System of Georgia, President Cabrera and/or John Does 26-50, each in their individual and official capacities did knowingly, intentionally and purposefully control and direct and/or co-direct and/or jointly control all actions attributed in this Complaint to the Georgia Individual Defendants, the University

System of Georgia, Georgia Tech, the University of Georgia and/or the University of North Georgia.

## ADDITIONAL FACTUAL ALLEGATIONS

### THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES DEPRIVE WOMEN OF EQUAL OPPORTUNITIES CONTRARY TO TITLE IX AND EQUAL PROTECTION

#### The Male-Female Sport Performance Gap

179.   The reason for sex-separated sport (*i.e.*, for creating separate men's and women's teams or a separate women's category) and the reason the Title IX regulations endorse sex-separated sports teams is to give women a meaningful opportunity to compete that they would be denied were they required to compete against men.

180.   Biological differences between men and women prevent meaningful competition between men and women in almost all sports contested at a collegiate level in NCAA Divisions I, II and/or III.

181.   Developmental biologist Dr. Emma N. Hilton and sport physiologist Dr. Tommy R. Lundberg report that "the performance gap between males and females . . . often amounts to 10 – 50% depending on sport." Hilton, E.N., Lundberg, T.R., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine* (2021) 51:199-214, p. 199.

182.   Hilton and Lundberg note that the sport performance gap between

men and women is not limited to certain sports but applies generally to most skills

necessary for success in sport. *Id*. Here is a chart that illustrates male sport

performance advantages across a wide group of discrete sport skills:



**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 202, Fig. 1.

183.   The source of male athletic performance advantages over women

(sometimes described as the "Male-Female Sport Performance Gap") is attributed

by many scientists to genetic differences between males and females and the

effects higher levels of testosterone have on the male body throughout male development.

184.   The developmental and physiological effects brought about by genetic differences between males and females and higher levels of circulating testosterone in males begin well before puberty.

185.   In the womb and in the 6-9 month "mini puberty" phase immediately post birth natal males experience endogenous synthesis and secretion of higher levels of testosterone than natal females, triggering differentiation in male body structure beginning even before birth.

186.   The result is "is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and weight. On average women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 75% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight."[19] The impact of these differences is "an

---

[19] Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance," *Endocr. Rev.* 2018 Oct; 39(5): 803-829.

obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events."[20]

187.   Also, "levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12%[.]"[21] Increased levels of hemoglobin are due to the fact that, "[t]estosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone for erythrocyte production and thereby hemoglobin synthesis[.]"[22] These effects from testosterone and erythropoietin "[i]ncreas[e] the amount of hemoglobin in the blood [with] the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports. . . It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities."[23]

188.   Further, due to the impacts of testosterone, and perhaps other factors, on male development, "on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men."[24] The

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

athletic advantages conferred by men's larger and stronger bones includes, "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities" and greater male protection from stress fractures.[25]

189.   Additionally, there is a sex difference in pulmonary function which "may be largely explained by the androgen-sensitive difference in height, which is a strong predictor of lung capacity and function."[26]

190.   There are many ways to illustrate the Male-Female Sport Performance Gap and demonstrate that men competing on women's teams is incompatible with equal opportunities for women.

191.   A point of comparison that helps put the Male-Female Sport Performance Gap in perspective is to understand that *every* women's world record in *every* track and field event is bested *every* year by dozens, and in many cases hundreds, of high school age males.

192.   The following chart illustrates the performance gap by comparing the times of three 400m female Olympic gold medalists to thousands of males in 2017:

---

[25] *Id.*
[26] *Id.*

# Performance gap in elite sports



Above chart used with permission from Ross Tucker and derived from: Coleman, D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 89.

193.   As demonstrated in the chart, in a single year tens of thousands of males outperformed the best female 400m runners in the world.

194.   Here is a table which shows that high school boys ages 14-15 have eclipsed many women's world records by large margins:

**Table 3** Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," Sports Medicine, (2021) 51:199-214, p. 204, Table 3.

195.   These examples reflect that the plain language of Title IX which speaks in terms of binary, biological sex (*i.e.*, male and female) is well supported by science. There are highly relevant and extremely large differences between the sexes in terms of athletic and physical capacity and this translates into a large Male-Female Sport Performance Gap.

196.   Thus, in terms of fairness and equality for women competing in collegiate sport, the eligibility line of "biological sex" drawn by Title IX is the appropriate dividing line to ensure equal athletic opportunities for women.

197.   Deviation from the line drawn by Title IX harms females by making them compete against males, which is not fair, and in many cases can be unsafe.

198.   Because of the Male-Female Sport Performance Gap any quest to assign eligibility in male and female sport on terms other than biological sex is quixotic, doomed to fail scientifically, practically, and legally.

### Testosterone Suppression Does Not Bridge the Male-Female Sport Performance Gap

199.   Nevertheless, despite the science-backed dividing line for eligibility in women's sport provided by Title IX, which is sex and sex alone, the NCAA has chosen to define eligibility in women's collegiate sport in terms of testosterone suppression by allowing men to compete as women merely by suppressing testosterone to a certain level that is still above the female range.

200.   In other words, the NCAA gives males who wish to compete against women the option to suppress testosterone to a level that is still above the highest level a female can produce without doping.

201.   For a male who wishes to begin competing against females in NCAA competitions, the NCAA Transgender Eligibility Policies require only a year of testosterone suppression before a male may compete against females.

202.   However, multiple peer reviewed scientific research papers confirm that testosterone suppression does not work to bridge the Male-Female Sport Performance Gap.

203.   In one peer reviewed article researchers studied the effects of a year of hormone suppression on males and found that while males on hormone

suppression experienced some reduction in muscle mass, they "generally maintained their strength levels."[27]

204.   In another report, researchers Hilton and Lundberg concluded "that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, *evidence for loss of the male performance advantage*, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, *is lacking*."[28]

205.   Hilton and Lundberg continued:

Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting

---

[27] Wiik, Anna, et al., "Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals," *J Clin Endocrinol Metab*, March 2020, 105(3):e805–e813, available at: https://academic.oup.com/jcem. (accessed Mar. 14, 2024)

[28] Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 211.

organizations may need to reassess their policies regarding inclusion of transgender women.

*Id*.

206.    Thus, peer reviewed scientific studies demonstrate testosterone suppression does relatively little to mitigate the strength, speed, size, power and other athletically relevant differences between men and women (*i.e.*, the Male-Female Sport Performance Gap).

207.    A review published in April 2023 reported that there have been a total of 19 published peer reviewed research reports on the effects of testosterone suppression (as part of gender affirming hormone treatment or "GAHT") on performance.[29]

208.    "Collectively, the existing research indicates that while GAHT affects biology, the changes it creates are minimal compared to the initial biological differences between typical males and typical females, which means that both biological attributes and performance differences are retained even after years of GAHT." *Id*.

209.    "In spite of testosterone suppression in transwomen reducing circulating hemoglobin concentration to the levels of reference women, all of these

---

[29] "Should Transwomen be allowed to Compete in Women's Sports?" Brown, Gregory A., Ph.D. and Lundberg, Tommy, Ph.D., available at: https://www.sportpolicycenter.com/news/2023/4/17/should-transwomen-be-allowed-to-compete-in-womens-sports (accessed Mar. 14, 2024)

reviews came to the conclusion that even after 3 years of testosterone suppression there are still lasting male athletic advantages in transwomen." *Id*.

210.   Thus, while testosterone suppression is the supposed backbone of the NCAA's Transgender Eligibility Policies in which the NCAA authorizes men to compete in women's sports after only a year of testosterone suppression, peer reviewed scientific research confirms that the NCAA's reliance upon testosterone suppression is not supported by reliable scientific data.

211.   Nor has the NCAA ever published any data or studies supporting its testosterone suppression policy.

212.   Clearly, there is nothing about the NCAA's reliance on male testosterone suppression that can justify the discriminatory effects of the NCAA's Transgender Eligibility Policies on females.

213.   Testosterone suppression does not bridge the Male-Female Sport Performance Gap.

214.   Relevantly as well, as explained below, close analysis of the NCAA Gender Eligibility Policies demonstrates they have been thrown together in slapdash fashion, without apparent rhyme or reason, making it painfully clear that in this area the NCAA is focused upon gender ideology alone and is not even attempting to pursue competitive fairness for women.

**The NCAA's Transgender Eligibility Policies Allow Men to Compete Against Women While Retaining Higher Levels of Testosterone Than Women**

215.   The ranges of testosterone produced by males and females do not overlap.

216.   Men produce far more testosterone than women and there is a significant gap between the upper end of the testosterone range for women and the lower end of the testosterone range for men.

217.   A 2018 metanalysis established that in healthy individuals there is "a clear bimodal distribution of testosterone levels, with the lower end of the male range being four- to five-fold higher than the upper end of the female range (males 8.8-30.9 nmol/L, females 0.4-2.0 nmol/L)." Clark RV, Wald JA, Swerdloff RS, *et al.*, "Large divergence in testosterone concentrations between men and women: Frame of reference for elite athletes in sex-specific competition in sports, a narrative review." *Clin Endocrinol* (Oxf). 2019; 90:15–22. https://doi.org/10.1111/cen.13840.

218.   Currently, in 19 out of 25 women's sports the NCAA only requires males who want to compete against females to show testosterone suppression to a level of less than 10 nanomoles per liter (<10 nmol/L).

219.   The <10 nmol/L testosterone threshold used by the NCAA for granting eligibility to males to compete against females in most NCAA sports is five times higher than the upper end of the female testosterone range, twenty-five

59

times higher than the testosterone level of females at the lower end of the female

range, and *includes testosterone levels that are within the normal male range* of

8.8 nmol/L to 30.9 nmol/L.

220.   Importantly, the female range of 0.4 nmol/L to 2.0 nmol/L *includes*

*elite female athletes*.

221.   This means that even after "suppression" males are allowed to

compete in the female category with testosterone levels far higher than any female

athlete could ever achieve without doping.

222.   Moreover, under current NCAA rules, some males (those falling

within the lower end of the normal male testosterone range (*i.e.*, between 8.8 to

10.0 nmol/L or so) could compete in NCAA women's sports without substantially

reducing their testosterone level at all.

223.   These facts further confirm a discriminatory NCAA policy that

disparately impacts women.

224.   To be sure, as explained above, Plaintiffs do not concede that rules

that permit a man to compete in women's scholastic sports through engaging in

any level of testosterone suppression can pass muster under Title IX.

225.   Yet, even were it to be found somehow that a process of relying upon

male testosterone suppression to permit men to access women's sports and sports

teams could preserve equal opportunities for women in sports under Title IX, *the*

60

*NCAA's current eligibility rules* would still fail because they *provide a testosterone advantage to men* competing as women *that women cannot replicate without doping*.

226.   However, the facts about the NCAA's Transgender Eligibility Policies get even worse.

227.   As explained below, the <10 nmol/L testosterone suppression level, which is the central feature of the NCAA's Transgender Eligibility Policy requirements for males wishing to compete as females is not supported by robust scientific research and it was formally dispensed with years ago by the International Olympic Committee (IOC), yet the NCAA still relies upon it.

### The 2015 IOC Consensus Statement, Still Relied on by the NCAA, Was Withdrawn by the IOC in 2021

228.   The current NCAA Transgender Eligibility Policies stem from changes made by the NCAA in 2022 to take what the NCAA represents is a "sport-by-sport approach" that "aligns transgender student-athlete participation with the Olympic Movement."[30]

229.   Specifically, the NCAA claims that "the updated NCAA policy calls for transgender student-athlete participation for each sport to be determined by the policy for the national governing body [("NGB")] of that sport. If there is no NGB

---

[30] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed Mar. 14, 2024) (App. A, NCAA 000001).

policy for a sport, it would then be determined by the policy for that sport's international federation. If there is no international federation policy, it would be determined by policy criteria previously established by the International Olympic Committee."[31]

230.    However, the NCAA's claim of substantial alignment of the NCAA Transgender Eligibility Policies with the Olympic Movement is false.

231.    Instead, the NCAA has adopted a hodgepodge of sport-by-sport testosterone suppression levels (*i.e.*, threshold testosterone levels below which the NCAA allows men to compete in the women's category) which are applied inconsistently with how comparable athletes are treated in the Olympic Movement.

232.    The unifying theme of all iterations of the NCAA's transgender eligibility rules since 2022 is that men can compete on women's teams merely by demonstrating suppression of testosterone below a certain level.

233.    (Before 2022 the NCAA did not even require suppression below a defined level.)

234.    Most of the NCAA's testosterone suppression thresholds, *i.e.*, those currently applied in 19 out of 25 women's sports, are set at 10 nmol/L of serum testosterone.

---

[31] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed Mar. 14, 2024) (App. A, NCAA 000001).

235.    In general, this means that a male student-athlete who affirms they are transgender will be allowed to compete on a women's team if the student-athlete provides a single blood test result showing serum testosterone of less than 10 nmol/L twenty-eight (28) days before competing and obtains a signature of a single medical professional affirming the student-athlete has undergone hormone suppression for a year (however, no demonstration of a continuous level of suppression within that one year is required).

236.    The NCAA's claim that the <10 nmol/L suppression level is sourced from current Olympic Movement policies is untrue.

237.    Rather, the level of <10 nmol/L used by the NCAA in most women's sports is derived from an outdated, non-peer reviewed, two-and-a-half-page statement issued by the participants in an IOC-organized meeting *in 2015* which included four lawyers, multiple IOC employees, four IOC Medical & Scientific Commission members and ten academicians.[32]

238.    The document relied on by the NCAA is headlined *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism November 2015* (the "2015 IOC Consensus Statement"). *Id.*

---

[32] https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf (accessed Mar. 14, 2024).

239.   The first page of the 2015 IOC Consensus Statement merely lists the participants in the meeting. *Id*.

240.   The portion of the document dealing with transgender eligibility is a one-page outline of concepts for consideration by sports organizations with no references to scientific literature, studies, data, or testing. *Id*.

241.   Moreover, the 2015 IOC Consensus Statement, which again is currently relied upon by the NCAA for 19 of the 25 women's sports governed by the NCAA, *was in fact replaced by the IOC on November 16, 2021*.

242.   On that date, the IOC transferred responsibility for developing transgender eligibility rules to its member international sport federations and expressly "replac[ed] . . . previous IOC statements on this matter, *including the 2015 Consensus Statement*."[33]

243.   Therefore, *in 2022* when the NCAA first claimed to apply Olympic Movement policies to NCAA women's sports and at that time relied upon the 2015 IOC Consensus Statement to implement a <10 nmol/L testosterone suppression level for all NCAA women's sports, the NCAA was applying an outmoded, previously replaced, no longer operative, and withdrawn, IOC recommendation.

---

[33] https://stillmed.olympics.com/media/Documents/Beyond-the-Games/Human-Rights/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf (accessed Mar. 14, 2024) (emphasis added).

