**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| RILEY GAINES, *et al.*, <br><br>       *Plaintiffs*, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*, <br><br>       *Defendants*, <br> and <br><br> NATIONAL WOMEN'S LAW CENTER, <br><br>  [*Proposed*] *Intervenor-Defendant*. | No. 1:24-cv-01109-MHC <br><br><br> May 6, 2024 |

**[PROPOSED] INTERVENOR-DEFENDANT NATIONAL WOMEN'S LAW CENTER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................1

BACKGROUND .................................................................................................3

ARGUMENT ....................................................................................................11

I.    NWLC Satisfies the Requirements for Permissive Intervention....................12

    A.    NWLC's Motion Is Timely. ................................................................12

    B.    NWLC's Defense Shares Common Questions of Law and Fact. .......15

II.   The Court Should Exercise Its Discretion to Grant NWLC Intervention.
      ....................................................................................................................18

III.  The Court Should Accept the Proposed Motion to Dismiss as a
      "Pleading" Under Rule 24(c)........................................................................23

CONCLUSION ...............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*335-7 LLC v. City of New York*,
No. 20 Civ. 1053, 2020 WL 3100085 (S.D.N.Y. June 11, 2020) .....................21

*Alabama v. U.S. Dep't of Com.*,
No. 18 Civ. 772, 2018 WL 6570879 (N.D. Ala. Dec. 13, 2018).................16, 18

*Athens Lumber Co. v. Fed. Election Comm'n*,
690 F.2d 1364 (11th Cir. 1982) ...................................................................11, 19

*B.P.J. v. W. Va. State Bd. of Educ.*,
No. 21 Civ. 316, 2021 WL 5711547 (S.D. W. Va. Dec. 1, 2021).....................17

*Cellco P'ship & N.Y. SMSA Ltd. P'ship v. Cnty. of Monmouth, N.J.*,
No. 23 Civ. 18091, 2024 WL 989824 (D.N.J. Mar. 7, 2024)............................23

*Chiles v. Thornburgh*,
865 F.2d 1197 (11th Cir. 1989) .......................................................................13

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
178 F. Supp. 2d 805 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th
Cir. 2006) ...........................................................................................................4

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
170 F.R.D. 93 (E.D.N.Y. 1996).......................................................................16

*Corr. v. Advance Loc. Media, LLC*,
918 F.3d 1161 (11th Cir. 2019) ..................................................................12, 13

*De Fernandez v. Seaboard Marine, Ltd.*,
No. 20 Civ. 25176, 2023 WL 3074980 (S.D. Fla. Apr. 25, 2023) ..............19, 23

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
276 F. Supp. 3d 324 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir.
2018) ..................................................................................................................17

*Haffer v. Temple Univ. of the Com. Sys. of Higher Educ.*,
    678 F. Supp. 517 (E.D. Pa. 1987) ...........................................................................4

*Hartford v. Ferguson*,
    No. 23 Civ. 5364, 2023 WL 3853011 (W.D. Wash. June 6, 2023) ...................21

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ...................................................................17

*Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, FL*,
    254 F. App'x 769 (11th Cir. 2007) ........................................................................13

*Kobach v. U.S. Election Assistance Comm'n*,
    No. 13 Civ. 4095, 2013 WL 6511874 (D. Kan. Dec. 12, 2013) ..................16, 18

*Lancer Ins. Co. v. Hitts*,
    No. 09 Civ. 302, 2010 WL 2867836 (M.D. Ga. July 20, 2010), *as
    amended* (July 22, 2010) ......................................................................................15

*Little River Transp., LLC v. Oink Oink, LLC*,
    No. 22 Civ. 22509, 2023 WL 3791781 (S.D. Fla. Apr. 13, 2023) .....................23

*Nielsen v. DeSantis*,
    No. 20 Civ. 236, 2020 WL 6589656 (N.D. Fla. May 28, 2020) ........................21

*Owners Ins. Co. v. Hawkins*,
    No. 22 Civ. 1265, 2023 WL 1824930 (N.D. Ga. Feb. 7, 2023) ........................13

*Parents for Priv. v. Dallas Sch. Dist. No. 2*,
    326 F. Supp. 3d 1075 (D. Or. 2018), *aff'd sub nom. Parents for
    Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ......................................................16

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
    667 F.3d 910 (7th Cir. 2012) .................................................................................4

*Piambino v. Bailey*,
    757 F.2d 1112 (11th Cir. 1985) ...........................................................................23

*Pickup v. Brown*,
    No. 12 Civ. 2497, 2012 WL 6024387 (E.D. Cal. Dec. 4, 2012) ........................21

*Purcell v. BankAtlantic Fin. Corp.*,
    85 F.3d 1508 (11th Cir. 1996) ...........................................................................11

*Roberts v. Colo. State Bd. of Agric.*,
    998 F.2d 824 (10th Cir. 1993) .............................................................................4

*SEC v. U.S. Realty & Imp. Co.*,
    310 U.S. 434 (1940).............................................................................................15

*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ..............................................................................19

