# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

RILEY GAINES, *et al.*,

                      *Plaintiffs*,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, *et al.*,

                      *Defendants*,

and

NATIONAL WOMEN'S LAW CENTER,

      [*Proposed*] *Intervenor-Defendant*.

No. 1:24-cv-01109-MHC

May 6, 2024

### DECLARATION OF EMILY MARTIN

I, Emily Martin, hereby declare as follows:

1.      I am the Chief Program Officer for the National Women's Law Center ("NWLC"), which is moving for intervention in the above-captioned action. I am over the age of 18, of sound mind, and am competent to make this declaration.

2.      I submit this declaration in support of NWLC's motion to intervene, including to explain NWLC's interest in this litigation. I have personal knowledge of the statements set forth in this declaration, or I have learned the information provided herein from the cited data sources and knowledgeable NWLC employees. If called as a witness, I could and would testify competently to the matters set forth herein.

3.      I joined NWLC in 2009. I currently serve as Chief Program Officer. In this role, I lead the development and execution of an integrated policy and legal strategy across NWLC's gender justice priorities, with a particular focus on low-income women, women and girls of color, and LGBTQI+ individuals. Before beginning my current position in December 2023, I served as NWLC's Vice President for Education & Workplace Justice, where I oversaw NWLC's advocacy, policy, and litigation efforts to forward frameworks that allow women and girls to achieve and succeed at school and at work. I have also served as NWLC's General Counsel.

4.      NWLC was founded in 1972 and is a nonpartisan, nonprofit organization dedicated to the advancement and protection of the legal rights of women and girls, and the right of all persons to be free from sex discrimination. NWLC pursues its mission through working in the courts, in public policy, and through public education.

5.      For over 50 years, NWLC has worked to secure equal opportunity in education for women and girls, including through full enforcement of the U.S. Constitution and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.* NWLC seeks to ensure that all individuals, including LGBTQI+ individuals, are protected from sex discrimination.

6.      Founded the same year as Title IX was enacted, NWLC has participated

in all major Title IX cases before the Supreme Court as counsel or amicus curiae.

7.    NWLC has itself been a party to litigation when necessary to advance the purposes and enforcement of Title IX, *see, e.g.*, *Nat'l Women's L. Ctr. v. U.S. Dep't of Educ.*, No. 17 Civ. 1137 (D.D.C. June 12, 2017), and other statutes that advance gender equality, *see, e.g.*, *Nat'l Women's L. Ctr. v. OMB*, No. 17 Civ. 2458, (D.D.C. Mar. 4, 2019); *Ctr. for Reprod. Rts. & Nat'l Women's L. Ctr. v. U.S. Dep't of Health and Hum. Servs.*, No. 18 Civ. 1688 (D.D.C. July 19, 2018).

8.    NWLC has been counsel in numerous cases on the proper interpretation of Title IX. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104 (D. Mass. 2021), *order clarified*, No. 20 Civ. 11104, 2021 WL 3516475 (D. Mass. Aug. 10, 2021); *SurvJustice Inc. v. DeVos*, No. 18 Civ. 535, 2019 WL 5684522 (N.D. Cal. Nov. 1, 2019). NWLC specifically has a long history of advancing the rights of girls and women as student athletes through litigation. *See, e.g.*, *Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 183 (3d Cir. 1998) (arguing as counsel for amicus), *vacated*, 525 U.S. 459 (1999); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910 (7th Cir. 2012) (NWLC, as party counsel, obtaining reversal of summary judgment against a challenge brought by members of a girls' basketball team, who argued an obvious disparity in prime-time scheduling of girls' and boys' high school basketball games denied plaintiffs equal

3

athletic opportunity); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th Cir. 2006) (NWLC, as party counsel, successfully representing a class of girl student-athletes claiming the high school athletic association discriminated against them by scheduling athletic seasons and tournaments for girls' sports during nontraditional and less advantageous times of the academic year than boys' athletic seasons and tournaments); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th Cir. 1993) (NWLC, as party counsel, successfully representing women's fast pitch softball team at Colorado State University in claiming university violated Title IX by discontinuing varsity team); *Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 678 F. Supp. 517 (E.D. Pa. 1987) (NWLC, as party counsel, representing class of women student athletes at Temple University alleging unlawful gender discrimination under Title IX and the federal and state constitutions).

9.      In cases where (unlike here) there is already an existing party robustly arguing in favor of transgender-inclusive policies, NWLC also routinely files amicus briefs in the Courts of Appeals in Title IX cases in support of transgender students who experience sex-based discrimination. *See, e.g.*, Brief of Amici Curiae NWLC and 51 Additional Organizations in Support of Appellant, *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, No. 23-1078, 2024 WL 1627008 (4th Cir. Apr. 16, 2024),

ECF No. 69-3[1]; Brief of Amici Curiae National Women's Law Center and 33 Additional Organizations in Support of Appellees, *Doe v. Horne*, No. 23-16026 (9th Cir. July 24, 2023), ECF No. 72 (appeal filed)[2]; Brief for Amici Curiae National Women's Law Center and 34 Additional Civil Rights and Other Organizations in Support of Appellees, *Soule v. Conn. Ass'n of Schs., Inc*., 90 F.4th 34 (2d Cir. 2023), ECF No. 124[3]; Brief for Amici Curiae National Women's Law Center, Lawyers' Committee for Civil Rights Under Law and 60 Additional Organizations in Support of Appellees and Affirmance, *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), ECF No. 71, *withdrawn pending amendment*, 2024 WL 1846141 (9th Cir. Apr. 29, 2024)[4]; Brief of Amici Curiae National Women's Law Center and 58 Additional Organizations in Support of Appellee and Affirmance, *A.M. by E.M. v. Indianapolis Pub. Schs*., 617 F. Supp. 3d 950 (S.D. Ind. 2022), *appeal dismissed*, No. 22-2332, 2023 WL 371646 (7th Cir. Jan. 19, 2023)[5]; *En Banc* Brief of the National Women's Law Center and 50 Additional Organizations as Amici Curiae in Support of Plaintiff-

---

[1]https://nwlc.org/wp-content/uploads/2023/04/2023.03.04-ECF-No.-69-3-Brief-of-Amici-Curiae-NWLC-and-51-Additional-Organizations-ISO-Appellant-and-Reversal.pdf.

[2]https://nwlc.org/wp-content/uploads/2023/10/2023-10-13-72-AMICI-CURIAE-NWLC-AND-33-ORGANIZATIONS-ISO-APPELLEES-AND-AFFIRMANCE.pdf.

[3]https://nwlc.org/wp-content/uploads/2021/11/ECF-Stamped-Soule-Amicus-Brief.pdf.

