# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al*., | |
| *Plaintiffs*, | |
| v. | Case No. 1:24-cv-01109-MHC |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al*., | |
| *Defendants*. | |

## BRIEF IN SUPPORT OF MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS

Plaintiffs Swimmer A and Track Athlete A (collectively, "Doe Plaintiffs"), by and through the undersigned counsel, respectfully seek leave to proceed under pseudonyms in this action to protect their identities from public disclosure while they pursue this lawsuit. This motion is supported by the Declarations of Swimmer A (**Ex. G** hereto) and Track Athlete A (**Ex. H** hereto),[1] as well as the following declarations being filed simultaneously herewith:

- Declaration of Dr. Wayne Lewis (**Ex. A** hereto),

- Declaration of Dr. Donna Hughes (**Ex. B** hereto),

- Declaration of Dr. Carole Hooven (**Ex. C** hereto),

---

[1] Plaintiffs are simultaneously filing these declarations provisionally under seal along with a motion pursuant to Local Rule 79.1(C)(2) requesting permission to file the Declarations under seal and will file them promptly upon receipt of an order from the Court authorizing them to do so under seal.

- Declaration of Plaintiff Riley Gaines (**Ex. D** hereto),

- Declaration of Macy Petty (**Ex. E** hereto), and

- Declaration of Plaintiff Lily Mullens (**Ex. F** hereto).

## INTRODUCTION

On March 14, 2024, sixteen young women filed a lawsuit against the NCAA—one of the most powerful sports organizations in the United States—to challenge its transgender eligibility policies for the sports in which they either currently compete or have competed at the collegiate level. In their declarations, the Doe Plaintiffs express their own concerns regarding their personal safety and fears of backlash, stigma, and reprisals on the college campuses and communities where they study, work, and reside if it became publicly known that they were taking a position on this issue. As detailed in the supporting declarations of Dr. Wayne Lewis, Donna Hughes, and Carol Hooven, America's college campuses have largely failed to provide a safe environment in which rational dialogue and debate on the issue of gender identity and ideology can occur. As further support of these observations, opinions, and experiences, Plaintiffs Riley Gaines and Lily Mullens as well as declarant Macy Petty have already spoken out publicly against the NCAA's policies, and as a result, they and others like them have been subjected to ridicule, shout-downs, death threats, stalkers, and other threats to their safety.

For these reasons and those that follow,[2] the Doe Plaintiffs are seeking to proceed anonymously because they reasonably fear similar treatment on the college campus communities where they currently live, study, compete, or work. In fact, the Doe Plaintiffs have expressed that they may want to reconsider their participation in this lawsuit seeking to vindicate their rights if the Court were to deny this motion.

## ARGUMENT

### A.    This Court has the Power to Allow Plaintiffs to Use Pseudonyms

Fed. R. Civ. P. 10(a) requires that the title of the complaint "must name all the parties." This rule "creates a strong presumption in favor of parties' proceeding in their own names [because] Defendants have the right to know who their accusers are, as they may be subject to embarrassment or fundamental unfairness if they do not." *Plaintiff B v. Francis*, 631 F.3d 1310, 1315 (11th Cir. 2011) (citing *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005) ("[The plaintiff] has denied [the defendant] the shelter of anonymity—yet it is [the defendant], and not the plaintiff, who faces disgrace if the complaint's allegations can be substantiated. And if the complaint's allegations are false, then anonymity provides a shield behind which defamatory charges may be launched without shame or liability.")).

---

[2] Additional facts and related details will be discussed in the Argument section.

However, "the rule is not absolute." *Doe v. Neverson*, 820 F. App'x 984, 986 (11th Cir. 2020) (quoting *Plaintiff B v. Francis*, 631 F.3d 1310, 1315 (11th Cir. 2011)). "A party may proceed anonymously in a civil suit in federal court by showing that he has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Plaintiff B v. Francis*, 631 F.3d at 1315–16 (internal quotes omitted). "Whether a party's right to privacy outweighs the presumption of openness is a 'totality-of-the-circumstances question.'" *Doe v. Neverson*, 820 F. App'x at 986 (quoting *In re Chiquita Brands Int'l Inc.*, 965 F.3d 1238, 1247 n.5 (11th Cir. 2020)).

