# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al*.<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br><br>NATIONAL COLLEGIATE<br>ATHLETIC ASSOCIATION, *et al*.<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:24-cv-01109-MHC<br>)<br>)<br>)<br>)<br>)<br>) |

## **DECLARATION OF WAYNE D. LEWIS, JR., PhD**

I, Wayne D. Lewis, Jr., under penalty of perjury, declare as follows:

1.      I am a resident of the United States, an adult over the age of eighteen, and am competent to testify and have personal knowledge of the facts stated in this declaration.

2.      Since June 2021, I have served as the sixth President of Houghton University in Allegany County, New York. Houghton University athletic teams compete as a member of NCAA Division III.

3.      Prior to becoming the President of Houghton University, I was the Dean of the School of Education and a Full Professor of Education at Belmont University. Belmont University athletic teams compete as a member of NCAA Division I.

4. Before serving at Belmont University, I served the Commonwealth of Kentucky for four years in state government, first as Executive Director of Education Policy & Programs in the Education & Workforce Development Cabinet, then as Commissioner of Education (chief state schools officer). As Kentucky Commissioner of Education, I also served as an ex officio member of the Kentucky Council on Postsecondary Education, the Commonwealth's statewide postsecondary and adult education coordinating agency.

5. For eleven years I served as a faculty member at the College of Education at the University of Kentucky, initially as an Assistant Professor, then promoted to Associate Professor with tenure. Among other roles at the University of Kentucky, I was elected by the College of Education faculty to serve as a University Senator and was elected to serve on the University's Graduate Council and the University's Honorary Degrees Committee. I continue to serve on doctoral advisory committees at the University of Kentucky. The University of Kentucky athletic teams compete as a member of NCAA Division I.

6. Since 2022, I have been a member of the National Collegiate Athletic Association (NCAA) Division III Membership Committee.

7. I received my bachelor's degree in Criminal Justice from Loyola University in New Orleans, Louisiana in 2001. I obtained a Master of Arts in Urban Studies from the University of Akron in Akron, Ohio in 2002. I commenced

post-baccalaureate studies at the University of New Orleans in New Orleans, Louisiana in 2004, earning certification as a special education teacher for students with mild to moderate disabilities. I received my Doctor of Philosophy in Educational Research & Policy Analysis from North Carolina State University in Raleigh, North Carolina in May 2009.

8. Continuously during the period from July 2009 through the present I have served as a Faculty Member or University Administrator at a NCAA member institution (i.e., at Houghton University, Belmont University, and the University of Kentucky).

9. The focus of my degree studies, research and teaching has been on educational administration, leadership, and policy in K12 schools and higher education contexts, with secondary areas of focus in the preparation of teachers and educational leaders.

10. I am particularly familiar with the debate and issues related to Title IX, as my doctoral study at North Carolina State University and graduate teaching at the University of Kentucky has included the impact of key federal policies on the delivery of education in K12 schools and at the postsecondary level. Examples of such policies have included the Individuals with Disabilities Education Act (IDEA), the Elementary and Secondary Education Act (ESEA), the

Higher Education Act (HEA), the GI Bill, and notably for the purposes of this testimony, Title IX of the Education Amendments of 1972.

11. At Houghton University, a female student athlete recently competed at the NCAA Division III women's track and field regional meet, where one of her opponents was Sadie Schreiner, a biological male student athlete who competes on the women's track and field team at Rochester Institute of Technology (RIT).

12. Following that competition, I wrote a statement that I titled, "In Defense of Women's Athletics," a copy of which is attached to this Affidavit as **Attachment 1**.

13. As expected, my public position on the participation of biological males in women's athletics was met with both support and criticism. Criticism included both critics of the merits of my position and statement, as well as those who agreed with my position and statement, but who decried my stating the position publicly, for fear of reputational harm to Houghton University, or by extension, reputational harm to them as current students or alumni of Houghton University. Some of that criticism came through in-person or phone conversations, but most of it was public and written on social media platforms.

14. I have been contacted by legal counsel for the Plaintiffs in the case of *Gaines, et al. v. NCAA, et al.*, Case No. 1:24-cv-01109-MHC, Northern District of Georgia, Atlanta Division, (the "Case") and asked to provide my professional

opinion about the potential for Plaintiffs who are either current college or university students at a NCAA member institution or are employees in a University Department of Education at a NCAA member institution to experience retaliation, hostile treatment and/or backlash as a result of being identified as Plaintiffs in the Case to students, faculty and the public at large.

15.     I am generally familiar with the allegations in the Complaint filed in the Case, including the allegations that the NCAA's transgender eligibility policies conflict with Title IX and harm female student-athletes by allowing biologically male competitors who identify as transgender to compete on women's teams.

16.     I am generally familiar with the relief sought by the Plaintiffs in the Complaint filed in the Case, including the request that the Court enjoin the NCAA from enforcing its transgender eligibility policies and from permitting biologically male competitors, including those identifying as transgender, from competing on women's teams in college athletic competitions which take place under NCAA rules.

17.     I am aware that the issues being raised by Plaintiffs in the Case have become one of the most divisive issues on college and university campuses.

18.     Regrettably, the divisiveness of the issues being litigated in the lawsuit has increased, while a safe environment on most campuses for students and educators to debate such issues, has diminished.

