**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| RILEY GAINES, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01109-MHC |
| | ) | |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE TO NATIONAL WOMEN'S LAW CENTER'S MOTION TO INTERVENE AS DEFENDANT

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................... ii

INTRODUCTION ................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 4

    A.    Plaintiffs' Complaint ....................................................................... 4

    B.    Motion for Plaintiffs to Proceed Under Pseudonym ............................ 4

    C.    NWLC's Inaccurate Accusations Concerning Plaintiffs ...................... 5

    D.    Women's Organizations Opposing NWLC's Motion to Intervene ...... 7

    E.    NCAA's Motion to Dismiss ........................................................... 9

    F.    NWLC Opposes the NCAA's Transgender Eligibility Policies .......... 9

    G.    NWLC's Position is that the NCAA's Transgender Eligibility Policies Violate Title IX ....................................................................... 11

    H.    NWLC Seeks to Intervene to Advocate for its Own Policy Views .... 12

    I.    Intervention is Part of NWLC's Effort to Lobby the NCAA Board of Governors ................................................................................. 12

    J.    NWLC Raises Issues Not Relevant Under the NCAA's Policies....... 13

ARGUMENT ........................................................................................ 14

    A.    Standard for Permissive Intervention ............................................. 14

    B.    NWLC Lacks a Defense Sharing a Common Question of Law or Fact with the Defenses of the NCAA or Georgia Defendants ................... 16

    C.    Intervention Will Prejudice the Original Parties and Cause Undue Delay ........................................................................................ 19

    D.    Additional Factors Support Denial of Intervention........................... 21

        1.    NWLC lacks standing or a legal interest in the case ............... 21

        2.    NCAA is adequately defending its policies ............................ 22

        3.    Judicial economy.................................................................. 24

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brenner v. Scott*,
   298 F.R.D. 689 (N.D. Fla. 2014).............................................................18

*Burke v. Ocwen Fin. Corp.*,
   833 F. App'x 288 (11th Cir. 2020)................................................... 15, 19

*Bush v. Viterna*,
   740 F.2d 350 (5th Cir. 1984) .................................................... 21, 22, 23

*Chiles v. Thornburgh*,
   865 F.2d 1197 (11th Cir. 1989) ...................................................... 19, 21

*Clark v. Putnam County*,
   168 F.3d 458 (11th Cir. 1999) ................................................................24

*Com. of Va. v. Westinghouse Elec. Corp.*,
   542 F.2d 214 (4th Cir. 1976) ..................................................................24

*Edwards v. City of Houston*,
   78 F.3d 983 (5th Cir. 1996) ............................................................ 22, 24

*FSLIC v. Falls Chase Special Taxing Dist.*,
   983 F.2d 211 (11th Cir. 1993) ................................................................22

*Grogan v. American Brands, Inc.*,
   70 F.R.D. 579 (M.D.N.C.1976)...............................................................19

*In re Env't Elecs. Sys., Inc.*,
   11 B.R. 962 (Bankr. N.D. Ga. 1981)................................................. 15, 17

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*,
   No. 12-MD-02324, 2014 WL 12496734 (S.D. Fla. July 10, 2014) ....................14

*Johnson v. Mortham*,
   915 F. Supp. 1529 (N.D. Fla. 1995) ................................................ 15, 21, 22

*Kneeland v. National Collegiate Athletic Association*,
   806 F.2d 1285 (5th Cir. 1987) ........................................................ 22, 23

*Mass. Food Assoc. v. Mass. Alcoholic Bev. Comm.*,
  197 F.3d 560 (1st Cir. 1999) ................................................................24

*Mausolf v. Babbitt*,
  85 F.3d 1295 (8th Cir. 1996) ...............................................................14

*Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*,
  425 F.3d 1308 (11th Cir. 2005) ...........................................................19

*Norris v. Ken Detnzer Sec. of State in His Off. Capacity*,
  No. 3:15CV343–MCR/EMT, 2015 WL 12669919 (N.D. Fla. Sept. 17, 2015)
  ................................................................................................... 17, 25

*Piambino v. Bailey*,
  757 F.2d 1112 (11th Cir. 1985) ...........................................................15

*Piedmont Heights Civic Club, Inc. v. Moreland*,
  83 F.R.D. 153 (N.D. Ga. 1979) ................................................. 4, 18, 24

*Piedmont Paper Prod., Inc. v. Am. Fin. Corp.*,
  89 F.R.D. 41 (S.D. Ohio 1980)..............................................................18

*Premier Foods of Bruton, Inc. v. City of Orlando*,
  192 F.R.D. 310 (M.D. Fla. 2000) .........................................................17

*Resort Timeshare Resales, Inc. v. Stuart*,
  764 F. Supp. 1495 (S.D. Fla. 1991)......................................................25

*Sellers v. U.S.*,
  709 F.2d 1469 (11th Cir. 1983) ...........................................................20

*State v. Biden*,
  338 F.R.D. 219 (W.D. La. 2021).............................................. 20, 22, 24

*Stuart v. Huff*,
  706 F.3d 345 (4th Cir. 2013) ...............................................................25

*Texas v. U.S.*,
  805 F. 3d 653 (5th Cir. 2015) ................................................... 22, 23

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
  454 U.S. 464 (1982) .............................................................................14

