UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RILEY GAINES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:24-cv-01109-MHC |
| v. | ) | |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

## DEFENDANT NCAA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs previously filed a 155-page, 637-paragraph Complaint (Dkt. 1), which the NCAA moved to dismiss (Dkt. 55). In response, Plaintiffs filed an even longer Amended Complaint (Dkt. 64) that still suffers from the same fatal problems.

The Supreme Court has held that the NCAA is not covered by Title IX. *NCAA v. Smith*, 525 U.S. 459 (1999) (*Smith I*). The Supreme Court has also held that the NCAA is not a state actor that can be sued under Section 1983. *NCAA v. Tarkanian*, 488 U.S. 179 (1988). Despite those binding precedents from our Nation's highest court, Plaintiffs have sued the NCAA for alleged violations of those laws (Title IX [Counts I and V] and Section 1983 [Counts II, III, and IV]), and they do so with a pleading filed by a group of Plaintiffs who lack standing to assert claims for

prospective injunctive relief. The Court should dismiss the claims against the NCAA with prejudice.

## I.     <u>The Court Should Dismiss the Title IX Claims Against the NCAA</u>

### A.     **Plaintiffs Do Not Sufficiently Allege That the NCAA Receives Federal Financial Assistance**

Counts I and V of the Amended Complaint purport to assert causes of action against the NCAA for alleged Title IX violations. To fit under Title IX, a plaintiff must allege "(1) that she was excluded from participation in, denied benefits of, or subjected to discrimination in an educational program; (2) that the exclusion was on the basis of sex; and (3) that the defendant receives federal financial assistance." *Riddle v. Orange Cnty. Sch. Bd.*, No. 6:19-cv-771-Orl-22LRH, 2019 U.S. Dist. LEXIS 249520, at *6-7 (M.D. Fla. July 2, 2019) (citation omitted); *accord Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). Plaintiffs have not met that third required prong.[1] Twenty-five years ago, the Supreme Court held that a college athlete could not sue the NCAA under Title IX merely because it receives dues payments from colleges. *See Smith I*, 525 U.S. at 462. Since then, no court has applied Title IX to the NCAA because its member institutions receive federal funding. *See, e.g.*, *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015) (dismissing Title IX claims because "there is no allegation that the NCAA has

---

[1] Plaintiffs also cannot meet the first or second prongs, but it is not necessary to argue those points in this Motion.

received Federal financial assistance such that it would be subject to suit under Title IX").

Plaintiffs' apparent attempt to surmount that legal roadblock fails because they do not present sufficient allegations that the NCAA is a recipient of federal funding. Plaintiffs offer only a legal conclusion: that "from at least 2014 through the present the NCAA has been a direct and/or indirect recipient and beneficiary of financial assistance from the U.S. federal government." Am. Compl. ¶ 170. But "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth."). Plaintiffs here fail to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. They fail to show "facial plausibility" because they do not "plead[] factual content that allows the court to draw the reasonable inference" that the NCAA receives federal assistance. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (explaining that "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" (quotation marks and citation omitted)).

Plaintiffs attempt to base their legal conclusion of federal funding on allegations that "[s]tarting in 2014, the NCAA and the U.S. Department of Defense (DoD) entered into a 'partnership'" to study concussions. Am. Compl. ¶ 159; *see also* Am. Compl. ¶ 170 (containing similar conclusory allegation that the NCAA received federal funding tied to this "Grand Alliance"). But Plaintiffs never allege any facts to show that the NCAA itself received DoD money or any other federal funds. Instead, the only reasonable inference from the specific facts Plaintiffs allege is that the concussion research project described in ¶¶ 160-169 of the Amended Complaint is a separate research entity funded by both the DoD and the NCAA. Plaintiffs specifically and repeatedly allege that. They factually allege that "The NCAA-U.S. Department of Defense Concussion Assessment, Research and Education Consortium" is a "project, *funded by NCAA and DoD*." *Id.* at ¶ 165 (emphasis added).[2] They describe "[t]he *research funded by the NCAA and the federal government* through the NCAA-DoD Grand Alliance." *Id.* at ¶ 167 (emphasis added). They quote President Obama that "[t]he NCAA and the Department of Defense *are teaming up* to commit *$30 million for concussion education and a study involving up to 37,000 college athletes* which will be the most

