**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| RILEY GAINES, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01109-MHC |
| | ) | |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS OF THE NCAA AND GEORGIA DEFENDANTS

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ........................................................................ iv

I.    FACTS ALLEGED IN FIRST AMENDED COMPLAINT ..........................1

    A.    Joint Control of Collegiate Athletics ....................................................1

        1.    NCAA Adopts and Enforces College Athletics Eligibility Rules and Conducts NCAA Championships ........................................1

            a.    The NCAA's Control over Eligibility Rules ...................2

            b.    The NCAA's Control over End-of-Season National Championships ................................................................3

        2.    Georgia Defendants Control their Facilities ...............................4

    B.    The NCAA is Federally Funded ...........................................................5

    C.    Plaintiffs' Harm and Injuries ...............................................................6

        1.    Competitive Harm .......................................................................6

        2.    Emotional Harm ..........................................................................6

        3.    Increased Exposure to Safety Risks ............................................7

        4.    Invasion of Privacy .....................................................................7

II.    ARGUMENT ............................................................................................8

    A.    Standard of Review ..............................................................................8

    B.    The NCAA and Georgia Defendants Violated Title IX ........................8

        1.    Title IX Forbids Discrimination Based on "Sex" .......................9

        2.    Title IX Guarantees Equal Opportunity for Women in Relation to Men ......................................................................................10

        3.    Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination ................11

        4.    Georgia Defendants' Duty Not to Use Their Facilities as Means for Sex Discrimination, or At Least Prevent It .........................13

        5.    Equal, Separate and Private Showers and Locker Rooms ........15

        6.    Plaintiffs Have Adequately Alleged Traceability and Redressability Against the Georgia Defendants ......................16

    C.    Plaintiffs Have Adequately Alleged Fourteenth Amendment Equal

Protection and Bodily Privacy Claims .................................................19

D.  The Individual Georgia Defendants are Not Entitled to Qualified
    Immunity .........................................................................................21

    1.  Legal Standard ..........................................................................22

    2.  Clearly Established Law Protects Women's Competition and
        Bodily Privacy in Locker Rooms..............................................22

E.  Plaintiffs With Current Eligibility Have Adequately Alleged Standing
    to Challenge Current NCAA Policies and Seek Damages..................26

    1.  Plaintiffs Have Adequately Alleged Competitive Injuries .......26

    2.  Plaintiffs Have Adequately Alleged Current and Ongoing
        Informational Injury and Increased Safety Risks .....................28

    3.  Plaintiffs Have Adequately Alleged Current and Ongoing
        Emotional and Dignitary Injuries .............................................29

    4.  Plaintiffs Have Alleged Current Competitive Harms...............30

    5.  Plaintiffs with Current Eligibility Have Standing to Pursue
        Actual and Nominal Damages ..................................................31

F.  Plaintiffs Adequately Alleged the NCAA Is a State Actor.................32

    1.  *Tarkanian* Is Not Dispositive...................................................32

    2.  State Universities Delegated to the NCAA the Authority to Re-
        Define Women's Sports Nationally...........................................34

    3.  State Universities Delegate to the NCAA the Authority to Run
        NCAA National Championships ...............................................38

G.  Plaintiffs Alleged State Action by Individual Georgia Defendants....39

H.  Title IX Applies to the NCAA on the Alleged Facts .........................39

    1.  The NCAA is an Indirect Recipient of Federal Funding..........41

    2.  The NCAA's Federally Funded Member Institutions Have
        Ceded "Controlling Authority" to the NCAA ..........................42

        a.  *The Eleventh Circuit Has Adopted the Ceding
            Controlling Authority Test*..............................................43

        b.  *The Third Circuit's Reasons for not Applying the Ceding
            Controlling Authority to the NCAA Are Not Persuasive*45

I.      Plaintiffs' Fictitious Defendant Allegations Are Sufficient................48

J.      Proper State Entities ...........................................................................49

III.    CONCLUSION...............................................................................................50

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023) ...................................................................25

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ............................................... 8, 9, 20, 23

*Alabama, et al. v. U.S. Sec. of Educ., et al*,
   No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024)..................... 10, 24

*Alexander v. Choate*,
   469 U.S. 287 (1985).............................................................................13

*Amnesty Int'l, USA v. Battle*,
   559 F.3d 1170 (11th Cir. 2009) .............................................................31

*Arkansas v. DOE*,
   No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) .............24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................8

*B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*,
   98 F.4th 542 (4th Cir. 2024) ................................................... 25, 43, 44

*Bailey v. Bd. Of Cnty. Com'rs*,
   956 F.2d 1112 (11th Cir. 1992) ..............................................................38

*Barrs v. S. Conf.*,
   734 F. Supp. 2d 1229 (N.D. Ala. 2010)....................................... 44, 47

*Baughcum v. Jackson*,
   92 F.4th 1024 (11th Cir. 2024) .................................................. 17, 18

*Board of Regents of the Univ. Sys. v. Doe*,
   630 S.E.2d 85 (Ga. Ct. App. 2006)........................................................49

*Bostock v. Clayton Cnty., Ga.*,
590 U.S. 644 (2020) ................................................................. 10, 25, 26

*Bowers v. NCAA*,
118 F. Supp. 2d 494 (D.N.J. 2000) ............................................. 41, 42

*Brannum v. Overton Cnty. Sch. Bd.*,
516 F.3d 489 (6th Cir. 2008) .................................................. 15, 19, 20

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) .................................................... 33, 34, 35, 36, 39

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ........................................................................ 9, 44

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
563 F.2d 793 (6th Cir. 1977) ...................................................... 11, 23

*Carroll Indep. Sch. Dist. v. DOE*,
2024 WL 3381901 (N.D. Tex. Jul. 11, 2024) .................................... 24

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012) ....................................................... 27

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
695 F.2d 1126 (9th Cir. 1982) ...................................................... 11, 23

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
80 F. Supp. 2d 729 (W.D. Mich. 2000) ................................... 44, 45, 47

*Cureton v. NCAA*,
198 F.3d 107 (3d Cir. 1999) ............................................................ 46

*Davis v. Monroe Cnty. Bd. of Ed.*,
526 U.S. 629 (1999) ............................................................... 10, 12, 13

*Dean v. Barber*,
951 F.2d 1210 (11th Cir. 1992) ....................................................... 48

*Dep't of Educ. v. Louisiana*,
144 S. Ct. 2507 (Aug. 16, 2024) ...................................................... 24

*Doe v. Luzerne Cnty.*,
 660 F.3d 169 (3d Cir. 2011) ...............................................20

*Fed. Election Comm'n v. Akins*,
 524 U.S. 11 (1998)................................................................28

*Focus on the Family v. Pinellas Suncoast Transit Authority*,
 344 F.3d 1263 (11th Cir. 2003) ..........................................17

*Fortner v. Thomas*,
 983 F.2d 1024 (11th Cir. 1993) ........................... 19, 20, 26

*Franklin v. Gwinnett Cnty. Public Schools*,
 503 U.S. 60 (1992)..................................................................9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000)..............................................................26

*Gebser v. Lago Vista Ind. School Dist.*,
 524 U.S. 274 (1998)..............................................................12

*Grimm v. Gloucester County School Board*,
 972 F.3d 586 (4th Cir. 2020) ........................................ 25, 29

*Grove City Coll. v. Bell*,
 465 U.S. 555 (1984)..............................................................40

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982)..............................................................22

*Harris v. Thigpen*,
 941 F.2d 1495 (11th Cir. 1991) ..........................................19

*Hecox v. Little*,
 104 F.4th 1061 (9th Cir. 2024) ..........................................25

*Horner v. Kentucky High Sch. Athletic Ass'n*,
 43 F.3d 265 (6th Cir. 1994) ......................................... 23, 43

*Houchins v. KQED, Inc.*,
 438 U.S. 1 (1978)..................................................................19

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ............................................................. 9, 12, 16, 29

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ............................................................................ 33

*Kansas v. DOE*,
   No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. Jul. 2, 2024) ........................ 24

*Kent v. Johnson*,
   821 F.2d 1220 (6th Cir. 1987) ............................................................... 19

*Louisiana v. DOE*,
   No. 24-30399, 2024 WL 3452887 (5th Cir. Jul. 17, 2024) ........................... 24

*Louisiana v. DOE*,
   No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. Jun. 13, 2024) .................. 24

*Lugar v. Edmondson Oil Co., Inc.*,
   457 U.S. 922 (1982) ........................................................... 32, 34, 35, 36

*Mamon v. Midland Funding, LLC*,
   No. 1:13-cv-02301-AT-GGB, 2013 WL 12382685 (N.D. Ga. Nov. 14, 2013) ..... 9

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) ............................................................................ 22

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................ 31

*N. Haven Bd. of Ed. v. Bell*,
   456 U.S. 512 (1982) ............................................................................ 12

*Nat'l Broad. Co. v. Commc'ns Workers of Am.*, AFL-CIO,
   860 F.2d 1022 (11th Cir. 1988) ............................................................. 34

*Nat'l Collegiate Athletic Ass'n v. Smith*,
   525 U.S. 459 (1999) ........................................................................ 40, 41

*NCAA v. Tarkanian*,
   488 U.S. 179 (1988) ............................................................................ 33

*Neal v. Bd. of Trs. of Cal. State Univs.*,
  198 F.3d 763 (9th Cir. 1999) ........................................................ 11, 23

*Oklahoma v. Cardona*,
  No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. Jul. 31, 2024).............24

*Pearson v. Callahan*,
  555 U.S. 223 (2009)...................................................................22

*Peltier v. Charter Day Sch., Inc.*,
  37 F. 4th 104 (4th Cir. 2022) ...............................................29

*Quad Int'l, Inc. v. Doe*,
  No. CIV.A. 12-675-N, 2013 WL 105268 (S.D. Ala. Jan. 7, 2013)....................48

*Reed v. Goertz*,
  598 U.S. 230 (2023)..................................................................18

