## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:24-cv-01109-MHC |
| | ) |
| NATIONAL COLLEGIATE | ) |
| ATHLETIC ASSOCIATION, *et al*. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
## FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiffs seek to amend their Complaint primarily in three respects: *First*, ***adding***[1] Defendant Georgia Tech Athletic Association, Inc. (GTAA), a nonprofit organization that Plaintiffs recently discovered is the entity that "[has] control of the intercollegiate athletics conducted at or in the name of the Georgia Institute of Technology," GTAA Bylaws art. VI § 1, and accepted the NCAA bid award and executed the NCAA's Host Agreement to host the 2022 NCAA Division I Women's Swimming and Diving National Championships (2022 NCAA Championships). This amendment also names the existing defendant Georgia Tech University President Angel Cabrera in his additional individual and official capacity as Chair of the Board of Trustees of GTAA.

---

[1] To be more precise, upon learning of the GTAA's role, Plaintiffs seek to identify "John Doe 26" as the GTAA.

Plaintiffs only recently discovered GTAA's role as a party that contracted with the NCAA to "host" the 2022 NCAA Championship as a result of five Plaintiffs agreeing to testify at a hearing held on August 27, 2024, by the Georgia Senate Special Committee on the Protection of Women's Sports (Committee).[2] At that hearing the Georgia Senate Committee discussed documents recently obtained by the Committee from Georgia Tech University. Among these documents from Georgia Tech University was an event hosting agreement for the 2022 NCAA Championships signed by GTAA. The discovery of the document identifying GTAA as having signed the event hosting agreement with the NCAA led to further inquiry and to the subsequent discovery by counsel for the Plaintiffs that, pursuant to both the NCAA's and GTAA's bylaws, Georgia Tech University has ceded control of some, or all, of its athletics program to GTAA.

*Second,* ***dismissing*** parties who are already represented by Defendant Board of Regents of the University System of Georgia (the Board of Regents), namely the University System of Georgia, Georgia Institute of Technology (Georgia Tech), the University of Georgia, and the University of North Georgia, which Plaintiffs agree

---

[2] The committee's agenda is available at https://www.senate.ga.gov/committees/Documents/WomensSportsAgenda8.27.24.pdf.

do not have a separate legal entity status apart from the Board of Regents. Plaintiffs make these changes in response to the State Defendants' Motion to Dismiss.

*Third*, **adding** to the twelve current Plaintiffs with remaining NCAA eligibility who are challenging the NCAA Transgender Eligibility Policies (TEP)[3] Plaintiff Brooke Slusser, an NCAA volleyball athlete on the San Jose State University (SJSU) NCAA Division I women's volleyball team. Slusser competes on the SJSU women's volleyball team with Blaire Fleming, a male who identifies as transgender. Like all other Plaintiffs already in this lawsuit, Slusser alleges that the NCAA violated Title IX and the Fourteenth Amendment through its TEP. Most of Slusser's allegations relate to events that occurred after the original complaint was filed and during the 2024 NCAA volleyball season which began in August.[4]

Under Federal Rule of Civil Procedure 15(a), justice requires these amendments. They are not the result of undue delay or a bad faith motive, nor will they unduly prejudice the parties. They are also not futile. Accordingly, Plaintiffs respectfully request that the Court grant their motion for leave to file their Second Amended Complaint.

---

[3] Current Plaintiffs with remaining NCAA eligibility are: Track Athlete A, Ellie Eades (University of Kentucky), Ainsley Erzen (University of Arkansas), Ellis Fox (Texas A&M University), Nanea Merryman (Cedarville University), and Katie Blankinship, Julianna Morrow, Lily Mullens, Kate Pearson, Susanna Price, Carter Satterfield and Halle Schart (all at Roanoke College).

[4] The first game of the SJSU women's volleyball season took place on August 30, 2024. *See* https://sjsuspartans.com/sports/womens-volleyball/schedule.

**A.     Legal Standard for Motion to Amend Complaint**

Motions to amend are governed by Rule 15(a), which provides that, outside an initial period (which has expired here), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Rule 15 further provides that a district "court should freely give leave when justice so requires." *Id.*

"While allowing an amendment is a discretionary decision, [the 11th Circuit] ha[s] explained that district courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021). "Leave to amend should be 'freely given when justice so requires' unless there is an 'apparent or declared reason' to deny it such as 'undue prejudice to the opposing party.'" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) and *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006)).

