# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RILEY GAINES, *et al.*      )
                     )
        Plaintiffs,   )
                     )
    v.                )   Case No. 1:24-cv-01109-MHC
                     )
NATIONAL COLLEGIATE  )
ATHLETIC ASSOCIATION, *et al.* )
                     )
        Defendants.  )

## SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE, AND CLASS RELIEF AND DEMAND FOR JURY TRIAL

## INTRODUCTION[1]

1.    This is an action under Title IX of the Education Amendments of 1972, (Pub. L. 88-352), codified at 20 U.S.C. § 1681(a) ("Title IX"), and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution to remedy sex[2] discrimination against women in college athletics.

2.    Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the

---

[1] Attached as **Appendix A** is a Table of Contents for this Amended Complaint.

[2] "Sex" is used here to refer solely to binary, biological sex. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); *Black's Law Dictionary* (5th ed. 1979) ("**Sex.** The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female").

basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

3.      The NCAA's Transgender Eligibility Policies on their face and in practice discriminate against women based on sex and deprive women[3] of equal opportunity in comparison to men in college sports regulated by the NCAA.

4.      The decision to implement the NCAA's Transgender Eligibility Policies is an Association-wide decision made by the NCAA Board of Governors.

5.      The NCAA's Transgender Eligibility Policies were intentionally designed and are purposefully implemented and enforced by the NCAA to give NCAA member institutions to which Title IX applies an excuse for violating Title IX by allowing men to compete on women's teams in intercollegiate sports and impose a nationwide rule that requires colleges, universities, student-athletes and other to uncritically accept and comply with the subordination of women's rights to the interests of a relatively small number of men.

---

[3] "Women" "men" "male" and "female" are used herein in their strict biological sense as used in Title IX's sport-specific regulations adopted in chronological proximity to Title IX's passage, without regard for "gender identity."

## The NCAA Transgender Eligibility Policies
## Are Discriminatory on Their Face

6.     The NCAA's Transgender Eligibility Policies obtained from the

NCAA's website are attached to the Complaint as **Appendix B** (hereafter referred

to as "App. B") and Bates labeled NCAA 000148 – NCAA 000298.[4]

7.     The NCAA is aware of significant scientific research demonstrating

that men have inherent athletic advantages over women.

8.     The NCAA justifies its Transgender Eligibility Policies, which are

uniformly applicable in NCAA Divisions I, II and III, in part on the idea that

biological differences between men and women which create sport performance

advantages for men can be overcome by a program of testosterone suppression in

men who identify as transgender.

9.     In 19 out of 25 NCAA women's sports the testosterone threshold for

males who want to compete as women is 10 nanomoles per liter (nmol/L) which is

five times (5x) greater than the highest level of testosterone any woman produces

without doping.

10.     In six NCAA women's sports the threshold is lower than 10 nmol/L.

However, in *every* single NCAA women's sport *the NCAA's testosterone threshold*

---

[4] The current NCAA policies can be compared to the NCAA policies on March 14,
2024, when this lawsuit was filed by referencing the NCAA policies submitted
with Plaintiffs' original Complaint as ECF No. 1-1, which were Bates labeled
NCAA 000001 – NCAA 000147.

*applicable to males* who seek to compete against women *is higher than the highest testosterone level women can produce without doping*.

11.     Thus, while there are a handful of sports (*i.e.*, 6 out of 25 NCAA women's sports) in which the NCAA applies a slightly lower testosterone suppression threshold for men seeking to compete as women than the threshold of 10 nmol/L that is most frequently used by the NCAA, every single testosterone threshold applied by the NCAA *is higher than the highest testosterone level women can produce without doping*.

12.     Thus, the testosterone thresholds in the NCAA's Transgender Eligibility Policies discriminate on their face against biological women.

**The NCAA Transgender Eligibility Policies Conflict with Title IX's Foundational Principle That Title IX Protects Against Discrimination Based on Biological Sex**

13.     The NCAA Transgender Eligibility Policies *as applied in every single NCAA women's sport* are grounded in the same premise: that testosterone suppression and personal choice alone can make a man eligible to compete on a women's sports team.

14.     Title IX was enacted by Congress to increase opportunities for biological women.

15.     Congress recognized when enacting Title IX that men and women are not interchangeable.

16.     Therefore, the NCAA's premise that eligibility to compete on a women's team can be based not on "sex" but instead upon testosterone suppression and personal choice conflicts with Title IX because Title IX protects women based on biological sex and the plain language of the statute does not authorize the reimagining of sex to mean something other than biological sex.

17.     The NCAA reinterprets the term "sex" in Title IX to require biological women to cede opportunities to those whom the NCAA defines as "transwomen" but which faithful adherence to the plain language of Title IX requires be defined as "men" for purposes of applying Title IX to college sports.

18.     Title IX cannot be reasonably interpreted to permit men to take women's places in women's sports merely if men are willing to suppress their testosterone level.

19.     Therefore, the NCAA's Transgender Eligibility Policies violate Title IX as they flow from the fundamentally flawed starting point that for purposes of Title IX compliance "sex" can be redefined by entities covered by Title IX.

20.     Transgender Eligibility Policies which authorize men to take the place of women on women's college sports teams, in women's college sports locker rooms, and in NCAA national championships, thereby diminishing opportunities for women, are impermissible *per se* under Title IX.

**The NCAA Transgender Eligibility Policies Fail to Effectively
Accommodate the Physical Abilities of Women and Give Women
Equal Competitive Opportunities in Comparison to Men**

21.     As explained below, *see infra* at ¶¶ 181-190, women already have
fewer athletic opportunities in NCAA collegiate sports than do men.

22.     Title IX's implementing regulations and guidance require that, if an
entity subject to Title IX provides athletic programs or opportunities separated by
sex, then it must do so in a manner that "provide[s] equal athletic opportunity for
members of both sexes." 34 C.F.R. § 106.41(c).

23.     One aspect of assessing "equal athletic opportunity for members of
both sexes" is ascertaining, **"[w]hether the** selection of sports and **levels of
competition effectively accommodate the** interests and **abilities of both sexes**."
34 C.F.R. § 106.41(c)(1) (emphasis added).

24.     On the effective accommodation prong, the "governing principle" is
that "the athletic interests and abilities of male and female students must be equally
**effectively accommodated**." 44 Fed. Reg. 71,413, 71,414 (1979) (the "Policy
Interpretation") (emphasis added). More specifically, the covered entity (in this
case the NCAA and each member institution that receives federal financial
assistance) must accommodate the physical abilities of girls and women "to the
extent necessary to provide equal opportunity in . . . levels of competition," and
competitive opportunities "which equally reflect their abilities." *Id*. at 71,417-418.

25.     As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added). Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate "equal" teams. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," *id*. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." *Id*. at 71,417.

26.     In 1979, the Department of Education Office for Civil Rights (OCR) issued a policy interpretation of Title IX and the Regulations to provide more specific guidance about the statute's application to intercollegiate athletics. Policy Interpretation, 44 Fed. Reg. 71,413 *et seq*.

27.     The Policy Interpretation was further clarified by OCR through issuance of OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "OCR Clarification"). 44 Fed. Reg. at 71,417.

28.     In determining "whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," both the 1979 Policy Interpretation and the 1996 OCR Clarification

state that compliance with the effective accommodation prong is assessed by examining:

      a.      The determination of athletic interests and abilities of students,

      b.      The selection of sports offered, and

      c.      The levels of competition available, including the opportunity for team competition.

29.      Finally, an overall determination of compliance can be made based on:

      a.      Whether the entity's policies are discriminatory in language or effect,

      b.      Whether substantial and unjustified disparities exist in the program as a whole between male and female students, or

      c.      Whether substantial disparities exist in individual segments between opportunities afforded to male and female students.

*See* Policy Interpretation, 44 Fed. Reg. 71,418.

30.      As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences women must be affirmatively protected with sex-separated sports teams, competitions, championships, and locker rooms to achieve equality and equal opportunity for women.

31.     Pursuant to 34 CFR § 106.33 "separate toilet, locker room, and shower facilities . . . provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

32.     The NCAA's Transgender Eligibility Policies deprive women of the required separate and comparable facilities by allowing men to access such facilities and deprive the women using them of bodily privacy.

33.     Specifically in terms of the requirements for women to have competitive opportunities "which equally reflect their abilities," equal "opportunities to engage in . . . post-season competition," and equal opportunities for public recognition, the NCAA's Transgender Eligibility Policies breach Title IX by permitting men to compete against women in women's competitions (including NCAA Championships) where a man may rely upon inherent aspects of their maleness, including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX requires to be protected for women and made equally available to them.

34.     The NCAA's testosterone suppression rationale deprives women of equal opportunities as established by peer-reviewed scientific research. *See infra* at ¶¶ 284-296.

35.     That female athletes are harmed by having to compete against males is in no sense surprising or unexpected. "This is because it is neither myth nor

outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (special concurrence; citing scientific literature).

36.     *The NCAA's Transgender Eligibility Policies* are not sex neutral in operation but *disproportionality burden female athletes* by reducing female competitive opportunities, forcing women athletes to compete against men in sex-separated sports, depriving women of equal opportunities to protect their bodily privacy, and authorizing men to access women's safe spaces necessary for women to prepare for athletic competition, including showers, locker rooms and restrooms.

37.     The NCAA and the other Defendants knew or should have known that the NCAA's Transgender Eligibility Policies violate Title IX because they result in numerous discriminatory impacts against women ("Discriminatory Impacts"), including:

    a.     preventing women from even knowing whether they are competing against men in women's sports,

    b.     authorizing men to compete on women's teams or in the women's category of competitions,

    c.     subjecting women to a higher risk of injury in sport by:

i.      permitting men to compete on women's sports teams without notifying effected women, and

ii.     permitting men to compete on women's sports teams in Contact Sports and Limited-Contact Sports.

d.      permitting men to be awarded points, prizes, awards, medals, trophies, places, rankings, or results in women's competitions,

e.      allowing men to access women's showers, locker rooms, restrooms and other such safe spaces and depriving women of the right to know biological men are accessing their safe spaces,

f.      depriving women of equal access to separate showers, locker rooms, and associated restroom facilities which protect their right to bodily privacy,

g.      diminishing equal opportunities and resources for women,

h.      diverting opportunities and resources to men,

i.      subjecting women to a loss of privacy and emotional harm,

j.      depriving women of a fair opportunity to compete in college sports,

k.      depriving women of a fair opportunity to prepare to compete in college sports by allowing men to access women's spaces including women's locker rooms,

11

l.      depriving women of a fair opportunity to compete for titles, placements, and recognition at NCAA national championships, and

m.      suppressing the free speech rights of women and men advocating for the rights of biological women to a fair opportunity to compete, separate and equal locker rooms and a correct application of Title IX.

**The NCAA Purports to Interpret Title IX for Its Members**

38.     The last two NCAA Presidents have told Congress that the NCAA's Transgender Eligibility Policies comply with Title IX and that any revisions to the NCAA's Transgender Eligibility Policies must comply with Title IX.

39.     The NCAA's current Transgender Eligibility Policies include an August 2011 guidance document from the NCAA Office of Inclusion entitled *NCAA Inclusion of Transgender Student-Athletes* (the "*NCAA Guidance on Transgender Student Athletes*" or "*NCAA Guidance on TSA*").[5]

40.     The *NCAA Guidance on TSA* states, "[t]he purpose of this resource is to *provide guidance to NCAA athletic programs about how to ensure transgender*

---

[5]

https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf (accessed June 26, 2024) (App. B, NCAA 000167-204).

*student-athletes* fair, respectful, and *legal access* to collegiate sports teams *based on current* medical and *legal knowledge*."[6]

41.    The NCAA purports to base upon Title IX its guidance to college and universities on "legal access" for transgender student-athletes.[7]

42.    Through its Transgender Eligibility Policies, the NCAA instructs its member colleges and universities how these colleges and universities *must* interpret Title IX to comply with NCAA rules.

43.    For instance, the *NCAA Board of Governors Statement on Transgender Participation* issued on April 12, 2021, states "The NCAA Board of Governors firmly and unequivocally supports the opportunity for transgender student-athletes to compete in college sports," and references the NCAA's "*long-*

---

[6] *Id*. (*NCAA Guidance on TSA*, p. 2) (App. B, NCAA 000170).

[7] *Id*. (*NCAA Guidance on TSA*, p. 5 (App. B, NCAA 000173; referencing "federal laws, regulations, and legal decisions"), p. 15 (App. B, NCAA 000183; "Colleges and universities often have legal obligations to provide equal opportunity to student-athletes[.]"), p. 16 (App. B, NCAA 000184; "state and federal non-discrimination laws . . . prohibit discrimination based on gender identity and expression"), pp. 16-17 (App. B, NCAA 000184-185; recommending as a "best practice" to adopt a " athletics departmental policy addressing the participation of transgender student-athletes that is consistent with school policy and state or federal non-discrimination laws"), p. 28 (App. B, NCAA 000233; identifying Title IX and the Equal Protection Clause of the Fourteenth Amendment as sources of federal law upon which the *NCAA Guidance on TSA* is based).

*standing policy* that provides a more inclusive path for transgender participation in college sports,"[8] including a hyperlink directly to the *NCAA Guidance on TSA*.

44.     Another NCAA resource made available to colleges and universities is entitled: "*On The Team: Equal Opportunity for Transgender Student Athletes*" ("*On The Team*").[9]

45.     The *On The Team* Report, written by the National Center on Lesbian Rights and the Women's Sports Foundation, likewise conveys "*guidance to* high school and *collegiate athletic programs about* how to ensure transgender student athletes fair, respectful, and *legal access* to school sports teams."[10]

46.     *On The Team* is an earlier version of the NCAA-branded *NCAA Guidance on TSA* which likewise purports to found the NCAA's guidance on its interpretation of Title IX.[11]

47.     The NCAA takes the position that its interpretation of Title IX as requiring a pathway for men who identify as transgender to be included on women's teams is consistent with, and supported by, a pending Proposed Title IX

---

[8] https://www.ncaa.org/news/2021/4/12/ncaa-board-of-governors-statement-on-transgender-participation.aspx (accessed Mar. 14, 2024) (emphasis added).
[9] https://www.nclrights.org/wp-content/uploads/2013/07/TransgenderStudentAthleteReport.pdf (accessed on June 26, 2024) (App. B, NCAA 000205-261), accessible through link on NCAA website at: https://www.ncaa.org/sports/2016/12/8/five-ways-to-have-an-lgbtq-inclusive-athletics-department.aspx#TCOC (accessed June 26, 2024).
[10] *Id.*, p. 2 (emphasis added) (App. B, NCAA 000207).
[11] *Id.* (*On the Team*, p. 50) (App. B, NCAA 000255).

Rule issued for public comment in 2023 by the Office of the Civil Rights in the Department of Education known as *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, Proposed Rule by the United States Department of Education to amend 34 CFR Part 106.41(b), 88 Fed. Reg. 22860 (April 13, 2023) (the "OCR Proposed Title IX Rule on Athletic Teams").

48.     Current NCAA President Charlie Baker has relied upon the OCR Proposed Title IX Rule on Athletic Teams as a basis for the NCAA's contention that the NCAA Transgender Eligibility Policies comply with Title IX.

49.     The OCR Proposed Title IX Rule on Athletic Teams, however, is not faithful to the ordinary meaning of Title IX's language, nor is it a reasonable interpretation of it, nor is it consistent with Department of Education regulations issued in far closer chronological proximity to the passage of Title IX.

50.     Therefore, the interpretive guidance in the OCR Proposed Title IX Rule on Athletic Teams which is currently being relied upon by the NCAA to justify its Transgender Eligibility Policies under Title IX is not entitled to deference.

51.     Pursuant to applicable Eleventh Circuit authority neither the OCR Proposed Title IX Rule on Athletic Teams nor equating "sex" to gender identity or

transgender status can uphold the NCAA's Transgender Eligibility Policies under

Title IX. *See Adams*, 57 F.4th at 817 ("equating 'sex' to 'gender identity' or

'transgender status' would also call into question the validity of sex-separated

sports teams" contrary to the meaning of Title IX).

52.     The NCAA's misinterpretation of Title IX, which is being imposed

nationwide upon collegiate sport, cannot stand.

## JURISDICTION & VENUE

53.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§

1331, 1343 and 42 U.S.C. §§ 1983, 1988.

54.     Plaintiffs' claims for declaratory and injunctive relief are authorized

by 28 U.S.C. §§ 2201 and 2202.

55.     Venue is proper in this judicial district pursuant to 28 U.S.C.

§ 1391(b)(1) as all Defendants reside in the State of Georgia within the meaning of

the venue statute. Venue is proper in this judicial district pursuant to 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events complained of herein occurred

in this District and Division.

## THE PARTIES

### PLAINTIFFS WHO COMPETED AT 2022 NCAA SWIMMING AND DIVING CHAMPIONSHIPS

56.     **Swimmer A** resides in the United States and competed in the 2022

NCAA Championships. Swimmer A has moved to proceed under a pseudonym

16

because she is currently enrolled at and attending an NCAA institution and reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.[12]

57.     Plaintiff **Kylee Alons** is an All-American swimmer who competed at North Carolina State University and in the 2022 NCAA Championships.

58.     **Grace Countie** is an All-American swimmer who competed at the University of North Carolina University and in the 2022 NCAA Championships.

59.     Plaintiff **Riley Gaines** is an All-American swimmer who competed at the University of Kentucky and in the 2022 NCAA Championships.

60.     Plaintiff **Reka Gyorgy** is an All-American swimmer who competed at Virginia Tech University and in the 2022 NCAA Championships.

61.     Plaintiff **Kaitlynn Wheeler** is an All-American swimmer who competed at the University of Kentucky and in the 2022 NCAA Championships.

## PLAINTIFFS CURRENTLY COMPETING AT
## NCAA DIVISION I INSTITUTIONS

62.     Plaintiff **Ainsley Erzen** is a rising junior two-sport athlete in soccer and track and field at the University of Arkansas, a NCAA Division I school where she is an 800-meter runner and a member of Arkansas' 2024 NCAA Division I

---

[12] **Note regarding pseudonym filings**: On June 4, 2024 counsel for Plaintiffs filed a motion for Swimmer A and Track and Field Athlete A to proceed under pseudonym and supporting brief (along with other required documents).

National Champion Women's Indoor Track and Field Team and a member of Arkansas' 2023 Southeastern Conference Champion Women's Soccer Team. In high school Ainsley was the first runner from the State of Iowa to win a national championship, winning the 800m national championship in 2:06.52.

63.    Plaintiff **Ellie Eades** is a rising senior NCAA tennis player at the University of Kentucky where she competes on the women's tennis team in NCAA Division I and has competed in the SEC Championships.

64.    Plaintiff **Ellis Fox** is a rising sophomore NCAA swimmer at Texas A&M University where she competes on the women's swimming and diving team in NCAA Division I and has competed in the SEC Championships.

65.    Plaintiff Brooke Slusser is a rising senior NCAA volleyball athlete who competes on the San Jose State University volleyball team in NCAA Division I. Brooke previously competed for two seasons on the University of Alabama volleyball team in the SEC.

## PLAINTIFF CURRENTLY COMPETING AT NCAA DIVISION II INSTITUTION

66.    Plaintiff **Nanea Merryman** is a rising sophomore NCAA volleyball athlete who competes on the Cedarville University volleyball team in NCAA Division II.

## PLAINTIFFS CURRENTLY COMPETING AT
## NCAA DIVISION III INSTITUTIONS

67.    Plaintiff **Lillian "Lily" Mullens** is a rising senior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III. During the 2023-24 NCAA season Lily was named to the College Sports Communicators Academic All-District Women's Swimming and Diving Team. Lily competed at the 2024 NCAA Division III Swimming and Diving Nationals.

68.    Plaintiff **Elizabeth "Carter" Satterfield** is a rising junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III. During the 2023-24 NCAA season Carter was named to the College Sports Communicators Academic All-District Women's Swimming and Diving Team.

69.    Plaintiff **Kaitlin "Katie" Blankinship** is a rising junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

70.    Plaintiff **Susanna Price** is a rising senior NCAA swimmer at Roanoke College, where she competes on the women's swimming team and the women's cross country and outdoor track and field teams in NCAA Division III. During the 2023-24 NCAA season Susanna was named to the College Sports Communicators Academic All-District Women's Swimming and Diving Team.

71.     Plaintiff **Kate Pearson** is a rising junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

72.     Plaintiff **Julianna Morrow** is a rising junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III.

73.     Plaintiff **Halle Schart** is a rising junior NCAA swimmer at Roanoke College, where she competes on the women's swimming team in NCAA Division III. During the 2023-24 NCAA season Halle was named to the College Sports Communicators Academic All-District Women's Swimming and Diving Team.

74.     **Track Athlete A** is a rising senior NCAA track and field athlete who competes on a women's track and field team in NCAA Division III. Track Athlete A is moving to proceed under a pseudonym because she is currently enrolled at and attends an NCAA institution and reasonably fears retribution and reprisal for bringing the claims set forth in this Complaint.

75.     Each Plaintiff is female by biological sex.

76.     Each Plaintiff is a current or former women's athlete at a NCAA member college or university at the NCAA Division I, II or III level who has been harmed by, is being harmed by, and/or is threatened harm by, the NCAA's policies which violate Title IX and Equal Protection on the basis of sex by depriving

women of adequate information to know whether they are competing against men in women's sports and by permitting men to compete on women's teams.

77.    Each Plaintiff except for Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, and Grace Countie have remaining NCAA eligibility.

78.    None of the Plaintiffs holds any personal animus towards persons who identify as transgender.

79.    Nor does any Plaintiff consider themselves "anti-trans," or "anti-trans activists," although they have been falsely labeled as such merely for challenging the NCAA Transgender Eligibility Policies.

## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

80.    Defendant NCAA is an unincorporated association with headquarters and principal place of business in Indianapolis, Indiana at 700 West Washington Street, Indianapolis, Indiana 46202.

## GEORGIA DEFENDANTS

81.    Defendant Board of Regents of the University System of Georgia (the Board of Regents) is the unitary governing and management authority which manages, governs, controls, supervises, and oversees the public colleges and universities that comprise the University System of Georgia, including but not limited to the University of Georgia in Athens, Georgia, the Georgia Institute of Technology in Atlanta, Georgia ("Georgia Tech"), and the University of North

Georgia in Dahlonega, Georgia. The headquarters and principal place of business of the Board of Regents is 270 Washington Street, SW, Atlanta, GA 30334.

82.     The University System of Georgia operates an education program or activity receiving federal financial assistance.

83.     Georgia Tech is a research university of the University System of Georgia, located in Atlanta, Georgia, which is governed by the Board of Regents of the University System of Georgia. Georgia Tech operates an education program or activity receiving federal financial assistance.

84.     Defendant Georgia Tech Athletic Association, Inc. ("GTTA"), is a nonprofit corporation organized under the laws of the State of Georgia as a separate and distinct legal entity from Georgia Tech. According to its Articles of Incorporation, its purposes are (1) "to promote the educational program of the Georgia Institute of Technology by encouraging participation by the student body in an athletic and physical education program and affording necessary and appropriate facilities to aid in the participation of healthful exercise in athletic games and contests;" and (2) "to promote the athletic and physical education program of the Georgia Institute of Technology by erecting and managing stadia and other suitable buildings, by providing adequate equipment for those participating in its program, to arrange and conduct athletic contests, to charge admission to such games and contests for the purpose of defraying expenses of the

corporation, and to aid in the accomplishment of the purposes hereinbefore set forth."

85.     Despite its separate legal existence from Georgia Tech, GTAA has an entwined and symbiotic affiliation with Georgia Tech in that GTAA *is* the athletics program of Georgia Tech, and Georgia Tech has ceded control over its athletics programs to GTAA. For example, the GTAA Bylaws in effect during the 2022 NCAA Championships state that GTAA's Board of Trustees "shall have control of the intercollegiate athletics conducted at or in the name of the Georgia Institute of Technology." GTAA Bylaws art. VI § 1 (June 3, 2021).[13] Moreover, GTAA's Board of Trustees is comprised of the President of Georgia Tech, the Executive Vice President for Administration and Finance of Georgia Tech, plus eight (8) additional faculty members of Georgia Tech, all appointed by the President of Georgia Tech, and three (3) Georgia Tech student members, each appointed by Georgia Tech faculty. GTAA Bylaws art. V §§ 1, 3, and 4. All of GTAA's officers also must be members of Georgia Tech's administration. GTAA Bylaws art. VII § 1.

86.     In addition, the composition of GTAA's Board of Trustees— including the intertwining of GTAA and Georgia Tech—is dictated by NCAA's

---

[13] This version of GTAA's Bylaws is available at https://ramblinwreck.com/wp-content/uploads/2022/03/GTAA-Board-of-Trustees-Bylaws-Amended-June-3-2021_FINAL-5-1.pdf.

bylaws. NCAA Bylaw 8.1.1 requires that "A member institution's president or chancellor has ultimate responsibility and final authority for the conduct of the intercollegiate athletics program *and the actions of any board in control of that program*." (Emphasis added.) The NCAA's bylaws further dictate that "A board in control of athletics [of a member institution] must conform to the following provisions" of the NCAA's bylaws, which include a requirement that the member institution's "[a]dministration and/or faculty staff members shall constitute at least a majority of the board in control of athletics or an athletics advisory board, irrespective of the president or chancellor's responsibility and authority or whether the athletics department is financed in whole or in part by student fees." NCAA Bylaw 8.1.2.

87.    The Georgia Tech Director of Athletics is also an officer of GTAA. This Director of Athletics is "hired by and with the approval of the [GTAA] Board" and "shall be responsible to the [GTAA] Board for the proper conduct of intercollegiate athletics, for the maintenance and efficient use of the physical plant of the Association, and for the general administration of the affairs of the Association according to the directions and regulations of the Board." GTAA Bylaws art. VII § 3. The GTAA Board sets the compensation of the Director of Athletics at its regular June meeting. GTAA Bylaws art. VII § 1.

88.     Additionally, at the McAuley Aquatic Center on the Georgia Tech campus, a separate set of both men's and women's locker rooms located on the pool deck level—apart from those used by the athletes during the 2022 NCAA Swimming Championships—have been dedicated as "GTAA Lockers," as well as a separate "GTAA Lounge."

89.     The University of Georgia is a research university of the University System of Georgia, located in Athens, Georgia, which is also governed by the Board of Regents of the University System of Georgia. Claims asserted herein relating to the University of Georgia are solely for injunctive relief under Title IX.

90.     University of Georgia operates an education program or activity receiving federal financial assistance.

91.     The University of North Georgia is a state university of the University System of Georgia, located in Dahlonega, Georgia, which is also governed by the Board of Regents of the University System of Georgia. Defendant University of North Georgia is sued solely for injunctive relief under Title IX.

92.     The University of North Georgia operates an education program or activity receiving federal financial assistance.

