UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RILEY GAINES, *et al.*,          )
                                 )
            Plaintiffs,          )
                                 )     Case No. 1:24-cv-01109-MHC
      v.                         )
                                 )
NATIONAL COLLEGIATE ATHLETIC     )
ASSOCIATION, *et al.*,           )
                                 )
            Defendants.          )

## <u>DEFENDANT NCAA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

ALSTON & BIRD LLP
Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant NCAA*

## I.    INTRODUCTION

The Supreme Court has held that the National Collegiate Athletic Association ("NCAA") is not covered by Title IX. *NCAA v. Smith*, 525 U.S. 459 (1999) (*Smith I*). The Supreme Court has also held that the NCAA is not a state actor that can be sued under 42 U.S.C § 1983. *NCAA v. Tarkanian*, 488 U.S. 179 (1988). Despite those binding precedents from our Nation's highest court, Plaintiffs have sued the NCAA for alleged violations of those laws (Title IX [Counts I and V] and Section 1983 [Counts II, III, and IV]), and they do so with a pleading filed by a group of Plaintiffs who lack standing to assert claims for prospective injunctive relief. The Court should dismiss all claims against the NCAA with prejudice.

## II.    PROCEDURAL HISTORY

Plaintiffs brought this class action in March 2024 against the NCAA and various State and individual defendants and anchored the Complaint in allegations about a transgender swimmer who competed at the 2022 Division I Women's Swimming Championships in Atlanta. They sought damages and retrospective injunctive relief for those events and prospective equitable relief from the NCAA's transgender athletic eligibility policies.

In June, the NCAA filed a motion to dismiss arguing, among other things, that the Complaint was a shotgun pleading. The other Defendants filed a separate motion

1

to dismiss. Rather than oppose, Plaintiffs filed an amended complaint ("FAC"), and the Court declared as moot the Defendants' initial motions to dismiss.

The FAC added 30 pages and 148 paragraphs of new facts, divided the original three counts relating to the swimming championships into four separate claims, and added new Counts V and VI claiming that enforcement of the NCAA Transgender Eligibility Policies violates Title IX and the Equal Protections Clause. Defendants again filed motions to dismiss. Plaintiffs filed a consolidated opposition, but also a motion to file a second amended complaint ("SAC"). The Court granted Plaintiffs' motion to file the SAC, rendering moot the pending motions to dismiss. Plaintiffs then filed an even longer pleading, now 201 pages and 853-paragraphs, which added allegations about a new Plaintiff, Brooke Slusser, and a new Defendant, the Georgia Tech Athletic Association ("GTAA").

## III.  SECOND AMENDED COMPLAINT

The Plaintiffs in the SAC can be divided into two groups:

- **Plaintiffs with No More Eligiblity:** Kylee Alons, Riley Gaines, Reka Gyorgy, Kaitlynn Wheeler, Grace Countie, and Swimmer A are former college swimmers who competed in the 2022 Women's Swimming Championships. SAC ¶¶ 57-61.

- **Eligible Plaintiffs:** Ainsley Erzen, Ellie Eades, Nanea Merryman, Ellis Fox, Lillian Mullens, Elizabeth Satterfield, Kaitlin Blankinship, Susanna Price,

Kate Pearson, Julianna Morrow, Halle Schart, Track Athlete A who are current college athletes with ongoing athletic eligibility. SAC ¶¶ 62-74. Brooke Slusser is a volleyball player at San Jose State University ("SJSU") whose eligibility, as alleged, will expire during 2024. SAC ¶¶ 65, 699.

The Defendants in the SAC are:

- **The NCAA:** The NCAA is an association comprised of more than 1,100 member colleges, universities, and athletic conferences. SAC ¶ 128.

- **Georgia Defendants:** (1) the Board of Regents of the University System of Georgia ("Board of Regents"); (2) the GTAA; (3) Georgia Tech, the University of Georgia, and the University of North Georgia (altogether "Georgia Universities"); (4) Georgia Tech President, Ángel Cabrera, and (5) 23 current and former Regents ("Members"). SAC ¶¶ 81-117.

- **John Does 1-25:** Alleged agents of the NCAA. SAC ¶ 118.

- **John Does 26-50:** Alleged additional members of the Board of Regents of the University System of Georgia or agents or employees of one or more public colleges or universities in Georgia. SAC ¶ 119.

The Plaintiffs with No More Eligibility allege violations of Title IX and the Fourteenth Amendment arising from the Defendants' alleged actions in permitting a transgender swimmer (Lia Thomas) to participate in the 2022 Division I Women's Swimming Championships. SAC ¶¶ 419-610. The Eligible Plaintiffs as well as

Plaintiff Slusser allege that the current NCAA Transgender Eligibility Policy violates their rights under Title IX and the 14th Amendment based on the potential to compete or practice against a transgender athlete during their upcoming seasons. SAC ¶¶ 611-725. Each claim is summarized below:

- **Count I (SAC ¶¶ 748-776)**: The Plaintiffs with No More Eligibility allege the NCAA and Georgia Defendants violated their Title IX rights by allowing Lia Thomas to compete in the 2022 Division I Women's Swimming Championships. They seek injunctive relief to correct the swimming records from the Championships, declaratory relief that the Defendants violated Title IX, as well as nominal and compensatory damages.