244.   Of course, as noted above, one of the problems with the nearly decade-old 2015 IOC Consensus Statement and its <10 nmol/L testosterone suppression level is that it discriminates against women by allowing men to compete on women's teams with a testosterone level that is five times higher than the highest recorded testosterone level for elite female athletes.[34]

245.   As also noted above, by 2021 when the NCAA adopted its testosterone suppression threshold robust scientific evidence demonstrated testosterone suppression of men wishing to compete against women was not sufficient to protect women.

246.   These facts are indicative of a NCAA policy driven by ideology and not science, but it gets even worse.

247.   The NCAA adds insult to injury by claiming sport-by-sport alignment with Olympic Movement policies and then in case-after-case not following Olympic Movement policies.

## The NCAA's Transgender Policies Are in Fact
## Dramatically Out-of-Step with Current Olympic Movement Policies

248.   The sport-by-sport testosterone suppression levels currently used by the NCAA are found on the NCAA website by clicking on three separate links (for fall sports, winter sports and spring sports) in the NCAA "Transgender Student-

---

[34] *See supra* at ¶¶ 215 – 225.

Athlete Eligibility Review Procedures"[35] or in a document referred to on the

NCAA website as the "NCAA Transgender Student-Athlete Participation Policy

Phase Two: 2022-23 and 2023-24 Academic Years Eligibility Review Form -

Instructions."[36]

249.   Review of these documents on the NCAA website – to which student-

athletes and NCAA institution athletic staff are directed by the NCAA in order to

comply with the NCAA's policies – demonstrates massive inconsistences between

current Olympic sport policies and the NCAA's radically out-of-step and

dangerous approach to transgender eligibility in women's sports.

250.   The <u>extraordinary underlying principle of the NCAA's Transgender</u>

<u>Eligibility Policies which the NCAA applies in every women's sport</u>—*that males*

*may compete on women's teams with only a single year of testosterone*

*suppression*—does not, in fact, align with the policies of key Olympic Movement

governing bodies.

---

[35] https://www.ncaa.org/sports/2022/1/28/transgender-student-athlete-eligibility-review-procedures.aspx (accessed Mar. 14, 2024) (Note on NCAA website: Approved: Jan. 27, 2022, Distributed Jan. 28, 2022, Updated: Jan. 19, 2023) (App. A, NCAA 000003).

[36] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSAEligibility ReviewForm.pdf (accessed Mar. 14, 2024) (App. A, NCAA 000005).

251.   Nor does the NCAA offer a shred of scientific data on its website supporting this underlying principle which, as demonstrated below, lies dramatically outside practices of the leading governing bodies in Olympic sport.

**Swimming**

252.   For instance, in the NCAA's category of "Women's Swimming & Diving" *the NCAA claims it applies* USA Swimming's policy for transgender eligibility merely because the NCAA has set a testosterone suppression threshold of 5 nmol/L.[37]

253.   However, for male athletes who identify as transgender and seek to compete in the women's category the eligibility policy of USA Swimming, the U.S. NGB for swimming, states "it shall be presumed that the athlete is not eligible unless the athlete demonstrates that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L (as measured by liquid chromatography coupled with mass spectrometry) continuously *for a period of at least thirty-six (36) months before the date of Application.* This must include at a minimum three (3) separate blood tests within the past three hundred sixty-five days (365) days preceding the Application, with the last test conducted within

---

[37] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlines
AndThresholdsWinter.pdf (accessed Mar. 14, 2024) (NCAA TRANSGENDER
STUDENT-ATHLETE PARTICIPATION POLICY SPORT-SPECIFIC
TESTOSTERONE THRESHOLDS AND CHAMPIONSHIP ELIGIBILITY
DEADLINES 2023-24 WINTER SPORTS) (App. A, NCAA 000012).

ninety (90) days prior to the athlete's Application."[38] Thus, USA Swimming

requires testosterone suppression *under the maximum threshold for 36 months*

before the date of application.

254.   In contrast, the NCAA only requires, "[l]aboratory results

demonstrating *a one-time total serum testosterone level* that is within the allowable

levels for the sport in which the student-athlete plans to compete . . . within four

weeks (28 days) prior to the applicable competition date"[39] and a male athlete's

"medical professional" (a physician certification is not required by the NCAA)

need only certify "[t]he identified student-athlete has, as of the date identified

below, received hormone suppression treatment for at least one calendar year."[40]

255.   Thus, while USA Swimming rules require more than three years of

suppression below the 5 nmol/L level, in contrast NCAA procedures only require a

---

[38] https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/rules_policies/usa-swimming-policy-19.pdf (accessed Mar. 14, 2024) (USA Swimming Athlete Inclusion, Competitive Equity, and Eligibility Policy) (emphasis added).

[39] https://www.ncaa.org/sports/2022/1/28/transgender-student-athlete-eligibility-review-procedures.aspx (accessed Mar. 14, 2024) (NCAA Transgender Student-Athlete Eligibility Review Procedures) (emphasis added) (App. A, NCAA 000003).

[40] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSAEligibilityReviewForm.pdf (accessed Mar. 14, (2024) (NCAA Transgender Student-Athlete Participation Policy Eligibility Review Form: Section Two – Medical Professional Attestation) (App. A, NCAA 000007).

single blood test result below 5 nmol/L within 28 days of the male athlete's first competition date.

256.   While the NCAA requires certification from a medical professional of one year of testosterone suppression, the NCAA does not require that "suppression" during that year be continuously below the 5 nmol/L threshold.

257.   Furthermore, USA Swimming's policy specifies that "[a]s a condition of eligibility, the athlete must satisfy the Elite Athlete/Event Fairness Panel that . . . [f]rom a medical perspective, the prior physical development of the athlete as a Male, as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender Female competitors."[41]

258.   The NCAA has no comparable process directed at ensuring competitive fairness and disqualifying male athletes who should not compete against females due to Retained Male Advantage.

259.   Thus, the NCAA's claim to be following "transgender student-athlete participation [policies] . . . determined by" USA Swimming is plainly not accurate.

**Diving**

260.   Furthermore, the NCAA's application of a 5 nmol/L threshold *to Diving athletes* is also inconsistent with the NCAA's stated approach of applying

---

[41] https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/rules_policies/usa-swimming-policy-19.pdf (accessed Mar. 14, 2024) (USA Swimming Athlete Inclusion, Competitive Equity, and Eligibility Policy).

the policy "determined by the . . . national governing body of that sport [and] [i]f there is no NGB policy for a sport . . . the policy for that sport's international federation."[42]

261.   USA Diving is the U.S. NGB for the sport of diving, not USA Swimming.

262.   Thus, if the NCAA were applying sport-by-sport NGB eligibility policies as it claims it would have looked to the rules of USA Diving or its international federation World Aquatics.[43]

263.   USA Diving does not have transgender eligibility rules, therefore, pursuant to the sport-by-sport approach to which the NCAA claims it subscribes, the NCAA should, but does not, apply the eligibility rules of World Aquatics to diving athletes.

264.   World Aquatics' rules do not permit a male athlete to compete in the women's category in World Aquatics events, regardless of gender identity, unless the athlete has undertaken gender transition and hormone suppression starting at the developmental stage known as Tanner Stage 2 (which starts for most people

---

[42] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed Mar. 14, 2024) (App. A, NCAA 000001).

[43] World Aquatics, formerly known as the Fédération Internationale de Natation (FINA), is the international federation for swimming, open water swimming, diving, water polo and other aquatic sports. *See* https://www.worldaquatics.com/about (accessed Mar. 14, 2024).

around age 12) and have maintained continuous suppression of testosterone under 2.5 nmol/L since then.[44]

265.   Therefore, the NCAA's policies for both swimmers and divers *do not comply* with the NCAA's claimed sport-by-sport Olympic alignment policy.

**Water Polo**

266.   Nor does the NCAA's eligibility policy for Women's Water Polo comply with the NCAA's Olympic alignment claim.

267.   The NCAA sets a "Approved Testosterone Threshold"[45] of <2.5 nmol/L for Women's Water Polo and cites the international federation now known as World Aquatics (previously known as FINA) as the source of this "benchmark." *Id.*

268.   However, as explained above, World Aquatics' eligibility policy requires hormone suppression *beginning at Tanner Stage 2* (*i.e.*, approximately age 12) as the starting point for any effort to qualify for eligibility in the women's category.

---

[44] https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf (accessed Mar. 14, 2024) (World Aquatics POLICY ON ELIGIBILITY FOR THE MEN'S AND WOMEN'S COMPETITION CATEGORIES) (Section F.4. Eligibility for the Women's Category).
[45]
https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlinesAndThresholdsSpring.pdf (accessed Mar. 14, 2024) (App. A, NCAA 000015).

269.   Thus, the NCAA is clearly not undertaking a faithful application of World Aquatics' eligibility rules for men who wish to compete in Women's Water Polo, nor therefore is the NCAA seeking to protect the opportunities of female water polo players.

270.   Thus, *in all three women's aquatics sports* (swimming, diving, and water polo) governed at the collegiate level by the NCAA*, the NCAA does not apply Olympic sport policies*, contrary to what the NCAA claims.

**Cross-country and Track and Field**

271.   Similarly, the NCAA governs three women's athletics (*i.e.*, running and track and field) sports at the collegiate level, namely women's cross country, women's indoor track and field and women's outdoor track and field.

272.   *For each of these three running sports the NCAA likewise does not apply relevant Olympic sport policies*, despite claiming otherwise.

273.   Each of the running and track and field sports fall under the purview of USA Track & Field (USATF) as the U.S. NGB and World Athletics as the international federation.

274.   As to each of these sports, the NCAA seeks to justify applying a <10 nmol/L testosterone threshold by linking to a USATF webpage entitled USATF Statement Regarding Transgender/Transsexual Policy (the "USATF Statement").[46]

275.   The USATF Statement references the IOC policy "updated in November of 2015" which as discussed above is the 2015 IOC Consensus Statement which has been superseded. *See supra* at ¶¶ 228 - 246.

276.   The USATF Statement may have at one time contained a hyperlink to the 2015 IOC Consensus Statement, however, the hyperlink has been removed, likely in recognition of the fact that the 2015 IOC Consensus Statement has been withdrawn.

277.   Nor does the USATF Statement reference a testosterone threshold of <10 nmol/L as the NCAA Transgender Eligibility Policy inaccurately claims.[47] The USATF Statement does not reference a testosterone suppression threshold.[48]

---

[46] https://www.usatf.org/governance/policies/usatf-statement-regarding-transgender-transsexual- (accessed Mar. 14, 2024).

[47] *See*, *e.g.*, https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlines AndThresholdsFall.pdf (accessed March 14, 2024) (NCAA TRANSGENDER STUDENT-ATHLETE PARTICIPATION POLICY SPORT-SPECIFIC TESTOSTERONE THRESHOLDS AND CHAMPIONSHIP ELIGIBLITY DEADLINES 2023 FALL SPORTS) (Approved Testosterone Threshold for Women's Cross-Country) (App. A, NCAA 000008).

[48] *See* https://www.usatf.org/governance/policies/usatf-statement-regarding-transgender-transsexual- (accessed Mar. 14, 2024)

278.   Nor is the USATF Statement relied on by the NCAA indicative of current USATF eligibility standards for athletes comparable to NCAA athletes.

279.   The appropriate USATF eligibility rule had the NCAA wanted to apply equivalent Olympic sport standards is Rule 1(a) of the USATF Competition Rules which makes the eligibility rules of World Athletics applicable to USATF national championships, including U.S. junior national championships such as the U20 Championships.[49]

280.   World Athletics eligibility rules are virtually identical to the previously described standards applied by World Aquatics which require transitioning and continuous testosterone suppression below 2.5 nmol/L *starting by Tanner Stage 2.*[50]

281.   Thus, *in women's cross country, women's indoor track and field and women's outdoor track and field the NCAA does not apply Olympic aligned policies, despite claiming otherwise.*

---

[49] *See* https://www.flipsnack.com/USATF/2024-usatf-competition-rules/full-view.html (accessed Mar. 14, 2024).
[50] *See* World Athletics Book of Rules, Book C, Rule C3.5 – Eligibility Regulations Transgender Athletes – effective 31 March 2023, Section 3.2, available at: https://worldathletics.org/about-iaaf/documents/book-of-rules (accessed Mar. 14, 2024).

**Rowing**

282.   *In the sport of Women's Rowing as well, the NCAA does not follow the applicable Olympic Movement policy.*

283.   Instead, the NCAA applies a 5 nmol/L threshold which the NCAA inaccurately claims is based on US Rowing policy.

284.   However, US Rowing's policies do not reference a testosterone threshold.[51]

285.   Here again, the NCAA's supposed Olympic alignment standard should have it look to the policy of World Rowing (also known as FISA) which policy states on this point:

> As a general guideline, a rower who has changed their gender, or intends to do so, and seeks to be determined as eligible to compete as a woman, will be required:
>
> a.   First, to satisfy the Gender Advisory Panel that the rower's serum testosterone concentration has been *less than 2.5 nmol/L continuously for a period of at least the previous 24 months*; and
>
> b.   Secondly, meet any other requirements reasonably set by the Gender Advisory Panel and endorsed by the Executive Committee."[52]

---

[51] https://usrowing.org/documents/2020/8/13/USRowing_Policy_Manual_06112020.pdf (accessed Mar. 14, 2024).

[52] Appendix R1 – Bye-Law to Rule 13 Men's and Women's Events, World Rowing Rule Book, available at: https://worldrowing.com/technical/rules/2021-rule-book/ (emphasis added) (accessed Mar. 14, 2024).

286.   Accordingly, Women's Rowing is yet another women's sport in which the NCAA is not following relevant Olympic sport policies, contrary to what it claims.

**Triathlon**

287.   Another example is the sport of triathlon where the NCAA has adopted a testosterone suppression threshold of <2.5 nmol/L.[53]

288.   Yet, the World Triathlon rules which the NCAA claims to be following state, "[t]he athlete must demonstrate that the concentration of [serum] testosterone . . . has been less than 2.5 nmol/L *continuously for a period of at least 24 months*"[54] and, as explained above, the NCAA only has a one year look back period for testosterone suppression and does not require suppression below a specified threshold during that one year period.

289.   Thus, *in the sport of Women's Triathlon as well the NCAA is not following the Olympic "sport-by-sport" standards it claims to be following*.

290.   The NCAA's patent failures to meet even its own announced Olympic alignment standards demonstrate the NCAA is not focused upon competitive fairness in women's sport nor upon ensuring equal opportunities for women.

---

[53] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlinesAndThresholdsFall.pdf (accessed Mar. 14, 2024) (App. A, NCAA 000009).
[54] https://www.triathlon.org/uploads/docs/TRI_Gender_Eligibility_Guidelines.pdf (accessed Mar. 14, 2024).

### The NCAA's Transgender Eligibility Policies Expose Women to Higher Safety Risks in Contact Sports

291.   Another clear indicator that the NCAA's goal is not equal opportunities for women is that in women's contact sports prone to violent collisions such as rugby, field hockey, lacrosse, soccer, softball, basketball and wrestling the NCAA allows a man to compete against women while maintaining Retained Male Advantage,[55] (including male advantages in size, strength, power, weight and speed) if the man merely applies to do so and satisfies the 10 nmol/L testosterone ceiling, in each case requiring only affirmation of a year of suppression without any particular level below which the male athlete's testosterone must be suppressed within that year.