*Smith v. Nat'l Collegiate Athletic Ass'n*,
    139 F.3d 180 (3d Cir. 1998), *vacated,* 525 U.S. 459 (1999)...............................4

*Students & Parents for Priv. v. U.S. Dep't of Educ.*,
    No. 16 Civ. 4945, 2016 WL 3269001 (N.D. Ill. June 15, 2016)........................17

**Statutes**

20 U.S.C. § 1681 *et seq.*...................................................................................*passim*

**Other Authorities**

7C Fed. Prac. & Proc. Civ. § 1911 (3d ed.) ............................................................15

Fed. R. Civ. P. 24 ..............................................................................................*passim*

U.S. Const. amend. XIV .........................................................................................18

**Articles**

*Board of Governors revises penalties for campus sexual violence
    attestation*, NCAA (Apr. 25, 2024, 7:13 PM),
    https://www.ncaa.org/news/2024/4/25/media-center-board-of-
    governors-revises-penalties-for-campus-sexual-violence-
    attestation.aspx.....................................................................................................2

Deborah Brake, *Title IX's Trans Panic*, 29 WM. & MARY J. OF RACE,
    GENDER, & SOC. JUST. 41, 70 (2023).................................................................22

Julie Kliegman & Jesse Dougherty, *Pressure mounts on NCAA to clarify stance on transgender athletes*, WASH. POST., Apr. 23, 2024 .................2

Karleigh Webb, *NCAA caught between a lawsuit and a hard place on trans-athlete inclusion*, OUTSPORTS (Apr. 25, 2024), https://www.outsports.com/2024/4/25/24092572/ncaa-board-meeting-trans-athletes-riley-gaines-charlie-baker/ ................................................2

*Ohio lawmakers advance trans sports ban with genital check*, REUTERS (June 3, 2022, 5:50 PM), https://www.reuters.com/world/us/ohio-lawmakers-advance-trans-sports-ban-with-genital-check-2022-06-03/ .........................................................5

Zoe Christen Jones, *Utah investigates winning student athlete's gender after parents of second- and third-place finishers submit complaints*, CBS NEWS (Aug. 18, 2022, 3:13 PM), https://www.cbsnews.com/news/transgender-investigation-student-athelete-utah-high-school/ ...................................................................................5

## INTRODUCTION AND SUMMARY OF ARGUMENT

The National Women's Law Center ("NWLC") respectfully moves for permissive intervention as a defendant pursuant to Federal Rule of Civil Procedure 24(b)(1). For over 50 years, NWLC has been a leading advocate for equal opportunities for women and girls, including in athletics. NWLC advocates for inclusive policies that allow all women—including transgender women—to participate fully in society, including in sports.

Plaintiffs in this action seek to represent a sweeping nationwide class of all "[w]omen who are past, current, or future [National Collegiate Athletic Association] [("]NCAA["]) athletes," Compl. ¶ 562. Plaintiffs seek equally sweeping relief: a nationwide ban on transgender women participating in women's NCAA sports; a nationwide invalidation of all sports participation and athletic records of transgender women who have participated in NCAA athletic events to date; and a ban on transgender women using women's locker room, restroom, or shower facilities at the University System of Georgia and other institutions hosting NCAA competitions. *Id.* at 153. Plaintiffs even refuse to acknowledge transgender women in their Complaint, offensively referring to them as "male" or "males." *E.g.*, *id.* ¶ 64.

While Plaintiffs purport to speak on behalf of all women, they do not represent the interests of women who are transgender and want to continue participating in NCAA sports, nor the cisgender women who want to continue participating with

them. Their attempts to exclude transgender women from NCAA sports actually hurt *all* women—transgender and cisgender alike—by reinforcing pernicious sex stereotypes and depriving all individuals of the benefits of inclusive policies. Transgender inclusion helps all women and girls learn free from sex stereotypes and ensures all women and girls can enjoy the lifelong benefits of playing school sports.

For its part, the NCAA, facing increasing pressure from anti-transgender activists, in recent years added new restrictions to its longstanding policy that since 2010 had allowed transgender women to participate in women's sports after one year of gender-affirming hormone therapy.[1] And in the wake of this suit, the NCAA recently signaled it is reevaluating whether it will continue to permit transgender women and girls to participate *at all* in women's athletics.[2] Considering the external pressure it faces and its recent regressive steps, the NCAA plainly is not in a position to adequately defend the inclusive policies or the rights of the transgender women at

---

[1] Julie Kliegman & Jesse Dougherty, *Pressure mounts on NCAA to clarify stance on transgender athletes*, WASH. POST., Apr. 23, 2024, www.washingtonpost.com/sports/2024/04/23/ncaa-transgender-rule-changes/; Karleigh Webb, *NCAA caught between a lawsuit and a hard place on trans-athlete inclusion*, OUTSPORTS (Apr. 25, 2024, 3:38 PM), https://www.outsports.com/2024/4/25/24092572/ncaa-board-meeting-trans-athletes-riley-gaines-charlie-baker/.