[4]https://nwlc.org/wp-content/uploads/2020/12/ECF-Stamped-Hecox-Amicus-12.21.2020.pdf.

[5]https://nwlc.org/wp-content/uploads/2022/11/2022.11.10-NWLC-Amicus.pdf.

Appellee and Affirmance, *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (11th Cir. 2022) (en banc)[6]; Brief of Amici Curiae National Women's Law Center, Et Al., in Support of Respondent, *G.G. by Deirdre Grimm v. Gloucester Cnty. Sch. Bd.*, 15-2056 (Aug. 11, 2017) (appeal dismissed).[7]

10.    NWLC's efforts are not limited to the courtroom. Its work includes extensive public education and advocacy. NWLC equips students with the tools to advocate for their own Title IX rights,[8] educates coaches and school officials about how to meet their obligations under Title IX,[9] provides testimony to state and federal congressional committees on Title IX,[10] and publishes reports on gender equity in

---

[6]https://nwlc.org/wp-content/uploads/2022/03/2021.11.23-Amicus-Brief-of-NWLC-and-50-orgs-AS-FILED.pdf.

[7]https://nwlc.org/wp-content/uploads/2017/03/GG-Amicus-Brief.pdf.

[8] *See, e.g.*, Linda Bunker, *Keeping Score: An Athletics Equity Checklist for Students, Athletes, Coaches, Parents, Administrators, and Advocates*, NWLC (updated Sept. 2022), https://nwlc.org/wp-content/uploads/2023/03/final_nwlc_KeepingScore.pdf; *The Department of Education's Proposed Title IX Athletics Rule,* NWLC (Apr. 13, 2023), https://nwlc.org/resource/the-department-of-educations-proposed-title-ix-athletics-rule/#; *Submit a Comment Responding to President Biden's Proposed Title IX Rule,* NWLC (July 1, 2022), https://nwlc.org/resource/submit-a-comment-responding-to-president-bidens-proposed-title-ix-rule/.

[9] *See, e.g.*, Neena Chaudhry, *What You Need To Know About Title IX and Athletics: A Webinar For Coaches, Parents, and School Officials*, NWLC (Apr. 18, 2013), https://nwlc.org/wp-content/uploads/2015/08/2013_4_18_athletics_webinar_final.pdf.

[10] *See, e.g.*, Testimony of Fatima Goss Graves, *The Importance of Protecting Female Athletics and Title IX*, NWLC (Dec. 5, 2023), https://oversight.house.gov/wp-content/uploads/2023/12/2023.12.05_Written-Testimony-FGG.pdf; Testimony of Elizabeth Tang, *South Dakota Senate State Affairs Committee*, NWLC (Jan. 13, 2022), https://nwlc.org/wp-content/uploads/2022/02/SD-SB-46-testimony-1.13.22-1.pdf.

education.[11] These efforts include advocacy for, and publishing and distributing education materials regarding, the inclusion of transgender women in women's sports.[12]

11.    NWLC also advocates to the U.S. Department of Education regarding the proper interpretation and application of Title IX in regulations. NWLC helped to lead advocacy, imploring President Biden "to swiftly release a Title IX athletics rule that would ensure *all* students, including transgender, non-binary, and intersex students, can participate fully and equally in school sports."[13] In 2023, NWLC submitted comments in response to the U.S. Department of Education's proposed Title IX rule addressing the rights of students who are trans, non-binary, and intersex to play school sports free from discrimination ("Title IX Athletics Rule")—both on

---

[11] *See, e.g.*, NWLC & PRRAC, *finishing last: girls of color and school sports opportunities*, NWLC https://nwlc.org/wp-content/uploads/2022/03/final_nwlc_girlsfinishinglast_report.pdf.

[12] *See, e.g.*, Blog Post: *Once and For All: This is Why We Support Trans Women and Girls in Sports,* NWLC (Dec. 6, 2023), https://nwlc.org/once-and-for-all-this-is-why-we-support-trans-women-and-girls-in-sports/; Shiwali Patel, Blog Post: *Gender Justice in Sports Cannot Succeed without Trans Women and Girls*, NWLC (Mar. 31, 2023), https://nwlc.org/gender-justice-in-sports-cannot-succeed-without-trans-women-and-girls/. For earlier examples of such advocacy by NWLC, *see, e.g.*, *Fulfilling Title IX's Promise: Let Transgender and Intersex Students Play* (June 2022), NWLC https://nwlc.org/wp-content/uploads/2019/09/NWLC_Trans50th_FactSheet.pdf; *Facts on Trans Inclusion in Athletics,* NWLC (Sept. 2019), https://nwlc.org/wp-content/uploads/2019/09/Trans-Athlete-Facts.pdf.

[13] Letter from Women's Sports Foundation & NWLC to President Joseph Biden, Jr. Regarding Athletics NPRM (Aug. 10, 2022), https://nwlc.org/resource/wsf-nwlc-letter-to-president-biden-regarding-athletics-nprm/.

behalf of NWLC as an organization,[14] and on behalf of 41 Women and Girls' Rights & Gender Justice Organizations.[15] To equip students and other members of the public with tools to advocate for their own rights, NWLC created a Fact Sheet in partnership with other LGBTQI+ advocacy organizations on the proposed Title IX Athletics Rule[16] and encouraged students, parents, and others to submit their own comments.[17] NWLC also helped lead over 80 organizations to urge the finalization of the Title IX Athletics Rule protecting transgender, nonbinary, and intersex student athletes.[18]

---

[14] Emily J. Martin, et al., *Nondiscrimination on the Basis of Sex in Athletics Education or Activities Receiving Federal Financial Assistance, 88 Fed. Reg. 22860, Docket ID ED-2022-OCR-0143*, NWLC (May 15, 2023), https://nwlc.org/wp-content/uploads/2023/05/NWLC-Comment-on-88-Fed.-Reg.-22860-Title-IX-Athletics-Rule-5.15.2023.pdf.

[15] NWLC, *Comment from 41 Women's and Girls' Rights & Gender Justice Organizations: Nondiscrimination on the Basis of Sex in Athletics Education Programs or Activities Receiving Federal Financial Assistance, ED-2022-OCR-0143*, NWLC (May 15, 2023), https://nwlc.org/wp-content/uploads/2023/05/NWLC-Organizational-Sign-On-Comment-5.15.23.pdf; *see also* Emily J. Martin, et al., *Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, NWLC (Sept. 12, 2022), https://nwlc.org/wp-content/uploads/2022/09/NWLC-long-comment-9.12.22-vF.pdf.