The "'first step' in deciding whether privacy trumps publicity is to apply" three factors—whether the party seeking anonymity:

    (1)    is challenging government activity;

    (2)    would be compelled, absent anonymity, to disclose information of utmost intimacy; or

    (3)    would be compelled, absent anonymity, to admit an intent to engage in illegal conduct and thus risk criminal prosecution.

*In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247. However, the Eleventh Circuit has "made clear that this is only the first step. Along with these factors, a court should carefully review *all* the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247 (internal quotes omitted) (emphasis in original). "Other factors to consider

4

include whether the party seeking anonymity is a minor or faces a real threat of physical harm absent anonymity [and] whether the party's requested anonymity poses a unique threat of fundamental unfairness to the defendant." *Id.* (internal quotes omitted).

Applying the relevant factors here demonstrates that the Doe Plaintiffs' privacy interests outweigh the customary practice of disclosing the plaintiff's identity.

**B.    The Doe Plaintiffs' Privacy Interests Outweigh the Public Interest in Disclosure under the Eleventh Circuit's Relevant Factors**

Applying the relevant factors identified below, the Doe Plaintiffs' privacy interests outweigh the public's interest in knowing their identity.

**B.1.    The "First Step" Factors Weigh in Favor of the Doe Plaintiffs' Anonymity**

The Eleventh Circuit has established three factors as a "first step" in deciding whether privacy trumps publicity—whether the party seeking anonymity:

(1)    is challenging government activity;

(2)    would be compelled, absent anonymity, to disclose information of utmost intimacy; or

(3)    would be compelled, absent anonymity, to admit an intent to engage in illegal conduct and thus risk criminal prosecution.

*In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247. Each of these weigh in favor of permitting the Doe Plaintiffs to proceed under a pseudonym.

### B.1.i.        *Governmental Activity vs. Private Party Defendants*

This factor is relevant to the inquiry because while a private party defendant may "face[] disgrace if the complaint's allegations can be substantiated… provid[ing] a shield behind which defamatory charges may be launched [against the defendant] without shame or liability," *Plaintiff B v. Francis*, 631 F.3d at 1315 (citing *Doe v. Smith*, 429 F.3d at 710), "a government agency…can suffer no injury to its good name and reputation." *Freedom From Religion Found., Inc. v. Emanuel Cnty. Sch. Sys.*, 109 F. Supp. 3d 1353, 1357 (S.D. Ga. 2015).

Plaintiffs acknowledge this factor weighs *against* their request for anonymity because, while they assert claims against government agencies like the University System of Georgia and its public universities, they also include claims against individuals like the President of Georgia Tech and the individual members of the Board of Regents. (Compl. Doc. 1 ¶¶ 146, 150–174, 177.) The Eleventh Circuit has held that suing a government agency does not provide more reason to *grant* anonymity; rather, suing private individuals provides more reason to *deny* anonymity. *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). "[T]he operative principle is that a suit against a private party weighs *against* a plaintiff's request for anonymity." *Freedom From Religion Found., Inc.*, 109 F. Supp. 3d at 1357. (emphasis in original) (granting anonymity and holding that other factors

outweighed suit against individual administrators and teachers of public school district).

However, this factor does not weigh as heavily against anonymity as it might in other cases involving truly private parties and private conduct, because the party defendants here are not particularly "private" and their actions at issue have a very public nature. With respect to the individual defendants, each of them holds public office (Compl. Doc. 1 ¶¶ 146, 150–174, 177) and is being sued for actions taken under color of their public office by implementing the NCAA's transgender eligibility policy. (Compl. Doc. 1 ¶¶ 92–94.)

Moreover, although the NCAA is an unincorporated association, it is very public in nature insofar as it is comprised of more than 1,100 colleges and universities, most of which receive federal funding. (Compl. Doc. 1 ¶¶ 17–18.) More than two-thirds of the NCAA's Division I schools are public universities, as are almost half of its Division II schools.[3] The NCAA is also the largest collegiate athletic rulemaking and enforcement body in the United States, to whom its member institutions have ceded control over the regulation of college sports. (Compl. Doc. 1 ¶¶ 19, 22.) In addition, the NCAA itself shined a spotlight on its

---

[3] NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, INSTITUTIONAL CHARACTERISTICS OF NCAA MEMBER SCHOOLS (2015), at 5, https://ncaaorg.s3.amazonaws.com/research/demographics/2017RES_institutionalcharacteristics.pdf.

policies and actions that are at the center of this lawsuit when it issued a series of media releases in January and February 2022 publicizing its transgender eligibility policies[4] and decisions relating to its 2022 Women's Swimming and Diving Championships.[5]

Thus, while this factor weighs against Plaintiffs proceeding anonymously, the Court should afford this factor less weight.