19. I contend that in the current environment on college campuses, individuals who are identified as Plaintiffs in the Case are likely to experience discrimination, retaliation, hostile treatment, and backlash for serving as Plaintiffs in the Case. Such discrimination and pushback can take many forms including threats of violence, the possibility of actual violence, being labeled a bigot for voicing a view supported by biological and physiological facts, shunning and hostile treatment by other students and university employees which can make it nearly impossible for the subject of the mistreatment to participate normally in the life of the campus and have a positive educational and social experience, discriminatory treatment such as exclusion from university-sponsored events and activities, potential discriminatory treatment by course instructors with the possibility that instructors' biases would impact grading, and the potential deprivation of scholarships, honors, or awards the student would otherwise have been considered for. Many of these forms of mistreatment can be extraordinarily difficult for University Administrators to detect or address, leaving students on college campuses subject to such treatment without an effective remedy in many cases.

20. Depending on the course, instructors may exercise a substantial degree of subjectivity in grading assignments and in assigning course grades. While in some course fields or disciplines, grading is primarily objective with

responses on assignments and assessments being either correct or incorrect, in the humanities and social sciences especially, where instructors exercise much more judgement in rating the merits of an argument or the legitimacy of a claim, biases held against students resulting in differential grading could seldom, if ever, be detected. Even in the event a student makes a claim of harsh or discriminatory grading practices, in all but the most egregious cases, students would be unable to provide enough objective evidence to prove partiality on the part of the instructor.

21.   It is not possible to identify which university a student would be likely to be harmed versus one where a student would be safe. The effect of social media and national cable news is that cultural norms on university campuses, particularly related to issues of diversity, equity, and inclusion, are more similar than dissimilar. Whether in Louisiana, Kentucky, Ohio, or New York, the biologically-supported claim that biological men have physiological advantages over women and should not be permitted to compete in women's athletics is very often deemed as hate speech, discriminatory, and bigoted by university administrators, faculty, and students. By and large, regardless of the university's location, employees and students who reject the position that transgender women (biological males) should be treated just as biological females in sport, are unwilling to do so publicly for fear of retaliation and isolation.

22. As a former education faculty member and school of education dean, I contend that the hostility and potential retaliation a Plaintiff in this case would experience in a school of education would be among the worst of any department on a university campus. Within the field of teacher education, acceptance of gender ideology and advocacy for unqualified equality of treatment of transgender and cisgender persons is pervasive. Questioning the assumptions of gender ideology or making arguments for distinctions between the treatment of biological women and transgender women are either quickly silenced or met with extraordinary hostility.

23. An identified Plaintiff in this case would have little chance of being hired by a public school district as a teacher in the South, the Midwest, or the Northeast. The assumptions of gender ideology and advocacy that transgender women be treated equally with biological women is as pervasive in public school districts as in university schools of education. Even a school district administrator who rejected these claims or desired to be impartial would face such pressure from transgender rights activists and teachers unions, along with growing fears of losing federal funding, that she would be unlikely to take a chance on hiring a Plaintiff in this Case.

24. Based on my education, research and training and upon my experience as a University Administrator and Faculty Member, I believe it is highly likely individuals identified as Plaintiffs in the Case will experience

discrimination, retaliation, hostile treatment, and/or backlash for serving as Plaintiffs in the Case and this mistreatment is likely to have a significant adverse impact on the Plaintiffs, depriving them of educational experiences and opportunities, job opportunities and experiences they might otherwise have had and subjecting them to potentially severe hostility and mistreatment, including the possibility of violence.

25. Based on the foregoing, I understand and respect the application by some Plaintiffs to remain anonymous and proceed as Plaintiffs in the Case under a pseudonym.

26. I affirm that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.

Executed on April 26/0⸱, 2024.

*Wayne D. Lewis, Jr.*
_____
Wayne D. Lewis, Jr.

9

# ATTACHMENT 1

# In Defense of Women's Athletics

By Houghton President, Wayne D. Lewis, Jr.

Biological males' participation in women's athletics is wrong. Most Americans and most of the world know it to be wrong. A fringe agenda under the guise of making school and collegiate athletics more inclusive for transgender people has grown to the place of now unfairly displacing gifted and hardworking female athletes, obliterating the historic achievements and records of female athletes of the past, and threatening to dismantle the opportunities and protections for girls and women in sport trailblazing leaders fought so hard to create and protect. Too many leaders, parents, professional athletes and people of good will have been silent as female athletes are humiliated, silenced and robbed of hard-earned opportunities. That silence is complicit with the fringe agenda that threatens to dismantle girls' and women's athletics.

I currently serve a Christian university as its president. I believe God has formed each of us, men and women, with intention and purpose. I further believe sex and gender are a divine prerogative and are neither separate from each other nor subject to change. However, my assertion that biological males' participation in women's athletics is wrong is not a Christian position. It is a moral position. While I currently serve a Christian university, most of my career has been in the public sector as a teacher, professor, administrator and state education chief. If I served in any of those roles again, my position would be the same.

Throughout human history and to the present, most of the world and most Americans have upheld the truth that men and women

have important distinguishing characteristics. American society is organized based on that understanding. Our organization of sport exists based on that understanding. Stating the obvious and widely supported truth that men and women have important biological differences is not a position of hatred or bigotry. It is common sense. While I believe most policy attempts to be inclusive of persons who identify as transgender are likely well-meaning, I struggle to understand how leaders with the best interest of girls and women at heart could advocate for or endorse practices that not only place female athletes at a competitive disadvantage, but also subject them to disrespect and embarrassment and place them at greater risk for harassment and assault.

Enough is enough. I will not sit by silently as a university president whose female student-athletes step weekly onto tracks, courts, and fields to compete but, in some cases, are forced to do so on playing fields we know to be unfair. I hope you will join me.