*Vazzo v. City of Tampa*,
  No. 8:17-CV-2896-T-36AAS, 2018 WL 1629216 (M.D. Fla. Mar. 15, 2018)
  .................................................................................................. 17,18

*Venegas v. Skaggs,*
  867 F.2d 527 (9th Cir. 1989) .................................................................21

*Victim Rts. L. Ctr. v. Rosenfelt*,
  988 F.3d 556 (1st Cir. 2021) ..................................................... 22, 23, 24

*W. Virginia v. U.S. Dep't of Treasury*,
  571 F. Supp. 3d 1229 (N.D. Ala. 2021) ...............................................21

*Weller v. Actors' Equity Ass'n*,
  93 F.R.D. 329 (S.D.N.Y. 1981)..............................................................17

*Worlds v. Dep't of Health & Rehab. Servs., State of Fla.*,
  929 F.2d 591 (11th Cir. 1991) ...............................................................15

## Rules

Federal Rule of Civil Procedure 24(b).............................................. 15, 19

Federal Rule of Civil Procedure 24(b)(1)(B)..................................... 14, 17

Federal Rule of Civil Procedure 24(b)(3) ...............................................14

Federal Rule of Civil Procedure 24(c) ....................................................15

Plaintiffs, by counsel, submit their response to the National Women's Law Center (NWLC) motion to permissively intervene.

## **INTRODUCTION**

On May 6, 2024, NWLC moved to intervene and simultaneously issued press releases attacking the sixteen Plaintiffs  as "anti-trans activists." NWLC's attack on student-athletes (some teenagers) for their legitimate views on biology, sport eligibility, and the meaning of Title IX was cruel and inaccurate. NWLC knew its attack would incite animosity and Plaintiffs are not "anti" anyone.

NWLC's attacks in press releases mirror the scorched earth polemics in its brief which, among other things, attempts to paint Plaintiffs' views on women's rights as racist and bigoted. *See* ECF 36-1 at 11-13. As NWLC's own words demonstrate, adding NWLC as a party would divert time, resources, and attention toward an ideological side show, distracting from the ultimate object of the case, ascertaining the legality of Defendants' policies and actions under Title IX and the Equal Protection Clause.

There are two preconditions for permissive intervention. First, a common claim or defense that shares with the main action a common question of law or fact. Though it seeks to intervene as a defendant, NWLC shares no "defense" with the NCAA or Georgia Defendants. It cannot be a defendant to Plaintiffs' claims

and does not allege it is covered by Title IX or the Equal Protection Clause.
Instead, NWLC has merely a generalized interest in the outcome of the lawsuit.

Second, intervention must not prejudice the parties or unduly delay the case.
Intervention would prejudice Plaintiffs and undermine expeditious progress of the
case. For starters, NWLC's insistence on publicly attacking Plaintiffs for
advancing a good faith legal position harms Plaintiffs, disqualifying NWLC under
the prejudice prong of Rule 24(b)(3), by imposing a cost on Plaintiffs for merely
filing a lawsuit. Further, if the intervention threshold is as low as NWLC contends,
intervention will unleash a torrent of intervention motions from women's
organizations whose interests are not represented by NWLC. Representatives of six
women's organizations, spanning a philosophical continuum from radical
feminism to conservatism, have submitted declarations, confirming many such
organizations do not share NWLC's narrow view that women are defined by
choice rather than biology, and each of these organizations is interested in joining
the case as a party if advocacy groups are permitted to do so.

Further, although NWLC moves to intervene "as a defendant," ostensibly to
defend the NCAA's policies, NWLC has consistently criticized the NCAA's
current Transgender Athlete Eligibility Policies since 2022. Making NWLC a party
will facilitate its ulterior goal of pressuring the NCAA to conform to demands
NWLC has been making upon the NCAA Board of Governors for nearly three

years. Generating pressure is why the NWLC told the NCAA Board of Governors in advance it would intervene. NWLC's lobbying campaign against the NCAA is a concern for Plaintiffs, as NWLC's positions are even more disadvantageous to women than the NCAA's. For example, NWLC's position is that trans-identifying males cannot be required to provide hormone testing results to compete in women's sports, although the NCAA's current policy requires submission of such data. Rule 24 intervention was not designed to facilitate an advocacy organization pressuring a defendant. Because the NWLC and NCAA are not aligned on key issues, adding NWLC will multiply issues in the case, and given NWLC's adversarial stance towards the NCAA and Plaintiffs, may complicate discovery.

NWLC sought intervention on the theory the NCAA was signaling it would regress on "whether it will continue to permit transgender women and girls to participate *at all* in women's athletics." ECF No. 36-1 at 17. This basis was dispelled by the NCAA's motion to dismiss, demonstrating it will vigorously defend its policies that have not changed as NWLC predicted.

Although NWLC claims to bring a unique perspective to this lawsuit, that is not the standard for permissive intervention. NWLC has not identified anything it wants to share with the Court that cannot be communicated through an amicus brief. Thus, NWLC presents the "classic amicus curiae situation," where a group seeking intervention has "a genuine concern over the outcome of the litigation, yet

3

they stand at such a distance to it that their participation as intervenors might significantly complicate the proceedings." *Piedmont Heights Civic Club, Inc. v. Moreland*, 83 F.R.D. 153, 158–59 (N.D. Ga. 1979). As this Court denied intervention in *Piedmont Heights* it should do so here.