_____

[2] The Amended Complaint at paragraph 167 provides a link to an article asserting "[t]he Concussion Assessment, Research and Education Consortium, known as the CARE consortium, is a major concussion/TBI research study *supported by the DOD and the National Collegiate Athletic Association*, as a part of the DOD-NCAA Grand Alliance." *See* Exhibit B (emphasis added).

comprehensive concussion study ever." *Id.* at ¶ 160 (first emphasis added; second italics in Amended Complaint).

Plaintiffs also describe "The NCAA-DOD Grand Alliance and the millions in ***federal dollars contributed to the project***." *Id.* at ¶ 168 (emphasis added); *see also id.* at ¶ 165 (describing project with "additional ***funding from the NCAA and DoD***") (emphasis added). They assert "that more than $105 million had been given to the Grand Alliance concussion education and study program" and that "[a]t least $85 million in ***funding for the NCAA-DoD Grand Alliance has come from the federal government***." *Id.* at ¶¶ 162-63 (emphasis added). But Plaintiffs do not expressly allege that any federal DoD dollars are received by the NCAA because there is no good faith basis for Plaintiffs to make that allegation. Without any factual averment to support an allegation that "the DoD provides the NCAA funding" (*id.* at ¶ 159), Plaintiffs' unsupported legal conclusions that the NCAA receives federal financial assistance because of that program are entitled to no weight. The Court should therefore dismiss the Title IX claims against the NCAA.

### B.    Plaintiffs' Alternative Ceding Control Theory Has Been Rejected

Unable to assert facts that the NCAA receives federal assistance, Plaintiffs may be trying an alternative path to Title IX application using a vague, general allegation that The NCAA's Transgender Eligibility Policies are collegiate sport eligibility rules over which NCAA member institutions have given the NCAA

"control," Am. Compl. ¶ 173, and that members have given the NCAA control over competition rules and championship events. *Id.* ¶ 131. But that attempt also fails as a matter of law. No court has ever applied Title IX to the NCAA under a "ceding control" theory, and the Third Circuit has rejected that argument twice.

In *Smith v. NCAA*, 266 F.3d 152 (3d Cir. 2001) (*Smith II*), the Third Circuit directly addressed and closed as a matter of law the ceding-control issue that Plaintiffs here describe as having been "left open" by the Supreme Court in *Smith I* Compl. ¶ 44. Like Plaintiffs here, the *Smith II* plaintiffs grounded their ceding-control theory on the allegation "that the NCAA exercised controlling authority over its federally-funded member institutions because it had the power to establish rules governing intercollegiate athletics at member schools." 266 F.3d at 157. *Smith II* granted the NCAA's motion to dismiss because "[t]he fact that the institutions make . . . decisions cognizant of NCAA sanctions does not mean the NCAA controls them." *Id.* at 156 (quoting *Cureton v. NCAA*, 198 F.3d 107, 116 (3d Cir. 1999)).

*Smith II* relied on that court's *Cureton* decision granting summary judgment to the NCAA and holding as a matter of law "that the NCAA['s] members have not ceded controlling authority to the NCAA by giving it the power to enforce its

eligibility rules directly against the students." 198 F.3d at 117-18.[3] *Cureton*

specifically rejected the argument that Plaintiffs appear to be making here:

> [W]e cannot understand how the fact that the NCAA
> promulgates rules and regulations with respect to
> intercollegiate athletics somehow means that the NCAA
> has controlling authority over its members' programs or
> activities receiving Federal financial assistance. After all,
> the institutions decide what applicants to admit, what
> employees to hire, and what facilities to acquire.

*Id.* at 118. *Cureton* relied on the Supreme Court's holding in *Tarkanian* "that the

NCAA does not 'control' its members." *Id.* at 117 (citing 488 U.S. at 192). *Cureton*

also relied on the NCAA constitution, which "expressly provides for the retention of

institutional control over individual athletic programs." *Id.* at 118.