*Richardson v. Johnson*,
  598 F.3d 734 (11th Cir. 2010) ..............................................48

*Saucier v. Katz*,
  533 U.S. 194 (2001)..................................................................22

*Sepulveda v. Ramirez*,
  967 F.2d 1413 (9th Cir. 1992) ...........................................20

*Smith v. Nat'l Collegiate Athletic Ass'n*,
  266 F.3d 152 (3d Cir. 2001) ................................................ 41, 42, 46

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..................................................................21

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002)...................................................................8

*Tennessee v. Cardona*,
  No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) .....................24

*Tennessee v. Cardona*,
  No. 24-5588, 2024 WL 3453880 (6th Cir. Jul. 17, 2024) ....................................23

*Texas v. United States*,
   No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. Jul. 11, 2024)......................24

*Tinker v. Des Moines Ind. Comm. School Dist.*,
   393 U.S. 503 (1969).............................................................................14

*United States v. Virginia*,
   518 U.S. 515 (1996)............................................................ 8, 10, 15, 19

*Vielma v. Gruler*,
   808 F. App'x 872 (11th Cir. 2020).....................................................48

*Vinyard v. Wilson*,
   311 F.3d 1340 (11th Cir. 2002) ........................................................22

*Whitaker  v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..........................................................25

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
   477 F.3d 1282 (11th Cir. 2007) ................................................... 43, 44

*Williams v. Sch. Dist. of Bethlehem, Pa.*,
   998 F.2d 168 (3d Cir. 1993) ...................................................... 10, 23

*Worthy v. Phenix City*,
   930 F.3d 1206 (11th Cir. 2019) ........................................................30

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*,
   647 F.2d 651 (6th Cir. 1981) ...................................................... 10, 23

Statutes

20 U.S.C. § 1681 ....................................................... 8, 9, 10, 39, 44

Rules

Federal Rule Civil Procedure 25(d)(1) .................................................49

Regulations

34 C.F.R. § 106.30 ...................................................................................16

34 C.F.R. § 106.33 ........................................................................ 8, 15, 16

34 C.F.R. § 106.41(c).............................................................................23

85 Fed. Reg. 30026 (May 19, 2020) .......................................................16

Other Authorities

Local Rule 5 ............................................................................................51

Local Rule 7 ............................................................................................51

The NCAA acts as U.S. public colleges and universities' national athletics governing agency. The NCAA and colleges and universities across the country – including the Georgia Defendants[1] – jointly control college athletics. First Amended Complaint (FAC), [Doc 64] ¶¶ 122–51. Over 90% of NCAA member schools are federally funded, either directly or indirectly. *Id.* ¶ 123. The NCAA and its members are subject to Title IX and the Constitution due to their receipt or control of federal funds, joint efforts, and intertwined relationship.

# I.   FACTS ALLEGED IN FIRST AMENDED COMPLAINT

## A.   Joint Control of Collegiate Athletics

### 1.   NCAA Adopts and Enforces College Athletics Eligibility Rules and Conducts NCAA Championships

NCAA member institutions cede controlling authority to the NCAA to conduct the following aspects of each member's program for intercollegiate athletics:

(1) conducting and marketing NCAA championships,

(2) managing media rights and financial distributions regarding NCAA championships,

(3) developing guidance, rules and policies for student-athlete physical and mental health, safety and performance,

(4) providing education and training for diversity, equity and inclusion initiatives in intercollegiate sports,

(5) adopting eligibility rules governing intercollegiate athletics

---

[1] "Georgia Defendants" refers to Defendants other than the NCAA *and to* the Georgia Tech Athletic Association (GTAA), a Georgia not-profit, and its representatives, which Plaintiffs recently discovered signed the event hosting agreement for the 2022 Championships. Plaintiffs are today seeking leave to file a Second Amended Complaint (SAC) naming GTAA as an additional Defendant.

and student-athletes, and

(6) running the eligibility rules enforcement process to which all member institutions, their staffs, coaches and student-athletes are subject and to which they submit.

FAC ¶ 131. This framework is implemented and enforced through the NCAA by-laws, whereby member institutions delegate to the NCAA the right to define significant parameters of their athletics programs. *Id.* ¶¶ 122–151, 171–180, 710–724.

The delegation of authority by NCAA member institutions to the NCAA to define the parameters of collegiate sports is part of the bargain: the NCAA creates "a coherent collegiate sports product," *id.* ¶ 140, in exchange for the NCAA member institutions' right to a share of "more than $600,000,000.00 annually" in NCAA revenues, *id.* ¶ 145–147, and to increase the value of their institutional brands and of the athletic conferences of which virtually all are members. *Id.* ¶ 143–144.

### a.   The NCAA's Control over Eligibility Rules

As part of its role in "adopting eligibility rules" and "diversity, equity, and inclusion initiatives in intercollegiate sports," the NCAA adopted the NCAA Transgender Eligibility Policies (TEP). *Id.* ¶¶ 129.e., 175. "The decision to implement the NCAA's [TEP] is an Association-wide decision made by the NCAA Board of Governors." *Id.* ¶ 171. This decision falls "directly within core areas which NCAA members have outsourced to the NCAA." *Id.* ¶ 172. "Each public university governed by the University System of Georgia applies the NCAA [TEP] and is required by the NCAA to do so." *Id.* ¶ 121. Pursuant to the NCAA TEP, males are authorized

to compete on women's teams in college sports if they affirm a female gender identity and affirm they have engaged in a single year of testosterone suppression. *Id.* ¶¶ 192, 198, 262, 286. Further, the "NCAA requires its members to submit to NCAA rules and regulations regarding . . . the rules under which athletic contests between Association members will be played . . . [and] the rules for national championships among Association members." *Id.* ¶ 127.

> ### b. The NCAA's Control over End-of-Season National Championships

The NCAA controls the planning and operation of NCAA championships. The NCAA Constitution expressly provides that "The Association shall . . . Conduct all NCAA Championships." *Id.* ¶ 129.a. The NCAA must "conduct[] championships in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes." *Id.* ¶ 129.c.i. The NCAA requires championship hosts to "complete an anti-discrimination questionnaire." *Id.* ¶ 214.

The NCAA has repeatedly and publicly made clear it controls who competes in NCAA championships. For example, in 2020, the NCAA Board of Governors unequivocally threatened to withdraw its championship from any host university, city, or state across the country that did not follow the TEP. *Id.* ¶ 227.

The NCAA selected Georgia Tech to host the 2022 NCAA Championships. Georgia Tech "gave the NCAA the privilege to operate and control the McAuley Aquatic Center during the period of the Championships," *id.* ¶ 413, and was required

3

"to comply with the NCAA [TEP]." *Id.* ¶ 419. The "women's locker room at the McAuley Aquatic Center" was under Georgia Tech control and was "not accessible by men, including trans-identifying men," but was made accessible to Lia Thomas, a man who under the TEP competed on a women's team at the "insistence of NCAA officials." *Id.* ¶¶ 449–51. Thus, the NCAA controlled which athletes were eligible to compete in women's events and allowed a man to compete in the 2022 NCAA Championships. *Id.* ¶ 437.

### 2.   Georgia Defendants Control their Facilities

While the NCAA controls the rules of collegiate athletics and operationally controls all NCAA championships, universities still legally and physically control their own facilities. The Georgia Defendants always retained "full access, authority and control" over the McAuley Aquatic Center. *Id.* ¶¶ 414–417, 739. For the 2022 NCAA Championships, the Georgia Defendants made Georgia Tech representatives available, including a "Tournament Manager" and a "Facility Manager" to ensure the TEP and the NCAA plans were followed, *id.* ¶¶ 422–32, and agreed to work "side-by-side with the NCAA" to implement the TEP. *Id.* ¶ 425. The Georgia Defendants gave the NCAA "operational control," but not legal or physical control, of the facilities which were still run by the Tournament Manager and Facility Manager, both Georgia Defendants employees. *Id.* ¶¶ 414–417, 422–32.

Given Georgia Tech's legal and physical control of its own facilities, the

Georgia Defendants and the NCAA collaboratively and interdependently worked together such that they "jointly organized" the 2022 NCAA Championships. *Id.* ¶ 727. The Georgia Defendants took "an active role in the decision-making process . . . that led to Lia Thomas participation in the event and . . . use of the women's locker rooms." *Id.* ¶ 420. Neither the Georgia Defendants nor the NCAA did anything to stop Thomas' access, *id.* ¶¶ 424–451, 459, 478, 507–12, 705, despite Georgia officials being in regular communication with the NCAA. *Id.* ¶¶ 420–433.

The Individual Georgia Defendants knew about the TEP at the 2022 NCAA Championships and could have acted to prevent or stop it, including the members of the Board of Regents, Georgia Tech President Cabrera and the Tournament Manager and Facility Manager. *Id.* ¶¶ 418–25, 432, 727, 737–39, 745, 748, 752–55.[2]

## B.    The NCAA is Federally Funded

The NCAA is an indirect recipient of federal funding through its "Grand Alliance" with the Department of Defense (DoD) through which the NCAA helps channel federal funds to its member institutions for concussion research and education. *Id.* ¶¶ 152–70. Then the NCAA and the DoD partnered "to fund the most comprehensive study conducted in the history of concussion research." *Id.* ¶ 161. The

---

[2] The SAC alleges the GTAA also knew about and could have prevented or stopped the discrimination. Second Amended Complaint (SAC) [Doc. 88-2] ¶¶ 124, 424–431. The GTAA maintained control over separate locker rooms not used during the 2022 NCAA Championships. SAC ¶¶ 88. These locker rooms could have accommodated Thomas.

research furthers the NCAA's mission of improving athlete health and safety and "has resulted in NCAA rule changes." *Id.* ¶ 167; *id.* ¶ 129(c)(ii).