This Court has previously recognized that Rule 15(a)'s "liberal policy of permitting amendments to facilitate determination of claims on the merits" is such that "unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Luxottica Grp. v. Airport Mini Mall, LLC*, 169 F. Supp. 3d 1343, 1345 (N.D. Ga. 2016) (quoting *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989)). "Thus, the Court should deny leave

to amend only where the amendment will result in undue delay, bad faith, undue prejudice, a repeated failure to cure deficiencies by amendments previously allowed, or futility." *Id.*; *see also*, *Blackburn v. Shire US Inc*, 18 F.4th 1310, 1317–18 (11th Cir. 2021) ("When deciding whether to grant leave to amend, a court considers five factors: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, and (5) futility.")

**B.   Applying the five factors here, no substantial reason exists to deny Plaintiffs leave to amend their Complaint.**

### 1.   No undue delay

*First*, there is no undue delay. No scheduling order has been entered yet, and discovery has not yet commenced under Local Rule 26.2, as no defendant has yet answered the Complaint. [*See* Doc. 65 at 3 (noting no deadline for answering Amended Complaint).] Instead, the parties are addressing the Defendants' motions to dismiss. [*See id.*] Moreover, Plaintiffs, who specifically identified John Does in their initial and First Amended Complaint because they did not have access to internal NCAA and Georgia Defendant documents such as the event hosting agreement, only learned of GTAA's involvement as a contracting party to the NCAA's Host Agreement within the last month and have acted promptly to amend to identify GTAA as a party.

Likewise, with Slusser's allegations. Most of her allegations occurred after the initial complaint was filed and during the 2024 volleyball season. She could not reasonably have sought to participate in this litigation any sooner.

### 2.    No bad faith or dilatory motive

*Second*, for similar reasons, there is no bad faith or dilatory motive. Plaintiffs acted promptly to amend—within a matter of weeks—upon learning of the GTAA's involvement and of Slusser's allegations. In fact, Plaintiffs' original complaint anticipated the possibility that additional identities would be identified through the course of discovery. Paragraph 176 of the original complaint [Doc. 1 at 46] alleged that John Does 26–50 were "agents or employees of one or more public colleges or universities in Georgia who engaged in the conduct attributed to the Georgia Individual Defendants that are described in this Complaint, including those individuals who directed operations and made decisions in relation to the 2022 NCAA Championships and/or who will do so in relation to other collegiate athletic events described in this Complaint." While GTAA is an entity rather than an "individual," Plaintiffs anticipated the need to amend to identify parties such as GTAA who shared responsibility for the 2022 NCAA Championships and the decisions related thereto. Plaintiff's amendment is not in bad faith or intended to delay.

Plaintiffs' good faith is further demonstrated by seeking to *dismiss* parties in this amendment, after the Georgia Defendants correctly pointed out in their Motion to Dismiss that the current Defendant Board of Regents of the University System of Georgia is the proper (and only) legal entity regarding any claims against the University System of Georgia and its member institutions, including Georgia Tech, the University of Georgia, and the University of North Georgia. Thus, there is no bad faith or dilatory motive.

### 3.     No repeated failure to cure

*Third*, Plaintiffs have not repeatedly failed to cure. While Plaintiffs filed a First Amended Complaint, the purpose was to add additional plaintiffs and cure certain deficiencies identified by Defendants in their first motions to dismiss the original complaint, as follows:

- Addressing the NCAA's argument that the original complaint was a "shotgun pleading" that contained multiple counts where each count adopted the allegations of the preceding counts. [Doc. 55-1 at 2–5];

- Identifying Plaintiffs Grace Countie, Ellis Fox, Nanea Merryman, and Halle Schart, First Amended Complaint (FAC) [Doc. 64] ¶¶ 58, 64, 65, 72];

- Adding allegations regarding the NCAA's indirect funding received from the federal government through its participation in the Grand Alliance. FAC ¶¶ 152–170;

- Adding further factual detail to various allegations throughout the complaint.

Plaintiffs did not wait for the Court to rule on the motions to dismiss the original complaint but took the initiative to make these changes to its pleading. *Compare*, *Mandala v. Tire Stickers, LLC*, 829 F. App'x 896, 903 (11th Cir. 2020) ("Moreover, Mandala was granted previously two opportunities to amend the complaint and cure any pleading deficiencies, yet he failed to do so.") These latest amendments in the proposed Second Amended Complaint, likewise, do not address any pleading failures identified by the Court but reflect the diligence of Plaintiffs to continue investigating their case through all available means. Thus, Plaintiffs have not repeatedly failed to cure.