93.     Defendant Ángel Cabrera, the President of Georgia Tech University, is sued in his individual and official capacities. Defendant Cabrera is also sued in his individual and official capacities as the Chair of the Board of Trustees of the

GTAA (*see* GTAA Bylaws art. VII § 1) in which capacity he has "has the ultimate responsibility and authority for the operations and personnel of the [Georgia Tech] athletics program on all matters as they pertain to the National Collegiate Athletic Association and the Atlantic Coast Conference" (*see* GTAA Bylaws art. VII § 2), as dictated by the NCAA's bylaws stated above.

94.     President Cabrera had the authority to control and direct and was aware of, or should have been aware of, all actions of Georgia Tech, the GTAA, and other State Defendants described in this Complaint.

95.     Defendant Doug Aldridge, a member of the Board of Regents of the University System of Georgia since February 8, 2022, is sued in his individual and official capacities.

96.     Defendant Tom Bradbury, a member of the Board of Regents of the University System of Georgia since January 7, 2022, is sued in his individual and official capacities.

97.     Defendant Richard "Tim" Evans, a member of the Board of Regents of the University System of Georgia since January 9, 2022, is sued in his individual and official capacities.

98.     Defendant W. Allen Gudenrath, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in his individual and official capacities.

99.     Defendant Erin Hames, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in her individual and official capacities.

100.    Defendant Samuel D. Holmes, a member of the Board of Regents of the University System of Georgia since July 16, 2019, is sued in his individual and official capacities.

101.    Defendant Bárbara Rivera Holmes, a member of the Board of Regents of the University System of Georgia since January 1, 2018, is sued in her individual and official capacities.

102.    Defendant C. Thomas Hopkins, Jr., MD, a member of the Board of Regents of the University System of Georgia from January 1, 2018 through January 1, 2024, is sued in his individual and official capacities.

103.    Defendant James M. Hull, a member of the Board of Regents of the University System of Georgia since January 8, 2016, is sued in his individual and official capacities.

104.    Defendant Cade Joiner, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in his individual and official capacities.

105.    Defendant Patrick C. Jones, a member of the Board of Regents of the University System of Georgia since June 30, 2022, is sued in his individual and official capacities.

106.    Defendant C. Everett Kennedy, III, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in his individual and official capacities.

107.    Defendant Sarah-Elizabeth Langford, a member of the Board of Regents of the University System of Georgia since February 10, 2017, is sued in her individual and official capacities.

108.    Defendant Rachel B. Little, a member of the of Regents of the University System of Georgia from November 22, 2016, is sued in her individual and official capacities.

109.    Defendant Lowery Houston May, a member of the Board of Regents of the University System of Georgia since January 3, 2020, is sued in her individual and official capacities.

110.    Defendant Jose R. Perez, a member of the Board of Regents of the University System of Georgia since July 16, 2019, is sued in his individual and official capacities.

111.   Defendant Neil L. Pruitt, Jr., a member of the Board of Regents of the University System of Georgia since February 10, 2017, is sued in his individual and official capacities.

112.   Defendant Harold Reynolds, a member of the Board of Regents of the University System of Georgia since January 3, 2020, and current Chair of the Board, is sued in his individual and official capacities.

113.   Defendant Sachin Shailendra, a member of the Board of Regents of the University System of Georgia from January 1, 2021, is sued in his individual and official capacities.

114.   Defendant T. Dallas Smith, a member of the Board of Regents of the University System of Georgia since January 3, 2020, and current Vice Chair of the Board, is sued in his individual and official capacities.

115.   Defendant Mat Swift, a member of the Board of Regents of the University System of Georgia since January 5, 2024, is sued in his individual and official capacities.

116.   Defendant James K. Syfan, III, a member of the Board of Regents of the University System of Georgia since January 9, 2022, is sued in his individual and official capacities.

117.   Defendant Don L. Waters, a member of the Board of Regents of the University System of Georgia from 2013, is sued in his individual and official capacities.

118.   John Does 1-25 are agents of the NCAA who acting under color of law undertook the actions attributed to the NCAA in this Complaint and are therefore liable for the constitutional and Title IX violations described herein pursuant to 42 U.S.C. § 1983. Plaintiffs do not currently know, and cannot without discovery reasonably determine, the names of these individuals.

119.   John Does 27-50 are additional members of the Board of Regents of the University System of Georgia or their agents and/or individual agents or employees of the University System of Georgia and/or agents or employees of one or more public colleges or universities in Georgia and/or agents or employees of GTAA who engaged in the conduct attributed to the "Georgia Individual Defendants" that are described in this Complaint, including those individuals who directed operations and made decisions in relation to the 2022 NCAA Championships and/or who will do so in relation to other collegiate athletic events described in this Complaint. Each of these individuals is sued in their individual and/or official capacities. Plaintiffs do not currently know, and cannot without discovery reasonably determine, the names of these individuals.

120.   The identified individual members of the Board of Regents of the University System of Georgia in their individual and official capacities, or some of them, at all relevant times had, and currently have, the authority or apparent authority to control and direct, and did knowingly, intentionally and purposefully control and direct, all actions of GTAA, the University System of Georgia and/or any public college or university in the State of Georgia described in this Complaint.

121.   The identified individual members of the Board of Regents of the University System of Georgia, President Cabrera and/or John Does 27-50, each in their individual and official capacities did knowingly, intentionally and purposefully control and direct and/or co-direct and/or jointly control all actions attributed in this Complaint to the Georgia Individual Defendants, the University System of Georgia, Georgia Tech, GTAA, the University of Georgia and/or the University of North Georgia.

## GENERAL FACTUAL ALLEGATIONS
### GENERAL PRACTICES OF THE GEORGIA DEFENDANTS

122.   NCAA sponsored, regulated and/or organized competitions and NCAA national championships in which NCAA policies and rules are applied are frequently hosted by public colleges and universities in the State of Georgia.

123.   For instance, in 2006 and 2016 the NCAA Division 1 Women's Swimming and Diving Championships were hosted by Georgia Tech University (and upon information and belief, co-hosted by GTAA) at the McAuley Aquatic Center on the Georgia Tech campus in Atlanta, Georgia in the Northern District of Georgia.[14]

124.   In 2022, the NCAA Division 1 Women's Swimming and Diving Championships were co-hosted by Georgia Tech University and GTAA at the McAuley Aquatic Center on the Georgia Tech campus in Atlanta, Georgia in the Northern District of Georgia.

125.   This year the NCAA Division 1 Women's Swimming and Diving Championships were held March 20-23, 2024, at the Ramsey Center in on the University of Georgia campus in Athens, Georgia.[15]

126.   In 2026 the NCAA Division I Men's and Women's Swimming and Diving Championships will return to Atlanta to again be hosted by Georgia Tech University (and upon information and belief, co-hosted by GTAA) at the McAuley Aquatic Center.[16]

---

[14] https://ramblinwreck.com/sports/genrel/facilities/mcauley-aquatic-center/ (accessed June 26, 2024)
[15] https://www.ncaa.com/_flysystem/public-s3/files/Host%20Sites%202022-2026_1.pdf (accessed June 26, 2024)
[16] *Id.*

127.   Each public university governed by the Board of Regents of the University System of Georgia, and its separately incorporated but affiliated and entwined non-profit athletic association, applies the NCAA Transgender Eligibility Policies and is required by the NCAA to do so.

## ORGANIZATION AND PRACTICES OF THE NCAA

128.   The NCAA is an unincorporated association comprised of more than 1,100 member colleges and universities as well as multi-sport membership athletic conferences in which colleges and universities are members.

129.   NCAA members are primarily (more than 90%) institutions which receive federal funds and are subject to Title IX.

130.   The NCAA was established by two or more entities which are covered by Title IX.

131.   The NCAA is an educational organization principally engaged in the business of providing education services.

132.   NCAA "[m]ember institutions and conferences believe that intercollegiate athletics programs provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of the educational experience." NCAA Constitution (Const.), Preamble.

### NCAA's Role in Controlling College Sports for its Members

33

133.   The NCAA requires its members to submit to NCAA rules and regulations regarding, among other things:

      a.    how members may recruit student-athletes,

      b.    when members may recruit student-athletes,

      c.    when representatives of members may contact prospective student athletes,

      d.    how members may provide benefits to student-athletes,

      e.    the value of scholarships that may be provided to student-athletes,

      f.    the value of other benefits that may be provided to student-athletes,

      g.    how many scholarships can be given to student-athletes,

      h.    how, when and for how long student-athletes and their teams may practice and train,

      i.    the start date, end date and length of season in which student-athletes may play their sport(s),

      j.    the grades that must be achieved by student-athletes,

      k.    when games may be scheduled between NCAA member institutions,

      l.    when games can be scheduled against non-NCAA members,

m.    who may coach members' student-athletes,

n.    who may tutor members' student-athletes,

o.    how many classes student-athletes must attend,

p.    what roles non-athlete students can play in the athletic departments of Association members,

q.    what roles supporters of a college or university can play in relation to an Association member's athletic department and student-athletes,

r.    what drugs and medications student-athletes can use without notification to the Association,

s.    what drugs are banned for use by student-athletes,

t.    the rules under which athletic contests between Association members will be played,

u.    the venues at which national championships among Association members will be played,

v.    the rules for national championships among Association members,

w.    the distribution of revenues from certain tournaments in which Association members may participate,

x.      when student athletes may consider transferring to another

Association member,

y.      who is considered a male and who is considered a female for

purposes of playing on member schools' sports teams, and

z.      the NCAA Transgender Eligibility Policies.

134.   According to the NCAA, its basic purposes are "to support and

promote healthy and safe intercollegiate athletics, including national

championships, as an integral part of the education program and the student-athlete

as an integral part of the student body." NCAA Const., Preamble.

135.   To accomplish these purposes the NCAA's principal roles in the

intercollegiate athletics programs of its member institutions are to:

a.      **Conduct all NCAA national championships**, NCAA Const.,

Preamble, NCAA Const., Art. 1.D. ("Intercollegiate athletics programs shall

be conducted by the Association . . . in a manner designed to protect, support

and enhance the physical and mental health and safety of student-athletes");

NCAA Const., Art. 2.A.2.a. ("The Association shall . . . Conduct all NCAA

Championships."),

b.      **Oversee broadcasting, communications and media rights

for all NCAA-conducted national championships and make financial**

**distributions to members from such championships**, NCAA Const., Art. 2.A.2.a.,

    c.    **Promote healthy and safe intercollegiate athletics**, through:

    i.    **conducting championships in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes**, NCAA Const., Preamble, NCAA Const., Art. 1.D.; and ***NCAA Mission and Priorities***, *available at*: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx ("Coordinate and deliver safe, fair and inclusive competition directly and by Association members: Set rules and guidelines and provide enforcement. Create programs that support outstanding performance on and off the field. Deliver excellent and inclusive championships."),

    ii.    **developing and promulgating guidance, rules and policies based on consensus of the medical, scientific, sports medicine and sport governing communities, as appropriate, for student-athlete physical and mental health, safety and performance**, NCAA Const., Art. 2.A.2.b.; NCAA Const., Art. 2.D.1.d. (NCAA members must implement "NCAA guidance, rules and policies based on consensus of the medical, scientific, sports medicine, and sport governing communities" and must "make NCAA

guidance, rules and policies available to student-athletes”); *NCAA*

*Mission and Priorities*, *available at*:

https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx

(“Provide world-class services to student-athletes and members that

leverage the NCAA’s collective scale: Lead research and promote

innovation that improves health, safety and performance. Provide

capabilities and programming that fill in the gaps for members.

Identify, co-create and distribute best practices to student-athletes and

members.”).

d.    **Create diverse and inclusive environments in collegiate**

**sport and . . . provide education and training with respect to the**

**creation of such environments,** NCAA Const., Art. 1.F, and **Promote**

**gender equity, diversity and inclusion in all aspects of intercollegiate**

**athletics**, NCAA Const., Art. 2.A.2.c.,

e.    **Adopt eligibility rules governing intercollegiate athletics**

**and student-athletes** in areas such as recruiting, scholarships, benefits,

name, image and likeness, performance enhancing drugs, and transgender

eligibility, NCAA Const., Art. 1.E (“rules established by the Association”);

NCAA Const., Art. 2.A.2.d. (“Establish the rules for sports competitions and

participation”); NCAA Const. Art. 2.B.5 (“Each division shall establish

policies and procedures for enforcement of Association and division rules and regulations, and the Association will provide requested support for divisional implementation."); ***NCAA Mission and Priorities***, available at: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx  ("Set rules and guidelines and provide enforcement."),

    f.    **Run the NCAA Rules "*Enforcement Process*" in each NCAA Division, which consists of:**

        i.    **Investigating violations of NCAA eligibility rules**, NCAA Const., Art. 2.A.2.g. ("Provide regulatory services as requested by each division"); NCAA Const. Art. 2.B.5 ("Each division shall establish policies and procedures for enforcement of Association and division rules and regulations, and the Association will provide requested support for divisional implementation."); and ***NCAA Mission and Priorities***, available at: https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx ("Set rules and guidelines and provide enforcement."),

        ii.    **Conducting an independent, final and binding adjudication process** for potential violations by NCAA members of NCAA rules governing intercollegiate athletics, *Id*.

136.   With respect to the NCAA Enforcement Process (identified in sub-paragraph 129.f. above) members institutions are required to "comply completely and promptly with the rules and regulations governing the division enforcement process and shall cooperate fully in that process as a condition of membership in the [NCAA]." NCAA Const., Art. 2.D.1.h.

137.   As explained in Paragraph 129 above, NCAA member institutions expressly cede controlling authority to the NCAA to conduct the following six (6) aspects of each member's education program and educational experience regarding intercollegiate athletics:

(1)   conducting and marketing NCAA championships,

(2)   managing media rights and financial distributions regarding NCAA championships,

(3)   developing guidance, rules and policies for student-athlete physical and mental health, safety and performance,

(4)   providing education and training for diversity, equity and inclusion initiatives in intercollegiate sports,

(5)   adopting eligibility rules governing intercollegiate athletics and student-athletes, and

(6)     running the eligibility rules enforcement process to which all member institutions, their staffs, coaches and student-athletes are subject and to which they submit.

138.   NCAA member schools in all three divisions are required to comply with the NCAA Constitution and Bylaws.

139.   The multi-sport athletic conferences, such as the Atlantic Coast Conference (ACC), Southeastern Conference (SEC), Big Ten Conference, Big 12 Conference, Pac-12 Conference and other college athletic conferences, are subject to the NCAA through the Article 2.C of the NCAA Constitution which makes it mandatory that all conferences:

a.     must adhere to the NCAA Constitution and the principles established by the relevant NCAA Division, including in the conduct of athletics events, and

b.     shall comply completely and promptly with the rules and regulations regarding the rules enforcement process existing in each NCAA Division, and

c.     shall cooperate fully in the rule enforcement process as a condition of membership in the NCAA.

140.   The NCAA is governed by the NCAA Board of Governors and the three NCAA Divisions (Division I, Division II, Division) which are constituent

parts of the NCAA, created, described and authorized in the NCAA Constitution and are not separate entities. NCAA Const. Art. 2.A.3.d. (Board of Governors); NCAA Const. Art. 2.B (Divisions).

141.   The NCAA Board of Governors employs the NCAA President and alongside the three NCAA Divisions annually evaluates the NCAA President. NCAA Const. Art. 2.A.3.d(ii).

142.   The NCAA President is an ex officio member of the Board of Governors and acts to "accomplish the purposes of the [NCAA] as determined by the Board of Governors and [the Divisions via their divisional leadership bodies]." NCAA Const. Art. 2.A.3.e(i, ii, iv, v).

143.   The NCAA Board of Governors monitors adherence by the Divisions to the principles of the NCAA Constitution. NCAA Const. Art. 2.A.3.d(xi).

144.   The NCAA is a multi-billion-dollar business venture between the NCAA and its member institutions.

145.   Among other things, the NCAA receives the following benefits from its member institutions:

    a.    The ability to *recognize, publicize, and market* each member institution and their athletics teams as an NCAA member,

    b.    Agreement that member institutions and their athletics teams and athletic departments will participate in safety initiatives by the NCAA,

c.      Participation by student-athletes in the safety initiatives of the NCAA,

d.      Agreement that member institutions and their athletics teams and athletic departments will adhere to uniform rules of the game, including sports eligibility rules developed by the NCAA,

e.      Agreement that member institutions and their athletics teams and athletic departments will comply with the NCAA's enforcement process for NCAA rules and initiatives,

f.      Agreement that each member institution's *athletics teams* will participate in NCAA championships which the NCAA actively conducts, controls and monetizes,

g.      Participation by the athletics teams of its member institutions in NCAA championships for which the teams qualify,

h.      Agreement that *student-athletes* from the member institution's athletics teams will participate in NCAA championships for which the student-athletes' collegiate teams qualify,

i.      Participation by student-athletes in NCAA championships,

j.      Access to *data* from each member institution's student-athletes from which physical and mental health, safety and performance of student-athletes can be assessed,

k.     A commitment to *use and distribute* NCAA guidance, rules and policies for student-athlete physical and mental health, safety and performance,

l.     *Collaboration* from member institutions *in* student-athlete physical and mental health, safety and performance *research projects* identified by the NCAA,

m.     Agreement to participate in NCAA education programs, including programs related to physical and mental health, safety and performance of student-athletes and diversity, equity and inclusion in collegiate sports,

n.     *Implementation of the NCAA's education and training for diversity, equity and inclusion initiatives* in intercollegiate sports, and

o.     The payment of regular dues from NCAA member institutions.

146.   Each of the foregoing items which the member institutions give to the NCAA through NCAA membership *facilitate the NCAA's ability to develop and market a coherent collegiate sports product, and contribute to building the NCAA brand, and obtaining public acceptance* for the NCAA collegiate sports product and brand, which in turn enhances the college sports product, brand and marketability of each NCAA member institution in the collegiate sports marketplace.

44

147.   Each NCAA member institution receives from the NCAA:

a.   NCAA marketing and conducting of intercollegiate athletics national championships,

b.   NCAA's management of media rights and financial distributions regarding NCAA championships,

c.   NCAA's development of guidance, rules and policies for student-athlete physical and mental health, safety and performance,

d.   NCAA's education and training concerning physical and mental health, safety and performance of student-athletes and diversity, equity and inclusion initiatives in intercollegiate sports,

e.   NCAA eligibility rules governing intercollegiate athletics and student-athletes, and

f.   The NCAA's eligibility rules enforcement process to which all member institutions and their athletic departments, staff, coaches, and student-athletes are subject.

148.   The NCAA receives substantial revenues from its operation and control of NCAA championships, including through negotiating media rights, ticket sales agreements, and corporate sponsorships for NCAA championships on behalf of NCAA members and being paid directly for those media rights, ticket sales and corporate sponsorships.

149.   The NCAA benefits from its relationship with its member institutions by, among other things, being able to keep a portion of the revenues which the NCAA generates from NCAA collegiate national championships and a portion of the revenues generated from the NCAA brand, sales of merchandise, and other functions the NCAA performs.

150.   NCAA member institutions benefit from the increased value to their own brands and the brands of their multipurpose athletic conferences that results from the structures, coherence, and consistency provided by the NCAA such as:

      a.      Consistent management and branding of national championships,

      b.      National television, radio and other media rights deals and corporate sponsorships for national championships,

      c.      Nationwide media accessibility to national championships,

      d.      Uniform athlete safety and health rules and procedures,

      e.      Uniform eligibility rules and procedures, and

      f.      Uniform dispute resolution procedures.

151.   NCAA member institutions benefit from revenue sharing from the NCAA of a portion of revenues generated by the NCAA.

152.   One of the NCAA's fundamental tenets is that it distributes most of its revenue back to its membership.

153.   The NCAA distributes more than $600,000,000.00 annually to its members.

154.   The largest amount of NCAA revenue is distributed through what are known as the "Basketball Performance Fund" and the "Equal Conference Fund," which allocate revenue among conferences based on the participation of a conference's automatic qualifying team in, and a conference's overall performance at, the Division I Men's Basketball Championship.

155.   Certain NCAA member institutions benefit from other grants and other revenue streams which the NCAA generates and shares with some NCAA member institutions, such as research funding obtained by the NCAA from the U.S. federal government.

156.   The relationship between the NCAA and its member institutions is intended by the NCAA and its member institutions to, among other things, maximize the revenue flowing from college sports and reduce the expenses of members.

157.   NCAA members expect the NCAA to effectively and uniformly regulate and control the six areas of intercollegiate athletics set forth in Paragraph 131 above, to receive collaborative input from the member institutions and their member multi-sport conferences, and to make payments to members of NCAA revenues.

## NCAA Role in Supporting Mental and Physical Health,
## Safety and Performance of Student-Athletes in Collegiate Sport

158.  The NCAA supports mental and physical health, safety and performance in college sport through the work of playing rules committees for each NCAA sanctioned sport.

159.  Each playing rules committee makes changes to playing rules to enhance safety in sport and these recommendations are guided by the NCAA Injury Surveillance Program.

160.  The NCAA has since 1999 been invested in concussion research and the development of concussion education for student-athletes and health care providers to NCAA member institutions.

161.  The NCAA's focus upon concussion research and concussion education is consistent with the NCAA's constitutional responsibilities to member institutions and student-athletes of member institutions to promote healthy and safe intercollegiate athletics, to conduct national championships in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes, and to develop and promulgate guidance, rules and policies for student-athlete physical and mental health, safety and performance.

162.  The constitutional principles of the NCAA ensure that student-athletes at all member schools are provided medical care and safety standards that reflect best practices, which are guided by cutting-edge research, education and policy.

163.   Promoting research and education regarding student-athlete health and safety and developing educational materials and guidance on student-athlete health matters such as concussions are core functions of the NCAA, including the NCAA's Sports Science Institute.

164.   NCAA-directed and funded concussion research was previously known as the NCAA National Sport Concussion Outcomes Study.

165.   Starting in 2014 the NCAA and the U.S. Department of Defense (DoD) entered a "partnership" through which the NCAA provides to the DoD data regarding injuries by student-athletes and the DoD provides the NCAA funding for education and research on sport concussion injuries, the NCAA participates in the identification of NCAA member institutions that will conduct the scientific research, the DoD and NCAA ultimately receive access to the government funded research, and the NCAA uses the research to revise its educational materials, protocols and rules for student-athletes.

166.   President Obama announced the NCAA-DoD education and research partnership known as the "Grand Alliance" on May 29, 2014, saying:

> Today, . . . I'm proud to announce a number of new commitments and partnerships . . . that are going to help us move the ball forward on [concussion education and research]. The NCAA and the Department of Defense are teaming up to commit *$30 million for concussion education and a study involving up to 37,000 college athletes* which will be the most comprehensive concussion study ever. And our service academies – Army, Navy, Air Force, and Coast Guard – are all signed up to support this study in any way that they can . . . These

efforts are going to make a lot of difference for a lot of people – from soldiers on the battlefield to students out on the football field.

167.  On the NCAA website, Chief Medical Officer Brian Hainline calls the Grand Alliance a "partnership" between the NCAA and the DoD, saying, "In partnership with the U.S. Department of Defense, the NCAA launched the landmark multi-million dollar NCAA-DoD Grand Alliance to fund the most comprehensive study conducted in the history of concussion research that includes an education and research grand challenge aimed at improving the culture of concussion reporting and management. . . The NCAA-DoD Grand Alliance includes two initiatives, the CARE Consortium, which will offer critical insights into the natural history and neurophysiology of sport-related concussion; and the Mind Matters Challenge, a $7 million initiative aimed at changing important concussion safety behaviors and the culture of concussion reporting and management." *Available at*: https://www.ncaa.org/sports/2016/8/3/concussion-data-and-research.aspx.

168.  An October 7, 2021, announcement stated that more than $105 million had been given to the Grand Alliance concussion education and study program.

169.  At least $85 million in funding for the NCAA-DoD Grand Alliance has come from the federal government.

170.  On October 8, 2021, NCAA Chief Medical Officer Hainline, said, "We are confident that this award from [the Medical Technology Enterprise

Consortium through the U.S. Army Medical Research and Development Command], coupled with additional funding from the NCAA and DoD, will provide us the support to develop an array of interventions that mitigate possible long-term effects of concussion[.]"

171.   The current Health, Safety & Performance landing page on the NCAA website says "The NCAA-U.S. Department of Defense Concussion Assessment, Research and Education Consortium is the largest concussion and repetitive head impact study in history. The project, funded by the NCAA and DoD, launched in 2014 and now includes participants on 30 campuses across the country. The CARE Consortium, part of the broader NCAA-DoD Grand Alliance, is composed of two major components: a clinical study core, which aims to define how symptoms and physical signs manifest and evolve over time in different people (known in the scientific community as the "natural history" of concussion), and the advanced research core, which seeks to identify the neurobiology of concussion and repetitive head impact exposure (how the brain itself is affected)." *Available at*: https://www.ncaa.org/sports/2018/3/7/ncaa-dod-care-consortium.aspx.

172.   The NCAA and DoD have co-hosted multiple Grand Alliance Concussion Conferences for athletic trainers, team physicians, sports medicine clinicians and athletic health care administrators from NCAA member schools. *See*

https://www.ncaa.org/news/2021/5/11/ncaa-dod-grand-alliance-conference-highlights-concussion-biomarker-research.aspx.

173.   The research funded by the NCAA and the federal government through the NCAA-DoD Grand Alliance has resulted in NCAA rule changes. For instance, "[t]he CARE consortium has resulted in changes in the NCAA football contact practice guidelines and the diagnosis and management of sports-concussion." *See*

https://mrdc.health.mil/index.cfm/media/articles/2018/research_supporting_lifetime_of_brain_injury.

174.   The NCAA-DOD Grand Alliance and the millions in federal dollars contributed to the project are promoted on the NCAA website and by NCAA staff members in their outreaches to NCAA stakeholders and member institutions.

175.   By contributing to policy changes and NCAA-developed concussion guidance materials the federal funding obtained by the NCAA contributes to the NCAA's mission and to its standing with NCAA member institutions.

176.   For the reasons set forth above, from at least 2014 through the present the NCAA has been a direct and/or indirect recipient and beneficiary of financial assistance from the U.S. federal government.

## THE ASSOCIATION-WIDE NATURE OF THE
## NCAA'S TRANSGENDER ELIGIBILITY POLICIES

177.   The decision to implement the NCAA's Transgender Eligibility Policies is an Association-wide decision made by the NCAA Board of Governors.

178.   The Board of Governors' decisions in this area fall directly within core areas which NCAA members have outsourced to the NCAA.

179.   The NCAA's Transgender Eligibility Policies are collegiate sport eligibility rules over which NCAA member institutions have given the NCAA control.

180.   NCAA's Transgender Eligibility Policies apply in NCAA Championships which NCAA member institutions have given the NCAA control to conduct.

181.   The NCAA founds its Transgender Eligibility Policies upon what the NCAA characterizes as nondiscrimination and inclusion principles which the NCAA refers to as "core principles" and over which the NCAA Constitution gives the NCAA primary responsibility in shaping collegiate sport policies.