- **Count II (SAC ¶¶ 777-792)**: The Plaintiffs with No More Eligibility allege the NCAA and GTAA subverted their rights under Title IX by unlawfully collaborating to allow Lia Thomas to compete in the 2022 Division I Women's Swimming Championships and access facilities. They seek the same injunctive and declaratory relief and damages requested in Count I.

- **Count III (SAC ¶¶ 793-810)**: The Plaintiffs with No More Eligibility allege the NCAA and Georgia Defendants violated the Equal Protection Clause of the 14th Amendment by allowing Lia Thomas to compete in the 2022 Division I Women's Swimming Championships and seek the same relief.

4

- **Count IV (SAC ¶¶ 811-827)**: The Plaintiffs with No More Eligibility allege the NCAA and Georgia Defendants violated an alleged 14th Amendment right to bodily privacy by allowing Lia Thomas to access unisex changing facilities at the 2022 Division I Women's Swimming Championships. They seek declaratory relief and damages.

- **Count V (SAC ¶¶ 828-846)**: The Eligible Plaintiffs allege the NCAA is violating Title IX by enforcing the NCAA Transgender Eligibility Policy because of the potential for the Plaintiffs to compete or practice against a transgender athlete in their respective collegiate seasons. They seek declaratory relief, preliminary and permanent injunctive relief, and damages.

- **Count VI (SAC ¶¶ 847-853)**: The Eligible Plaintiffs allege the Georgia Defendants are violating the Equal Protections Clause of the 14th Amendment by enforcing the NCAA Transgender Eligibility Policy at upcoming championships and collegiate events which may allow transgender athletes to compete or practice. They seek prospective injunctive relief.

## IV.  ARGUMENT

### A.  The Court Should Dismiss the Title IX Claims Against the NCAA

#### 1.  Plaintiffs Do Not Sufficiently Allege That the NCAA Receives Federal Financial Assistance

The Court should dismiss Counts I and V to the extent they assert claims against the NCAA under Title IX. To state a legally cognizable claim under Title IX,

a plaintiff must sufficiently allege "(1) that she was excluded from participation in, denied benefits of, or subjected to discrimination in an educational program; (2) that the exclusion was on the basis of sex; and (3) that the defendant receives federal financial assistance." *Riddle v. Orange Cnty. Sch. Bd.*, No. 6:19-cv-771-Orl-22LRH, 2019 U.S. Dist. LEXIS 249520, at *6-7 (M.D. Fla. July 2, 2019) (citation omitted); *accord Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). Plaintiffs have not met the federal-funding prong.[1] Twenty-five years ago, the Supreme Court held that a college athlete could not sue the NCAA under Title IX merely because it receives dues payments from colleges. *See Smith I*, 525 U.S. at 462. Since then, no court has applied Title IX to the NCAA due to its member institutions' receipt of federal funding. *See, e.g.*, *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015) (dismissing Title IX claims because "there is no allegation that the NCAA has received Federal financial assistance such that it would be subject to suit under Title IX").

Plaintiffs attempt to bypass that high legal roadblock with allegations that, "[s]tarting in 2014, the NCAA and the U.S. Department of Defense (DoD) entered into a 'partnership'" to study concussions called the "Grand Alliance." SAC ¶ 165 and ¶ 176. Plaintiffs then assert that "from at least 2014 through the present the

---

[1] Plaintiffs also fail to meet the first and second prongs, but it is not necessary to argue those points in this Motion.

NCAA has been a direct and/or indirect recipient and beneficiary of financial assistance from the U.S. federal government." *Id.* ¶ 176. But that vague, alternative assertion fails on all three respects because (1) the "direct" funding assertion is factually insufficient; (2) the "indirect" funding assertion is legally insufficient; and (3) the "beneficiary" assertion is categorically insufficient.

### a.    The NCAA Is Not A Direct Funding Recipient

Plaintiffs fail to "plead[] factual content that allows the court to draw the reasonable inference" that the NCAA receives direct federal assistance. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (explaining that "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" (quotation marks and citation omitted)). Plaintiffs never allege any facts to show that the NCAA directly received DoD money or any other federal funds in the Grand Alliance. Instead, the only reasonable inference from the *facts* as alleged is that the concussion research project described in SAC ¶¶ 160-169 is a separate research entity that the DoD and the NCAA each fund separately.

Plaintiffs state that "The NCAA-U.S. Department of Defense Concussion Assessment, Research and Education Consortium" is a "project, ***funded by NCAA and DoD***." *Id.* ¶ 165 (emphasis added). They describe "[t]he ***research funded by the***

***NCAA and the federal government*** through the NCAA-DoD Grand Alliance." *Id.* ¶ 167 (emphasis added). They quote President Obama that "[t]he NCAA and the Department of Defense ***are teaming up*** to commit *$30 million for concussion education and a study involving up to 37,000 college athletes* which will be the most comprehensive concussion study ever." *Id.* ¶ 160 (first emphasis added; second italics in Amended Complaint).