292.   By failing to protect women in contact sports, increasing the risk of injury for females, and allowing male bodied athletes to compete against women, the NCAA is depriving women of an equal opportunity—in comparison to men— to receive the benefits of safe sport.

### Concussions

293.   Concussions raise serious long term health implications and can have lifelong debilitating effects.

---

[55] Retained Male Advantage is defined as the significant athletic advantages that males retain over females due to male biology and physical development even after testosterone suppression. *See supra* at p. 6, fn. 1 and at ¶¶ 199 – 213.

294.   "[Y]oung athletes may suffer significant long-term cognitive, memory, and fine motor impairment secondary to sports related, mild, traumatic brain injuries." Brown, K.A., Patel, D.R., "Participation in sports in relation to adolescent growth and development," *Transl Pediatr* 2017;6(3):150-159, p. 156, *available at* https://tp.amegroups.com/article/view/14626/14780

295.   "[D]amage to the brain from collisions has been shown to cause greater instance of mental illness such as depression and psychosis. Through . . . even one substantial head injury, the connections between brain neurons can be profoundly disrupted." "What Parents Should Know About Youth Athletics and Mental Health," Skyland Trail.org, *available at* https://www.skylandtrail.org/what-parents-should-know-about-youth-athletics-and-mental-health/ (Skyland Trail is a non-profit mental health treatment organization based in Atlanta.).

296.   "Studies from US collegiate sports have shown that female athletes are 1.9 times more likely to develop a sports-related concussion than are their male contemporaries in comparable sports." Sanderson, K. Why Sports Concussions Are Worse for Women, *Nature* (Aug. 3, 2021), https://www.nature.com/articles/d41586-021-02089-2.

297.   Concussions are just one type of serious athletic injury for which female athletes are at higher risk than males and the NCAA's discriminatory

eligibility policy hurts women by imposing an even higher risk of concussions and other injuries on them.

298.   The NCAA has diminished equal opportunities for women in sport by permitting athletes with retained male advantage, size, strength, power, and speed to compete on women's sports teams in contact sports, increasing female athletes' risk of injury in violation of Title IX.

### No NCAA Monitoring of Male Testosterone Suppression

299.   In addition to the problems with the NCAA's Transgender Eligibility Policies described above, they inadequately protect women for the additional reason that the NCAA does not have a monitoring and enforcement program for its testosterone suppression requirement.

300.   This demonstrates another discriminatory aspect of the NCAA's program.

301.   The NCAA drug tests women for performance enhancing drugs, including synthetic testosterone, at its championships and makes them subject to no advance notice drug testing throughout the season.

302.   However, the NCAA does not monitor the testosterone levels of men who are required to suppress testosterone to compete in women's sports.

303.   Therefore, even if the NCAA's testosterone suppression requirement could have an effect on reducing the massive performance advantages that males

have over females in sport the NCAA neither monitors or enforces its published

testosterone suppression standards nor does it have a program to deter non-

compliance.

304.   For instance, the NCAA does not conduct independent, arms-length

blood testing or other monitoring of compliance with testosterone thresholds.

305.   The NCAA could hardly show less attention to protecting competitive

fairness for women in its Transgender Eligibility Policies.

**Summary of Defects in NCAA's Transgender Eligibility Policies**

306.   The NCAA's Transgender Eligibility Policies are a house of cards, ill

grounded and insubstantial in every way, and without scientific substance or merit.

They exist only as a fig leaf for the NCAA's ideology-driven decision to

subordinate women's opportunities in sport to the interests of men who declare

themselves transgender.

307.   No men are disadvantaged by the NCAA's Transgender Eligibility

Policies only women are.

308.   As the Thomas case described below, *see infra* ¶¶ 519 - 521,

demonstrates, men who perform at a relatively low level when competing against

other men can shift to the women's category and achieve at a much higher level

relative to women.

309.   The NCAA's Transgender Eligibility Policies allow a man to make the relatively easy (in terms of comparative athletic challenge) shift to a women's team, depriving women of athletic accomplishments, recognition, awards, scholarships, and roster spots.

310.   But the same easy opportunity to shift to a men's team and reap relative sport performance benefits and the awards and recognition that flow from those relative sport performance benefits is non-existent for women.

311.   Women far more rarely move to men's teams for the simple reason that women are not generally (if ever at a high collegiate level) competitive on men's teams even if they receive a therapeutic use exemption to use testosterone as part of gender affirming hormone treatment.

312.   Perhaps for this reason, another transgender swimmer who competed in the 2022 Women's National Swimming and Diving Championships and is a biological woman elected to continue to compete on the women's swimming team. This transgender competitor did reach an event Final in the NCAA Women's Swimming National Championships but would not have been competitive in the NCAA Men's Swimming Championships.

313.   As explained above, the only real hurdle the NCAA places before a man who wishes to compete on a NCAA women's team and have access to

women's showers and locker rooms is a requirement of one-year of unmonitored (by the NCAA) testosterone suppression.

314.   This hurdle is low indeed and toothless for maintaining a level playing field. For the reasons explained above, it does not come close to meeting the NCAA's Title IX obligation to preserve equal opportunities for women.

315.   Therefore, the NCAA Transgender Eligibility Policies disparately and adversely affect women and reduce their opportunities in college sport. These Policies violate Title IX, and an injunction should issue enjoining the NCAA's use of these Policies or any policies which allow a man to participate in the women's category, on a women's team or in a women's competition, event, or championship.

316.   Thus far, the NCAA's Transgender Eligibility Policies, considered largely in the abstract, have been demonstrated to be manifestly inconsistent with the NCAA's claims about them, massively out-of-step with the policies of other sports organizations, and totally unsupported by scientific literature, reasoning or analysis.

317.   The next section explains how in practice the NCAA's regressive policies have harmed Plaintiffs and other women similarly situated, depriving them of an equal and fair opportunity to compete in college sport.

## EVENTS LEADING TO 2022 NCAA WOMEN'S SWIMMING
## AND DIVING CHAMPIONSHIPS AT GEORGIA TECH

318.   The NCAA's 2010 NCAA Transgender Participation Policy stated

that men who wished to compete in NCAA competition on a women's team[56]

could do so by "completing one calendar year of testosterone suppression

treatment."[57] No specific level of testosterone suppression was required. Nor was

independent testing or monitoring of hormone levels or of testosterone suppression

required. Nor did the policy include any provisions requiring evaluation of any

competitive advantage of male athletes competing on a women's team and there

was no requirement to evaluate risk of injury to female student-athletes.

319.   The NCAA's 2010 NCAA Transgender Participation Policy remained

unchanged until 2022.

### April 12, 2021, NCAA Board of Governors Statement

320.   On April 12, 2021, the NCAA Board of Governors released a

statement widely interpreted as directed at state legislators considering legislation

to protect female athletes from males competing on female sports teams.

---

[56] The Policy (as updated in 2022 to, in the wording of the NCAA, "remove
outdated language") refers to such individuals as "[a] trans female (MTF) student-
athlete being treated with testosterone suppression medication for gender
dysphoria[.]"
[57]
https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthlet
eParticipationPolicy.pdf (accessed Mar. 14, 2024)

321.   As they had in 2016 in relation to state legislatures considering legislation related to male and female bathroom usage, the NCAA Board of Governors threatened to withdraw NCAA events from states where "Saving Women's Sports" legislation was passed. Commenting on the NCAA's Transgender Eligibility Policies, the NCAA's top leadership proclaimed:

> The NCAA Board of Governors firmly and unequivocally supports the opportunity for transgender student-athletes to compete in college sports. This commitment is grounded in our values of inclusion and fair competition.
>
> The NCAA has a long-standing policy that provides a more inclusive path for transgender participation in college sports. Our approach — which requires testosterone suppression treatment for transgender women to compete in women's sports — embraces the evolving science on this issue and is anchored in participation policies of both the International Olympic Committee and the U.S. Olympic and Paralympic Committee. Inclusion and fairness can coexist for all student-athletes, including transgender athletes, at all levels of sport. Our clear expectation as the Association's top governing body is that all student-athletes will be treated with dignity and respect. We are committed to ensuring that NCAA championships are open for all who earn the right to compete in them.
>
> When determining where championships are held, NCAA policy directs that only locations where hosts can commit to providing an environment that is safe, healthy and free of discrimination should be selected. We will continue to closely monitor these situations to determine whether NCAA championships can be conducted in ways that are welcoming and respectful of all participants.

322.   Through this and other such communications the NCAA has made clear that it will retaliate against those which criticize or oppose its Transgender Eligibility Policies.

323.   The NCAA apparently believes that tough statements like this on transgender eligibility and threats of retaliation will generate support for the NCAA on college and university campuses.

324.   The NCAA also recognizes that the atmosphere on many college campuses makes it difficult for anyone, and particularly for female athletes, to oppose its Transgender Eligibility Policies.

325.   At the time the above quoted public statement on the NCAA's Transgender Eligibility Policies was released, the NCAA was preparing for the imminent release of what it understood was likely to be an embarrassing and damaging loss in the *NCAA v. Alston* case then pending in the U.S. Supreme Court (for which a decision was anticipated to be announced in June 2021).

326.   Thus, the NCAA's April 12, 2021, statement on its Transgender Eligibility Policies appears to have been calculated to further its collegiate sport monetization aims and deflect attention from an upcoming loss in the courts by engendering support for the NCAA among activist groups and on college and university campuses in advance of the *Alston* ruling.

**January 19, 2022, NCAA Board of Governors Announces NCAA Will Follow Transgender Eligibility Rules of U.S. Governing Bodies of Olympic Sports**

327.   As explained above, *see* ¶¶ 1-16, in the Fall of 2021 Lia Thomas swam the fastest times in the nation in women's freestyle events from the 200 free to the mile, making it apparent that if allowed to compete in the 2022 NCAA

Women's Swimming Championships Thomas would be competitive if not dominant, taking places and results from women.

328.   Thomas' competitive performances focused attention upon the NCAA's Transgender Eligibility Policies.

329.   Riley Gaines was confident that the NCAA would see the unfairness of letting Thomas, who had previously competed on the UPenn men's team, compete in the women's national championship, and she believed the NCAA would not allow Thomas to compete in Atlanta.

330.   Many other women shared Riley's initial optimism, they trusted the NCAA to do the right thing and protect equal opportunities and competitive fairness for women.

331.   To the contrary, however, the NCAA had made up its mind on what it would do; it just needed to figure out how to get there with the least possible off-campus damage to its reputation.

332.   The NCAA knew it could expect on-campus support on this issue, one of the few issues on which the NCAA could expect such support even as it battled name, image, and likeness (NIL) issues in the wake of the *Alston* decision, which had been highly critical of the NCAA's exploitation of college athletes and violation of antitrust laws.

333.   To generate support for its policies the NCAA regularly participated in organizing forums and shows of public support for the NCAA and its' policies on transgender eligibility issues.

334.   Furthermore, an NCAA-approved speech code was in place in many college athletic departments, helping to ensure athletes would not vocally dissent, as if they did so they could risk losing their scholarship or other discipline.[58]

### Ivy League Support of NCAA

335.   On January 6, 2022, the Ivy League issued the following statement supporting the NCAA:

> **PRINCETON, N.J.** – The Ivy League releases the following statement of support regarding Penn's Lia Thomas' participation on the women's swimming & diving team:
>
> *Over the past several years, Lia and the University of Pennsylvania have worked with the NCAA to follow all of the appropriate protocols in order to comply with the NCAA policy on transgender athlete participation and compete on the Penn women's swimming and diving team. The Ivy League has adopted and applies the same NCAA policy.*
>
> *The Ivy League reaffirms its unwavering commitment to providing an inclusive environment for all student-athletes while condemning transphobia and discrimination in any form.*
>
> *The league welcomes her participation in the sport of women's swimming and diving and looks forward to celebrating the success of all of our student-athletes throughout the season.[59]*

---

[58] *See supra* at ¶¶ 28-31.

[59] https://ivyleague.com/news/2022/1/6/general-the-ivy-league-releases-statement-of-support-regarding-penns-lia-thomas-participation-in-womens-swimming-diving.aspx (accessed Mar. 14, 2024)

336.   On January 19, 2022, the NCAA Board of Governors made an announcement which did not change the NCAA's policy of allowing men identifying as transgender to compete on collegiate women's teams, but which did seek additional political cover for the NCAA's Transgender Eligibility Policy by purporting to align the NCAA's Policy more closely with the sport-by-sport rules of NGBs in Olympic sports.

337.   The NCAA press release stated:

**Board of Governors updates transgender participation policy**
**Policy will take effect immediately, and impacted athletes can**
**regain eligibility later if approved by divisions**

Media Center
Posted: 1/19/2022 8:41:00 PM

The NCAA Board of Governors on Wednesday voted in support of a sport-by-sport approach to transgender participation that preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete. The new policy, effective immediately, aligns transgender student-athlete participation for college sports with recent policy changes from the United States Olympic and Paralympic Committee and International Olympic Committee.

Like the Olympics, the updated NCAA policy calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors. If there is no NGB policy for a sport, that sport's international federation policy would be followed. If there is no international federation policy, previously established IOC policy criteria would be followed.

The Board of Governors urged the divisions to provide flexibility to allow for additional eligibility if a transgender student-athlete loses eligibility based on the policy change provided they meet the newly adopted standards.

The policy is effective starting with the 2022 winter championships. Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Starting with the 2022-23 academic year, transgender student-athletes will need documented levels at the beginning of their season and a second documentation six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation would begin with the 2023-24 academic year.

"We are steadfast in our support of transgender student-athletes and the fostering of fairness across college sports," said John DeGioia, chair of the board and Georgetown president. "It is important that NCAA member schools, conferences and college athletes compete in an inclusive, fair, safe and respectful environment and can move forward with a clear understanding of the new policy."

"Approximately 80% of U.S. Olympians are either current or former college athletes," said Mark Emmert, NCAA president. "This policy alignment provides consistency and further strengthens the relationship between college sports and the U.S. Olympics."

Additionally, the NCAA's Office of Inclusion and the Sport Science Institute released the Gender Identity and Student-Athlete Participation Summit Final Report. The report assists ongoing membership efforts to support inclusion, fairness, and the mental and physical health of transgender and non-binary student-athletes in collegiate sport.

338.   Via the revised Transgender Eligibility Policy stated above, the

NCAA pledged to apply the eligibility policy of the relevant U.S. Olympic Sport

NGB, or, if the NGB had no policy, the rules of the relevant international

federation.

339.   But, as explained above, *see* ¶¶ 228 - 290, there was not an honest realignment of NCAA policies at that time, nor has there been such since then.

340.   The NCAA's claim to be substantially in accord with Olympic Movement policies is not accurate.

341.   Events in the wake of the NCAA's announcement of its supposed realignment further demonstrate the insincerity of the NCAA's approach.

**February 1, 2022, USA Swimming Adopts Transgender Eligibility Rules**

342.   As of January 19, 2022, when the NCAA issued its public pledge to follow the eligibility rules of the relevant NGB, neither FINA (then the name of the international swimming federation) nor USA Swimming had rules on the books regarding eligibility for transgender athletes.