[2] *Board of Governors revises penalties for campus sexual violence attestation*, NCAA (Apr. 25, 2024, 7:13 PM), https://www.ncaa.org/news/2024/4/25/media-center-board-of-governors-revises-penalties-for-campus-sexual-violence-attestation.aspx ("The Board of Governors discussed transgender student-athlete participation. The current policy remains under review.").

issue in this suit. And Plaintiffs in this case seek to determine the policies of not only the State Defendants,[3] but to determine the lawfulness of the NCAA's policies in every college and university where they apply. *See* Compl. at 152–53.

Whereas none of the existing parties to this case can adequately defend the claims at issue in this suit, NWLC can. NWLC seeks to intervene to defend the lawfulness of policies that are inclusive of transgender women, and to ensure the interests of all women are represented in this case. This Court should exercise its discretion to allow NWLC's intervention because, in protecting its own interests, NWLC will also represent a vital perspective not currently represented—that of women who support the inclusion of transgender women in women's sports.

## BACKGROUND

### NWLC

NWLC is a nonpartisan, nonprofit organization dedicated to the advancement and protection of the legal rights of women and girls, and the right of all persons to be free from sex discrimination. Ex. 1, Declaration of Emily Martin ("Martin Decl.") ¶ 4. NWLC was founded in 1972, the same year that Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, was enacted, and it has played a critical role in advocating for Title IX's protections and proper interpretation ever since. Martin Decl. ¶¶ 4–5. NWLC assists policymakers in

---

[3] *See* ECF No. 31 at 1 & n.1 (listing State Defendants).

enforcing Title IX's prohibition of and protections against sex discrimination, equips students with tools to advocate for their own rights to access equal educational opportunities, including the opportunity to play school sports, and litigates on behalf of students who have been harmed by sex discrimination.

For decades, a cornerstone of NWLC's work has been to enforce Title IX to ensure women and girls in athletics enjoy the full protection against sex discrimination promised by our laws, including through litigation. *Id.* ¶ 8 (citing *e.g.*, *Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180 (3d Cir. 1998), *vacated*, 525 U.S. 459 (1999); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910 (7th Cir. 2012); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th Cir. 2006); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th Cir. 1993); *Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 678 F. Supp. 517 (E.D. Pa. 1987)).

Over 50 years of experience advocating for strong Title IX protections has led NWLC to firmly support the inclusion of women and girls who are transgender in all aspects of educational life—including sports—as a matter of both civil rights law and of human rights. NWLC is not alone. The overwhelming majority of women's rights and gender justice organizations share the view that the inclusion of women and girls who are transgender in sports advances the goal of equal opportunities for women and girls to benefit from athletic participation. Martin Decl. ¶¶ 11, 15;

Exhibit A to Martin Decl. ("Decl. Ex. A") at 3–4.

Policies excluding women and girls who are transgender from school sports harm not only those women and girls, but threaten all women and girls who excel in athletics, as well as all who depart from gender stereotypes. This is so because these policies rely on and invite inappropriate policing of students' bodies, appearances, and gender expressions. In the context of such exclusionary policies, any woman or girl who is perceived as "suspiciously" strong, fast, agile, or talented in her sport risks challenge, scrutiny by officials of their schools, school boards, and athletic associations, accusations, and the burden to prove she is a "real" woman or girl.[4] Among the more egregious examples of body policing promoted by policies that exclude transgender women and girls is sex verification, which refers to pseudoscientific, intrusive, and harmful practices ranging from collecting private, sensitive medical documents to needless and traumatizing genital examinations that expose student athletes to new risks of sex harassment and sexual assault.[5] Martin Decl. ¶ 23; Decl. Ex. A at 4. Black and brown women and girls who play school sports are at a particularly high risk of harm under these policies, because Black and

---

[4] *See, e.g.*, Zoe Christen Jones, *Utah investigates winning student athlete's gender after parents of second- and third-place finishers submit complaints*, CBS NEWS (Aug. 18, 2022, 3:13 PM), https://www.cbsnews.com/news/transgender-investigation-student-athlete-utah-high-school/.

[5] *See, e.g.*, *Ohio lawmakers advance trans sports ban with genital check*, REUTERS (June 3, 2022, 5:50 PM), https://www.reuters.com/world/us/ohio-lawmakers-advance-trans-sports-ban-with-genital-check-2022-06-03/.

brown women are often viewed as "nonconforming" with white-centric stereotypes of femininity. Decl. Ex. A at 3–4.

Targeting women who are transgender as insufficiently "feminine" forces *all* women into more rigid gender roles—a dynamic that has harmful implications far beyond sports. These policies also reinforce a false binary by assuming that those assigned male at birth are inevitably and inherently athletically superior and those identified as female are inherently weaker and less athletic. This narrative harms all women and girls and perpetuates harmful gender-based inequities in athletics, such as the over-resourcing of men's sports programs and the chronic failure to invest in women's sports programs and women athletes. *See* Decl. Ex. A at 6–7.