[16] *The Department of Education's Proposed Title IX Athletics Rule*, NWLC (Apr. 13, 2023), https://nwlc.org/resource/the-department-of-educations-proposed-title-ix-athletics-rule/#.

[17] Auden Perino & Hunter Iannucci, *Just Let Kids Play!*, NWLC (May 10, 2023), https://nwlc.org/just-let-kids-play/.

[18] *See, e.g.*, Press Release: *Advocacy Groups Demand Immediate Release of Title IX Rule*, NWLC (March 15, 2024), https://nwlc.org/press-release/advocacy-groups-

12.    NWLC also engages and advocates before regulators of athletics, like the National Collegiate Athletic Association (the "NCAA"), to implement and maintain policies that promote values of inclusion and diversity in sports, and has done so for decades.

13.    Most recently, NWLC sent the NCAA Board of Governors a letter urging it to reject regressive policies that would bar all women athletes who are transgender from participating in sports. Letter from NWLC to the NCAA (Apr. 24, 2024) (attached hereto as Exhibit A). And NWLC joined with others to "call on the NCAA's Board of Governors to protect the freedom of transgender NCAA athletes to participate in the sports they love," emphasizing that "[e]very single student should have access to the lifesaving power of sports."[19] Following its Board of Governor's meeting, the NCAA stated that "[t]he Board of Governors discussed transgender student-athlete participation. The current policy remains under review."[20] NWLC released a public statement to caution the NCAA that bans on transgender women participating in sports "perpetuate harmful stereotypes about

---

demand-immediate-release-of-title-ix-rule/; Letter to President Joseph R. Biden, Jr. (Mar. 15, 2024), https://nwlc.org/wp-content/uploads/2024/03/2024.03.15-Title-IX-Letter.pdf.

[19] Letter from NWLC to NCAA Board of Governors 1 (Apr. 23, 2024), https://www.athleteally.org/wp-content/uploads/2024/04/Open-Letter-to-NCAA-Orgs.pdf.

[20] *Board of Governors revises penalties for campus sexual violence attestation*, NCAA (Apr. 25, 2024), https://www.ncaa.org/news/2024/4/25/media-center-board-of-governors-revises-penalties-for-campus-sexual-violence-attestation.aspx.

gender and athleticism and require the policing and scrutiny of women's bodies. These policies hurt all women."[21]

14. NWLC's most recent efforts advocating before the NCAA's Board of Governors builds on its similar work in recent years during which the NCAA has faced increased pressure from anti-transgender activists to change its longstanding policy of including transgender women in women's sports, in effect since 2010.[22] In 2022, NWLC wrote an open letter to the NCAA criticizing it for its new restrictions on transgender athletes' participation made in response to that pressure.[23] Also in 2022, NWLC joined the Women's Sports Foundation and 25 organizations to voice concerns that the change was "unprecedented in both process and timeline" and

---

[21] Press Release: *National Women's Law Center on NCAA's Continued Review of Policy on Transgender Women Athletes: Make the Right Choice*, NCAA (Apr. 26, 2024), https://nwlc.org/press-release/national-womens-law-center-on-ncaas-continued-review-of-policy-on-transgender-women-athletes-make-the-right-choice/.

[22] Julie Kliegman and Jesse Dougherty, *Pressure mounts on NCAA to clarify stance on transgender athletes*, WASH. POST. (Apr. 23, 2024), http://www.washingtonpost.com/sports/2024/04/23/ncaa-transgender-rule-changes; Karleigh Webb, *NCAA caught between a lawsuit and a hard place on trans-athlete inclusion*, OUTSPORTS (Apr. 25, 2024), https://www.outsports.com/2024/4/25/24092572/ncaa-board-meeting-trans-athletes-riley-gaines-charlie-baker/.

[23] Blog Post: *Dear NCAA, It's Not Too Late to Let Trans & Intersex Students Play!*, NWLC (Jan. 27, 2022), https://nwlc.org/dear-ncaa-its-not-too-late-to-let-trans-intersex-students-play/.

"counter to the NCAA principles of fairness and inclusion."[24] In 2020, NWLC advocated for the NCAA to relocate all NCAA events from Iowa because the state's passage of a law that bans transgender girls from competing on college teams made the state out of compliance with the NCAA's anti-discrimination policy, which states the NCAA "must and shall operate [their] championships and events in alignment with [their] values as [they] strive to promote an inclusive atmosphere in which student-athletes participate[.]"[25] NWLC also advocates with other athletic associations on their policies concerning the participation of athletes who are transgender in sports.[26]

15.    Leading women's rights organizations, including NWLC and organizations that advocate for the rights of women and girls in sports, understand gender equity in school requires equal access to participation in athletics for all

[24] *25 Organizations Join WSF Letter to NCAA Regarding Transgender Athlete Participation Policy*, WOMEN'S SPORTS FOUND. (Mar. 22, 2022), https://www.womenssportsfoundation.org/advocacy/25-organizations-join-wsf-letter-to-ncaa-regarding-transgender-athlete-participation-policy/.
[25] *Letter Urges NCAA to Remove Events from Idaho*, NAT'L CTR. FOR TRANSGENDER EQUAL. (June 10, 2020), https://transequality.org/press/releases/letter-urges-ncaa-to-remove-events-from-idaho.
[26] Press Release, *NWLC Condemns NAIA's Ban on Transgender Women's Participation in Women's College Sports*, NWLC (Apr. 8, 2024), https://nwlc.org/press-release/nwlc-condemns-naias-ban-on-transgender-womens-participation-in-womens-college-sports/.

women and girls, including those who are transgender.[27]

16.    Policies that exclude women and girls who are transgender from school sports programs for women and girls undermine Title IX's intent to make athletic participation, with all its educational benefits, available to all students free from sex discrimination.

17.    Athletics provide students with academic and social benefits— sometimes even lifesaving ones—including a sense of community and belonging among peers, improved academic outcomes, and leadership building.

18.    Bans on women and girls who are transgender participating in sports single out these students as acceptable targets for violence and harassment, and remove a much-needed bulwark of safety and well-being that can insulate students from the risks of discrimination and harassment that they disproportionately face in school.[28]

---

[27] *See, e.g.*, Letter to Congress from Women's & Girls' Rights Organizations Opposing H.R. 734 (Apr. 14, 2023), https://nwlc.org/wp-content/uploads/2023/03/Sign-on-Statement-Opposing-H.R.-734-4.14.23.pdf; Open Letter Supporting Trans Women & Girls (Mar. 31, 2021), https://nwlc.org/press-release/open-letter-supporting-trans-women-girls/; *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (Apr. 9, 2019), https://nwlc.org/wp-content/uploads/2019/04/Womens-Groups-Sign-on-Letter-Trans-Sports-4.9.19.pdf.