### B.1.ii.    Disclosing Information of "Utmost Intimacy" and Admitting an Intent to Engage in "Illegal Conduct"

The Eleventh Circuit has stated that "[d]ivulging personal information of the utmost intimacy or having to admit an intent to engage in prohibited conduct are proper factors to consider when a plaintiff requests anonymity." *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). However, "personal embarrassment, standing alone, does not require the granting of his request to proceed under a pseudonym." *Id.*

---

[4] Press Release, Board of Governors Updates Transgender Participation Policy (Jan. 19, 2022), available at https://ncaaorg.sidearmsports.com/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx.

[5] Press Release, National Collegiate Athletic Association, CSMAS Subcommittee Recommends No Additional Changes to Testosterone Threshold for Trans Women at 2022 Women's Swimming and Diving Championships (Feb. 10, 2022), available at https://www.ncaa.org/news/2022/2/10/media-center-csmas-subcommittee-recommends-no-additional-changes-to-testosterone-threshold-for-trans-women-at-2022-womens-swimming-and-diving-championships.aspx.

Many cases granting plaintiffs anonymity have involved allegations of a sexual nature, such as sexual assault,[6] homosexuality,[7] abortion,[8] and transsexuality.[9] This case certainly has elements in a similar vein insofar as it involves transsexuality, as well as the embarrassment that some of the Doe Plaintiffs suffered by being forced to share a locker room with a six-foot-four-inch, fully genataliaed male-bodied individual and expose themselves while changing into competition swimsuits. (Compl. ¶¶ 361–417.)

However, while those elements are present here, Plaintiffs' interests go beyond mere embarrassment arising from the locker room incident and extend to matters of personal beliefs and positions for which they objectively fear stigmatization, ostracization, retaliation, online bullying, and acts of hostility both in person and online, including possible threats of physical violence, in the college campus communities where they live, work, and study, if forced to disclose their identities. *Doe v. Neverson*, 820 F. App'x at 987–88 (reversing district court's denial of anonymity and stating "we have held that 'social stigma' is sufficient to

---

[6] *Doe v. Neverson*, 820 F. App'x 984 (11th Cir. 2020).

[7] *Doe v. Commonwealth's Att'y for City of Richmond*, 403 F. Supp. 1199 (E.D. Va. 1975), *aff'd,* 425 U.S. 901 (1976).

[8] *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678 (11th Cir. 2001).

[9] *Doe v. McConn*, 489 F. Supp. 76 (S.D. Tex. 1980).

warrant proceeding anonymously"). In this regard, the Court of Appeals opinion in

*Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981), is both instructive and analogous.

In *Stegall*, a plaintiff mother and her minor children sought permission to

proceed anonymously in their lawsuit challenging the constitutionality of prayer

and Bible reading exercises in public school. *Id.* at 180. The district court denied

their motion, but the Eleventh Circuit reversed, holding that the district court

abused its discretion. *Id.* at 186. In reaching its conclusion, the appellate court

considered the "utmost intimacy" and "illegal conduct" factors together, stating:

> Here, the Does complain of public manifestations of religious belief;
> religion is perhaps the quintessentially private matter. Although they
> do not confess either illegal acts or purposes, the Does have, by filing
> suit, made revelations about their personal beliefs and practices that
> are shown to have invited an opprobrium analogous to the infamy
> associated with criminal behavior. Evidence on the record indicates
> that the Does may expect extensive harassment and perhaps even
> violent reprisals if their identities are disclosed to a Rankin County
> community hostile to the viewpoint reflected in plaintiffs' complaint.
> [Citation.] The threat of hostile public reaction to a lawsuit, standing
> alone, will only with great rarity warrant public anonymity. But the
> threats of violence generated by this case, in conjunction with the
> other factors weighing in favor of maintaining the Does' anonymity,
> tip the balance against the customary practice of judicial openness.