<b><u>FACTUAL AND PROCEDURAL BACKGROUND</u></b>

**A.    Plaintiffs' Complaint**

The Complaint was filed March 14, 2024, by 16 current and former NCAA female student-athletes, all younger than age 25. While Plaintiff Riley Gaines has become known for advocating for protecting women's opportunities in college sports since the 2022 NCAA Women's Swimming and Diving Championships, her co-Plaintiffs are not well known nationally.

**B.    Motion for Plaintiffs to Proceed Under Pseudonym**

On June 18, 2024, Plaintiffs moved for two Plaintiffs to proceed under pseudonyms based on "concerns regarding their personal safety and fears of backlash, stigma, and reprisals on the college campuses and communities where they study, work, and reside if it became publicly known that they were taking a position on [the] issue" of the NCAA's transgender eligibility policies in women's sport. ECF No. 58, p. 2. ("Pseudonym Motion"). Plaintiffs' *Pseudonym Motion* is supported by Declarations from three University Professors and/or administrators: *Dr. Wayne Lewis*, a University President and previously a long-time professor in the Southeastern Conference (SEC), ECF No. 58-2, *Dr. Donna Hughes*, endowed

chair in the College of Arts and Sciences' Department of Gender and Women's Studies at the University of Rhode Island, ECF No. 58-3, *Carole Hooven, PhD*, a twenty-year member of the Department of Human Evolutionary Biology at Harvard University, ECF No. 58-4, and three student-athletes: Riley Gaines, ECF No. 58-5, Macy Petty, ECF No. 58-6, and Lilly Mullens ECF No. 58-7, who have all experienced and observed harsh threats, acts of violence, retaliation and reprisals to which Plaintiffs are subject merely for expressing their views on the NCAA's policies and pursuing their sex-based rights under Title IX and the U.S. Constitution. NWLC's vitriol towards Plaintiffs contributes to these hardships.

### C.   NWLC's Inaccurate Accusations Concerning Plaintiffs

On the day it moved to intervene the NWLC's lawyers issued multiple press releases calling Plaintiffs "anti trans extremists" and inaccurately claiming Plaintiffs are seeking to misuse Title IX for the purpose of "bullying" trans students.[1] NWLC repeatedly mischaracterized Plaintiffs' legal position, claiming, for example, Plaintiffs are "trying to force a blanket ban that will exclude all trans

---

[1] *NWLC Joins Lawsuit Defending Trans Inclusion in College Sports*, May 6, 2024, *available at*: https://nwlc.org/resource/nwlc-joins-lawsuit-defending-trans-inclusion-in-college-sports/ (**Exhibit 1**); *Press Release: National Women's Law Center Intervenes in Defense of Transgender College Athletes*, May 6, 2024, *available at*: https://www.acluga.org/en/press-releases/press-release-national-womens-law-center-intervenes-defense-transgender-college (**Exhibit 2**). **Note**: **Exhibits 1-9** are authenticated in the Declaration of Kimberly Layton submitted as **Exhibit 15**.

women from college sports governed by the NCAA"[2] and that "plaintiffs seek to categorically ban transgender women and girls from playing NCAA sports[.]"[3] NWLC said it was "proud to be entering this important legal battle to ensure extremists cannot misuse Title IX as a weapon to enforce bullying and exclusion of [trans] students[.]"[4]

Extending its rhetoric even further, NWLC claimed Plaintiffs' lawsuit is "not only an attack on trans women and girls – it's an attack on all women and girls."[5] Without any evidence NWLC asserts, "It's no coincidence that the activists who brought this case think women should be solely defined by our ability to carry children" and "[t]his case is part of a broader, extreme effort to control women's bodies and lives, but we won't let them succeed in selling women out."[6]

When NWLC uses the term "*anti-trans extremist*" it intends to incite extreme abhorrence and aversion. It claims that "anti-trans extremists overlap with villains from the anti-abortion movement and full-on white supremacists and

---

[2] **Exhibit 1**.
[3] Cooley, ACLU Represent National Women's Law Center in Intervening to Defend Transgender College Athletes, May 6, 2024, *available at*: https://www.cooley.com/news/coverage/2024/2024-05-08-cooley-aclu-represent-national-womens-law-center-in-intervening-to-defend-transgender-college-athletes (**Exhibit 3**).
[4] **Exhibit 1**.
[5] **Exhibit 2**.
[6] *Id*.

misogynists – they're all creepily trying to control other people's bodies!"[7] and that "'compromising' with anti-trans extremists threatens the lives and health of many girls and women, especially trans women, gender nonconforming women, and intersex women."[8]

However, Plaintiffs are not "anti-trans activists," do not seek to "exclude all trans women from college sports governed by the NCAA" or "think women should be solely defined by [their] ability to carry children," and this lawsuit does not "bully" trans students.

### D.    Women's Organizations Opposing NWLC's Motion to Intervene

NWLC claims an "overwhelming majority of women's rights and gender justice organizations share [NWLC's] view[s]."[9] This claim is rebutted through five declarations and two letters from seven leaders in women's organizations from across the philosophical and ideological spectrum. Those disputing NWLC's views, include: *Kara Dansky*, President of *Women's Declaration International USA* (WDI USA), a "nonpartisan organization [whose] supporters generally consider themselves to be liberal, very liberal or progressive," **Exhibit 10** p. 2, ¶3, attaching letters from *Kristin Zebrowski*, Georgia State Contact and Black

---

[7] *Just Let Kids Play!* May 10, 2023, *available at*: https://nwlc.org/just-let-kids-play/ (**Exhibit 4**).