In short, Plaintiffs have not—and cannot—assert a claim against the NCAA

under Title IX, and the Court should dismiss the Title IX claims with prejudice.

## II.   The Court Should Dismiss the Section 1983 Claims Against the NCAA

### A.   The NCAA Is Not a State Actor Subject to Section 1983 Liability

Counts II, III, and IV of the Amended Complaint purport to assert claims

against the NCAA under Section 1983, but Plaintiffs' allegations do not meet the

requirement of 42 U.S.C. § 1983 to show that the NCAA's alleged conduct was

committed by a state actor acting under color of state law. *See Harvey v. Harvey*,

---

[3] Although *Cureton* applied Title VI, rather than Title IX, the Third Circuit held that "the statutes are essentially similar." 198 F.3d at 117.

949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 156-57 (1978)). Plaintiffs do not show that the NCAA acted with "power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). That failure is fatal because "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (citation omitted).

Plaintiffs' allegations that the state university defendants acted in accordance with NCAA policies are not sufficient to turn the NCAA into a state actor under Section 1983. The Supreme Court so held in *Tarkanian* when it **rejected** the argument that a Nevada state university clothed the NCAA with state authority by delegating its own functions to the NCAA. 488 U.S. at 192. *Tarkanian* held the NCAA was not a Nevada state actor because Nevada state law was not the source of the NCAA's rulemaking. *Id.* Instead, the NCAA's rules arose from and were enforced by the NCAA's several hundred member institutions most of which were in other states, and thus the NCAA did not act under color of Nevada law or any other state's law. *Id.*

The Supreme Court concluded that "[n]either [the university's] decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient

8

reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance." *Id.* at 195; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297-98 (2001) (reiterating *Tarkanian's* holding that the NCAA's "connection with [the state is] too insubstantial to ground a state-action claim" because "the NCAA's policies were shaped not by the [university] alone, but by several hundred member institutions, most of them having no connection with [the state], and exhibiting no color of [state] law"); *Collier v. Nat'l Collegiate Athletic Ass'n*, 783 F. Supp. 1576, 1578 (D.R.I. 1992) (ruling the NCAA was not a state actor). Under *Tarkanian*, the Georgia state university Defendants' conduct in compliance with NCAA policies is insufficient to convert the NCAA into a state actor, and for that reason alone, the Court should dismiss Counts II, III, and IV.

**B. Plaintiffs' Allegations Are Insufficient to Justify a Section 1983 Claim Against the NCAA**

Nor do Plaintiffs' conclusory allegations that the state defendants were "joint participants" with the NCAA permit Plaintiffs to pursue Section 1983 claims against the NCAA. The Eleventh Circuit has made clear that "[o]nly in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey*, 949 F.2d at 1130. This is not one of those rare cases. Plaintiffs' threadbare allegations do not meet any of the three tests for conduct by a private party to be considered state action: (1) the **"state compulsion test"** (which considers whether

the State coerced or at least significantly encouraged the action alleged to violate the Constitution), (2) the **"public function test"** (which asks whether the private party performed a public function that was traditionally the exclusive prerogative of the State), and (3) the **"nexus/joint action test"** (which considers whether the State so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise). *See Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001); *Jain v. Myers*, No. 20-11908, 2024 U.S. App. LEXIS 217, at *7 (11th Cir. Jan. 4, 2024).

**State Compulsion Test**. First, the complaint lacks any allegations that any government actor coerced or encouraged the NCAA to violate Plaintiffs' rights, which provides the necessary basis to reject state compulsion as a ground for satisfying the state action requirement here. *See*, *e.g.*, *McCoy v. Johnson*, 176 F.R.D. 676, 680 (N.D. Ga. 1997) (rejecting state compulsion theory where plaintiff made no allegations of any state compulsion on defendant); *Smith v. Lifeline Animal Project, Inc.*, No. 1:22-CV-2325-SEG, 2024 US Dist. LEXIS 55715, *12-13 (N.D. Ga. Feb. 16, 2024).