### C. Plaintiffs' Harm and Injuries

The NCAA and Georgia Defendants injured Plaintiffs by implementing the TEP at the 2022 NCAA Division I Women's Swimming and Diving National Championships (2022 NCAA Championships) when they allowed a man to compete against the nation's best female collegiate swimmers and use the women's locker room. The NCAA TEP continues to harm women in college sports.

#### 1. Competitive Harm

Males enjoy significant athletic performance advantages rooted in male biology. *Id.* ¶¶ 34–37, 264–307. These advantages create a performance gap that exclusively favors men. *Id.*; *see also id.* ¶¶ 368–87 (safety risks for women). The TEP ignores this. It has no provisions for monitoring compliance with the testosterone suppression requirements it purports to impose or the TEP's effect on women's athletics generally. *Id.* ¶¶ 388–96. It also permits males to compete with circulating testosterone higher than what women can produce naturally. *Id.* ¶¶ 297–308.

#### 2. Emotional Harm

The Plaintiffs have suffered emotional and dignitary injuries because the TEP communicates to them that competitive fairness and safety for women are not worth protecting to the same degree that they are protected for men. *See, e.g., Id.* ¶ 511 ("a pervasive sense of: 'Why can't we get the respect that male competitors would

get?'"), ¶ 554 ("the NCAA does not care about protecting women or their rights"), ¶ 657 (the TEP "create[s] psychological and emotional injury and dignitary harm").

### 3.     Increased Exposure to Safety Risks

The NCAA and member institutions do not provide "any notice to female competitors, even in Contact Sports and Limited-Contact Sports with a higher risk of collisions and concussions and other injuries, that they will be facing a male student-athlete." *Id.* ¶ 646. "In fact, the NCAA refuses to make available information to student-athletes regarding whether any of their opponents are males[.]" *Id.* ¶ 647. This "disparately and adversely impact[s] women . . . increasing their" *Id.* ¶ 410, and "depriv[ing] them of information vital to … exercising informed consent before competing head-to-head against a male." *Id.* ¶ 651; *see also id.* ¶¶ 412, 648–53. The safety risks for women created by the NCAA TEP are clear. *Id.* ¶ 380.

### 4.     Invasion of Privacy

Due to the NCAA's TEP and the Georgia Defendants' inaction, Thomas continued throughout the 2022 NCAA Championships to use the women's locker room while women were disrobing and to disrobe himself in front of women. *Id.* ¶¶ 462–74, 503–12. This caused some Plaintiffs to stop using the locker room to which Title IX guarantees them equal access. *Id.* ¶¶ 479–83, 508. Other Plaintiffs, unaware of other available options, simply sought to endure the unwelcome presence of a male in their locker room as best they could. *Id.* ¶¶ 470–72, 497–99, 503–12.

## II.   ARGUMENT

"Title IX's mandate of gender equity in sports" has revolutionized women's sports. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022) (Lagoa, J. concurring). "[O]ne need not look further than … [a] local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Id.* at 819. Title IX requires separation by biological sex where necessary to ensure equal educational opportunities for women, 20 U.S.C. § 1681(a), and bodily privacy. 34 C.F.R. § 106.33. The Fourteenth Amendment requires the same thing. *United States v. Virginia* (*VMI*), 518 U.S. 515, 550, 533 (1996).

However, the Defendants unlawfully redefined "sex" to include men who self-identify as women and suppress their natural testosterone levels. This redefinition guts Title IX and the Fourteenth Amended protections for "women," steals women's opportunities, and eliminates women's safe spaces.

### A.   Standard of Review

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (cleaned up).

### B.   The NCAA and Georgia Defendants Violated Title IX

The Georgia Defendants all but say they are "understandably" aware the

NCAA's policies violate Title IX [Doc. 74-1 at 1], but say *they* cannot be liable for such violations because they "neither caused nor exercise[d] control over the" NCAA. [*Id.* at 14–15.] They are mistaken. The Georgia Defendants are jointly liable for Title IX violations which they could have refused to join in and prevented, particularly those involving the use of their own facilities. This is especially so if, as the NCAA argues, the NCAA does not control its members. [Doc. 75-1 at 7.]

Likewise, the NCAA also claims in a footnote Plaintiffs have not adequately pled Title IX claims but does not explain why. [Doc. 75-1 at 2 n.1.] The Court may disregard this argument for purposes of this Motion. *Mamon v. Midland Funding, LLC*, No. 1:13-cv-02301-AT-GGB, 2013 WL 12382685, at *4 (N.D. Ga. Nov. 14, 2013) (finding unargued position abandoned).

### 1.    Title IX Forbids Discrimination Based on "Sex"

Forty-five years ago, the Supreme Court recognized a private right of action to seek monetary damages for violations of Title IX. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979); *Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60 (1992). "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Title IX equalizes opportunities for women by extending its protections based on "sex." 20 U.S.C. § 1681(a). It forbids treating women worse than men.

"Sex" in Title IX does not mean gender identity. *Adams*, 57 F.4th at 813–14

9

("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX."); *Alabama, et al. v. U.S. Sec. of Educ., et al*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("sex" in Title IX is "biological sex and not gender identity" (cleaned up)); "Sex" means the physiological or "biological distinctions between male and female." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020).

## 2. Title IX Guarantees Equal Opportunity for Women in Relation to Men

Title IX protects female students "from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). The "[p]hysical differences" between the sexes are "enduring." *VMI*, 518 U.S. at 533. Thus, Title IX not only *permits* sex-based distinctions, but *requires* them where necessary to ensure equal opportunity.

For women to have "equal opportunity" in athletic competition, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Equal opportunity in theory doesn't count. "[T]he mere opportunity for girls to try out" for a team is not enough if they cannot realistically make the roster because of competition from men. *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). Nor is the mere chance to participate on a team enough if women cannot

realistically win scholarships or "enjoy the thrill of victory" in sports where males dominate based on sex-linked advantages. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). Title IX's promise of equal opportunity means nothing if institutions ignore biology to permit a man to take a woman's place.

In sport, the enduring physical differences between men and women trend in a single direction. In each NCAA sport, males enjoy significant athletic performance advantages rooted in male biology. FAC ¶¶ 34–37, 264–307. Therefore, where collegiate sports are sex-separated due to enduring physical differences (i.e., male advantages in size, strength, speed and performance) that separation must be maintained. Men cannot take women's places on women's teams.

The law agrees with the facts alleged here. Due to the "average physiological differences" between the sexes, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). Most "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds*.

### 3.   Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination

Sex discrimination includes a federal funding recipient's deliberate indifference towards any conduct that deprives women of equal educational opportunity.

*E.g.*, *Jackson*, 544 U.S. at 182 ("deliberate indifference constituted intentional discrimination on the basis of sex"); *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274, 290–291 (1998) (deliberate indifference to sexual harassment); *Davis*, 526 U.S. at 642 (deliberate indifference to hostile educational environment).

Deliberate indifference occurs when the environment the funding recipient controls "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 650–51, *rev'g* 120 F.3d 1390 (11th Cir. 1997) (en banc); *accord Davis*, 120 F.3d at 1412 (Barkett, J. dissenting) (Title IX forbids "intentional discrimination which exposes one sex to disadvantageous terms or conditions to which members of the other sex are not exposed").

Title IX sex discrimination takes many forms, not just "severe, pervasive, and objectively offensive" student-on-student sexual harassment the U.S. Supreme Court addressed in *Davis*. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183; *accord N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) ("if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (cleaned up)). A plaintiff need only establish that her environment "effectively denied [her] equal access to an institution's resources and opportunities," and the school was deliberately indifferent

to that fact. *Davis*, 526 U.S. at 650–51; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (acts that bar "meaningful access" to a desired benefit).

A recipient's duty not to be deliberately indifferent to sex discrimination is heightened where "the recipient retains substantial control" over the environment where the discrimination occurs. *Davis*, 526 U.S. at 646. In facilities which the school controls, its power "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id*. (cleaned up).

Title IX sex discrimination may, therefore, simply refer to any act which diminish(es) a female's use or enjoyment of a particular resource, school location, or opportunity to which females are entitled access, such as a locker room or an athletic field. Where the recipient was aware of the circumstances, which Plaintiffs have alleged here, a recipient's refusal to act to prevent loss of women's opportunities arising from a man's intrusion "fly[s] in the face of Title IX's core principles" and will subject the recipient to claims for monetary damages. *Id*. at 651.

### 4. Georgia Defendants' Duty Not to Use Their Facilities as Means for Sex Discrimination, or At Least Prevent It

The Georgia Defendants' duty was to ensure that their facilities were not used to carry out sex discrimination. Plaintiffs have adequately alleged the Georgia Defendants' knowledge and ability to control the McAuley Aquatic Center. FAC ¶¶ 413-33, 444-51, 458-59, 507-08, 705, 739, 752-53, which is where Lia Thomas competed against female competitors. Plaintiffs' allegations are sufficient to make a

prima facie case that Defendants were deliberately indifferent to Plaintiffs' loss of competitive opportunities, points, placements, and recognition and liable for mental and emotional stress and suffering and other injuries suffered by Plaintiffs and the class of women they seek to represent.

The fact that the NCAA also had operational control of the championships did not diminish the Georgia Defendants' duty to uphold the Title IX rights of women in their facility. The Georgia Defendants and NCAA both had "'comprehensive authority . . . to prescribe and control conduct[.]'" *Id.* (quoting *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 507 (1969)).

The Georgia Defendants argue "[i]f Georgia Tech refused to host the 2022 Championships because of the NCAA's [TEP] … the NCAA may have cancelled the 2022 Championships altogether" or "the NCAA may have transferred the event to the campus of a member institution." [Doc. 74-1 at 16.] Thus, they claim "the conduct of the named State Defendants is ultimately irrelevant." [*Id.*]

This misses the point. Whatever might have happened in a hypothetical universe, the Georgia Defendants hosted the 2022 NCAA Championships and either intentionally permitted a man to compete against women and share their locker room or were deliberately indifferent to this fact. Just because other recipients could, hypothetically, have committed sex discrimination at other facilities does not excuse the Georgia Defendants from *actually* committing sex discrimination at theirs.