### 4. No undue prejudice to opposing party

*Fourth*, given the early stage of this case, none of the parties will suffer undue prejudice. While motions to dismiss the First Amended Complaint by both the NCAA and the Georgia Defendants are currently pending, none of the proposed amendments identifying GTAA as a named party will impact the NCAA or the Georgia Defendants or the arguments they raise in their motions to dismiss. As a result, as explained in their Motion to Amend at ¶ 8, Plaintiffs request that the Court grant their Motion to Amend without finding that it moots the pending Motions to Dismiss the FAC (and supporting briefs) [Doc. 74 & 74-1; Doc. 75 & 75-1 (collectively Motions to Dismiss)], which Plaintiffs agree can be applied to the Second Amended Complaint without need for refiling of the Motions to Dismiss and

supporting briefs (by Defendants) and without need for refiling the Response in Opposition to the Motions to Dismiss (by Plaintiffs).

As relates to the *dismissal* of the University System of Georgia and the University Defendants, this amendment is a concession to some of the arguments raised by the Georgia Defendants' Motion to Dismiss and thus does not unduly prejudice them. Rather, this amendment is a benefit both to the Georgia Defendants, as it will avoid any need for them to reply regarding these concessions, and to the Court, to the extent it removes any need to further consider these matters.

As for the Slusser allegations, her newly alleged facts are relevant only to the claims against the NCAA. While Ms. Slusser's facts certainly strengthen the Plaintiffs' case against the NCAA from the standpoint that Brooke Slusser is another athlete who has competed against a male and been harmed by the NCAA TEP, her allegations do not raise new categories of legal issues that have not been addressed in the Motions to Dismiss. Slusser's allegations support the Title IX and Fourteenth Amendment claims alleged by the current Plaintiffs and support the same claims for relief asserted by Plaintiffs who still have eligibility. To whatever extent the NCAA contests its liability under Title IX, the Fourteenth Amendment or standing doctrines, the NCAA has had the opportunity to make its case in its Motion to Dismiss already. Adding Slusser and her allegations now does not unduly prejudice the NCAA.

Moreover, Ms. Slusser is a member of the putative class of individuals whom Plaintiffs seek to represent. Thus, the NCAA cannot claim that if Slusser were not in the case that it could avoid addressing her evidence if offered in support of the existing Plaintiffs' claims. Furthermore, regardless of whether a class is certified, her facts would be relevant evidence to prove deficiencies in the TEP and the harms arising from it, including those harms faced by women who are competing in contacts sports, such as volleyball athlete Nanea Merryman and soccer athlete Ainsley Erzen who are current Plaintiffs.

### 5.    No futility

#### a.    *GTAA Allegations*

*Finally*, the proposed amendment adding GTAA (and identifying President Cabrera's related role and capacity) is not futile. Plaintiffs are asserting both Title IX direct claims against GTAA and Cabrera as well as § 1983 claims enforcing both their U.S. Constitutional and Title IX rights.

Regarding their Title IX claims, Plaintiffs' proposed amendment plausibly alleges that GTAA is subject to Title IX because Georgia Tech is a recipient of federal funds and has ceded control to GTAA over its athletic programs. As cited in the proposed amendment, GTAA's bylaws provide that its Board of Trustees "shall

have control of the intercollegiate athletics conducted at or in the name of the Georgia Institute of Technology." GTAA Bylaws art. VI § 1 (June 3, 2021).[5]

In *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit considered a similar relationship between the University of Georgia and the related University of Georgia Athletic Association (UGAA) (albeit with less detail than contained in the proposed amendment here). The *Williams* plaintiff alleged "that UGA, a funding recipient, has ceded control over one of its programs, the athletic department, to UGAA and provided extensive funding to UGAA." *Id.* at 1294. The Eleventh Circuit held that these allegations were sufficient to survive a motion to dismiss the UGAA from the plaintiff's Title IX claims. *Id.* The Eleventh Circuit stated it was "persuaded…by the analysis of the Western District of Michigan, noting that if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability." *Id.* (citing *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F.Supp.2d 729, 733–34 (W.D. Mich. 2000)).

---

[5] This version of GTAA's Bylaws, which is the version that was in effect at the time of the 2022 Championships, is available at https://ramblinwreck.com/wp-content/uploads/2022/03/GTAA-Board-of-Trustees-Bylaws-Amended-June-3-2021_FINAL-5-1.pdf.

Thus, Plaintiffs' Title IX claims against GTAA and President Cabrera in his capacity as Chair of GTAA's board would not be futile.

Regarding their § 1983 claims, Plaintiffs' proposed amendment also plausibly alleges that GTAA was acting as a state actor under color of law. Private parties, such as the GTAA, are deemed to be state actors when "one of the following three conditions is met: (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ('State compulsion test'); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ('public function test'); or (3) the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise ('nexus/joint action test')." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (internal quotation marks omitted).