182.   The NCAA regards its Transgender Eligibility Policies as integral to athlete health and safety, an area which the NCAA Constitution reflects that NCAA member institutions have given the NCAA authority to develop guidance and standards.

183.   Compliance by member institutions with the NCAA's Transgender Eligibility Policies falls within the rules enforcement process which the NCAA Constitution makes the responsibility of the NCAA.

184.   Compliance by NCAA member institutions with the NCAA's Transgender Eligibility Policies is mandatory.

185.   The NCAA's Transgender Eligibility Policies affect student-athlete eligibility, impact student-athlete health, and can influence NCAA regulated competitions, including NCAA Championships.

186.   However, development of the NCAA's Transgender Eligibility Policies have been largely driven by the NCAA's Inclusion Department and the NCAA's Committee to Promote Cultural Diversity and Equity.

### NCAA'S RECENT HISTORY OF DISCRIMINATION TOWARDS WOMEN

187.   The NCAA has a long history of failing to govern intercollegiate sport in a way that provides equal opportunities for women.

188.   For instance, University of Notre Dame Head Women's Basketball Coach Muffet McGraw said in March, 2021, "the fact there's a huge disparity between men's and women's [NCAA] sports is hardly breaking news. We have been fighting this battle for years . . . What bothers me is that no one on the NCAA's leadership team even noticed. . . This is the issue that women have been battling for decades."

189.   Numerous statistical measures demonstrate the NCAA's lack of adequate attention to women's sports and its discrimination against women.

190.   In 2021 an external review of eight-five NCAA Championship tournaments in twenty-four sports across all three NCAA divisions (the "Kaplan Report") identified inequities in ten women's sports.

191.   Phase 1 of the Kaplan Report found that "[t]he NCAA's current organizational structure and culture prioritizes men's basketball over everything else, contributing to gender inequity."

192.   Excluding basketball, in the 2018 to 2019 season the NCAA spent $1,697 less per woman participant in Division I and national championship spending.

193.   Research has found that Division I athletic departments at NCAA member institutions spend approximately twice as much on men's programs compared to women's programs.

194.   Champion Women and the California Women's Law Center report, based on data from the U.S. Department of Education, that most intercollegiate athletic departments of NCAA members are not meeting any of the standards Title IX sets for schools to demonstrate equity in sports opportunities.

195.   They report that NCAA member institutions would need to provide women an additional 148,030 sports opportunities to match the same ratio of opportunities that are offered to men.

196.   Such inequities led Carolyn Maloney Chairwoman of the House Committee on Oversight and Reform and fellow members of Congress Jackie Speier and Mikie Sherrill to write to NCAA President Mark Emmert on March 14, 2022, that, "[i]n creating and perpetuating structural inequities between men's and women's championships, and failing to implement substantive changes that would rectify these inequities, [the] NCAA is violating the spirit of gender equity as codified in Title IX."

## NCAA'S DEVELOPMENT AND IMPLEMENTATION
## OF TRANSGENDER ELIGIBILITY POLICIES

### The 2010 NCAA Policy on Transgender Student-Athlete Participation

197.   The NCAA's first transgender student-athlete policy is referred to as the 2010 NCAA Policy on Transgender Student-Athlete Participation, a copy of which is attached as **Appendix C**.

198.   The NCAA's 2010 NCAA Transgender Participation Policy stated that men who wished to compete in NCAA competition on a women's team[17]

---

[17] The Policy (as updated in 2022 to, in the wording of the NCAA, "remove outdated language") refers to such individuals as "[a] trans female (MTF) student-athlete being treated with testosterone suppression medication for gender dysphoria[.]"

could do so by "completing one calendar year of testosterone suppression treatment."[18]

199.   No specific level of testosterone suppression was required.

200.   Nor was independent testing or monitoring of hormone levels or of testosterone suppression required.

201.   Nor did that policy include any provisions requiring evaluation of any competitive advantage of male athletes competing on a women's team or require any evaluation of increased risk of injury to women student-athletes.

202.   The 2010 NCAA Policy on Transgender Student-Athlete Participation continues to be a part of the NCAA Transgender Eligibility Policies today.

203.   The current NCAA Transgender Eligibility Policies "requires transgender student-athletes to provide documentation that meets the 2010 NCAA policy plus meet the sport standard for documented testosterone levels at three points in time: 1. Prior to any competition during the regular season; 2. Prior to the first competition in an NCAA championship event; and 3. Prior to any competition in the non-championship segment."[19]

---

[18] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthleteParticipationPolicy.pdf (accessed June 26, 2024)

[19] Available at: https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (App. B, NCAA 000148).

204.   Thus, the primary differences between the 2010 policy and the current policy are (1) the addition of sport-by-sport testosterone thresholds, and (2) the requirement for testosterone levels to be measured at three points in time each year.

### Origin of the 2010 NCAA Policy on Transgender Student-Athlete Participation

205.   The 2010 NCAA Policy on Transgender Student-Athlete Participation was not supported by any scientific research or study commissioned by the NCAA.

206.   The 2010 NCAA Policy on Transgender Student-Athlete Participation was not recommended by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport.

207.   The 2010 NCAA Policy on Transgender Student-Athlete Participation was not recommended by any NCAA committee with a primary responsibility for competitive fairness, sports medicine, sports safety analysis, sports safety research, or sport rulemaking.

208.   The origin of the 2010 NCAA Policy on Transgender Student-Athlete Participation was a report entitled *On The Team: Equal Opportunity for Transgender Student Athletes* from the National Center on Lesbian Rights and the Women's Sports Foundation in October 2010 that provided guidance on how

colleges and universities should accommodate the interests of student-athletes who have transitioned or are transitioning from one gender to another (the "Report").[20]

209.   The Report was co-authored by the National Center for Lesbian Rights' Director of the Sports Project Helen Carroll and GLESN (Gay, Lesbian and Straight Education Network) project director Pat Griffin, who has overseen educational efforts for lesbian, gay, bisexual and transgender issues in sports for the Women's Sports Foundation, the Report stresses that any transgender student-athlete "should be allowed to participate in any gender-segregated sports activity so long as that athlete's use of hormone therapy, if any, is consistent with the national governing body's existing policies on banned medications."

210.   The Report emerged after the National Center for Lesbian Rights and the Gay, Lesbian and Straight Education Network sponsored a "think tank" entitled "Equal Opportunities for Transgender Student-Athletes" in 2009 that included representatives from the NCAA, the National High School Federation, and experts on transgender issues from disciplines ranging from law and medicine to advocacy and athletics. The think-tank goals were to develop model policies and identify best practices for high school and collegiate athletics programs to ensure the full inclusion of transgender student-athletes.

---

[20] *See* App. B, NCAA 000205-261.

211.   The Report offers a comprehensive discussion of what the term "transgender" means and how to provide access and equal opportunities to the individuals it applies to.

212.   In April 2011, the NCAA Executive Committee heard a presentation regarding transgender student-athletes and noted the NCAA's effort to better educate institutions about accommodating the interests of student-athletes who are transitioning and to develop Association-wide policies regarding transgender student-athlete participation in college sports.

213.   In August 2011 the NCAA Executive Committee approved the 2010 NCAA Policy on Transgender Student-Athlete Participation.

214.   The NCAA's August 2011 decision to approve the 2010 NCAA Policy on Transgender Student-Athlete Participation was the conclusion of a process, which included input from NCAA member committees, including the Student-Athlete Advisory Committees, other sports governance consultants, the Women's Sports Foundation and the National Center for Lesbian Rights.

215.   The 2010 NCAA Policy on Transgender Student-Athlete Participation remained unchanged and fully stated the NCAA's policy regarding the eligibility of transgender individuals until 2022.

**April 27, 2016, NCAA Adopts Championship Bid Policy and Questionnaire**

216.   On April 27, 2016, the NCAA adopted supplemental new policies to "ensure that NCAA events are conducted in a manner consistent with the Association's core values."

217.   An impetus for the supplemental policies was the NCAA Board of Governors' decision to ensure that the 2010 NCAA Policy on Transgender Student-Athlete Participation was implemented at NCAA Championships in all divisions.

218.   The NCAA announced that the supplemental policy would require all hosts of NCAA championships to certify "its ability to deliver and maintain an environment that is safe, healthy and free of discrimination and respects the dignity of all persons."

219.   Furthermore, the NCAA announced it was requiring staff to inquire of all sites that would host championship events to obtain assurances the events would be hosted "in alignment with our values."

220.   The announcement further stated that all prospective hosts would be required to complete an "anti-discrimination questionnaire."

221.   A copy of the anti-discrimination bid questionnaire (the "Bid Questionnaire") the NCAA began using in 2016 is attached as **Appendix D**.

222.   The process described by the Board of Governors announcement described a role in NCAA championship preparations for the NCAA Committee to Promote Cultural Diversity and Equity.

223.   The Bid Questionnaire states that it "may be just the first step to provide information to the Committee to Promote Cultural Diversity and Equity, the championship sport committees and the NCAA staff for evaluation."

224.   The Bid Questionnaire states that it is to be completed by the host institution or committee and accompanied by supporting documentation.

225.   The Bid Questionnaire is directed in part at supporting and facilitating the participation of transgender individuals in NCAA national championships.

226.   For instance, the Bid Questionnaire asks for copies of all relevant and applicable local laws, regulations, and policies, and asks for responses to questions such as:

a.      Does your city, county or state regulate choice of bathrooms or locker rooms that may affect student-athletes, coaches, administrators, game officials, or fans during the Event?

b.      If the Event is planned to be held on institutional/campus property, does your institution have provisions that interfere with any person's choice of bathroom or locker room?

c.      If the event is planned to be held on institutional/campus property, does your institution have non-discrimination provisions related to public accommodations?

d.      Does your city, county or state have any laws, regulations, or policies related to the participation of transgender student-athletes?

e.      Please provide a summary for each Law, Regulation, or Policy related to the participation of transgender student-athletes.

f.      Whether laws regulations or policies override NCAA Championship, Event or Participation policies and operations at Event Facilities.

g.      Whether an individual has a legal cause of action against an individual, institution, or association for violating any such law, regulation or policy.

h.      Considering the Laws, Regulations or Policies applicable to the locations that seek to host NCAA Championships, how would you provide an environment that is safe, healthy, and free of discrimination?

227.   The Bid Questionnaire continued in use as an aspect of NCAA policy and practice until April 26, 2022.

228.   After use of the Bid Questionnaire was officially retired the NCAA has continued to ask the same questions and focus upon the same issues as those

set forth in the Bid Questionnaire in relation to preparing for and conducting NCAA Championships.

### June 11, 2020, NCAA Board of Governors Statement on Idaho Sports Bill

229.   On June 11, 2020, the NCAA commented upon the adoption of legislation by the Idaho legislature which restricted trans-identifying males from competing on women's sports teams.

230.   The NCAA Board of Governors statement said, the "resulting law is harmful to transgender student-athletes and conflicts with the NCAA's core values of inclusivity, respect and the equitable treatment of all individuals."

231.   The statement continued, "Further, Board of Governors policy requires host sites to demonstrate they will provide an environment that is safe, healthy, and free of discrimination, plus safeguards the dignity of everyone involved in the event."

### April 12, 2021, NCAA Board of Governors Statement

232.   On April 12, 2021, the NCAA Board of Governors released a statement directed at state legislators considering legislation to protect women athletes from men competing on women's sports teams.

233.   As they had in 2016 in relation to state legislatures considering legislation related to male and female bathroom usage and in 2020 in relation to legislation in Idaho, the NCAA Board of Governors threatened to withdraw NCAA

Championships from states where "Saving Women's Sports" legislation was

passed. Commenting on the NCAA's Transgender Eligibility Policies, the Board of

Governors said:

> The NCAA Board of Governors firmly and unequivocally supports
> the opportunity for transgender student-athletes to compete in college
> sports. This commitment is grounded in our values of inclusion and
> fair competition.
>
> The NCAA has a long-standing policy that provides a more inclusive
> path for transgender participation in college sports. Our approach —
> which requires testosterone suppression treatment for transgender
> women to compete in women's sports — embraces the evolving
> science on this issue and is anchored in participation policies of both
> the International Olympic Committee and the U.S. Olympic and
> Paralympic Committee. Inclusion and fairness can coexist for all
> student-athletes, including transgender athletes, at all levels of sport.
> Our clear expectation as the Association's top governing body is that
> all student-athletes will be treated with dignity and respect. We are
> committed to ensuring that NCAA championships are open for all
> who earn the right to compete in them.
>
> When determining where championships are held, NCAA policy
> directs that only locations where hosts can commit to providing an
> environment that is safe, healthy and free of discrimination should be
> selected. We will continue to closely monitor these situations to
> determine whether NCAA championships can be conducted in ways
> that are welcoming and respectful of all participants.

234.   The above reference to "long-standing policy" is hyper-linked on the

NCAA website to the August, 2011 NCAA Guidance on TSA developed by the

National Lesbian Law Center and the Women's Sports Foundation. *See supra*

¶¶ 39-46, 200-205.

### August 3, 2021, NCAA Board of Governors Meeting

235.   At its August 3, 2021, meeting the NCAA Board of Governors

received an update on the "legal and legislative landscape related to transgender

athlete participation" and adopted the following resolution:

> WHEREAS, the NCAA Board of Governors reaffirms its policy to provide fair and nondiscriminatory championships opportunities to all student-athletes, including transgender athletes.
>
> WHEREAS, the Board of Governors wholeheartedly commits to foundational values of inclusion and fair competition.
>
> WHEREAS, the NCAA's longstanding Association-wide policy provides an inclusive path for transgender participation.
>
> THEREFORE, BE IT RESOLVED, the NCAA intends to require all hosts of previously awarded championship sites to reaffirm their commitment to ensure a nondiscriminatory environment for all college athletes. If a host cannot commit to a nondiscriminatory environment, the host is expected to inform the NCAA immediately. For host sites still to be awarded, the host similarly must commit to honor the NCAA core values of inclusivity, respect and equitable treatment of all individuals. Regardless of location, NCAA Championships will continue to be open to transgender athletes who have earned the right to compete for a national title and the Association commits to their safety.

236.   The above reference to "long-standing Association-wide policy" is

hyper-linked on the NCAA website to the August, 2011 NCAA Guidance on TSA

developed by the National Lesbian Law Center and the Women's Sports

Foundation. *See supra* ¶¶ 39-46, 200-205.

237.   Also at this meeting, the NCAA Board of Governors received an update on outcomes from the October 2020 NCAA Gender Identity and Student-Athlete Participation Summit.

238.   The NCAA Board of Governors recommended that various NCAA Committees "work with relevant governance bodies to socialize and determine priorities for implementation of the consensus statements."

### Fall 2022, Lia Thomas' Participation in Collegiate Women's Swimming Draws National Interest

239.   In the Fall of 2021 University of Pennsylvania (UPenn) women's swimming team member Lia Thomas, who was formerly named Will Thomas and a member of the UPenn men's swimming team, swam the fastest times in the nation in women's freestyle events from the 200 free to the mile, making it apparent that if allowed to compete in the 2022 NCAA Division I Women's Swimming and Diving Championships (the "2022 NCAA Championships") Thomas would be competitive if not dominant, taking places and results from women.

240.   Lia Thomas' competitive performances focused national attention upon the NCAA's Transgender Eligibility Policies.

### January 6, 2022, Ivy League Declaration of Public Support for NCAA Transgender Eligibility Policies

241.   On January 6, 2022, in response to public attention on the performances of Lia Thomas the Ivy League issued the following statement supporting the 2010 NCAA Transgender Participation Policy:

**PRINCETON, N.J.** – The Ivy League releases the following statement of support regarding Penn's Lia Thomas' participation on the women's swimming & diving team:

*Over the past several years, Lia and the University of Pennsylvania have worked with the NCAA to follow all of the appropriate protocols in order to comply with the NCAA policy on transgender athlete participation and compete on the Penn women's swimming and diving team. The Ivy League has adopted and applies the same NCAA policy.*

*The Ivy League reaffirms its unwavering commitment to providing an inclusive environment for all student-athletes while condemning transphobia and discrimination in any form.*

*The league welcomes her participation in the sport of women's swimming and diving and looks forward to celebrating the success of all of our student-athletes throughout the season.*[21]

### January 19, 2022, NCAA Board of Governors Announces NCAA Will Follow Transgender Eligibility Rules of U.S. Governing Bodies of Olympic Sports

242.   On January 19, 2022, also apparently in response to growing public concerns regarding the performances of Lia Thomas in collegiate swimming competitions, the NCAA Board of Governors made an announcement which did

---

[21] https://ivyleague.com/news/2022/1/6/general-the-ivy-league-releases-statement-of-support-regarding-penns-lia-thomas-participation-in-womens-swimming-diving.aspx (accessed Mar. 14, 2024)

not change the NCAA's policy of allowing men identifying as transgender to compete on collegiate women's teams.

243.  However, the announcement purported to align the NCAA's Transgender Eligibility Policies with the sport-by-sport rules of NGBs in Olympic sports.

244.  The NCAA Board of Governors press release stated:

**Board of Governors updates transgender participation policy Policy will take effect immediately, and impacted athletes can regain eligibility later if approved by divisions**

Media Center
Posted: 1/19/2022 8:41:00 PM

The NCAA Board of Governors on Wednesday voted in support of a sport-by-sport approach to transgender participation that preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete. The new policy, effective immediately, aligns transgender student-athlete participation for college sports with recent policy changes from the United States Olympic and Paralympic Committee and International Olympic Committee.

Like the Olympics, the updated NCAA policy calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors. If there is no NGB policy for a sport, that sport's international federation policy would be followed. If there is no international federation policy, previously established IOC policy criteria would be followed.

The Board of Governors urged the divisions to provide flexibility to allow for additional eligibility if a transgender student-athlete loses

eligibility based on the policy change provided they meet the newly adopted standards.

The policy is effective starting with the 2022 winter championships. Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Starting with the 2022-23 academic year, transgender student-athletes will need documented levels at the beginning of their season and a second documentation six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation would begin with the 2023-24 academic year.

"We are steadfast in our support of transgender student-athletes and the fostering of fairness across college sports," said John DeGioia, chair of the board and Georgetown president. "It is important that NCAA member schools, conferences and college athletes compete in an inclusive, fair, safe and respectful environment and can move forward with a clear understanding of the new policy."

"Approximately 80% of U.S. Olympians are either current or former college athletes," said Mark Emmert, NCAA president. "This policy alignment provides consistency and further strengthens the relationship between college sports and the U.S. Olympics."

Additionally, the NCAA's Office of Inclusion and the Sport Science Institute released the Gender Identity and Student-Athlete Participation Summit Final Report. The report assists ongoing membership efforts to support inclusion, fairness, and the mental and physical health of transgender and non-binary student-athletes in collegiate sport.

245.   Via the revised NCAA Transgender Eligibility Policies as stated above, the NCAA pledged to apply sport-by-sport the eligibility policy of the relevant U.S. Olympic Sport National Governing Body (NGB), or, if the NGB had no policy, the rules of the relevant international sport federation.

246.   But, as explained below, *see* ¶¶ 242-263, 323-367, there was not a true alignment of NCAA policies with Olympic sport policies at that time, nor has there been such since.

247.   Events in the wake of the NCAA's January 19, 2022, announcement soon demonstrated gaps between the NCAA Board of Governors' statement and its intent.

**February 1, 2022, USA Swimming Adopts Transgender Eligibility Rules**

248.   As of January 19, 2022, when the NCAA issued its public pledge to follow the eligibility rules of the relevant NGB or international sport federation, neither FINA (then the name of the international swimming federation) nor USA Swimming had rules on their books regarding eligibility for transgender athletes.

249.   However, on February 1, 2022, less than two weeks after the NCAA Board of Governors' announcement, USA Swimming adopted detailed transgender eligibility rules.

250.   The new USA Swimming rules, (discussed further below at ¶¶ 327-334), which remain in effect today, provide that males wishing to compete as a transgender athlete in the female category must demonstrate they have maintained a testosterone level below 5 nanomoles per liter *continuously for at least 36 months before competition*. These athletes must also *provide evidence they do not have a*

*competitive advantage from retained male advantage*[22] *which must be submitted to a review panel of three independent medical experts*. USA Swimming's rules were adopted with an express goal of promoting competitive fairness and are applicable to events such as the U.S. Open and Junior Nationals, to USA Swimming members, and to those wishing to be eligible to set American records beginning with the 13-14 age group.

251.   Had they been applied by the NCAA Board of Governors, USA Swimming's rules would have prevented Thomas from competing in the 2022 NCAA Division I National Women's Swimming and Diving Championships because Thomas had not sought to suppress testosterone under the required level for at least three years before the competition, nor had any scientific analysis been conducted to establish Thomas did not retain male competitive advantage.

**February 10, 2022, NCAA Declines to Apply USA Swimming Rules**

252.   However, notwithstanding the NCAA Board of Governors' January 19, 2022, announcement supposedly adopting "a sport-by-sport approach to transgender participation" in which "transgender participation for each sport [would] be determined by the policy for the national governing body of that sport," *the NCAA Board of Governors acted swiftly to reject USA Swimming's rules*.

---

[22] "Retained male advantage" refers to the retention of sport performance enhancing advantages of being biologically male that persist after testosterone suppression and other "gender affirming hormone treatment" ("GAHT").

253.   On February 10, 2022, the NCAA announced that "implementing additional changes at this time could have unfair and potentially detrimental impacts on schools and student-athletes intending to compete in 2022 NCAA women's swimming championships[.]"[23]

254.   Instead, the NCAA announced that student-athletes who had been following the 2010 NCAA Transgender Participation Policy need only demonstrate a serum testosterone level below the "maximum allowable limit" for that sport within four weeks of the championship.

255.   Thus, USA Swimming's rule requiring testosterone suppression for at least three years in advance of competition and requiring scientific review of retained male competitive advantage was rejected by the NCAA Board of Governors just days after the Board of Governors said it intended to follow the transgender eligibility rules of U.S. NGBs.

256.   The NCAA also said that notwithstanding USA Swimming's lower 5 nanomole per liter limit, the testosterone threshold for women's swimming would be 10 nanomoles per liter, double the threshold in the new USA Swimming policy.

---

[23] https://www.ncaa.org/news/2022/2/10/media-center-csmas-subcommittee-recommends-no-additional-changes-to-testosterone-threshold-for-trans-women-at-2022-womens-swimming-and-diving-championships.aspx (accessed Mar. 14, 2024).

257.   Thus, although Thomas did not qualify to compete in the women's category under USA Swimming's rules, the NCAA Board of Governors permitted Thomas to compete for the remainder of the 2022 season, including in the Ivy League Championships and in the 2022 NCAA Division I Women's Swimming and Diving National Championships under a far less stringent standard.

## THE NCAA'S CURRENT TRANSGENDER ELIGIBILITY POLICIES

258.   On March 30, 2022, following the 2022 NCAA Division I Women's Swimming and Diving National Championships at which Thomas competed (the 2022 Championships are discussed below at ¶¶ 413-600), NCAA President Mark Emmert said the NCAA was "committed to using the same standards as the Olympics and simply phasing" them in for transgender athletes.

259.   Soon thereafter the NCAA announced a three-step phase-in of Olympic eligibility standards for transgender athletes.

260.   As announced in 2022, Phase One was the policy the NCAA ultimately landed on in 2022 which allowed Lia Thomas to compete in the 2022 NCAA Division I Women's Swimming and Diving Championships by not applying rules in swimming that were more stringent than the 2010 NCAA Policy on Transgender Student-Athlete Participation.

261.   During Phase One men who relied on the 2010 NCAA Policy on Transgender Student-Athlete Participation would continue to be able to compete in NCAA women's sports.

262.   Phase Two, to be in place during 2022-23, would implement testosterone thresholds used in specific Olympic sport rules but no other requirements, such as those related to the length of suppression or other monitoring requirements.

263.   In 2022 the NCAA announced a Phase Three, which the NCAA said would be in place during 2023-24 and would bring about the full implementation of Olympic sport rules.

264.   On January 11, 2023, the NCAA Board of Governors voted to extend Phase Two of the NCAA Transgender Student-Athlete Policies through the 2023-24 academic year with Phase Three to become effective in the 2024-25 academic year.

265.   In May 2024, however, after this lawsuit was filed, the NCAA silently, without issuing any announcement, simply changed its website to eliminate Phase Three entirely from its Transgender Student-Athlete Participation Policies.

266.   Thus, nearly three years after the NCAA told the public it was going to implement transgender eligibility policies used in Olympic sport, the NCAA has

not done so, and the NCAA has just recently removed its previous written commitment to do so from its website.

267.   Nevertheless, the NCAA continues to make the inaccurate claim that it has been making since early 2022, that, "[t]he new policy aligns transgender student-athlete participation with the Olympic Movement." *See* NCAA Transgender Student-Athlete Participation Policy (Updated May 2024); *currently available at*: https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed Jun. 23, 2024).

268.   The NCAA's current Transgender Eligibility Policies for men who wish to compete on women's teams simply requires one year of testosterone suppression and measurements at three points during the season confirming suppression of testosterone below the applicable sport threshold.

269.   As explained below, the NCAA's current Transgender Eligibility Policies do not align with policies in many Olympic Movement sports.

### DISCRIMINATORY IMPACTS OF THE NCAA'S CURRENT TRANSGENDER ELIGIBILITY POLICIES

**The Premise of the NCAA's Transgender Eligibility Policies—that Men Can Equally, Fairly, and Lawfully Compete in Women's Sports Through Testosterone Suppression—is Flawed**

**The Male-Female Sport Performance Gap**

270.   The reason for sex-separated sport (*i.e.*, for creating separate men's and women's teams or a separate women's category) and the reason the Title IX

regulations endorse sex-separated sports teams is to give women a meaningful opportunity to compete that they would be denied were they required to compete against men.

271.   Biological differences between men and women prevent meaningful competition between men and women in all sports contested at a collegiate level in NCAA Divisions I, II and/or III.

272.   Developmental biologist Dr. Emma N. Hilton and sport physiologist Dr. Tommy R. Lundberg report that "the performance gap between males and females . . . often amounts to 10 – 50% depending on sport." Hilton, E.N., Lundberg, T.R., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine* (2021) 51:199-214, p. 199.

273.   Hilton and Lundberg note that the sport performance gap between men and women is not limited to certain sports but applies generally to most skills necessary for success in sport. *Id*. Here is a chart that illustrates male sport performance advantages across a wide group of discrete sport skills:



**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 202, Fig. 1.

274.   The source of male athletic performance advantages over women (sometimes described as the "Male-Female Sport Performance Gap") is attributed by many scientists to genetic differences between males and females and the effects higher levels of testosterone have on the male body throughout male development.

275.   The developmental and physiological effects brought about by genetic differences between males and females and higher levels of circulating testosterone in males begin well before puberty.

276.   In the womb and in the 6-9 month "mini puberty" phase immediately post birth natal males experience endogenous synthesis and secretion of higher levels of testosterone than natal females, triggering differentiation in male body structure beginning even before birth.