Plaintiffs also describe "The NCAA-DOD Grand Alliance and the millions in federal dollars contributed ***to the project***." *Id.* ¶ 168 (emphasis added); *see also id.* ¶ 165 (describing project with "additional ***funding from the NCAA and DoD***") (emphasis added). Plaintiffs assert "that more than $105 million had been given ***to the Grand Alliance concussion education and study program***" and that "[a]t least $85 million in funding ***for the NCAA-DoD Grand Alliance*** has come from the federal government." *Id.* ¶¶ 162-63 (emphasis added). Without any factual averment to support an allegation that "the DoD provides the NCAA funding" (*id.* ¶ 159), Plaintiffs' unsupported legal conclusions that the NCAA receives "direct" federal financial assistance because of the Grand Alliance are entitled to no weight.

### b.     The NCAA Is Not an Indirect Funding Recipient

The NCAA's alleged participation in the Grand Alliance is also insufficient to constitute indirect funding because Plaintiffs fail to allege that the NCAA "is able to control decisions made with respect to the [federal] money," especially "the most

important decision [of] whether the grant money should be accepted at all." *Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) (*Smith II*). The general rule is that courts "are hesitant to impose Title IX obligations on an entity that is not a direct recipient of federal financial assistance." *Id.* at 162. *Smith II* permitted Title IX claims to move forward against the NCAA only due to extensive factual allegations that the NCAA "effectively controlled" the National Youth Sports Program (NYSP) and its Fund that received federal funding. For example, the *Smith II* plaintiffs alleged that "the NYSP Committee was an NCAA committee responsible for the administration of the NYSP" and "all the members of the [NYSP] Fund's Board of Directors were either employees of the NCAA or members of the NCAA's NYSP Committee," and that "upon dissolution of the [NYSP] Fund, its assets will be distributed exclusively to the NCAA." *Id.* at 161; *see also id.* at 162 ("The [NYSP] Fund has no employees and its business address is the same as the NCAA's.") (quoting *Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000)). *Smith II* held that the allegations in that case "render[ed] the NCAA, the NYSP, and the [NYSP] Fund virtually indistinct," and, most importantly, the NCAA "was in a 'position to decide whether to "receive" federal funds and thereby accept the concomitant obligations of Title IX.'" 266 F.3d at 162 (citation omitted).

Plaintiffs' naked assertion of a "partnership" between the NCAA and the DoD to fund the Grand Alliance is neither the formal nor functional equivalent of the

allegations that made the entities in *Smith II* virtually indistinct. Plaintiffs never allege that the NCAA controlled decisions with respect to the DoD money, specifically the decision of whether to receive the money in the first place. Just the opposite. As described above, Plaintiffs allege merely that the DoD and the NCAA "are teaming up" to separately fund the Grand Alliance effort. SAC ¶ 160. The SAC's allegations fall short of *Smith II* and are insufficient to impose a Title IX obligation on the NCAA.

### c.    Beneficial Status is Insufficient

Plaintiffs' attempt to hang Title IX liability on the NCAA being a "beneficiary" of federal funding fails as a matter of law. In *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986), the Supreme Court concluded that merely having a beneficial relationship with an entity that receives federal funding is not sufficient to impose obligations arising out of a federal program. Plaintiffs' allegations that the Grand Alliance "contributes to the NCAA's mission" is legally insufficient for potential Title IX liability.

### 2.    Plaintiffs' Ceding Control Theory Has Been Rejected

Plaintiffs cannot avoid dismissal through an alternative argument that the NCAA's member schools allegedly cede control of their federally funded programs to the NCAA. No court has ever applied Title IX to the NCAA under a "ceding control" theory, and the Third Circuit has explicitly rejected that argument twice,

relying on Supreme Court precedent. In *Smith II*, the plaintiff alleged that the NCAA exercised controlling authority because it promulgated rules governing intercollegiate athletics, required its members to agree to those rules, and made individual eligibility and waiver decisions. 266 F.3d at 154, 157. The court affirmed a decision dismissing those claims because control over eligibility rules does not amount to control over the federally funded athletic programs managed and operated by its members. *Id.* at 157.

*Smith II* relied on *Cureton*, which held as a matter of law "that the NCAA['s] members ***have not ceded controlling authority*** to the NCAA by giving it the power to enforce its eligibility rules directly against the students." 198 F.3d at 117-18 (emphasis added). *Cureton* specifically rejected the argument that Plaintiffs appear to be making here: "[W]e cannot understand how the fact that the NCAA promulgates rules and regulations with respect to intercollegiate athletics somehow means that the NCAA has controlling authority over its members' programs or activities receiving Federal financial assistance." *Id.* at 118. Members following those rules is not enough to establish the requisite level of control because "they have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA." *Id.* at 116. Both *Smith II* and *Cureton* relied on the Supreme Court's holding in *Tarkanian*, 488 U.S. at 192, "that the NCAA does not 'control' its members" (in the context of Section 1983).