343.   However, on February 1, 2022, less than two weeks after the NCAA Board of Governors' announcement, USA Swimming adopted detailed transgender eligibility rules.

344.   The new USA Swimming rules, discussed above, which remain in effect today, provide that males wishing to compete as a transgender athlete in the female category must demonstrate they have maintained a testosterone level below 5 nanomoles per liter *continuously for at least 36 months before competition.* These athletes must also *provide evidence they do not have a competitive advantage from retained male advantage which must be submitted to a review*

*panel of three independent medical experts.* USA Swimming's rules were adopted with an express goal of promoting competitive fairness and are applicable to events such as the U.S. Open and Junior Nationals, to USA Swimming members, and to those wishing to be eligible to set American records beginning with the 13-14 age group.

345.   Had they been applied by the NCAA, USA Swimming's rules would have prevented Thomas from competing in the 2022 NCAA Women's Swimming Championships because Thomas had not sought to suppress testosterone under the required level for at least three years before the competition, nor had any scientific analysis been conducted to establish Thomas did not retain male competitive advantage.

### NCAA Declines to Apply USA Swimming Rules

346.   However, notwithstanding the NCAA Board of Governors' January 19, 2022, announcement supposedly adopting "a sport-by-sport approach to transgender participation" in which "transgender participation for each sport [would] be determined by the policy for the national governing body of that sport," *the NCAA acted swiftly to reject USA Swimming's rules.*

347.   On February 10, 2022, the NCAA announced that "implementing additional changes at this time could have unfair and potentially detrimental

impacts on schools and student-athletes intending to compete in 2022 NCAA women's swimming championships[.]"[60]

348.   Instead, the NCAA announced that student-athletes who had been in compliance with the 2010 transgender policy need only demonstrate a serum testosterone level below the "maximum allowable limit" for that sport within four weeks of the championship.

349.   Thus, USA Swimming's rule requiring testosterone suppression for at least three years in advance of competition and requiring scientific review of male competitive advantage was rejected by the NCAA just days after the NCAA Board of Governors said it intended to follow the transgender eligibility rules of U.S. NGBs.

350.   The NCAA also said that notwithstanding USA Swimming's lower 5 nanomole per liter limit, the testosterone threshold for women's swimming would be 10 nanomoles per liter, double the threshold in the new USA Swimming policy.

351.   Thus, although Thomas did not qualify to compete in the women's category under USA Swimming's rules, the NCAA permitted Thomas to compete for the remainder of the 2022 season, including in the Ivy League Championships

---

[60] https://www.ncaa.org/news/2022/2/10/media-center-csmas-subcommittee-recommends-no-additional-changes-to-testosterone-threshold-for-trans-women-at-2022-womens-swimming-and-diving-championships.aspx (accessed Mar. 14, 2024).

and in the 2022 NCAA Women's Swimming Championships under a far less stringent standard.

352.   Thomas won the Ivy League Championships in the 500-yard, 200-yard and 100-yard freestyle events and qualified for the 2022 NCAA Championships in all three events.

## 2022 NCAA WOMEN'S SWIMMING CHAMPIONSHIPS

353.   On March 2, 2022, the NCAA announced the 281 swimmers who qualified for the 2022 NCAA Division I Women's Swimming and Diving Championships.[61]

354.   The 41 divers who qualified were to be announced on March 10, 2022.

355.   The field at the 2022 NCAA Championships was an elite one, comprised of the best collegiate women's swimmers and divers in the country, including numerous All Americans and Olympic and World Championship competitors from the U.S. and other countries.

356.   In the lead-up to the 2022 NCAA Championships female athletes traveling to Georgia to compete from schools across the country began receiving the same message from coaches, compliance staff, sports information directors and

---

[61] https://www.ncaa.com/news/swimming-women/article/2022-03-02/2022-ncaa-division-i-womens-swimming-and-diving-championships-qualifying (accessed Mar. 14, 2024).

other university staff: that criticism of the NCAA for permitting a male bodied athlete to compete in the women's competition would not be tolerated.

357.   Female student-athletes were warned that they were scholarship athletes and did not have the right to speak out on this issue.

358.   Similarly, at the 2022 NCAA Championships meet officials at the McAuley Aquatic Center at Georgia Tech sought to prevent speech and actions which communicated disagreement with the NCAA's policies and practices.

359.   Implicit in these warnings and other actions was that if women athletes, or their coaches or other team personnel did speak up they could lose their scholarships or positions or be punished in other ways.

360.   On information and belief, this organized effort was promoted and supported by the NCAA which willfully participated, conspired, coordinated, collaborated and/or substantially cooperated with public colleges and universities, including but not limited to Georgia Tech and the University System of Georgia and Georgia Individual Defendants, to, under color of law and acting within the ambit of state authority, chill, discourage and deprive women student-athletes, coaches, staff, and administrators from exercising their rights to freely speak and communicate on this issue and discouraging public statements in opposition to the NCAA's policies.

**Violation of the Constitutional Right to Bodily Privacy of Female Swimmers and Divers at the McCauley Aquatics Center on the Georgia Tech Campus**

361.   The locker rooms at the McCauley Aquatics Center are relatively small, such that swimmers and divers disrobing in them are generally within 10-15 feet of most of the other athletes in the room.

362.   Modern technical swimsuits in which competitors in the NCAA Division I Women's Swimming and Diving Championships compete are very difficult to put on and take off due to the tightness of the suits and the materials from which they are made.

363.   It is not uncommon for it to take 30 or 40 minutes for a female competitor to put on a competition suit, and almost all swimming and diving athletes require at least 15-20 minutes to put on their "tech suit."

364.   Thus, while putting on their swimsuits women must stand or sit undressed or partially clad and with the private parts (*i.e*., breasts, buttocks, and genital area) of their bodies exposed for long periods of time, making the process of putting on competition swimsuits a private activity that many women swimmers and divers prefer to engage in only in a secure and safe place, shielded from male access.

365.   Additionally, during a competition such as the 2022 NCAA Division I Women's Swimming and Diving Championships competitors must frequently change swimsuits and attire, often changing from street clothes or warm up gear to

practice swimsuits for practice or warming up and to competition or tech suits shortly before competing and back into street clothes or warmup gear or a practice swimsuit. A competitor may have to repeat this cycle of dressing, undressing, and showering multiple times in a single day, particularly if they are competing in more than a single event.

366.   Nationals is different from in season competitions for several reasons, not only are there far more athletes, and the pressure is higher, but at nationals the athletes are changing with far more strangers in the room. All of these factors argue in favor of a need for greater, rather than lesser, privacy standards.

367.   To accommodate the large number of women swimmers and divers for the Championships both the locker room regularly designated as a women's locker room and the locker room regularly designated as the men's locker room were reserved by the NCAA, Georgia Tech, the University System of Georgia and one or more Georgia Individual Defendants for use of the women swimmers and divers.

368.   However, unbeknownst to all or most female swimmers and divers and, on information and belief, by agreement of the NCAA and Georgia Tech, the University System of Georgia and/or one or more of the Georgia Individual Defendants, both locker rooms (including the adjacent restrooms) were designated

as "unisex" in order to permit Thomas uninhibited access to the locker rooms and restrooms used by, and designated for, the female swimmers and divers.

369.   No *written* "unisex" designation or warning was, however, placed on the locker rooms or restrooms.

370.   Nor were any of the Plaintiffs who competed in the NCAA Championships advised that the locker rooms had been temporarily designated "unisex" and that there was no locker room where female swimmers and divers could disrobe and dress in private without the prospect that a male would intrude upon their privacy.

371.   Thus, throughout the 2022 NCAA Division I Women's Swimming and Diving Championships Thomas, who is approximately six feet four inches tall and possessed full male genitalia, had complete and unrestricted access to the women's locker rooms, showers, and restrooms at the McCauley Aquatics Center.

372.   The first time most of the Plaintiffs became aware of Thomas' access to the women's locker rooms and restrooms at the McCauley Aquatics Center was: (1) when Thomas walked in on them while they were fully naked or in a state of substantial undress, revealing their bodies and private parts to Thomas and subjecting them to distress, shame, humiliation and embarrassment, (2) when they unwittingly walked in on Thomas and observed Thomas undressed with male genitalia exposed, subjecting them to distress, shame, humiliation and

embarrassment, or (3) when Thomas undressed in front of them, causing them distress, shame, humiliation and embarrassment.

373.   Swimmer A had no advance warning she would encounter a male body in the locker room at the NCAA Championships.

374.   On the first competition day Swimmer A walked into the locker room and was shocked to see a naked Thomas 10 feet in front of her and a full-frontal view of Thomas' male genitalia.

375.   Swimmer A found the experience "disturbing" and "violating," and promptly gathered her belongings and walked into the hallway without changing.

376.   Swimmer A immediately felt physical symptoms of a racing heartbeat and a racing mind. It felt like someone had "flipped an adrenaline switch" and she experienced a "huge element of shock." She was "upset."

377.   As Swimmer A thought about what had happened, she thought "I really don't like this" and she felt "very uncomfortable" and realized that for the rest of the competition she would have to "change [her] approach" and a focus for her would have to be "trying to navigate the locker room."

378.   She felt this had a "negative impact" on her trying to prepare to compete as she had to try to "mentally multi-task" to figure out how she could try to maintain privacy while she was preparing to compete.

379.   The next day Swimmer A "decided to brave the locker room" because she had to put on her racing suit, a difficult and time-consuming chore.

380.   As she walked in, she saw Thomas in the locker room changing.

381.   She again felt sensations of anxiety and went to the adjacent bathroom where she changed in a bathroom stall even though changing in bathroom stalls is not supposed to be done by the swimmers and is difficult because of the reduced space and difficulty of getting into the racing suit.

382.   It took Swimmer A 30-minutes in a bathroom stall to get into her tech suit.

383.   Swimmer A's perspective on NCAA Nationals was that the locker room experience very much detracted from her preparation to compete and "that's the last thing we should have to focus on at a NCAA Championship."

384.   On one of the early days of the NCAA Championship Kylee Alons saw Thomas in the locker room; that was the first moment that Kylee understood that Thomas had access to the women's locker room.

385.   From that moment on, the locker room became an "uncomfortable" place for Kylee.

386.   She was "stressed out" by having a male body in the locker room. She felt that her "privacy and sense of safety was violated." "It was not a private locker room anymore."

387.   She also recognized that "any male official or other man could walk into" the locker room, as the NCAA and Georgia Tech were not protecting women's privacy.

388.   As a result, Kylee looked for another place to change and found an equipment storage closet in an area behind the bleachers.

389.   Kylee said that although she much preferred changing in the women's locker room at meets where that was a safe space, at the point in the 2022 NCAA Championships when she began using a storage closet to undress and change clothes and swimsuits, she was just "relieved" to be able to change in some place that had more privacy from men than the women's locker room did at that moment.

390.   Kylee was disappointed that the NCAA never got women swimmers' feelings on the topic of locker room access.

391.   Because the NCAA never reached out and just assumed female athletes would go along with having no dedicated women's locker room or changing area, Kylee felt disrespected and taken advantage of.

392.   Kylee believes NCAA officials were well aware of how much pressure the women competitors would be under at the NCAA Championships and felt they could "take advantage of us."

393.   She noted that, "men don't have to go through this."

394. Kylee felt the way the NCAA handled the entire meet was very disruptive to concentration and competing at her best.

395. Riley Gaines "had no idea that Thomas was going to be using the women's locker room until he was in the locker room."

396. Riley remembered the moment she found out about Thomas' locker room access.

397. Riley described the locker room at a swimming competition as a place where women are "vulnerable" but it is not a quiet place.

398. Riley recalled that in this moment girls were laughing, chatting, crying.

399. Riley said she was "fully undressed" amidst the typical locker room clamor, when the room suddenly became silent, and Riley turned around to see Thomas "towering over every girl in the room."

400. Riley, who had no clothes on, was mortified and said she, "felt very uncomfortable and wanted to hide."

401. Riley said it was "dead silence" in the room before she let out an "uncomfortable laugh," although she was "hurting inside."

402. Riley recalled, "Thomas put his things down near her" and immediately "took all his clothes off."

403.   Riley pulled her clothes on and immediately went to the pool deck to find an NCAA official.

404.   Riley found a male wearing an official's uniform and demanded to know why there was a male body undressing in the women's locker room.

405.   The official's response to Riley was: "we had to get around this by changing the locker room to unisex."

406.   Although Riley was distressed by the thought of changing day-after-day in the locker room with Thomas, she did not see any other option.

407.   Riley was scheduled to swim in multiple events on three out of the four days of the Championships which required many changes of swimsuits and clothing daily. Her heavy competition schedule did not allow time for diversions.

408.   Thereafter, Riley used the locker room with the added burden and worry of the need to shield her body with towels and trying to change as quickly as possible. Every day she felt uncomfortable about the entire experience.

409.   Kaitlynn Wheeler was with her teammate Riley in the locker room and like Riley was also undressed when Thomas walked into the women's locker room.

410.   Kaitlynn too felt emotions of shame, desperation and humiliation and longed to be anywhere else in that moment.

411.   For Kaitlynn it was a traumatic moment that has driven her to speak up for other women as she hopes her sisters, her nieces, and other women never have to go through such a degrading experience where bodily privacy is violated without consent.

412.   The actions, policies and/or practices of the NCAA and the Georgia Individual Defendants and/or Georgia Tech or the University System of Georgia to provide Thomas access to the women's locker rooms, restrooms, and showers at the 2022 NCAA Division I Women's Swimming and Diving Championships caused significant mental and emotional disruption for women preparing to compete in one of the most significant athletic competitions of their lives and adversely affected the ability of many women to prepare for their competitions.

413.   The unconstitutional locker room, showers, and restroom policies and/or practices of the NCAA and the Georgia Individual Defendants and/or Georgia Tech or the University System of Georgia caused some women, including one or more Plaintiffs, to engage in difficult, uncomfortable, and degrading responses such as "deck changing," *i.e.*, changing or disrobing in one's parka in a hallway or other area to avoid exposure to Thomas, furtively changing in a storage closet, and/or not showering or not changing and as a result wearing wet clothing on the team bus.

414.   Plaintiffs' experience was that the unconstitutional locker room, showers, and restroom practices of the NCAA and the Georgia Individual Defendants and/or Georgia Tech or the University System of Georgia ruined the competition for them and was a significant distraction that undermined their focus and competitive edge and thereby impugned the fairness and integrity of the competition.

415.   Additionally, these women lost the opportunity for camaraderie that they typically experience in the locker room at meets.

416.   Kylee Alons said, in place of that camaraderie was a pervasive sense of: "Why can't we get the respect that male competitors would get?"

417.   For many women, the trauma caused by the unconstitutional locker room, showers, and restroom actions and practices of the NCAA, the Georgia Individual Defendants and/or Georgia Tech and/or the University System of Georgia thoroughly undermined their ability to enjoy the achievement of competing at the most significant swimming competition at which they would ever have the chance to compete in their lives.