Depriving transgender women and girls of their right to play women and girls' sports—as Plaintiffs here seek to do—denies them opportunities to gain academic and social benefits of sports free from sex discrimination, including a sense of community and belonging among their peers. Martin Decl. ¶¶ 16–17; Decl. Ex. A at 4–5. It does so at great cost, robbing young transgender people—who face increased risk of suicide because of the disproportionate discrimination, hostility, and stigma they suffer—of the potentially life-saving benefits of playing sports. Decl. Ex. A at 4–5. Categorical bans excluding women and girls who are transgender from participating in women's sports also send the message that transgender students are acceptable targets for violence and harassment, and remove a much-needed bulwark

of safety and well-being that can insulate these students from the risks of discrimination and harassment they disproportionately face in school. *Id.* at 5.

Consistent with its mission of advancing the rights of all women and girls under Title IX and beyond, NWLC has been a strong public advocate for the inclusion of transgender women in women's sports and inclusive restroom and locker room policies. Martin Decl. ¶¶ 10–11, 14, 24–27. For example, the President and CEO of NWLC testified before the U.S. House Committee on Oversight and Accountability on "The Importance of Protecting Female Athletics and Title IX," during which she explained why trans-exclusionary policies undermine Title IX's purpose to ensure equal athletic opportunities for all students. *Id.* ¶ 10. NWLC submitted comments in response to the U.S. Department of Education's proposed Title IX rules advocating for the rights of transgender students to play school sports free from discrimination, helped lead efforts of over 80 organizations urging the release and finalization of rules that will do so, and co-lead advocacy against federal legislation that would amend Title IX to ban transgender girls from participating in sports. *Id.* ¶ 11. NWLC's work includes equipping students with the tools to advocate for their own Title IX rights, publishing reports on gender equity, educating coaches and school officials on Title IX obligations, and publishing educational materials advocating for the inclusion of women who are transgender in women's sports. *Id.* ¶ 10.

NWLC also is specifically involved with advocating for regulators of athletics, like the NCAA, to implement and maintain policies that promote values of inclusion and diversity in sports, including the inclusion of transgender women athletes. In 2020, NWLC advocated for the NCAA to relocate all NCAA events from Iowa because the state's passage of a law that bans transgender women and girls from competing on college teams. *Id.* ¶ 14. In 2022, NWLC wrote an open letter to the NCAA criticizing its new restrictions on transgender athletes' participation and joined with other organizations to call on the NCAA to comply with its NCAA principles of fairness and inclusion. *Id.* Most recently, NWLC sent the NCAA Board of Governors a letter urging it to reject regressive policies that would bar all women athletes who are transgender from participating in sports. *Id.* ¶ 13; Decl. Ex. A. Similarly, NWLC has responded to the decisions of athletic leagues to enact policy changes that exclude transgender women and reinforce dangerous stereotypes that harm all women. *Id*.

The NCAA Policy

In 2010, the NCAA adopted a policy allowing transgender women to participate in women's sports after one year of gender-affirming hormone therapy. Compl. App. A at 2. Since then, only a handful of transgender women have participated in NCAA sports. Compl. ¶¶ 14, 541, 552 (identifying only five transgender athletes who have competed in NCAA sports, only some of whom

competed post-season).

After Lia Thomas became the only transgender woman to win an NCAA Division I title at the NCAA nationals in March 2022, *id.* ¶ 471, athletic organizations, including the NCAA, faced a vocal backlash from anti-trans activists. Despite the individuals who loudly criticized Ms. Thomas's participation, many cisgender women athletes and NWLC, along with other national organizations within the gender justice movement, supported her. Martin Decl. ¶ 14. The NCAA nevertheless adopted increasingly restrictive policies that make it more difficult for transgender women to participate. Compl. App. A at 2. As of August 1, 2023, the NCAA newly required transgender women to document that they had lowered their level of circulating testosterone beneath a certain threshold set by the governing body for a particular sport (e.g., below 5 nmol/L for USA Swimming). *See id.* at 6, 13. And the NCAA announced plans to, as of August 1, 2024, require transgender women to show that they meet all the criteria of the relevant governing body, including not just lowering circulating testosterone beneath a particular threshold, but doing so continuously for a particular length of time (e.g., for 36 months for USA Swimming). *See* ¶ 254; App. A at 2.

<u>Plaintiffs' Lawsuit and the NCAA's Response</u>

Plaintiffs in this case are sixteen cisgender women who want to exclude transgender women from NCAA women's sports. Plaintiffs have participated in only

five different sports among them (swimming, track, volleyball, soccer, and tennis), yet seek to exclude transgender women from *all* sports. *See, e.g.*, Compl. at 48; 59–67 (discussing 25 women's sports); 69–71 (diving); 71–74 (water polo); 75–76 (rowing); 76 (triathlons). Only two of the sixteen Plaintiffs have ever competed against a transgender athlete in college: (a) Riley Gaines, who tied with a transgender woman swimmer for fifth place in the women's 200 freestyle at the 2022 NCAA Nationals rather than being the sole fifth place recipient; and (b) "Track Athlete A," who competes in Division III track and field and placed behind a transgender woman at the March 2024 All Atlantic Regionals in the 200-meter dash. Compl. ¶¶ 487, 541.