[28] CDC data show transgender students are many times more likely than cisgender students to experience violence and harassment; a safe and supportive school environment, including access to sports opportunities, can promote academic

19.     Attempts to prohibit transgender women from competing in all NCAA events; ban transgender women from locker room, shower, and restroom facilities; and invalidate the athletic records of transgender women threaten harm to all women and are counter to women's rights, gender justice, and Title IX.

20.     Before Title IX, women and girls were explicitly, and as a matter of course, denied opportunities to play sports, denied equal training and support, and otherwise denied the opportunities to develop athleticism that were provided to men and boys, all based on the assumption men and boys were categorically athletically superior and naturally inclined towards physical activity and competition in a way that women and girls were not. Opponents of gender equity in sports based their beliefs on biological determinism—a mistaken (and sexist) belief that certain traits are innate and natural to men and women based on their sex assigned at birth and are fundamentally immutable.

21.     The same tropes that were used to justify denying women and girls equal opportunity to play sports 50 years ago, are now being used to push women

---

success and mitigate negative outcomes associated with discrimination and violence. Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students, 2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 67, 70 (2019); *Adolescent Health: What Works in Schools*, U.S. DEP'T OF HEALTH & HUM. SERVS., CTRS. FOR DISEASE CONTROL & PREVENTION (2020), https://www.cdc.gov/healthyyouth/whatworks/pdf/what-works-safe-supportiveenvironments.pdf.

and girls who are transgender out of school sports, allegedly in the name of "protecting women's sports." The arguments against inclusion of transgender athletes perpetuate the very same discriminatory and outdated stereotypes against which women and girls have fought so hard, both before and after Title IX's passage. These arguments rest on the false premise that anyone assigned female at birth is innately and eternally athletically inferior to anyone assigned male at birth; they send a powerful and harmful message to *all* women and girls of "innate biological female inferiority" and seek to codify sexist stereotypes of how women and girl athletes should look and play.[29]

22.     Recent data from the CDC show state policies that prevent transgender high school students from playing are correlated with *lower* participation by *all* high school girls between 2011 and 2019; meanwhile, more girls overall are playing school sports in states with policies allowing transgender students to play.[30]

23.     Excluding women and girls who are transgender from participation in sports also dangerously invites policing of who is or is not a woman—including through invasive and humiliating "sex verification" practices—and erects barriers

---

[29] Deborah L. Brake, *Title IX's Trans Panic*, 29 WM. & MARY J. OF RACE, GENDER, & SOC. JUST. 41, 72–73 (2023) (Professor Brake, whose scholarly work has been cited in Supreme Court opinions, was previously senior counsel at NWLC).

[30] *Fair Play: The Importance of Sports Participation for Transgender Youth*, CTR. FOR AM. PROGRESS, 14–17 (2021), https://www.americanprogress.org/article/fair-play/.

for all women and girls who play sports.[31] Under these laws, all women and girls who are students could be subjected to intrusive demands for medical tests or information. Especially tall women, very muscular women, women who present in more stereotypically masculine ways, and women whose athletic performance is especially excellent could be forced to undergo medical testing or be prevented from playing sports, in addition to being subjected to suspicion and harassment based on their physical appearance and athletic performance. This "sex testing" ranges from collecting sensitive medical documents to needless and traumatizing genital examinations, and it creates new risks of sex harassment against student athletes. Black and brown women and girls (who face increased body policing and gender scrutiny based on racialized stereotypes of femininity) and intersex women and girls would be especially vulnerable to this sort of scrutiny.

24.    NWLC has also advocated for inclusive restroom and locker room policies.

25.    NWLC joined with other sexual assault and domestic violence organizations, to oppose antitransgender initiatives that utilize and perpetuate the myth that protecting transgender people's access to restrooms and locker rooms

---

[31] *See, e.g.*, Marjorie Cortez, *After a girl beat their daughters in sports, Utah parents triggered investigation into whether she was transgender*, DESERET NEWS (Aug. 17, 2022, 8:20 PM MDT), https://www.deseret.com/utah/2022/8/17/23310668/school-investigates-female-athlete-transgender-complaint.

endangers the safety or privacy of others. These organizations together stated that

based on their collective experience, the threat of sexual assault is real and pervasive,

and that efforts to ban transgender people from using public restrooms put

transgender people in harm's way but do not give anyone more security or make

anyone safer.[32]

26.       In NWLC's recent comments on Title IX regulations, it highlighted that

transgender students are singled out and shamed when attempting to access school

restrooms at alarming rates, making these spaces sites of intense pain and harm for

the students subject to sex discrimination.[33]

27.       Efforts to ban women who are transgender from playing sports or using

---

[32] *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community*, NAT'L TASK FORCE (Apr. 13, 2018), https://www.4vawa.org/ntf-action-alerts-and-news/2018/4/12/national-consensus-statement-of-anti-sexual-assault-and-domestic-violence-organizations-in-support-of-full-and-equal-access-for-the-transgender-community.

[33] Emily J. Martin, et al., *Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, NWLC 48 (Sept. 12, 2022) https://nwlc.org/wp-content/uploads/2022/09/NWLC-long-comment-9.12.22-vF.pdf; *id.* at n.223 (discussing study examining the connection between discrimination and poor mental health outcomes in transgender and nonbinary youth from ages 13-24, 58% of transgender and nonbinary respondents reported being barred or discouraged from bathrooms aligning with their gender identity, and of those 58%, 85% reported depressive mood, and 60% seriously considered suicide. *See* Myeshia Price-Feeney et al., *Impact of Bathroom Discrimination on Mental Health Among Transgender and Nonbinary Youth*, 68 J. OF ADOLESCENT HEALTH 1142 (2021)).

restrooms and locker rooms are contrary to NWLC's core mission: advancement and protection of the legal rights of women and girls, and the right of all persons to be free from sex discrimination. Policies and rules that affect the ability of transgender women and girls to fully participate in school sports and access restrooms and locker rooms, will directly impact NWLC, its mission, and the communities it serves.

28.    As an organization that has been dedicated to women's rights and gender justice for over 50 years, and has been deeply committed to full implementation of Title IX from its inception, NWLC is uniquely positioned to represent the perspectives of women and girls (and, indeed, all individuals) who support the inclusion of women and girls who are transgender in women's and girls' sports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on this 6th day of May, 2024.