*Id*. The record evidence on which the Court of Appeals based its conclusion

included local newspaper reports of a public meeting at which members of the

community expressed opinions that plaintiffs "want[] to destroy Christianity," that

"Christians must beat the evil out of these people," that plaintiffs "should be

ashamed of themselves," and that "[w]e have got to band together and whop this evil thing." *Id.* at 182 n.6.

Similarly here, the Doe Plaintiffs "have, by filing suit, made revelations about their personal beliefs [with respect to transgenderism and male physical advantages] that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior" in the college campuses and communities where they live, work, and study. *Id.* at 186. They have also introduced "[e]vidence on the record [that they] may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a [college] community hostile to the viewpoint reflected in plaintiffs' complaint." *Id.*

Here, Plaintiffs' Complaint reflects the viewpoint that biological males generally have inherent physical advantages over females in athletic contests and thus should not be allowed to compete in female-only events as a matter of fairness, regardless of which gender an athlete may identify as. In *Stegall*, the relevant community was the "Rankin County [Mississippi] community"; here, it is academia and the college campus communities where the Doe Plaintiffs study, compete, work, and reside.

Regrettably, efforts have already been made to inflame public opinion against Plaintiffs merely for filing this lawsuit raising their claims under Title IX. For example, on the day the National Women's Law Center (NWLC) filed a

motion to intervene in this case, the NWLC and its lawyers issued press releases falsely calling Plaintiffs "anti trans extremists" and claiming they are seeking to misuse Title IX for the purpose of "bullying" trans students. *NWLC Joins Lawsuit Defending Trans Inclusion in College Sports*, May 6, 2024, *available at*: https://nwlc.org/resource/nwlc-joins-lawsuit-defending-trans-inclusion-in-college-sports/; *National Women's Law Center Intervenes in Defense of Transgender College Athletes*, May 6, 2024, *available at*: https://www.aclu.org/press-releases/national-womens-law-center-intervenes-in-defense-of-transgender-college-athletes (quote attributed to Shiwali Patel, Senior Counsel at the NWLC). Extending its rhetoric even further, the NWLC characterized Plaintiffs' lawsuit as "not only an attack on trans women and girls–it's an attack on all women and girls." *Id*. (quote attributed to Jennesa Calvo-Friedman, Staff Attorney for the ACLU's Women's Rights Project). With no supporting evidence, the NWLC claimed that "[i]t's no coincidence that the activists who brought this case think women should be solely defined by our ability to carry children" and that "[t]his case is part of a broader, extreme effort to control women's bodies and lives, but we won't let them succeed in selling women out." *Id*. (quote attributed to Jennesa Calvo-Friedman, Staff Attorney for the ACLU's Women's Rights Project).

The vicious rhetoric already leveled against Plaintiffs by the NWLC's lawyers merely because Plaintiffs brought this case impugns Plaintiffs' reputations,

harms their academic and professional opportunities, and raises the very real threat of physical violence towards them on the campuses on which they live, which is why the Doe Plaintiffs need pseudonym protection. Demonstrating just how charged and dangerous the atmosphere around the issues in this case have become is NWLC literature focusing on the very topic of this case, *i.e*., rules governing eligibility on women's sports teams, which labels all who disagree with the NWLC as "anti-trans extremists" and states that "anti-trans extremists overlap with villains from the anti-abortion movement and full-on white supremacists and misogynists – they're all creepily trying to control other people's bodies!" *Just Let Kids Play!* May 10, 2023, *available at*: https://nwlc.org/just-let-kids-play/ (authors Auden Perino, NWLC Senior Counsel, Hunter Iannucci, NWLC Counsel).

NWLC and its lawyers have already made the leap from Plaintiffs merely filing this lawsuit to calling them "anti trans extremists," demonstrating that Plaintiffs already face hostile rhetoric and extreme backlash for merely raising their Title IX claims in this Court. The Doe Plaintiffs are reasonably concerned about additional dangers to them on their campuses if their status as Plaintiffs is publicly tied back to them, and have submitted the declarations of multiple academics, with decades of experience, who find their fears reasonable and well supported.

Plaintiffs have designated the Declarations of Drs. Lewis, Hughes, and Hooven—with more than 70 years' combined work experience on college faculties and administration—who describe the general hostility towards Plaintiffs' viewpoint in college campus communities today. (Exs. A, B, and C.) Each of these experts has not only observed hostilities on college campuses around the country generally but has personally experienced hostilities for expressing the viewpoint reflected in the Complaint.