[8] *Id*.

[9] *Id*.

Women's Caucus Member for WDI USA, and *Lauren Levey*, coordinator, WDI

USA Lesbian Caucus; *Sharon Byrne*, Executive Director of the *Women's*

*Liberation Front* (WoLF), a delegate to the United Nations Conference on the

Status of Women since 2020, who explains "WoLF is a non-profit radical feminist

organization dedicated to the liberation of women by ending male violence,

protecting reproductive sovereignty, preserving woman-only spaces, abolishing

gender, and ending invidious sex discrimination . . . [that regards] [r]adical

feminism [as] based on the recognition that women and girls are oppressed under a

male-supremacist system called patriarchy which is organized around the

extraction of resources from female bodies and minds, including reproductive,

sexual, emotional, and labor resources, and that gender is a hierarchical caste

system that organizes male supremacy," **Exhibit 11**, p. 1-2, ¶3; *May Mailman*

Director of the *Independent Women's Law Center* (IWLC) and senior legal advisor

of the *Independent Women's Network* (IWN), IWLC is a nonprofit, nonpartisan

501(c)(3) organization founded by women to foster education and debate on legal,

social, and economic policy issues, **Exhibit 12**, p. 1, ¶3; *Doreen Denny*, Senior

Advisor for *Concerned Women for America* (CWA), "a grassroots organization

with more than half a million members in all fifty states and thousands in the state

of Georgia . . . [that] encourages policies that strengthen and protect women and

families and advocates for the traditional virtues that are central to America's

cultural health and welfare," **Exhibit 13**, p. 1, ¶2; and *Fiona Mcanena*, Director of

Campaigns for *Sex Matters*, "a charity registered in England with objectives to:

promote human rights where they relate to biological sex, advance education about

sex and the law, [and] promote the sound administration of the law in relation to

sex and equality in the law," **Exhibit 14**, p. 1, ¶3. If NWLC is permitted to

intervene, then WDI USA, WoLF, IWLC, IWN, CWA, and Sex Matters, are each

interested in intervening as a party.

### E.    NCAA's Motion to Dismiss

On June 5, 2024, the NCAA moved to dismiss Plaintiffs' Complaint.

ECF 55-1. The NCAA's motion alleges the Complaint is an "impermissible

shotgun pleading," *id*. at 2-5, Title IX does not apply to the NCAA, *id*. at 5-10, the

NCAA is not a state actor, *id*. at 10-19, and Plaintiffs lack standing. *Id*. at 19-23.

### F.    NWLC Opposes the NCAA's Transgender Eligibility Policies

Although NWLC seeks to join this lawsuit as a *defendant*, NWLC's

consistent position for years has been that the NCAA's Transgender Eligibility

Policies are inconsistent with Title IX. Since January 2022 NWLC has lobbied the

NCAA Board of Governors to change its Transgender Eligibility Policies.

On January 27, 2022, NWLC "criticiz[ed]"[10] the NCAA's Transgender Athlete Eligibility Policies saying they were a "hasty change in response to pressure by those who are furious about a tiny number of trans college athletes earning success in their sports."[11] NWLC claimed they do "not provid[e] minimum protections across sports for equity, inclusion, or evidence-based policies."[12]

On February 15, 2022, NWLC joined a letter "to express concerns about the process and content of the newly adopted NCAA Transgender Athlete Participation Policy."[13] The letter called the policy changes "alarming."[14]

On May 6, 2024, NWLC again criticized the NCAA, charging that "[u]nder political pressure, a few years ago, the NCAA hastily scaled back its own long-term, previous policy that offered a clear path to inclusion for trans women in college who were receiving gender-affirming medical care."[15] NWLC's

---

[10] "Criticizing" the NCAA's 2022 modifications to its Transgender Eligibility Policies is the term used by NWLC's Chief Program Officer. *See* Martin Decl., ECF No. 36-2, p. 11 of 28, ¶ 14.

[11] *Dear NCAA, It's Not Too Late to Let Trans & Intersex Students Play!* January 27, 2022, *available at*: https://nwlc.org/dear-ncaa-its-not-too-late-to-let-trans-intersex-students-play/ (**Exhibit 5**).

[12] *Id.*

[13] *25 Organizations Join WSF Letter to NCAA Regarding Transgender Athlete Participation Policy*, February 15, 2022, *available at*: https://www.womenssportsfoundation.org/advocacy/25-organizations-join-wsf-letter-to-ncaa-regarding-transgender-athlete-participation-policy/ (**Exhibit 6**).

[14] *Id.*

[15] **Exhibit 2**.

Memorandum accuses the NCAA of "adopt[ing] increasingly restrictive policies that make it more difficult for transgender women to participate."[16]

### G.   NWLC's Position is that the NCAA's Transgender Eligibility Policies Violate Title IX

NWLC advocates for no restrictions on male-to-female transgender athletes competing in intercollegiate sports,[17] which conflicts with the NCAA's current Transgender Eligibility Policies. NWLC's position is that Title IX prohibits sex verification practices, including "[a] requirement of third-party documentation of a student's gender by a health care provider."[18] However, the NCAA Transgender Eligibility Policies require male-to-female transgender athletes to specify they are receiving transgender care from a health care provider.[19]

The NCAA requires that a male-to-female transgender athletes provide blood test results confirming testosterone below a threshold.[20] However, NWLC

---

[16] Memorandum, ECF No. 36-1, p. 15 of 32.