**Public Function Test**. Second, the complaint lacks the required allegations that the NCAA, as a private actor, "perform[ed] functions that are traditionally the *exclusive* prerogative of the state." *Langston v. ACT*, 890 F.2d 380, 384 (11th Cir. 1989); *Harvey*, 949 F.2d at 1131. The Supreme Court has held that few activities

are "exclusively reserved to the states." *Flagg Bros.*, 436 U.S. at 158. The Court has also held that, by fostering amateur athletics at the college level, the NCAA does not perform a public function. *See Tarkanian*, 488 U.S. at 197 n.18 ("[W]hile we have described that function as 'critical,' . . . by no means is it a traditional, let alone an exclusive state function." (internal citation omitted)); *see also Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir. 1999) ("The case law makes pellucid that the administration of an amateur sports program lacks the element of exclusivity and therefore is not a traditional public function."); *McHale v. Cornell Univ.*, 620 F. Supp. 67, 70 (N.D.N.Y. 1985) (holding that the "[r]egulation of intercollegiate sports cannot fairly be said to be traditionally and exclusively a state function"); *cf. San Francisco Arts & Athletics v. U.S. Olympic Comm.*, 483 U.S. 522, 545 (1987) (regulation of Olympic sports teams by a private organization was not an exclusively public function).

**Joint Action Test**. Third, the complaint lacks sufficient allegations of joint action because it does not show with facts that Georgia has "so far insinuated itself into a position of interdependence" with the NCAA that NCAA is "merely a surrogate for the state." *Focus on the Fam.*, 344 F.3d at 1278-79. "To charge a private party with a state action under [the nexus/joint action test], the governmental body and private party must be intertwined in a symbiotic relationship." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1027 (11th Cir. 1988) (internal

quotation marks and citation omitted). This "symbiotic relationship must involve the alleged constitutional violation." *Id.*

Plaintiffs do not plead adequate facts to meet that test; instead, they merely repeat the words of the test in a conclusory manner that "the above-identified individuals and Georgia Tech and the University System of Georgia so far insinuated themselves into a position of interdependence with the NCAA that these individuals and entities may be recognized as joint participants in the challenged activities of the NCAA." Am. Compl. ¶ 740. Plaintiffs also merely recite a form of the word "joint" in rote fashion without facts that "[the NCAA] and Georgia Tech jointly altered the policies and practices of Georgia Tech" regarding athletic competition and access to locker rooms. Am. Compl. ¶¶ 717, 718. Because Plaintiffs' allegations that the NCAA acted under color of law are entirely conclusory, they are insufficient to establish state action here. *Iqbal*, 556 U.S. at 678.

## C. No Other Allegations Are Sufficient to Allow a Section 1983 Claim.

Having failed to meet any of the three state-actor tests, Plaintiffs offer a few other allegations to plead a Section 1983 claim against the NCAA, but those also fail to establish state action. For example, the gist of the Complaint is that the NCAA developed rules for athletic competitions. But State action does not exist merely because a private party formulates rules and regulations later implemented by the state. *See Tarkanian*, 488 U.S. at 194 (holding that a state actor's voluntary decision

12

to adopt a private association's rules did not transform the private association's rules into state rules nor did it transform the private actor into a state actor); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1384-85 (7th Cir. 1992) (finding three bar associations had not engaged in state action by formulating disciplinary rules in question); *Willis v. Ga. Dep't of Juv. Just.*, No. 7:05-cv-59, 2007 U.S. Dist. LEXIS 70012, at *23-24 (M.D. Ga. Sept. 21, 2007) (comparing the case to *Tarkanian* and noting "[i]n both cases, that states' reliance on and adoption of a private party's actions are not sufficient to make that private party a state actor" and "[a]lthough these state entities acted in compliance with private parties when they allegedly violated the plaintiffs' rights, that does not transform private parties' actions into actions of the state").

Plaintiffs also allege that the NCAA and Georgia Defendants adopted, implemented, and enforced the NCAA Transgender Eligibility Policies in public buildings on a public university campus. Compl. ¶ 741. But state action does not exist merely because a state provides a forum to a private entity. *Hill v. McClellan*, 490 F.2d 859, 860 (5th Cir. 1974);[4] *see also Frazier v. Bd. of Trs. of Nw. Miss.*, 765 F.2d 1278, 1288 n.21 (5th Cir. 1985) ("[T]he sharing of [a] space [by government

---

[4] Cases decided by the former Fifth Circuit before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981).

and private actors] is not alone sufficient in this case . . . ."), *modified on other grounds*, 777 F.2d 329 (5th Cir. 1985), *cert. denied*, 476 U.S. 1142 (1986).