Whether the NCAA and Georgia Defendants considered alternative sites or cancelling the Championships is a question of fact for discovery. If such discussions did occur, that would only confirm that, at a minimum, the Georgia Defendants exercised joint control with the NCAA over whether the McAuley Aquatic Center would be used to violate Title IX. As in *Davis*, where the school was jointly liable for immediate injuries caused by others, the Georgia Defendants can be jointly liable for injuries immediately caused by the NCAA's TEP which they knowingly participated in implementing at the 2022 NCAA Championships.

### 5.   Equal, Separate and Private Showers and Locker Rooms

There is a constitutional privacy interest "to shield one's body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd*., 516 F.3d 489, 494, 496 (6th Cir. 2008) (citation omitted). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. Accordingly, Title IX mandates women must have "separate" and "comparable" locker rooms. 34 C.F.R. § 106.33. Permitting a man to use women's locker rooms is incongruent with Title IX. Students do not have equal educational benefits if forced to shower or share private spaces with the opposite sex.

Plaintiffs allege that because Thomas was permitted in their locker room without their knowledge, they unwillingly exposed their bodies to him and unwillingly

15

saw his male genitalia. FAC ¶¶ 490–91, 500. The Georgia Defendants went along with the NCAA's lead and participated in these violations because they controlled their facilities jointly with the NCAA's operational control of the 2022 Championships. FAC ¶¶ 414–417, 739.

These alleged circumstances constitute sex discrimination under Title IX. Even if Plaintiffs' experience in the Georgia Tech locker rooms in 2022 may not be *per se* sexual harassment, it was sufficiently analogous. However one characterizes Plaintiffs' unwelcome and hostile experience, it is "encompass[ed within the] diverse forms of intentional sex discrimination" recognized by the Supreme Court. *Jackson*, 544 U.S. at 183; *see also* 85 Fed. Reg. 30026, 30036 (May 19, 2020) (codified at 34 C.F.R. § 106.30) (defining "sexual harassment" as "conduct on the basis of sex" that is "[u]nwelcome conduct that a reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education"). Plaintiffs also allege violations of 34 C.F.R. § 106.33 which requires "separate" locker rooms for women. FAC ¶¶ 430, 443–512.

### 6.   Plaintiffs Have Adequately Alleged Traceability and Redressability Against the Georgia Defendants

The Georgia Defendants contend Plaintiffs' Title IX and Fourteenth Amendment injuries and the threat of future injuries to them are not traceable to, or redressable by, the Georgia Defendants. [Doc. 74-1 at 10–13.] They argue traceability and redressability are lacking for four reasons: (1) they "did not create the NCAA's

[TEP]," (2) they did not cause Plaintiffs to compete against transgender athletes, (3) while conceding the Complaint alleges that the Georgia Defendants "could have prevented" Thomas's use of the locker rooms, "the NCAA's 'independent action' sever[ed] the causal chain necessary to establish traceability," and (4) an order against only the Georgia Defendants "would neither change the NCAA's [TEP] nor prevent other NCAA member institutions from deeming transgender athletes eligible to compete . . . , nor prevent Plaintiffs from competing against such transgender athletes at NCAA events hosted outside of the State of Georgia." [*Id.*]

The Georgia Defendants conflate traceability and redressability for standing purposes with evidence of legal causation on the merits. *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024), relied upon by the Georgia Defendants, held that three plaintiffs had standing to sue county probate judges – who engaged in ministerial acts and had no authority to change the law – over the constitutionality of a law restricting gun ownership to individuals under age twenty-one. *Id*. at 1032. The *Baughcum* Court held "[t]he plaintiffs' injuries are fairly traceable to the probate judges and redressable by an order directed to them" because the judges are "responsible for issuing licenses[.]" *Id*.; *accord Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1273 (11th Cir. 2003) (indirect harm is still "fairly traceable" for standing purposes (citation omitted)).

The case for traceability is stronger against the Georgia Defendants than the

probate judges in *Baughcum*. The Georgia Defendants have the discretion not to allow their facilities to be used to commit Title IX violations. *See* FAC ¶¶ 414–417, 444, 739. Moreover, like the probate judges who could each only issue licenses and implement Georgia's eligibility policy in a single county, the Georgia Defendants do not need to be able to address the hosting of events outside of Georgia. There is redressability through monetary damages under Title IX and against individual Georgia Defendants under §1983 for the violations at the 2022 NCAA Championships and through injunctive relief to prevent future Title IX violations in public university facilities in Georgia. Indeed, the Georgia Defendants' effort to blame the NCAA for using the Georgia Defendants *own public facilities* and the Georgia Defendants' *own public employees* to further sex discrimination and failing to prevent discrimination they knew would occur shows why an injunction requiring individual Georgia Defendants to follow Title IX is needed for future NCAA events they host, including the NCAA Division I Women's Swimming and Diving Championships in 2026, and SEC, ACC, and NCAA Championships in other sports. FAC ¶ 783.

Finally, Plaintiffs may obtain declaratory or injunctive relief against the Individual Defendants in their official capacity to preclude them from enforcing the unlawful TEP at future athletic competitions. *Reed v. Goertz*, 598 U.S. 230, 234 (2023) ("the *Ex parte Young* doctrine allows suits … for declaratory or injunctive relief [under § 1983] against state officers in their official capacities").

### C.    Plaintiffs Have Adequately Alleged Fourteenth Amendment Equal Protection and Bodily Privacy Claims

As explained above, Plaintiffs allege that the Defendants failed to protect bodily privacy by permitting Thomas to use a locker room with female athletes. *Supra at* 7. The "fundamental rights of privacy" of all humans has been recognized by the U.S. Supreme Court since at least the 1970s. *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2 (1978); *accord Harris v. Thigpen*, 941 F.2d 1495, 1513 (11th Cir. 1991) (quoting *Houchins*, 438 U.S. 1, 5 n.2). This includes a right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). *Cf. Brannum*, 516 F.3d at 494. This right has been established for decades.

Since 1996, the Equal Protection Clause has subjected sex discrimination to intermediate scrutiny. At that time, Justice Ginsburg recognized that, "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements[.]" *VMI*, 518 U.S at 550 n.19. In other words, equal access to educational opportunities necessarily implies a right to bodily privacy for women from men. This applies just as much to sports locker rooms where women will be entirely unclothed as it applies to the "living arrangements" described in *VMI*. Thus, post *VMI*, it has been clearly established that failing to provide women separate locker rooms necessary to enjoy their equal access to education is unlawful sex discrimination under the Fourteenth

19

Amendment. *See also Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011); *Adams*, 57 F.4th at 804–07. *Cf. Brannum*, 516 F.3d at 494–95.

Even prior to *VMI*, the Eleventh Circuit recognized the Fourteenth Amendment right to bodily privacy, holding "most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Fortner*, 983 F.2d at 1030 (cleaned up). Thus, as of 1993, *Fortner* made clear that state universities must protect the bodily privacy of female student-athletes in women's locker rooms.

The Georgia Defendants argue that the constitutional right to bodily privacy recognized for decades is "limited to circumstances where the state maintains physical custody of the individual (*e.g.*, prisons, arrestees, foster care)." [Doc. 74-1 at 21.] Not so. The prison cases vindicated privacy rights in spite of the prisoners' loss of liberty. College athletes clearly have greater privacy rights than incarcerated inmates, or even parolees. *See*, *e.g.*, *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) ("The prison cases are instructive because the constitutional rights of parolees are even more extensive than those of inmates."). The Georgia Defendants cannot credibly argue their duty to the nation's best female college swimmers is less than what correctional officers owe to prisoners.

With respect to competitive fairness and equal athletic opportunities for women, the TEP has a disparate, unequal, and discriminatory impact upon women

vis-à-vis men. Moreover, the TEP was adopted knowing it would be applied to women and adversely impact them. Recently, the Supreme Court reaffirmed that any consciousness of a protected trait constitutes an equal protection violation. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023). *VMI* held that sex is a protected trait. If sex consciousness can be discrimination, sport transgender eligibility policies which involve consciousness of a student's biological sex and disadvantage women are subject to, and fail, *VMI*'s heightened scrutiny.

Finally, the Georgia Defendants characterize their conduct as merely "providing a venue for the NCAA to hold the 2022 Championships." [Doc. 74-1 at 20.] However, this is not the extent of the conduct alleged, which includes "knowingly invit[ing] the NCAA to conduct the 2022 NCAA Championships in a public facility … knowing that the NCAA intended to implement the NCAA [TEP]." FAC ¶ 739; *see also* ¶¶ 705, 752. These are plausible allegations the Court must accept for now. Factual disputes are an issue for summary judgment or trial.

### D.   The Individual Georgia Defendants are Not Entitled to Qualified Immunity

The individual Georgia Defendants claim they are entitled to qualified immunity if women's entitlement to equal opportunity in athletics and privacy in locker rooms was not clearly established in March 2022. [Doc. 74-1 at 19–22.]

1.    **Legal Standard**

There are two relevant inquiries to qualified immunity: (1) whether "the facts alleged show the officer's conduct violated a constitutional right," and (2) whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding the two-step inquiry can be conducted in sequence best suited to the particular case); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs do not need to cite a case identical to their own to defeat qualified immunity. When "the words of a federal statute … [are] so clear and the conduct so bad th[en] case law is not needed to establish that the conduct cannot be lawful." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). The focus is "on the objective legal reasonableness of an official's acts." *Harlow*, 457 U.S. at 819. Subjective state of mind or knowledge of the law is irrelevant. *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985).