Here, Plaintiffs are relying on the "nexus/joint action test." "[T]he relevant inquiry under the nexus/joint action test is whether 'the State has so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise.'" *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (quoting *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026–27 (11th Cir. 1988)). "To charge a private party with [S]tate action under this standard, the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Id. See also Lugar v. Edmondson Oil Co.*,

457 U.S. 922, 937 (1982) (finding joint action when "[private entity] has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State").

The proposed amendment plausibly alleges an interdependent and symbiotic relationship between Georgia Tech and GTAA. Georgia Tech did not merely cede control of its athletics program to GTAA. The GTAA bylaws also require that its Board consist of Georgia Tech's President and Executive for Administration and Finance, plus eight additional faculty members of Georgia Tech, all appointed by the President of Georgia Tech, and three Georgia Tech student members, each appointed by Georgia Tech faculty. GTAA Bylaws art. V §§ 1, 3, and 4. All of GTAA's officers also must be members of Georgia Tech's administration. GTAA Bylaws art. VII § 1. The Georgia Tech Director of Athletics is also an officer of GTAA. *Id.* This Director of Athletics is "hired by and with the approval of the [GTAA] Board" and "shall be responsible to the [GTAA] Board for the proper conduct of intercollegiate athletics, for the maintenance and efficient use of the physical plant of the Association, and for the general administration of the affairs of the Association according to the directions and regulations of the Board." GTAA Bylaws art. VII § 3. The GTAA Board sets the compensation of the Director of Athletics at its regular June meeting. GTAA Bylaws art. VII § 1.

Thus, the proposed amendment alleges sufficient facts to find a symbiotic and interdependent relationship between Georgia Tech and GTAA that would support holding GTAA was a state actor with respect to the 2022 NCAA Championships it hosted at the McAuley Aquatic Center on the Georgia Tech campus. Moreover, the proposed amendment alleges, based on documents recently obtained, that GTAA signed the agreement with the NCAA agreeing to be the "host" of the 2022 NCAA Championships.

Lastly, adding GTAA and identifying President Cabrera's related role and capacity do not affect Plaintiffs' case against the NCAA in any material respect. The NCAA is not prejudiced by adding these additional defendants and, thus, has no futility argument to make in response to these proposed amendments.

### b.   *Slussser Allegations*

Slusser's allegations are not futile either. She alleges that she suffered injuries similar to those experienced by the twelve existing plaintiffs with NCAA eligibility arising from the NCAA's TEP. Her allegations, like those of the other plaintiffs in this case, address competitive harm and risk of injury concerns like those already articulated in the First Amended Complaint and arise from a loss of equal opportunity to participate in collegiate women's sports caused by the NCAA's TEP. She also alleges similar bodily privacy concerns arising from using locker rooms

with, being lodged on road trips with, and living with a male without her prior knowledge or consent.

In response to Ms. Slusser's allegations, Plaintiffs anticipate that the NCAA will raise the same arguments it has already raised in its pending Motion to Dismiss. Those arguments are that Title IX does not apply to the NCAA [Doc. 75-1 at 2–5], the NCAA is not a state actor under 42 U.S.C. § 1983 that violated Title IX and the U.S. Constitution [*id.* at 5–15], and Plaintiffs lack standing to seek prospective relief from the NCAA's TEP because the alleged injuries are not "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling" [*id.* at 16–21.] Plaintiffs have already responded to these arguments in their Combined Response in Opposition to the pending Motions to Dismiss [Doc. 87], which is being filed contemporaneously with this brief in support of Plaintiffs' motion to file a Second Amended Complaint. As Plaintiffs have noted above, Plaintiffs are amenable to the NCAA and Georgia Defendants' pending Motions to Dismiss being applied to the Second Amended Complaint without need for refiling and without Plaintiffs refiling their Combined Response in Opposition.

***State Action Doctrine.*** The NCAA is a state actor under Section 1983 because of its joint action with SJSU, a state university, and every other NCAA member institution that is also a public college or university. The NCAA and public institutions in every state of the country work together in a joint, symbiotic,

intertwined relationship to create a national product of collegiate athletics. The NCAA regulates and enforces the rules for collegiate athletic competition, generally, FAC ¶¶ 122–151, 171–180, 710–724, and the NCAA championships, in particular, *id.* ¶¶ 129.a., 214, 227, 413, 419, 437, while the public schools control the facilities at which competitions occur and construct their respective teams, *id.* ¶¶ 414–417, 739, receiving millions of dollars in revenues and institutional brand value from the national product the NCAA regulates. *Id.* ¶¶ 145–147. This is joint action under the State Action doctrine. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298–299 (2001).