277.   The result is "is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and weight. On average women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 75% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight."[24] The impact of these differences is "an obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events."[25]

278.   Also, "levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12%[.]"[26] Increased levels of hemoglobin are due to the fact that, "[t]estosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone for erythrocyte production

---

[24] Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance," *Endocr. Rev.* 2018 Oct; 39(5): 803-829.
[25] *Id.*
[26] *Id.*

and thereby hemoglobin synthesis[.]"[27] These effects from testosterone and erythropoietin "[i]ncreas[e] the amount of hemoglobin in the blood [with] the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports. . . It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities."[28]

279.   Further, due to the impacts of testosterone, and perhaps other factors, on male development, "on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men."[29] The athletic advantages conferred by men's larger and stronger bones includes, "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities" and greater male protection from stress fractures.[30]

280.   Additionally, there is a sex difference in pulmonary function which "may be largely explained by the androgen-sensitive difference in height, which is a strong predictor of lung capacity and function."[31]

---

[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

281.   There are many ways to illustrate the Male-Female Sport Performance

Gap and demonstrate that men competing on women's teams is incompatible with



equal opportunities for women.

282.   A point of comparison that helps put the Male-Female Sport

Performance Gap in perspective is to understand that *every* women's world record

in *every* track and field event is bested *every* year by dozens, and in many cases

hundreds, of high school age males.

283.   The following chart illustrates the performance gap by comparing the

times of three 400m female Olympic gold medalists to thousands of males in 2017:

Above chart used with permission from Ross Tucker and derived from: Coleman,
D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception

to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 89.

284.   As demonstrated in the chart, in a single year tens of thousands of

males outperformed the best female 400m runners in the world.

285.   Here is a table which shows that high school boys ages 14-15 have

eclipsed many women's world records by large margins:

**Table 3**  Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," Sports Medicine, (2021) 51:199-214, p. 204, Table 3.

286.   These examples reflect that the plain language of Title IX which

speaks in terms of binary, biological sex (*i.e.*, male and female) is supported by

science.

287. There are relevant and large differences between the sexes in terms of athletic and physical capacity and this translates into a large Male-Female Sport Performance Gap.

288. Thus, in terms of fairness and equality for women competing in collegiate sport, the eligibility line of "biological sex" drawn by Title IX is the appropriate dividing line to ensure equal athletic opportunities for women.

289. Deviation from the biological line drawn by Title IX harms women and deprives them of equal opportunities to men by making them compete against men, which reduces women's sport opportunities, is not fair, and in many cases can be unsafe.

**Testosterone Suppression Does Not Bridge the
Male-Female Sport Performance Gap**

290. Despite the science-backed dividing line for eligibility in women's sport provided by Title IX, which is sex and sex alone, the NCAA has chosen to define eligibility in women's collegiate sport in terms of testosterone suppression by allowing men to compete as women by suppressing testosterone to a certain level that is still above the female range.

291. As explained above, the NCAA gives men who wish to compete against women the option to suppress testosterone to a level that is still above the highest level a female can produce without doping.

292.   The NCAA Transgender Eligibility Policies require only a year of testosterone suppression before a man may compete against women.

293.   However, peer reviewed scientific research papers confirm testosterone suppression does not bridge the Male-Female Sport Performance Gap.

294.   In one peer reviewed article researchers studied the effects of a year of hormone suppression on males and found that while males on hormone suppression experienced some reduction in muscle mass, they "generally maintained their strength levels."[32]

295.   In another report, researchers Hilton and Lundberg concluded "that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, *evidence for loss of the male performance advantage*, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, *is lacking*."[33]

296.   Hilton and Lundberg continued:

---

[32] Wiik, Anna, et al., "Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals," *J Clin Endocrinol Metab*, March 2020, 105(3):e805–e813, available at: https://academic.oup.com/jcem. (accessed Mar. 14, 2024)

[33] Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 211.

Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

*Id.*

297.   Peer reviewed scientific studies confirm testosterone suppression does relatively little to mitigate the strength, speed, size, power and other athletically relevant differences between men and women (*i.e.*, the Male-Female Sport Performance Gap).

298.   A review published in April 2023 reported there have been a total of 19 published peer reviewed research reports on the effects of testosterone suppression (as part of gender affirming hormone treatment or "GAHT") on performance.[34]

---

[34] "Should Transwomen be allowed to Compete in Women's Sports?" Brown, Gregory A., Ph.D. and Lundberg, Tommy, Ph.D., available at: https://www.sportpolicycenter.com/news/2023/4/17/should-transwomen-be-allowed-to-compete-in-womens-sports (accessed Mar. 14, 2024)

299.   "Collectively, the existing research indicates that while GAHT affects biology, the changes it creates are minimal compared to the initial biological differences between typical males and typical females, which means that both biological attributes and performance differences are retained even after years of GAHT." *Id*.

300.   "In spite of testosterone suppression in transwomen reducing circulating hemoglobin concentration to the levels of reference women, all of these reviews came to the conclusion that even after 3 years of testosterone suppression there are still lasting male athletic advantages in transwomen." *Id*.

301.   Thus, while testosterone suppression is the backbone of the NCAA's Transgender Eligibility Policies and a basis upon which the NCAA authorizes men to compete in women's sports after only a year of testosterone suppression, peer reviewed scientific research confirms the NCAA's reliance upon testosterone suppression is not supported by reliable scientific data.

302.   Nor has the NCAA ever published any data or studies supporting its testosterone suppression policy.

**The NCAA's Transgender Eligibility Policies Allow Men to Compete Against Women While Retaining Higher Levels of Testosterone Than Women**

303.   The ranges of testosterone produced by men and women do not overlap.

304.   Men produce far more testosterone than women and there is a significant gap between the upper end of the testosterone range for women and the lower end of the testosterone range for men.

305.   A 2018 metanalysis established that in healthy individuals there is "a clear bimodal distribution of testosterone levels, with the lower end of the male range being four- to five-fold higher than the upper end of the female range (males 8.8-30.9 nmol/L, females 0.4-2.0 nmol/L)." Clark RV, Wald JA, Swerdloff RS, *et al.*, "Large divergence in testosterone concentrations between men and women: Frame of reference for elite athletes in sex-specific competition in sports, a narrative review." *Clin Endocrinol* (Oxf). 2019; 90:15–22. https://doi.org/10.1111/cen.13840.

306.   Currently, in 19 out of 25 women's sports the NCAA only requires men who want to compete against women to show testosterone suppression to a level of less than 10 nanomoles per liter (<10 nmol/L).

307.   The <10 nmol/L testosterone threshold used by the NCAA for granting eligibility to men to compete against women in most NCAA sports is five times higher than the upper end of the female testosterone range, twenty-five times higher than the testosterone level of females at the lower end of the female range, and *includes testosterone levels that are within the normal male range* of 8.8 nmol/L to 30.9 nmol/L.

308.   Importantly, the female range of 0.4 nmol/L to 2.0 nmol/L *includes elite female athletes*.

309.   This means that even after "suppression" men are allowed to compete in the women's category with testosterone levels far higher than any female athlete could ever achieve without doping.

310.   Moreover, under current NCAA rules, some men (those falling within the lower end of the normal male testosterone range (*i.e.*, between 8.8 to 10.0 nmol/L or so) could compete in NCAA women's sports without substantially reducing their testosterone level at all.

311.   These facts further confirm the NCAA's policy disparately impacts women.

312.   Plaintiffs do not concede that rules that permit a man to compete in women's scholastic sports through engaging in any level of testosterone suppression can pass muster under Title IX.

313.   But, even were it to be found that relying upon male testosterone suppression to permit men to access women's sports and sports teams could preserve equal opportunities for women in sports, *the NCAA's current eligibility rules* would still fail under Title IX because the policies *provide a testosterone advantage to men that women cannot replicate without doping*.

314.   In addition, as explained below, the <10 nmol/L testosterone suppression level, which is a central feature of the current NCAA Transgender Eligibility Policies was formally dispensed with years ago by the International Olympic Committee (IOC).

### The 2015 IOC Consensus Statement, Still Relied on by the NCAA, Was Withdrawn by the IOC in 2021

315.   As stated above, *see* ¶¶ 236-241, current NCAA Transgender Eligibility Policies stem from changes made by the NCAA in 2022 to take what the NCAA calls a "sport-by-sport approach" that "aligns transgender student-athlete participation with the Olympic Movement."[35]

316.   Specifically, the NCAA states that "the updated NCAA policy calls for transgender student-athlete participation for each sport to be determined by the policy for the national governing body [("NGB")] of that sport. If there is no NGB policy for a sport, it would then be determined by the policy for that sport's international federation. If there is no international federation policy, it would be determined by policy criteria previously established by the International Olympic Committee."[36]

---

[35] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed June 26, 2024) (App. B, NCAA 000148).
[36] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed June 26, 2024) (App. A, NCAA 000148).

317.   Most of the NCAA's testosterone suppression thresholds, *i.e.*, those currently applied in 19 out of 25 women's sports, are set at 10 nmol/L of serum testosterone.

318.   The NCAA's claim that the <10 nmol/L suppression level is sourced from current Olympic Movement policies is inaccurate.

319.   Rather, the level of <10 nmol/L used by the NCAA in most women's sports is derived from an outdated, non-peer reviewed, two-and-a-half-page statement issued by the participants in an IOC-organized meeting *in 2015* which included four lawyers, multiple IOC employees, four IOC Medical & Scientific Commission members and ten academicians.[37]

320.   The document relied on by the NCAA is headlined *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism November 2015* (the "2015 IOC Consensus Statement"). *Id*. A copy of the 2015 IOC Consensus Statement is attached as **Appendix E**.

321.   The first page of the 2015 IOC Consensus Statement merely lists the participants in the meeting. *Id*.

---

[37]
https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf (accessed Mar. 14, 2024).

322.   The portion of the document dealing with transgender eligibility is a one-page outline of concepts for consideration by sports organizations with no references to scientific literature, studies, data, or testing. *Id.*

323.   Moreover, the 2015 IOC Consensus Statement *was in fact replaced by the IOC on November 16, 2021*.

324.   On that date, the IOC transferred responsibility for developing transgender eligibility rules to its member international sport federations and expressly "replac[ed] . . . previous IOC statements on this matter, *including the 2015 Consensus Statement*."[38]

325.   Therefore, *in 2022* when the NCAA first claimed to apply Olympic Movement policies to NCAA women's sports and at that time relied upon the 2015 IOC Consensus Statement to implement a <10 nmol/L testosterone suppression level for all NCAA women's sports, the NCAA was applying an outmoded, previously replaced, no longer operative, and withdrawn, IOC recommendation.

326.   As noted above, *see supra* at ¶¶ 299-303, one of the problems with the nearly decade-old 2015 IOC Consensus Statement and its <10 nmol/L testosterone suppression level is that it discriminates against women by allowing men to

---

[38] https://stillmed.olympics.com/media/Documents/Beyond-the-Games/Human-Rights/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf (accessed Mar. 14, 2024) (emphasis added).

compete on women's teams with a testosterone level that is five times higher than the highest recorded testosterone level for elite female athletes.

327.   As also noted above, *see supra* at ¶¶ 287-291, by 2021 when the NCAA adopted its testosterone suppression threshold robust scientific evidence demonstrated testosterone suppression of men wishing to compete against women was not sufficient to protect women.

328.   These facts are indicative of a NCAA policy driven by ideology rather than science.

### The NCAA's Transgender Policies Are Out-of-Step with Current Olympic Movement Policies

329.   The sport-by-sport testosterone suppression levels currently used by the NCAA are found on the NCAA website by clicking on three separate links (for fall sports, winter sports and spring sports) in the NCAA "Transgender Student-Athlete Eligibility Review Procedures."[39]

330.   Review of these documents on the NCAA website – to which student-athletes and NCAA institution athletic staff are directed by the NCAA in order to comply with the NCAA's policies – demonstrates inconsistences between current

---

[39] https://www.ncaa.org/sports/2022/1/28/transgender-student-athlete-eligibility-review-procedures.aspx (accessed June 26, 2024) (Note on NCAA website: Approved: Jan. 27, 2022/Distributed: Jan. 28, 2022/Updated: Jan. 19, 2023/Updated May 2024) (App. B, NCAA 000150).

Olympic sport policies and the NCAA's approach to transgender eligibility in women's sports.

331.   The underlying principle of the NCAA's Transgender Eligibility Policies which the NCAA applies in every women's sport—*that men may compete on women's teams with only a single year of testosterone suppression*—does not, in fact, align with the policies of key Olympic Movement governing bodies.

332.   The NCAA does not provide scientific data on its website supporting this underlying principle which, as demonstrated below, lies outside practices of the leading governing bodies in Olympic sport.

### Swimming

333.   For instance, in the NCAA's category of "Women's Swimming & Diving" *the NCAA claims it applies* USA Swimming's policy for transgender eligibility merely because the NCAA has set a testosterone suppression threshold of 5 nmol/L.[40]

334.   However, for male athletes who identify as transgender and seek to compete in the women's category the eligibility policy of USA Swimming, the

---

[40] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlines AndThresholdsWinter.pdf (accessed June 26, 2024) (NCAA TRANSGENDER STUDENT-ATHLETE PARTICIPATION POLICY SPORT-SPECIFIC TESTOSTERONE THRESHOLDS AND CHAMPIONSHIP ELIGIBILITY DEADLINES 2023-24 WINTER SPORTS) (App. B, NCAA 000166).

U.S. NGB for swimming, states "it shall be presumed that the athlete is not eligible unless the athlete demonstrates that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L (as measured by liquid chromatography coupled with mass spectrometry) continuously *for a period of at least thirty-six (36) months before the date of Application*. This must include at a minimum three (3) separate blood tests within the past three hundred sixty-five days (365) days preceding the Application, with the last test conducted within ninety (90) days prior to the athlete's Application."[41] Thus, USA Swimming requires testosterone suppression *under the maximum threshold for 36 months* before the date of application.

335.   In contrast, the NCAA only requires, "[l]aboratory results demonstrating *a one-time total serum testosterone level* that is within the allowable levels for the sport in which the student-athlete plans to compete . . . within four weeks (28 days) prior to the applicable competition date"[42] and a male athlete's "medical professional" (a physician certification is not required by the NCAA)

---

[41] https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/rules_policies/usa-swimming-policy-19.pdf (accessed Mar. 14, 2024) (USA Swimming Athlete Inclusion, Competitive Equity, and Eligibility Policy) (emphasis added).

[42] https://www.ncaa.org/sports/2022/1/28/transgender-student-athlete-eligibility-review-procedures.aspx (accessed June 26, 2024) (NCAA Transgender Student-Athlete Eligibility Review Procedures) (emphasis added) (App. B, NCAA 000150).

need only certify "[t]he identified student-athlete has, as of the date identified

below, received hormone suppression treatment for at least one calendar year."[43]

336.   Thus, while USA Swimming rules require more than three years of

suppression below the 5 nmol/L level, in contrast NCAA procedures only require a

single blood test result below 5 nmol/L within 28 days of the male athlete's first

competition date.

337.   While the NCAA requires certification from a medical professional of

one year of testosterone suppression, the NCAA does not require that

"suppression" during that year be continuously below the 5 nmol/L threshold.

338.   Furthermore, USA Swimming's policy specifies that "[a]s a condition

of eligibility, the athlete must satisfy the Elite Athlete/Event Fairness Panel that . . .

[f]rom a medical perspective, the prior physical development of the athlete as a

Male, as mitigated by any medical intervention, does not give the athlete a

competitive advantage over the athlete's cisgender Female competitors."[44]

---

[43]

https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSAEligibility
ReviewForm.pdf (accessed June 26, 2024) (NCAA Transgender Student-Athlete
Participation Policy Eligibility Review Form: Section Two – Medical Professional
Attestation) (App. B, NCAA 000154).

[44] https://www.usaswimming.org/docs/default-source/governance/governance-lsc-
website/rules_policies/usa-swimming-policy-19.pdf (accessed Mar. 14, 2024)
(USA Swimming Athlete Inclusion, Competitive Equity, and Eligibility Policy).

339.   The NCAA has no comparable process directed at ensuring competitive fairness and disqualifying male athletes who should not compete against females due to Retained Male Advantage.

340.   Thus, the NCAA's claim to be following "transgender student-athlete participation [policies] . . . determined by" USA Swimming is not accurate.

### Diving

341.   Furthermore, the NCAA's application of a 5 nmol/L threshold *to Diving athletes* is also inconsistent with the NCAA's stated approach of applying the policy "determined by the . . . national governing body of that sport [and] [i]f there is no NGB policy for a sport . . . the policy for that sport's international federation."[45]

342.   USA Diving is the U.S. NGB for the sport of diving, not USA Swimming.

343.   Thus, if the NCAA were applying sport-by-sport NGB eligibility policies it should have looked to the rules of USA Diving or its international federation World Aquatics.[46]

---

[45] https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (accessed June 26, 2024) (App. B, NCAA 000148).

[46] World Aquatics, formerly known as the Fédération Internationale de Natation (FINA), is the international federation for swimming, open water swimming, diving, water polo and other aquatic sports. *See* https://www.worldaquatics.com/about (accessed Mar. 14, 2024).

344.   USA Diving does not have transgender eligibility rules, therefore, pursuant to the sport-by-sport approach to which the NCAA claims it subscribes, the NCAA should, but does not, apply the eligibility rules of World Aquatics to diving athletes.

345.   World Aquatics' rules do not permit a male athlete to compete in the women's category in World Aquatics events, regardless of gender identity, unless the athlete has undertaken gender transition and hormone suppression starting at the developmental stage known as Tanner Stage 2 (which starts for most people around age 12) and have maintained continuous suppression of testosterone under 2.5 nmol/L since then.[47]

346.   Therefore, the NCAA's policies for both swimmers and divers *do not align* with the relevant Olympic sport policies.

## Water Polo

347.   Nor does the NCAA's eligibility policy for Women's Water Polo align with the relevant Olympic sport policy.

---

[47] https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf (accessed Mar. 14, 2024) (World Aquatics POLICY ON ELIGIBILITY FOR THE MEN'S AND WOMEN'S COMPETITION CATEGORIES) (Section F.4. Eligibility for the Women's Category).

348.   The NCAA sets a "Approved Testosterone Threshold"[48] of <2.5 nmol/L for Women's Water Polo and cites the international federation now known as World Aquatics (previously known as FINA) as the source of this "benchmark." *Id.*

349.   However, as explained above, World Aquatics' eligibility policy requires hormone suppression *beginning at Tanner Stage 2* (*i.e.*, approximately age 12) as the starting point for any effort to qualify for eligibility in the women's category.

350.   Thus, the NCAA is applying World Aquatics' complete eligibility rules for men who wish to compete in Women's Water Polo.

351.   Thus, *in all three women's aquatics sports* (swimming, diving, and water polo) governed at the collegiate level by the NCAA*, the NCAA does not apply Olympic sport policies*, contrary to what the NCAA claims.

**Cross-country and Track and Field**

352.   Similarly, the NCAA governs three women's athletics (*i.e.*, running and track and field) sports at the collegiate level, namely women's cross country, women's indoor track and field and women's outdoor track and field.

---

48

https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlines AndThresholdsSpring.pdf (accessed June 26, 2024) (App. B, NCAA 000160).

353.   *For each of these three running sports the NCAA likewise does not apply relevant Olympic sport policies.*

354.   Each of the running and track and field sports fall under the purview of USA Track & Field (USATF) as the U.S. NGB and World Athletics as the international federation.

355.   As to each of these sports, the NCAA seeks to justify applying a <10 nmol/L testosterone threshold by linking to a USATF webpage entitled USATF Statement Regarding Transgender/Transsexual Policy (the "USATF Statement").[49]

356.   The USATF Statement references the IOC policy "updated in November of 2015" which as discussed above is the 2015 IOC Consensus Statement which has been superseded. *See supra* at ¶¶ 313-319.

357.   The USATF Statement may have at one time contained a hyperlink to the 2015 IOC Consensus Statement, however, the hyperlink has been removed, likely in recognition of the fact that the 2015 IOC Consensus Statement has been withdrawn.

---

[49] https://www.usatf.org/governance/policies/usatf-statement-regarding-transgender-transsexual- (accessed Mar. 14, 2024).

358.    Nor does the USATF Statement reference a testosterone threshold of

<10 nmol/L as the NCAA Transgender Eligibility Policy inaccurately claims.[50]

The USATF Statement does not reference a testosterone suppression threshold.[51]

359.    Nor is the USATF Statement relied on by the NCAA indicative of

current USATF eligibility standards for athletes comparable to NCAA athletes.

360.    The appropriate USATF eligibility rule had the NCAA wanted to

apply equivalent Olympic sport standards is Rule 1(a) of the USATF Competition

Rules which makes the eligibility rules of World Athletics applicable to USATF

national championships, including U.S. junior national championships such as the

U20 Championships.[52]

361.    World Athletics eligibility rules are virtually identical to the

previously described standards applied by World Aquatics which require

---

[50] *See*, *e.g.*,
https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlines
AndThresholdsFall.pdf (accessed June 26, 2024) (NCAA TRANSGENDER
STUDENT-ATHLETE PARTICIPATION POLICY SPORT-SPECIFIC
TESTOSTERONE THRESHOLDS AND CHAMPIONSHIP ELIGIBILITY
DEADLINES 2023 FALL SPORTS) (Approved Testosterone Threshold for
Women's Cross-Country) (App. B, NCAA 000162).
[51] *See* https://www.usatf.org/governance/policies/usatf-statement-regarding-
transgender-transsexual- (accessed Mar. 14, 2024)
[52] *See* https://www.flipsnack.com/USATF/2024-usatf-competition-rules/full-
view.html (accessed Mar. 14, 2024).

transitioning and continuous testosterone suppression below 2.5 nmol/L *starting by Tanner Stage 2*.[53]

362.   Thus, *in women's cross country, women's indoor track and field and women's outdoor track and field the NCAA does not align with Olympic policies*.

## Rowing

363.   *In the sport of Women's Rowing, from 2020 until May 2024 the NCAA did not even cite to the applicable Olympic Movement policy*.

364.   Instead, the NCAA applied a 5 nmol/L threshold which the NCAA inaccurately claimed it based on US Rowing policy.

365.   However, US Rowing's policies do not reference a testosterone threshold.[54]

366.   For the past four years the NCAA should have looked to the policy of World Rowing (also known as FISA) which states on this point:

> As a general guideline, a rower who has changed their gender, or intends to do so, and seeks to be determined as eligible to compete as a woman, will be required:
>
>> a.    First, to satisfy the Gender Advisory Panel that the rower's serum testosterone concentration has been *less*

---

[53] *See* World Athletics Book of Rules, Book C, Rule C3.5 – Eligibility Regulations Transgender Athletes – effective 31 March 2023, Section 3.2, available at: https://worldathletics.org/about-iaaf/documents/book-of-rules (accessed Mar. 14, 2024).

[54] https://usrowing.org/documents/2020/8/13/USRowing_Policy_Manual_06112020.pdf (accessed Mar. 14, 2024).

*than 2.5 nmol/L continuously for a period of at least the previous 24 months*; and

b.   Secondly, meet any other requirements reasonably set by the Gender Advisory Panel and endorsed by the Executive Committee."[55]

367.   The NCAA did not change the testosterone threshold in NCAA women's rowing to 2.5 nmol/L until after Plaintiffs pointed out the NCAA's error in Plaintiffs' original complaint.

368.   However, the NCAA's rules still do not require suppression for "at least the previous 24 months."

369.   Thus, Women's Rowing is another women's sport in which the NCAA is not following relevant Olympic sport policies.

**Triathlon**

370.   Another example is the sport of triathlon where the NCAA has adopted a testosterone suppression threshold of <2.5 nmol/L.[56]

371.   Yet, the World Triathlon rules state, "[t]he athlete must demonstrate that the concentration of [serum] testosterone . . . has been less than 2.5 nmol/L

---

[55] Appendix R1 – Bye-Law to Rule 13 Men's and Women's Events, World Rowing Rule Book, available at: https://worldrowing.com/technical/rules/2021-rule-book/ (emphasis added) (accessed Mar. 14, 2024).
[56] https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlinesAndThresholdsFall.pdf (accessed June 26, 2024) (App. B, NCAA 000163).

*continuously for a period of at least 24 months*"[57] and, as explained above, the NCAA only has a one year look back period for testosterone suppression and does not require suppression below a specified threshold during that one year period.

372.    Thus, *in the sport of Women's Triathlon as well the NCAA is not following the Olympic "sport-by-sport" standards.*

373.    The NCAA's failures to meet even its own announced Olympic alignment standard demonstrates the NCAA Transgender Eligibility Policies are not ensuring equal opportunities for women.

**The NCAA's Transgender Eligibility Policies Expose Women
to Higher Safety Risks in Collision, Contact and Limited-Contact Sports**

374.    Some medical professionals evaluate the relative risk of acute injury in sports by categorizing sports as contact, limited-contact, or non-contact sports.

375.    In "contact sports" (hereafter, "Contact Sports) athletes routinely make contact with each other or with inanimate objects, making the risk of serious injury through collisions with other athletes a known risk.

376.    Contact Sports regulated by the NCAA include: basketball, beach volleyball, diving, fencing, ice hockey, lacrosse, soccer, volleyball, water polo, and wrestling.

---

[57] https://www.triathlon.org/uploads/docs/TRI_Gender_Eligibility_Guidelines.pdf (accessed Mar. 14, 2024).

377.   Within the category of Contact Sports, in certain sports, sometimes referred to as "collision sports" (hereafter, "Collision Sports"), athletes purposefully hit or collide with each other making the risk of serious injury through purposeful collisions with other athletes a known risk.

378.   Collision Sports regulated by the NCAA include: fencing, ice hockey, and wrestling

379.   In "limited contact sports" (hereafter, "Limited-Contact Sports") athlete contact with each other or with inanimate objects is less frequent but still occurs making the risk of serious injury through collisions with other athletes a known risk.

380.   Moreover, it is recognized that some limited-contact sports can be as dangerous as collision or contact sports.

381.   Limited-Contact Sports regulated by the NCAA are: softball, skiing and tennis.

382.   Softball is a Limited-Contact Sport where the risk of collisions with other athletes and with inanimate objects presents a known injury risk and where the risk of injury increases with the speed at which a thrown or struck ball travels.

383.   Skiing is a Limited-Contact Sport where the risk of collisions with other athletes is generally rare and where collision with inanimate objects presents a higher known risk.

384.   Tennis is a Limited-Contact Sport where the risk of injury increases with the speed at which a struck ball travels.

385.   It is known that Retained Male Advantage increases injury risks for women who compete against men in Contact Sports and Limited-Contact Sports.

386.   Therefore, another way that allowing men to compete on women's teams denies women equal opportunities is that in women's Collision Sports and Contact Sports, and in the Limited-Contact sport of softball, which are all prone to violent contact and collisions, the NCAA increases safety risks for women by allowing men to compete against women while maintaining Retained Male Advantage,[58] (including male advantages in size, strength, power, weight and speed).