11

As it has developed in the case law, the "ceding control" theory is extremely limited and requires explicit allegations of complete operational and financial control. Plaintiffs must allege facts to show that the "entity truly assumes control of a federally funded program," such that it indirectly controls those funds. *Smith II*, 266 F.3d at 157; *see also Williams v. Board of Regents*, 477 F.3d 1282, 1294 (11th Cir. 2007) (discussing the policy underlying the theory: allowing "funding recipients to cede control over their programs to indirect funding recipients" would "allow funding recipients to receive federal funds but avoid Title IX liability"). The cases that Plaintiffs pointed to in earlier briefing are in accord. They involved situations of schools granting athletic associations (GTAA and Michigan High School Athletic Association) general control over the entirety of the athletic programs or interscholastic athletic activities. *See Williams*, 477 F.3d at 1290, 1294; *Communities for Equity v. Michigan High School Athletic Ass'n*, 80 F. Supp. 2d 729, 736-37 (W.D. Mich. 2000).

Plaintiffs' allegations here do not establish that members ceded to the NCAA control over their *athletic programs*. Their allegations regarding the NCAA's rulemaking and Transgender Eligibility Policies, at best, mirror those that failed as a matter of law in *Smith* and *Cureton*. They fail to allege that members did not retain the choice either (1) to resist the NCAA's policies, or (2) to withdraw fully or partially from NCAA participation. Plaintiffs' extensive allegations regarding

12

Slusser underscore that member institutions retain control over their athletic programs about transgender issues. They allege that Slusser's school, SJSU, was the entity that "recruit[ed] Fleming, g[ave] Fleming a scholarship, and allow[ed] Fleming to be in positions to violate Brooke's right to bodily privacy." SAC ¶ 698.

Plaintiffs' allegations regarding organization of the Swimming and Diving Championships and designation of locker rooms, too, fail to establish the ceding of control. Even if Plaintiffs had alleged that the NCAA assumed complete control over the Championships and locker room decisions, such allegations about control over specific activities would be insufficient to show control over the federally funded *programs*. But Plaintiffs only allege that the GTAA assumed control of the Aquatic Center; that Georgia Tech and the GTAA were required to take an active role in decision-making and prepare the safety and security and marketing planning; and that Tech and the GTAA designated the Tournament Manager, Facility Manager, and other championship staff. SAC ¶¶ 422, 424, 426, 428-434. That is not enough.

**B.    The Court Also Should Dismiss the Section 1983 Claims**

Plaintiffs' Section 1983 claims against the NCAA are also subject to dismissal. In Counts II, III, and IV, the Plaintiffs with No More Eligibility purport to assert Section 1983 claims against the NCAA for alleged violations of Title IX and the Equal Protection Clause of the 14th Amendment during the 2022 NCAA Swimming Championships. The Court should dismiss those claims for two reasons: (1) the

NCAA is not a "state actor" for Section 1983 purposes, and (2) Plaintiffs fail to show a cognizable 14th Amendment injury.

### 1.    The NCAA is Not a State Actor

Plaintiffs fail to adequately plead the cornerstone requirement of a Section 1983 action—that the NCAA was acting "under the color of state law." To obtain relief under Section 1983, Plaintiffs must not only demonstrate that they were deprived of a federally protected right, but that the deprivation was conducted by a state actor acting under the color of state law. *See Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 156-57 (1978)). In other words, the alleged deprivation "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 2753 (1982).

As explained by the Eleventh Circuit, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (citation omitted). Accordingly, "[o]nly in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey*, 949 F.2d at 1130; *see also Fla. Country Clubs, Inc. v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.*, 98 F. Supp. 2d 1356, 1365 (M.D.

Fla. 2000) ("As … the Eleventh Circuit ha[s] previously stated, it is extremely difficult for a plaintiff to satisfy the threshold sufficiency that is necessary for a court to find that a private individual has acted as a state actor for purposes of considering an alleged section 1983 violation."). This is not one of those rare cases.

Here, the NCAA is an "unincorporated association," i.e., a private actor. SAC ¶¶ 80, 128. For the NCAA to be deemed a state actor, Plaintiffs must plausibly allege that the NCAA meets one following three tests: (1) the "state compulsion test" (whether the State coerced or at least significantly encouraged the action alleged to violate the federally protected right), (2) the "public function test" (whether the private party performed a public function that was traditionally the exclusive prerogative of the State), and (3) the "nexus/joint action test" (whether the State so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise). *See Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001).

Plaintiffs allege only the joint action test. *See* SAC ¶¶ 434, 786, 795, 808, 813, 822; *see also* Dkt. 87 at 32, *id.* at 37.[2] But Plaintiffs fail to show that Georgia (or any

---

[2] Plaintiffs cannot satisfy either of the other two state-action tests. The SAC lacks any allegations that a government actor coerced or encouraged the NCAA to violate Plaintiffs' rights or create the NCAA Transgender Eligibility Policy. *See, e.g., McCoy v. Johnson*, 176 F.R.D. 676, 680 (N.D. Ga. 1997) (rejecting state compulsion theory where plaintiff made no allegations of any state compulsion on defendant). The SAC also lacks an allegation that the NCAA "perform[ed] functions that are traditionally the exclusive prerogative of the state." *Langston v. ACT*, 890 F.2d 380,

other state) has "so far insinuated itself into a position of interdependence" with the NCAA that the NCAA is "merely a surrogate for the state." *Focus on the Fam.*, 344 F.3d at 1278-79. Plaintiffs also fail to plausibly allege that any governmental body and the NCAA are "intertwined in a symbiotic relationship" that "involve[s] the alleged constitutional violation." *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1027 (11th Cir. 1988) (internal quotation marks and citation omitted).