## Competition at the 2022 NCAA Championships

418.   As noted above, the NCAA Women's Swimming and Diving Championships is one of the most noteworthy and memorable competitions in which a female swimming or diving athlete can compete.

419.   For all Plaintiffs this elite event, more competitive than many World Cup races and other international competitions, was one of the most, and for some, the most, significant athletic competition(s) in which they would ever participate.

420.   Yet, for all their hard work, training, passion, determination, and extraordinary level of physical fitness, these young athletes were vulnerable.

421.   They were vulnerable to the views of peers on the college campuses to which they would soon return.

422.   They were vulnerable to the powerful effect of their own hopes, dreams and aspirations which compelled them to try to focus on their competitions and avoid distractions at all costs.

423.   They were vulnerable to the rules of the NCAA by which they could be disqualified and to the aura of the NCAA which they dared not challenge.

424.   The NCAA and its leaders were aware of these vulnerabilities, and they relied upon them when adopting the NCAA's discriminatory and repressive policies; they played upon these vulnerabilities to create an environment that discouraged women from drawing attention to the stripping of their constitutional freedoms and to the oppression of women that was daily taking place just outside the public's eye.

425.   For the reasons described above, the women competitors were already disadvantaged by the time the Championships started.

426.   The stress of the competition only increased the isolation, disadvantage, and sense of unfairness they experienced.

427.   Each competition day at the Championships in which individual races (as opposed to relays) are contested involves Heats in the morning, followed by Finals in the evening.

428.   The evening Finals are divided into an A Final (or "Championship Final") comprised of the 8 fastest swimmers in the Heats and a B Final (or "Consolation Final") comprised of the next 8 fastest swimmers in the Heats.

429.   Each placement in the Finals is significant.

430.   Swimmers' teams receive a descending value of points for each of the 16 places won in the A and B Finals.

431.   Thus, the places in which the top 16 swimmers finish directly affect the team competition.

432.   Additionally, competitors in the A Final are named "All-Americans," while competitors in the B Final are named "Second Team All-Americans."

433.   It is a great honor just to compete in either Final in the evening session.

434.   Further, the NCAA awards trophies and an opportunity to stand on the podium to the top five finishers in each A Final.

435.   Thus, for each A Final in which Thomas competed, a woman who otherwise would have competed in that A Final was knocked down to the B Final.

436.   For each Final in which Thomas competed, a woman who otherwise would have competed in the B Final was knocked out of the B Final, losing the honor of competing in the evening session and the opportunity to win points for her team.

437.   Of course, one of the points of an athletic competition is placement, therefore, regardless of All-American awards or trophies, each place and each rank in a NCAA championship or other NCAA competition is of value to those who compete in it.

438.   Thus, each competitor who lost a placement or rank to an ineligible athlete necessarily experienced a devaluation of the competitor's placement in the competition.

439.   The female athletes recognized the supreme advantage possessed by the 6-foot 4-inch Thomas who was far bigger than any other swimmer at the competition and was the only swimmer who possessed the biological advantage of a male body structure, strength, power and increased aerobic capacity.

440.   When Swimmer B, a very accomplished swimmer, learned she would be competing against Thomas the magnitude of the task of competing against a male was so overwhelming and felt so "unfair" that she "felt helpless" and began

uncontrollably crying. Swimmer B had never cried about facing any opponent. It was a humiliating experience she should never have been put through.

**Wednesday, March 16 – Events Include:**
**200-yard Medley Relay and 800-yard Freestyle Relay**[62]

441.   The McCauley Aquatics Center pools were open for training and warmups on Wednesday, March 16, 2022.

442.   The first competitions contested in the Championships were two relays conducted on Wednesday evening.

443.   In the 200-yard medley relay the team from the University of Kentucky on which Plaintiff Riley Gaines competed was in Heat 2, and the North Carolina State team of Plaintiff Kylee Alons competed in Heat 3.[63]

444.   Kylee anchored the NC State team which finished second in 1:32.96, less than a second out of first place.[64] Riley anchored the Kentucky team which finished twentieth in a time of 1:36.47.

445.   In the 800-yard freestyle relay the University of Kentucky team competed in Heat 3[65] and finished ninth overall.[66] In this relay Riley Gaines held

---

[62] The competition summary in this Complaint focuses primarily upon participation in the meet by the Plaintiffs and the competitions in which Thomas took part and is not a comprehensive summary of all events at the meet.

[63] https://ramblinwreck.com/wp-content/uploads/2022/03/WedFinalsHeatSheet.pdf

[64] https://ramblinwreck.com/wp-content/uploads/2022/03/Wednesday-Timed-Finals-Results.pdf

[65] https://ramblinwreck.com/wp-content/uploads/2022/03/WedFinalsHeatSheet.pdf

down the second position and her teammate, Plaintiff Kaitlynn Wheeler, anchored the Kentucky team.[67]

**Thursday, March 17 – Events Include:**
**500-yard Freestyle, 50-yard Freestyle and 200-yard Freestyle Relay**

446.   There were 60 entries in the women's 500-yard freestyle and 8 Heats.[68] The prelims for the 500 freestyle were contested on Thursday, March 17 beginning at 10:01 am.[69] Thomas competed in Heat 8 which was scheduled to commence at 10:40 am.[70]

447.   The 50-yard freestyle was also contested on Thursday.[71] There were 68 entrants in the 50-yard freestyle and prelims for the 50-freestyle consisted of 9 Heats commencing at 11:16 am.[72] Kylee Alons competed in Heat 7 which took place at 11:23 am.[73]

448.   In Heat 8 in the prelims Thomas (UPenn) (4:34.06, qualifying time) competed against Brooke Forde (Stanford) (4:36.96), Kensey McMahon (Alabama) (4:38.34), Erica Laning (Arizona State) (4:38.80), Abigail McCulloh

---

[66] https://ramblinwreck.com/wp-content/uploads/2022/03/Wednesday-Timed-Finals-Results.pdf
[67] https://ramblinwreck.com/wp-content/uploads/2022/03/Wednesday-Timed-Finals-Results.pdf
[68] https://ramblinwreck.com/wp-content/uploads/2022/03/ThursdaySchedule.pdf
[69] *Id.*
[70] https://ramblinwreck.com/wp-content/uploads/2022/03/ThursdayPrelimsHeatSheet.pdf
[71] *Id.*
[72] *Id.*
[73] *Id.*

(Georgia) (4:39.17), Myra Geringer (Ohio State) (4:39.55), Ching Hwee Gan

(Indiana) (4:40.39), and Ayla Spitz (California) (4:40.89).

449.   Along with Thomas, McMahon (4:38.76) and Forde (4:38.19) made it

to the Championship Final in the 500-yard freestyle with the seventh and eighth

fastest qualifying times. McCulloh (4:40.58) and Laning (4:40.70) made it to the

Consolation Finals.

450.   The qualifiers and alternates for the 500-yard freestyle finals[74] are set

forth below:

**Event 3  Women 500 Yard Freestyle**

|  |  |  |  |  |
|---|---|---|---|---|
| | NCAA: | 4:24.06 | 3/16/2017 | Katie Ledecky |
| | Meet: | 4:24.06 | 3/16/2017 | Katie Ledecky |
| American: | | 4:24.06 | 3/16/2017 | Katie Ledecky |
| US Open: | | 4:24.06 | 3/16/2017 | Katie Ledecky |
| | Pool: | 4:30.81 | 3/17/2016 | Leah Smith |

| Lane | Name | Yr | School | Prelims |
|---|---|---|---|---|
| **Heat 1  Consolation Final** | | | | |
| 1 | Laning, Erica | 5Y | ASU | 4:40.70 |
| 2 | McCulloh, Abigail | FR | Georgia | 4:40.58 |
| 3 | Donohoe, Madelyn | JR | Virginia | 4:39.61 |
| 4 | Mathieu, Tylor | JR | Florida | 4:39.07 |
| 5 | Mrozinski, Julia | FR | Tennessee | 4:39.60 |
| 6 | Coetzee, Dune | FR | Georgia | 4:40.24 |
| 7 | Mull, Lola | SO | Northwestern | 4:40.70 |
| 8 | Nordin, Emma | 5Y | ASU | 4:40.78 |
| **Heat 2  Championship Final** | | | | |
| 1 | Tankersley, Morgan | SR | Stanford | 4:38.65 |
| 2 | Pfeifer, Evie | 5Y | Texas | 4:37.39 |
| 3 | Weyant, Emma | FR | Virginia | 4:37.25 |
| 4 | Thomas, Lia | 5Y | Penn | 4:33.82 |
| 5 | Sullivan, Erica | FR | Texas | 4:36.79 |
| 6 | McKenna, Paige | FR | Wisconsin | 4:37.36 |
| 7 | Forde, Brooke | 5Y | Stanford | 4:38.19 |
| 8 | McMahon, Kensey | SR | Alabama | 4:38.76 |
| **Alternates** | | | | |
| 1 | Gyorgy, Reka | 5Y | VT | 4:41.06 |
| 2 | Stege, Kristen | JR | Tennessee | 4:41.34 |

---

[74] https://ramblinwreck.com/wp-content/uploads/2022/03/ThursdayFinalsHeatSheet.pdf

451.   The Championship Final in the 500 freestyle was held at 6:11 pm on the same day.[75] The Consolation Final was held at 6:03 pm.[76]

452.   Tylor Mathieu of the University of Florida was the ninth fastest swimmer in the prelims, missing out on competing in the Championship Final due to Thomas' participation.

453.   Plaintiff Reka Gyorgy an All-American swimmer from Virginia Tech University knows from experience what a career milestone and achievement it is to compete in the NCAA Women's Swimming Championships.

454.   Reka competed in the 2016 Olympic Games for the country of Hungary and in multiple European Championships and she competed in several NCAA Championships.

455.   As an Olympian and experienced international swimmer Reka confirms from personal experience that the NCAA Women's Swimming Championships is one of the fastest meets in the world.

456.   The depth in the NCAA Finals can be even deeper than at the Olympic Games because there are limits at the Olympics on how many swimmers from each country can compete.

457.   Reka came into the 2022 NCAA Championships excited to be able to compete in what she knew would be one of the last competitions in her career.

---

[75] https://ramblinwreck.com/wp-content/uploads/2022/03/ThursdaySchedule.pdf
[76] *Id.*

458.   In the 500 free Reka strongly hoped to make it to the Finals and obtain an All-American ranking.

459.   The field in the 500 free was very accomplished and Reka knew that she would have to give it her best.

460.   After she completed her Heat, Reka sat in the stands watching the other competitors with pressure mounting. Finally, she watched Heat 8, the last of the heats for the 500 free, a heat in which Thomas would compete and win.

461.   When the times flashed on the board from Thomas' heat, Reka realized immediately that she had fallen to 17th place and would miss competing in the Consolation Final by one placement.

462.   Shortly afterwards Reka walked outside the venue where she cried in the hallway with a friend.

463.   Reka later shared that missing out on the Consolation Final in the 500 free in her last collegiate swimming competition was the biggest disappointment of her career.

464.   It was a very difficult way for an Olympian to end her collegiate career, deprived of an opportunity to race in a Finals event because the NCAA had allowed a male swimmer into the competition.

465.   After the 500 free Reka poured out her heart in a thoughtfully composed letter to the NCAA in which she explained how unfair the rules are that allowed Thomas to compete against women.[77]

466.   Reka handed her letter to an NCAA official on the last day of the Championships. However, no one at the NCAA has ever responded to Reka's letter.

467.   Reka found it ironic that at the 2022 National Championships the NCAA was passing out t-shirts celebrating "50 years of Title IX."

468.   Looking back, Reka believes that the NCAA showed through its actions at the 2022 National Championships that the NCAA does not care about protecting women or their rights.

469.   Although the NCAA never responded to Reka's letter, the Hungarian Swimming Federation found out about her letter and thanked Reka for sending it.

470.   Reka was told the Hungarian Federation sent her letter to the international swimming federation and urged the international federation to change its rules to provide more protection for women.

471.   The Championship Final was won by Thomas with a time of 4:33.24. Emma Weyant (Virginia) finished second in 4:34.99. Erica Sullivan (Texas)

---

[77] An accurate copy of the content of Reka's letter to the NCAA is attached as **Appendix B**.

finished third in 4:35.92. Brooke Forde (Stanford) swam a personal best of 4:36.18 to finish fourth.

472.   The second, third and fourth place finishers in the Final that Thomas won were all medalists for the United States Olympic Team at the Tokyo Olympic Games held the prior summer, just a little over six months before the NCAA Championships.

473.   Not only did Thomas beat these decorated Olympians, Thomas trounced them, finishing over a second-and-a-half in front of the nearest competitor.

474.   By finishing in first place Thomas achieved 20 points for the UPenn Team.

475.   Kylee Alons competed in the 50-yard Championship Final also held that day which began at 6:42 pm.[78] Kylee finished in eighth place.[79]

476.   The Women's 200-yard freestyle relay was also contested on Thursday with heats at 7:37 pm, 7:41 pm and 7:46 pm. Kylee Alons competed in Heat 3 on the North Carolina State team which finished in third place.[80] Swimmer A competed in a relay on this day as well.

---

[78] https://ramblinwreck.com/wp-content/uploads/2022/03/ThursdaySchedule.pdf
[79] https://ramblinwreck.com/wp-content/uploads/2022/03/Thursday-Finals-Results.pdf
[80] https://ramblinwreck.com/wp-content/uploads/2022/03/Thursday-Finals-Results.pdf

**Friday, March 18 – Events Include:**
**200-yard Freestyle, 100-yard Butterfly and 400-yard Medley Relay**

477.   On Friday, March 18, 2022, the Women's 200-yard Freestyle was contested with the first of seven prelims beginning at 10:47 am and the Consolation Final at 6:35 pm and the Championship Final at 6:40 pm.

478.   Riley Gaines competed in Heat 6 of the prelims of the 200-yard Freestyle at 10:59 am. Thomas competed in Heat 7 of the prelims at 11:02 am.