Despite Plaintiffs' limited experience and perspective, they seek to bring a national class action representing all "future, current, or past NCAA women's athletes" in all sports "who have competed or may compete against [women who are transgender] athletes or who have shared or may share a locker room, shower, or restroom with a [woman who is transgender] by virtue of the NCAA's Transgender Eligibility Policies." Compl. ¶ 561. They also seek sweeping, nationwide relief prohibiting transgender women from competing in all NCAA events, banning transgender women from women's locker room, shower, and restroom facilities, and invalidating the athletic records of all transgender women. Compl. at 152–53.

In the wake of this lawsuit, the NCAA has signaled it is reevaluating whether it will continue to permit transgender women and girls to participate *at all* in

women's athletics, stating, "[T]he current policy remains under review." Martin Decl. ¶ 13. NWLC has continued to strongly urge the NCAA to include women who are transgender in women's sports, explaining in a recent letter to the NCAA Board of Governors, Decl. Ex. A, and in recent public statements, that bans on transgender women participating in sports "perpetuate harmful stereotypes about gender and athleticism and require the policing and scrutiny of women's bodies. These policies hurt all women," Martin Decl. ¶ 13.

## ARGUMENT

Federal Rule of Civil Procedure 24(b) provides, "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(l). Granting permissive intervention "lies within the discretion of the district court." *Athens Lumber Co. v. Fed. Election Comm'n*, 690 F.2d 1364, 1367 (11th Cir. 1982); *accord Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996). In exercising its discretion, the court must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

NWLC meets the requirements of Rule 24 for permissive intervention, and the equities strongly favor allowing NWLC to intervene. First, NWLC's request to intervene is timely, as this litigation has just begun, and no responsive pleadings

have yet been filed. Second, NWLC has a strong institutional interest in the subject of the litigation, and its defense shares common questions of law and facts with existing parties. Finally, the equities strongly favor intervention, and NWLC's participation will not cause delay or undue prejudice. As an organization whose core mission is advancing and protecting the legal rights of *all* women and girls—including transgender women and girls—NWLC's participation will provide a critical perspective otherwise absent from this case. Including this perspective is particularly important given that Plaintiffs purport to represent all NCAA cisgender women athletes past, present, and future, but plainly do not.

## I.    NWLC Satisfies the Requirements for Permissive Intervention.

### A.    NWLC's Motion Is Timely.

As an initial matter, NWLC's motion is timely. The Court considers four factors in determining the timeliness of a motion to intervene:

> (1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before petitioning for leave to intervene; (2) the extent of the prejudice that existing parties may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest; (3) the extent of the prejudice that the would-be intervenor may suffer if denied the opportunity to intervene; and (4) the existence of unusual circumstances weighing for or against a determination of timeliness.

*Comm'r, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1171 (11th Cir. 2019) (citation omitted).

NWLC's motion to intervene is timely under all these factors. First, this motion comes less than two months after the original Complaint was filed, ECF No. 1, and within the time Defendants were granted to answer or otherwise respond to the Complaint. ECF No. 35 (granting State Defendants and NCAA until June 5, 2024, to answer or otherwise respond to the Complaint); *see Owners Ins. Co. v. Hawkins*, No. 22 Civ. 1265, 2023 WL 1824930, at *3 (N.D. Ga. Feb. 7, 2023) ("[A]pproximately two months after learning of the action . . . is a reasonable length of time between when [proposed-intervenor] learned of this matter and when it sought to intervene."); *see also Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (concluding motion to intervene was timely filed when party filed it seven months after original complaint, three months after motion to dismiss, and before any discovery had begun).

Second, no existing party to the litigation will be harmed or prejudiced by the timing of NWLC's motion to intervene, which the Eleventh Circuit has called the "most important consideration in determining timeliness." *Advance Loc. Media*, 918 F.3d at 1171 (citation omitted). This case is at a nascent stage: there have not yet been responses to the Complaint, and no scheduling order has yet issued. Thus, NWLC's intervention would do nothing to upset advances made through litigation, unlike cases where prejudice has been found. *Cf. Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, FL*, 254 F. App'x 769, 771 (11th Cir. 2007) (concluding

13

district court did not abuse its discretion in deciding intervention sought one day before district court approved a consent decree would substantially prejudice the existing parties "by practically undoing twenty-two months of litigation and settlement negotiations").

Third, NWLC—and the women whose interests it represents—would be prejudiced if NWLC is denied the opportunity to intervene. This is so because Plaintiffs purport to represent a class of *all* "future, current, or past NCAA women's athletes," Compl. ¶ 561, and seek to categorically ban women who are transgender from participation in NCAA sports. As noted, the core of NWLC's decades-long advocacy has been to ensure equal opportunity, including in sports, for *all* women—including women who are transgender. *See supra* p. 12. NWLC has publicly and directly advocated for the NCAA's inclusive policies and has publicly and directly opposed those policies' contraction. *See, e.g.*, Decl. Ex. A. Absent NWLC's intervention, its own interests in advancing the purposes and enforcement of Title IX will be harmed because it will be unable to defend the lawfulness of inclusive athletics policies, and the perspectives of women who support inclusion of transgender women in athletics—including the transgender women whom Plaintiffs seek to exclude—will be absent from this case. In other words, NWLC's participation will ensure that the Court will have the range of briefing and information necessary to resolve this lawsuit.