Emily Martin

17

# EXHIBIT A



1350 I STREET NW
SUITE 700
WASHINGTON, DC 20005
202-588-5180
NWLC.ORG

April 24, 2024

National College Athletic Association
700 W. Washington Street
P.O. Box 6222
Indianapolis, IN 46206

To the National College Athletic Association Board of Governors:

The National Women's Law Center ("NWLC") urges you to maintain the current eligibility standard for LGBTQI+ student athletes, and to continue working towards your values of inclusion and diversity in sport. The NCAA must not abandon existing policies based on heckling and legal threats from a vocal minority of anti-trans extremists. If you choose to enact a categorical membership ban targeting transgender and/or intersex[1] women, know that this reprehensible decision would expose the NCAA to legal liability for impermissible sex discrimination.

NWLC is a leading national organization in the fight to end sex discrimination, and to expand opportunities for women and girls in every aspect of life, including education and athletics. We work across issues central to the lives of women and girls, with a particular focus on women and girls of color, LGBTQI+ people, and low-income women and families. Since our founding in 1972—the same year Title IX was enacted—NWLC has participated in every major Title IX case before the US Supreme Court[2] (whether as counsel or as *amicus*), and in numerous court cases to clarify and fully enforce Title IX's broad promise of education opportunity, free from sex discrimination and enforcement of sex stereotypes. NWLC assists policymakers in enforcing Title IX's protections against sex discrimination, equips students with tools to advocate for their own rights in school sports and other aspects of education, and we litigate on behalf of students who have been harmed by sex discrimination.

NWLC is proud to represent the strong consensus of the gender justice movement in saying: trans women are women.[3] To that end, NWLC will seek to intervene as a defendant in the

---

[1] "Intersex" refers to people who have natural variations in sex-linked characteristics that are not perceived as fitting binary definitions of "male" or "female." People who are not intersex are sometimes referred to as "endosex."

[2] *E.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (concluding reprisal for complaining about sex discrimination constitutes intentional sex discrimination contemplated by Title IX); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) (establishing school boards are liable for student-on-student harassment when they are deliberately indifferent to the harassment and create a hostile educational environment).

[3] *See, e.g.*, Letter to Congress from Womens' & Girls' Rights Organizations Opposing H.R. 734 (Apr. 14, 2023), https://nwlc.org/wp-content/uploads/2023/03/Sign-on-Statement-Opposing-H.R.-734-4.14.23.pdf; Open Letter Supporting Trans Women & Girls (Mar. 31, 2021), https://nwlc.org/press-release/open-letter-supporting-trans-women-girls/; Statement of Women's Rights and Gender Justice Organizations in Support

recently filed lawsuit against the NCAA's current eligibility standards (*Gaines et al. v. NCAA et al.*), to *all* women and girls are protected, including trans and intersex women and girls and nonbinary athletes. Gender equity in school sports, including intercollegiate competition, requires equal access to participation for trans women, cisgender women,[4] and intersex women. Anti-trans athletics policies perpetuate harmful stereotypes about gender, biology, and athleticism and require the policing and scrutiny of women's bodies. In this way, anti-trans policies harm *all* women.

## I.    Introduction

Over 50 years' experience advocating for a strong Title IX has led NWLC to firmly support the inclusion of trans, nonbinary, and intersex students in all aspects of school, including sports, as a matter of both civil rights law and of human rights. As many years of federal court decisions underscore, discriminating against students based on trans status or intersex traits *is* sex discrimination, as the U.S. Department of Education's new Title IX rules recognize and affirm.[5] Trans, nonbinary, and intersex students must be able to play school sports as their full selves, and not be bullied and excluded from the same opportunities their peers enjoy.

In addition to the harms that flow from targeting and excluding trans, nonbinary, and intersex students, these policies, cynically advanced using the language of gender equity, utterly fail to address the real barriers to equal athletic opportunity for women and girls, and substitute harmful scapegoating for actual needed reform. Sexism undeniably continues to pervade the world of university sports. Women college athletes continue to receive fewer opportunities—60,000 less—when compared to men.[6] Moreover, NCAA Division I schools spend $2 on men student athletes for every $1 they spend on women student athletes.[7] Excluding trans women from eligibility for Division I-FBS recruiting and athletic scholarships would do nothing to remedy the fact 74% of DI-FBS recruiting dollars are spent on men, and 56% of Division I-FBS athletic scholarship dollars are offered to men student athletes—leaving all women NCAA athletes only 44% of

---

of Full and Equal Access to Participation in Athletics for Transgender People (Apr. 9, 2019), https://nwlc.org/wp-content/uploads/2019/04/Womens-Groups-Sign-on-Letter-Trans-Sports-4.9.19.pdf.

[4] "Cisgender" refers to people whose gender fully aligns with their assigned sex. The term is sometimes abbreviated as "cis."

[5] 34 C.F.R. § 106.10. The Department of Education has proposed regulations on participation by trans, nonbinary, and intersex students in school sports, and has begun the process of clarifying that categorical bans targeting trans women and girls in school sports are unlawful under Title IX. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (proposed Apr. 13, 2023), https://www.govinfo.gov/content/pkg/FR-2023-04-13/pdf/2023-07601.pdf. Were NCAA to implement a categorical ban on participation by trans women and girls in sports, this would subject NCAA and its member institutions to administrative enforcement by the Department of Education when it finalizes these proposed regulations.

[6] Women's Sports Foundation, *50 Years of Title IX* (May 2022), https://www.womenssportsfoundation.org/wp-content/uploads/2022/04/FINAL6_WSF-Title-IX-Infographic-2022.pdf.

[7] This is while large Division I men's teams report deficits rather than net revenue for their schools. *See* National Women's Law Center, *Quick Facts About Title IX and Athletics* (June 21, 2022) https://nwlc.org/resource/quick-facts-about-title-ix-and-athletics.

scholarship dollars.[8] Women of color experience particular barriers, receiving fewer opportunities to play sports in college than men and white women, and are significantly underrepresented in NCAA divisions I, II, and III.[9] Artificially pitting the interests of cis women against trans women distracts from these issues and ultimately strengthens these unequal systems by perpetuating sexism, to the detriment of *all* women.

NWLC strongly encourages the NCAA to remain on the right side of both history and the law by *retaining* the current eligibility policies for student athletes, and by resisting pressure to enact the agenda of far-right, anti-trans extremists. Relying on disinformation and incorrect assertions about the law, these extremists are demanding policies that would violate Title IX and further entrench discrimination against a vulnerable group of women and girls. The NCAA must not acquiesce to these extremists' pressure and preemptively abandon its policy. Moreover, to the extent the NCAA believes that this acquiescence will insulate it from future litigation and enforcement efforts, it is mistaken.