After more than 25 years as a professor at the University of Rhode Island in Women's Studies, Dr. Hughes faced severe backlash after publishing an essay expressing similar viewpoints, prompting a social media movement calling for the university to discipline her and fire her from her position, and leading the school's dean to publicly denounce and condemn her statements. (Hughes Decl., Ex. B ¶¶ 1, 8–9.) Notably, Dr. Hughes afterward heard from others in her campus community who felt they could not speak up in her defense for fear of academic retaliation. (*Id.* ¶ 12.)

Similarly, Dr. Hooven describes how she was forced to resign as co-chair of the Department of Human Evolutionary Biology (HEB) at Harvard University after successfully teaching there for 20 years and conducting research into which male and female sex hormones most significantly affect behavioral tendencies. (Hooven Decl., Ex. C ¶¶ 3–6.) Her forced resignation stemmed from ostracization after an

interview discussing the publication of her research in which she stated that "there are in fact two sexes—there male and female—and those sexes are designated by the kinds of gametes we produce." (*Id.* ¶¶ 16, 26–27.) She was labeled "transphobic" and "harmful" and was accused of "threatening the safety of the community" when she merely asked for a discussion of the issues. (*Id.* ¶¶ 18, 21.)

Likewise, Dr. Lewis, President of Houghton University in New York, encountered opposition to his statement espousing the viewpoint reflected in the Complaint—even from those who *supported* his position—out of fear of reputational harm merely for expressing the position. (Lewis Decl., Ex. A ¶¶ 12–13.) Dr. Lewis's extensive experience in academia and education in a variety of settings has led him to opine that "in the current environment on college campuses, individuals who are identified as Plaintiffs in [this] Case are likely to experience discrimination, retaliation, hostile treatment, and backlash for serving as Plaintiffs." (*Id.* ¶ 19.) In his opinion, simply asserting that "biological men have physiological advantages over women and should not be permitted to compete in women's athletics is very often deemed as hate speech, discriminatory, and bigoted by university administrators, faculty, and students." (*Id.* ¶ 21.) "Such discrimination and pushback can take many forms including threats of violence, the possibility of actual violence, being labeled a bigot…, shunning and hostile

treatment" that "can make it nearly impossible…to participate normally in the life of the campus." (*Id.* ¶ 19.)

All three experts agree that individuals who publicly oppose transgender athletes in women's sports on college campuses face a threat of significant discrimination, retaliation, and hostile treatment in the form of threats of violence, shunning, and exclusion from campus activities, among others. (Lewis Decl., Ex. A ¶¶ 19, 24; Hughes Decl., Ex. B ¶ 13; Hooven Decl., Ex. C ¶¶ 29–30.)

In addition to the declarations of these faculty and administrators, the Doe Plaintiffs have designated the declarations of some co-Plaintiffs and a non-Plaintiff recently graduated student-athlete who have already spoken publicly and faced tangible hostilities beyond mere embarrassment.[10] In her declaration and its accompanying videos, Plaintiff Riley Gaines details the events after her public presentation at San Francisco State University, where a group of activists and protestors shouted and screamed profanities at her while she was trapped in a small office for three hours. (Gaines Decl., Ex. D ¶¶ 9–20.) During this time, members of the crowd shouted things like:

---

[10] The Eleventh Circuit has deemed it appropriate to consider the adverse prior experiences of similarly situated plaintiffs. *See, Plaintiff B v. Francis*, 631 F.3d 1310, 1318 (11th Cir. 2011) (noting the adverse consequences of publicity experienced by the plaintiff in *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205 (M.D.Fla. 2002), and holding "[t]his is certainly part of 'all the circumstances' of *this* case") (emphasis in original).

16

- "Trans rights are under attack, what do we do? We fight back!" (*Id.* ¶ 11);

- "You did this to yourself, bitch! You come on this campus and think we're not going to start a riot?!" (*Id.* ¶ 17)

- "Tell her to talk her shit right here, and then we'll let that bitch leave. Tell her, say 'I'm a fucking transphobe' right here, right fucking here!" (*Id.* ¶ 17);

- "You asshole bitch!" and "loser" (*Id.* ¶ 17);

- "Tell her to pay us and then she can go!" (*Id.* ¶ 18).