[17] **Exhibit 4** ("If NWLC were writing the [Title IX] athletes rules, we'd just say that: everyone gets to play.").

[18] *NWLC Letter to Department of Education Re: Nondiscrimination on the Basis of Sex in Athletics Education Programs or Activities Receiving Federal Financial Assistance, 88 Fed. Reg. 22860, Docket ID ED-2022-OCR-0143* , May 15, 2023, *available at*: https://nwlc.org/wp-content/uploads/2023/05/NWLC-Comment-on-88-Fed.-Reg.-22860-Title-IX-Athletics-Rule-5.15.2023.pdf  ("NWLC Letter to DOE").

[19] NCAA Transgender Eligibility Procedures, ECF No. 1-1 at 6-8 (male-to-female athlete must provide medical professional attestations and testosterone levels).

[20] NCAA Transgender Eligibility Procedures, ECF No. 1-1 at 4 (requirement to submit serum testosterone levels).

says it is an "impermissible certification requirement" for a student to be asked to "prove the specific gender affirming care they are receiving, including by producing a list of prescribed medications with dosages, along with quarterly blood testing results detailing levels of sex hormones."[21]

### H.    NWLC Seeks to Intervene to Advocate for its Own Policy Views

In its own words, NWLC "intervened because the plaintiffs do not speak for all women, and to ensure that the rights of transgender women and girls are adequately represented in the case."[22] Thus, NWLC asserts that, "in protecting [NWLC's] own interests, NWLC will also represent *a vital perspective* [allegedly] *not currently represented*—that of women who support the inclusion of transgender women in women's sports."[23] NWLC does not allege that the relief Plaintiffs request would collide with any property or liberty interest, or other protectible interest *possessed by NWLC*. Rather, NWLC wants to intervene because the relief Plaintiffs seek conflicts with NWLC's policy views.

### I.    Intervention is Part of NWLC's Effort to Lobby the NCAA Board of Governors

NWLC acknowledges it, "engages and advocates before regulators of athletics, like the National Collegiate Athletic Association . . . and has done so for

---

[21] NWLC Letter to DOE.
[22] **Exhibit 3**; *see* Memorandum, ECF No. 36-1, p. 3 ("NWLC seeks to defend the lawfulness of policies that are inclusive of transgender women and to ensure the interests of all women are represented in this case.").
[23] Memorandum, ECF No. 36-1, p. 9.

decades."[24] Recent lobbying efforts include an April 24, 2024, letter to the NCAA

demanding the Board of Governors[25] not change its current policies in response to

*this lawsuit*,[26] advising to do so "would expose the NCAA to legal liability[.]"[27]

Labeling Plaintiffs "anti-trans extremists," and "far-right, anti-trans

extremists," NWLC told the NCAA Board of Governors NWLC would "seek to

intervene as a defendant in the recently filed lawsuit against the NCAA's current

eligibility standards (*Gaines et al. v. NCAA et al*.)."[28] NWLC advised not to follow

"the Eleventh Circuit's holding in *Adams v. School Board of St. John's County,*"

because allegedly *Adams* is in "the minority of decisions interpreting Title IX."[29]

NWLC's Chief Program Officer says the letter to the Board of Governors *about*

*this lawsuit* "builds on its similar work in recent years" of "advocating before the

NCAA's Board of Governors."[30]

### J.    NWLC Raises Issues Not Relevant Under the NCAA's Policies

NWLC complains of "policing of students' bodies, appearances and gender

expressions," stating "any woman or girl who is perceived as 'suspiciously' strong,

---

[24] Martin Decl., ECF No. 36-2, p. 10 of 28, ¶ 12.

[25] *Id*., ¶ 13.

[26] NWLC Letter to NCAA Board of Governors, ECF 36-2, pp. 20-21 of 28.

[27] *Id*., *see also* p. 24 of 28.

[28] *Id*., pp. 20-22 of 28, see especially p. 22 ("far-right, anti-trans extremists," "anti-trans extremists—including the plaintiffs in the recent lawsuit against the NCAA").

[29] *Id*., p. 25 of 28.

[30] Martin Decl., ECF No. 36-2, p. 11 of 28, ¶ 14.

fast, agile, or talented in her sport risks challenge, scrutiny by officials of their schools, school boards, and athletic associations, accusations, and the burden to prove she is a 'real' woman or girl," citing news articles about *high school sports policies* in Utah and Ohio, not the NCAA's Policies.[31]

## **ARGUMENT**

### A.    **Standard for Permissive Intervention**

Article III of the Constitution "forecloses the conversion of courts of the United States into judicial versions of college debating forums." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982). While Rule 24 "promotes judicial economy by facilitating [intervention] . . . a federal case is a limited affair, and not everyone with an opinion is invited to attend." *Mausolf v. Babbitt*, 85 F.3d 1295, 1301 (8th Cir. 1996). It is a NWLC's burden to satisfy the standards for intervention. *See In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, No. 12-MD-02324, 2014 WL 12496734, at *2 (S.D. Fla. July 10, 2014).