And Plaintiffs also recite the phrase "[a]cting in concert," perhaps implying a conspiracy between the NCAA and state actors. Am. Compl. ¶¶ 719, 741, 752, 756; *see also Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) (equating "act in concert" with "a § 1983 conspiracy"). But that also is not enough. To establish a prima facie case of Section 1983 conspiracy, a plaintiff must show, among other things, that the defendants reached an understanding to violate his rights. *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002). Moreover, Plaintiffs may not rely on unsupported speculation and suspicions of a conspiracy but must instead allege sufficient facts to show that a definite agreement was made. *See Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984) (holding that a conspiracy allegation that is vague and conclusory fails to state a claim upon which relief can be granted and is subject to dismissal). In other words, "[i]t is insufficient to 'merely string together' discrete events, without showing support for a reasoned inference that the private and state actors agreed to violate the plaintiff's rights." *Benjamin v. Chemtall Inc.*, No. CV413-088, 2013 U.S. Dist. LEXIS 103014, at *3 (S.D. Ga. July 22, 2013) (quoting *Harvey*, 949 F.2d at 1133), *R. & R. adopted*, 2013 U.S. Dist. LEXIS 103016 (S.D. Ga. July 22, 2013). "[T]he linchpin for conspiracy

is agreement, which presupposes communication . . . ." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992).

Here, Plaintiffs do not allege any communication between the NCAA and any government actors – in particular, between the NCAA and the State Defendants – related to the adoption of the policies challenged in this lawsuit. Simply repeating the legal test is insufficient to establish a conspiracy to violate their constitutional rights. *See Reed v. Strickland*, No. 2:22-CV-437-MHT-KFP, 2023 U.S. Dist. LEXIS 100792, at *17 (M.D. Ala. June 9, 2023) (finding the plaintiff's "ambiguous and conclusory factual allegations" to be insufficient to nudge the plaintiff's claim forward as the allegations did not establish when an agreement may have been formed or the substance of the agreement). Rather, the Plaintiffs' claims are merely naked assertions of an alleged "conspiracy" that lack the type of supportive operative facts required to state a claim under Section 1983. *See Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir. 1984). Accordingly, for this reason too, any Section 1983 claim against the NCAA fails, and the Court should dismiss Counts II, III, and IV with prejudice. *See Williams v. Brooks Trucking Co.*, 757 F. App'x 790, 795 (11th Cir. 2018) (holding that a plaintiff's Section 1983 claim was unsuccessful because he did not sufficiently allege defendants acted under color of state law or conspired with a state actor).

**III.**   **Plaintiffs Lack Standing to Prospectively Challenge the NCAA Policies**

Even if Plaintiff had successfully alleged either a Title IX or Section 1983 claim, Article III standing requirements would still necessitate limiting this case to its obvious factual core: the grievances of Plaintiffs Countie, Gaines, Gyorgy, Alons, Wheeler, and Swimmer A over Lia Thomas's participation in the 2022 NCAA Swimming and Diving Championships held in Georgia. Am. Compl. ¶¶ 413-604. Four of the six counts explicitly relate "to the 2022 NCAA Division I Women's Swimming and Diving Championships," and the Amended Complaint explicitly limits those counts to "the six Plaintiffs who participated in the 2022 NCAA Championships. Am. Compl. ¶ 682 (Count I), ¶ 711 (Count II), ¶ 726 (Count III), and ¶ 744 (Count IV).