2.    **Clearly Established Law Protects Women's Competition and Bodily Privacy in Locker Rooms**

Well before the 2022 NCAA Championships, it was well-settled that Title IX protects women vis-à-vis men based on biological sex alone by awarding damages when women's right to equal opportunities is disregarded. *See, e.g.*, *Jackson*, *supra* (2005) *Franklin*, *supra* (1992); *Gebser*, *supra* (1998); *Davis*, *supra* (1999). Likewise, the U.S. Department of Education (DoE) and numerous Title IX cases before

2022 specifically applied Title IX to protect women's equal opportunities in scholastic sport based on biological sex.[3] Moreover, neither the Supreme Court nor the Eleventh Circuit has ever held that "sex" under Title IX means gender identity.[4] The law did not become recently unsettled. Rather, an ideology emerged claiming that men should be able to compete against women if they suppress testosterone and self-identify as women.[5] *See* FAC ¶ 13. This anti-science ideology infected the NCAA in 2010 when it first permitted men to compete in women's sports, eventually culminating in the current NCAA TEP. FAC ¶¶ 191–262, 322.

The Georgia Defendants cite the newly revised DoE Title IX Rule (effective Aug. 30, 2024) in support of their qualified immunity argument, contending that Rule is "consistent with the NCAA's [TEP]." [Doc. 74-1 at 20.] However, seven district courts and three circuit courts of appeal have preliminarily enjoined enforcement of the DoE Rule because it is inconsistent with the clear meaning of Title IX.[6]

---

[3] 34 C.F.R. § 106.41(c) ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes"); *Neal*, 198 F.3d at 773; *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994); *Clark*, 695 F.2d at 1131; *Yellow Springs*, 647 F.2d at 657; *Cape*, 563 F.2d at 795; *Williams*, 998 F.2d at 175.

[4] *See Adams*, 57 F.4th at 817 ("equating 'sex' to 'gender identity' or 'transgender status'" implausibly undermines "the validity of sex-separated sports teams").

[5] Plaintiffs do not here take issue with medical treatments for gender dysphoria. Rather, Plaintiffs start with the irrefutable scientific fact that a man cannot change his sex through surgery, testosterone suppression, or any other means.

[6] *See Tennessee v. Cardona,* No. 24-5588, 2024 WL 3453880 (6th Cir. Jul. 17, 2024) (denying DoE's motion for a partial stay of the district court's preliminary injunction

The only outlier court was the Northern District of Alabama, and in that case the Eleventh Circuit enjoined enforcement of the Rule pending appeal.[7] In fact, all nine Supreme Court Justices accept that the plaintiffs challenging the DoE Rule "were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly redefines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024).

The blizzard of decisions enjoining the DoE Rule, with which the NCAA TEP is consonant, confirms that the TEP sprung from ideology—not clearly established

---

that enjoined enforcement in Tennessee, Kentucky, Ohio, Indiana, Virginia, & W. Virginia)*; Louisiana v. DOE,* No. 24-30399, 2024 WL 3452887 (5th Cir. Jul. 17, 2024) (denying motion for partial stay of district court's injunction that enjoined enforcement in Louisiana, Mississippi, Montana, & Idaho)*; Oklahoma v. Cardona,* No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. Jul. 31, 2024) (enjoining enforcement in Oklahoma)*; Arkansas v. DOE,* No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (enjoining enforcement in Arkansas, Missouri, Iowa, Nebraska, N. Dakota, & S. Dakota)*; Carroll Indep. Sch. Dist. v. DOE,* No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. Jul. 11, 2024) (partially enjoining enforcement in a specific school district)*; Texas v. United States,* No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. Jul. 11, 2024) (enjoining enforcement against individual plaintiffs and state of Texas)*; Kansas v. DOE,* No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. Jul. 2, 2024) (enjoining enforcement in Kansas, Alaska, Utah, Wyoming, and in specific schools)*; Tennessee v. Cardona,* No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) (enjoining enforcement in Tennessee, Kentucky, Ohio, Indiana, Virginia, & West Virginia)*; Louisiana v. DOE,* No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. Jun. 13, 2024) (enjoining enforcement in Louisiana, Mississippi, Montana, & Idaho)*.*

[7] *Alabama v. U.S. Sec. of Edu.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) (enjoining enforcement in Alabama, Florida, Georgia & S. Carolina).

law. The Georgia Defendants are not entitled to qualified immunity for relying upon clearly unlawful policies.

Nor do the three cases from outside this Circuit cited by the Georgia Defendants unsettle Title IX's mandate of "separate" women's locker rooms. [Doc. 74-1 at 20–21 n.12 (citing cases).] *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 766 (7th Cir. 2023), is not a sports case at all but instead involves a restroom policy and a request by transgender students to "use the stalls in the locker room to change in privacy."[8] *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), and *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), do not discuss locker room usage. Thus, neither decision supports the idea that Title IX requirements concerning sports locker rooms changed.

Moreover, all three cases and the DoE's enjoined Rule have this in common: they rely on a novel extension of *Bostock* (which interpreted Title VII) to re-interpret Title IX, a maneuver that was expressly not reached by the majority in *Bostock* itself.

---

[8] Restrooms, typically containing private stalls and where students do not disrobe and pull on a technical swimming suit which can leave a woman mostly unclothed for 30 minutes, are fundamentally different from swimmers locker rooms. Recent cases recognizing a right of a transgender child to use their bathroom of choice, start with the premise that **"[n]o one questions that students have a privacy interest in their body when they go to the bathroom**." *Grimm v. Gloucester County School Board*, 972 F.3d 586, 613 (4th Cir. 2020). The transgender bathroom decisions are based on the idea that bodily privacy is protected by "how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Id.* (quoting *Ex rel Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017)). These decisions do not unsettle the law in this area.

*Bostock*, 590 U.S. at 681 ("none of these other laws are before us"). Clearly established law does not become unsettled in this manner.

As for the right to bodily privacy in locker rooms under the Fourteenth Amendment, as explained above, it has been well-established since at least 1993. *Fortner*, 983 F.2d at 1030.

### E.   Plaintiffs With Current Eligibility Have Adequately Alleged Standing to Challenge Current NCAA Policies and Seek Damages

The NCAA concedes Plaintiffs have standing as to the events in 2022. [Doc. 75-1 at 16.] However, they argue there is no standing among Plaintiffs with current NCAA eligibility to challenge current NCAA policies. [*Id.* at 17–21.] To show standing, a "plaintiff must demonstrate standing separately for each form of relief sought" based on the following factors:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 185 (2000). Plaintiffs with current eligibility easily satisfy these requirements.

### 1.   Plaintiffs Have Adequately Alleged Competitive Injuries

For starters, the NCAA ignores that Plaintiffs with current eligibility are also seeking retrospective relief including damages (and nominal damages) in addition to injunctive relief. FAC ¶¶ 698–700, 707–708, 757–58, 788. Next, the NCAA

contends "no Plaintiff alleges a substantial likelihood that she will compete against a transgender woman at any certainly impending time in the future." [Doc. 75-1 at 18.] This claim is simply false. The FAC recites that "transgender athlete Sadie Schreiner of Rochester Institute of Technology (RIT) [is] a male," that "*Track Athlete A will compete against Schreiner next year*" and that "the *NCAA's [TEP]* have harmed Track Athlete A, causing her to lose placements and points to a male, and . . . *will continue to harm her in the future by causing her to lose competitive opportunities, points, and placements to Schreiner in the future*." FAC ¶¶ 73, 627–32 (emphasis added). These are sufficient allegations to show (1) past injury, and (2) that Track Athlete A will compete against Schreiner, a specifically identified trans-identifying male, in the upcoming NCAA track and field season. These allegations are "plausible" and more than sufficient to satisfy Rule 8 which "does not require detailed factual allegations." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (cleaned up).[9] To be clear, Count V is not limited to prospective injunctive relief, but also seeks retrospective relief, including nominal and actual damages, against the NCAA for Track Athlete A and other Plaintiffs with current NCAA eligibility. *See* FAC ¶ 778, Prayer for Relief.

---

[9] Track Athlete A is proceeding as a pseudonym plaintiff due to concerns over retribution. It would not have been prudent to lay out her track schedule in the Complaint.

### 2.      Plaintiffs Have Adequately Alleged Current and Ongoing Informational Injury and Increased Safety Risks

The NCAA and its member institutions do not disclose which athletes competing in women's sports are men. *Supra* at 7. This is an "injury in fact" suffered by all Plaintiffs who are current NCAA athletes because the NCAA is withholding information that "on [Plaintiffs'] view of the law, [Title IX] requires that [the NCAA] make public." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). Title IX does not permit the NCAA or its members to surreptitiously turn women's sports into co-ed sports. When this happens, Plaintiffs are entitled to know about it.

Disclosing when men compete against women is necessary for a proper assessment of risk and informed consent to participate in competition. *Cf. Akins*, 524 U.S. at 21 (recognizing information "would help them (and others to whom they would communicate it) to evaluate candidates for public office."). Beyond safety risks, refusal to make available information about men competing on women's teams also prevents women from being able to protect their rights to bodily privacy and separate women's locker rooms.

A woman participating on a men's team does not increase safety risks for men. However, allowing men to participate on women's teams does increase safety risks for women, and this increased risk is faced collectively by the entire class of women student-athletes to whom the NCAA TEP apply, which is the smallest group of injured parties that can be currently identified due to the NCAA's failure to provide

information allowing women to individually measure risks. *See Jackson*, 544 U.S. at 174 (describing sex discrimination under Title IX as "differential" and "less favorable" treatment); *Peltier v. Charter Day Sch., Inc.*, 37 F. 4th 104, 129–30 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2657 (2023) ("discrimination" under Title IX "means treating an individual worse than others who are similarly situated" (cleaned up)). Therefore, Plaintiffs with current NCAA eligibility have standing to seek injunctive relief rectifying the *current* (i.e., not just prospective) information and safety disparity created by the TEP.

The NCAA and this Court must accept as true for purposes of this motion that the TEP increases safety risks for Plaintiffs Ainsely Erzen (soccer), Ellie Eades (tennis), Nanea Merryman (volleyball) and other female athletes competing in Contact and Limited-Contact Sports. FAC ¶¶ 633–658. The FAC also provides examples of males such as Blaire Fleming, who played on NCAA women's teams for years without public disclosure that Fleming is a man. FAC ¶¶ 640-43.