The NCAA's own governing documents state that it "conducts" all NCAA championships. FAC ¶ 129. Many preliminary championship rounds take place at university campus locations, some of which are public institutions. The 2024 NCAA Division I Women's Volleyball Championship will take place in December 2024 in Louisville, Kentucky, and will be hosted by the University of Louisville, a public university. These allegations of operational control over NCAA championships defeat any futility argument raised by the NCAA on state action grounds.

***Title IX.*** As explained in Plaintiffs' Consolidated Response in Opposition to Defendants' Motions to Dismiss [Doc. 87], the NCAA is subject to Title IX. First, the NCAA is an indirect recipient of federal funding through its "Grand Alliance" with the Department of Defense through which the NCAA helps channel federal

funds to its member institutions for concussion research and education which the NCAA then uses in developing NCAA playing rules. Plaintiffs allege that the NCAA is operating a comprehensive concussion research study in "partnership" with the United States Department of Defense. FAC ¶¶ 152–70. By being in "partnership" with the Department of Defense, the NCAA has control over how federal dollars are used in the study. While further discovery is needed regarding how the NCAA exerts its control within the Grand Alliance, these allegations, which must be taken as true, are sufficient to survive a motion to dismiss and defeat any futility argument. *Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 160–63 (3d Cir. 2001); *Bowers v. NCAA*, 118 F.Supp.2d 494, 528 (D.N.J. 2000) (holding that the "obvious administrative entanglements that exist between the NCAA and the NYSPF" show that the NCAA could significantly influence "how NYSPF's federal funding is spent.").

Second, just as the University of Georgia System has ceded operational control of its athletics program to GTAA, the NCAA's federally funded member institutions have ceded operational control of college athletics rulemaking, rule enforcement, and the conducting of national championships, among other things, to the NCAA. *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282 (11th Cir. 2007). Federally funded NCAA member institutions have ceded control to the NCAA for reasons similar to those that support the NCAA's status as a state actor.

*See supra* at 15–16. But even if the Court does not find state action, the FAC clearly alleges that the federally funded NCAA member entities – over 90% of the members – ceded the rulemaking and enforcement components and the end-of-season national championship aspects of their athletic programs to the NCAA. FAC ¶¶ 122–151, 171–180, 710–724. Beyond that, the Georgia Defendants in particular also ceded operational control of their public facility for the purpose of hosting the 2022 NCAA Championships. FAC ¶¶ 413–16, 419. If the NCAA doubts these allegations, that's an issue to be resolved after discovery and on summary judgment or at trial and is not a basis to find that Slusser's claims are futile.

**_Standing._** Finally, Slusser has standing to seek retroactive compensatory and nominal damages. The NCAA does not challenge such standing in its motion to dismiss any of the existing plaintiffs. Slusser's allegations are also consistent with the other Plaintiffs in that respect.

Slusser also has standing to seek prospective relief from the NCAA's TEP because she alleges that she will continue to participate in NCAA regulated competition until at least the end of November 2024 and, should SJSU qualify, thereafter in the NCAA Division I Women's Volleyball National Championship tournament which will be held in December 2024.

**C.      Conclusion**

Given Rule 15(a)'s "liberal policy of permitting amendments to facilitate determination of claims on the merits" and the absence of "a substantial reason…to deny leave to amend" based on the five factors above, *Luxottica Grp. v. Airport Mini Mall, LLC*, 169 F. Supp. 3d 1343, 1345 (N.D. Ga. 2016), this Court should grant Plaintiffs' Motion for Leave to file Second Amended Complaint, deem the Second Amended Complaint [Doc. 88-2] filed as of the date of this filing, and order all other just and proper relief.

Respectfully submitted,

*/s/ William Bock III*
William Bock III, No. 14777-49[6]
Kevin D. Koons, No. 27915-49[7]
Justin R. Olson, No. 31450-49[8]
*Attorneys for Plaintiffs*
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Email: wbock@kgrlaw.com
Email: kkoons@kgrlaw.com
Email: jolson@kgrlaw.com

*/s/ Bryan P. Tyson*
Bryan P. Tyson, No. 515411
Thomas C. Rawlings, No. 595795
Deborah A. Ausburn, No. 028610
*Attorneys for Plaintiffs*
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Email: btyson@taylorenglish.com
Email: trawlings@taylorenglish.com
Email: dausburn@taylorenglish.com

---

[6] *Pro hac vice*
[7] *Pro hac vice*
[8] *Pro hac vice*

19

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), counsel certifies that the foregoing was prepared

in Times New Roman, 14-point font, in compliance with Local Rule 5.1(C).

*/s/ William Bock III*
William Bock