387.   By increasing the risk of injury for women competing in basketball, beach volleyball, diving, fencing, ice hockey, lacrosse, soccer, softball, tennis, volleyball, water polo, and wrestling, through allowing men to compete on women's teams, the NCAA is depriving women of an equal opportunity—in comparison to men—to practice safe sport.

---

[58] Retained Male Advantage is defined as the significant athletic advantages that males retain over females due to male biology and physical development even after testosterone suppression. *See supra* at ¶¶ 244 n. 20.

**Concussions**

388.   Concussions raise serious long term health implications and can have lifelong debilitating effects.

389.   "[Y]oung athletes may suffer significant long-term cognitive, memory, and fine motor impairment secondary to sports related, mild, traumatic brain injuries." Brown, K.A., Patel, D.R., "Participation in sports in relation to adolescent growth and development," *Transl Pediatr* 2017;6(3):150-159, p. 156, *available at* https://tp.amegroups.com/article/view/14626/14780

390.   "[D]amage to the brain from collisions has been shown to cause greater instance of mental illness such as depression and psychosis. Through . . . even one substantial head injury, the connections between brain neurons can be profoundly disrupted." "What Parents Should Know About Youth Athletics and Mental Health," Skyland Trail.org, *available at* https://www.skylandtrail.org/what-parents-should-know-about-youth-athletics-and-mental-health/ (Skyland Trail is a non-profit mental health treatment organization based in Atlanta.).

391.   "Studies from US collegiate sports have shown that female athletes are 1.9 times more likely to develop a sports-related concussion than are their male contemporaries in comparable sports." Sanderson, K. Why Sports Concussions Are Worse for Women, *Nature* (Aug. 3, 2021), https://www.nature.com/articles/d41586-021-02089-2.

392.   The size, strength and speed of trans identifying male opponents in Contact Sports and Limited-Contact Sports materially increases the injury risk of female student-athletes in those sports.

393.   Concussions are just one type of serious athletic injury for which women are at higher risk than men and the NCAA's Transgender Eligibility Policies deprive women of equal opportunities by imposing an even higher risk of concussions and other injuries upon them.

### No NCAA Monitoring of Male Testosterone Suppression

394.   The NCAA does not have a monitoring and enforcement program for the testosterone suppression requirement in its Transgender Eligibility Policies.

395.   The NCAA drug tests women for performance enhancing drugs, including synthetic testosterone, at NCAA championships and makes women subject to no advance notice drug testing during the season.

396.   However, the NCAA does not monitor the testosterone levels of men who are required to suppress testosterone to compete in women's sports.

397.   Therefore, even if the NCAA's testosterone suppression requirement could reduce the sport performance advantages that men have over women the NCAA does not monitor or otherwise enforce its published testosterone suppression standards or have a program to deter non-compliance.

398.   For instance, the NCAA does not conduct independent, arms-length blood testing or other monitoring of compliance with testosterone thresholds.

399.   In this way as well, the NCAA's Transgender Eligibility Policies discriminate against women.

**No Assessment of Physical, Emotional or Psychological Harm of NCAA Transgender Eligibility Policies on Women Student-Athletes**

400.   The NCAA has also not conducted research related to its Transgender Eligibility Policies and any physical, emotional or psychological harm to women arising from these policies.

401.   In contrast, the NCAA has made a massive investment in concussion research which primarily benefits men student-athletes in the sport of football, which is not a sport in which women's teams are offered.

402.   The NCAA's failure to conduct any research related to risks arising for women from its Transgender Eligibility Policies demonstrates lack of equal access to safe sport and lack of access to equal and adequate resources and research investments for women.

**NCAA LGBTQ-Inclusive Codes of Conduct**

403.   The NCAA seeks to suppress criticism of its Transgender Eligibility Policies from female athletes and their supporters.

404.   The NCAA has developed "*LGBTQ-Inclusive Codes of Conduct*" which "outlin[e] consequences for engaging in homophobic and transphobic behaviors" and proclaim offending "language or conduct will not be tolerated."[59]

405.   The NCAA recommends *LGBTQ-Inclusive Codes of Conduct* to the athletic departments of member institutions.

406.   The NCAA understands that in some quarters, including on many college campuses, merely standing up for fairness in women's sports will be labeled "transphobic."

407.   Thus, the NCAA's "Sample Team Code of Conduct" operates as a speech code, calculated to chill women student-athletes from expressing opinions about transgender eligibility in women's sport that are contrary to those imposed by the NCAA.

**Summary of Defects in NCAA's Transgender Eligibility Policies**

408.   The NCAA's Transgender Eligibility Policies exist as a fig leaf for the NCAA Board of Governors' ideology-driven decision to subordinate women's

---

[59] *See* https://www.ncaa.org/sports/2016/12/8/five-ways-to-have-an-lgbtq-inclusive-athletics-department.aspx (accessed June 26, 2024) (App. B, NCAA 000143-44).

opportunities in collegiate sport to the interests of men who declare themselves transgender.

409.   No men are disadvantaged by the NCAA's Transgender Eligibility Policies only women are.

410.   As the Lia Thomas case described below, *see infra* ¶¶ 601-603, demonstrates, men who perform at a relatively low level when competing against other men can shift to the women's category and achieve at a much higher level relative to women.

411.   The NCAA's Transgender Eligibility Policies allow a man to make the relatively easy (in terms of comparative athletic challenge) shift to a women's team, depriving women of athletic accomplishments, recognition, awards, scholarships, and roster spots.

412.   But the same easy opportunity to shift to a men's team and reap relative sport performance benefits and the awards and recognition that flow from those relative sport performance benefits is non-existent for women.

413.   Women far more rarely move to men's teams for the simple reason that women are not generally (if ever at a high collegiate level) competitive on men's teams even if they receive a therapeutic use exemption to use testosterone as part of gender affirming hormone treatment.

414.   The only real hurdle the NCAA places before a man who wishes to compete on a NCAA women's team and have access to women's showers and locker rooms is a requirement of one-year of unmonitored (by the NCAA) testosterone suppression.

415.   This hurdle is toothless for maintaining a level playing field and therefore does not meet the NCAA's Title IX obligation to preserve equal opportunities for women.

416.   For the reasons explained above, the NCAA Transgender Eligibility Policies disparately and adversely impact women and reducing their opportunities and increasing their risks to participate in college sport.

417.   The next section explains further how in practice the NCAA's policies have harmed Plaintiffs and other women similarly situated, depriving them of equal, safe and fair opportunities to compete in college sport.

418.   The NCAA Transgender Eligibility Policies deter participation in intercollegiate athletics by women through providing insufficient information for women to protect their personal safety in sport, reducing competitive fairness in competitions, including NCAA Championships, increasing safety risks for women competing in intercollegiate sports, and causing dignitary harm to women by elevating controversial social policies which attempt to redefine "females" and

prioritizes the rights and interests of men over implementing Title IX and

protecting scholastic sports opportunities for women.

## 2022 NCAA WOMEN'S SWIMMING AND DIVING CHAMPIONSHIPS

### Discussions Between NCAA and Georgia Tech to Host 2022 NCAA Division I Women's Swimming and Diving Championships

419.   The GTAA, on behalf of Georgia Tech, entered into an agreement

with the NCAA to host the 2022 NCAA Division I Women's Swimming and

Diving Championships at the McAuley Aquatic Center, a public building, on the

Georgia Tech campus.

420.   Pursuant to the event bid specifications and hosting agreement with

the NCAA, Georgia Tech and GTAA gave the NCAA the privilege to operate and

control the McAuley Aquatic Center during the period of the Championships.

421.   The venue guidelines specified, to which both GTAA and Georgia

Tech agreed, gave the NCAA "operational control" of the McAuley Aquatic

Center during the period of the Championships.

422.   At all other times the operation and control of the McAuley Aquatic

Center was a public function that was traditionally the exclusive prerogative of

Georgia Tech, and on information and belief, Georgia Tech ceded control of that

function to GTAA.

423.   Without the delegation of control by Georgia Tech and GTAA, no one other than Georgia Tech or GTAA has a say in how the McAuley Aquatic Center is run.

424.   Pursuant to the NCAA Board of Governors event hosting policies and Bid Questionnaire the NCAA required Georgia Tech and GTAA to have extensive interactions with the NCAA regarding the NCAA's Transgender Eligibility Policies and the handling of matters involving transgender athletes, coaches and athletics staff members from participating schools during the period of the Championships.

425.   To host the Championships, Georgia Tech and GTAA were required to conform to the directions of the NCAA to comply with the NCAA Transgender Eligibility Policies and the terms of the Board of Governors' event hosting policies, including those aspects of the NCAA Transgender Eligibility Policies which violated Title IX and the Equal Protection Clause and Georgia Tech and GTAA officials agreed to do so.

426.   In this respect, Georgia Tech and GTAA officials were required to take an active role in the decision-making process related to implementation of the NCAA's Transgender Eligibility Policies at the 2022 NCAA Championships and that led to Lia Thomas participation in the event and to Thomas' use of the women's locker rooms at the event.

427.   Had Georgia Tech and GTAA officials not agreed to go along with implementation of the NCAA Transgender Eligibility Policies at the 2022 NCAA Championships, the NCAA would likely have withdrawn the event as multiple public announcements from the NCAA Board of Governors state.

428.   Pursuant to the NCAA's bid specifications which Georgia Tech and GTAA agreed to, Georgia Tech and GTAA were required to identify a Tournament Manager. The function of the Tournament Manager is to ensure the policies of the sport committee and NCAA are implemented and followed in the administration of the tournament. Specific responsibilities include: direction and supervision of competition venue arrangements, development of participant information, security, lodging, transportation, marketing, financial administration, securing a diverse staff and adherence to policies outlined in the NCAA tournament manual.

429.   The Tournament Manager, who was a representative of Georgia Tech and GTAA, was required to be familiar with the Bid Questionnaire and the NCAA Transgender Eligibility Policies and to agree to fully implement all NCAA policies as required by the NCAA.

430.   Georgia Tech and GTAA also appointed a Facility Manager to work with the NCAA in the production of the Championships. The Facility Manager appointed by Georgia Tech and GTAA assisted the NCAA with direction and supervision of competition venue arrangements including the locker rooms and this

Georgia Tech and GTAA representative as well had to agree to implement the

NCAA Transgender Eligibility Policies at the venue, particularly in relation to

locker room usage.

431.   During the lead up to the 2022 NCAA Championships and throughout

the course of the event, Georgia Tech and GTAA employees and representatives

worked side-by-side with NCAA staff to ensure the successful fulfillment of all

logistical challenges incident to staging a major sporting event and the

implementation of all NCAA policies including the NCAA Transgender Eligibility

Policies.

432.   Georgia Tech and GTAA were required to submit a safety and

security plan and an emergency management plan for review and approval by the

NCAA.

433.   Georgia Tech and GTAA were required to submit a marketing plan

and budget for the event and negotiated with the NCAA over these terms.

434.   Georgia Tech and GTAA made its staff available to undertake

security, maintenance, facilities management, and equipment operation roles,

among other things, and Georgia Tech and GTAA staff regularly participated in

strategic meetings with NCAA staff to jointly staff and plan the event.

435.   The NCAA's bid specifications require NCAA Championship event hosts to work collaboratively with the NCAA to create positive experiences for its student athletes, participating institutions, fans and the community.

436.   The preparation for the Championships involved Georgia Tech and GTAA in planning for protests related to Thomas' participation in the Championships and the NCAA made clear its expectation that Georgia Tech and GTAA would comply in every way with the NCAA's Transgender Eligibility Policies, including its policies requiring Thomas to have full access to the women's locker room, and Georgia Tech and GTAA complied.

437.   Georgia Tech and GTAA had financial incentives for entering into agreement with the NCAA to host the 2022 National Championships and sought to profit financially from hosting the Championships as well as to increase its stature and public visibility through hosting the event and it was willing to participate in implementing and enforcing the NCAA's Transgender Eligibility Policies to do so.

438.   Georgia Tech, GTAA, President Cabrera, any number of other Georgia Tech and GTAA officials the University System of Georgia and the Members of the Board of Regents or any one of them could have prevented the NCAA's Transgender Eligibility Policies from being implemented at the McAuley Aquatic Center had they chosen to do so by simply refusing to allow the policies to be implemented in the Aquatic Center and refusing to allow the event to go

116

forward if the NCAA did not desist from enforcing its Transgender Eligibility Policies at the 2022 National Championships.

439.   Through the Bid Questionnaire and related communications Georgia Tech knew well in advance that it was being required to comply with the NCAA's Transgender Eligibility Policies and was not caught off guard but made a conscious and volitional choice to join the NCAA in enforcing the policies.

## Public Awareness of Lia Thomas' Participation in 2022 National Championships

440.   As a result of significant media attention given to Lia Thomas' competition in NCAA Division I Women's Swimming events during the 2021-22 collegiate season there was significant advance public awareness that a trans-identifying male would likely be competing at the 2022 National Championships at Georgia Tech.

441.   As a result of this public awareness and media attention it is likely that the individual members of the Board of Regents of the University System of Georgia were aware of Lia Thomas' upcoming participation in the event and were advised of the NCAA's Transgender Eligibility Policies and how they would be enforced at the event.

442.   Administrators at Georgia Tech and GTAA were contacted by NCAA officials, required to review the Bid Questionnaire and, as indicated in the Board of Governors' public statements, had to provide their assurances that the NCAA's

117

Transgender Eligibility Policies would be applied at the 2022 National Championships hosted by Georgia Tech and GTAA.

443.   On March 2, 2022, the NCAA announced the 281 swimmers who qualified for the 2022 NCAA Division I Women's Swimming and Diving Championships.[60]

444.   The 41 divers who qualified were to be announced on March 10, 2022.

445.   The field at the 2022 NCAA Championships was an elite one, comprised of the best collegiate women's swimmers and divers in the country, including numerous All Americans and Olympic and World Championship competitors from the U.S. and other countries.

446.   Hundreds of student-athletes who competed in the 2022 NCAA Championships received federal financial assistance and attended NCAA member institutions which received federal financial assistance.

447.   In the lead-up to the 2022 NCAA Championships female athletes traveling to Georgia to compete from schools across the country began receiving the same message from coaches, compliance staff, sports information directors and

---

[60] https://www.ncaa.com/news/swimming-women/article/2022-03-02/2022-ncaa-division-i-womens-swimming-and-diving-championships-qualifying (accessed Mar. 14, 2024).

other university staff: that criticism of the NCAA for permitting a male bodied

athlete to compete in the women's competition would not be tolerated.

448.    Women student-athletes were warned that they were scholarship

athletes and did not have the right to speak out on this issue.

449.    However, none of the Plaintiffs were told by their coaches, school

representatives or the NCAA that they would have to share a locker room with Lia

Thomas, a six-foot four inch adult man with full male genitalia.

### Locker Room Availability for Female Swimmers and Divers
### at the McAuley Aquatic Center on the Georgia Tech Campus

450.    The locker rooms at that the McAuley Aquatic Center are operated by

GTAA and Georgia Tech.

451.    Pursuant to the policies and practices of GTAA and Georgia Tech,

before the 2022 NCAA Championship the McAuley Aquatic Center women's

locker room operated by GTAA and Georgia Tech was at all times used by, and

available only for use by, women.

452.    While operated by GTAA and Georgia Tech the women's locker

room at the McAuley Aquatic Center was not accessible by men, including trans-

identifying men, prior to the 2022 NCAA Championship.

453.    Due to the number of athletes who would be competing at the 2022

NCAA Championship the decision was made by GTAA and Georgia Tech in

consultation with the NCAA to convert both locker rooms, the women's locker

room and the men's locker room, to women's only locker rooms for the entirety of the 2022 NCAA Women's Swimming and Diving Championships.

454.   Without intervention by the NCAA both locker rooms at the McAuley Aquatic Center during the 2022 NCAA Women's Swimming and Diving Championships would have been available only to, and accessible only by, women in accordance with the policies and practices of GTAA and Georgia Tech.

455.   However, pursuant to the NCAA Board of Governor's locker room policy for NCAA Championships and pursuant to the NCAA Board of Governor's Bid Questionnaire, and instructions by the NCAA Board of Governor's regarding upholding the NCAA Transgender Event Policies, NCAA officials met with GTAA and Georgia Tech officials to convince them to change the policies and practices of GTAA and Georgia Tech regarding operation of the women's locker rooms during the period of the 2022 Women's NCAA Championships.

456.   But for the insistence of NCAA officials that Lia Thomas be admitted to the women's locker rooms at the McAuley Aquatic Center during the 2022 NCAA Women's Swimming and Diving Championships Thomas would not have been admitted to those locker rooms.

457.   However, due to the insistence of the NCAA officials and the agreement of GTAA and Georgia Tech officials to change their policies and practices regarding admitting men to women's locker rooms, Lia Thomas was

given access to the women's locker rooms at the McAuley Aquatic Center during

the 2022 NCAA Women's Swimming and Diving Championships.

458.   The locker rooms at the McAuley Aquatic Center that were used for

the event are relatively small, such that swimmers and divers disrobing in them are

generally within 10-15 feet of most of the other athletes in the room.

459.   Modern technical swimsuits in which competitors in the NCAA

Division I Women's Swimming and Diving Championships compete are very

difficult to put on and take off due to the tightness of the suits and the materials

from which they are made.

460.   It is not uncommon for it to take 30 or 40 minutes for a female

competitor to put on a competition suit, and almost all swimming and diving

athletes require at least 15-20 minutes to put on their "tech suit."

461.   Thus, while putting on their swimsuits women must stand or sit

undressed or partially clad and with the private parts (*i.e.*, breasts, buttocks, and

genital area) of their bodies exposed for long periods of time, making the process

of putting on competition swimsuits a private activity that many women swimmers

and divers prefer to engage in only in a secure and safe place, shielded from male

access.

462.   Additionally, during a competition such as the 2022 NCAA Division I

Women's Swimming and Diving Championships competitors must frequently

change swimsuits and attire, often changing from street clothes or warm up gear to

practice swimsuits for practice or warming up and to competition or tech suits

shortly before competing and back into street clothes or warmup gear or a practice

swimsuit. A competitor may have to repeat this cycle of dressing, undressing, and

showering multiple times in a single day, particularly if they are competing in

more than a single event.

463.   Nationals is different from in-season competitions for several reasons,

not only are there far more athletes, and the pressure is higher, but at a national

championship the athletes are changing with far more strangers in the room. All of

these factors argue in favor of a need for greater, rather than lesser, privacy

standards.

464.   To accommodate the large number of women swimmers and divers

for the Championships both the locker room regularly designated as a women's

locker room and the locker room regularly designated as the men's locker room

were reserved by the NCAA and GTAA and Georgia Tech for use of the women

swimmers and divers.

465.   However, unbeknownst to all or most female swimmers and divers, by

agreement of the NCAA and GTAA and Georgia Tech, both locker rooms

(including the adjacent restrooms) were designated as "unisex" in order to permit

Thomas uninhibited access to the locker rooms and restrooms used by, and designated for, the women swimmers and divers.

466.   No *written* "unisex" designation or warning was, however, placed on the locker rooms or restrooms.

467.   Nor were any of the Plaintiffs who competed in the NCAA Championships advised that the locker rooms had been temporarily designated "unisex" and that there was no locker room where female swimmers and divers could disrobe and dress in private without the prospect that a male would intrude upon their privacy.

468.   Thus, throughout the 2022 NCAA Division I Women's Swimming and Diving Championships Thomas, who is approximately six feet four inches tall and possessed full male genitalia, had complete and unrestricted access to the women's locker rooms, showers, and restrooms at the McAuley Aquatic Center.

469.   The first time most of the Plaintiffs became aware of Thomas' access to the women's locker rooms and restrooms at the McAuley Aquatic Center was: (1) when Thomas walked in on them while they were fully naked or in a state of substantial undress, revealing their bodies and private parts to Thomas and subjecting them to distress, shame, humiliation and embarrassment, (2) when they unwittingly walked in on Thomas and observed Thomas undressed with male genitalia exposed, subjecting them to distress, shame, humiliation and

embarrassment, or (3) when Thomas undressed in front of them, causing them distress, shame, humiliation and embarrassment.

470.   Swimmer A had no advance warning she would encounter a male body in the locker room at the NCAA Championships.

471.   On the first competition day Swimmer A walked into the locker room and was shocked to see a naked Thomas 10 feet in front of her and a full-frontal view of Thomas' male genitalia.

472.   Swimmer A found the experience "disturbing" and "violating," and promptly gathered her belongings and walked into the hallway without changing.

473.   Swimmer A immediately felt physical symptoms of a racing heartbeat and a racing mind. It felt like someone had "flipped an adrenaline switch" and she experienced a "huge element of shock." She was "upset."

474.   As Swimmer A thought about what had happened, she thought "I really don't like this" and she felt "very uncomfortable" and realized that for the rest of the competition she would have to "change [her] approach" and a focus for her would have to be "trying to navigate the locker room."

475.   She felt this had a "negative impact" on her trying to prepare to compete as she had to try to "mentally multi-task" to figure out how she could try to maintain privacy while she was preparing to compete.

476.    The next day Swimmer A "decided to brave the locker room" because she had to put on her racing suit, a difficult and time-consuming chore.

477.    As she walked in, she saw Thomas in the locker room changing.

478.    She again felt sensations of anxiety and went to the adjacent bathroom where she changed in a bathroom stall even though changing in bathroom stalls is not supposed to be done by the swimmers and is difficult because of the reduced space and difficulty of getting into the racing suit.

479.    It took Swimmer A 30-minutes in a bathroom stall to get into her tech suit.

480.    Swimmer A's perspective on NCAA Nationals was that the locker room experience very much detracted from her preparation to compete and "that's the last thing we should have to focus on at a NCAA Championship."

481.    On one of the early days of the NCAA Championship Kylee Alons saw Thomas in the locker room; that was the first moment that Kylee understood that Thomas had access to the women's locker room.

482.    From that moment on, the locker room became an "uncomfortable" place for Kylee.

483.    She was "stressed out" by having a male body in the locker room. She felt that her "privacy and sense of safety was violated." "It was not a private locker room anymore."

484.   She also recognized that "any male official or other man could walk into" the locker room, as the NCAA and GTAA and Georgia Tech were not protecting women's privacy.

485.   As a result, Kylee looked for another place to change and found an equipment storage closet in an area behind the bleachers.

486.   Kylee said that although she much preferred changing in the women's locker room at meets where that was a safe space, at the point in the 2022 NCAA Championships when she began using a storage closet to undress and change clothes and swimsuits, she was just "relieved" to be able to change in some place that had more privacy from men than the women's locker room did at that moment.

487.   Kylee was disappointed that the NCAA never got women swimmers' feelings on the topic of locker room access.

488.   Because the NCAA never reached out and just assumed female athletes would go along with having no dedicated women's locker room or changing area, Kylee felt disrespected and taken advantage of.

489.   Kylee believes NCAA officials were well aware of how much pressure the women competitors would be under at the NCAA Championships and felt they could "take advantage of us."

490.   She noted that, "men don't have to go through this."

491.   Kylee felt the way the NCAA handled the entire meet was very disruptive to concentration and competing at her best.

492.   Riley Gaines "had no idea that Thomas was going to be using the women's locker room until he was in the locker room."

493.   Riley remembered the moment she found out about Thomas' locker room access.

494.   Riley described the locker room at a swimming competition as a place where women are "vulnerable" but it is not a quiet place.

495.   Riley recalled that in this moment girls were laughing, chatting, crying.

496.   Riley said she was "fully undressed" amidst the typical locker room clamor, when the room suddenly became silent, and Riley turned around to see Thomas "towering over every girl in the room."

497.   Riley, who had no clothes on, was mortified and said she, "felt very uncomfortable and wanted to hide."

498.   Riley said it was "dead silence" in the room before she let out an "uncomfortable laugh," although she was "hurting inside."

499.   Riley recalled, "Thomas put his things down near her" and immediately "took all his clothes off."

500.    Riley pulled her clothes on and immediately went to the pool deck to find an NCAA official.

501.    Riley found a male wearing an official's uniform and demanded to know why there was a male body undressing in the women's locker room.

502.    The official's response to Riley was: "we had to get around this by changing the locker room to unisex."

503.    Although Riley was distressed by the thought of changing day-after-day in the locker room with Thomas, she did not see any other option.

504.    Riley was scheduled to swim in multiple events on three out of the four days of the Championships which required many changes of swimsuits and clothing daily. Her heavy competition schedule did not allow time for diversions.

505.    Thereafter, Riley used the locker room with the added burden and worry of the need to shield her body with towels and trying to change as quickly as possible. Every day she felt uncomfortable about the entire experience.

506.    Kaitlynn Wheeler was with her teammate Riley in the locker room and like Riley was also undressed when Thomas walked into the women's locker room.

507.    Kaitlynn too felt emotions of shame, desperation and humiliation and longed to be anywhere else in that moment.

508.   For Kaitlynn it was a traumatic moment that has driven her to speak up for other women as she hopes her sisters, her nieces, and other women never have to go through such a degrading experience where bodily privacy is violated without consent.

509.   Grace Countie was also surprised to see Thomas in the locker room at the Championships and, like fellow plaintiffs Swimmer A, Alons, Gaines, and Wheeler, had not been advised in advance that Thomas would be using the women's locker room, nor was she or Swimmer A, Alons, Gaines, and Wheeler instructed or advised that there was any other location in which they could change than the locker rooms to which Thomas had access.

510.   Grace had anticipated that Thomas would be instructed to change in a separate space from women.

511.   She felt uncomfortable to be changing in the same room as Thomas and sought each day to change quickly into her technical swimming suit to avoid being in the locker room with Thomas while she was changing was stressful.

512.   For Grace having to change in a locker room to which a male had access did not feel safe and she felt it detracted from her ability to concentrate and perform at the highest level at the 2022 National Championships.

513.   The actions, policies and/or practices of the NCAA and the Georgia Individual Defendants and/or GTAA or the Board of Regents to provide Thomas

access to the women's locker rooms, restrooms, and showers at the 2022 NCAA Division I Women's Swimming and Diving Championships caused significant mental and emotional disruption for women preparing to compete in one of the most significant athletic competitions of their lives and adversely affected the ability of many women to prepare for their competitions.

514.    The locker room, showers, and restroom policies and/or practices to which they were subjected during the 2022 National Championships caused some women, including one or more Plaintiffs, to engage in difficult, uncomfortable, and degrading responses such as "deck changing," *i.e.*, changing or disrobing in one's parka in a hallway or other area to avoid exposure to Thomas, furtively changing in a storage closet, and/or not showering or not changing and as a result wearing wet clothing on the team bus.

515.    Plaintiffs' experience was that the locker room, showers, and restroom practices ruined the competition for them and was a significant distraction that undermined their focus and competitive edge and thereby impugned the fairness and integrity of the competition.

516.    Additionally, these women lost the opportunity for camaraderie that they typically experience in the locker room at meets.

517.    Kylee Alons said, in place of that camaraderie was a pervasive sense of: "Why can't we get the respect that male competitors would get?"