The allegations that the State Defendants adopted NCAA policies and acted in accordance with NCAA policies in public buildings (SAC ¶¶ 777-827) are insufficient to turn the NCAA into a state actor under Section 1983. State action does not exist merely because a state provides a forum to a private entity. *Hill v. McClellan*, 490 F.2d 859, 860 (5th Cir. 1974); *see also Frazier v. Bd. of Trs. of Nw. Miss.*, 765 F.2d 1278, 1288 n.21 (5th Cir. 1985) ("[T]he sharing of [a] space [by government and private actors] is not alone sufficient in this case . . . ."), *modified on other grounds*, 777 F.2d 329 (5th Cir. 1985), *cert. denied*, 476 U.S. 1142 (1986).

More importantly, state action does not exist merely because a private party formulates rules and regulations later implemented by the state. *Tarkanian* illustrates this principle. 488 U.S. at 195. There, UNLV's former head basketball coach, Jerry

---

384 (11th Cir. 1989); *see also Tarkanian*, 488 U.S. at 197 n.18 ("[W]hile we have described [the] function [of fostering amateur athletics at the collection level] as 'critical,' . . . by no means is it a traditional, let alone an exclusive state function." (internal citation omitted)).

Tarkanian, filed a Section 1983 action against the NCAA after he was suspended by UNLV for violating NCAA rules. *Id.* at 185-88. Tarkanian argued that the NCAA was a state actor for Section 1983 purposes because by adopting the NCAA's standards, UNLV had clothed the NCAA with state authority by delegating its "authority over personnel decisions" to the NCAA. *Id.* at 192. The Supreme Court rejected that argument, holding the NCAA was not a Nevada state actor because Nevada state law was not the source of the NCAA's rulemaking. *Id.* Instead, the NCAA's rules arose from and were enforced by several hundred member institutions, most of which were in other states. *Id.* Thus, the NCAA did not act "under color of Nevada law" or any other state's law. *Id.* NCAA was not a state actor for Section 1983 because, "[n]either [the university's] decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance." *Id.* at 195.

Here, the State Defendants' voluntary decision to comply with NCAA policies is insufficient to convert the NCAA into a state actor. *Id.*; *see also Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1384-85 (7th Cir. 1992) (finding three bar associations had not engaged in state action by formulating disciplinary rules simply because the Illinois Supreme Court voluntarily adopted those rules); *Hu v. ABA*, 568 F. Supp. 2d 959, 965 (N.D. Ill. 2008) (holding that the ABA was not a state actor simply because

the Illinois Supreme Court required ABA accreditation for law schools in the state and law schools abided by ABA standards); *Willis v. Ga. Dep't of Juv. Just.*, 2007 U.S. Dist. LEXIS 70012, at *23-24 (M.D. Ga. Sept. 21, 2007) (comparing the case to *Tarkanian* and noting "[i]n both cases, that states' reliance on and adoption of a private party's actions are insufficient to make it a state actor" and "[a]lthough these state entities acted in compliance with private parties when they allegedly violated the plaintiffs' rights, that does not transform private parties' actions into actions of the state"); *Collier v. Nat'l Collegiate Athletic Ass'n*, 783 F. Supp. 1576, 1578 (D.R.I. 1992) (ruling the NCAA was not a state actor).

The Supreme Court's more recent holding in *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001), does not require a contrary conclusion. *Brentwood* held that a private collective athletic membership organization composed of public and private high schools in Tennessee was a state actor under Section 1983. *Id.* In so holding, the Supreme Court reiterated *Tarkanian's* holding and highlighted the difference between *Brentwood* and *Tarkanian*. In *Brentwood*, all the members of the athletic association were schools located in Tennessee; members of Tennessee's State Board of Education were assigned to serve as board members of the association; and the association's ministerial employees were treated as state employees in that they were eligible for membership in the state retirement system. *Id.* at 298-300. By contrast, the Supreme Court noted that in

18

*Tarkanian*, the NCAA's "connection with [the state was] too insubstantial to ground a state-action claim" because "the NCAA's policies were shaped not by the [university] alone, but by several hundred member institutions, most of them having no connection with [the state], and exhibiting no color of [state] law." *Id.* at 297.