479.   Both Riley and Thomas qualified for the Championship Final.

480.   The qualifiers and alternates for the 200-yard freestyle finals are set forth below:

**Event 10   Women 200 Yard Freestyle**

|  | NCAA: | 1:39.10 | 3/20/2015 | Missy Franklin | |
|---|---|---|---|---|---|
|  | Meet: | 1:39.10 | 3/20/2015 | Missy Franklin | |
|  | American: | 1:39.10 | 3/20/2015 | Missy Franklin | |
|  | US Open: | 1:39.10 | 3/20/2015 | Missy Franklin | |
|  | Pool: | 1:41.35 | 3/16/2022 | Isabel Ivey | |

| Lane | Name | Yr | School | Prelims |
|---|---|---|---|---|
| **Heat 1** | **Consolation Final** | | | |
| 1 | Spitz, Ayla | JR | California | 1:44.92 |
| 2 | Coetzee, Dune | FR | Georgia | 1:44.65 |
| 3 | Stepanek, Chloe | SO | TAMU | 1:44.43 |
| 4 | Tiltmann, Reilly | FR | Virginia | 1:43.59 |
| 5 | Laning, Erica | 5Y | ASU | 1:44.38 |
| 6 | Peplowski, Anna | FR | Indiana | 1:44.55 |
| 7 | Bates, Talia | JR | Florida | 1:44.74 |
| 8 | Atkinson, Emma | SO | VT | 1:44.93 |
| **Heat 2** | **Championship Final** | | | |
| 1 | Gaines, Riley | SR | Kentucky | 1:43.05 |
| 2 | Transom, Laticia-Leigh | SR | USC | 1:42.93 |
| 3 | Ivey, Isabel | SR | California | 1:42.24 |
| 4 | Ruck, Taylor | JR | Stanford | 1:41.89 |
| 5 | Thomas, Lia | 5Y | Penn | 1:42.09 |
| 6 | Pash, Kelly | JR | Texas | 1:42.78 |
| 7 | Nordmann, Lillie | FR | Stanford | 1:43.02 |
| 8 | Tankersley, Morgan | SR | Stanford | 1:43.53 |
| **Alternates** | | | | |
| 1 | Nikonova, Ekaterina | FR | Florida | 1:45.05 |
| 2 | Hetrick, Paige | SO | Louisville | 1:45.11 |

481.   Yet, Riley entertained strong doubts about whether she should even compete in the Championship Final against Thomas.

482.   Riley was concerned that by participating she would be endorsing the NCAA's discrimination against women.

483.   Ultimately, however, her loyalty to her teammates caused Riley to compete.

484.   In the Championship Final Riley touched the wall and immediately searched for Thomas' name on the screen and saw a "5" next to it, signifying Fifth place.

485.   Riley felt momentary pride for the women swimmers who had finished in front of Thomas.

486.   Then, Riley looked for her own name and saw a "5" next to her name. She was shocked.

487.   Riley and Thomas had tied for Fifth place in a time of 1:43.40.[81]

488.   By finishing in a tie for Fifth place both Riley and were awarded 13.5 points for their respective teams, and Fifth place winners were to receive a trophy.

489.   Had Riley finished in Fifth place alone she would have received 14 points for the University of Kentucky Swim Team.

---

[81] https://ramblinwreck.com/wp-content/uploads/2022/03/Friday-Finals-Results-1.pdf

490.   As she prepared to participate in the podium ceremony following the Championship Final for the 200 free, Riley was told that there was only a single Fifth Place trophy, and the NCAA had decided Riley would not be permitted to hold the trophy on the podium.

491.   Instead, only Thomas would be allowed to hold the Fifth place trophy.

492.   Riley was perplexed and she questioned a meet official about why she would not be allowed to also hold the Fifth-place trophy she had won but instead a "male" would be holding the Fifth-place trophy.

493.   The official said that they were proceeding in "chronological order." To which Gains responded: "What do you mean? We tied with the exact same time."

494.   Riley asked: "Do you mean alphabetical order? Because Gaines comes before Thomas."

495.   At that, the official appeared to soften and responded, "I'm so sorry, we have been advised that when photos are taken it is crucial that Lia Thomas holds the trophy."

496.   Thus, the NCAA purposefully deprived Riley Gaines of her podium moment with the trophy she won, and should have been able to hold on the podium, for the achievement of finishing Fifth in the women's 200 free at the 2022 NCAA Championships.

497.   Reilly Tiltmann of the University of Virginia was left out of the Championship Final, finishing with the ninth fastest time of 1:43.59 in the prelims.[82]

498.   Ekaterina Nikonova from the University of Florida had the seventeenth best time in the prelims, missing out on competing in the Consolation Final by a single place.

499.   Also on Friday, the 100-yard Butterfly was contested with prelims beginning at 10:33 am and the Consolation Final at 6:23 pm and the Championship Final at 6:28 pm, just 12 minutes before the Finals of the 200-yard Freestyle.[83]

500.   Kylee Alons competed in Heat 5 of the 100-yard Butterfly at approximately 10:40 am.[84]

501.   Kylee finished fifth in the Finals of the 100-yard Butterfly.[85] By finishing fifth Kylee achieved 14 points for her team.

502.   The last event of the evening on Friday was the 400-yard medley relay. Riley Gaines competed for the University of Kentucky team[86] in Heat 3[87] at 8:24 pm.[88] The Kentucky team finished thirteenth out of twenty-five teams.[89]

---

[82] https://ramblinwreck.com/wp-content/uploads/2022/03/FridayFinalsHeatSheet.pdf
[83] https://ramblinwreck.com/wp-content/uploads/2022/03/FridaySchedule.pdf
[84] https://ramblinwreck.com/wp-content/uploads/2022/03/FridayPrelimsHeatSheet.pdf
[85] https://ramblinwreck.com/wp-content/uploads/2022/03/Friday-Finals-Results-1.pdf

**Saturday, March 19 – Events Include:**
**100-yard Freestyle, 200-yard Butterfly and 400-yard Relay**

503.   The 2022 NCAA Championships concluded on Saturday, March 19, 2022.

504.   Among the events contested on March 19 was the 100-yard Freestyle in which Thomas competed, with prelims commencing at 10:24 am, the Consolation Final taking place at 6:41 pm and the Championship Final occurring at 6:45 pm.

505.   Kylee Alons also competed in the 100-yard freestyle, competing in the first preliminary heat at 10:24 am.[90] Thomas competed in prelim Heat 8 at 10:35 am.[91] Thomas had the fourth fastest prelim time at 47.37. Kylee Alons had the fourteenth fastest prelim time at 48.02.

506.   The qualifiers and alternates for the 100-yard freestyle finals are set forth below:

---

[86] https://ramblinwreck.com/wp-content/uploads/2022/03/Friday-Finals-Results-1.pdf
[87] https://ramblinwreck.com/wp-content/uploads/2022/03/FridayFinalsHeatSheet.pdf
[88] https://ramblinwreck.com/wp-content/uploads/2022/03/FridaySchedule.pdf
[89] https://ramblinwreck.com/wp-content/uploads/2022/03/Friday-Finals-Results-1.pdf
[90] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsHeatSheet.pdf
[91] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsHeatSheet.pdf

**Event 17  Women 100 Yard Freestyle**

| | | | | |
|---|---|---|---|---|
| NCAA: | 45.56 | 3/18/2017 | Simone Manuel | |
| Meet: | 45.56 | 3/17/2017 | Simone Manuel | |
| American: | 45.56 | 3/18/2017 | Simone Manuel | |
| US Open: | 45.56 | 3/18/2017 | Simone Manuel | |
| Pool: | 46.70 | 3/19/2016 | Olivia Smoliga | |

| Lane | Name | Yr | School | Prelims |
|---|---|---|---|---|
| **Heat 1 Consolation Final** | | | | |
| 1 | Huske, Torri | FR | Stanford | 48.12 |
| 2 | Flynn, Lindsay | FR | Michigan | 47.94 |
| 3 | Antoniou, Kalia | SR | Alabama | 47.84 |
| 4 | Ivey, Isabel | SR | California | 47.61 |
| 5 | MacNeil, Maggie | SR | Michigan | 47.77 |
| 6 | Zenick, Katherine | SO | Ohio St | 47.91 |
| 7 | Alons, Kylee | SR | NCSU | 48.02 |
| 8 | Bates, Talia | JR | Florida | 48.14 |
| **Heat 2 Championship Final** | | | | |
| 1 | Dupre, Cora | JR | Alabama | 47.51 |
| 2 | Albiero, Gabi | SO | Louisville | 47.45 |
| 3 | Scott, Morgan | SR | Alabama | 47.27 |
| 4 | Walsh, Gretchen | FR | Virginia | 46.78 |
| 5 | Berkoff, Katharine | JR | NCSU | 46.89 |
| 6 | Thomas, Lia | 5Y | Penn | 47.37 |
| 7 | Countie, Grace | SR | UNC | 47.50 |
| 8 | Henig, Iszac | JR | Yale | 47.55 |
| **Alternates** | | | | |
| 1 | Stepanek, Chloe | SO | TAMU | 48.21 |
| 2 | Nikonova, Ekaterina | FR | Florida | 48.24 |

507.   In the 100-yard freestyle Championship Final Thomas finished in eighth place with a time of 48.18, well off Thomas' pace of 47.37 in the prelim.[92]

508.   In the Consolation Final Kylee Alons finished fourth in 47.68, a time that would have bested Thomas' time in the Championship Final had they been racing head-to-head.

509.   For her finish Alons earned 5 points for her NC State team. Had she finished one place higher she would have earned 6 points for her team. The UPenn Swim Team obtained 11 points for Thomas' eighth place finish.

---

[92] https://ramblinwreck.com/wp-content/uploads/2022/03/Saturday-Finals-Results.pdf

510.   Isabel Ivey of the University of California, Berkley, was left out of the Championship Final finishing with the ninth fastest time of 47.61 in the prelims.[93]

511.   Chloe Stepanek from Texas A&M University finished with the seventeenth best time in the prelims, missing out on competing in the Consolation Final by a single place.

512.   Also on that Saturday, the Women's 200-yard Butterfly was contested. In her preliminary heat which took place at 11:14 am[94] Riley Gaines had a time of 1:53.63 finishing in a tie for ninth with Lillie Nordmann of Stanford University just .26 second out of eighth and a spot in the Championship Final.[95]

513.   Riley competed in the Consolation Final at 7:09 pm[96] finishing fifth in the Consolation Final with a time of 1:53.67. Riley's finish earned 4 points for the University of Kentucky Swim Team.

514.   The 400-yard relay was also contested on Saturday with Riley Gaines competing for the Kentucky team[97] in Heat 1 at 8:10 pm.[98] Kylee Alons competed

---

[93] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayFinalsHeatSheet.pdf
[94] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsHeatSheet.pdf
[95] https://ramblinwreck.com/wp-content/uploads/2022/03/Saturday-Prelims-Results.pdf
[96] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsSchedule.pdf
[97] https://ramblinwreck.com/wp-content/uploads/2022/03/Saturday-Finals-Results.pdf

for the North Carolina State relay team in Heat 4 at 8:30 pm.[99] Kylee's NC State team finished tied for fourth with the University of Michigan in a time of 3:09.95.[100]

515.    As a result of Thomas' three top eight finishes, which totaled 44.5 points, the UPenn Team finished in 20th place in the 2022 NCAA Women's Swimming and Diving Championship meet with 44.5 points, ahead of Minnesota (21st), Miami (Florida) (22nd), Virginia Tech (23rd), Duke (24th), Missouri (25th), Arizona State (26th), Rutgers (27th), Arkansas (28th), Yale (29th), Purdue (30th), South Carolina (31st), LSU (32nd), Notre Dame (33rd), Wyoming (tie 34th), UCLA (tie 34th), Florida International (36th), San Diego State (tie 37th), Harvard (tie 37th) and Texas A&M (39th).[101]

516.    Reka Gyorgy's Virginia Tech team would have finished higher in the team competition absent Thomas' participation, as would have at least 20 other teams.

517.    Riley Gaines' and Kaitlynn Wheeler's Kentucky team finished 12th with 115.5 points just .5 points behind Indiana in 11th and would have at least tied

[98] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsSchedule.pdf
[99] https://ramblinwreck.com/wp-content/uploads/2022/03/SaturdayPrelimsSchedule.pdf
[100] https://ramblinwreck.com/wp-content/uploads/2022/03/Saturday-Finals-Results.pdf
[101] https://swimswam.com/2022-womens-ncaa-championships-results-records-summary/

Indiana had Riley taken sole position of fifth place in the 200 free, rather than

tying with Thomas.

518.   One person can disrupt so much.

**Comparing Thomas' NCAA Competition Times Before and After Transition Demonstrates Thomas' Retained Male Advantage and the Failure of the NCAA's Transgender Eligibility Policies to Ensure Equal Opportunities for Women**

519.   On April 5, 2022, *Swimming World Magazine* published a comparison

of Thomas' times in NCAA competitions when competing in the male vs. female

categories.

520.   *Swimming World's* analysis demonstrates Thomas' Retained Male

Advantage when competing in the female category.

521.   The article explained:

Just how much of an advantage did Lia Thomas possesses over biological females? The numbers paint a clear picture. The fact that the University of Pennsylvania swimmer soared from a mid-500s ranking (554th in the 200 freestyle; all divisions) in men's competition to one of the top-ranked swimmers in women's competition tells the story of the unfairness which unfolded at the NCAA level.

In her final meet, Thomas finaled in three events at the NCAA Championships, highlighted by a victory in the 500 freestyle. She also finished fifth in the 200 freestyle and was eighth in the 100 freestyle. Although she didn't contest the event at the NCAA Champs, Thomas had one of the country's top times in the 1650 freestyle. Here's a look at her performances throughout the season, including their comparative status to her times as a member of Penn's men's squad.

- In the 500 freestyle, Thomas' time of 4:33.24 from her NCAA-title swim handed her the fastest time in the nation by more than a second over Arizona State's **Emma Nordin** (4:34.87). Additionally, Thomas' difference from her personal best with the Penn men's program was just 6%, as opposed to the typical 10% to 11% difference generally seen between men and women.

- Thomas' best time in the 200 freestyle ended up being her 1:41.93 mark from the Zippy Invitational in December. That effort ultimately ended up 3.76% slower than her best time before her transition. Again, that time was between 7% and 8% faster than the typical separation between men and women.

- When Thomas won the 200 freestyle at the Ivy League Champs in 1:43.12, she was even with runnerup **Samantha Shelton** at the midway point, but crushed the Harvard swimmer over the last 100, highlighted by a 25.04 split for the last 50 yards. The closing split of Thomas was faster than the finishing laps of **Missy Franklin** in her American-record performance, and the best closing effort of the likes of **Katie Ledecky**, **Mallory Comerford** and **Siobhan Haughey**, among others.

- In the 100 freestyle, Thomas' best time prior to her transition was 47.15. At the NCAA Championships, she posted a prelims time in the event of 47.37. That time reflects minimal mitigation of her male-puberty advantage.

- During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, she ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle. As her career at Penn wrapped, she moved to fifth, first and eighth in those respective events on the women's deck.[102]

---

[102] "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," Swimming World Magazine, April 5, 2022, by John Lohn, Editor-in-Chief, *available at*: https://www.swimmingworldmagazine.com/news/a-look-at-the-numbers-and-times-no-denying-the-advantages-of-lia-thomas/. (accessed Mar. 14, 2024)

522.   For nearly two years following the 2022 NCAA Division I Women's Swimming and Diving Championships, Plaintiffs and others similarly situated have dealt with the disappointment, losses of placement, ill treatment, and emotional turmoil, generated by the NCAA's purposeful and illegal actions in 2022 and with the lingering effects of the NCAA's Transgender Eligibility Policies which the NCAA put into place then, the harmful effects of which continue to reverberate.

## THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES CONTINUE TO HARM WOMEN AND RESULT IN LOST AND UNEQUAL OPPORTUNITIES FOR FEMALE STUDENT-ATHLETES

### Roanoke College Swimmers

523.   In the Fall of 2023, during the current NCAA swimming season, a former member of the NCAA Division III Roanoke College men's swimming team requested to join the Roanoke College women's swim team.