Fourth, there are no unusual circumstances weighing against timeliness. Thus, under all four factors, NWLC's motion to intervene is timely.

## B. NWLC's Defense Shares Common Questions of Law and Fact.

NWLC also has a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "[T]he claim or defense clause of Rule 24(b)([1]) is generally given a liberal construction." *Lancer Ins. Co. v. Hitts*, No. 09 Civ. 302, 2010 WL 2867836, at *4 (M.D. Ga. July 20, 2010), *as amended* (July 22, 2010). "This provision plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation." *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940). Indeed, "a permissive intervenor does not even have to be a person who would have been a proper party at the beginning of the suit." 7C Fed. Prac. & Proc. Civ. § 1911 (3d ed.). "Close scrutiny of the kind of interest the intervenor is thought to have seems especially inappropriate under Rule 24 since it makes no mention of interest. The rule requires only that the intervenor's claim or defense share a common question of law or fact with the main action." *Id.*

Rule 24(b)(1)(B)'s requirement that a permissive intervenor "ha[ve] a claim or defense that shares with the main action a common question of law or fact" is thus met where, as here, a proposed defendant-intervenor "intend[s] to defend . . . based on the same law and facts that the existing parties to the litigation have already

raised." *Alabama v. U.S. Dep't of Com.*, No. 18 Civ. 772, 2018 WL 6570879, at *3 (N.D. Ala. Dec. 13, 2018) (holding requirement met where proposed intervenors, including "an organization that 'works to increase Latino political empowerment'" argued challenged rule was "lawful under [] both the Constitution and the APA") (internal quotation marks omitted); *see, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, No. 13 Civ. 4095, 2013 WL 6511874, at *4 (D. Kan. Dec. 12, 2013) (common question of law or fact met where applicants for intervention have "clearly shown their interests in either increasing participation in the democratic process, or protecting voting rights" and "[as] demonstrated by their answers, that their goal in this action is to defend against the claims of Plaintiffs"); *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996) (holding "[t]he intervenors in this case have questions of law and fact in common with the parties" where "[t]he intervenors include rabbis, kosher consumers, and rabbinical and lay organizations all with an interest in the enforcement and the constitutionality of the Kosher Laws").

Notably, and supporting intervention here, when cisgender plaintiffs have challenged policies allowing transgender students to use restrooms and locker rooms, courts have routinely allowed advocacy organizations to intervene to defend those policies. *See Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1081 (D. Or. 2018), *aff'd sub nom. Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020) (Basic Rights Oregon granted permission to intervene to defend school

restroom and locker room policy); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 331 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018) (LGBTQ-advocacy organization, Pennsylvania Youth Congress, allowed to intervene to defend restroom and locker room policy); *Students & Parents for Priv. v. U.S. Dep't of Educ.*, No. 16 Civ. 4945, 2016 WL 3269001, at *1 (N.D. Ill. June 15, 2016) (granting permissive intervention to Illinois Safe Schools Alliance to defend policy). In the converse situation, when transgender student plaintiffs have challenged state laws banning transgender women and girls from sports teams, courts have likewise granted intervention to cisgender women interested in defending those laws. *See B.P.J. v. W. Va. State Bd. of Educ.*, No. 21 Civ. 316, 2021 WL 5711547, at *1 (S.D. W. Va. Dec. 1, 2021) (denying intervention as a matter of right but granting permissive intervention); *Hecox v. Little*, 479 F. Supp. 3d 930, 955 (D. Idaho 2020) (finding that proposed intervenors "met the test for intervention as a matter of right," and that "[a]lternatively . . . permissive intervention [wa]s . . . appropriate").

Here, NWLC has a substantial and longstanding interest in advocating for the equality of women and girls—including in athletics and access to sex-separated facilities, and including for women and girls who are transgender. *See supra* p. 7. Relatedly, it has a strong interest in the proper interpretation of Title IX and the Equal Protection Clause on these topics. *See id.* Those interests all would be directly

impaired if Plaintiffs were to obtain the relief they seek: a nationwide ban on the participation of transgender women in NCAA events and on transgender women using women's restrooms and locker rooms at those competitions.