## II. The gender justice community supports trans inclusion because anti-trans policies hurt all women and girls.

Title IX was enacted to ensure *all* students can access the full scope of educational benefits and opportunities free from sex discrimination, including the opportunity to play sports. This unquestionably includes the rights of trans, nonbinary, and intersex students to play sports as their full selves, consistent with their affirmed gender.

Although anti-trans extremists—including the plaintiffs in the recent lawsuit against the NCAA—purport to speak for all women and girls in advocating for transphobic policies, they do not speak for the women's rights community and advocates, including groups like the Women's Sports Foundation, Legal Momentum, American Association of University Women, YWCA, National Organization for Women, and Equal Rights Advocates, which have voiced strong support for trans inclusion in athletics.[10] Our groups collectively have a long history of championing women's rights in all spaces, including in schools and in sports. We know the law requires that women and girls who are trans be given the same dignity, protection, and opportunities as women and girls who are cis. We also recognize how harmful anti-trans policies are to *all* women and girls.

Indeed, anti-trans sports policies undermine Title IX's purpose to secure opportunities for all women and girls by mandating harmful scrutiny and the policing of women's bodies. Although anti-trans policies aim to harm trans and nonbinary people, they present a serious threat to all women and girls who do not conform to narrow sex and race stereotypes, because these policies rely on inappropriate policing of bodies, appearances, and gender expressions. This harms both trans and cis women and girls. Athletics bans are especially likely to harm Black and brown women (who face increased body policing and gender scrutiny based on racialized stereotypes of femininity) and intersex women and girls (who are born with natural variations in sex-linked

---

[8] *Id.*

[9] Women's Sports Foundation, *supra* note 6, at 12.

[10] *See, e.g.*, Letter to Congress from Womens' & Girls' Rights Organizations Opposing H.R. 734, *supra* note 3; Open Letter Supporting Trans Women & Girls, *supra* note 3; Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People, *supra* note 3.

characteristics). These harms include being subjected to dangerous and unscientific "sex testing" schemes, which can range from collecting private, sensitive medical documents to needless and traumatizing genital examinations that expose student athletes to new risks of sex harassment and sexual assault.[11]

Anti-trans bans mean any woman who is perceived as "suspiciously" strong, fast, agile, or talented in her sport (meaning she falls outside regressive stereotypes of white femininity) risks challenge, official scrutiny, and accusations of not being a "real woman." Recently, cis teenage girls in Utah have been subjected to "investigation" of their gender based on their success in school sports.[12]  Black women in particular have long faced disgraceful, racist abuse that overlaps with scrutiny of their femininity and gender expression. In the 1930s, for example, Tidye Pickett and Louise Stokes became the first Black women on the US Olympic team after facing racist accusations they had unfair advantage over "normal women."[13] These biases persist today. For example, Caster Semenya and Serena Williams have faced repeated accusations of being "a man" or "a hermaphrodite" because they are fast, strong, and talented in their respective sports.[14]

Access to school sports opportunities is a key benefit of education. As the NCAA well knows, student athletes are more likely to complete secondary degrees, to plan for their futures, and to achieve academically in metrics from class attendance to higher grades and test scores.[15] Students who participate in school sports develop skills such as leadership and self-discipline that provide benefits throughout all other aspects of their lives.[16] Excluding trans girls and women from

---

[11] *See, e.g., Ohio lawmakers advance trans sports ban with genital check*, REUTERS (June 2022), https://www.reuters.com/world/us/ohio-lawmakers-advance-trans-sports-ban-with-genital-check-2022-06-03/.

[12] Zoe Cristen Jones, *Utah investigates winning student athlete's gender after parents of second- and third-place finishers submit complaints*, CBS NEWS (Aug. 18, 2022), https://www.cbsnews.com/news/transgender-investigation-student-athlete-utahhigh-school/.

[13] Milton Kent et al., *Beating Opponents, Battling Belittlement: How African American Female Athletes Use Community to Navigate Negative Images*, SCH. OF GLOB. JOURNALISM & COMMC'NS, MORGAN STATE UNIV., 9, https://www.documentcloud.org/documents/4528427-The-Image-of-BlackWomen-in-Sports2.html#document/ (last visited Oct. 9, 2023).

[14] Anna North, *'I am a woman and I am fast': What Caster Semenya's Story Says About Gender and Race in Sports*, VOX (May 3, 2019), https://www.vox.com/identities/2019/5/3/18526723/caster-semenya-800-genderrace-intersex-athletes; Jason Pham, *Serena Williams Shut Down Body Critics: 'I Am Strong and Muscular —and Beautiful'*, BUSINESS INSIDER (May 31, 2018), https://www.businessinsider.com/serenawilliams-shut-down-body-critics-who-said-she-was-born-a-guy-2018-5.

[15] Nat'l Coalition for Women and Girls in Education, *Title IX at 45: Advancing Opportunity through Equity in Education* 41–42 (2017), https://www.ncwge.org/TitleIX45/Title%20IX%20at%2045-Advancing%20Opportunity%20through%20Equity%20in%20Education.pdf; Stacy M. Warner et al., *Examining Sense of Community in Sport: Developing the Multidimensional 'SCS' Scale*, 27 J. OF SPORT MANAGEMENT 349, 349-50 (2013); R. Bailey, *Physical education and sport in schools: A Review of benefits and outcomes*, 76 J. OF SCHOOL HEALTH 397-401 (2006).

[16] *See, e.g.*, Jennifer Y. Mak & Chong Kim, *Relationship Among Gender, Athletic Involvement, Student Organization Involvement and Leadership*, 25 HUM. KINETICS J. 89 (2016); Robert P. Dobosz & Lee A. Beaty, *The Relationship Between Athletic Participation and High School Students' Leadership Ability*, 34 ADOLESCENCE 215 (1999); M. R. Eime et al., *A systematic review of the psychological and social benefits of participation in sport for children and adolescents: Informing development of a conceptual model of health through sport*, 10 INT'L J. OF BEHAVIORAL NUTRITION & PHYSICAL ACTIVITY 98 (2013).

school sports creates deep harm by excluding them from these benefits. Moreover, categorical anti-trans bans identify trans and nonbinary students as acceptable targets for violence and harassment, and remove a much-needed bulwark of safety and well-being that can insulate students from the risks of discrimination and harassment that they disproportionately face in school.[17]

### III. Should the NCAA categorically ban trans women and girls from playing sports, it will run afoul of federal law and expose its member institutions to legal liability.