Similarly, Plaintiff Lily Mullens describes the experience of the six Plaintiffs from the women's swimming team at Roanoke College near Roanoke, Virginia. After publicly voicing objections to the participation of a male-bodied person on their women's team, social media posts were directed to them saying things like:

- "have the [women's] swim team drawn and quartered" (Ex. F-1);

- "kate, bailey, and lily, i hope karma gets you one day" (Ex. F-2); and

- "Special fuck you to the transphobic swim team members" (Ex. F-3).

These comments are similar in the level of hostility, threats, and intensity as the public comments directed to the plaintiffs in *Stegall*, on which the Court of Appeals reversed the district court's denial of anonymity:

- Plaintiffs "want[] to destroy Christianity,"

- "Christians must beat the evil out of these people,"

- Plaintiffs "should be ashamed of themselves," and

- "We have got to band together and whop this evil thing."

17

*Doe v. Stegall*, 653 F.2d at 186.

Moreover, the Doe Plaintiffs' own declarations demonstrate they have already encountered similar hostilities on their own campuses. These include:

- refusing to allow a speaker on campus who would question transgender ideology (Ex. G ¶¶ 8–9);

- LGBTQ+ student groups on campus who expressly advocate interrupting any behavior deemed to denigrate the LGBTQ+ community (*Id.* ¶ 10);

- being called an "idiot" for holding similar views (Ex. H ¶ 12);

- closing comments to social media posts and removing any comments favorable to Plaintiffs' viewpoint (*Id.* ¶ 17);

- upon learning the views of one Doe Plaintiff, a teammate stating "she just wished [Doe Plaintiff] were dead" (*Id.* ¶ 18);

Therefore, the "utmost intimacy" and "illegal conduct" factors, as applied by the *Stegall* Court, weigh heavily in favor of maintaining the Doe Plaintiffs' anonymity.

### B.2.   Other Factors

The Eleventh Circuit has "made clear that [these factors are] only the first step. Along with these factors, a court should carefully review *all* the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247 (internal quotes omitted). "Other factors to consider include whether the party seeking anonymity is a minor

or faces a real threat of physical harm absent anonymity [and] whether the party's requested anonymity poses a unique threat of fundamental unfairness to the defendant." *Id.* (internal quotes omitted).

### B.2.i.    *Real Threats of Physical Harm*

The facts recited above also constitute real threats of physical harm to the Doe Plaintiffs if they are forced to reveal their identities.

In *Doe v. Neverson*, 820 F. App'x 984 (11th Cir. 2020), the plaintiff sought anonymity in her case against a well-known recording artist for sexual assault. The district court denied the plaintiff's motion, but the Eleventh Circuit reversed, holding that "the district court failed to consider that, in other cases, we have held that 'social stigma' is sufficient to warrant proceeding anonymously" and "may have too easily discounted evidence that Ms. Doe would be subject to threats and harassment if she were required to proceed under her real name." *Id.* at 988. The Court of Appeals was persuaded by Ms. Doe's evidence consisting of comments made by readers on websites and blogs that reported news of her lawsuit. *Id.* The readers made comments such as:

- "THESE H0's GOTTA STOP WITH THIS BS";

- "Just another female tryna get some money from a celebrity";

- "Man get tf outta here ... where she at #LeaveTreyAlone #ThirstTraps";

- "I know someone can pull up Diddys 2017 New Year's Eve photos let's find out who this chick is roomies";

- "how much would it have been if he killed the same person ...";

- "Y'all Gon stop lying on my man, I'm ready to fight!"; and

- "She lying. Idc who it is. She lying."

*Id.* at 985–86. In reaching its conclusion, the Eleventh Circuit stated, "In today's digital age, Ms. Doe's evidence seems similar to the news report we relied on in *Stegall.*" *Id.* at 988.

Here, Plaintiffs have submitted similar social media posts and other comments, including:

- To "have the [women's] swim team drawn and quartered" (Ex. F-1);

- "i hope karma gets you one day" (Ex. F-2); and

- "Special fuck you to the transphobic swim team members" (Ex. F-3).

- being called "idiotic" (Ex. H ¶ 12);

- "[I] just wished she were dead" (*Id.* ¶ 18); and

- "Trans rights are under attack, what do we do? We fight back!" (Gaines Decl., Ex. D ¶ 11).