First, NWLC must establish it "has a . . . defense that shares with the main action a common question of law or fact." Fed. R. Civ. Pro. 24(b)(1)(B). Second, NWLC must demonstrate intervention will not prejudice the parties or delay the case. Fed. R. Civ. Pro. 24(b)(3). Even if both threshold requirements are met,

---

[31] Memorandum at 5, *see especially* fn. 4 and fn. 5.

NWLC must still demonstrate "whether intervention should be allowed." *In re Env't Elecs. Sys., Inc*., 11 B.R. 962, 964 (Bankr. N.D. Ga. 1981). Other relevant factors include "whether the movant's interests are adequately represented by existing parties [and] . . . judicial economy." *Johnson v. Mortham*, 915 F. Supp. 1529, 1535 (N.D. Fla. 1995).

Permissive intervention is *permissive*. Therefore "even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention." *Worlds v. Dep't of Health & Rehab. Servs., State of Fla.*, 929 F.2d 591, 595 (11th Cir. 1991); *accord Burke v. Ocwen Fin. Corp*., 833 F. App'x 288, 293 (11th Cir. 2020).

In this case, the Court's analysis is affected by NWLC's failure to meet the Rule 24(c) requirement to submit "a *pleading* that sets out the claim or defense for which intervention is sought." (emphasis added). Courts in this Circuit do not reflexively deny intervention for failure to "strictly to heed the requirements of Rule 24(c)," *Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985), but it is a requirement movant's defenses be "clearly spelled out" in their papers. *Id*. Therefore, as NWLC did not attach a proposed answer it was required to demonstrate that the three alleged common questions of law and single question of fact identified on p. 24 of its brief "clearly spelled out" NWLC's "defense."

**B.    NWLC Lacks a Defense Sharing a Common Question of Law or Fact with the Defenses of the NCAA or Georgia Defendants**

NWLC alleges the three "common questions of law presented by NWLC's defense are: [1] whether Title IX prohibits transgender women from participating on women's athletic teams [2] whether Title IX and the Fourteenth Amendment prohibit transgender women from using the same locker room, restroom, and shower facilities as other women, and [3] whether there is a substantive due process right to exclude transgender women from such facilities."[32] The single common fact "presented by NWLC's defense" is "the impacts that allowing transgender students to play has on opportunities for cisgender women and girls."[33] NWLC does not specify to what "defense" these alleged common legal questions and common fact are purportedly tied.

Although NWLC is seeking to intervene as a "defendant," NWLC has not alleged it or its members are in any way subject to the claims of Plaintiffs. For instance, NWLC is not a college athletic conference, they are not a college or university, nor do they claim a member is a transgender student-athlete competing at a NCAA institution. Rather, the only interest NWLC asserts is a generalized interest shared by many advocacy groups interested in the issue of transgender eligibility in women's sport. NWLC hopes Plaintiffs do not prevail, but NWLC has

---

[32] Memorandum, ECF No. 36-1, p. 24 of 32 (numbering added).
[33] *Id.*

not shown it has a *defense* that shares common questions of law or fact with any NCAA defense. Therefore, NWLC has not identified it has a "defense that shares with the main action a common question of law or fact." Rule 24(b)(1)(B).

"A proposed defendant intervenor must have a *defense* that shares a common question of law or fact with the main action." *Vazzo v. City of Tampa*, No. 8:17-CV-2896-T-36AAS, 2018 WL 1629216, at *4 (M.D. Fla. Mar. 15, 2018), *report and recommendation adopted sub nom. Vazzo v. City of Tampa, Fla.*, No. 8:17-CV-2896-T-36AAS, 2018 WL 1620901 (M.D. Fla. Apr. 4, 2018) (emphasis added). "Mere interest in the subject matter or outcome of the primary case is not enough." *Weller v. Actors' Equity Ass'n*, 93 F.R.D. 329, 330 (S.D.N.Y. 1981). "[T]he intervening party must demonstrate more than a general interest in the subject matter of the litigation before permissive intervention is allowed." *In re Env't Elecs. Sys., Inc.*, 11 B.R. at 964. Where movant "has only asserted an interest in the outcome of the case . . . permissive intervention is not appropriate . . . and should not be allowed." *Id. See Norris v. Ken Detnzer Sec. of State in His Off. Capacity*, No. 3:15CV343–MCR/EMT, 2015 WL 12669919 at *2 (N.D. Fla. Sept. 17, 2015) (permissive intervention denied to advocacy groups that had "no enforcement role in upholding the challenged amendments ... and thus they [did] not share a claim or defense"); *Premier Foods of Bruton, Inc. v. City of Orlando*, 192 F.R.D. 310, 312 (M.D. Fla. 2000) (denying permissive intervention where the

proposed intervenor had "general complaints . . . unrelated to the agreement at issue in th[e] case"). Here, NWLC has general complaints but does not share a common defense with the NCAA.

Another concern with allowing intervention by an advocacy group lacking a defense in the case is that if "the interests expressed by the proposed intervenors [would] be found sufficient to allow intervention, the door would indeed be open wide for all who wish to express an opinion on [a broad question of public policy] to intervene." *Piedmont Heights Civic Club, Inc. v. Moreland*, 83 F.R.D. at 158–59. As noted in *Vazzo*, "there is a legitimate dispute on whether advocacy organizations with no enforcement authority over a law, like Equality Florida, actually [has] a common 'defense' with the . . . entity defending the law." *Vazzo*, *4. *See Brenner v. Scott*, 298 F.R.D. 689, 691–92 (N.D. Fla. 2014) (permissive intervention denied to an advocacy group based on the "procedural complexity that intervention would entail" and because intervention could "bring forth other proposed intervenors who would assert only generalized political interests and whose participation probably would generate more heat than light" but allowing amicus participation.)