Although the retrospective claims of those six Plaintiffs suffer from the fatal problems described above, they do meet the Article III standing burden to allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (citation omitted). But the Court should dismiss the claims of all Plaintiffs under Count V—challenging the current NCAA transgender

athletic policies and seeking prospective injunctive relief—because no Plaintiff presents sufficient allegations to establish Article III standing.[5]

Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Under Rule 12(b)(1), a district court should dismiss claims for lack of subject matter jurisdiction when a plaintiff lacks standing. *E.g.*, *Hall v. Xanadu Mktg., Inc.*, 682 F. Supp. 3d 1278 (N.D. Ga. 2023) (Cohen, J.). "The plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 219 L.Ed.2d 604, 617 (U.S. 2024) (internal quotations, brackets and citation omitted). "[S]tanding is not dispensed in gross"; each plaintiff must demonstrate standing for each form of relief sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted).

All Plaintiffs lack standing to challenge the current NCAA policies and to seek injunctive relief as set forth in Count V because none meets her burden to allege a future injury that is "concrete, particularized, and actual or imminent" in the sense that it is "certainly impending." *Clapper*, 568 U.S. at 409. Their "allegations of *possible* future injury" are insufficient. *Id.* Each Plaintiff seeking prospective relief fails to allege facts showing a "substantial likelihood" of "real," "immediate," and

---

[5] Count VI alleges no claim against the NCAA but is explicitly limited to other defendants.

"definite" future injury. *Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1356-57 (11th Cir. 2021) (the court could "easily dispense with the possibility" that a plaintiff who "may someday be in another car accident" had standing to pursue prospective declaratory relief). Thus, Plaintiffs do not meet the Eleventh Circuit's "'high standard,' which demands 'a robust judicial role in assessing [the] risk' of harm." *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 94-95 (11th Cir. 2022) (citation omitted).

This lawsuit presents grievances of the named Plaintiffs about the potential of having to compete against transgender women or share locker rooms with them in future collegiate championships. But no Plaintiff alleges a substantial likelihood that she will compete against a transgender woman at any certainly impending time in the future.

The Amended Complaint explicitly limits Count V to "Plaintiffs who still have remaining NCAA eligibility." Am. Compl. ¶ 761. That excludes Plaintiffs Gaines, Gyorgy, Alons, Countie, and Wheeler. *See id.* at ¶ 76. The Plaintiffs who allegedly have remaining NCAA eligibility and thus are covered by Count V are Eades, Erzen, Fox, Merryman, the Roanoke Swimmers, Track Athlete A, and Swimmer A. Count V explicitly limits their claims to prospective relief. *Id.* at 777 ("preliminary and permanent injunctive relief"). Those remaining-eligibility Plaintiffs collectively allege as a prospective injury only that they are "at increased

18

risk of injury and/or being required to compete against and/or share locker rooms and other women's safe spaces with biological males." *Id.* at ¶ 653; *see also id.* at ¶ 644 (Plaintiffs "have reasonable concerns that due to the NCAA's Transgender Eligibility Policies they will be required to compete against biological males during their NCAA careers.").

Those Plaintiffs' allegations are insufficient to confer standing because they suggest only that they *might* someday compete against a transgender woman without specifying a particular event or a particular future date. Again, a mere possibility is insufficient for standing. *See Clapper*, 568 U.S. at 409. Plaintiffs Erzen (soccer and track), Eades (tennis), and Fox (swimmer) are Division I athletes who state only that they are "aware" of transgender collegiate athletes and list four by name without alleging that they are likely to compete against any of them. Am. Compl. ¶ 637. Indeed, of the four athletes they identify, three were in different NCAA divisions, and the other played a different sport than those three Plaintiffs. *Id.* at ¶¶ 638-643. Track Athlete A alleges that she competed against a transgender woman at a single past competition, (*id.* at ¶ 627), and then merely speculates that she may compete against that athlete again in the future without alleging when that is likely to occur or how doing so would affect her (*id.* at ¶¶ 628-632). Plaintiff Merryman alleges that she played volleyball against a transgender athlete in high school and is "aware" that high-school level transgender athletes are "seeking to be recruited to play on

women's' college or university teams" that she does not identify. *Id.* at 633. Finally, Swimmer A and the Roanoke Swim Team Plaintiffs offer no plaintiff-specific allegations of future injury.[6]