### 3. Plaintiffs Have Adequately Alleged Current and Ongoing Emotional and Dignitary Injuries

Courts have found that "emotional and dignitary harm" are cognizable injuries under Title IX. *Peltier*, 37 F.4th at 129; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020). As with the informational injuries arising from the TEP, emotional and dignitary harms arise from the TEP treating women worse than men who are similarly situated. *Jackson*, 544 U.S. at 174; *Peltier*, 37 F.4th at 129–

29

30. Women suffer emotional and dignitary injuries because the NCAA policies communicate to them that competitive fairness and safety for women are not worth protecting to the same degree that they are protected for men. *See*, *e.g.*, FAC ¶¶ 511, 554, 657. The TEP harms women in this way because men do not suffer a competitive or safety disadvantage if a woman is permitted to try out for the men's team.

### 4. Plaintiffs Have Alleged Current Competitive Harms

The NCAA also contends Plaintiffs who "*might* someday compete against a transgender [athlete]" have not adequately alleged current harm and characterizes the Plaintiffs' level playing field and risk of injury concerns as merely "'nebulous allegations of future harm.'" [Doc. 75-1 at 19–20 (quoting *Worthy v. Phenix City*, 930 F.3d 1206, 1216 (11th Cir. 2019)).]

Plaintiffs' allegations are not "nebulous." Rather, Plaintiffs allege *current* competitive and safety harms. *See supra* at 7–8. That they face an increased risk of such harms *today* is traceable to the TEP. Diminished fairness and safety in NCAA women's competitions exists in all sports covered by the TEP which allows an unknown number of men with retained male advantage to compete on NCAA women's teams. FAC ¶¶ 264–412. The facts the Court must assume as true at this stage show that competitive advantages result from a massive performance gap that makes male participation on any NCAA women's team unfair and illegal under Title IX. FAC ¶¶ 264–96. Moreover, the TEP effectively bans any constructive dialogue on the

topic by labeling all dissent as "transphobic." FAC ¶¶ 397–412.

Thus, participation by men in NCAA women's sports creates *current* competitive imbalances and safety risks across all NCAA women's sports. This is injury-in-fact. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010). The extent these injuries are not yet quantifiable by Plaintiffs because the TEP does not require public monitoring of compliance, harm to women, or encourage meaningful feedback. FAC ¶¶ 388–412. Only discovery will tell.

### 5.   Plaintiffs with Current Eligibility Have Standing to Pursue Actual and Nominal Damages

Finally, Plaintiffs bringing Count V have "standing to bring a [Title IX] claim for nominal damages even without alleging a specific injury flowing from the violations." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009). Plaintiffs must simply show that their Title IX or Fourteenth Amendment rights were violated by the TEP or its application. *Id.*

Count V is brought against the NCAA by Plaintiffs with remaining NCAA eligibility who assert a private right of action for damages and injunctive relief, FAC ¶¶ 763-64, seeking all relief in their prayer for relief, ¶ 778, which, among other things, requests nominal and actual damages. Prayer for Relief ¶ 7. Therefore, Count V cannot be dismissed based on the standing ground raised by the NCAA, which goes solely to prospective injunctive relief.

The NCAA concedes the "Roanoke Swimmers allege past injury," [Doc. 75-

1 at 20 & n.6], and does not dispute that Track Athlete A adequately "alleges that she competed against a transgender woman [in] a past competition." [Doc. 75-1 at 19.] Thus, the Roanoke Plaintiffs and Track Athlete A are plainly entitled to seek nominal and actual damages against the NCAA.

### F.  Plaintiffs Adequately Alleged the NCAA Is a State Actor

The NCAA argues it was not a state actor under Counts: II (Title IX), III (Equal Protection Clause), and IV (14th Amendment Bodily Privacy). [Doc. 75-1 at 7–15.] However, resolving the NCAA's status as a § 1983 state actor requires more than simply applying the result in *Tarkanian*. Plaintiffs' allegations are different.

The NCAA is a state actor because the NCAA and public institutions in every state of the country work together in a joint, symbiotic, intertwined relationship to create a national product of collegiate athletics. The NCAA regulates and enforces collegiate athletic competition, generally, and NCAA championships, in particular, while the public schools control the facilities at which competitions occur and construct their respective teams using the NCAA's eligibility rules, annually receiving millions of dollars in revenues and institutional brand value from the national product the NCAA regulates. This is joint action under the state action doctrine.

#### 1.  *Tarkanian* Is Not Dispositive

Whether a private entity is a state actor under § 1983 is "necessarily [a] fact-bound inquiry" that "var[ies] with the circumstances." *Lugar v. Edmondson Oil Co.,*

*Inc.*, 457 U.S. 922, 939 (1982) (reversing grant of dismissal); *accord Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) ("true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required.").

*Tarkanian* addressed the narrow circumstance of whether a state university's "actions in compliance with the NCAA rules and recommendations [in relation to the employment discipline of a single coach] turned the NCAA's conduct into state action." *NCAA v. Tarkanian*, 488 U.S. 179, 193 (1988). The NCAA enforced its rules by recommending the University of Nevada, Las Vegas (UNLV) discipline its head basketball coach, and UNLV subsequently complied. The Supreme Court found only that UNLV retained authority to apply NCAA sanctions to its own coach, and that UNLV's decision to do so did not transform the NCAA into a state actor.

As the Court later recognized, the facts in *Tarkanian* reflect that the NCAA is a "collective membership" of "several hundred member institutions, most of them having no connection with Nevada." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). Thus, the Court found the NCAA was not "the surrogate *for the one State*," *i.e.*, Nevada. *Id.* (emphasis added). *Tarkanian* did not resolve the issue whether when *adopting* eligibility rules and/or *conducting national championships* the NCAA is a surrogate for public universities in every State who bargain with it to deliver the product of national collegiate athletics.

The NCAA also ignores the holding and analysis of *Brentwood*, which is far

more analogous to the facts here than *Tarkanian*. In *Brentwood*, the Supreme Court held that when there is "pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness," then an athletic association engages in state action. *Brentwood*, 531 U.S. at 298. *See also Lugar*, 457 U.S. at 937 (finding joint action when "[private entity] has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State"); *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, AFL-CIO, 860 F.2d 1022, 1027 (11th Cir. 1988) ("To charge a private party with state action . . . the governmental body and private party must be intertwined in a 'symbiotic relationship.'" (citations omitted)).

The Court in *Brentwood* found pervasive entwinement because the Association was comprised of "members" who are "public schools," scholastic athletics "play an integral part in the public education of" the state institutions, and the member schools "adopt and enforce the rules that make the system work." *Brentwood Acad.*, 531 U.S. at 299. That many of the Association's members were private schools did not preclude finding pervasive entwinement. *Id.*

### 2. State Universities Delegated to the NCAA the Authority to Re-Define Women's Sports Nationally

The NCAA argues that "Georgia state university Defendants' conduct in compliance with the NCAA policies is insufficient to convert the NCAA into a state actor." [Doc. 75-1 at 9.] But the FAC alleges that the NCAA has a symbiotic,

entwined relationship with its member institutions – including hundreds of public universities – that produces what the FAC refers to as NCAA college athletics. *See supra* 1–4. The FAC also alleges that the NCAA had a symbiotic, entwined relationship with the Georgia Defendants for purposes of hosting the 2022 Championships. *See supra* at 3–4. These allegations are on all fours with the *Brentwood* factors for establishing pervasive entwinement. These facts were not considered by the Supreme Court in *Tarkanian*. No further allegations are required to state a § 1983 claim against the NCAA under Federal Rule 8(a)(2).

The NCAA's argument that it is not a state actor fundamentally ignores the "necessarily fact-bound inquiry" of the state action doctrine. *Lugar*, 457 U.S. at 939. Fundamentally, the NCAA wants to rely upon its interpretation of NCAA documents rather than factual reality. Regardless of what the NCAA's governing documents say about NCAA member institutions retaining authority and control, the FAC alleges that this is not how the NCAA works in fact. Moreover, the NCAA's own governing documents state that it "conducts" all NCAA championships. FAC ¶ 129. If the NCAA disagrees, it may produce evidence to the contrary in discovery.

It is also legally irrelevant that NCAA public school members include private universities in their national athletics enterprise. As the Supreme Court said in *Brentwood*, 531 U.S. at 300, the NCAA does not lose authority delegated by state entities merely because private entities associate with it, too. All that is necessary is that the

NCAA be a "willful participant," not the exclusive participant, "in joint activity with the State or its agents" such that the two are pervasively entwined. *Brentwood*, 531 U.S. at 296–298 (citing *Lugar*, 457 U.S. at 931).

These alleged facts are not implausible legal conclusions. NCAA members ceded authority to the NCAA to define the parameters of national collegiate athletics as part of the bargain for the NCAA creating "a coherent collegiate sports product," FAC ¶ 140, and in exchange for the NCAA member institutions' right to an annual revenue share and increased value to their own institutional brands and multipurpose athletic conferences. FAC ¶¶ 143, 147. Thus, it is entirely plausible that the delegation of authority to define the nature and parameters of women's college sports nationally was part of the *quid* for at least 600,000,000 *quos*. The NCAA does not attempt to address these allegations in its analysis. [*See* Doc. 75-1 at 12–15.]

The Georgia Defendants do not argue it is implausible the NCAA controls material aspects of their athletic programs. They concede this, stating "they control neither the NCAA nor its policies any more than Plaintiffs do," [Doc. 74-1 at 1], the NCAA created, mandated, and enforced the TEP, [Doc. 74-1 at 13], and "only the NCAA purportedly excluded or denied Plaintiffs from the opportunity to compete against only women athletes." [Doc. 74-1 at 17.]