518.   For many women, the trauma caused by the locker room, showers, and restroom actions and practices thoroughly undermined their ability to enjoy the achievement of competing at the most significant swimming competition at which they would ever have the chance to compete in their lives.

### Competition at the 2022 NCAA Championships

519.   The McAuley Aquatic Center pools were open for training and warmups on Wednesday, March 16, 2022.

520.   The first competitions contested in the Championships were two relays conducted on Wednesday evening.

521.   The NCAA Women's Swimming and Diving Championships is one of the most noteworthy and memorable competitions in which a female swimming or diving athlete can compete.

522.   For all Plaintiffs this elite event, more competitive than many World Cup races and other international competitions, was one of the most, and for some, the most, significant athletic competition(s) in which they would ever participate.

523.   Yet, for all their hard work, training, passion, determination, and extraordinary level of physical fitness, these young athletes were vulnerable.

524.   They were vulnerable to the views of peers on the college campuses to which they would soon return.

525.    They were vulnerable to the powerful effect of their own hopes, dreams and aspirations which compelled them to try to focus on their competitions and avoid distractions at all costs.

526.    They were vulnerable to the rules of the NCAA by which they could be disqualified and to the aura of the NCAA which they dared not challenge.

527.    The NCAA and its leaders were aware of these vulnerabilities, and they relied upon them when adopting and applying the NCAA's locker room policies and they played upon these vulnerabilities to create an environment that discouraged women from drawing attention to the loss of bodily privacy of women that during the period of the National Championships would daily take place just outside the public's eye.

528.    For the reasons described above, the women competitors were already disadvantaged by the time the Championships started.

529.    The stress of the competition only increased the isolation, disadvantage, and sense of unfairness they experienced.

530.    Each competition day at the Championships in which individual races (as opposed to relays) are contested involves Heats in the morning, followed by Finals in the evening.

531.   The evening Finals are divided into an A Final (or "Championship Final") comprised of the 8 fastest swimmers in the Heats and a B Final (or "Consolation Final") comprised of the next 8 fastest swimmers in the Heats.

532.   Each placement in the Finals is significant.

533.   Swimmers' teams receive a descending value of points for each of the 16 places won in the A and B Finals.

534.   Thus, the places in which the top 16 swimmers finish directly affect the team competition.

535.   Additionally, competitors in the A Final are named "All-Americans," while competitors in the B Final are named "Second Team All-Americans."

536.   It is a great honor just to compete in either Final in the evening session.

537.   Further, the NCAA awards trophies and an opportunity to stand on the podium to the top five finishers in each A Final.

538.   Thus, for each A Final in which Thomas competed, a woman who otherwise would have competed in that A Final was knocked down to the B Final.

539.   For each Final in which Thomas competed, a woman who otherwise would have competed in the B Final was knocked out of the B Final, losing the honor of competing in the evening session and the opportunity to win points for her team.

540.   Of course, one of the points of an athletic competition is placement, therefore, regardless of All-American awards or trophies, each place and each rank in a NCAA championship or other NCAA competition is of value to those who compete in it.

541.   Thus, each competitor who lost a placement or rank to an ineligible athlete necessarily experienced a devaluation of the competitor's placement in the competition.

542.   The female athletes recognized the supreme advantage possessed by the 6-foot 4-inch Thomas who was far bigger than any other swimmer at the competition and was the only swimmer who possessed the biological advantage of a male body structure, strength, power and increased aerobic capacity.

**WOMEN'S 500-YARD FREESTYLE EVENT**

543.   Kylee Alons, Reka Gyorgy, and Lia Thomas were three of the 60 entrants in the 8 Heats of the women's 500-yard freestyle contested on Thursday, March 17.

544.   Plaintiff Reka Gyorgy, an All-American swimmer from Virginia Tech University, knows from experience what a career milestone and achievement it is to compete in the NCAA Women's Swimming Championships.

545.   Reka competed in the 2016 Olympic Games for the country of Hungary and in multiple European Championships and she competed in several NCAA Championships.

546.   As an Olympian and experienced international swimmer Reka confirms from personal experience that the NCAA Women's Swimming Championships is one of the fastest meets in the world.

547.   The depth in the NCAA Finals can be even deeper than at the Olympic Games because there are limits at the Olympics on how many swimmers from each country can compete.

548.   Reka came into the 2022 NCAA Championships excited to be able to compete in what she knew would be one of the last competitions in her career.

549.   In the 500 free Reka strongly hoped to make it to the Finals and obtain an All-American ranking.

550.   The field in the 500 free was very accomplished and Reka knew that she would have to give it her best.

551.   After she completed her Heat, Reka sat in the stands watching the other competitors with pressure mounting. Finally, she watched Heat 8, the last of the heats for the 500 free, a heat in which Thomas would compete and win.

552.   When the times flashed on the board from Thomas' heat, Reka realized immediately that she had fallen to 17th place and would miss competing in the Consolation Final by one placement.

553.   Shortly afterwards Reka walked outside the venue where she cried in the hallway with a friend.

554.   Reka later shared that missing out on the Consolation Final in the 500 free in her last collegiate swimming competition was the biggest disappointment of her career.

555.   It was a very difficult way for an Olympian to end her collegiate career, deprived of an opportunity to race in a Finals event because the NCAA had allowed a male swimmer into the competition.

556.   After the 500 free Reka poured out her heart in a thoughtfully composed letter to the NCAA in which she explained how unfair the rules are that allowed Thomas to compete against women.[61]

557.   Reka handed her letter to an NCAA official on the last day of the Championships.

558.   No one at the NCAA has ever responded to Reka's letter.

---

[61] An accurate copy of the content of Reka's letter to the NCAA is attached as **Appendix F**.

559.   Reka found it ironic that at the 2022 National Championships the NCAA was passing out t-shirts celebrating "50 years of Title IX."

560.   Looking back, Reka believes that the NCAA showed through its actions at the 2022 National Championships that the NCAA does not care about protecting women or their rights.

561.   Although the NCAA never responded to Reka's letter, the Hungarian Swimming Federation found out about her letter and thanked Reka for sending it.

562.   Reka was told the Hungarian Federation sent her letter to the international swimming federation and urged the international federation to change its rules to provide more protection for women.

563.   The Championship Final was won by Thomas with a time of 4:33.24. Emma Weyant (Virginia) finished second in 4:34.99. Erica Sullivan (Texas) finished third in 4:35.92. Brooke Forde (Stanford) swam a personal best of 4:36.18 to finish fourth.

564.   The second, third and fourth place finishers in the Final won by Thomas were all previous Olympic medalists for the United States and fifth place finisher Kensey McMahon competed for the U.S. in the 2022 World Championships.

565.   Thomas finished over a second-and-a-half in front of the nearest competitor.

566.    Tylor Mathieu of the University of Florida was the ninth fastest swimmer in the prelims, missing out on competing in the Championship Final due to Thomas' participation.

567.    By finishing in first place Thomas achieved 20 points for the UPenn Team.

### WOMEN'S 200-YARD FREESTYLE EVENT

568.    On Friday, March 18, 2022, the Women's 200-yard Freestyle was contested with the first of seven prelims beginning at 10:47 am and the Consolation Final at 6:35 pm and the Championship Final at 6:40 pm.

569.    Riley Gaines competed in Heat 6 of the prelims of the 200-yard Freestyle at 10:59 am. Thomas competed in Heat 7 of the prelims at 11:02 am.

570.    Both Riley and Thomas qualified for the Championship Final, with Thomas competing in Lane 5 due to a faster prelim time and Riley in Lane 1. Riley was disadvantaged in the Championship Final by Thomas' participation in the prelims because Riley was required to swim in lane 1 (an outside lane) in the Final but would have competed from Lane 7 had Thomas not participated in prelims.

571.    Riley entertained strong doubts about whether she should even compete in the Championship Final against Thomas.

572.    Riley was concerned that by participating she would be endorsing the NCAA's discrimination against women.

138

573.   Ultimately, however, her loyalty to her teammates caused Riley to compete.

574.   In the Championship Final Riley touched the wall and immediately searched for Thomas' name on the screen and saw a "5" next to it, signifying Fifth place.

575.   Riley felt momentary pride for the women swimmers who had finished in front of Thomas.

576.   Then, Riley looked for her own name and saw a "5" next to her name. She was shocked.

577.   Riley and Thomas had tied for Fifth place in a time of 1:43.40.

578.   By finishing in a tie for Fifth place both Riley and Thomas were awarded 13.5 points for their respective teams, and Fifth place winners were to receive a trophy.

579.   Had Riley finished in Fifth place alone she would have received 14 points for the University of Kentucky Swim Team.

580.   Riley Gaines' and Kaitlynn Wheeler's University of Kentucky team finished the National Championships in 12th place with 115.5 points, just .5 points behind Indiana University in 11th place.

581.   As she prepared to participate in the podium ceremony following the Championship Final for the 200 free, Riley was told that there was only a single

Fifth Place trophy, and the NCAA had decided Riley would not be permitted to hold the trophy on the podium.

582.    Instead, only Thomas would be allowed to hold the Fifth place trophy.

583.    Riley was perplexed and she questioned a meet official about why she would not be allowed to also hold the Fifth-place trophy she had won but instead a "male" would be holding the Fifth-place trophy.

584.    The official said that they were proceeding in "chronological order." To which Gains responded: "What do you mean? We tied with the exact same time."

585.    Riley asked: "Do you mean alphabetical order? Because Gaines comes before Thomas."

586.    At that, the official appeared to soften and responded, "I'm so sorry, we have been advised that when photos are taken it is crucial that Lia Thomas holds the trophy."

587.    Thus, the NCAA purposefully deprived Riley Gaines of her podium moment with the trophy she won and should have been able to hold on the podium, for the achievement of finishing Fifth in the women's 200 free at the 2022 NCAA Championships.

588.   Reilly Tiltmann of the University of Virginia was the first woman out of the Championship Final, finishing with the ninth fastest time of 1:43.59 in the prelims.

589.   Ekaterina Nikonova from the University of Florida had the seventeenth best time in the prelims, missing out on competing in the Consolation Final by a single place.

## WOMEN'S 100-YARD FREESTYLE EVENT

590.   The 2022 NCAA Championships concluded on Saturday, March 19, 2022.

591.   Among the events contested was the 100-yard Freestyle in which Kylee Alons, Grace Countie, and Lia Thomas competed.

592.   Thomas had the fourth fastest prelim time at 47.37 and Grace Countie the seventh fastest time at 47.50 and both qualified for the Championship Final. Kylee Alons had the fourteenth fastest prelim time at 48.02, qualifying for the Consolation Final.

593.   Thomas finishing with a faster time in the prelims than Grace pushed Grace to Lane 7, a lane further from the center of the pool which disadvantaged Grace in the Championship Final.

594.   When Grace Countie, a very accomplished 13-time All American swimmer, learned she would be directly competing against Thomas in the

Championship Final the magnitude of the task of competing directly against a male (with Thomas in Lane 6 and Grace in Lane 7) felt so overwhelming and unfair that she began crying on a phone call with a close relative. Grace had never previously cried before facing any opponent.

595.   Grace beat Thomas in the Championship Final, finishing in seventh place in 47.36.

596.   Thomas finished in eighth with a time of 48.18, well off Thomas' pace of 47.37 in the prelim.

597.   Although Grace Countie outperformed Thomas in the Championship Final, she did not have a typical race experience. Having to compete against a male greatly increased her stress level and Grace felt her "stomach doing flip turns" in the ready room.

598.   Grace recalls that during the race she did not execute a race strategy and essentially blacked out from the stress. This was an unusual experience for Grace. She felt deprived of an opportunity to compete at her best due to having to deal with the extra stress of competing against a man.

599.   Grace felt her participation in the event was "like an experiment" and "so wrong." She recalled "waiting for someone to speak up [for women] and no one did." "Nobody said anything."

600.    In the Consolation Final Kylee Alons finished fourth in 47.68, a time that would have beaten Thomas' time in the Championship Final had they been racing head-to-head.

601.    For their finishes Countie earned 12 points for the UNC team, Alons earned 5 points for the NC State team and Thomas 11 points for the UPenn Swim Team.

602.    Isabel Ivey of the University of California, Berkley, was left out of the Championship Final, finishing with the ninth fastest time of 47.61 in the prelims.

603.    Chloe Stepanek from Texas A&M University finished with the seventeenth best time in the prelims, missing out on competing in the Consolation Final by a single place.

604.    As a result of Thomas' three top eight finishes at the National Championships, which totaled 44.5 points, the UPenn Team finished in 20th place at the meet with 44.5 points, ahead of Minnesota (21st), Miami (Florida) (22nd), Virginia Tech (23rd), Duke (24th), Missouri (25th), Arizona State (26th), Rutgers (27th), Arkansas (28th), Yale (29th), Purdue (30th), South Carolina (31st), LSU (32nd), Notre Dame (33rd), Wyoming (tie 34th), UCLA (tie 34th), Florida International (36th), San Diego State (tie 37th), Harvard (tie 37th) and Texas A&M (39th).

605.   Reka Gyorgy's Virginia Tech team would have finished higher in the team competition absent Thomas' participation, as would have at least 20 other teams.

606.   One person can disrupt so much, for so many others.

**Comparing Thomas' NCAA Competition Times Before and After
Transition Demonstrates Thomas' Retained Male Advantage
and the Failure of the NCAA's Transgender Eligibility Policies
to Ensure Equal Opportunities for Women**

607.   On April 5, 2022, *Swimming World Magazine* published a comparison of Thomas' times in NCAA competitions when competing in the male vs. female categories.

608.   *Swimming World's* analysis demonstrates Thomas' Retained Male Advantage when competing in the female category.

609.   The article explained:

Just how much of an advantage did Lia Thomas possess over biological females? The numbers paint a clear picture. The fact that the University of Pennsylvania swimmer soared from a mid-500s ranking (554th in the 200 freestyle; all divisions) in men's competition to one of the top-ranked swimmers in women's competition tells the story of the unfairness which unfolded at the NCAA level.

In her final meet, Thomas finaled in three events at the NCAA Championships, highlighted by a victory in the 500 freestyle. She also finished fifth in the 200 freestyle and was eighth in the 100 freestyle. Although she didn't contest the event at the NCAA Champs, Thomas had one of the country's top times in the 1650 freestyle. Here's a look at her performances throughout the season, including their comparative status to her times as a member of Penn's men's squad.

- In the 500 freestyle, Thomas' time of 4:33.24 from her NCAA-title swim handed her the fastest time in the nation by more than a second over Arizona State's **Emma Nordin** (4:34.87). Additionally, Thomas' difference from her personal best with the Penn men's program was just 6%, as opposed to the typical 10% to 11% difference generally seen between men and women.

- Thomas' best time in the 200 freestyle ended up being her 1:41.93 mark from the Zippy Invitational in December. That effort ultimately ended up 3.76% slower than her best time before her transition. Again, that time was between 7% and 8% faster than the typical separation between men and women.

- When Thomas won the 200 freestyle at the Ivy League Champs in 1:43.12, she was even with runnerup **Samantha Shelton** at the midway point, but crushed the Harvard swimmer over the last 100, highlighted by a 25.04 split for the last 50 yards. The closing split of Thomas was faster than the finishing laps of **Missy Franklin** in her American-record performance, and the best closing effort of the likes of **Katie Ledecky**, **Mallory Comerford** and **Siobhan Haughey**, among others.

- In the 100 freestyle, Thomas' best time prior to her transition was 47.15. At the NCAA Championships, she posted a prelims time in the event of 47.37. That time reflects minimal mitigation of her male-puberty advantage.

- During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, she ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle. As her career at Penn wrapped, she moved to fifth, first and eighth in those respective events on the women's deck.[62]

---

[62] "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," Swimming World Magazine, April 5, 2022, by John Lohn, Editor-in-Chief, *available at*: https://www.swimmingworldmagazine.com/news/a-look-at-the-numbers-and-times-no-denying-the-advantages-of-lia-thomas/. (accessed Mar. 14, 2024)

610.   For nearly two years following the 2022 NCAA Division I Women's Swimming and Diving Championships, Plaintiffs and others similarly situated have dealt with the disappointment, losses of placement, ill treatment, and emotional turmoil, generated by the NCAA's purposeful actions in 2022 and with the lingering effects of the NCAA's Transgender Eligibility Policies which the NCAA put into place then, the harmful effects of which continue to reverberate.

## THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES CONTINUE TO IMPACT WOMEN, RESULTING IN LOST AND UNEQUAL OPPORTUNITIES FOR FEMALE STUDENT-ATHLETES

### Roanoke College Swimmers

611.   In the Fall of 2023, during the current NCAA swimming season, a former member of the NCAA Division III Roanoke College men's swimming team requested to join the Roanoke College women's swim team.

612.   Roanoke College granted the request of the former men's swimming team member to join the Roanoke women's swimming team.

613.   Thereafter, representatives of Roanoke College met with members of the women's swimming team and encouraged them to welcome the transgender swimmer onto the women's team.

614.   Plaintiff Lily Mullens recalled, "[w]e were emotionally blackmailed and asked to carry the responsibility of other people's mental health and wellbeing at the expense of our own."

615.    In response, Plaintiffs Lily Mullens, Carter Satterfield, Halle Schart, Katie Blankinship, Susanna Price, Kate Pearson, and Julianna Morrow (the "Roanoke College Swimmers") and their teammates refused to be coerced and appealed to Roanoke College for protection from having a male swimmer on the Roanoke women's team, and in the women's locker room and showers and at practices, meets and competitions, but in reliance upon the NCAA Transgender Eligibility Policies, Roanoke College rejected their concerns.

616.    The Roanoke College Swimmers communicated to the NCAA, protesting the NCAA Transgender Eligibility Policies, and emphasizing concerns about competitive fairness and locker room usage. However, the NCAA did not respond.

617.    The male swimmer participated in practices with the Roanoke College Swimmers in preparation for the season.

618.    The Roanoke College Swimmers have been injured due to the NCAA's promulgation and enforcement of its Transgender Eligibility Policies. They suffered significant stress and emotional and mental anguish and lost time and money protesting application of the NCAA Transgender Eligibility Policies to their team.

619.    The Roanoke College Swimmers suffered pushback from other students and from the administration and staff of Roanoke College when they

protested the application of the NCAA Transgender Eligibility Policies which would not have happened had the policies not been adopted by the NCAA.

620.  Lily Mullens said, "[t]his has been too great a burden to bear for many of our teammates who have lost hours of sleep, many tears, and the will to train to race a swimmer who has an advantage in the water that our bodies may never possess."

621.  Another Roanoke women's swim team member, Senior Bailey Gallagher, was reported in the media to have said, "I could not eat, could not sleep, and spent a lot of time dealing with anxiety concerned with how this was going to get resolved."

622.  Plaintiff Kate Pearson said, "[o]ur school was prioritizing one individual swimmer over 17 women whose only request was fairness."

623.  Each of the Roanoke College Swimmers experienced mental anguish, and the loss of time and resources expended on the eligibility matter.

624.  Upon learning of the plight of the Roanoke College Swimmers Riley Gaines and a former UPenn teammate of Thomas', Paula Scanlon, joined the Roanoke College Swimmers in a press conference to bring the Roanoke College Swimmers' plight, and their school's and the NCAA's refusal to comply with their Title IX obligations, to the attention of the public.

625.   At the press conference Riley Gaines recalled, "[m]y team, when we were going through this a year-and-a-half ago, we all felt the same, but we were scared to say it."

626.   Riley said, "[a]nd so to see all of these girls standing together linking arms, I wanted so badly to be a part of that to support them. To show them that they could do this and show them that it's liberating to speak the truth."

627.   In response to the situation, however, the Roanoke College Board of Trustees met and voted to endorse the NCAA Transgender Eligibility Policies.

628.   The Roanoke College Board issued a public statement expressing the Board's "strong desire to cement our school's approach to similar requests in the future," and stating that the Board had "voted to formally adopt the NCAA policy."[63]

629.   Although the former member of the Roanoke men's swimming team whose application pursuant to the NCAA Transgender Eligibility Policies started the controversy ultimately decided to withdraw from participating on the team, that swimmer's withdrawal did not make the Roanoke College Swimmers whole. It could not, and did not, lessen the anguish they had experienced, and they live with the uncomfortable realization that should this male or another male seek to

---

[63] https://www.roanoke.edu/news/transgender_sports_statement (accessed Mar. 14, 2024).

compete on the Roanoke College women's swimming team, due to the NCAA's Transgender Eligibility Policies, Roanoke College and the NCAA will support the male.

630. Regrettably as well, the Roanoke swimmers have continued to face retaliation and reprisals for having challenged the NCAA's Transgender Eligibility Policies.

631. For instance, Lily Mullens signed an affidavit under oath reporting on a social media posts that said, "have the [women's] swim team drawn and quartered" and "Special fuck you to the transphobic swim team members."

632. She also reported on academic hostility in which swim team members have been deprived of study abroad opportunities in retaliation for their opposition to the NCAA policies.

**All-Atlantic Regional Track and Field Championships**

633. On March 3, 2024, Plaintiff Track Athlete A, a Junior, competed in the women's 200-meter dash in the All-Atlantic Regional Championships in track and field, where transgender athlete Sadie Schreiner of Rochester Institute of Technology (RIT), a male, won the women's 200-meter dash and also broke the women's regional collegiate meet record.

634.   Schreiner has broken numerous women's school and/or conference records and deprived women on Schreiner's team and on the teams of competitors of placements, points, prizes, awards, and recognition.

635.   Schreiner qualified for the Division III national championships where Schreiner finished third in the 200-meter dash and eighth in the 400-meter dash, becoming a two-time NCAA All-American after advancing to the finals in both events.

636.   Because Schreiner is an underclassmen Track Athlete A will compete against Schreiner next year.

637.   Absent the NCAA Transgender Eligibility Policies which violate Title IX Schreiner would not be eligible to compete in NCAA women's sports competitions or on the RIT women's track and field team.

638.   Therefore, the NCAA's Transgender Eligibility Policies have harmed Track Athlete A, causing her to lose placements and points to a male, and the NCAA's Transgender Eligibility Policies will continue to harm her in the future by causing her to lose competitive opportunities, points, and placements to Schreiner in the future.

**Volleyball**

639.   The NCAA rules recognize inherent physical differences between male and female NCAA volleyball athletes. For example, the net height for men's

competition is 7 feet and 11 5/8 inches. The net height for women's competition is 7 feet 4 1/8 inches, a difference of 7 1/2 inches from the height of the men's net.

640. Brooke Slusser plays NCAA Division I women's volleyball at San Jose State University (SJSU).

641. SJSU is a public, state university of the State of California.

642. Brooke transferred from the University of Alabama to SJSU in 2023.

643. Brooke has been the primary setter on the SJSU women's volleyball team during the 2023 and 2024 NCAA seasons.

644. During the 2023 season Brooke played in 115 sets and was an Honorable Mention selection for the All-Mountain West team.

645. Brooke is a scholarship athlete and currently a co-captain of the 2024 SJSU women's volleyball team.

646. Upon transferring to SJSU in the Fall of 2023 Brooke began sharing a residence with four members of the SJSU women's volleyball team.

647. One of the teammates with whom Brooke shared a residence at SJSU in 2023 was Blaire Fleming, a scholarship athlete, who was then a junior and is now a senior volleyball player on the SJSU women's team. Fleming missed part of the 2023 season due to an injury, participating in 61 sets that year.

648. Fleming is a male who identifies as transgender and who claims a female identity.

649.    Fleming previously played at Coastal Carolina University, another NCAA school, and has played at SJSU on the women's volleyball team during the 2022, 2023 and 2024 seasons.

650.    At no point during Brooke's recruitment from the University of Alabama or during the 2023 volleyball season (i.e., approximately August – November) did either SJSU or Fleming advise Brooke that Fleming is a male, even though it was known to SJSU that Brooke was rooming with Fleming.

651.    Brooke was frequently assigned by the SJSU athletic department to room with Fleming on road trips to competitions even though Fleming is male and without Brooke being informed by SJSU that Fleming is male.

652.    Brooke was not aware for months after her arrival at SJSU that Fleming is male.

653.    However, towards the end of the 2023 volleyball season Brooke learned that Fleming is male when Brooke overheard a conversation between two students, who are not members of the SJSU women's volleyball team, in which a statement was made that Fleming is a "guy."

654.    Upon overhearing the remark, Brooke inquired and was told that Fleming is a "dude."

655.   Brooke was surprised to learn Fleming is male, although this was consistent with Brooke's observation that Fleming played volleyball with jumping ability and power that surpassed that of any girl on the team.

656.   As Fleming had not informed Brooke that he was male or transgender, and as the SJSU women's volleyball team coaches had not told the team that Blaire was male, Brooke was initially unsure about how to proceed with this new information.

657.   Brooke ended up not discussing what she had learned about Fleming's true sex for the rest of the 2023-24 school year while she thought about how to respond.

658.   Brooke did learn however that the reason she had been assigned to room with Fleming so often during road trips in the 2023 season was that SJSU officials asked Fleming who he wanted to room with, and he chose Brooke.

659.   At the times she was assigned to room with Fleming during the 2023 season, Brooke had no idea that Fleming was being given the choice of which girl he wanted to room with on team road trips.

660.   In April 2024 an online news article was published stating that Blaire Fleming was male, but Brooke was not immediately aware of the publication of this news article.

661.    When Brooke got back to her apartment near the end of the day that the article about Fleming was published, Fleming and another student asked if Brooke would go with them to get a sandwich because there was something Fleming wanted to say.

662.    At that time, Fleming told Brooke that he was born male and considered himself to be a "transgender woman."

663.    Brooke asked why Fleming had not shared this information with her before, particularly as they had been living together. Fleming responded that there never seemed to be a good time to bring it up, and that he had been afraid that Brooke might not be his friend if Brooke knew the truth. Fleming also said that if Brooke was uncomfortable with it that Fleming would leave the volleyball team.

664.    Brooke responded that while she did not want Fleming to be bullied, Brooke was uncomfortable with Fleming continuing on the SJSU women's volleyball team as she questioned whether it was safe or fair for the other women on the team and for opposing teams for Fleming to compete on the women's team.

665.    Soon thereafter, SJSU officials convened a meeting to address the news article about Fleming's sex.

666.    In this meeting SJSU officials told the SJSU women's volleyball team members that they should not speak about Fleming's sex or gender identity with anyone outside the team.

667.   The women's volleyball team members were told by SJSU representatives that if the women spoke publicly about Fleming being male things would go badly for the team members.

668.   SJSU representatives stated that any information about Fleming's sex was Fleming's information alone and that the women on the team could not share it, that they could not share what they thought about playing with a male, and that they could not speak with others outside the team about any safety or privacy concerns that related to Fleming being male and playing on the SJSU team.

669.   The statements of the SJSU representatives caused Brooke to understand that if she were to protest Fleming's participation on the SJSU team or to speak publicly about harms from Fleming's participation on the SJSU team that she would be disciplined by SJSU and could be suspended or removed from the team and/or have her athletic scholarship taken away.