As thus viewed, the Supreme Court has twice ***rejected*** Plaintiffs' argument that state action exists when a private party formulates rules and regulations later implemented by the state. Rather—under *Tarkanian* and *Brentwood*—the NCAA, a nationwide association, is not (and cannot) be a state actor here because its policies and actions are independent of any particular state. *Brentwood*, 531 U.S. at 297; *Tarkanian*, 488 U.S. at 194; *see also Langston v. ACT*, 890 F.2d 380, 385 (11th Cir. 1989) (holding the American College Testing Program ('ACT') was not a state actor under to Section 1983 when the plaintiff failed to allege that the University of Alabama or any other agency of the state exerted influence over the ACT's decisions); *Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharm.*, 34 F.4th 190, 196-97 (3d Cir. 2022) (following *Tarkanian* to hold the National Association of Boards of Pharmacy ('NAPB'), a nationwide membership organization, was not a state actor when plaintiffs failed to include allegations to show the NAPB was operating under color of a particular state's law); *Mattei v. Int'l Conference of Funeral Serv. Examining Bds.*, 2015 U.S. Dist. LEXIS 116009, at *10 (W.D. Tex. Sep. 1, 2015) ("It is only when an organization's membership consists entirely of

institutions located in the same state that such organization may be construed as a state actor for purposes of Section 1983").

### 2.    Count IV Fails to Allege a Fourteenth Amendment Violation

Beyond Plaintiffs' failure to sufficiently allege that the NCAA was "acting under the color of state law," Count IV independently fails because Plaintiffs do not allege a violation of a cognizable 14th Amendment right to bodily privacy in bathrooms and locker rooms. *See* SAC ¶ 817 ("There is a sex-based constitutional right to bodily privacy"). Courts have held just the opposite. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020) ("[T]here is no Fourteenth Amendment fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth.").

The Eleventh Circuit has recognized "a constitutional right to bodily privacy." *Fortner v. Thomas*, 983 F.2d 1024, 1031-32 (11th Cir. 1993) (prisoners had a constitutional right to bodily privacy to be free from "involuntary exposure" of their bodies to opposite gendered correctional officers). But that "right to bodily privacy . . . implicates the Fourth Amendment." *Powell v. Barrett*, 541 F.3d 1298, 1314 n.7 (11th Cir. 2008) (citing *Fortner*, 983 F.2d at 1026). Other circuits agree that "the constitutional right to privacy, which includes the right to shield one's body from exposure to viewing by the opposite sex, derives from the Fourth Amendment, rather than the Due Process Clause." *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d

489, 494 (6th Cir. 2008); *accord Parents for Privacy*, 949 F.3d at 1223 (locating right to bodily privacy in the Fourth Amendment).

The right to bodily privacy is not a broad-based right to be free from any intrusion under the 14th Amendment but is a right under the Fourth Amendment to be free from unreasonable *government* search. Thus, courts in this Circuit have found a violation of the right to bodily privacy only in the context of *government* intrusion, usually in custodial contexts. *See, e.g.*, *Fortner* 983 F.2d at 1032; *see also Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015) (arrestees had a constitutional right to bodily privacy to be free from compelled nudity); *Hodges-Johnson v. Belcher*, 564 F. Supp. 3d 1334, 1346 (N.D. Ga. 2021) ("The Eleventh Circuit has held that there is a broad, clearly established principle that individuals who have been placed in police custody have a constitutional right to bodily privacy.") (citation omitted). The Eleventh Circuit has held that prisoners' rights to bodily privacy "was limited and . . . prisoners' rights to privacy are evaluated on a case-by-case basis." *Padgett v. Donald*, 401 F.3d 1273, 1281 (11th Cir. 2005).

Here, Plaintiffs' attempt to assert a broad-based 14th Amendment right to bodily privacy is legally wrong. Plaintiffs fail to allege any Fourth Amendment violation because they present no facts of intrusion by any government official and in a custodial context. Count IV is thus subject to dismissal.

### C.    Plaintiffs Lack Standing for Declaratory and Injunctive Relief

Even if Plaintiffs had successfully alleged either a Title IX or Section 1983 claim, Article III standing requirements would still necessitate limiting this case to its obvious factual core: the grievances of the Plaintiffs over Lia Thomas's participation in the 2022 NCAA Swimming Championships. SAC ¶¶ 419-610. Four of the six counts explicitly relate "to the 2022 NCAA Division I Women's Swimming and Diving Championships," and the SAC explicitly limits those counts to "the six Plaintiffs who participated in the 2022 NCAA Championships." SAC ¶ 749 (Count I), ¶ 778 (Count II), ¶ 794 (Count III), and ¶ 812 (Count IV). Although the retrospective claims of those six Plaintiffs suffer from the fatal problems described above, they do meet the Article III standing burden to allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Count V, however, challenges the current NCAA transgender policies and seeks prospective injunctive relief "on behalf of Plaintiffs who still have remaining NCAA eligibility." SAC ¶ 829.[3] The Court should dismiss Count V because either the Plaintiffs lack standing to seek injunctive relief or their claims will be moot by the time the Court rules on this motion.

---

[3] Plaintiffs limit Count VI to defendants other than the NCAA.

Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Under Rule 12(b)(1), a district court should dismiss claims for lack of subject matter jurisdiction when a plaintiff lacks standing. *E.g.*, *Hall v. Xanadu Mktg., Inc.*, 682 F. Supp. 3d 1278 (N.D. Ga. 2023) (Cohen, J). "The plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 219 L.Ed.2d 604, 617 (U.S. 2024) (internal quotations, brackets and citation omitted). "[S]tanding is not dispensed in gross"; each plaintiff must demonstrate standing for each form of relief sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted).