524.   Roanoke College granted the request of the former men's swimming team member to join the Roanoke women's swimming team.

525.   Thereafter, representatives of Roanoke College met with members of the women's swimming team and encouraged them to welcome the transgender swimmer onto the women's team.

526.   Plaintiff Lily Mullens recalled, "[w]e were emotionally blackmailed and asked to carry the responsibility of other people's mental health and wellbeing at the expense of our own."

527.   In response, Plaintiffs Lily Mullens, Carter Satterfield, Katie Blankinship, Susanna Price, Kate Pearson, and Julianna Morrow (the "Roanoke College Swimmers") and their teammates refused to be coerced and appealed to Roanoke College for protection from having a male swimmer on the Roanoke women's team, and in the women's locker room and showers and at practices, meets and competitions, but in reliance upon the NCAA Transgender Eligibility Policies, Roanoke College rejected their concerns.

528.   The Roanoke College Swimmers communicated to the NCAA, protesting the NCAA Transgender Eligibility Policies, and emphasizing concerns about competitive fairness and locker room usage. However, the NCAA did not respond.

529.   The Roanoke College Swimmers have been injured due to the NCAA's promulgation and enforcement of its Transgender Eligibility Policies. They suffered significant stress and emotional and mental anguish and lost time and money protesting application of the NCAA Transgender Eligibility Policies to their team.

530.   The Roanoke College Swimmers suffered pushback from other students and from the administration and staff of Roanoke College when they protested the application of the NCAA Transgender Eligibility Policies which would not have happened had the policies not been adopted by the NCAA.

531.   Lily Mullens said, "[t]his has been too great a burden to bear for many of our teammates who have lost hours of sleep, many tears, and the will to train to race a swimmer who has an advantage in the water that our bodies may never possess."

532.   Another Roanoke women's swim team member, Senior Bailey Gallagher, was reported in the media to have said, "I could not eat, could not sleep, and spent a lot of time dealing with anxiety concerned with how this was going to get resolved."

533.   Sophomore and Plaintiff Kate Pearson said, "[o]ur school was prioritizing one individual swimmer over 17 women whose only request was fairness."

534.   Each of the Roanoke College Swimmers experienced mental anguish, and the loss of time and resources expended on the eligibility matter.

535.   Upon learning of the plight of the Roanoke College Swimmers Riley Gaines and a former UPenn teammate of Thomas', Paula Scanlon, joined the Roanoke College Swimmers in a press conference to bring the Roanoke College

Swimmers' plight, and their school's and the NCAA's refusal to comply with their

Title IX obligations, to the attention of the public.

536.   At the press conference Riley Gaines recalled, "[m]y team, when we

were going through this a year-and-a-half ago, we all felt the same, but we were

scared to say it."

537.   Riley said, "[a]nd so to see all of these girls standing together linking

arms, I wanted so badly to be a part of that to support them. To show them that

they could do this and show them that it's liberating to speak the truth."

538.   In response to the situation, however, the Roanoke College Board of

Trustees met and voted to endorse the NCAA Transgender Eligibility Policies.

539.   The Roanoke College Board issued a public statement expressing the

Board's "strong desire to cement our school's approach to similar requests in the

future," and stating that the Board had "voted to formally adopt the NCAA

policy."[103]

540.   Although the former member of the Roanoke men's swimming team

whose application pursuant to the NCAA Transgender Eligibility Policies started

the controversy ultimately decided to withdraw from participating on the team, that

swimmer's withdrawal did not make the Roanoke College Swimmers whole. It

could not, and did not, lessen the anguish they had experienced, and they live with

---

[103] https://www.roanoke.edu/news/transgender_sports_statement (accessed
Mar. 14, 2024).

the uncomfortable realization that should this male or another male seek to compete on the Roanoke College women's swimming team, due to the NCAA's Transgender Eligibility Policies, Roanoke College and the NCAA will support the male.

### All-Atlantic Regional Track and Field Championships

541.   On March 3, 2024, Plaintiff Track Athlete A, a Junior, competed in the women's 200-meter dash in the All-Atlantic Regional Championships in track and field, where transgender athlete Sadie Schreiner of Rochester Institute of Technology (RIT), a male, won the women's 200-meter dash and also broke the women's regional collegiate meet record.

542.   On information and belief, Schreiner has broken numerous women's school and/or conference records and deprived women on Schreiner's team and on the teams of competitors of placements, points, prizes, awards, and recognition.

543.   Schreiner qualified for the Division III national championships in the 200m event.

544.   Because Schreiner is an underclassmen Track Athlete A will compete against Schreiner next year.

545.   Absent the NCAA Transgender Eligibility Policies which violate Title IX Schreiner would not be eligible to compete in NCAA women's sports competitions or on the RIT women's track and field team.

546.   Therefore, the NCAA's Transgender Eligibility Policies have harmed Track Athlete A, causing her to lose placements and points to a male, and the NCAA's Transgender Eligibility Policies will continue to harm her in the future by causing her to lose competitive opportunities, points, and placements to Schreiner in the future.

### Volleyball

547.   Volleyball Athlete A who plays NCAA Division II women's volleyball played against a male athlete who was competing on a women's team in club tournaments in high school. This male athlete was the best athlete against whom Volleyball Athlete A had ever played and was able to considerably outjump female players and spike harder than females, giving the male a significant advantage.

548.   Volleyball Athlete A is aware that this male athlete, who is still in high school, is being recruited to play college volleyball.

549.   Volleyball Athlete A is also aware of other male athletes playing volleyball at the high school level and seeking to be recruited to play on women's college or university teams at NCAA Division I, II and/or III institutions.

550.   Volleyball Athlete A, who is a freshman, has a reasonable concern that, if the NCAA's Transgender Eligibility Policies are not changed, she will be required to face male volleyball players in future NCAA women's competitions.

**Track and Field, Soccer, Tennis**

551.   Plaintiffs Ainsely Erzen and Ellie Eades are aware that the NCAA's Transgender Eligibility Policies have permitted males to compete in NCAA women's track and field, tennis, and soccer.

552.   For instance, biological male CeCé Telfer won the 400-meter hurdles at the NCAA Women's Division II Outdoor Track and Field Championships in 2019. It is reported that biological male Brooklyn Ross will be playing NCAA Division II collegiate tennis at Lewis University this year. Biological male Athena Del Rosario played NCAA Division III college soccer at the University of California Santa Cruz for four years.

553.   As a result, Eades who is a junior and Erzen who is a sophomore have reasonable concerns that due to the NCAA's Transgender Eligibility Policies they will be required to compete against biological males during the course of their NCAA careers.

554.   Moreover, given that some transgender athletes do not publicly disclose their sex, each Plaintiff in this case who has remaining collegiate eligibility is concerned that she may not know in advance of competing or participating in future NCAA competitions (or practices or scrimmages) that she will be, or is, facing a male athlete. Indeed, it is possible each Plaintiff could have already played against a (transgender) male athlete unwittingly.

555.   These facts put Plaintiffs competing in soccer, volleyball, and tennis at increased risk of injury due to the NCAA's Transgender Eligibility Policies.

556.   All Plaintiffs who currently have remaining NCAA eligibility are, for the foregoing reasons, also at continuing risk of violation of their right to bodily privacy as a result of the NCAA Transgender Eligibility Policies.

557.   Accordingly, the NCAA's Transgender Eligibility Policies put all Plaintiffs with current NCAA eligibility at risk of injury and/or being required to compete against and/or share locker rooms with biological males in violation of Title IX.

558.   Therefore, all Plaintiffs with current NCAA eligibility seek an injunction enjoining the NCAA from continuing enforcement of its Transgender Eligibility Policies.

## CLASS ACTION ALLEGATIONS

**On behalf of Plaintiffs Swimmer A, Swimmer B, Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, The Roanoke College Swimmers, Track Athlete A, and others similarly situated**

559.   Plaintiffs Swimmer A, Swimmer B, Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, the Roanoke College Swimmers, and Track Athlete A are identified as putative class representatives to bring one or more class actions under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

560.   The foregoing individuals are adequate class representatives because they have competed as NCAA athletes and have been subject to the NCAA's eligibility rules, they have been injured or threatened with injury as a result of the violations of law described in this Complaint, they are similarly situated to the other members of the proposed classes, and they are actively interested in the claims of the class and willing to discharge all the responsibilities of class representatives.

561.   Through this action, Plaintiffs seek to represent a class of future, current, or past NCAA women's athletes who have competed or may compete against male athletes or who have shared or may share a locker room, shower, or restroom with a male by virtue of the NCAA's Transgender Eligibility Policies.

562.   Plaintiffs anticipate that they may ultimately seek multiple classes or subclasses when they move for class certification, including, but not limited to:

    (a)    Women who competed in the 2022 NCAA Women's Swimming and Diving Championships;

    (b)    Women who are past, current, or future NCAA athletes;

    (c)    Women who are current or future NCAA athletes;

    (d)    Women who are current NCAA athletes.

    (e)    Women who have competed or may compete at NCAA events in the State of Georgia; and

    (f)    Female student athletes at Georgia colleges or universities governed by the University System of Georgia which are subject to NCAA rules.

563.   The class is so numerous that joinder of all members is impractical.

564.   The class size of the class of Women who competed in the 2022 NCAA Women's Swimming and Diving Championships is believed to be approximately 322 individuals.

565.   The exact class size of the remaining classes or subclasses is unknown to Plaintiffs at this time, however, it is expected that the precise number and identification of the class members will be ascertainable from the Association's records or the records of Association members during discovery.

566.   There are questions of law and fact common to all members of the class.

567.   Those common questions include, but are not limited to, the following:

  (a)   Does Title IX prohibit competition and participation by males on women's teams in collegiate sport governed by the Association?

  (b)   Do the NCAA's eligibility rules, or aspects of them, violate Title IX?

  (c)   Do the NCAA's eligibility rules, or aspects of them, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution?

  (d)   Do (or has) the NCAA's policies or practices, or aspects of them, violate[d] the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution?

  (e)   Do (or has) the NCAA's policies or practices, or aspects of them, violate[d] the First Amendment to the U.S. Constitution?

(f)     Should the records of the NCAA be changed to remove records set by males competing in the women's category in an NCAA event or in NCAA events because those males should have been ineligible pursuant to law?

(g)     Should the eligibility rules of the NCAA be changed to conform them to law?

(h)     Did the NCAA and/or the Georgia Individual Defendants and/or Georgia Tech or the University System of Georgia, or any combination of them, act under color of law in converting the women's locker room to "unisex" during the 2022 National Championships?

568.   The putative class representatives' claims are typical of the claims of the class because they, like the class members, have been injured, been threatened with injury, and/or had their rights deprived or threatened to be deprived due to the Association's practices or policies and/or the policies or practices of the Georgia Individual Defendants and/or Georgia Tech and/or the University System of Georgia acting in concert.

569.   The putative class representatives will fairly and adequately protect the interests of the class because: (a) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (b) their interests are not antagonistic to those of the other class members; and (c) they have engaged counsel experienced in litigating class actions.

570.   The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class

action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.

571.   Joinder of all class members is impracticable.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(1)**

572.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for one or more Defendants and/or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2)**

573.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate.

574.   Such generally applicable grounds consist of the adoption and/or maintenance by the NCAA of the Gender Eligibility Policies.

575.   Such generally applicable grounds may also consist of the adoption and/or maintenance by the NCAA in concert with others, including, but not limited to, the George Individual Defendants or the University System of Georgia or other Defendants, of policies and practices in violation of Title IX and/or the First and/or Fourteenth Amendments to the U.S. Constitution.

576.   This relief would predominate over monetary relief.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(3)**

577.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3).

578.   The common questions of law and fact identified above predominate over questions affecting only individual members.

579.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

580.   Because all members of the class are geographically dispersed throughout the country and allege that they were subjected to the same Association-wide policy or practice of Title IX and/or constitutional violations, requiring each class member to pursue their claims individually would entail needless duplication and would waste the resources of both the parties and the judiciary.

581.   The financial burden of proving the NCAA and/or the University System of Georgia or other Defendants engaged in such a pattern or practice (or

patterns and practices) of discrimination would also make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

## COUNT I

## Violations of Title IX

## Discrimination Against Women Competing in NCAA Competitions

## Against the NCAA, the University System of Georgia, Georgia Tech, the University of Georgia (for injunctive relief only) and the University of North Georgia (for injunctive relief only)

582. Plaintiffs restate the foregoing paragraphs numbered 1 through 581 as if set forth fully herein.

583. Title IX is applicable to all public colleges and universities in the State of Georgia directly, through Congress' enforcement power under Section 5 of the Fourteenth Amendment.

584. Title IX is applicable to the NCAA by its own terms as explained *supra* at ¶¶ 28-56 and pursuant to 42 U.S.C. § 1983 when the NCAA was acting under color of law in connection with the 2022 NCAA Championships.

585. The NCAA knew that its actions described above violated federal law and acted in bad faith when implementing its transgender eligibility policies and in authorizing Thomas to use the women's showers, women's locker rooms and associated toilet facilities in or adjacent to the women's locker room at the 2022 NCAA Championships.

586.   As noted above, Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

587.   A private right of action for damages and injunctive relief exists to enforce the guarantees of Title IX. *Adams*, 57 F.4th at 811.

588.   This private right of action can be pursued to rectify discrimination against women in scholastic sport. *Soule v. Connecticut Ass'n of Sch., Inc*., 90 F.4th 34, 45-7 (2d Cir. 2023).

589.   As the Department of Health, Education & Welfare explained in 1975, the fundamental goal of the original Title IX regulations was to guarantee men and women an equal opportunity "to compete in athletics in a meaningful way." *Sex Discrimination in Athletic Programs*, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975).

590.   The athletics regulations enacted under Title IX provide that, "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics *shall provide equal athletic opportunity for members of both sexes*." 34 CFR § 106.41(c) (emphasis added).

591.   And as the U.S. Department of Education currently notes on its Office of Civil Rights website, discrimination covered under Title IX "include[s] . . . the failure to provide equal athletic opportunity."[104]

592.   Title IX and its implementing regulations are founded upon the premise that "sex" is an immutable biological characteristic, a concept that is supported by a basic understanding of developmental biology and long understood legal usage.[105]

593.   Thus, Title IX defines "sex" "based on biology and reproductive function." *Adams*, 57 F.4th at 812.

594.   For instance, the Title IX regulations regarding scholastic sports authorize "separate teams for members of ***each sex*** where selection for such teams is based upon competitive skill." 34 CFR § 106.41 (emphasis added).

595.   Both the legislative history of Title IX and its implementing regulations make clear that the reference to "sex" in Title IX is directed solely at binary, biological sex and not at gender identity.

596.   The Eleventh Circuit has previously concluded that "[t]here simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX." *Adams*, 57 F.4th at 814.

---

[104] https://www2.ed.gov/policy/rights/guid/ocr/sexoverview.html (accessed Mar. 14, 2024).
[105] *See supra* at fn. 1.

597.   The focus on biological differences between males and females which require the protection of women to provide equal opportunity for women in sport is clear in relation to the history and regulations pertaining to Title IX's application to college athletic programs.