NWLC's defense shares common questions of law and fact with the claims and defenses of the parties in this case. *Cf. Alabama*, 2018 WL 6570879, at *3; *Kobach*, 2013 WL 6511874, at *4. Among the common questions of law presented by NWLC's defense are: whether Title IX prohibits transgender women from participating on women's athletic teams; whether Title IX and the Fourteenth Amendment prohibit transgender women from using the same locker room, restroom, and shower facilities as other women; and whether there is a substantive due process right to exclude transgender women from such facilities. Among the common facts presented by NWLC's defense are the impacts that allowing transgender students to play has on opportunities for cisgender women and girls. *See* Martin Decl. ¶ 10 n.8 (referencing NWLC publication showing that the inclusion of girls who are transgender creates *more* opportunities for *all* women and girls to play and arguing lack of proof of categorical "dominance" or overwhelming advantage of transgender women or girls).

## II.   The Court Should Exercise Its Discretion to Grant NWLC Intervention.

Because NWLC has satisfied Rule 24's prerequisites for permissive intervention, whether to grant such intervention is "within the discretion of the

district court." *Athens Lumber*, 690 F.2d at 1367. The Court's discretion must be informed by, among other things, "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The Court should exercise its discretion to grant intervention. Critically, NWLC's intervention would ensure resolution of Plaintiffs' claims properly considers the rights and interests of transgender women athletes, who are otherwise completely absent from this litigation. NWLC's perspective is particularly useful in "assist[ing] the Court in 'resolv[ing] the issue'" because "neither of the parties share[s]" NWLC's interests in defending the interests of transgender student athletes. *De Fernandez v. Seaboard Marine, Ltd.*, No. 20 Civ. 25176, 2023 WL 3074980, at *7 (S.D. Fla. Apr. 25, 2003) (citation omitted). Rather, in response to external pressure, the NCAA has adopted more restrictive policies through rushed, non-transparent processes. Martin Decl. ¶ 13. As an organization dedicated to the advancement and protection of the legal rights of women and girls, and the right of all persons to be free from sex discrimination, NWLC does not have such conflicting interests. *See, e.g.*, *Sierra Club v. Espy*, 18 F.3d 1202, 1207–08 (5th Cir. 1994) (allowing timber industry to intervene in action against U.S. Forest Service given that "government must represent the broad public interest, not just the economic concerns of the timber industry").

NWLC's intervention would also ensure that the Court considers the interests

of the many cisgender women in athletics who do not wish to be represented by Plaintiffs in this class action and who support inclusive policies. Efforts to ban women and girls who are transgender from women's sports—like those of the Plaintiffs here—harm *all* women. Policing who is or isn't a "woman"—including through restrictive "sex verification" requirements—is dangerous; it erects barriers for *all* women, including cisgender women, who fall outside stereotypical notions of femininity. Martin Decl. ¶ 23; Decl. Ex. A at 7–8. Tall women, very muscular women, or women who present in more stereotypically masculine ways could be forced to undergo medical testing or be prevented from playing sports. Martin Decl. ¶ 23. Black and brown women and girls are particularly vulnerable to this sort of scrutiny given racist and sexist stereotypes, as they are already targeted for their nonconformity with society's ideals about white femininity. *Id.*; Decl. Ex. A at 3–4. Indeed, research indicates that in jurisdictions with trans-inclusive policies, more girls overall play school sports than in jurisdictions that have enacted hostile policies to exclude and target transgender and nonbinary students. Martin Decl. ¶ 22.

Moreover, NWLC is particularly well-suited to contribute to the case because of its deep subject-matter expertise with respect to Title IX in general and the athletics regulations under Title IX in particular. Where proposed intervenors "are substantial organizations with experienced attorneys who might well bring perspective that others miss or choose not to provide," permissive intervention is

appropriate. *Nielsen v. DeSantis*, No. 20 Civ. 236, 2020 WL 6589656, at *1 (N.D. Fla. May 28, 2020); *see Hartford v. Ferguson*, No. 23 Civ. 5364, 2023 WL 3853011, at *2 (W.D. Wash. June 6, 2023) ("Alliance's knowledge of the relevant subject matter will provide a helpful perspective that is not necessarily represented by other Defendants."); *335-7 LLC v. City of New York*, No. 20 Civ. 1053, 2020 WL 3100085, at *3 (S.D.N.Y. June 11, 2020) (granting intervention of two tenant groups "whose viewpoint and knowledge of the underlying circumstances would assist the court" in lawsuit filed by landlords challenging the constitutionality of city and state rent stabilization laws); *Pickup v. Brown*, No. 12 Civ. 2497, 2012 WL 6024387, at *4 (E.D. Cal. Dec. 4, 2012) (Equality California "will provide a helpful, alternative viewpoint from the vantage of some persons who have undergone [anti-LGBTQI+ conversion attempts] or are potential patients of treatment that will aid the court in resolving plaintiffs' claims fully and fairly").