Title IX prohibits sex discrimination against transgender women and girls, including in the form of anti-trans sports participation categorical bans. Moreover, public institutions of higher education are bound by the Equal Protection Clause, which also prohibits anti-trans categorical bans. The plaintiffs in *Gaines v. NCAA* misrepresent the law by erroneously arguing that permitting trans women and girls to play on teams consistent with their affirmed gender violates Title IX. But federal law is on the side of trans inclusion, with multiple federal courts holding anti-trans policies violate trans students' rights to be free from sex discrimination under Title IX and the Equal Protection Clause. Should the NCAA categorically ban trans women and girls from participating in sports consistent with their gender, both the NCAA and its member institutions will be exposed to liability for violating the law.

### A. Anti-trans sports categorical bans violate Title IX.

Title IX was enacted 50 years ago to provide broad protection against "be[ing] excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any education program or activity" on the basis of sex.[18] As many federal courts have held,[19] Title IX's broad purpose requires that all students—including trans, nonbinary, and intersex students—have an equal opportunity to play school sports, regardless of their sex.

Multiple federal courts have held Title IX prohibits discrimination based on transgender status, and, in the context of sex-separated sports, have held that categorical bans on trans women and girls playing sports consistent with their affirmed gender violates Title IX.[20] Indeed, the

---

[17] CDC data shows that transgender students are many times more likely than cisgender students to experience violence and harassment; a safe and supportive school environment, including access to sports opportunities, can promote academic success and mitigate negative outcomes associated with discrimination and violence. Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students, 2017*, 68 MORBIDITY AND MORTALITY WEEKLY REPORT 67, 70 (2019); U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, *Adolescent Health: What Works in Schools* (2020), https://www.cdc.gov/healthyyouth/whatworks/pdf/what-works-safe-supportiveenvironments.pdf.
[18] 20 U.S.C. §§ 1681 et seq.
[19] *B.P.J. v. West Virginia*, No. 23-1078, 2024 WL 1627008, *4–5 (4th Cir. Apr. 16, 2024); *Doe v. Horne*, 2023 WL 4661831, 32 (D. Az. July 2023); *A.M. v. Indianapolis Pub. Sch.*, 617 F.Supp.3d 950, 966 (S.D. Ind. July 26, 2022).
[20] The Supreme Court in *Bostock v. Clayton County* affirmed that under Title VII, discrimination on the basis of transgender status is discrimination on the basis of sex. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Since then, several federal courts have applied the Supreme Court's reasoning to find that under Title IX, discrimination on the basis of transgender status is unlawful sex discrimination, including when it occurs in

U.S. Court of Appeals for the Fourth Circuit and federal district courts in Arizona and Idaho have blocked enforcement of state anti-trans sports categorical bans, with each holding that by singling out transgender students alone for exclusion *because* they are trans, anti-trans sports bans constitute impermissible sex discrimination under Title IX.[21] The U.S. Court of Appeals for the Eleventh Circuit's holding in *Adams v. School Board of St. John's County* that Title IX does not require that trans students be able to access sex-separated spaces consistent with their affirmed gender is the minority of decisions interpreting Title IX.  The majority of federal courts addressing the question, including federal appellate courts, have held that preventing trans students from accessing sex-separated spaces or opportunities that match their gender is impermissible sex discrimination under Title IX.[22]

These holdings are consistent with longstanding Title IX regulations and with the purpose of Title IX. In 1975, the Department of Health, Education, and Welfare[23] ("HEW") issued regulations implementing Title IX which *permit*, but do not require, sex-separated sports teams where "selection for such teams is based upon competitive skill or the activity involved is a contact sport."[24] The purpose of enabling separate gender teams was not to enforce separation based on purportedly innate differences between men and women, but to ensure the equitable participation of women and girls in school sports given the history they faced of being systematically excluded and denied athletic opportunities as compared to men and boys.[25]

By asserting that Title IX permitting sex-separated teams requires excluding trans women and girls from sports because of a so-called gap in athletic performance created by "[b]iological differences between men and women,"[26] the *Gaines* plaintiffs and other anti-trans advocates not only mischaracterize Title IX's purpose, but reproduces the stereotypes historically used to deny women and girls opportunities to play—the very stereotypes that Title IX seeks to dispel. Before Title IX, women and girls were consistently denied the same opportunities to play sports or develop athleticism that were provided to men and boys, based on the assumption men and boys were athletically superior and naturally inclined towards physical activity in a way women and girls were

---

the context of sex-separated programs like access to bathrooms and sports. *B.P.J. v. West Virginia*, No. 23-1078, 2024 WL 1627008 (4th Cir. Apr. 16, 2024); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, (2020), *as amended* (Aug. 28, 2020); *Doe v. Horne*, 2023 WL 4661831 (D. Az. July 2023); *A.M. v. Indianapolis Pub. Sch.*, 617 F.Supp.3d 950 (S.D. Ind. July 26, 2022). Even before the Supreme Court held that transgender people are protected from sex discrimination, several federal courts held that policies that prohibit trans students from accessing spaces like bathrooms consistent with their affirmed gender violates Title IX. *See, e.g., Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 564 (M.D. Pa. 2019). *See also Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018).
[21] *See B.P.J.* at 4–5; *Horne* at 32; *A.M.*, 617 F.Supp.3d at 966.
[22] *B.P.J.*, No. 23-1078; *Grimm*, 972 F.3d 586; *Whitaker*, 858 F.3d 1034.
[23] In 1979, HEW was abolished and was split into the U.S. Department of Education and U.S. Department of Health and Human Services.
[24] 34 C.F.R. § 106.41(b).
[25] Deborah L. Brake, *Title IX's Trans Panic*, 29 Wm. & Mary J. Race, Gender & Soc. Just. 41, 64 (2023) (citing Erin Buzuvis, *Title IX: Separate but Equal for Girls and Women in Athletics*, Oxford Handbook of Feminism & L. in the U.S. 23) ("Similar to the case for women-only discussion groups, the concern was that male players might hog the playing field, refusing to fully engage with women as teammates or opponents, creating negative sport experiences that would further suppress girls' and women's interests and abilities.").
[26] Complaint at 141, *Gaines v. National Collegiate Athletic Ass'n et al.*, No. 1:24-cv-01109 (N.D. Ga 2024), ECF No. 24.

6

not.[27] By claiming that being assigned male at birth is innately linked to athletic success while suggesting individuals assigned female at birth will always be inferior to individuals assigned male at birth in their athletic performance, anti-trans advocates rely on the very same misogyny and stereotyping women and girls fought so hard against before and during Title IX's passage. This does not just promote anti-trans discrimination, but discrimination against all women and girls who challenge sex stereotypes because of how they look or play.[28]

**B. Categorical bans targeting trans women athletes fail constitutional review under the Equal Protection Clause.**

As the Supreme Court recently explained, "it is impossible to discriminate against a person for [being] transgender without discriminating against an individual based on sex."[29] The two are inextricably linked. For this reason, federal courts judging constitutional claims against policies that discriminate against transgender students have consistently applied a standard known as heightened scrutiny. This means that a policy discriminating based on a person's transgender status must contain a very strong justification. Courts agree that a desire to harm or exclude a politically unpopular minority is *not* a legally valid interest.