Additionally, since her experience at San Francisco State University, Plaintiff Riley Gaines has been spat upon, received death threats, had personal information publicized, and had to hire private security. (Gaines Decl., Ex. D ¶¶ 22–23.)

Thus, the evidence submitted by Plaintiffs demonstrates the Doe Plaintiffs will be subject to threats and harassment if required to proceed under their real

names. This factor, too, weighs heavily in favor of granting the Doe Plaintiffs'
request for anonymity.

### B.2.ii.    *Age of Doe Plaintiffs*

Courts have also looked to the age of plaintiffs as a factor in determining
whether to grant anonymity. *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247
("Other factors to consider include whether the party seeking anonymity is a
minor…."); *see also*, *Doe v. Stegall*, 653 F.2d at 186 (noting the minority of
plaintiffs). In *Doe v. Alger*, 317 F.R.D. 37, 40 (W.D. Va. 2016), the district court
expressly considered the plaintiff's age as a factor when allowing a college student
to proceed under a pseudonym. The court noted that if the plaintiff and other
college students involved in the case were just a year or so younger, then Fed. R.
Civ. Proc. 5.2(a)(3) would *mandate* the use of initials, absent a court order. *Id.*
(holding that this "factor weighs in favor of anonymity, as well").

While none of the Doe Plaintiffs are minors, the Court should consider the
fact that they are still young adults in college, only a couple years past the age of
majority. Thus, this factor tips slightly in favor of granting the Doe Plaintiffs
anonymity.

### B.2.iii.    *No Unique Threat of Fundamental Unfairness to Defendants Due to Anonymity*

Finally, granting the Doe Plaintiffs anonymity would not "pose[] a unique
threat of fundamental unfairness to the defendant." *In re: Chiquita Brands Int'l,*

*Inc.*, 965 F.3d at 1247. The Court of Appeals in *Doe v. Stegall* has observed that "[t]he equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical." *Doe v. Stegall*, 653 F.2d at 185. "The public right to scrutinize governmental functioning is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself." *Id.* (citation omitted). "Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name." *Id.*

Here, the Doe Plaintiffs are not seeking to completely close the trial but rather the lesser remedy of anonymity. Moreover, they are not seeking to withhold their identities from Defendants; rather, they merely seek a protective order that would prevent Defendants and others on a need-to-know basis from disclosing their identities. Thus, Defendants face no unique threat of fundamental unfairness if the Doe Plaintiffs are allowed to proceed under pseudonyms. As a result, this factor weighs in favor of granting Doe Plaintiffs' motion.

*        *        *

Thus, considering the "first step" factors as well as "*all* the circumstances" of this case, *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d at 1247, the factors in total demonstrate that the Doe Plaintiffs' privacy interests outweigh the public's interest

in knowing their identities, and protection of their identities will not prejudice the Defendants. The Court should therefore grant the Doe Plaintiffs permission to proceed under pseudonyms.

## **CONCLUSION**

For the foregoing reasons, the Doe Plaintiffs request the Court to grant their motion and to enter an order[11] that would prohibit Defendants, their counsel, and those who have a need-to-know Doe Plaintiffs' identities from disclosing their identities, and for all other just and proper relief.

---

[11] Plaintiffs have submitted a proposed order with Plaintiffs' Motion. Plaintiffs are currently conferring with Counsel for the NCAA regarding whether the parties can agree to the language of the proposed order. If such agreement is reached Plaintiffs will submit the agreed order language to the Court.

Respectfully submitted,

*/s/ William Bock III*

William Bock III, Atty. No. 14777-49[12]
Kevin D. Koons, Atty. No. 27915-49[13]
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:        wbock@kgrlaw.com
Email:         kkoons@kgrlaw.com

*/s/ Bryan P. Tyson*

Bryan P. Tyson, Ga. Bar No. 515411
Thomas C. Rawlings, Ga. Bar No. 595795
Deborah A. Ausburn, Ga. Bar No. 028610
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Fax: (770) 434-7376
E-mail: btyson@taylorenglish.com
E-mail: trawlings@taylorenglish.com
E-mail: dausburn@taylorenglish.com

*Attorneys for Plaintiffs*

---

[12] *Pro hac vice*

[13] *Pro hac vice*

24

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), counsel certifies that the foregoing was

prepared in Times New Roman, 14-point font, in compliance with Local Rule

5.1(C).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411

*Attorney for Plaintiffs*