Responding to an argument that existing Defendants would not adequately represent nonparties with different views, the court in *Piedmont Paper Prod., Inc. v. Am. Fin. Corp.*, 89 F.R.D. 41, 44 (S.D. Ohio 1980), pointed out "the individual

defendants may call the applicant or any other [individual] sharing his views, as a witness." Similarly, in *Grogan v. American Brands, Inc*., 70 F.R.D. 579 (M.D.N.C.1976), a female employee sued her employer alleging sex discrimination and other women sought to intervene, contending, "that plaintiff neither represents them nor a majority of the female employees of defendants." *Id*. at 580. The court found the proper role, if any, of proposed intervenors was "as . . . witnesses for defendants." *Id*. at 583.

NWLC is one of hundreds of advocacy groups with a generalized interest in the lawsuit but has shown no unique reason to intervene. NWLC's motion should be denied due to failure to identify a defense that shares with the main action a common question of law or fact.

### C.   Intervention Will Prejudice the Original Parties and Cause Undue Delay

Prejudice arises under Rule 24(b) when proposed intervenors' "claims and interests . . . threaten . . . delay . . . and makes it unlikely that any new light will be shed on the issues to be adjudicated." *Chiles v. Thornburgh*, 865 F.2d 1197, 1215 (11th Cir. 1989). Intervention can be denied based on the "inevitability of expanded discovery, and the possibility that the existing parties would be forced to litigate new issues." *Burke*, 833 F. App'x at 294. *See Mt. Hawley Ins. Co. v. Sandy*

*Lake Properties, Inc*., 425 F.3d 1308, 1312 (11th Cir. 2005) (intervention would introduce new issues).

Care should be taken when intervention is sought by a group "advocating for positions not at issue," *State v. Biden*, 338 F.R.D. 219, 225 (W.D. La. 2021), as it "could expand the case to issues not before [the] court." *Id*. *See Sellers v. U.S.*, 709 F.2d 1469, 1472 (11th Cir. 1983) (denying intervention that "would have expanded [the] litigation to include [additional] disputes").

Manageability issues would likely arise from NWLC's practice of using demeaning rhetoric to attempt to intimidate those with different views. In sport cases where NWLC filed amicus briefs it described those who support protecting the female category as "[o]pponents of LGBTQI+ equality" and "attempt[ing] to score political points by demonizing trans, nonbinary, and intersex student athletes."[34] NWLC also misleadingly calls efforts to protect the women's category of sport transgender athlete "bans." NWLC and aligned groups recently inaccurately called state laws which allowed trans-identifying athletes to compete

---

[34] *Why Arizona's Anti-Trans Sports Ban Harms All Women and Girls*, October 16, 2023, *available at*: https://nwlc.org/why-arizonas-anti-trans-sports-ban-harms-all-women-and-girls/ (**Exhibit 7**); *NWLC Leads Amicus Brief Challenging Anti-Trans Sports Ban in West Virginia*, April 4, 2023, *available at*: https://nwlc.org/nwlc-leads-amicus-brief-challenging-anti-trans-sports-ban-in-west-virginia/ (**Exhibit 8**).

in their biological categories, as "laws banning trans students from school sports[.]"[35]

### D.   Additional Factors Support Denial of Intervention

If a common question related to a defense of the movant is shown and if the potential for prejudice or undue delay is excluded, the Court should next evaluate factors relevant to exercise of its discretion, including: (1) "whether the proposed intervenor has standing to assert a protected interest at issue in the suit," *Johnson*, 915 F. Supp. at 1535 (citing *Thornburgh*, 865 F.2d at 1212–13); (2) "whether the movant's interests are adequately represented by existing parties," *id*. (citing *Venegas v. Skaggs,* 867 F.2d 527, 530–31 (9th Cir. 1989); and (3) "judicial economy," *Id*. (citing *Bush v. Viterna,* 740 F.2d 350, 359 (5th Cir. 1984).

### 1.   NWLC lacks standing or a legal interest in the case

This Circuit does not require standing to pursue permissive intervention. *Chiles*, 865 F.2d at 1213. Nonetheless, lack of standing and an intervenor's interested bystander status weigh against intervention. *W. Virginia v. U.S. Dep't of Treasury*, 571 F. Supp. 3d 1229, 1248 (N.D. Ala. 2021), *aff'd sub nom. W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124 (11th Cir. 2023) (one of "several factors [that] counsel against permissive intervention [was

---

[35] Letter of 110 Organizations to the NCAA Board of Governors regarding Transgender Eligibility Policies, April 23, 2024, *available at*: https://www.athleteally.org/wp-content/uploads/2024/04/Open-Letter-to-NCAA-Orgs.pdf (**Exhibit 9**).

that the proposed intervenor] lacks Article III standing in its own right").

### 2.    NCAA is adequately defending its policies

The primary factor typically considered when weighing whether to exercise discretion is whether intervenor's interests are adequately represented by other parties. "The burden of establishing inadequate representation is on the applicant for intervention." *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996).