\* \* \*

"[A] plaintiff seeking declaratory or injunctive relief must allege and ultimately prove a real and immediate—as opposed to a merely hypothetical or conjectural—threat of *future* injury." *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (internal quotation marks and citation omitted). The Eleventh Circuit has instructed that "[o]pening the door of the federal courthouse to litigants with such nebulous allegations of future harm would constitute an overreach of federal equitable power" and has stated plainly that it refuses to allow courts "to venture down that path." *Worthy v. Phenix City*, 930 F.3d 1206, 1216 (11th Cir. 2019). Because none of the Plaintiffs has alleged with specificity that she will compete against a transgender woman athlete in a specific competition at a specific future date, none of them is able to demonstrate the required definite future harm.

---

[6] The Roanoke Swimmers allege past injury because a single transgender woman athlete asked to join their swim team in Fall 2023 and then later withdrew that request before she participated on the team. *Id.* at ¶¶ 605-626. The Amended Complaint does not seek past damages for the Roanoke group and does not seek any request for prospective relief because another transgender woman might ask to join their team.

The Court should dismiss Plaintiffs' prospective claims for injunctive and declaratory relief. *Mack*, 994 F.3d at 1356-57.

## IV.   The Court Should Dismiss the Fictitious-Party Pleadings Against John Does 1-25

Finally, Plaintiffs cannot sustain any claim against Defendants John Does 1-25 because those are improper fictitious defendants. "As a general matter, fictitious-party pleading is not permitted in federal court," which warrants dismissal of such allegations. *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). Although the court of appeals has recognized a limited exception when a plaintiff gives exceptionally detailed description of the John Does, Plaintiffs' here do not meet that high standard to avoid the general rule. *Id*.

The Amended Complaint describes "John Does 1-25" as "agents of the NCAA who acting under color of law undertook the actions attributed to the NCAA in this Complaint and are therefore liable for the constitutional and Title IX violations described herein pursuant to 42 U.S.C. § 1983." Am. Compl. ¶ 113. Plaintiffs refer to "John Does 1-25" nine times in the 186-page Amended Complaint but never provide a detailed description of "John Does 1-25." For example, Plaintiffs provide no details about their job titles and no details about the specific acts the individuals participated in to warrant liability. Plaintiffs' description of John Does 1-25 is thus insufficient to meet the high standard of identifying the individuals, and, as in other cases, requires dismissal of the Plaintiffs' claims against John Does 1-25. *See*

21

*Johnson v. Ga. Bureau of Investigation*, No. 1:23-cv-04218-LMM, 2024 U.S. Dist. LEXIS 108345, at *20-21 (N.D. Ga. May 31, 2024) (granting motion to dismiss claims against Defendant John Doe where Plaintiffs "assert[ed] general claims against an unknown current or former employee with the Federal Bureau of Investigation"); *McPhail v. Ocean Carrington Green LLC*, No. 1:22-CV-2879-CAP, 2023 U.S. Dist. LEXIS 170526, at *3 (N.D. Ga. Mar. 27, 2023) (dismissing claims against the "John Doe Corporations, whose identities and whereabouts are currently unknown"); *Stephens v. Fulton Cnty.*, No. 1:16-cv-3461-RWS-JKL, 2017 U.S. Dist. LEXIS 233438, at *17 (N.D. Ga. July 7, 2017) (dismissing claims against John Doe Defendants due to insufficient identifying allegations).

## V.   <u>Conclusion</u>

Plaintiffs filed the Amended Complaint in an apparent effort to fix the deficiencies that rendered their initial Complaint subject to dismissal. The Amended Complaint failed to do so, however, and fails to set forth valid causes of action against the NCAA or against the unidentified fictitious Joe Doe defendants. For that reason, the Motion to Dismiss should be granted and the Amended Complaint should be dismissed with prejudice against the NCAA and Joe Does 1-25.

Respectfully submitted this 24th day of July 2024.

ALSTON & BIRD LLP

*/s/ Cari K. Dawson*

22

Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant National Collegiate Athletic Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that this brief has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

*/s/ Christopher C. Marquardt*
Christopher C. Marquardt

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 24th day of July 2024.

*/s/ Cari K. Dawson*
Cark K. Dawson