This case does not present the narrow circumstances addressed in *Tarkanian* concerning NCAA "rules and recommendations" that a single State university

decided to enforce against a single university employee. Rather, it is about how the NCAA controls key aspects of college sports nationally that allowed it to change the meaning of "equal athletic opportunity" for women's sports in public universities and federally funded schools throughout the country. The authority to do so was delegated by NCAA member institutions, including hundreds of public universities across the nation. Through its TEP, the NCAA altered the very nature of women's sports across the college landscape and for all of the nation's major public colleges and universities by including men on women's teams.

The NCAA argues that "[s]tate action does not exist merely because a private party formulates rules and regulations later implemented by the state." [Doc. 75-1 at 12.] But that is not what the FAC alleges. The FAC alleges a fundamentally symbiotic, entwined relationship in which the NCAA and its member institutions, of which a substantial percentage are public universities, work together to present the national and monopolistic product of intercollegiate athletic competition. FAC ¶¶ 127–151. Due to the NCAA's grip on big-college sports, large public universities have no practical choice but to offer an intercollegiate athletics program through the NCAA.

The NCAA argues the FAC fails to allege a "§ 1983 conspiracy" in which the state actors and the NCAA "reached an understanding to violate" the Plaintiffs' rights or engaged in any communication to that effect. [Doc. 75-1 at 14–15.] Again, this is a pervasive entwinement and joint action case, not a conspiracy case. In a

conspiracy case, the only connection between a state and private actor is the conspiracy to violate the plaintiff's rights. *Bailey v. Bd. Of Cnty. Com'rs*, 956 F.2d 1112, 1122 (11th Cir. 1992). Here, the relationship is broader than that. The NCAA and the state universities work together to create women's college sports generally and the NCAA national championships specifically. While engaging in that joint and intertwined work, they violated Plaintiffs' rights.

### 3.  State Universities Delegate to the NCAA the Authority to Run NCAA National Championships

Even if the Court finds that NCAA is not engaged in joint action with its public member institutions, generally, the Amended Complaint nonetheless plausibly alleges that the NCAA was engaged in joint action with the Georgia Defendants with respect to the 2022 NCAA Championships and McAuley Aquatic Center, specifically. *See supra* at 3–4. The NCAA's own governing documents state that it "conduct[s]" all NCAA championships. FAC ¶ 129. In 2022, it worked hand-in-glove with the Georgia Defendants who delegated operational control over their facility so the NCAA could conduct the event according to the TEP. FAC ¶¶ 413–419.

These allegations of operational control over a specific event at a public institution are far more specific than the general regulatory and enforcement authority discussed in *Tarkanian*. Under these facts, *Brentwood* controls and warrants denial of the NCAA's motion on state action grounds.

### G.      Plaintiffs Alleged State Action by Individual Georgia Defendants

The Individual Georgia Defendants argue the FAC does not link any of the Title IX and constitutional violations "to any act of any Individual State Defendant," [Doc. 74-1 at 23], so, Plaintiffs have failed to allege state action and cannot seek an injunction against the state officials in their official capacity. [*Id.* at 22–25.]

The Individual Georgia Defendants misunderstand that the FAC alleges that every action taken by the Georgia Defendant was effected through the individual decisions of the Georgia Tech and Board of Regents chair, board members, and the individual John Doe agents of the Georgia Defendants. FAC ¶¶ 88–116; *see infra* at 48–50. As explained in the previous section and the section discussing traceability and redressability against the Georgia Defendants, Plaintiffs have alleged that the NCAA and Georgia Defendants jointly caused the Plaintiffs injuries at the 2022 NCAA Championships and will continue to cause future harm through implementation of the TEP at future events and championships. *See Supra* at 3–4, 16–18; *see also* FAC ¶ 783. The FAC sufficiently alleges state action by the Individual Georgia Defendants. *Brentwood*, 531 U.S. at 296–298.

### H.      Title IX Applies to the NCAA on the Alleged Facts

Regardless of whether the NCAA is a state actor, it is subject to Title IX. Title IX applies to "any education program or activity" that "receives federal financial assistance." 20 U.S.C. § 1681. Title IX's "inclusive terminology" "encompass[es]

*all* forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (internal citations and quotation marks omitted) (emphasis in original). Recognizing the "need to accord Title IX a sweep as broad as its language," the Court is "reluctant to read into [Title IX] a limitation not apparent on its face." *Id*. "[I]f any part of the NCAA received federal financial assistance, all NCAA operations would be subject to Title IX." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 460 (1999) (*Smith I*).

In 1999, the Supreme Court issued its only opinion regarding the applicability of Title IX to the NCAA. *Smith I*, 525 U.S. at 469. The Court held that because a student athlete had not alleged that "NCAA members paid their dues with federal funds earmarked for that purpose" proof of the NCAA's "receipt of dues" merely "demonstrates that it indirectly benefits from the federal assistance afforded its members" *Id*. at 468. The Court concluded that "this showing, without more, is insufficient to trigger Title IX coverage." *Id*.

However, the Court declined to address two alternative theories for bringing the NCAA under Title IX because those theories had not been previously addressed in the litigation. *Id*. at 469. First, plaintiff asserted the NCAA indirectly "receive[d] federal financial assistance through the National Youth Sports Program" administered by the NCAA. *Id*. Second, the plaintiff asserted "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling

entity is covered by Title IX regardless whether it is itself a recipient." *Id*. at 469–70. As explained below, both alternative theories that were acknowledged but not addressed in *Smith I* make the NCAA liable under Title IX in this case.

### 1.    The NCAA is an Indirect Recipient of Federal Funding

The NCAA is an indirect recipient of federal funding through its "Grand Alliance" with the Department of Defense by which the NCAA channels federal funds to member institutions chosen by the NCAA for concussion research and education. *See supra* at 5–6. These indirect funding allegations are sufficient to survive a motion to dismiss and are analogous to the indirect funding allegations addressed in *Smith II* – the Third Circuit's opinion on remand from the Supreme Court's decision in *Smith I. Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 160–63 (3d Cir. 2001) (*Smith II*). The Third Circuit addressed a program, known as the "National Youth Sports Program" (NYSP), that was funded by federal dollars provided to the NYSP "Fund" (NYSPF). *Id*. at 155. The Third Circuit held that Plaintiff's allegations "establish[ed]" that the NCAA "truly assumed control of the NYSP and its Fund . . . the NCAA did more than 'indirectly benefit' from federal assistance . . . rather . . . it was in a position to decide whether to 'receive' federal funds and thereby accept the concomitant obligations of Title IX." *Id*. at 162 (internal quotation alterations and marks omitted.); *see also Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000) (holding that the "obvious administrative entanglements that exist between

the NCAA and the NYSPF" and the NCAA's "ability to significantly influence how NYSPF's federal funding is spent" was evidence of indirect funding).

The NCAA argues that because Plaintiffs do not allege that the NCAA *directly* received the federal funding, its association with the DoD is insufficient to bring the NCAA within Title IX. [Doc. 75-1, 4–5.] However, like the NYSP, the issue here is not whether the NCAA directly receives funds, but whether the NCAA controls how the *indirect* federal funding is spent. In *Smith II*, the Third Circuit focused on "the degree to which the [NCAA] is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all." 266 F.3d at 161.

Here, Plaintiffs alleged that the NCAA is operating a comprehensive concussion research study in "partnership" with the DoD. FAC ¶¶ 152–70. By being in "partnership" with the DoD, the NCAA has control over how federal dollars are used in the study. While further discovery is needed regarding how the NCAA exerts its control within the Grand Alliance, these allegations, which must be taken as true, are sufficient to survive a motion to dismiss. To hold otherwise would, "ignore . . . evidence [of informal control and] . . . would be to elevate form over substance in a way that should not be countenanced." *Bowers*, 118 F. Supp. 2d at 529.

### 2.    The NCAA's Federally Funded Member Institutions Have Ceded "Controlling Authority" to the NCAA

Indirect funding aside, Plaintiffs have also alleged facts sufficient to trigger

the second theory in *Smith I* that the Supreme Court did not reach. NCAA member institutions which are direct funding recipients have ceded "controlling authority" to the NCAA over areas of collegiate athletics relevant to this case.

Federally funded NCAA member institutions have ceded control to the NCAA for reasons like those supporting the NCAA's status as a state actor. *See supra* at 32–38. But even if the Court did not find state action, the FAC clearly alleges that federally funded NCAA member entities – over 90% of NCAA members – ceded the rulemaking and enforcement components and the end-of-season national championship aspects of their athletic programs to the NCAA. FAC ¶¶ 122–151, 171–180, 710–724. Beyond that, the Georgia Defendants in particular also ceded operational control of their public facility for the purpose of hosting the 2022 NCAA Championships. FAC ¶¶ 413–16, 419. If the NCAA doubts these allegations, that's an issue to be resolved after discovery and on summary judgment or at trial.

### a. *The Eleventh Circuit Has Adopted the Ceding Controlling Authority Test*

Since *Smith I* both the Fourth and Eleventh Circuits have held that Title IX applies to associations that exercise "controlling authority" over funding recipients. *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007) (university ceded "controlling authority" to non-profit athletics association); *B.P.J. by Jackson*, 98 F.4th at 554 (Title IX covers "organizations that 'control[ ] and manage[ ]' direct funding recipients" (quoting *Horner*, 43 F.3d at 272)). The

Eleventh Circuit adopted the "controlling authority" test because "if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations" that would leave a large loophole in Title IX coverage. *Id. See also Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1230 (N.D. Ala. 2010) (applying *Williams* to hold recipients had sufficiently alleged ceded "controlling authority" to a college athletic conference).

In *Williams*, the Eleventh Circuit said that it relied upon the Western District of Michigan's analysis in *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733–35 (W.D. Mich. 2000), which, in turn, relied heavily on the Supreme Court's decision in *Cannon* holding that Title IX "was enacted for the benefit of . . . those discriminated against on the basis of sex" as opposed to simply being a "ban on discriminatory conduct by recipients of federal funds" or "a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id*. (citing *Cannon*, 441 U.S. at 691–92). Accordingly, "any entity which has controlling authority over a 'program or activity receiving Federal financial assistance' is subject to Title IX's anti-discrimination rule, even if that entity does not itself receive the federal funds which finance the program or activity." *Id*. at 733 (quoting 20 U.S.C. § 1681(a)). *Communities for Equity* noted relevant facts about whether the schools had ceded controlling authority:

- The association was "self-supporting" and did "not rely on taxpayer dollars." *Id*. at 736–37.