670.   The members of the SJSU team were told that Fleming's participation on the SJSU women's team was required by NCAA rules and that due to the NCAA rules SJSU had no discretion or ability to prevent Fleming from participating on the SJSU women's team and that SJSU was prevented by NCAA rules from treating Fleming differently in any manner from the other women's team members.

671.   The members of the SJSU team were also told that if they did not go along with Fleming's participation on the team or if they criticized Fleming's participation in any way that pursuant to NCAA rules and pursuant to SJSU's own policies any team member making public statements about their concerns regarding Fleming could be removed from the team.

672.   When the 2024 SJSU women's volleyball team members returned to campus to begin training for the 2024 season, Brooke learned that none of the nine (9) new recruits on the team for the 2024 season had been told that Fleming is male and participating on the women's team as a result of the NCAA Transgender Eligibility Policies, even though this was now a well-known fact to the athletic department and virtually everyone at SJSU.

673.   Brooke became aware that upon learning that one of their teammates was a trans-identifying male, several of the new recruits became upset, as it was too late for them to transfer, and they felt they had been misled.

674.   During practices immediately before the 2024 season Brooke saw that Fleming was hitting the ball with more force than before and far harder than any woman she had ever played against.

675.   It was clear that Fleming had recovered from the injury that had caused Fleming to miss part of the prior season.

676.    Brooke estimates that Fleming's spikes were traveling upwards of 80 miles per hour which was faster than she had ever seen a woman hit a volleyball. She recalls it was "scary" having balls hit that hard at her and unlike anything she had previously experienced in her volleyball career. Brooke recognized that Fleming's spikes significantly increased the risk of her, teammates and opponents being concussed as Fleming hit the ball so hard that if the ball was not blocked at the net by a defender it was difficult for the players to react to Fleming's spike and to even get their hands up in time to deflect a ball away from their face.

677.    Many of the girls on the team spoke with Brooke about their fears of being hit by balls spiked by Fleming and concerns about potential concussions from being hit by a Fleming spike were regularly discussed among the women on the team. Brooke observed that the girls were doing everything they could to dodge Fleming's spikes but still could not fully protect themselves.

678.    Throughout the 2024 pre-season and during their regular in-season practices Brooke and her teammates have been afraid of getting concussed from getting hit in the head by a volleyball struck by Fleming.

679.    Brooke has herself been hit in the head and about her body by volleyball's hit by Fleming causing greater bruising, pain, and discomfort than what Brooke has experienced from similar hits by female volleyball players.

680.    As a team captain Brooke personally spoke to her head coach about the risk of injury to team members from Fleming's hitting.

681.    The SJSU coach responded that having played for a Power 5 school Brooke must have played against male practice players and tried to suggest that Fleming's participation in practices was no different than SJSU using male practice players.

682.    Brooke responded to her coach, "You can't lie to me. At Alabama each of the practice players was warned by the coach that if they hit harder than 70% against the girls they would not ever come back to practice. No college women's team lets their male practice players hit like Blaire is hitting in our practices."

683.    Brooke told the SJSU coach that Fleming's participation in practices, and the fact that the coaches were not asking Fleming to pull back on use of his physical power, was putting everyone on the team at risk of serious injury and she again asked the coach to take steps to protect the women players on the team.

684.    However, the SJSU coach brushed Brooke off and would not talk further about it.

685.    Due to public knowledge that Fleming is male, the SJSU team has received public criticism for having an unfair advantage over other volleyball women's teams they have faced this season.

686.   Brooke and many of the girls on the SJSU women's volleyball team agree with this criticism and agree it is unfair to the teams they are playing that SJSU has a male on their team.

687.   They are also concerned about the risk for injury to the female athletes on teams SJSU faces due to Fleming competing against them.

688.   In a recent game against the University of Delaware, which took place in a tournament at the University of Iowa, a SJSU freshman set Fleming for a spike, and Fleming smashed the ball into the face of a woman on the University of Delaware team's back line, knocking the opposing player to the ground.

689.   Several days after the event, the teammate who had set the ball for Fleming came to Brooke in tears due to feelings of guilt that her set to Fleming had led to the Delaware player being hit in the head. The SJSU player wondered aloud whether she had done the right thing to set the ball for Fleming and whether she was responsible for any injury the University of Delaware player suffered.

690.   Due to public attention to Fleming's transgender status, during the 2024 season SJSU officials have met with all the players on the SJSU women's volleyball team and again instructed the girls on the SJSU women's team that they are not to confirm or state to anyone that Fleming is transgender or male, nor are they permitted to criticize Fleming being on the team, or to state their personal feelings or concerns about the matter, including their safety concerns.

691.   The SJSU officials said the girls should not worry about any media attention they were getting, because the story "hasn't hit any media source that matters."

692.   The SJSU officials have also told the girls that to speak about Fleming being transgender would "take away Blaire's power" and that they "have no right to tell Blaire's story" or to talk about how Blaire being on the team is impacting them.

693.   SJSU representatives have again emphasized to the women's volleyball team members that by allowing Fleming to compete on the women's volleyball team they are following NCAA rules and have no discretion to keep Fleming off the team or to treat Fleming differently than any female.

694.   Again, Brooke questioned these representatives in the team meeting and explained that Fleming's presence on the team caused safety and injury risks for the girls on the team.

695.   SJSU officials told the members of the women's volleyball team that going forward an armed police officer would be traveling with the team because "we heard that safety is your biggest concern."

696.   Brooke and other girls on the team responded that their safety concerns were about what could happen to them at practice and in games due to

Blaire being on the court, and that they did not have safety concerns about anything else.

697.   In a recent game, Brooke was briefly pulled from the game by the SJSU head coach who complained that she had not been setting Fleming enough and the coach ordered Brooke to set Fleming more frequently. Brooke responded that Fleming had not been calling to be set, however, upon returning to the game Brooke complied with her coaches' instruction and set Fleming on multiple occasions after being inserted back into the game.

698.   Due to the NCAA's Transgender Eligibility Policies which permit Fleming to play on the SJSU women's volleyball team and which led to SJSU recruiting Fleming, giving Fleming a scholarship, and allowing Fleming to be in positions to violate Brooke's right to bodily privacy, Brooke has suffered physical and emotional injuries, embarrassment, humiliation, emotional distress, mental anguish and suffering.

699.   Brooke will compete on the SJSU women's volleyball team through at least the Mountain West Conference Tournament which will take place on November 27-30, 2024, and thereafter, should SJSU qualify, in the NCAA Division I Women's Volleyball National Championship tournament in December which will culminate in the NCAA Division I Women's Volleyball National

Championship Finals on December 19-22, 2024, hosted by the University of

Louisville, a public, state university in Louisville, Kentucky.

700.   Nanea Merryman who plays NCAA Division II women's volleyball at

Cedarville University played against a male athlete who was competing on a

women's team in club tournaments in high school. This male athlete was the best

athlete against whom Nanea had ever played and was able to considerably outjump

female players and spike harder than females, giving the male a significant

advantage.

701.   Nanea is aware that this male athlete, who is still in high school, is

being recruited to play college volleyball.

702.   Nanea is also aware of other male athletes playing volleyball at the

high school level and seeking to be recruited to play on women's college or

university teams at NCAA Division I, II and/or III institutions.

703.   Nanea, who is a rising sophomore, has a reasonable concern that, if

the NCAA's Transgender Eligibility Policies are not changed, she will be required

to face male volleyball players in future NCAA women's competitions.

### Track and Field, Soccer, Tennis, Swimming

704.   Plaintiffs Ainsely Erzen, Ellie Eades and Ellis Fox are aware that the

NCAA's Transgender Eligibility Policies have permitted men to compete in

163

NCAA women's track and field, tennis, soccer, swimming, fencing, rowing, softball and likely other women's sports.

705.   For instance, biological male CeCé Telfer won the 400-meter hurdles at the NCAA Women's Division II Outdoor Track and Field Championships in 2019.

706.   Biological male Brooklyn Ross played NCAA Division II collegiate tennis at Lewis University this year.

707.   Biological male Athena Del Rosario played NCAA Division III college soccer at the University of California Santa Cruz for four years.

708.   It is reported that Athena Del Rosario played collegiate soccer for several years before coming out as a transgender individual.

709.   Recently, it was reported that Blaire Fleming, a NCAA Division I volleyball player at San Jose State University in California who has played on the San Jose State women's volleyball team for the past two seasons, is a trans-identifying male athlete.

710.   Prior to the Spring of 2024, it was not publicly known that Fleming was a male athlete competing on the San Jose State women's volleyball team.

711.   As a result, Plaintiffs Eades, Erzen, Fox, Merryman, Slusser, the Roanoke Swimmers and Track and Field Athlete A have reasonable concerns that

due to the NCAA's Transgender Eligibility Policies they will be required to compete against or alongside biological males during their NCAA careers.

712.   Like student-athletes Fleming and Del Rosario discussed above, some biologically male transgender NCAA athletes do not publicly disclose their sex and compete in NCAA competitions on women's teams.

713.   The NCAA does not require to be provided, nor does the NCAA provide or require member institutions or schools to provide, any notice to female competitors, even in Contact Sports and Limited-Contact Sports with a higher risk of collisions and concussions and other injuries, that they will be facing a Male student-athlete in competition.

714.   In fact, the NCAA refuses to make available information to student-athletes regarding whether any of their opponents are males who have been granted the opportunity to compete on a women's team pursuant to the NCAA's Transgender Eligibility Policies.

715.   Biological males have in the past competed in intercollegiate athletics in NCAA Contact Sports and Limited-Contact Sports.

716.   Biological males will continue in the future to compete in intercollegiate athletics in NCAA Contact Sports and Limited-Contact Sports unless the NCAA's Transgender Eligibility Policies are changed.

717.   Given that the NCAA prohibits the disclosure of information regarding the sex of student-athletes, does not conduct sex verification testing, and does not advise women who are facing a male in competition of the sex of a male opponent, each Plaintiff in this case who has remaining collegiate eligibility is concerned that she may not know in advance of competing or participating in future NCAA competitions (or practices or scrimmages) that she will be, or is, facing a male athlete. Indeed, it is possible each Plaintiff could have already played against a (transgender) male athlete unwittingly.

718.   These aspects of the NCAA Transgender Eligibility Policies put Plaintiffs competing in Contact and Limited-Contact Sports at increased risk of injury due to the NCAA's Transgender Eligibility Policies and deprive them of information vital to the women exercising informed consent before competing head-to-head against a male athlete.

719.   All Plaintiffs who currently have remaining NCAA eligibility are, for the foregoing reasons, also at continuing risk of violation of their right to bodily privacy and loss of their opportunity for separate and equal locker room facilities and other safe spaces as a result of the NCAA Transgender Eligibility Policies.

720.   Accordingly, the NCAA's Transgender Eligibility Policies put all Plaintiffs with current NCAA eligibility at increased risk of injury and/or being required to compete against and/or share locker rooms and other women's safe

spaces with biological males and deprive them of information vital to their

personal safety depriving them of equal opportunities in violation of Title IX.

721.   Additionally, the NCAA Transgender Eligibility Policies creates

emotional harm for Plaintiffs as they purport to reduce the identity of women to

personal choice and a testosterone level which devalues women.

722.   Moreover, each of the Plaintiffs has experienced that by taking a

position against the NCAA's policies they have been subjected to public attacks

and labeled as allegedly bigoted or anti-trans activists.

723.   Indeed, Plaintiffs have experienced these aspersions and been subject

to these public attacks merely because of challenging the NCAA's policies in this

case.

724.   Thus, the NCAA's policies create psychological and emotional injury

and dignitary harm for women.

725.   Therefore, all Plaintiffs with current NCAA eligibility seek an

injunction enjoining the NCAA from continued enforcement of its Transgender

Eligibility Policies and requiring the NCAA to prevent men from competing on

women's teams.

## CLASS ACTION ALLEGATIONS

**On behalf of Plaintiffs Swimmer A, Riley Gaines, Reka Gyorgy, Kylee Alons, Grace Countie, Kaitlynn Wheeler, Nanea Merryman, Ellis Fox, Brooke Slusser, The Roanoke College Swimmers, Track Athlete A, and others similarly situated**

726.    Plaintiffs Swimmer A, Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, Grace Countie, Nanea Merryman, Ellis Fox, Brooke Slusser, the Roanoke College Swimmers, and Track Athlete A are identified as putative class representatives to bring one or more class actions under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

727.    The foregoing individuals are adequate class representatives because they have competed as NCAA athletes and have been subject to the NCAA's eligibility rules, they have been injured and threatened with injury as a result of the violations of law described in this Complaint, they are similarly situated to the other members of the proposed classes, and they are actively interested in the claims of the class and willing to discharge all the responsibilities of class representatives.

728.    Through this action, Plaintiffs seek to represent a class of future, current, or past NCAA women's athletes who have competed or may compete against male athletes or who have shared or may share a locker room, shower, or restroom with a male by virtue of the NCAA's Transgender Eligibility Policies.

729.   Plaintiffs anticipate that they may ultimately seek multiple classes or subclasses when they move for class certification, including, but not limited to:

      a.    Women who competed in the 2022 NCAA Women's Swimming and Diving Championships,

      b.    Women who are past, current, or future NCAA athletes,

      c.    Women who are current or future NCAA athletes,

      d.    Women who are current NCAA athletes,

      e.    Women who have competed or may compete at NCAA events in the State of Georgia, and

      f.    Female student athletes at SEC colleges or universities which are subject to NCAA rules.

730.   The class is so numerous that joinder of all members is impractical.

731.   The class size of the class of Women who competed in the 2022 NCAA Women's Swimming and Diving Championships is believed to be approximately 322 individuals.

732.   The exact class size of the remaining classes or subclasses is unknown to Plaintiffs at this time, however, it is expected that the precise number and identification of the class members will be ascertainable from the NCAA's records or the records of NCAA members during discovery.

733.   There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

a.   Does Title IX prohibit competition and participation by males on women's teams in collegiate sport governed by the Association?

b.   Do the NCAA's eligibility rules, or aspects of them, violate Title IX?

c.   Do the NCAA's eligibility rules, or aspects of them, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution?

d.   Do (or has) the NCAA's policies or practices, or aspects of them, violate[d] the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution?

e.   Do (or has) the NCAA's policies or practices, or aspects of them, violate[d] the First Amendment to the U.S. Constitution?

f.   Should the records of the NCAA be changed to remove records set by males competing in the women's category in an NCAA event or in NCAA events because those males should have been ineligible pursuant to law?

g.   Should the eligibility rules of the NCAA be changed to conform them to law?

h.     Should the NCAA be required to advise female athletes when they will be facing or sharing a locker room or other safe space a male competitor?

i.     Did the NCAA and/or the Georgia Individual Defendants and/or GTAA or the Board of Regents, or any combination of them, act under color of law in converting the women's locker rooms to "unisex" and/or allowing Lia Thomas access to the women's locker rooms during the 2022 National Championships?

734.   The putative class representatives' claims are typical of the claims of the class because they, like the class members, have been injured, been threatened with injury, and/or had their rights deprived or threatened to be deprived due to the NCAA's practices or policies and/or the policies or practices of the Georgia Individual Defendants and/or GTAA and/or the Board of Regents acting in concert.

735.   The putative class representatives will fairly and adequately protect the interests of the class because: (a) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (b) their interests are not antagonistic to those of the other class members; and (c) they have engaged counsel experienced in litigating class actions.

171

736.   The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.

737.   Joinder of all class members is impracticable.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(1)**

738.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for one or more Defendants and/or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2)**

739.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate.

740.   Such generally applicable grounds consist of the adoption and/or maintenance by the NCAA of the Transgender Eligibility Policies.

741.   Such generally applicable grounds may also consist of the adoption and/or maintenance by the NCAA in concert with others, including, but not limited to, the Georgia Individual Defendants, GTAA, or the Board of Regents of the University System of Georgia or other Defendants, of policies and practices in violation of Title IX and/or the First and/or Fourteenth Amendments to the U.S. Constitution.

742.   This relief would predominate over monetary relief.

**Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(3)**

743.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3).

744.   The common questions of law and fact identified above predominate over questions affecting only individual members.

745.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

746.   Because all members of the class are geographically dispersed throughout the country and allege that they were subjected to the same Association-wide policy or practice of Title IX and/or constitutional violations, requiring each class member to pursue their claims individually would entail

needless duplication and would waste the resources of both the parties and the judiciary.

747.   The financial burden of proving the NCAA and/or the Board of Regents, GTAA, or other Defendants engaged in such a pattern or practice (or patterns and practices) of discrimination would also make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

## COUNT I

### Title IX Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships

### Against the NCAA, GTAA, and the Board of Regents

748.   Plaintiffs restate the foregoing paragraphs numbered 1 through 725 as if set forth fully herein.

749.   This Count I is brought on behalf of the six Plaintiffs who participated in the 2022 NCAA Championships on behalf of themselves and others similarly situated.

750.   The NCAA runs educational programs or activities receiving direct or indirect federal financial assistance, including but not limited to NCAA Championships, the NCAA Transgender Eligibility Policies and the management of intercollegiate athletics for its members in the six areas identified above in Paragraph 130.

751.   A private right of action for damages and injunctive relief exists to enforce the guarantees of Title IX.

752.   This private right of action can be pursued to rectify discrimination against women in scholastic sport.

753.   A fundamental goal of Title IX and the original Title IX athletics regulations is to guarantee men and women an equal opportunity "to compete in athletics in a meaningful way." Sex Discrimination in Athletic Programs, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975).

754.   The athletics regulations enacted under Title IX provide that, "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 CFR § 106.41(c) (emphasis added).

755.   The reference to "sex" in Title IX is directed solely at binary, biological sex and not at gender identity.

756.   There is no alternative definition of "sex" for transgender persons as compared to nontransgender persons under Title IX.

757.   Under Title IX separate athletic teams for men and women are the norm.

758.   The Title IX regulations regarding scholastic sports authorize "separate teams for members of **each sex** where selection for such teams is based upon competitive skill." 34 CFR § 106.41 (emphasis added).

759.   However, sex separate teams are not merely authorized under Title IX, Title IX requires sex-separation *from men* where women have less opportunity than men without it.

760.   Thus, where sex separation has not been provided by a covered entity, Title IX authorizes women to pursue a remedy enforcing sex separation from men, including separate sports teams, competitions, competitive opportunities, awards, recognition, publicity, showers, and locker rooms, among other things.

761.   Not only must there be such separation from men where necessary to give women equal and meaningful opportunities but separate opportunities for women must be comparable in every way to opportunities for men.

762.   When sports are or must be separated by sex, equal and meaningful opportunity for women requires:

- "the interests and abilities" of women are separately and equally accommodated,[64]

---

[64] Indeed, it is a general principle under Title IX that where single sex activities are provided to one sex, the other sex must be provided a substantially equal single-sex activity. For example, in another part of the Title IX regulations not applicable to scholastic athletics the regulation states that where a party covered by Title IX "provides a single-sex . . . extracurricular activity. . . [they] may be required to

- the women's team and all women's events are as equally open to women as the men's team and all men's events are to men,

- both sexes are provided separate and equal resources, including "locker rooms, practice and competitive facilities,"

- both sexes are provided separate and equal competitions and competitive opportunities, and

- eligibility rules (or other rules) do not burden women more than men.

763.   The NCAA's actions, practices, and/or policies described above deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in the 2022 NCAA Championships and constitutes sex discrimination against women within the meaning of Title IX.

764.   Such discrimination includes, but is not limited to, the NCAA's:

- Implementation and enforcement of the NCAA Transgender Eligibility Policies,

- authorization of Thomas to compete in the 2022 NCAA Division I Women's Swimming and Diving Championships,

---

provide a substantially equal single-sex . . . extracurricular activity for students of the excluded sex…" 34 CFR § 106.34(b)(2).

- granting or awarding eligibility, points, titles, trophies, results, or records, to Thomas based on Thomas' participation in the 2022 NCAA Division I Women's Swimming and Diving Championships, and

- authorization of Thomas to use women's toilets, showers, and/or locker rooms at the McAuley Aquatic Center,

- failing to provide women's toilets, showers, and/or locker rooms at the McAuley Aquatic Center separate from men (in this case Thomas).

765.   A woman's loss of records, awards and/or placement in an athletic competition as a result of competing against a transgender individual constitutes a concrete, particularized and redressable injury under Title IX.

766.   In addition to injunctive relief to correct the records of the sports organizations appropriate relief for such injury may include nominal and compensatory damages.

767.   The purposeful actions by the NCAA upended and undermined the competitive seasons, mental and emotional health and well-being, bodily privacy, and academic and athletic experiences of hundreds of female swimmers and their families.

768.   The NCAA knew that its actions described above violated Title IX and acted in bad faith.

769.   The GTAA (on behalf of Georgia Tech) and the Georgia University System (under the control of the Board of Regents) run programs or activities receiving federal financial assistance and are thereby covered entities under Title IX,

770.   Title IX is also applicable to all public colleges and universities in the State of Georgia directly, through Congress' enforcement power under Section 5 of the Fourteenth Amendment.

771.   Particularly given the high-profile nature of Thomas' qualification for the 2022 NCAA Championships, the NCAA, GTAA on behalf of Georgia Tech, and the Board of Regents on behalf of the University System of Georgia knew or should have known the Discriminatory Impacts and Title IX violations which did occur were likely to occur at the 2022 NCAA Championships.

772.   GTAA, on behalf of Georgia Tech, and the Board of Regents on behalf of the University System of Georgia participated in the NCAA's Title IX violations in 2022 by supporting, recognizing, facilitating, joining in, and implementing the decisions and actions of the NCAA to implement and enforce its Transgender Eligibility Policies and its event hosting policies which resulted in Discriminatory Impacts and in the harms set forth above in violation of Title IX.

773.   The actions, practices, and/or policies of GTAA on behalf of the Georgia Tech and the Board of Regents on behalf of the University System of Georgia deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in in the 2022 NCAA Championships and constituted sex discrimination against women within the meaning of Title IX.

774.   The discriminatory acts of the NCAA, the Board of Regents on behalf of the University System of Georgia, and GTAA on behalf of Georgia Tech were so substantial, severe, pervasive, objectively offensive, and competitively unfair and/or created such a substantial safety risk that they effectively barred access to equal and meaningful opportunities for women competitors in the 2022 NCAA Championships.

775.   The NCAA, the Board of Regents on behalf of the University System of Georgia, and GTAA on behalf of Georgia Tech acted with deliberate indifference to the known Title IX violations which injured Plaintiffs and others similarly situated and acted with conscious or reckless disregard of the rights of, and harms to, Plaintiffs and others similarly situated.

776.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT II

### Title IX Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships

### Against the NCAA and GTAA pursuant to 42 U.S.C. § 1983

777.   Plaintiffs restate the foregoing paragraphs numbered 1 through 725 as if set forth fully herein.

778.   This Count II is brought on behalf of the six Plaintiffs who participated in the 2022 NCAA Championships on behalf of themselves and others similarly situated.

779.   Title IX is further applicable to the NCAA and GTAA pursuant to 42 U.S.C. § 1983 to the extent the NCAA was acting under color of law in connection with the 2022 NCAA Championships.

780.   42 U.S.C. § 1983 imposes civil liability, including legal and equitable remedies, on one:

> who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]

781.   The NCAA and GTAA can be held accountable under 42 U.S.C. § 1983 for actions which violate Title IX where it collaborates or participates in a Title IX violation for which a state actor may also be held responsible.

782.   State action may exist if Georgia Tech or the Board of Regents and/or the University System of Georgia by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor.

783.   With respect to GTAA, Georgia Tech ceded control over its athletic program to GTAA, which serves as the athletic department of Georgia Tech, thus establishing a pervasive and intertwined symbiotic relationship between GTAA and Georgia Tech.

784.   Liability for Title IX violations by agents or employees of Georgia Tech and/or the University System of Georgia may be imposed on the NCAA and GTAA or their agents where either Georgia entity delegates authority to the NCAA or GTAA or provided a mantle of authority that enhanced the power of the NCAA and GTAA.

785.   The NCAA and GTAA acted under color of law when they and Georgia Tech jointly altered the policies and practices of Georgia Tech and GTAA to impose upon all competitors in the 2022 NCAA Championships the Transgender Eligibility Policies of the NCAA.

786.   The NCAA and GTAA acted under color of law when they and Georgia Tech jointly altered the policies and practices of Georgia Tech and GTAA to authorize Thomas to access the women's locker rooms at the McAuley Aquatic Center during the 2022 NCAA Championships.

787.   Acting in concert, the NCAA, GTAA, and Georgia Tech and/or John Does who were agents of Georgia Tech and GTAA or acting under the imprimatur of, or with apparent authority from, Georgia Tech, intentionally authorized and enabled Lia Thomas to compete in the 2022 NCAA Championships, to access the women's showers, locker rooms, and restrooms at the 2022 NCAA Championships and failed to warn the women competitors that Thomas had access to the women's showers, locker rooms, and restrooms at the 2022 NCAA Championships.

788.   The actions, practices, and/or policies of Georgia Tech and/or GTAA and/or the University System of Georgia under the control of the Board of Regents, which are described above, deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in scholastic sport and constituted sex discrimination against women within the meaning of Title IX.

789.   Individuals in a position to control and direct the actions of the Georgia Tech, the University System of Georgia under the control of the Board of Regents, GTAA, and the NCAA had actual knowledge of the discriminatory actions, practices, and/or policies which violated the Title IX rights of the Plaintiffs and others similarly situated.

790.   Georgia Tech, the University System of Georgia under the control of the Board of Regents, GTAA, and the NCAA acted with deliberate indifference to the known Title IX violations which injured Plaintiffs and others similarly situated

and acted with conscious or reckless disregard of the rights of, and harms to, Plaintiffs and others similarly situated.

791.    The discriminatory acts, practices, and/or policies of Georgia Tech, the University System of Georgia under the control of the Board of Regents, GTAA, and the NCAA are so substantial, severe, pervasive, objectively offensive, and competitively unfair and/or create such a substantial safety risk that they deprived Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in collegiate sport at the 2022 NCAA Championships and constitute sex discrimination against women within the meaning of Title IX.

792.    Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT III

### Fourteenth Amendment Equal Protection Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships

**Against the NCAA, GTAA, John Does 1-25, President Cabrera in his individual capacity and the individual members of the Board of Regents and John Does 26-50 in their individual capacities**

793.    Plaintiffs restate paragraphs numbered 1 through 725 as if set forth fully herein.

794.    This Count III is brought on behalf of the six Plaintiffs who participated in the 2022 NCAA Championships on behalf of themselves and others similarly situated.

795.   Georgia Tech University President Ángel Cabrera, the individual members of the Board of Regents of the University System of Georgia and their agents and employees, including John Does 27-50 in their individual capacities, the GTAA, all alongside the NCAA and John Does 1-25, jointly organized the 2022 NCAA Division I Women's Swimming and Diving Championships held at Georgia Tech's McAuley Aquatic Center on the Georgia Tech campus.