All but one of the Plaintiffs lack standing to challenge the current NCAA policies and to seek injunctive relief as set forth in Count V because none meets her burden to allege a future injury that is "concrete, particularized, and actual or imminent" in the sense that it is "certainly impending." *Clapper*, 568 U.S. at 409. Their "allegations of *possible* future injury" are insufficient. *Id.*

In *Clapper*, the plaintiffs (attorneys, journalists, and human rights organizations) brought a facial challenge to a provision of the Foreign Intelligence Surveillance Act ("FISA"), which authorized government electronic surveillance of non-U.S. persons located outside the U.S. *Id.* at 401. The plaintiffs alleged an "objectively reasonably likelihood" that their confidential communications with

foreign contacts would be intercepted, even though they had no facts to show that their communications were being targeted or that the government would seek to target their communications in the future. *Id.* at 410-12. Rather, plaintiffs alleged they were in contact with individuals they *believed* to be targets of U.S. government surveillance, and thus, plaintiffs *believed* their communications would be captured. *Id.* at 406-07. The Supreme Court rejected plaintiffs' argument finding that plaintiffs lacked standing because their alleged injury rested on "highly speculative fear" and relied on a "highly attenuated chain of possibilities." *Id.* at 410.

As in *Clapper*, each Plaintiff seeking prospective relief fails to allege facts showing a "substantial likelihood" of "real," "immediate," and "definite" future injury. *Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1356-57 (11th Cir. 2021) (the court could "easily dispense with the possibility" that a plaintiff who "may someday be in another car accident" had standing to pursue prospective declaratory relief). Thus, Plaintiffs do not meet the Eleventh Circuit's "'high standard,' which demands 'a robust judicial role in assessing [the] risk' of harm." *Banks v. Sec'y, Dep't of Health & Hum. Servs.*, 38 F.4th 86, 94-95 (11th Cir. 2022) (citation omitted).

The situation here is like that in *John & Jane Parents 1 v. Montgomery Cty. Bd. of Educ.*, 78 F.4th 622 (4th Cir. 2023). There, the board of education adopted guidelines that permitted schools to develop gender-support plans for transgender students without parental knowledge or consent and authorized the withholding of

related information if school officials deemed parents to be unsupportive. *Id.* at 626.
The plaintiffs were parents who challenged the policy without allegations that any
of their children were considering gender transition, had gender support plans, or
had any discussions with school officials about gender identity. *Id*. at 629-30. At
most, the plaintiffs alleged that some of their own children "might soon be subject
to a gender support plan that is withheld from them." *Id.* at 630.

Applying the logic of *Clapper*, the Fourth Circuit rejected the plaintiffs'
standing argument because the alleged injury depended "on a speculative fear, the
occurrence of which requires guesswork as to actions of others." *Id.* at 631; *id.* at 630
(explaining that, under *Clapper*, a "speculative chain of possibilities that required
guesswork as to how independent decisionmakers will exercise their judgment was
insufficient to establish Article III standing." (cleaned up)). Rather, the plaintiffs
needed to "show a substantial risk that they will be injured by the school's policy of
nondisclosure—not merely that it applies to their children in the abstract." *Id.* at 633.
Because they failed to do, they lacked standing. *Id.* at 635-36.

Like the plaintiffs in *Clapper* and *John & Jane Parents 1*, Plaintiffs here rest
their injuries on a speculative chain of possibilities. They present grievances about
the potential of having to compete against transgender women or share locker rooms
with them in future collegiate championships. But no Plaintiff alleges a substantial

likelihood that she will compete against a transgender woman at any certainly impending time in the future.

The Plaintiffs who allegedly have remaining NCAA eligibility and thus are covered by Count V are Eades, Erzen, Fox, Merryman, the Roanoke Swimmers, Track Athlete A, and Swimmer A.[4] Count V explicitly limits their claims to prospective relief. *Id.* at 845 ("preliminary and permanent injunctive relief"). Those Plaintiffs allege as a prospective injury only that they are "at increased risk of injury and/or being required to compete against and/or share locker rooms and other women's safe spaces with biological males." *Id.* ¶ 720; *see also id.* ¶ 711 (they "have reasonable concerns that due to the NCAA's Transgender Eligibility Policies they will be required to compete against biological males during their NCAA careers.").

Those allegations are insufficient to confer standing because they suggest only that these plaintiffs *might* someday compete against a transgender woman but do not specify a particular event or a particular future date. Plaintiffs Erzen (soccer and track), Eades (tennis), and Fox (swimmer) are Division I athletes who state only that they are "aware" of transgender collegiate athletes but do not allege that they are likely to compete against any of them. SAC ¶ 704. Nor is that likely. Of the four

---

[4] Although Plaintiff Slusser alleges NCAA eligibility at the time the complaint was filed, she alleges that that eligibility will run out by December 2024. *Id.* ¶ 699. As explained below, that will make her claim to injunctive relief moot.

transgender athletes they identify, three are in different NCAA divisions, and the other plays a different sport than those Plaintiffs. *Id.* ¶¶ 705-710.