598.   As one scholar summarized the discussions surrounding the adoption of Title IX in 1972 and the adoption of the first regulations thereunder two years later, the "biological differences between males and females that account for the [athletic] performance gap, as well as those sex traits and related customs that raised safety and privacy concerns, were key to the discussions and decisions around inclusion and segregation." Coleman, D.L., *et al*., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. of Gender L. & Pol'y 69, 80 (2020).

599.   The regulations' allowance for sex-separated sports served the "goal [of] parity across all categories of opportunity," and "reflect[ed] the general consensus at the time regarding sex segregation in sport." *Id.* at 81.

600.   Separate athletic teams for women are how women are provided equal athletic opportunity in sport.

601.   Therefore, separate athletic teams for men and women are the "norm." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996).

602.   And Title IX requires sex-separation *from men* where women have less opportunity than males without it.

603.   Thus, Title IX authorizes women to pursue a remedy requiring sex separation from males, including separate sports teams, competitions, showers, and locker rooms.

604.   Not only must there be such separation from males where necessary to give women equal opportunities but the separate opportunities for women must be comparable in every way to male opportunities.

605.   Pursuant to 34 CFR § 106.33 "separate toilet, locker room, and shower facilities . . . provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

606.   Under Title IX women demonstrate unequal opportunity in athletics by demonstrating that females have less opportunity than males[106] in scholastic sport.

607.   In determining whether equal athletic opportunities are provided, among other things, the Department of Education considers:

> (1)   Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>
> (2)   The provision of equipment and supplies;

---

[106] Referring, of course, to the meaning of "sex" as used in Title IX, which includes biological males irrespective of claimed gender identity.

(3)    Scheduling of games and practice time;

(4)    Travel and per diem allowance;

(5)    Opportunity to receive coaching and academic tutoring;

(6)    Assignment and compensation of coaches and tutors;

(7)    Provision of locker rooms, practice and competitive facilities;

(8)    Provision of medical and training facilities and services;

(9)    Provision of housing and dining facilities and services;

(10)   Publicity.

34 CFR § 106.41(c)

608.    Thus, the Title IX regulations pertaining to athletics specifically convey what is intuitively apparent and follows from the wording of Section 901(a) of Title IX of the Education Amendments of 1972 and its legislative history, that when sports are or must be separated by sex, equal opportunity for women cannot be achieved unless:

- "the interests and abilities" of women are separately and equally accommodated,[107]

---

[107] Indeed, it is a general principle under Title IX that where single sex activities are provided to one sex, the other sex must be provided a substantially equal single-sex activity. For example, in another part of the Title IX regulations not applicable to scholastic athletics the regulation states that where a party covered by Title IX "provides a single-sex . . . extracurricular activity. . . [they] may be

- the women's team and all women's events are as equally open to women as the men's team and all men's events are to men,

- both sexes are provided separate and equal resources, including "locker rooms, practice and competitive facilities,"

- both sexes are provided separate and equal competitions and competitive opportunities, and

- eligibility rules (or other rules) do not burden women more than men.

609. The NCAA's actions, practices, and/or policies described above deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in scholastic sport and constitutes sex discrimination against women within the meaning of Title IX.

610. Such discrimination includes, but is not limited to, the NCAA's:

a. transgender eligibility policies,

b. authorization of Thomas and other males who identify as transgender to compete in women's collegiate athletic competitions,

c. granting or awarding eligibility, points, titles, trophies, results, or records, to Thomas and other males who identify as

---

required to provide a substantially equal single-sex . . . extracurricular activity for students of the excluded sex…" 34 CFR § 106.34(b)(2).

transgender for competing in women's collegiate athletic

competition, and

d.     authorization of Thomas and other males who identify as

transgender to use women's toilets, showers, and/or locker

rooms in connection with women's collegiate sports

competitions.

611.   A women's loss of records, awards and/or placement in an athletic

competition as a result of competing against a transgender individual constitutes a

concrete, particularized and redressable injury under Title IX. *Soule*, 90 F.4th at

45-7.

612.   In addition to injunctive relief to correct the records of the sports

organizations appropriate relief for such injury may include nominal and

compensatory damages. *Id*. at 47.

613.   The actions, practices, and/or policies of the Georgia Individual

Defendants which are described above deprived Plaintiffs and a class of

individuals similarly situated of a meaningful and equal opportunity to compete in

scholastic sport and constitutes sex discrimination against women within the

meaning of Title IX.

614.   Such discrimination includes, but is not limited to:

    a.    Implementation of the NCAA's Transgender Eligibility Policies,

    b.    authorization of Thomas and other males who identify as transgender to compete in women's collegiate athletic competitions,

    c.    granting or awarding eligibility, points, titles, trophies, results, or records, to Thomas and other males who identify as transgender for competing in women's collegiate athletic competitions, and

    d.    authorization of Thomas and other males who identify as transgender to use women's toilets, showers, and/or locker rooms in connection with women's collegiate sports competitions.

615.   The above-described actions, practices, and/or policies of the NCAA and/or the University System of Georgia, Georgia Tech, the University of Georgia, the University of North Georgia which violate Title IX have injured and/or threaten to injure Plaintiffs and one or more classes of similarly situated individuals in the future.

616.   Individuals in a position to control and direct the actions of the University System of Georgia, Georgia Tech, the Georgia Individual Defendants, and the NCAA had actual knowledge of the discriminatory actions, practices, and/or policies which violated the Title IX rights of the Plaintiffs and others similarly situated.

617.   The University System of Georgia, Georgia Tech, and the NCAA acted with deliberate indifference to the known Title IX violations which injured Plaintiffs and others similarly situated and acted with conscious or reckless disregard of the rights of, and harms to, Plaintiffs and others similarly situated.

618.   The discriminatory acts of the University System of Georgia, Georgia Tech, and the NCAA are so substantial, severe, pervasive, objectively offensive, and competitively unfair and/or create such a substantial safety risk that they effectively bar access to equal opportunity in collegiate sport.

619.   Unless enjoined the NCAA, the University System of Georgia, Georgia Tech, and/or the University of Georgia, and/or the University of North Georgia are likely to commit similar violations of Title IX in the future.

620.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

**COUNT II**

**Title IX and U.S. Constitution, Fourteenth Amendment,
Equal Protection Clause, 42 U.S.C. §§ 1983, 1988.**

**Violation of Title IX Rights to Equal Opportunity and Equal Facilities**

**Against the University System of Georgia and Georgia Tech (as to Title IX
only), the University of Georgia and the University of North Georgia (only for
injunctive relief under Title IX), the NCAA (as to Title IX and as to Equal
Protection pursuant to § 1983), and the Georgia Individual Defendants (only
as to Equal Protection pursuant to § 1983; and in their individual and official
capacities as to injunctive relief but only in their individual capacities as to
damages)**

621.   Plaintiffs restate the foregoing paragraphs numbered 1 through 620 as
if set forth fully herein.

622.   The University System of Georgia, Georgia Tech, the University of
Georgia, and the University of North Georgia are state actors.

623.   In the realm of collegiate athletics public colleges and universities,
including Georgia Tech and other public colleges and universities in Georgia
operated by the members of the Board of Regents of the University System of
Georgia, have so far insinuated themselves into a position of interdependence with
the NCAA that these governmental entities may be recognized as joint participants
in the challenged activities of the NCAA.

624.   By adopting, implementing and enforcing in public buildings on a
public university campus the NCAA Transgender Eligibility Policies which
discriminate against women the University System of Georgia, Georgia Tech, the

University of Georgia, and the University of North Georgia and/or the Georgia Individual Defendants and the NCAA acting in concert and under color of law violated both Title IX as applied to Defendants through 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by depriving women of equal opportunities, facilities and benefits in comparison of those available to men.

625.   As a result of the actions of the Defendants, Plaintiffs Gaines, Gyorgy, Alons, Wheeler, Swimmer A, Swimmer B, and a class of similarly situated women swimmers were deprived of their constitutional right to equal protection and suffered injury thereby.

626.   The NCAA and the Georgia Individual Defendants are accountable under 42 U.S.C. § 1983 for their actions which violated the constitutional equal protection rights of Plaintiffs and those similarly situated as they collaborated and participated in these constitutional violations.

627.   Unless enjoined the NCAA and the Georgia Individual Defendants are likely to commit similar violations of Title IX, the Equal Protection Clause and/or 42 U.S.C. § 1983 in the future.

628.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT III

### Fourteenth Amendment, U.S. Constitution, 42 U.S.C. §§ 1983, 1988.

### Violation of the Right to Bodily Privacy

**Against the NCAA and the Georgia Individual Defendants (in their individual and official capacities as to injunctive relief but only in their individual capacities as to damages)**

629.   Plaintiffs restate the foregoing paragraphs numbered 1 through 628 as if set forth fully herein.

630.   The University System of Georgia, Georgia Tech, the University of Georgia, and the University of North Georgia are state actors.

631.   In the realm of collegiate athletics public colleges and universities, including Georgia Tech and other public colleges and universities in Georgia operated by the members of the Board of Regents of the University System of Georgia, have so far insinuated themselves into a position of interdependence with the NCAA that these governmental entities may be recognized as joint participants in the challenged activities of the NCAA.

632.   The University System of Georgia, Georgia Tech, and/or the Georgia Individual Defendants and the NCAA acting in concert and under color of law changed the designation of the locker rooms and showers to be used by the women swimmers at the 2022 NCAA Championships to "unisex" locker rooms and showers and authorized Thomas to use the women's locker rooms and showers

now designated as "unisex", and directed women swimmers and teams that Thomas, a biological male, was entitled to use these locker rooms and showers.

633.   This change was made so that Thomas, a fully grown adult male with full male genitalia, could use the same locker rooms to be used by more than 300 female student-athletes, depriving the female student-athletes of sex-separated women's locker room facilities and bathroom and restroom facilities where their right to bodily privacy could be protected, and exposing the women to a loss of bodily privacy and shock, humiliation, and embarrassment in violation of their constitutional right to bodily privacy.

634.   As a result of the actions of the NCAA and the University System of Georgia, Georgia Tech, and/or the Georgia Individual Defendants, Plaintiffs Gaines, Alons, Wheeler, Swimmer A, and a class of similarly situated women swimmers and divers had their right to bodily privacy violated because their unclad bodies were exposed in the presence of Thomas without their consent and against their wills and/or they were exposed to Thomas' unclad body without their consent and against their wills causing embarrassment, shame, humiliation and mental anguish.

635.   The NCAA and the Georgia Individual Defendants are accountable under 42 U.S.C. § 1983 for their actions which violated the constitutional right to

bodily privacy of Plaintiffs and those similarly situated as they collaborated and participated in these constitutional violations.

636.   The NCAA is also accountable under 42 U.S.C. § 1983 for its actions which violated the constitutional right to bodily privacy of Plaintiffs and those similarly situated because the University System of Georgia, Georgia Tech, and/or one or more of the Georgia Individual Defendants transformed the NCAA's rules and procedures into state rules and the NCAA into a state actor.

637.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully pray that the Court grant the following relief against Defendants, jointly and severally:

1.   Declare that the NCAA violated Title IX and the Fourteenth Amendment to the U.S. Constitution.

2.   Declare that the University System of Georgia and Georgia Tech violated Title IX.

3.   Declare that the NCAA and the University System of Georgia (or one or more of the System's constituent parts) threaten to or are reasonably likely to violate Title IX.

4.   Declare that the NCAA and the Georgia Individual Defendants threaten to or are reasonably likely to violate the Fourteenth Amendment to the U.S. Constitution in the future unless they are enjoined from doing so.

5.   Declare the extent of the violations or threat of violations so found.

6.   Enter injunctive relief providing for one or more of the following:

(a)  Enjoining the NCAA, the University System of Georgia, including all institutions it governs, and/or the Georgia Individual Defendants (in both their individual and official capacities) from enforcing or implementing the NCAA's eligibility rules that are in conflict with Title IX and/or the U.S. Constitution;

(b)  Requiring the NCAA to render ineligible any male who competed in women's events or on a women's team pursuant to rules of the Association which the Court finds are unlawful;

(c)  Requiring the NCAA to render invalid and reassign and revise all awards, records, points, prizes, titles, trophies, announcements or other recognition assigned, given, announced, communicated or recognized by the NCAA which were based in any way upon the competitive results or participation of any male who competed in women's events or on a women's team pursuant to the policies, practices, or rules of the NCAA which the Court finds are unlawful;

(d)  Pursuant to Title IX enjoin the University System of Georgia, including all institutions it governs, from implementing, applying, using, enforcing, or giving effect to the policies, practices, or rules of the Association which the Court finds are unlawful;

(e)  Pursuant to Title IX enjoin the University System of Georgia, including all institutions it governs, from permitting collegiate sports competition(s) to take place in premises controlled by the System or the institutions it governs for which competition(s) the eligibility rules of the NCAA enjoined by the Court are used to select participants or permit participants to qualify;

(f)  Pursuant to Title IX enjoin the University System of Georgia, including all institutions it governs, from operating or permitting the operation of any locker room, shower, or restroom in a manner which the Court has found unlawful or in a manner which permits a male athlete to use such women's facilities or facilities designated for women because the male athlete has been authorized or permitted to compete in a women's competition or on a women's team; and

(g)  Any other injunctive relief necessary to afford any Plaintiff, class member, or class full relief.

7.  Pursuant to Title IX, award Plaintiffs, and those class members similarly situated, all such damages as are available under their various claims, including, actual damages, nominal damages, punitive damages, and compensatory damages, including, but not limited to, damages for pain and suffering, mental and emotional distress, suffering and anxiety, expenses costs and other damages against the NCAA, the University System of Georgia, the Board of Regents, and Georgia Tech due to their wrongful conduct.

8.  Pursuant to Section 1983, award Plaintiffs, and those class members similarly situated, all such damages as are available under their various claims, including, actual damages, nominal damages, punitive damages, and compensatory damages, including, but not limited to, damages for pain and suffering, mental and emotional distress, suffering and anxiety, expenses costs and other damages against the NCAA and the Georgia Individual Defendants in their individual capacities due to their wrongful conduct.

9.  Award Plaintiffs reasonable attorneys' fees, and costs; and

10. Grant any other relief that the Court deems necessary, just, proper, and equitable.

11. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Dated: March 14, 2024                    Respectfully submitted,

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49[108]
Kevin D. Koons, Atty. No. 27915-49[109]
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:   wbock@kgrlaw.com
Email:    kkoons@kgrlaw.com

*/s/ Thomas C. Rawlings*
*/s/ Bryan P. Tyson*
Thomas C. Rawlings, Ga. Bar No. 595795
Bryan P. Tyson, Ga. Bar No. 515411
Deborah A. Ausburn, Ga. Bar No. 028610
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Fax: (770) 434-7376
E-mail: trawlings@taylorenglish.com
E-mail: btyson@taylorenglish.com
E-mail: dausburn@taylorenglish.com

*ATTORNEYS FOR PLAINTIFFS*

---

[108] Application for admission pro hac vice pending.
[109] Application for admission pro hac vice pending.