Notably, NWLC's expertise provides a necessary correction to Plaintiff's distorted description of the historical and legal landscape. As demonstrated in NWLC's proposed motion to dismiss, Plaintiffs' claims are built on a fundamentally flawed understanding of Title IX's regulations and controlling policy interpretations. *See* Ex. 2 (NWLC's proposed motion to dismiss). Plaintiffs also tell a misleading story about the goals of Title IX and the historical causes of inequities in athletics. Contrary to Plaintiffs' uninformed narrative, Title IX's allowance for sex separation

21

did not "depend on the assertion of innate biological difference between the sexes, but rather on the historic and societal reality that women and girls have not had the benefit of anywhere near the same opportunities as boys and men to develop their athleticism." Deborah Brake, *Title IX's Trans Panic*, 29 WM. & MARY J. OF RACE, GENDER, & SOC. JUST. 41, 70 (2023) (footnote omitted). Thus, some prominent scholars of Title IX have argued that, far from advancing the goals of Title IX, attempts to exclude girls who are transgender "rests on a biological determinism that has historically and continues to hurt women's equality in general and women's prospects for equal athletic opportunity in particular." *Id.* at 85 (footnote omitted). As Title IX advocates have reiterated for decades, men and boys continue to receive far more school sports opportunities at all ages and levels of play—and excluding women and girls who are transgender from women's and girls' sports perpetuates sex stereotypes rather than remedying any of the urgent problems facing women's and girls' sports.

Finally, NWLC's participation will cause no delay or prejudice. Responsive pleadings have not yet been filed and NWLC has already prepared its proposed motion to dismiss, which is being tendered simultaneously with this motion. NWLC is a single party and asserts no new claims. If intervention causes any delay at all, it will be "inconsequential compared to the overall length of th[e] case and the interests at stake," particularly given that Plaintiffs seek relief that will impact all transgender

and cisgender women and girls who play NCAA sports, have in the past, or dream of growing up to play one day. *De Fernandez*, 2023 WL 3074980, at *6.

NWLC has a long, demonstrated history of working to advance the rights of women and girls as student athletes and to ensure that all individuals—including transgender women—enjoy protection against sex discrimination. Accordingly, NWLC will bring a vital perspective to this lawsuit that Plaintiffs neglect and that the other Defendants cannot fully convey or defend.

## III. The Court Should Accept the Proposed Motion to Dismiss as a "Pleading" Under Rule 24(c).

NWLC contemporaneously submits a proposed motion to dismiss as an exhibit, which "clearly spells out" NWLC's position regarding Plaintiffs' claims, *see Piambino v. Bailey*, 757 F.2d 1112, 1123 (11th Cir. 1985), to satisfy the Rule 24(c) requirement. *See, e.g.*, *Little River Transp., LLC v. Oink Oink, LLC*, No. 22 Civ. 22509, 2023 WL 3791781, at *5 (S.D. Fla. Apr. 13, 2023); *Cellco P'ship & N.Y. SMSA Ltd. P'ship v. Cnty. of Monmouth, N.J.*, No. 23 Civ. 18091, 2024 WL 989824, at *6 (D.N.J. Mar. 7, 2024).

## CONCLUSION

For all of the forgoing reasons, NWLC respectfully requests that this Court allow NWLC to permissively intervene in this matter as a defendant.

Dated: May 6, 2024                              */s/ Nneka Ewulonu*

Joshua A. Block*                                Nneka Ewulonu
Jennesa Calvo-Friedman*                         Georgia Bar No. 373718
AMERICAN CIVIL LIBERTIES                        Cory Isaacson
UNION FOUNDATION                                Georgia Bar No. 983797
125 Broad Street, 18th Floor                    AMERICAN CIVIL LIBERTIES
New York, NY 10004                              UNION FOUNDATION OF
Phone: (212) 549-2569                           GEORGIA, INC.
jblock@aclu.org                                 P.O. Box 570738
jcalvo-friedman@aclu.org                        Atlanta, GA 30357
                                                Phone: (770) 303-8111
Patrick J. Hayden*                              newulonu@acluga.org
Katelyn Kang*                                   cisaacson@acluga.org
Valeria M. Pelet del Toro*
COOLEY LLP                                      Kathleen Hartnett*
55 Hudson Yards                                 Zoë Helstrom*
New York, NY 10001-2157                         COOLEY LLP
Phone: (212) 479-6000                           3 Embarcadero Center, 20th Floor
phayden@cooley.com                              San Francisco, CA 94111
kkang@cooley.com                                Phone: (415) 693-2000
vpeletdeltoro@cooley.com                        khartnett@cooley.com
                                                zhelstrom@cooley.com
Elizabeth Reinhardt*
COOLEY LLP                                      Celene Chen*
1299 Pennsylvania Avenue, NW                    COOLEY LLP
Washington, DC 20004-2400                       500 Boylston Street, 14th Floor
Phone: (202) 776-2353                           Boston, MA 02116-3736
ereinhardt@cooley.com                           Phone: (617) 937-2305
                                                celene.chen@cooley.com


                                                *Counsel for Intervenor-Defendant*
                                                *Pro hac vice pending*

24

## **RULE 7.1 CERTIFICATE OF COMPLIANCE WITH L.R. 5.1**

Pursuant to Local Rule 7.1D, I hereby certify that this brief has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

This 6th day of May, 2024.

/s/ Nneka Ewulonu
Nneka Ewulonu

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 6th day of May, 2024.

*/s/ Nneka Ewulonu*
Nneka Ewulonu