Federal courts scrutinizing policies that target trans women and girls for exclusion from education opportunities by banning them from accessing sex-separated spaces and programming that match their affirmed gender, including school sports, have consistently found it is unconstitutional to subject students to worse treatment because they are trans. This includes the Ninth Circuit, which prevented an Idaho sports categorical ban targeting trans women and girls from being implemented, reasoning that targeting trans women and girls because they are trans and excluding them from the benefits of playing sports violated the Equal Protection Clause. The Ninth Circuit rejected the Idaho's legislature claim that it needed to protect women's sports from supposed "dominance" by trans women and girls,[30] determining the proffered explanation was not

---

[27] Brake, *supra* note 25, at 86 (citing Susan Cahn, *Coming on Strong: Gender and Sexuality in Twentieth Century Women's Sport* 4 (1994)) ("Women were long protected out of sports due to beliefs about the frailty of 'the fairer sex' and a purported threat to women's fertility...[and] the belief that women are naturally inferior to men in sports competition.").

[28] The *Gaines* complaint also wrongly asserts that they were robbed of their right to championship under Title IX, arguing that they experienced "losses of placement" and awards when competing against trans athletes. Complaint, *supra* note 26, at 125, 145. However, no such right under Title IX exists. Neither the statute nor the regulations implementing Title IX suggest there is a right to championship, because Title IX's purpose is not about competition or winning, but providing all students access to equal athletic opportunities free from sex discrimination.

[29] *Bostock v. Clayton Cty.*, 150 S.Ct. 1731, 1747 (2020).

[30] Since 2008, 17 states and Washington D.C. have implemented inclusive school sports policies that protect the rights of trans students. In the 16 years these policies have been in place, including trans girls and women has *not* led to any competitive dominance or reduction in opportunities for cis girls and women. Fearmongering about the supposed athletic advantages of trans girls is based on false stereotypes about the connections between physical characteristics and athleticism. *See* American Civil Liberties Union, *Four Myths About Trans Athletes, Debunked* (Apr. 20, 2020), https://www.aclu.org/news/lgbtq-rights/four-myths-about-transathletes-debunked; Shoshana K. Goldberg, *Fair Play: The Importance of Sports Participation for Transgender Youth*, Ctr. for Am. Progress 14–15 (2021), https://www.americanprogress.org/wp-content/uploads/sites/2/2021/02/Fair-Playcorrection2.pdf; National Women's Law Center, *Fulfilling Title IX's Promise: Let Transgender and Intersex Athletes Play* 2 (2022), https://nwlc.org/resource/fulfilling-title-ixs-promise-let-transgender-and-intersexstudents-play/.

a legitimate interest to support such a policy.[31] Instead, the appeals court concluded Idaho's explanation was pretext for discrimination and encouraged invasive, abusive sex verification practices—which would hurt all women and girls.[32]

Additionally, the Fourth Circuit recently held that a West Virginia anti-trans sports categorical ban, which was enacted to target the *only* openly trans middle school girl in the state seeking to play school sports, triggers heightened review because it impermissibly singles out trans women and girls. This is consistent with previous precedent from the Fourth Circuit[33] finding that anti-trans school policies run afoul of the Equal Protection Clause, because they target trans students for mistreatment because they are trans.[34] The Fourth Circuit explained any law that has the sole purpose of excluding trans girls from the definition of "female" to ban them from educational opportunities, including sports, facially discriminates on the basis of trans status, which the Equal Protection Clause forbids.[35] In applying the Equal Protection Clause to claims involving trans girls seeking to play school sports, the Fourth and Ninth Circuits have analyzed the ways that anti-trans school sports policies increase stigma and discrimination in ways that deny trans women and girls equal education opportunity—and also send harmful messages to all students that sex stereotypes accurately spell out the bounds of their futures and destinies.

## IV. Conclusion

We strongly urge the NCAA to maintain its current eligibility standards for LGBTQI+ student athletes. Sidelining athletes because of who they are, what they look like, or how they play runs deeply antithetical to the values of inclusion and diversity in sport the NCAA must strive to uphold.

Were the NCAA to bend to anti-trans demands and impose a categorical ban, the effect of this decision will ripple through the lives of all student athletes. Not only athletes in NCAA member schools, but including young students in high school and middle school just beginning their athletic careers will hear the message that they do not belong. A NCAA categorical ban also is likely to stoke further hostility towards and violence against trans, nonbinary, and intersex people who are already living with targets on their backs because of aggressive attacks at the local, state, and federal levels on their rights and safety. We urge the NCAA to stay on the right side of history and the right side of law, by ensuring the policies it maintains reflect that trans, nonbinary, and intersex student athletes deserve the opportunity to devote themselves to the sports they love as their full selves. Please reach out with any questions about this letter. Thank you for your consideration.

---

[31] *Hecox v. Little*, 79 F.4th 1009, 1027–28 (9th Cir. 2023).

[32] *Id.*

[33] *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (2020), *as amended* (Aug. 28, 2020) (in which the Fourth Circuit held that a Virginia school's policy preventing a trans boy from using the boys' bathroom violated the Equal Protection Clause by singling him out for mistreatment because he was trans).

[34] *B.P.J. v. West Virginia*, No. 23-1078, 2024 WL 1627008, *6 (4th Cir. Apr. 16, 2024) (citing *Grimm*, 972 F.3d at 610–13) (applying Fourth Circuit precedent holding that mistreatment of students because they are trans violates the Equal Protection Clause to find that heightened scrutiny applies because of the West Virginia law's "differing treatment of cisgender and transgender girls," and explaining that "[i]f B.P.J. were a cisgender girl, she could play on her school's girls team," and because the law defines a person's sex based on their "reproductive biology and genetics at birth," the only purpose of the law is "to exclude transgender girls from the definition of 'female' and thus to exclude them from participation on sports teams").

[35] *Id.*

Signed,
The National Women's Law Center

Anya Marino
Director of LGBTQI Equality
amarino@nwlc.org

Shiwali Patel
Director of Justice for Student Survivors & Senior Counsel
spatel@nwlc.org

Auden Perino
Senior Counsel
aperino@nwlc.org

Hunter F. Iannucci
Counsel
hiannucci@nwlc.org