"Where an existing party pursues the same ultimate objective as an applicant seeking intervention, the proposed intervenor's interest is presumed to be adequately represented." *Johnson*, 915 F. Supp. at 1536, citing *FSLIC v. Falls Chase Special Taxing Dist.,* 983 F.2d 211, 215 (11th Cir. 1993); *accord Texas v. U.S.*, 805 F. 3d 653, 661 (5th Cir. 2015); *Kneeland v. National Collegiate Athletic Association*, 806 F.2d 1285, 1288 (5th Cir. 1987); *Edwards*, 78 F.3d at 1005; *Bush*, 740 F. 2d at 354; *State v. Biden*, 338 F.R.D. at 224–25. The ultimate objective of the NCAA *in this lawsuit* is to uphold its policies. Pursuit of a different objective is not a proper basis for intervention because, as explained above, it is not proper to use intervention to inject new issues into a lawsuit.

If a proposed intervenor merely demonstrates "divergent motivations" from a defendant that "have led them to pursue different legal strategies" this is not enough to render a defendant's representation inadequate. *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021). "Perfect identity of motivational

interests between the movant-intervenor and the [existing defendants] [is not] necessary to a finding of adequate representation." *Id*. at 562. Accordingly, in *Victim Rts. L. Ctr.* a defendant's "putative interests in 'regulatory flexibility' and minimizing future legal challenges" and unwillingness to make an additional constitutional argument did not render the defendant inadequate. *Id*.

In *Kneeland* two NCAA member universities sought to intervene in a lawsuit against the NCAA and Southwestern Conference (SWC). The universities argued "they ha[d] a stronger interest in the litigation and so [were] the appropriate parties to the suit" and that "the existing parties have not voiced [the universities'] concerns." *Id*. at 1288. Proposed intervenors also argued "that their interests are adverse to the NCAA and the SWC because the associations are the regulators while the universities are the regulated." *Id*.

However, the Fifth Circuit concluded that "when the party seeking to intervene has the same ultimate objective as a party to the suit, the existing party is presumed to adequately represent the party seeking to intervene unless that party demonstrates adversity of interest, collusion, or nonfeasance." *Kneeland*, 806 F.2d at 1288, citing *Bush,* 740 F.2d at 355. Because the proposed intervenors did not show adversity of interest, collusion, or nonfeasance they were not entitled to intervene. *Kneeland*, 806 F.2d at 1288, accord *Texas v. U.S.*, 805 F. 3d at 661;

*Clark v. Putnam County*, 168 F.3d 458, 461 (11th Cir. 1999); *Edwards*, 78 F.3d at

1005; *State v. Biden*, 338 F.R.D. at 224.

The NWLC has not alleged, much less shown, sufficient facts to overcome

the presumption of adequate representation and as *Kneeland* reflects, there is no

per se rule that a regulator, such as the NCAA, will not adequately represent the

interests of a regulated person. *See Mass. Food Assoc. v. Mass. Alcoholic Bev.

Comm.*, 197 F.3d 560, 568 (1st Cir. 1999) (the "cases do not support such a per se

rule"). Intervention is not appropriate because the NCAA's Policies are adequately

defended by the NCAA.

### 3.    Judicial economy

As discussed above, intervention by the NWLC threatens to open the

floodgates to intervention by other similarly situated advocacy organizations. Thus,

this Court "must consider the potential unmanageability of the . . . litigation should

[it] allow intervention." *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214,

217 (4th Cir. 1976). In *Westinghouse*, the Fourth Circuit denied intervention in part

because it foresaw a future in which the trial court could be deluged by additional

intervenors and briefs that offered "no new viewpoints and little if any illumination

to the original . . . dispute." *Id*. Instead of opening the floodgates, the Court should

recognize this is a "classic amicus curiae situation." *Piedmont Heights* 83 F.R.D. at

158-59; *see also Victim Rts. L. Ctr.,* 988 F.3d at 564 (amicus procedure sufficient

24

to present view); *Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013) (amicus was sufficient alternative avenue of expression); *Massachusetts Food Assoc.,* 197 at 568; *Norris,* 2015 WL 12669919, at *1; *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991). Likewise, here any contribution to this case by NWLC should be made in an *amicus* role.

## <u>CONCLUSION</u>

For the reasons explained above, NWLC's Motion to Intervene should be denied.

Respectfully submitted,

*/s/ William Bock III*

William Bock III, Atty. No. 14777-49[36]
Kevin D. Koons, Atty. No. 27915-49[37]
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:   wbock@kgrlaw.com
Email:    kkoons@kgrlaw.com

*/s/ Bryan P. Tyson*

Bryan P. Tyson, Ga. Bar No. 515411
Thomas C. Rawlings, Ga. Bar No. 595795
Deborah A. Ausburn, Ga. Bar No. 028610
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Fax: (770) 434-7376
E-mail: btyson@taylorenglish.com
E-mail: trawlings@taylorenglish.com
E-mail: dausburn@taylorenglish.com

*ATTORNEYS FOR PLAINTIFFS*

---

[36] *Pro hac vice*
[37] *Pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, counsel certifies that the foregoing was prepared

in Times New Roman, 14-point font, in compliance with Local Rule 5.1C.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411

*ATTORNEY FOR PLAINTIFFS*