44

- The association did not receive "membership dues, tournament entry fees, or service fees" from members. *Id*. at 737.

- Member schools were allowed to schedule matches against non-member schools. *Id.* at 736.

- The association required member schools to "adopt the Regulations and Interpretations" of the association that covered all aspects of athletic programs "as their own and agree to be primarily responsible for their enforcement." *Id*. at 737.

- The association had a "de facto monopoly over interscholastic sports" as all high schools in Michigan were members. *Id*.

- A school's decision to "disregard [association] rules, or leave the [association]" would subject the school to "sanctions (including possible expulsion), jeopardize its ability to compete in statewide tournaments, find it difficult to schedule opponents, and in general providing interscholastic athletic programs … ." *Id*.

Similar factual allegations by Plaintiffs in this case preclude dismissal. Here, the First Amended Complaint details how the NCAA exerts control over rules, rules enforcement, and championship events, including eligibility rules such as the TEP and locker room access at national championships. *See supra* at 1–4. *Communities for Equity* expressed concern that failing to hold an athletic association accountable under Title IX would leave student-athlete plaintiffs without a remedy because the schools and the athletic association would cast blame on each other. *Id*. at 738 n.3. This is presciently what the NCAA and Georgia Defendants are doing here.

        **b.**    ***The Third Circuit's Reasons for not Applying the Ceding Controlling Authority to the NCAA Are Not Persuasive***

The Court should apply the analysis in *Williams* and *Communities for Equity*,

not the analysis in *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999). First, that case was a Title VI case, not a Title IX case. Second, the Third Circuit relied heavily on *Tarkanian's* finding the NCAA was not a "state actor" pursuant to § 1983. As explained above, *Tarkanian*'s holding does not control the outcome at this stage of the case because the FAC alleges fundamentally different facts than in *Tarkanian*.

As the dissent argued in *Cureton,* the "*Tarkanian* [case] illustrates the extent of absolute control the NCAA has over its member[s]." *Id*. at 122 (McKee, J. dissenting). The reason this "control" was insufficient to make the NCAA a state actor was that the Supreme Court was focused on whether one *University controlled the NCAA*, not on whether the *NCAA controlled the University, id*. at 124, or upon whether public institutions in each State are intertwined with the NCAA.

The NCAA argues that Plaintiffs' arguments are foreclosed by *Smith II* and *Cureton* [Doc. 75-1 at 5–7]. But those cases are not binding and readily distinguishable. Those cases held only that the authority of individual schools over *their* athletic rosters severs the NCAA's control. *Cureton*, 198 F.3d at 117–118 (holding member schools decide which "applicants to admit" and which athletes compete on their rosters); *Smith II*, 266 F.3d at 157 ("Similar to the plaintiffs in *Cureton*, Smith is attacking an eligibility rule that NCAA members may choose to enforce or ignore."). This case, by contrast, is about the fact that individual NCAA member institutions are powerless to determine whether women on their individual teams will compete

against men on *other* schools' rosters and at the *NCAA championships.* Regardless of whether individual schools control their own rosters (itself a dubious prospect *in relation to the TEP*, given it is a Board of Governors' policy as to which there are no express exceptions), they cannot effectively prevent their women from competing against men that the NCAA allows to compete in collegiate athletics championships. The NCAA alone has the authority to decide who participates because it writes the eligibility rules, "conducts" the championships, and determines eligibility for the championships. FAC ¶ 413–37. Finally, while the Georgia Defendants maintain legal and physical control over their facilities, they ceded operational control to the NCAA pursuant to their agreement to host the 2022 NCAA Championships in particular. FAC ¶¶ 413, 419, 449–51.

The Georgia Defendants' motion highlights the extent of NCAA control. They argue that they are not responsible because they "did not create the *NCAA's* Transgender Policies . . . [and] did not and could not cause Plaintiffs to compete against transgender athletes." [Doc. 74-1 at 11–12.] Further, Georgia Defendants argue the NCAA had "operational control of the facilities and made the decisions regarding the locker rooms." [*Id.* at 12.] These arguments track the Michigan court's reasoning, *see Communities for Equity*, 80 F. Supp. 2d at 738 n.3, which influenced the Eleventh Circuit in *Williams* and led an Alabama district court in *Barrs* to apply the "controlling authority" argument to athletic associations.

In sum, at least one Defendant had controlling authority over women's collegiate athletics and the 2022 Championships. The Court should permit Plaintiffs to conduct discovery and develop evidence showing that via its rules which govern NCAA competitions and its authority to conduct NCAA championships the NCAA controlled significant aspects of the educational program of covered institutions, thereby invoking Title IX coverage. Plaintiffs' allegations show the NCAA is a recipient of federal financial assistance under both the ceding "controlling authority" and the "indirect recipient" theories. If the evidence shows that the NCAA lacked control, then that will establish Plaintiffs' claims against the Georgia Defendants.

## I.     Plaintiffs' Fictitious Defendant Allegations Are Sufficient

Defendants object to Plaintiffs' use of John Doe defendants. [*See* Doc. 74-1 at 5 n.4; Doc. 75-1 at 21-22.] While fictitious party pleading is generally disfavored, *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), unnamed defendants can be used where discovery will uncover the defendant's identity. *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). Normally "an unambiguous description of a defendant that enables service of process" is required. *Vielma v. Gruler*, 808 F. App'x 872, 880 (11th Cir. 2020). However, the Eleventh Circuit has yet to address whether the discovery exception is a standalone exception or part of the unambiguous description requirement. *Id.* at 881; *accord Quad Int'l, Inc. v. Doe*, No. CIV.A. 12-675-N, 2013 WL 105268, at *3 (S.D. Ala. Jan. 7, 2013) (holding 11th Circuit

does not foreclose discovery exception). Here, Plaintiffs have unambiguously identified John Doe defendants with as much specificity as possible prior to discovery alleged they needed discovery to determine their names, including:

- "[A]gents of the NCAA who … undertook the actions attributed to the NCAA in this Complaint … . FAC ¶ 113.

- "[A]gents or employees of one or more public colleges or universities in Georgia who engaged in the conduct attributed to the Georgia Individual Defendants that are described in this Complaint, including those individuals who directed operations and made decisions in relation to the 2022 NCAA Championships and/or who will do so … . FAC ¶ 114.

- Tournament Manager. FAC ¶¶ 422-23.

- Facility Manager. FAC ¶ 424.

- Official who told Riley Gaines they allowed Thomas into the locker room by changing it to unisex. FAC ¶¶ 495-96.

- Official who wouldn't let Gaines hold a trophy. FAC ¶¶ 577-81.

As demonstrated by their concurrently filed Motion for Leave to file the Second Amended Complaint, Plaintiffs are committed to replacing the John Does with named defendants once Plaintiffs discover their identities.

### J.    Proper State Entities

Plaintiffs agree the University System of Georgia Board of Regents and GTAA are the only proper state university defendants, and the University of Georgia, Georgia Tech University, and the University of North Georgia cannot be defendants. *Board of Regents of the Univ. Sys. v. Doe*, 630 S.E.2d 85, 87 (Ga. Ct. App.

2006). Plaintiffs agree they also cannot seek injunctive relief against individual former Board members in their official capacity. Current board members are substituted for former members that have resigned. Fed. R. Civ. P. 25(d)(1). However, under § 1983 former individual board members remain liable for damages caused by actions committed in their individual capacities. While they served, former board members directed activities of Georgia Tech and others, FAC ¶¶ 115–116, and directed the Title IX violations. FAC ¶¶ 727, 739, 741, 745, 753, 755, 782.

State Defendants argue "[i]t is unclear whether Plaintiffs seek relief or what type or relief they seek against the Board of Regents, the University System of Georgia, or the University Defendants pursuant to § 1983." [Doc. 74-1 at 18–19.] To be clear, Plaintiffs do not seek relief against entities under § 1983. Plaintiffs seek only injunctive relief and damages under a direct Title IX claim against these entities. (Count I). All injunctive relief under § 1983 is sought against state officials in their official capacity (Count VI), and all damages under § 1983 are sought against state officials in their individual capacity (Count III & Count IV).

## III.  CONCLUSION

For the foregoing reasons, the motions to dismiss of the NCAA and Georgia Defendants should be denied.

Respectfully submitted,

| | |
|---|---|
| */s/ William Bock III* | */s/ Bryan P. Tyson* |

William Bock III, No. 14777-49[10]        Bryan P. Tyson, No. 515411
Kevin D. Koons, No. 27915-49[11]          Thomas C. Rawlings, No. 595795
Justin R. Olson, No. 31450-49[12]         Deborah A. Ausburn, No. 028610
*Attorneys for Plaintiffs*                *Attorneys for Plaintiffs*
Kroger Gardis & Regas, LLP                Taylor English Duma LLP
111 Monument Circle, Suite 900            1600 Parkwood Circle, Suite 200
Indianapolis, IN 46204                    Atlanta, GA 30339
Tel: (317) 692-9000                       Tel: (770) 434-6868
Email: wbock@kgrlaw.com                   Email: btyson@taylorenglish.com
Email: kkoons@kgrlaw.com                  Email: trawlings@taylorenglish.com
Email: jolson@kgrlaw.com                  Email: dausburn@taylorenglish.com

---

[10] *Pro hac vice*
[11] *Pro hac vice*
[12] *Pro hac vice*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), counsel certifies that the foregoing was prepared in

Times New Roman, 14-point font, in compliance with L.R. 5.1(C).

*/s/ William Bock III*
William Bock III