796.   Plaintiffs are entitled to enforce their Equal Protection Clause rights pursuant to 42 U.S.C. §§ 1983, 1988.

797.   Pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

798.   The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.

799.   Further, the Equal Protection Clause bars purposeful discrimination based on sex.

800.   Here the NCAA, NCAA agents, GTAA, President Cabrera and individual members of the Board of Regents and individual employees and agents of Georgia Tech and GTAA have implemented athletic policies for intercollegiate competition which purport to divide competitive athletic opportunities equally on the basis of sex by creating separate women's and men's teams.

801. Having done so, the NCAA, GTAA, and those individuals cannot purposefully authorize men to compete on women's teams where women lack an equal opportunity to access competitive athletic opportunities on men's teams.

802. Due to inherent biological differences between men and women which give men and overwhelming sport performance advantage over women in most sports, by implementing the NCAA's Transgender Eligibility Policies in those sports where men have a sport performance advantage the NCAA, GTAA, and those individuals are discriminating against women by knowingly allowing men to deprive women of equal competitive sport opportunities.

803. Men have a demonstrable sport performance advantage in intercollegiate swimming.

804. Therefore, the NCAA, GTAA, and individuals acting under color of law authorizing males to compete on women's intercollegiate swimming teams violates the equal protection rights of women.

805. The NCAA, GTAA, and the above-identified individuals knew that the NCAA had a purposeful policy, namely the NCAA Transgender Eligibility Policies, that discriminated against women by allowing men to access women's competitive athletic opportunities to the detriment of women.

806. Particularly given the high-profile nature of Thomas' qualification for the 2022 NCAA Championships, the NCAA, GTAA, and the above-identified

individuals knew or should have known the Discriminatory Impacts and Equal

Protection violations which did occur were likely to occur at the 2022 NCAA

Championships.

807.   The GTAA and above-identified individuals knowingly invited the

NCAA to conduct the 2022 NCAA Championships in a public facility at the

McAuley Aquatic Center on the Georgia Tech campus over which Georgia Tech,

GTAA, and the Board of Regents had full access, authority and control knowing

that the NCAA intended to implement the NCAA Transgender Eligibility Policies

at the 2022 NCAA Championships, knowing that the NCAA Transgender

Eligibility Policies would divert women's competitive athletic opportunities to a

man, Lia Thomas, to the detriment of women, by allowing a man to compete as a

woman and take points, prizes, awards, recognition, opportunities and publicity

from women and by accessing facilities reserved for women, and nevertheless

agreed with the NCAA, knowingly allowing the NCAA to use the McAuley

Aquatic Center for this purpose, and knowingly supported the NCAA during the

2022 NCAA Championships so that the NCAA Transgender Eligibility Policies

would be implemented and women's athletic opportunities would be given to a

man.

808.   In relation to the 2022 NCAA Championships the above-identified

individuals and Georgia Tech, GTAA, and the Board of Regents so far insinuated

themselves into a position of interdependence with the NCAA that these individuals and entities may be recognized as joint participants in the challenged activities of the NCAA.

809.   By adopting, implementing and enforcing in public buildings on a public university campus the NCAA Transgender Eligibility Policies which discriminate against women and by doing so for financial gain by Georgia Tech, GTAA, and the University System of Georgia and the employees of these institutions, President Cabrera in his individual capacity, individual members of the Board of Regents in their individual capacities, John Does 1-50 and the NCAA, all acting in concert and under color of law, violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by depriving women of equal opportunities, facilities and benefits in comparison of those available to men.

810.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT IV

### Fourteenth Amendment Bodily Privacy Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships

**Against the NCAA, GTAA, John Does 1-25, President Cabrera in his individual capacity, and the individual members of the Board of Regents and John Does 26-50 in their individual capacities**

811.   Plaintiffs restate the foregoing paragraphs numbered 1 through 725 as if set forth fully herein.

812.   This Count IV is brought on behalf of the six Plaintiffs who participated in the 2022 NCAA Championships on behalf of themselves and others similarly situated.

813.   GTAA, President Ángel Cabrera, the individual members of the Board of Regents of the University System of Georgia and their agents and employees, including John Does 26-50 in their individual capacities alongside the NCAA and John Does 1-25 jointly organized the 2022 NCAA Women's Swimming and Diving Championships held at Georgia Tech's McAuley Aquatic Center on the Georgia Tech campus.

814.   Plaintiffs are entitled to enforce their Equal Protection Clause rights pursuant to 42 U.S.C. §§ 1983, 1988.

815.   The Equal Protection Clause of the Fourteenth Amendment is applicable to the NCAA, GTAA, John Does 1-25, President Cabrera in his individual capacity and the individual members of the Board of Regents and John Does 26-50 in their individual capacities pursuant to 42 U.S.C. § 1983 when the NCAA, GTAA, and/or the individuals identified above was/were acting under color of law in connection with the 2022 NCAA Championships.

816.   The NCAA, GTAA, John Does 1-25, President Cabrera, the individual members of the Board of Regents and John Does 26-50, acted under color of law when they altered the policies and practices of Georgia Tech and

GTAA to authorize Lia Thomas to access the women's locker rooms at the McAuley Aquatic Center during the 2022 NCAA Championships.

817.   There is a sex-based constitutional right to bodily privacy because most people have a special sense of privacy in their genitals, buttocks and breasts and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.

818.   The NCAA, GTAA, and the above-identified individuals against whom this Count is brought knew that the NCAA had a purposeful policy that discriminated against women by allowing men who identified as transgender to access women's locker rooms, shower rooms, and/or restrooms to the detriment and humiliation of women.

819.   Particularly given the high-profile nature of Thomas' qualification for the 2022 NCAA Championships, the NCAA, GTAA, and the individuals against whom this Count is brought knew or should have known the Discriminatory Impacts and Equal Protection violations which did occur were likely to occur at the 2022 NCAA Championships.

820.   Acting in concert, the NCAA, GTAA, and John Does 1-25 and President Cabrera and/or John Does 26-50 who were agents of Georgia Tech or acting under the imprimatur of, or with apparent authority from, Georgia Tech, and individual members of the Board of Regents, intentionally authorized and enabled

Lia Thomas to compete in the 2022 NCAA Championships, to access the women's
showers, locker rooms, and restrooms at the 2022 NCAA Championships and
failed to warn the women competitors that Thomas had access to the women's
showers, locker rooms, and restrooms at the 2022 NCAA Championships.

821.   These individuals and/or GTAA and/or the NCAA were in a position
to control and direct the actions of the Georgia Tech, the University System of
Georgia, and/or the NCAA and had actual knowledge of the discriminatory
actions, practices, and/or policies which violated the Equal Protection rights of the
Plaintiffs and others similarly situated.

822.   In relation to the 2022 NCAA Championships, Georgia Tech, GTAA,
and the University System of Georgia so far insinuated themselves into a position
of interdependence with the NCAA that these governmental entities may be
recognized as joint participants in the challenged activities of the NCAA.

823.   President Cabrera, John Does 26-50, and members of the Board of
Regents, GTAA, and the NCAA and John Does 1-25 acted with deliberate
indifference to the known Equal Protection violations which injured Plaintiffs and
others similarly situated and acted with conscious or reckless disregard of the
rights of, and harms to, Plaintiffs and others similarly situated.

824.   Without notice to female swimmers competing in the 2022 NCAA
Championships the NCAA, GTAA, and the above-identified individual defendants

sued in this Count and/or one or more other state actors or actors with apparent

state authority, acting in concert and under color of law, changed the designation of

the locker rooms to be used by the women swimmers at the 2022 NCAA

Championships to "unisex" locker rooms.

825.   This change was made by agreement so that Thomas, a fully grown

adult male with full male genitalia, would use the same locker rooms to be used by

more than 300 female student-athletes, depriving the female student-athletes of

sex-separated women's locker room facilities and bathroom and restroom facilities

where their right to bodily privacy could be protected, exposing the women to

shock, humiliation, and embarrassment in violation of their constitutional right to

bodily privacy.

826.   As a result of the actions of the Defendants, Plaintiffs Gaines, Gyorgy,

Alons, Countie, Wheeler, Swimmer A, and a class of similarly situated women

swimmers and divers were deprived of their constitutional right to equal protection

and bodily privacy and suffered severe emotional distress and injuries for which

Plaintiffs and members of the class are entitled to declaratory relief, compensation,

punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

827.   Wherefore, Plaintiffs request that the Court grant them the relief

requested in their prayer for relief below.

## COUNT V

## Title IX Violations in Relation to the Current
## NCAA Transgender Eligibility Policies

### Against the NCAA

828.   Plaintiffs restate the foregoing paragraphs numbered 1 through 725 as if set forth fully herein.

829.   This Count V is brought only on behalf of Plaintiffs who still have remaining NCAA eligibility at the time this Second Amended Complaint is filed on September 23, 2024.

830.   The NCAA runs educational programs or activities receiving direct or indirect federal financial assistance, including but not limited to NCAA Championships, the NCAA Transgender Eligibility Policies and the management of intercollegiate athletics for its members in the six areas identified above in Paragraph 130.

831.   A private right of action for damages and injunctive relief exists to enforce the guarantees of Title IX.

832.   This private right of action can be pursued to rectify discrimination against women in scholastic sport.

833.   A fundamental goal of Title IX and the original Title IX athletics regulations is to guarantee men and women an equal opportunity "to compete in

athletics in a meaningful way." Sex Discrimination in Athletic Programs, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975).

834.   The athletics regulations enacted under Title IX provide that, "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 CFR § 106.41(c) (emphasis added).

835.   The reference to "sex" in Title IX is directed solely at binary, biological sex and not at gender identity.

836.   There is no alternative definition of "sex" for transgender persons as compared to nontransgender persons under Title IX.

837.   Under Title IX separate athletic teams for men and women are the norm.

838.   The Title IX regulations regarding scholastic sports authorize "separate teams for members of **each sex** where selection for such teams is based upon competitive skill." 34 CFR § 106.41 (emphasis added).

839.   However, sex separate teams are not merely authorized under Title IX, Title IX requires sex-separation *from men* where women have less opportunity than men without it.

840.   Thus, where sex separation has not been provided by a covered entity, Title IX authorizes women to pursue a remedy enforcing sex separation from men,

including separate sports teams, competitions, competitive opportunities, awards, recognition, publicity, showers, and locker rooms, among other things.

841.   Not only must there be such separation from men where necessary to give women equal and meaningful opportunities but separate opportunities for women must be comparable in every way to opportunities for men.

842.   When sports are or must be separated by sex, equal and meaningful opportunity for women requires:

- "the interests and abilities" of women are separately and equally accommodated,[65]

- the women's team and all women's events are as equally open to women as the men's team and all men's events are to men,

- both sexes are provided separate and equal resources, including "locker rooms, practice and competitive facilities,"

- both sexes are provided separate and equal competitions and competitive opportunities, and

---

[65] Indeed, it is a general principle under Title IX that where single sex activities are provided to one sex, the other sex must be provided a substantially equal single-sex activity. For example, in another part of the Title IX regulations not applicable to scholastic athletics the regulation states that where a party covered by Title IX "provides a single-sex . . . extracurricular activity. . . [they] may be required to provide a substantially equal single-sex . . . extracurricular activity for students of the excluded sex…" 34 CFR § 106.34(b)(2).

- eligibility rules (or other rules) do not burden women more than men.

843.   The NCAA's actions, practices, and/or policies described above deprive Plaintiffs and a class of individuals similarly situated of a meaningful and equal opportunity to compete in collegiate sport governed by the NCAA and in NCAA Championships and constitutes sex discrimination against women within the meaning of Title IX.

844.   Such discrimination includes, but is not limited to, the NCAA's implementation and enforcement of the NCAA Transgender Eligibility Policies.

845.   Plaintiffs and a class of individuals similarly situated are entitled to preliminary and permanent injunctive relief enjoining the NCAA Transgender Eligibility Policies and permanently enjoining the NCAA from adopting or enforcing any rules which permit biological males to compete against women in intercollegiate competitions.

846.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

### COUNT VI

### Title IX and Equal Protection Violations in Relation to the Current NCAA Transgender Eligibility Policies

**Against GTAA and the Board of Regents under Title IX for Prospective Injunctive Relief Only**

**Against GTAA and Against President Cabrera and John Does 26-50 in their official capacities under 42 U.S.C. § 1983 for Prospective Injunctive Relief Only**

847.   Plaintiffs restated the foregoing paragraphs numbered 1 through 725 as if fully set forth herein.

848.   Essentially the same discriminatory, and unlawful NCAA policies are in force today as applied in 2022 when the NCAA Championships were held in Atlanta, Georgia and the current NCAA Transgender Eligibility Policies continue to subject female student-athletes to unequal treatment and discrimination in collegiate athletics in violation of Title IX and Equal Protection.

849.   The above-described actions, practices, and/or policies which violate Title IX and the Equal Protection Clause have injured and/or threaten to injure Plaintiffs and one or more classes of similarly situated individuals in the future.

850.   GTAA and individuals in a position to control and direct the actions of Georgia Tech, the University System of Georgia and the other public universities in Georgia had actual knowledge of the discriminatory actions, practices, and/or policies which violated the Title IX and Equal Protection rights of the Plaintiffs and others similarly situated.

851.   Plaintiffs with remaining NCAA eligibility seek an injunction pursuant to Title IX enjoining GTAA and the Board of Regents, with respect to its universities, and seek an injunction pursuant to § 1983 enjoining the GTAA and

the Presidents of Georgia Tech, the University of Georgia, and the University of

North Georgia in their individual capacities, from implementing any aspects of the

NCAA's eligibility policies which violate or have caused violations of Title IX or

Equal Protection in future NCAA sanctioned competitions, or National

Championships, or competitions in which NCAA eligibility rules apply in the State

of Georgia hosted by, organized in whole or in part by, or which take place in any

facility owned, operated or controlled by them at any public university or college

in the State of Georgia, including, but not limited to:

a.      the Southeastern Conference (SEC) Swimming and Diving

Championships to be hosted by the University of Georgia on February 18-

22, 2025,

b.      the 2026 NCAA Division I Women's Swimming and Diving

Championships to be held at the McAuley Aquatic Center at Georgia Tech

University,

c.      the 2026 NCAA Division I, II and III Women's Rowing

Championships to be hosted by the University of North Georgia, and

d.      the 2026 NCAA Division 1 Women's Tennis Championships to

be hosted by the University of Georgia.

852.   Unless enjoined, the universities, entities, and individuals sued in this Court are likely to commit similar violations of Title IX (as to the universities) and Equal Protection violations (as to the individuals) in the future.

853.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below, except that no monetary relief is sought pursuant to this Count VI.

## JURY DEMAND

Plaintiffs requests trial by jury for all matters so triable.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully pray that the Court grant the following relief against Defendants, jointly and severally:

1.   Declare that the NCAA violated Title IX and the Fourteenth Amendment to the U.S. Constitution.

2.   Declare that the Board of Regents, Georgia Tech and/or GTAA violated Title IX.

3.   Declare that the NCAA, GTAA, the Board of Regents (or one or more of the their constituent parts) threaten to or are reasonably likely to violate Title IX.

4.   Declare that the NCAA, GTAA, and the Georgia Individual Defendants threaten to or are reasonably likely to violate the Fourteenth Amendment to the U.S. Constitution in the future unless they are enjoined from doing so.

5.   Declare the extent of the violations or threat of violations so found.

6.   Enter injunctive relief providing for one or more of the following:

   (a)   Enjoining the NCAA, GTAA, the Board of Regents, including all institutions it governs, and/or the Georgia Individual

Defendants (in both their individual and official capacities) from enforcing or implementing the NCAA's eligibility rules that are in conflict with Title IX and/or the U.S. Constitution,

(b)     Requiring the NCAA to render ineligible any male who competed in women's events or on a women's team pursuant to rules of the Association which the Court finds are unlawful,

(c)     Requiring the NCAA to render invalid and reassign and revise all awards, records, points, prizes, titles, trophies, announcements or other recognition assigned, given, announced, communicated or recognized by the NCAA which were based in any way upon the competitive results or participation of any male who competed in women's events or on a women's team pursuant to the policies, practices, or rules of the NCAA which the Court finds are unlawful,

(d)     Pursuant to Title IX enjoin the Board of Regents, including all institutions it governs, from implementing, applying, using, enforcing, or giving effect to the policies, practices, or rules of the Association which the Court finds are unlawful,

(e)     Pursuant to Title IX enjoin the Board of Regents, including all institutions it governs, from permitting collegiate sports competition(s) to take place in premises controlled by the System or the institutions it governs for which competition(s) the eligibility rules of the NCAA enjoined by the Court are used to select participants or permit participants to qualify,

(f)     Pursuant to Title IX enjoin the Board of Regents, including all institutions it governs, from operating or permitting the operation of any locker room, shower, or restroom in a manner which the Court has found unlawful or in a manner which permits a male athlete to use such women's facilities or facilities designated for women because the male athlete has been authorized or permitted to compete in a women's competition or on a women's team,

(g)     Pursuant to Title IX to require sex verification testing by the NCAA,

(h)     Pursuant to Title IX to require notification to any women before competing with or against a man, and

(i)     Any other injunctive relief necessary to afford any Plaintiff, class member, or class full relief.

7.     Pursuant to Title IX, award Plaintiffs, and those class members similarly situated, all such damages as are available under their various claims, including, actual damages, nominal damages, punitive damages, and compensatory damages, including, but not limited to, damages for pain and suffering, mental and emotional distress, suffering and anxiety, expenses costs and other damages against the NCAA, GTAA, and the Board of Regents due to their wrongful conduct.

8.     Pursuant to Section 1983, award Plaintiffs, and those class members similarly situated, all such damages as are available under their various claims, including, actual damages, nominal damages, punitive damages, and compensatory damages, including, but not limited to, damages for pain and suffering, mental and emotional distress, suffering and anxiety, expenses costs and other damages against the NCAA, GTAA, and the Georgia Individual Defendants in their individual capacities due to their wrongful conduct.

9.     Award Plaintiffs reasonable attorneys' fees, and costs; and

10.    Grant any other relief that the Court deems necessary, just, proper, and equitable.

11.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Dated: September 23, 2024          Respectfully submitted,

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49[66]
Kevin D. Koons, Atty. No. 27915-49[67]
Justin R. Olson, Atty. No. 31450-49[68]
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:   wbock@kgrlaw.com
E-mail:   kkoons@kgrlaw.com
E-mail:   jolson@kgrlaw.com

*/s/ Bryan P. Tyson*
Bryan P. Tyson, Ga. Bar No. 515411
Thomas C. Rawlings, Ga. Bar No. 595795
Deborah A. Ausburn, Ga. Bar No. 028610
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Fax: (770) 434-7376
E-mail: btyson@taylorenglish.com
E-mail: trawlings@taylorenglish.com
E-mail: dausburn@taylorenglish.com

*ATTORNEYS FOR PLAINTIFFS*

---

[66] *Pro hac vice*
[67] *Pro hac vice*
[68] *Pro hac vice*

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

The NCAA Transgender Eligibility Policies Are Discriminatory on Their Face ..3

The NCAA Transgender Eligibility Policies Conflict with Title IX's Foundational Principle That Title IX Protects Against Discrimination Based on Biological Sex ...................................................................................4

The NCAA Transgender Eligibility Policies Fail to Effectively Accommodate the Physical Abilities of Women and Give Women Equal Competitive Opportunities in Comparison to Men ....................................................6

The NCAA Purports to Interpret Title IX for Its Members.................................12

JURISDICTION & VENUE ...................................................................16

THE PARTIES.......................................................................................16

PLAINTIFFS WHO COMPETED AT 2022 NCAA SWIMMING AND DIVING CHAMPIONSHIPS ...........................................................................16

PLAINTIFFS CURRENTLY COMPETING AT NCAA DIVISION I INSTITUTIONS ...............................................................................17

PLAINTIFF CURRENTLY COMPETING AT NCAA DIVISION II INSTITUTION ..................................................................................18

PLAINTIFFS CURRENTLY COMPETING AT NCAA DIVISION III INSTITUTIONS ...............................................................................19

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ..............................21

GEORGIA DEFENDANTS .....................................................................21

GENERAL FACTUAL ALLEGATIONS.................................................31

GENERAL PRACTICES OF THE GEORGIA DEFENDANTS.......................31

ORGANIZATION AND PRACTICES OF THE NCAA ...................................33

NCAA's Role in Controlling College Sports for its Members.............................33

NCAA Role in Supporting Mental and Physical Health, Safety and Performance of Student-Athletes in Collegiate Sport.................................................48

THE ASSOCIATION-WIDE NATURE OF THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES ...................................................................53

NCAA'S RECENT HISTORY OF DISCRIMINATION TOWARDS WOMEN
..................................................................................................54

NCAA'S DEVELOPMENT AND IMPLEMENTATION OF TRANSGENDER
ELIGIBILITY POLICIES ...................................................................56

Origin of the 2010 NCAA Policy on Transgender Student-Athlete Participation
..................................................................................................58

April 27, 2016, NCAA Adopts Championship Bid Policy and Questionnaire ....61

June 11, 2020, NCAA Board of Governors Statement on Idaho Sports Bill.......64

April 12, 2021, NCAA Board of Governors Statement .......................................64

August 3, 2021, NCAA Board of Governors Meeting .........................................66

Fall 2022, Lia Thomas' Participation in Collegiate Women's Swimming Draws
National Interest.......................................................................................67

January 6, 2022, Ivy League Declaration of Public Support for NCAA
Transgender Eligibility Policies ............................................................68

January 19, 2022, NCAA Board of Governors Announces NCAA Will Follow
Transgender Eligibility Rules of U.S. Governing Bodies of Olympic Sports .....68

February 1, 2022, USA Swimming Adopts Transgender Eligibility Rules .........71

February 10, 2022, NCAA Declines to Apply USA Swimming Rules................72

THE NCAA'S CURRENT TRANSGENDER ELIGIBILITY POLICIES .........74

DISCRIMINATORY IMPACTS OF THE NCAA'S CURRENT
TRANSGENDER ELIGIBILITY POLICIES.......................................................76

The Premise of the NCAA's Transgender Eligibility Policies—that Men Can
Equally, Fairly, and Lawfully Compete in Women's Sports Through
Testosterone Suppression—is Flawed..................................................76

The Male-Female Sport Performance Gap ...........................................................76

Testosterone Suppression Does Not Bridge the Male-Female Sport Performance
Gap ..........................................................................................................83

The NCAA's Transgender Eligibility Policies Allow Men to Compete Against
Women While Retaining Higher Levels of Testosterone Than Women..............86

The 2015 IOC Consensus Statement, Still Relied on by the NCAA, Was
Withdrawn by the IOC in 2021 .............................................................89

The NCAA's Transgender Policies Are Out-of-Step with Current Olympic Movement Policies ............................................... 92

Swimming ..................................................................... 93

Diving ......................................................................... 96

Water Polo .................................................................. 97

Cross-country and Track and Field ................................... 98

Rowing ...................................................................... 101

Triathlon .................................................................... 102

The NCAA's Transgender Eligibility Policies Expose Women to Higher Safety Risks in Collision, Contact and Limited-Contact Sports .................................... 103

Concussions ............................................................... 106

No NCAA Monitoring of Male Testosterone Suppression ............................... 107

No Assessment of Physical, Emotional or Psychological Harm of NCAA Transgender Eligibility Policies on Women Student-Athletes .......................... 108

NCAA LGBTQ-Inclusive Codes of Conduct ....................................... 109

Summary of Defects in NCAA's Transgender Eligibility Policies ................... 109

2022 NCAA WOMEN'S SWIMMING AND DIVING CHAMPIONSHIPS ... 112

Discussions Between NCAA and Georgia Tech to Host 2022 NCAA Division I Women's Swimming and Diving Championships ............................. 112

Public Awareness of Lia Thomas' Participation in 2022 National Championships ................................................................ 117

Locker Room Availability for Female Swimmers and Divers at the McAuley Aquatic Center on the Georgia Tech Campus .................................. 119

Competition at the 2022 NCAA Championships ............................... 131

WOMEN'S 500-YARD FREESTYLE EVENT ................................ 134

WOMEN'S 200-YARD FREESTYLE EVENT ................................ 138

WOMEN'S 100-YARD FREESTYLE EVENT ................................ 141

Comparing Thomas' NCAA Competition Times Before and After Transition Demonstrates Thomas' Retained Male Advantage and the Failure of the NCAA's Transgender Eligibility Policies to Ensure Equal Opportunities for Women .... 144

THE NCAA'S TRANSGENDER ELIGIBILITY POLICIES CONTINUE TO IMPACT WOMEN, RESULTING IN LOST AND UNEQUAL OPPORTUNITIES FOR FEMALE STUDENT-ATHLETES ..........................146

Roanoke College Swimmers ..................................................................146

All-Atlantic Regional Track and Field Championships .....................................150

Volleyball ....................................................................................151

Track and Field, Soccer, Tennis, Swimming ....................................................163

CLASS ACTION ALLEGATIONS .......................................................................168

On behalf of Plaintiffs Swimmer A, Riley Gaines, Reka Gyorgy, Kylee Alons, Grace Countie, Kaitlynn Wheeler, Nanea Merryman, Ellis Fox, Brooke Slusser, The Roanoke College Swimmers, Track Athlete A, and others similarly situated ....................................................................................168

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(1) .......172

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2) .......172

Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(3) .......173

COUNT I .........................................................................................174

Title IX Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships ................................................174

Against the NCAA, GTAA, and the Board of Regents .....................................174

COUNT II ........................................................................................181

Title IX Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships ................................................181

Against the NCAA and GTAA pursuant to 42 U.S.C. § 1983 ...........................181

COUNT III .......................................................................................184

Fourteenth Amendment Equal Protection Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships ...............184

Against the NCAA, GTAA, John Does 1-25, President Cabrera in his individual capacity and the individual members of the Board of Regents and John Does 26-50 in their individual capacities .....................................................184

COUNT IV .......................................................................................188

Fourteenth Amendment Bodily Privacy Violations in Relation to the 2022 NCAA Division I Women's Swimming and Diving Championships ............... 188

Against the NCAA, GTAA, John Does 1-25, President Cabrera in his individual capacity, and the individual members of the Board of Regents and John Does 26-50 in their individual capacities ........................................................................... 188

COUNT V ........................................................................................................... 193

Title IX Violations in Relation to the Current NCAA Transgender Eligibility Policies ................................................................................................................ 193

Against the NCAA ............................................................................................. 193

COUNT VI .......................................................................................................... 196

Title IX and Equal Protection Violations in Relation to the Current NCAA Transgender Eligibility Policies ....................................................................... 196

Against GTAA and the Board of Regents under Title IX for Prospective Injunctive Relief Only ........................................................................................ 196

Against GTAA and Against President Cabrera and John Does 26-50 in their official capacities under 42 U.S.C. § 1983 for Prospective Injunctive Relief Only ................................................................................................................................ 197

JURY DEMAND ................................................................................................. 199

PRAYER FOR RELIEF ...................................................................................... 199