The allegations of the other Eligible Plaintiffs are similarly deficient. Track Athlete A alleges that she competed against a transgender woman at a single past competition, (*id.* ¶ 633), and then merely speculates that she may compete against that athlete again in the future without alleging when that is likely to occur or how doing so would affect her (*id.* ¶¶ 634-638). Merryman alleges that she played volleyball against a transgender athlete in high school and is "aware" that high-school level transgender athletes are "seeking to be recruited to play on women's college or university teams" that she does not identify. *Id.* ¶ 700. Finally, Swimmer A and the Roanoke Swim Team Plaintiffs offer no plaintiff-specific allegations of future injury.[5] Again, a mere possibility is insufficient for standing. *See Clapper*, 568 U.S. at 409.

Although Plaintiff Slusser arguably alleges a non-speculative future "injury" from practicing against a transgender teammate, the Court will not have jurisdiction to grant her injunctive relief because, based on Plaintiffs' allegations, she will have no eligibility and will not face that future harm within a matter of weeks. SAC ¶ 65

---

[5] The Roanoke Swimmers allege past injury because a single transgender woman athlete asked to join their swim team in Fall 2023 and then later withdrew that request before she participated on the team. SAC ¶¶ 611-632. The SAC does not seek past damages for the Roanoke group and does not seek any request for prospective relief because another transgender woman might ask to join their team.

("Plaintiff Brooke Slusser is a rising senior NCAA volleyball athlete who competes on the San Jose State University volleyball team in NCAA Division I"), *id.* ¶ 643 ("Brooke has been the primary setter on the SJSU women's volleyball team during the 2023 and 2024 NCAA seasons"), *id.* ¶ 699 ("Brooke will compete on the SJSU women's volleyball team through at least the Mountain West Conference Tournament which will take place on November 27-30, 2024, and thereafter, should SJSU qualify, in the NCAA Division I Women's Volleyball National Championship tournament in December"). Slusser includes no allegation that she will play NCAA volleyball after this season. "The purpose of an injunction is to prevent future violations, so for a claim for injunctive relief to remain a live controversy there must exist some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n, Inc.*, 115 F.4th 1266, 1283 (11th Cir. 2024). Consequently, "if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief," then the case is moot. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (cleaned up).

Here, Slusser does not allege that she will have NCAA eligibility after December 2024. SAC ¶¶ 65, 643, 699. Given that, Slusser will not be subject to any alleged future harm and her injunction request will be moot. *Graham v. AG, Ga.*, 110 F.4th 1239, 1244-45 (11th Cir. 2024) (request for injunctive relief in concluded

election moot); *F.R. v. Gonsoulin*, No. 20-10992, 2021 U.S. App. LEXIS 28294, at *7-8 (11th Cir. Sep. 20, 2021) (injunction request for enrollment in a public high school moot after student graduated high school).

\* \* \*

"[A] plaintiff seeking declaratory or injunctive relief must allege and ultimately prove a real and immediate—as opposed to a merely hypothetical or conjectural—threat of *future* injury." *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (internal quotation marks and citation omitted). The Eleventh Circuit has instructed that "[o]pening the door of the federal courthouse to litigants with such nebulous allegations of future harm would constitute an overreach of federal equitable power," and has stated plainly that it refuses to allow courts "to venture down that path." *Worthy v. Phenix City*, 930 F.3d 1206, 1216 (11th Cir. 2019). Because none of the Plaintiffs has alleged with specificity that she will compete against a transgender woman athlete in a specific competition at a specific future date, none of them is able to demonstrate the required definite future harm. The Court should therefore dismiss Plaintiffs' prospective claims for injunctive and declaratory relief. *Mack*, 994 F.3d at 1356-57.

### D.    Plaintiffs Fail to Properly Allege Doe Defendants

The Court should dismiss the allegations against John Does 1-25. "As a general matter, fictitious-party pleading is not permitted in federal court."

29

*Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); *see also Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1268 (N.D. Ga. 2022) (disregarding fictious defendants); Fed. R. Civ. Proc. 10(a) ("The title of the complaint must name all parties."). A Doe claim is "properly dismissed" when "the description in [the] complaint was insufficient to identify the defendant among . . . many" possible people. *Richardson*, 598 F.3d at 738. Similarly here, Plaintiffs describe John Does 1-25 only as unknown "agents of the NCAA." SAC ¶ 118. That is not sufficient.

## V.    CONCLUSION

The Motion to Dismiss should be granted and the Second Amended Complaint should be dismissed with prejudice against the NCAA and John Does 1-25.

Respectfully submitted this 15th day of November 2024.

ALSTON & BIRD LLP

*/s/ Cari K. Dawson*
Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

*Counsel for Defendant National Collegiate Athletic Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that this brief has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

*/s/ Cari K. Dawson*
Cark K. Dawson

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 15th day of November, 2024.

*/s/ Cari K. Dawson*
Cark K. Dawson