# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RILEY GAINES, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01109-MHC |
| | ) | |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' CONSOLIDATED RESPONSE
## IN OPPOSITION TO MOTIONS TO DISMISS
## OF THE NCAA, BOARD DEFENDANTS, AND GTAA

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................... iv

I.  FACTS ALLEGED IN SECOND AMENDED COMPLAINT .................... 2

    A.  Joint Control of Collegiate Athletics .................................................. 2

        1.  NCAA Adopts and Enforces College Athletics Eligibility Rules and Conducts NCAA Championships ....................................... 2

            a.  The NCAA's Control over Eligibility Rules ...................... 3

            b.  The NCAA's Control over End-of-Season National Championships ................................................................. 4

        2.  Georgia Defendants Control their Facilities ............................ 5

    B.  The NCAA is Federally Funded .......................................................... 7

    C.  Plaintiffs' Harm and Injuries .............................................................. 7

        1.  Competitive Harm .................................................................... 8

        2.  Emotional Harm ...................................................................... 8

        3.  Increased Exposure to Safety Risks ........................................ 9

        4.  Invasion of Privacy ................................................................. 9

II.  ARGUMENT ............................................................................................ 9

    A.  Standard of Review ........................................................................... 10

    B.  Title IX Applies to the NCAA on the Alleged Facts ....................... 11

        1.  Direct Federal Funding is Not Required for Title IX to Apply 11

        2.  The NCAA is an Indirect Recipient of Federal Funding .......... 12

        3.  The NCAA's Federally Funded Member Institutions Have Ceded "Controlling Authority" to the NCAA ......................... 15

            a.  The Eleventh Circuit Has Adopted the Ceding Controlling Authority Test ................................................ 15

            b.  The Third Circuit's Reasons for not Applying the Ceding Controlling Authority Test to the NCAA Are Not Persuasive ....................................................................... 19

    C.  Title IX Applies to GTAA on the Alleged Facts ............................. 24

        1.  Georgia Tech Ceded Control of Its Athletic Program and

          Activities to the GTAA ............................................................24

2.     Title IX Applies Equally to Georgia Tech Athletes and Non-Georgia Tech Athletes at the 2022 NCAA Championship.......26

D.     Title IX Forbids Defendants From Allowing Men to Steal Women's Opportunities and Invade Women's Spaces ........................................28

1.     Title IX Forbids Discrimination Based on "Sex" ....................30

2.     Title IX Guarantees Equal Opportunity for Women in Relation to Men ........................................................................30

3.     Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination ................32

4.     Equal, Separate and Private Showers and Locker Rooms........34

5.     Title IX Has Clearly Prohibited Men from Taking Women's Opportunities Since Its Inception ..........................................35

6.     The Georgia Defendants Had Notice That Deliberate Indifference to Men Stealing Women's Opportunities Violates Title IX ........................................................................40

E.     Plaintiffs Adequately Allege the NCAA Is a State Actor .................41

1.     *Tarkanian* Is Not Dispositive ....................................................42

2.     State Universities Delegated to the NCAA the Authority to Re-Define Women's Sports Nationally ..........................................44

3.     State Universities Delegate to the NCAA the Authority to Run NCAA National Championships ...............................................48

F.     Plaintiffs Alleged State Action by GTAA and the Individual Board Defendants........................................................................48

G.     Plaintiffs Have Adequately Alleged Fourteenth Amendment Equal Protection and Bodily Privacy Claims .................................................50

H.     The Individual Board Defendants are Not Entitled to Qualified Immunity ........................................................................53

1.     Legal Standard ........................................................................53

2.     Clearly Established Law Protects Women's Competition and Bodily Privacy in Locker Rooms...............................................54

I.     All Plaintiffs Have Standing to Seek Retrospective Relief ...............55

       1.     Defendants Conflate Redressability and Traceability with Legal Causation ...................................................................................57

       2.     Plaintiffs Have Alleged Redressable and Traceable Injury ......58

  J.    Plaintiffs With Current Eligibility Have Standing to Allege Prospective and Declaratory Relief ....................................................61

       1.     Plaintiffs Have Adequately Alleged Competitive Injuries .......62

       2.     Plaintiffs Have Adequately Alleged Current and Ongoing Informational Injury and Increased Safety Risks ....................64

       3.     Plaintiffs Have Adequately Alleged Current and Ongoing Emotional and Dignitary Injuries ............................................65

       4.     Plaintiffs Have Alleged Current Competitive Harms ..............66

       5.     Plaintiffs with Current Eligibility Have Standing to Pursue Actual and Nominal Damages ....................................................68

  K.    Plaintiffs Have Adequately Alleged Traceability and Redressability Against the Individual Board Defendants ............................................69

  L.    Plaintiffs' Allegations Against GTAA Relate Back to the Filing of the Original Complaint ....................................................................69

  M.   Plaintiffs' Fictitious Defendant Allegations Are Sufficient ................78

  N.    Proper State Entities .............................................................79

III.    CONCLUSION .................................................................80

CERTIFICATE OF COMPLIANCE .......................................................81

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ...................................................................54

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ....................................................... passim

*Alabama, et al. v. U.S. Sec. of Educ., et al*,
  No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ............ 30, 39

*Alexander v. Choate*,
  469 U.S. 287 (1985) ............................................................................33

*Amnesty Int'l, USA v. Battle*,
  559 F.3d 1170 (11th Cir. 2009) ............................................................68

*Arkansas v. DOE*,
  No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ............39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................10

*B.P.J. by Jackson v. West Va. St. Bd. Of Educ.*,
  98 F.4th 542 (4th Cir. 2024) ........................................................ 16, 55

*Bagwell v. City of Atlanta*,
  109 F.R.D. 290 (N.D. Ga. 1985) .........................................................71

*Barrs v. S. Conf.*,
  734 F. Supp. 2d 1229 (N.D. Ala. 2010) .................................................16

*Baughcum v. Jackson*,
  92 F.4th 1024 (11th Cir. 2024) ...........................................................57

*Biedermann v. Ehrhart*,
  No. 1:20-CV-01388-JPB, 2021 WL 1061794 (N.D. Ga. Mar. 19, 2021) ............56

*Bloodworth v. United States*,
  623 F. App'x 976 (11th Cir. 2015) ....................................................................77

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020)................................................................................ 30, 55

*Bowden v. Wal-Mart Stores, Inc.*,
  124 F.Supp.2d 1228 (M.D. Ala. 2000) .............................................................71

*Bowers v. NCAA*,
  118 F. Supp. 2d 494 (D.N.J. 2000)............................................................. 13, 15

*Brannum v. Overton Cnty. Sch. Bd.*,
  516 F.3d 489 (6th Cir. 2008) ................................................................ 34, 50, 51

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001)........................................................................... passim

*Bridges v. Burnstein*,
  No. 1:04-cv-1022, 2005 WL 8154519 (N.D. Ga., Aug. 9, 2005) .......................71

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979)............................................................................ 16, 30

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
  563 F.2d 793 (6th Cir. 1977) ................................................................. 32, 37

*Carroll Indep. Sch. Dist. v. DOE*,
  No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. Jul. 11, 2024)................39

*Chalenor v. Univ. of N. Dakota*,
  291 F.3d 1042 (8th Cir. 2002) ..........................................................................28

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) ........................................................................63

*Church of Scientology of California v. United States*,
  506 U.S. 9 (1992)..............................................................................................79

*Citizens Insurance Company of the Midwest for deWitt v. Stone*,
  No. 1:16-cv-56, 2016 WL 9275409 (N.D. Fla. Nov. 30, 2016)................... 70, 71

*Clapper v. Amnesty Int'l, USA*,

568 U.S. 398 (2013) ............................................................................................. 62

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
    695 F.2d 1126 (9th Cir. 1982) ..................................................................... 32, 37

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ............................................ 16, 17, 18, 22

*Cureton v. NCAA*,
    198 F.3d 107 (3d Cir. 1999) ........................................................................ 19, 20

*Davis v. Monroe Cnty. Bd. of Ed.*,
    526 U.S. 629 (1999) .................................................................................... passim

*Dean v. Barber*,
    951 F.2d 1210 (11th Cir. 1992) ............................................................................ 78

*Dep't of Educ. v. Louisiana*,
    144 S. Ct. 2507 (Aug. 16, 2024) .......................................................................... 39

*Doe v. Luzerne Cnty.*,
    660 F.3d 169 (3d Cir. 2011) ................................................................................. 51

*Doe v. Univ. of Kentucky*,
    971 F.3d 553 (6th Cir. 2020) ................................................................................ 27

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ................................................................................................ 64

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
    344 F.3d 1263 (11th Cir. 2003) ..................................................................... 46, 57

*Fortner v. Thomas*,
    983 F.2d 1024 (11th Cir. 1993) ............................................................... 50, 51, 55

*Franklin v. Gwinnett Cnty. Public Schools*,
    503 U.S. 60 (1992) ......................................................................................... 30, 63

*Gebser v. Lago Vista Ind. School Dist.*,
    524 U.S. 274 (1998) ....................................................................................... 32, 36

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ........................................................................ 55, 66

*Grove City Coll. v. Bell*,
   465 U.S. 555 (1984) ...................................................................................11

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ...................................................................................54

*Harris v. Thigpen*,
   941 F.2d 1495 (11th Cir. 1991) ................................................................50

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) .................................................................55

*Horner v. Kentucky High Sch. Athletic Ass'n*,
   43 F.3d 265 (6th Cir. 1994) ................................................... 16, 27, 37

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978) .......................................................................................50

*Itel Capital Corp. v. Cups Coal Co., Inc.*,
   707 F.2d 1253 (11th Cir. 1983) ........................................................ 71, 75

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...................................................................... passim

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ...................................................................................42

*Jacobsen v. Osborne*,
   133 F.3d 315 (5th Cir. 1998) ........................................................... 70, 71

*Jones v. Georgia Dep't of Corr.*,
   763 F. App'x 906 (11th Cir. 2019) .............................................................77

*Kansas v. DOE*,
   No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. Jul. 2, 2024) ...........................39

*Kent v. Johnson*,
   821 F.2d 1220 (6th Cir. 1987) ...................................................................50

*Kirk v. Cronvich*,
   629 F.2d 404 (5th Cir. 1980) .....................................................................71

*Krupski v. Costa Crociere S. p. A.*,
    560 U.S. 538 (2010) ........................................................................ 74, 75

*Kuehn v. Cadle Co.*,
    335 F. App'x 827 (11th Cir. 2009) ................................................ 77, 78

*Lindley v. Taylor*,
    No. 2:10-cv-0141, 2015 WL 1293224 (N.D. Ala. Mar. 23, 2015) ......................71

*Louisiana v. DOE*,
    No. 24-30399, 2024 WL 3452887 (5th Cir. Jul. 17, 2024) ..................................39

*Louisiana v. DOE*,
    No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. Jun. 13, 2024) ....................39

*Lugar v. Edmondson Oil Co., Inc.*,
    457 U.S. 922 (1982) ........................................................... 42, 43, 45, 46

*Mack v. USAA Cas. Ins. Co.*,
    994 F.3d 1353 (11th Cir. 2021) ........................................................62

*Manders v. Lee*,
    338 F.3d 1304 (11th Cir. 2003) ........................................................76

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ........................................................................54

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................67

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ........................................................................33

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*,
    860 F.2d 1022 (11th Cir. 1988) ........................................................43

*Nat'l Collegiate Athletic Ass'n v. Smith*,
    525 U.S. 459 (1999) .................................................................. 11, 12

*NCAA v. Tarkanian*,
    488 U.S. 179 (1988) .................................................................. 42, 43

*Neal v. Bd. of Trs. of Cal. State Univs.*,
198 F.3d 763 (9th Cir. 1999) ........................................................................ 31, 37

*Noureddine v. Aronsky*,
2008 WL 11399648, n.8 (S.D. Fla. Jan. 29, 2008)...............................................49

*Oklahoma v. Cardona*,
No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. Jul. 31, 2024)..............39

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) .............................................................................52

*Pearson v. Callahan*,
555 U.S. 223 (2009)..............................................................................................53

*Peltier v. Charter Day Sch., Inc.*,
37 F. 4th 104 (4th Cir. 2022) ........................................................................ 65, 66

*Pompey v. Lumpkin*,
321 F.Supp.2d 1254 (M.D. Ala. 2004) .......................................................... 70, 71

*Portz v. St. Cloud State Univ.*,
16 F.4th 577 (8th Cir. 2021) ................................................................................28

*Quad Int'l, Inc. v. Doe*,
No. CIV.A. 12-675-N, 2013 WL 105268 (S.D. Ala. Jan. 7, 2013).....................79

*Reed v. Goertz*,
598 U.S. 230 (2023)..............................................................................................69

*Richardson v. Johnson*,
598 F.3d 734 (11th Cir. 2010) ..............................................................................78

*Saucier v. Katz*,
533 U.S. 194 (2001)..............................................................................................53

*Sepulveda v. Ramirez*,
967 F.2d 1413 (9th Cir. 1992) ..............................................................................52

*Smith v. Nat'l Collegiate Athletic Ass'n*,
266 F.3d 152 (3d Cir. 2001) ....................................................... 13, 14, 19, 20

*Snyder-Hill v. Ohio State Univ.*,
    48 F.4th 686 (6th Cir. 2022) ...................................................................26

*Soule Connecticut Ass'n of Sch., No. 3:20-CV-00201(RNC),*,
    2024 WL 4680533 (D. Conn. Nov. 5, 2024) ........................................37

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..................................................................................52

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)..................................................................................10

*Tennessee v. Cardona*,
    No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) .....................39

*Tennessee v. Cardona*,
    No. 24-5588, 2024 WL 3453880 (6th Cir. Jul. 17, 2024) ...................................39

*Texas v. United States*,
    No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. Jul. 11, 2024) .....................39

*Tinker v. Des Moines Ind. Comm. School Dist.*,
    393 U.S. 503 (1969)..................................................................................59

*Tolston v. City of Atlanta, Georgia*,
    723 F. Supp. 3d 1263 (N.D. Ga. 2024)........................................... 76, 77

*United States v. Virginia*,
    518 U.S. 515 (1996)........................................................ 10, 31, 34, 50

*Vielma v. Gruler*,
    808 F. App'x 872 (11th Cir. 2020)............................................... 78, 79

*Vinyard v. Wilson*,
    311 F.3d 1340 (11th Cir. 2002) ...............................................................54

*Wayne v. Jarvis*,
    197 F.3d 1098 (11th Cir. 1999) ...............................................................76

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...............................................................55

*Williams v. Board of Regents*,
  477 F.3d 1282 (11th Cir. 2007) ........................................................ 11, 16, 24, 25

*Williams v. Sch. Dist. of Bethlehem, Pa.*,
  998 F.2d 168 (3d Cir. 1993) ........................................................ 31, 37

*Winter v. Penn. State Univ.*,
  172 F. Supp. 3d 756 (M.D. Pa. 2016) .................................................. 27

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*,
  647 F.2d 651 (6th Cir. 1981) ........................................................ 31, 37

**Statutes**

20 U.S.C. § 1681 ........................................................ 11, 17, 18

20 U.S.C. § 1681(a) ........................................................ passim

20 U.S.C. § 1687 .................................................. 26

**Rules**

Fed. R. Civ. P. 15(c)(1)(B) .................................................. 70

Fed. R. Civ. P. 15(c)(1)(C) .................................................. 69

Fed. R. Civ. P. 15(c)(1)(C)(i) .................................................. 70

Fed. R. Civ. P. 15(c)(1)(C)(ii) ........................................................ 70, 74, 75

Fed. R. Civ. P. 25(d)(1) .................................................. 80

**Regulations**

34 C.F.R. § 106.30 .................................................. 35

34 C.F.R. § 106.33 ........................................................ 10, 34, 35

34 C.F.R. § 106.41 .................................................. 26

34 C.F.R. § 106.41(a) .................................................. 26

34 C.F.R. 106.41(c) ........................................................ 27, 37

85 Fed. Reg. 30026 (May 19, 2020) .................................................. 35

The National Collegiate Athletic Association ("NCAA") acts as the national athletics governing body for U.S. public colleges and universities. The NCAA and its member colleges and universities across the country – including the Georgia Defendants[1] – jointly control college athletics. Corrected Second Amended Complaint (SAC), [Doc. 94] ¶¶ 128–157. Over 90% of NCAA member schools are federally funded, either directly or indirectly. *Id.* ¶ 129.

Plaintiffs allege, and the NCAA does not dispute, that the NCAA is an association made up almost entirely of federally funded universities subject to Title IX and that these universities associate together as NCAA members to issue the rules that govern college sports nationwide for NCAA members. *Id.* ¶¶ 128-29, 133. Plaintiffs further allege, and the NCAA does not contest, that on behalf of its members the NCAA operates an elaborate "enforcement" process whereby it investigates "infractions" of its rules and imposes "sanctions" on member institutions which violate the rules. *Id.* ¶¶ 135.f., 136. Plaintiffs also allege, and the NCAA does not dispute, that it entirely "controls" the national championships for its member institutions, *id.* ¶¶ 135.a., that the NCAA annually distributes upwards of $600,000,000 to its members which comply with its rules, *id.* ¶¶ 143, 151-57, and that the NCAA exists to

---

[1] "Georgia Defendants" refers to Defendants other than the NCAA *including* the Georgia Tech Athletic Association, a Georgia non-profit, and its representatives, which Plaintiffs recently discovered signed the event hosting agreement for the 2022 NCAA Division I Swimming & Diving Championships (the "2022 Championships" or "2022 NCAA Championships").

provide a cohesive national collegiate sports product from which its members profit. *Id.* ¶¶ 143-57.

Nevertheless, the NCAA argues that Plaintiffs have not sufficiently alleged that the NCAA exercises any controlling authority over its members and that both the schools and the NCAA can sidestep any coverage under federal law when federally funded schools adopt rules through the NCAA. In so doing, the NCAA seeks to impose upon Plaintiffs a pleading standard foreign to the Federal Rules and not found in any case.

To the contrary, as further explained below, the NCAA and its members, including the Board Defendants,[2] and the Georgia Tech Athletic Association ("GTAA") are subject to Title IX and the Constitution due to their receipt or control of federal funds, joint efforts, and intertwined relationship. Plaintiffs have adequately pled as much and are entitled to discovery to establish their claims.

## I.    FACTS ALLEGED IN SECOND AMENDED COMPLAINT

### A.    Joint Control of Collegiate Athletics

#### 1.    NCAA Adopts and Enforces College Athletics Eligibility Rules and Conducts NCAA Championships

NCAA member institutions cede controlling authority to the NCAA to conduct the following aspects of each member's program for intercollegiate athletics:

---

[2] The "Board Defendants" refers to the Board of Regents of the University System of Georgia and the individually named defendants.

> (1) conducting and marketing NCAA championships,
>
> (2) managing media rights and financial distributions regarding NCAA championships,
>
> (3) developing guidance, rules and policies for student-athlete physical and mental health, safety and performance,
>
> (4) providing education and training for diversity, equity and inclusion initiatives in intercollegiate sports,
>
> (5) adopting eligibility rules governing intercollegiate athletics and student-athletes, and
>
> (6) running the eligibility rules enforcement process to which all member institutions, their staffs, coaches and student-athletes are subject and to which they submit.

SAC ¶ 137. This framework is implemented and enforced through the NCAA Constitution and bylaws, whereby member institutions delegate to the NCAA the right to define significant parameters of their athletics programs. *Id.* ¶¶ 128–157, 177–186, 777–792.

The delegation of authority by NCAA member institutions to the NCAA to define the parameters of collegiate sports is part of the bargain between the NCAA and its members that enables the NCAA to create "a coherent collegiate sports product," *id.* ¶ 146, in exchange for the NCAA member institutions' right to a share of "more than $600,000,000.00 annually" in NCAA revenues, *id.* ¶¶ 151–153, and to increase the value of their institutional brands and of the athletic conferences of which virtually all are members. *Id.* ¶¶ 149–150.

### a.    The NCAA's Control over Eligibility Rules

As part of its role in "adopting eligibility rules" and "diversity, equity, and

inclusion initiatives in intercollegiate sports," the NCAA adopted the NCAA Transgender Eligibility Policies (TEP). *Id.* ¶¶ 135.e., 181. "The decision to implement the NCAA's [TEP] is an Association-wide decision made by the NCAA Board of Governors." *Id.* ¶ 177. This decision falls "directly within core areas which NCAA members have outsourced to the NCAA." *Id.* ¶ 178. "Each public university governed by the Board of Regents of the University System of Georgia, and its separately incorporated but affiliated and entwined non-profit athletic association, applies the NCAA [TEP] and is required by the NCAA to do so." *Id.* ¶ 127. Pursuant to the NCAA TEP, males are authorized to compete on women's teams in college sports if they affirm a female gender identity and affirm they have engaged in a single year of testosterone suppression. *Id.* ¶¶ 198, 204, 268, 292, Appendix B. Further, the "NCAA requires its members to submit to NCAA rules and regulations regarding . . . the rules under which athletic contests between Association members will be played . . . [and] the rules for national championships among Association members." *Id.* ¶ 133.

### b.    The NCAA's Control over End-of-Season National Championships

The NCAA controls the planning and operation of NCAA Championships. The NCAA Constitution expressly provides that "The Association shall . . . Conduct all NCAA Championships." *Id.* ¶ 135.a. The NCAA must "conduct[] championships in a manner designed to protect, support and enhance the physical and mental health

and safety of student-athletes." *Id.* ¶ 135.c.i. The NCAA required championship hosts to "complete an 'anti-discrimination questionnaire.'" *Id.* ¶ 220.

The NCAA has repeatedly and publicly made clear it controls who competes in NCAA Championships. For example, in 2020, the NCAA Board of Governors unequivocally threatened to withdraw its championships from any host university, city, or state across the country that did not follow the TEP. *Id.* ¶ 233.

The NCAA selected Georgia Tech to host the 2022 NCAA Championships and signed a contract with the GTAA to host the Championships. *Id.* ¶ 419. The GTAA, on behalf of Georgia Tech, "gave the NCAA the privilege to operate and control the McAuley Aquatic Center during the period of the Championships," *id.* ¶ 420, and was required "to comply with the NCAA [TEP]." *Id.* ¶ 425. The "women's locker room at the McAuley Aquatic Center" was under GTAA and Georgia Tech control and was "not accessible by men, including trans-identifying men," but was made accessible to Lia Thomas, a man who under the TEP competed on a women's team at the "insistence of NCAA officials." *Id.* ¶¶ 452–457. Thus, the NCAA controlled which athletes were eligible to compete in women's events and allowed a man to compete in the 2022 NCAA Championships. *Id.* ¶¶ 179, 180, 420–439, 442, 455–457, 543, 569, 591, 807.

### 2. Georgia Defendants Control their Facilities

While the NCAA controls the rules of collegiate athletics and operationally

controls all NCAA championships, universities still legally and physically control their own facilities. The Georgia Defendants always retained "full access, authority and control" over the McAuley Aquatic Center. *Id.* ¶¶ 420–423, 807. For the 2022 NCAA Championships, the Georgia Defendants made Georgia Tech representatives available, including a "Tournament Manager" and a "Facility Manager" to ensure the TEP and the NCAA plans were followed, *id.* ¶¶ 428–438, and agreed to work "side-by-side with the NCAA" to implement the TEP. *Id.* ¶ 431. The Georgia Defendants gave the NCAA "operational control," but not legal or physical control, of the facilities which were still run by the Tournament Manager and Facility Manager, both employees of Georgia Defendants. *Id.* ¶¶ 420–423, 428–438.

Given GTAA and Georgia Tech's legal and physical control of their own facilities, the Georgia Defendants and the NCAA collaboratively and interdependently worked together such that they "jointly organized" the 2022 NCAA Championships. *Id.* ¶¶ 434, 795, 813. The Georgia Defendants took "an active role in the decision-making process . . . that led to Lia Thomas participation in the event and . . . use of the women's locker rooms." *Id.* ¶ 426. Neither the Georgia Defendants nor the NCAA did anything to stop Thomas' access, *id.* ¶¶ 457, 484, 513–518, 722, despite Georgia officials being in regular communication with the NCAA. *Id.* ¶¶ 426–439. Further, the GTAA maintained control over separate locker rooms not used during the 2022 NCAA Championships. *Id.* ¶¶ 88. These locker rooms could have

accommodated Thomas. *See id.* ¶ 510.

GTAA and the Individual Georgia Defendants knew about implementation of the TEP at the 2022 NCAA Championships and could have acted to prevent or stop it, including the members of the Board of Regents, Georgia Tech President Cabrera and the Tournament Manager and Facility Manager. *Id.* ¶¶ 424–431, 438, 795, 805–807, 813, 816, 820–823.

### B.    The NCAA is Federally Funded

The NCAA is an indirect recipient of federal funding through its "Grand Alliance" with the Department of Defense (DoD) through which the NCAA channels federal funds to member institutions the NCAA selects for concussion research and education. *Id.* ¶¶ 158–176. There the NCAA and the DoD have partnered "to fund the most comprehensive study conducted in the history of concussion research." *Id.* ¶ 167. The research furthers the NCAA's mission of improving athlete health and safety and "has resulted in NCAA rule changes." *Id.* ¶ 173; *id.* ¶ 135.c.ii.

### C.    Plaintiffs' Harm and Injuries

The NCAA and Georgia Defendants injured Plaintiffs by implementing the TEP at the 2022 NCAA Championships when they allowed a man to compete against the nation's best female collegiate swimmers and use the women's locker room. *Id.* ¶¶ 787, 807. The NCAA TEP continues to harm women in college sports. *Id.* ¶¶ 843-44, 848.

7

### 1. Competitive Harm

Males enjoy significant athletic performance advantages rooted in male biology. *Id.* ¶¶ 34–37, 270–314. These advantages create a performance gap that exclusively favors men. *Id.*; *see also id.* ¶¶ 374–393 (safety risks for women). The TEP ignores this. It has no provisions for monitoring compliance with the testosterone suppression requirements it purports to impose or the TEP's effect on women's athletics generally. *Id.* ¶¶ 394–402. It also permits men to compete with higher circulating testosterone than women can produce naturally. *Id.* ¶¶ 303–314.

### 2. Emotional Harm

Plaintiffs have suffered emotional and dignitary injuries because the TEP communicates to them that competitive fairness and safety for women are not worth protecting to the same degree that they are protected for men. *See, e.g.*, *Id.* ¶ 517 ("a pervasive sense of: 'Why can't we get the respect that male competitors would get?'"), ¶ 560 ("the NCAA does not care about protecting women or their rights"), ¶ 724 (the TEP "create[s] psychological and emotional injury and dignitary harm"), ¶ 721 (the TEP "creates emotional harm for Plaintiffs as they purport to reduce the identity of women to personal choice and a testosterone level which devalues women."). They are also subjected to slanderous public attacks falsely labeling them as "allegedly bigoted or anti-trans activists" simply for challenging the NCAA's policies. *Id.* ¶ 722–723.

### 3.    Increased Exposure to Safety Risks

The NCAA and member institutions do not provide "any notice to female competitors, even in Contact Sports and Limited-Contact Sports with a higher risk of collisions and concussions and other injuries, that they will be facing a male student-athlete." *Id.* ¶ 713. "In fact, the NCAA refuses to make available information to student-athletes regarding whether any of their opponents are males[.]" *Id.* ¶ 714. This "disparately and adversely impact[s] women . . . increasing their risks" *id.* ¶ 416, and "depriv[ing] them of information vital to … exercising informed consent before competing head-to-head against a male." *Id.* ¶ 718; *see also id.* ¶¶ 418, 714–53. The safety risks for women created by the NCAA TEP are clear. *Id.* ¶¶ 374–393.

### 4.    Invasion of Privacy

Due to the NCAA's TEP and the Georgia Defendants' inaction, Thomas continued throughout the 2022 NCAA Championships to use the women's locker room while women were disrobing and to disrobe himself in front of women. *Id.* ¶¶ 468–480, 509–518. This caused some Plaintiffs to stop using the locker room to which Title IX guarantees them equal access. *Id.* ¶¶ 485–489, 514. Other Plaintiffs, unaware of other available options, simply sought to endure the unwelcome presence of a male in their locker room as best they could. *Id.* ¶¶ 476–480, 503–505, 509–518.

## II.    ARGUMENT

"Title IX's mandate of gender equity in sports" revolutionized women's sports. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819

(11th Cir. 2022) (Lagoa, J. concurring). "[O]ne need not look further than … [a] local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Id.* Title IX requires separation by biological sex where necessary to ensure equal educational opportunities for women, 20 U.S.C. § 1681(a), and bodily privacy. 34 C.F.R. § 106.33. The Fourteenth Amendment requires the same thing. *United States v. Virginia* (*VMI*), 518 U.S. 515, 533, 550 (1996).

However, the Defendants unlawfully redefined "sex" to include men who self-identify as women and suppress their natural testosterone levels. This redefinition guts Title IX and the Fourteenth Amendment protections for "women," steals women's opportunities, and eliminates women's safe spaces.

Defendants offer a host of arguments why Title IX and the Constitution either do not apply to them or do not protect the right of female athletes to equal opportunity in women's sports. Each argument fails. Plaintiffs are entitled to proceed with this litigation against all the Defendants.

### A.    Standard of Review

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (cleaned up).

### B.    Title IX Applies to the NCAA on the Alleged Facts

The NCAA argues it is not subject to Title IX because it is not a recipient of federal funding, either directly or indirectly. Doc. 103-1 at 7–10. It also argues that the "controlling authority" test recognized by the Eleventh Circuit in *Williams v. Board of Regents*, 477 F.3d 1282, 1294 (11th Cir. 2007), does not apply to it because it has no say over collegiate athletic programs. Doc. 103-1 at 11–14. The NCAA is mistaken on both fronts.

### 1.    Direct Federal Funding is Not Required for Title IX to Apply

Title IX applies to "any education program or activity" that "receives federal financial assistance." 20 U.S.C. § 1681. Title IX's "inclusive terminology" "encompass[es] *all* forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (internal citations and quotation marks omitted) (emphasis in original). Recognizing the "need to accord Title IX a sweep as broad as its language," the Court is "reluctant to read into [Title IX] a limitation not apparent on its face." *Id.* "[I]f any part of the NCAA received federal financial assistance, all NCAA operations would be subject to Title IX." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 460 (1999) (*Smith I*).

In 1999, the Supreme Court issued its only opinion regarding the applicability of Title IX to the NCAA. *Smith I*, 525 U.S. at 469. The Court held that because a student-athlete had not alleged that "NCAA members paid their dues with federal

11

funds earmarked for that purpose" proof of the NCAA's "receipt of dues" merely "demonstrates that it indirectly benefits from the federal assistance afforded its members" *Id*. at 468. The Court concluded that "this showing, without more, is insufficient to trigger Title IX coverage." *Id*.

However, the Court declined to address two alternative theories for bringing the NCAA under Title IX because those theories had not been previously addressed in the litigation. *Id*. at 469. First, plaintiff asserted the NCAA indirectly "receive[d] federal financial assistance through the National Youth Sports Program" administered by the NCAA. *Id*. Second, the plaintiff asserted "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless of whether it is itself a recipient." *Id*. at 469–70. As explained below, both alternative theories that were acknowledged but not addressed in *Smith I* make the NCAA liable under Title IX in this case.

## 2. The NCAA is an Indirect Recipient of Federal Funding

The NCAA is an indirect recipient of federal funding through its "Grand Alliance" *partnership* with the DoD by which the NCAA channels federal funds to member institutions the NCAA chooses for concussion research and education. *See* SAC, ¶¶ 158–176. These indirect funding allegations are sufficient to survive a motion to dismiss and are analogous to the indirect funding allegations addressed in *Smith II*—the Third Circuit's opinion on remand from the Supreme Court's decision

12

in *Smith I. Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 160–63 (3d Cir. 2001) (*Smith II*). The Third Circuit addressed a program, known as the "National Youth Sports Program" (NYSP), that was funded by federal dollars provided to the NYSP "Fund" (NYSPF). *Id*. at 155. The Third Circuit held that Plaintiff's allegations "establish[ed]" that the NCAA "truly assumed control of the NYSP and its Fund . . . the NCAA did more than 'indirectly benefit' from federal assistance . . . rather . . . it was in a position to decide whether to 'receive' federal funds and thereby accept the concomitant obligations of Title IX." *Id*. at 162 (internal quotation alterations and marks omitted.); *see also Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000) (holding that the "obvious administrative entanglements that exist between the NCAA and the NYSPF" and the NCAA's "ability to significantly influence how NYSPF's federal funding is spent" was evidence of indirect funding).

The NCAA argues that because Plaintiffs do not allege that the NCAA *directly* received the federal funding, its association with the DoD is insufficient to bring the NCAA within Title IX. Doc. 103-1 at 8. However, like the NYSP, the issue here is not whether the NCAA directly receives funds, but whether the NCAA controls how the *indirect* federal funding is spent. In *Smith II*, the Third Circuit focused on "the degree to which the [NCAA] is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all." 266 F.3d at 161.

13

On this point, the NCAA argues that Plaintiffs fail to allege that the NCAA can "control decisions made with respect to the money.'" Doc. 103-1 at 9–10 (quoting *Smith II*, 266 F.3d at 161). But Plaintiffs have made this allegation by alleging that the NCAA is operating a comprehensive concussion research study in "partnership" with the DoD. SAC, ¶¶ 155, 158–176. By being in "partnership" with the DoD, the NCAA has control over how federal dollars are used in the study and "shares with some NCAA member institutions [the] research funding obtained by the NCAA from the U.S. federal government." *Id.* ¶ 155.

The NCAA argues that the allegation of partnership is not enough, stating "Plaintiffs' naked assertion of a 'partnership' between the NCAA and the DoD to fund the Grand Alliance is neither the formal nor functional equivalent of the allegations that made the entities in *Smith II* virtually indistinct." Doc. 103-1 at 10–11. But the NCAA is asking too much at this stage of the litigation. "Partnership" is not a label Plaintiffs pulled out of the air to describe the NCAA-DoD relationship. Rather, "partnership" is the *term the NCAA uses* in its own documents, SAC, ¶ 167, and the term used by the President of the United States when announcing the federal funding. *Id.* ¶ 166. While further discovery is needed regarding how the NCAA exerts its control within the Grand Alliance, these allegations, which must be taken as true, are sufficient to survive a motion to dismiss. To hold otherwise would, "ignore . . . evidence [of informal control and] . . . would be to elevate form over substance

14

in a way that should not be countenanced." *Bowers*, 118 F. Supp. 2d at 529.

### 3. The NCAA's Federally Funded Member Institutions Have Ceded "Controlling Authority" to the NCAA

Indirect funding aside, Plaintiffs have also alleged facts sufficient to trigger the second theory in *Smith I* that the Supreme Court did not reach. NCAA member institutions which are direct funding recipients have ceded "controlling authority" to the NCAA over areas of college athletics relevant to this case.

Federally funded NCAA member institutions have ceded control to the NCAA for reasons like those supporting the NCAA's status as a state actor. *See infra* at 44–48. But even if the Court did not find state action, the SAC clearly alleges that federally funded NCAA member entities—over 90% of NCAA members—ceded the rulemaking and enforcement components, the transgender athlete eligibility component, and the end-of-season national championship aspects of their athletic programs to the NCAA. SAC, ¶¶ 122–157, 177–186, 777–792. Beyond that, the Georgia Defendants in particular also ceded operational control of their public facility for the purpose of hosting the 2022 NCAA Championships and implementing the TEP in their facility. *Id*. ¶¶ 419–422, 425. If the NCAA doubts these allegations, that's an issue to be resolved after discovery and on summary judgment or at trial.

#### a. *The Eleventh Circuit Has Adopted the Ceding Controlling Authority Test*

Since *Smith I* both the Fourth and Eleventh Circuits have held that Title IX

applies to associations that exercise "controlling authority" over funding recipients. *See Williams*, 477 F.3d at 1294 (university ceded "controlling authority" to non-profit athletics association); *B.P.J. by Jackson v. West Va. St. Bd. Of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024) (Title IX covers "organizations that 'control[ ] and manage[ ]' direct funding recipients," quoting *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994)). The Eleventh Circuit adopted the "controlling authority" test because "if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations" that would leave a large loophole in Title IX coverage. *Williams,* 477 F.3d at 1294. *See also Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1230 (N.D. Ala. 2010) (applying *Williams* to hold recipients had sufficiently alleged ceded "controlling authority" to a college athletic conference).

In *Williams*, the Eleventh Circuit said it relied upon the Western District of Michigan's analysis in *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733–35 (W.D. Mich. 2000), which, in turn, relied heavily on the Supreme Court's decision in *Cannon v. University of Chicago,* 441 U.S. 677, 691-92 (1979), holding that Title IX "was enacted for the benefit of . . . those discriminated against on the basis of sex" as opposed to simply being a "ban on discriminatory conduct by recipients of federal funds" or "a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory

16

practices." Accordingly, "any entity which has controlling authority over a 'program or activity receiving Federal financial assistance' is subject to Title IX's anti-discrimination rule, even if that entity does not itself receive the federal funds which finance the program or activity." *Communities for Equity,* 80 F.Supp. 2d at 733 (quoting 20 U.S.C. § 1681(a)). *Communities for Equity* noted relevant facts about whether the schools had ceded controlling authority:

- The association was "self-supporting" and did "not rely on tax-payer dollars." *Id*. at 736–37.

- The association did not receive "membership dues, tournament entry fees, or service fees" from members. *Id*. at 737.

- Member schools were allowed to schedule matches against non-member schools. *Id.* at 736.

- The association required member schools to "adopt the Regulations and Interpretations" of the association that covered all aspects of athletic programs "as their own and agree to be primarily responsible for their enforcement." *Id*. at 737.

- The association had a "de facto monopoly over interscholastic sports" as all high schools in Michigan were members. *Id*.

- A school's decision to "disregard [association] rules, or leave the [association]" would subject the school to "sanctions (including possible expulsion), jeopardize its ability to compete in statewide tournaments, find it difficult to schedule opponents, and in general providing interscholastic athletic programs … ." *Id*.

Similar factual allegations by Plaintiffs in this case preclude dismissal, and detail how the NCAA exerts control over rules, rules enforcement, and championship events, including eligibility rules such as the TEP and locker room access at national

championships. *See supra* at 2–5. *Communities for Equity* presciently expressed concern that failing to hold an athletic association accountable under Title IX would leave student-athletes without a remedy because the schools and the athletic association would cast blame on each other. *Id*. at 738 n.3. This is precisely what the NCAA and Georgia Defendants are doing here.

The NCAA argues this reasoning does not apply because "Plaintiffs allegations here do not establish that member [institutions] ceded to the NCAA control over their *athletic programs*." Doc. 103-1 at 13 (emphasis original). To the contrary, the SAC plainly alleges that the NCAA effectively controls schools' athletic "programs" and/or "activit[ies]" of schools' athletic departments, *see* 20 U.S.C. § 1681, by controlling significant aspects of college athletics for its member institutions. *See supra* at 2–5. The NCAA dictates the terms under which its member's athletics programs are built and run because every program must comply with the rules the NCAA issues and enforces, and wants to compete in the NCAA championships, which the NCAA unequivocally controls. Even standing alone, were the NCAA not a rulemaking body, end of season national championships are an integral part of college athletics and thereby part of each NCAA member institution's college athletics program and activities that the NCAA controls.

    **b.**    ***The Third Circuit's Reasons for Not Applying the Ceding Controlling Authority Test to the NCAA Are Not Persuasive***

The NCAA asks this Court to apply decades-old Third Circuit decisions in *Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) (*Smith II*) and *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999), which opined NCAA member institutions retain control over their athletic programs no matter what the NCAA does because schools "retain the choice to (1) resist the NCAA's policies, or (2) to withdraw fully or partially from NCAA participation." Doc. 103-1 at 13. Yet, this reasoning guts the controlling authority test, making it easy for recipients of federal funds to avoid Title IX duties by outsourcing them to an athletic association, such as GTAA or the NCAA.

Instead, the Court should apply the analysis in *Williams* and *Communities for Equity*, not *Smith II* or *Cureton*.[3] First, *Cureton* was a Title VI case, not a Title IX case. Second, in both cases the Third Circuit incorrectly relied on *Tarkanian's* finding the NCAA was not a "state actor" pursuant to § 1983. As explained below, the *Tarkanian* holding does not control the outcome at this stage of the case because the SAC alleges fundamentally different facts than in *Tarkanian*. *See infra* at 42–44.

Moreover, *Tarkanian* was a state actor case not a Title IX case and is factually

---

[3] The NCAA argues: "No court has ever applied Title IX to the NCAA under a "ceding control" theory, and the Third Circuit has explicitly rejected that argument twice, relying on Supreme Court precedent." Doc. 103-1 at 11–12. This is not legal argument but simply an observation about what courts have done on different facts.

inapposite regarding the issues here. Indeed, as the dissent argued in *Cureton,* "*Tarkanian* [actually] illustrates the extent of absolute control the NCAA has over its member[s]." *Id*. at 122 (McKee, J. dissenting). The reason this "control" was insufficient to make the NCAA a state actor in *Tarkanian* was that the Supreme Court was focused on whether one *University controlled the NCAA*, not on whether the *NCAA controlled the University* or aspects of its athletics program*, id*. at 124, or upon whether public institutions in each State are intertwined with the NCAA.

Third, *Smith II* and *Cureton* are not binding, and fourth, they are readily distinguishable. Reduced to their relevant facts, these cases held only that the authority of individual schools to control whom they admit as students and to whom they award scholarships or permit to be on their athletic rosters offsets the authority over the school's decision-making that the NCAA gains through freshman eligibility rules pertaining to high school grade point averages and SAT scores which must be attained for prospective student-athletes to be eligible to compete in NCAA competitions. *Cureton*, 198 F.3d at 117–118 (holding member schools and not the NCAA decides which "applicants to admit" and which athletes compete on their rosters); *Smith II*, 266 F.3d at 157 ("Similar to the plaintiffs in *Cureton*, Smith is attacking an eligibility rule that NCAA members may choose to enforce or ignore."). Thus, with respect to the student admission decisions at issue in *Cureton* and *Smith*, the NCAA's control was not absolute and the school had final authority over every admission

decision. The NCAA simply parrots the outcomes in these cases, while ignoring the factual dissimilarities from the case at hand. Indeed, were the reasoning of *Cureton* and *Smith II* as broad as the NCAA suggests, and were those cases applied in other circuits in the manner the NCAA recommends here, there would be no ceding control cases involving high school athletic associations because high schools, just like NCAA member schools, retain the authority to choose which students they admit, and can generally withdraw from their high school association, just as NCAA members can withdraw from the NCAA.

By contrast, this case, at its core, concerns the fact that individual NCAA member institutions are powerless to determine whether women on their individual teams will compete against men on *other* schools' rosters and at the *NCAA championships*. Regardless of whether individual schools control their own rosters (itself a dubious prospect *in relation to the TEP*, given it is a Board of Governors' policy as to which there are no express exceptions), they cannot effectively protect their women from competing against men that the NCAA allows to compete in collegiate athletics championships. The NCAA *alone* has the authority to decide who participates in collegiate national championships for its member institutions because it writes the eligibility rules, "conducts" the championships, and determines eligibility for the championships. SAC, ¶¶ 419–443. Finally, while the Georgia Defendants maintained legal and physical control over their facilities, they ceded operational

control to the NCAA pursuant to their agreement to host the 2022 NCAA Champi-
onships in particular. SAC, ¶¶ 419, 425, 455–457. The factually dissimilar *Cureton*
and *Smith* cases are neither controlling nor persuasive in addressing the ceding con-
trol issue here.

The Board Defendants' motion highlights the extent of NCAA control. They
argue that they are not responsible because they "did not create the *NCAA's*
Transgender Policies . . . [and] did not and could not cause Plaintiffs to compete
against transgender athletes." Doc. 100-1 at 14. Further, Board Defendants argue the
NCAA had "operational control of the facilities and made the decisions regarding
the locker rooms." *Id.* at 15. These arguments track the Michigan court's reasoning,
*see Communities for Equity*, 80 F. Supp. 2d at 738 n.3, which influenced the Eleventh
Circuit in *Williams* and led an Alabama district court in *Barrs* to apply the "control-
ling authority" test to college athletic associations.

At this point, the NCAA argues "[e]ven if Plaintiffs had alleged that the
NCAA assumed complete control over the Championships and locker room deci-
sions, such allegations about control over specific activities would be insufficient to
show control over the federally funded *programs*." Doc. 103-1 at 13 (emphasis orig-
inal). This fundamentally ignores the SAC's allegation that participation of a mem-
ber institution's female athletes in an NCAA Championship is part of a member in-
stitution's athletic program, and part of the *quid pro quo* member institutions agree

to provide to the NCAA. SAC, ¶¶ 145 f., g., h., i., 146, 1489–49, 150 a. A student athlete does not cease to be a part of its member institution's program when competing at an NCAA Championship. If the NCAA "conducts" the operations of its Championships—as it says it does, SAC, ¶¶ 135 a., b., c.i, 137(1), (2), 180, 419-439—then it necessarily controls an aspect of its members' athletic programs/activities during that Championship as to each institution that participates in the Championship. Moreover, the extent to which member institutions treat the NCAA as actually in control both during the Championship and at all other times is a matter for discovery, not a motion to dismiss.

As the SAC alleges, one very public way the NCAA exerts control over member universities is by threatening that they cannot host NCAA Championship events unless they demonstrate adherence to the NCAA's DEI policies, including the TEP. SAC ¶¶ 218-220, 231, 233, 235. Discovery is likely to lead to much detail about how this threat is enforced and the extent to which NCAA institutions comply. For example, Plaintiffs specifically alleged that there is likely to have been extensive communications between the NCAA and Georgia Defendants over the TEP and a male accessing the women's locker room at the 2022 NCAA championships. *Id.,* ¶¶ 219-227, 424-442, 455-57. This information when obtained in discovery is likely to be highly relevant on the question of NCAA control.

In sum, at least one Defendant had controlling authority over women's

23

collegiate athletics and the 2022 Championships. The Court should permit Plaintiffs to conduct discovery and develop evidence showing that via its rules which govern NCAA competitions, its authority to conduct NCAA championships, as well as the influence and leverage the NCAA possesses over its members, the NCAA controlled significant aspects of the athletic programs and activities of covered institutions, thereby invoking Title IX coverage. Plaintiffs' allegations show the NCAA is a recipient of federal financial assistance under both the ceding "controlling authority" and the "indirect recipient" theories. If the evidence shows that the NCAA lacked control, then that will establish Plaintiffs' claims against the Georgia Defendants.

### C.    Title IX Applies to GTAA on the Alleged Facts

GTAA offers two reasons it is not subject to Title IX. First, it argues it does not receive federal funding. Second, it argues that Title IX imposes obligations on GTAA only with respect to Georgia Tech students, not any of the other female athletes from other schools competing at the 2022 National Championships.

### 1.    Georgia Tech Ceded Control of Its Athletic Program and Activities to the GTAA

First, regardless of whether GTAA receives direct or indirect federal funding, in *Williams* the Eleventh Circuit adopted the "controlling authority" test to impose Title IX liability on the University of Georgia Athletic Association (UGAA), the non-profit athletic association of the University of Georgia (UGA). *Williams*, 477 F.3d at 1294. GTAA makes no attempt to distinguish its relationship with Georgia

Tech from the apparently identical relationship UGAA has with UGA.

GTAA argues it is not subject to Title IX because the SAC is "devoid of any allegation that GTAA receives **any** funding, much less extensive funding, from Georgia Tech." Doc. 102-1 at 14 (emphasis original). However, GTAA's argument rests on a misunderstanding of *Williams* where the plaintiff alleged that UGA had "ceded control over one of it programs, the athletic department," to UGAA "and provided extensive funding." *Williams*, 477 F.3d at 1294.

The focus in *Williams* was not on the amount of funding provided by UGA, but that UGA had turned over *control* of its athletic activities to UGAA. As *Williams* noted, "if [the court] allowed funding recipients to cede control over their [activities] to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability." *Id.* Likewise, if Georgia Tech retained control over its athletic programs and athletic department activities, they would be subject to Title IX. Therefore, as in *Williams*, Georgia Tech cannot avoid Title IX liability by simply passing control of its programs and activities to GTAA.

The SAC sufficiently alleges Georgia Tech directly controls GTAA, whose bylaws expressly state its Board of Trustees "shall have control of the intercollegiate athletics conducted at or in the name of the Georgia Institute of Technology." GTAA Bylaws art. VI § 1 (June 3, 2021). SAC ¶ 85. Nothing more is needed, but there is

more. The GTAA Board is composed entirely of Georgia Tech executives and staff, including the Georgia Tech President. SAC ¶ 86. Additionally, all GTAA officers "must be members of Georgia Tech's administration." SAC ¶ 85. Thus, the SAC sufficiently alleges GTAA is controlled by Georgia Tech, a direct funding recipient, and that GTAA controls activities of the Georgia Tech athletics program.

### 2. Title IX Applies Equally to Georgia Tech Athletes and Non-Georgia Tech Athletes at the 2022 NCAA Championship

GTAA also argues that "[t]o the extent GTAA has any Title IX compliance obligations, those obligations are to Georgia Tech students and Georgia Tech student-athletes, none of whom are Plaintiffs in this litigation" because Title IX regulations apply only to "interscholastic, intercollegiate, club or intermural athletics offered by a recipient." Doc. 102-1 at 16 (quoting 34 C.F.R. § 106.41(a)). However, this argument is foreclosed by the plain language of Title IX which expressly prohibits "discrimination [on the basis of sex] under *any* education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Title IX defines "program or activity" broadly, encompassing "all of the operations of" "a college, university, or other postsecondary institution." 20 U.S.C. § 1687. *See, e.g.*, *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022) ("We further hold that 'education program or activity' is defined broadly.").

An "education program or activity" encompasses "interscholastic, intercollegiate, club or intramural athletics," 34 C.F.R. § 106.41, and covers any

intercollegiate event hosted by a school and all participants in that event, necessarily including athletes from other schools. Many intercollegiate events like, for example, a cross-country meet, or a volleyball tournament involve participants from multiple schools. Such intercollegiate athletic events "operate[d] or sponsor[ed]" by a university must comply with Title IX. 34 C.F.R. § 106.41(c). "Congress has made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs." *Horner*, 43 F.3d at 272. Moreover, Title IX was drafted to cover "any ***person***," not just any student. *See Winter v. Penn. State Univ.*, 172 F. Supp. 3d 756, 775 (M.D. Pa. 2016). Not requiring universities to operate sporting events they host in compliance with Title IX would contradict the clear purpose of the statute.

Courts recognize that Title IX protects persons who take advantage of a school's services even when not "students" of that school. For example, *Doe v. Univ. of Kentucky*, 971 F.3d 553 (6th Cir. 2020), reversed a district court's dismissal of a sexual harassment claim by a female community college student for sexual assault committed by a University of Kentucky (UK) student. The court concluded that there was a "genuine dispute as to whether she was denied the benefit of an education program or activity of the University" where the female victim had lived on the UK campus and paid UK fees. *Id*. at 558–59. Likewise, here, by hosting the 2022 Championships, the GTAA, Georgia Defendants, and NCAA, collaboratively operated a

covered "activity" in which swimmers from across the country participated.

Finally, GTAA argues that "compliance" with the "equitable participation" requirement of Title IX can only be "assessed by looking at Georgia Tech's under-graduate population" and examining "whether sports offered by Georgia Tech to its students effectively accommodate the interests and abilities of Georgia Tech students." Doc. 102-1 at 16–17. However, the only cases GTAA cites are against universities disbanding athletic teams: *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042 (8th Cir. 2002), involving a men's wrestling program, and *Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021), challenging dissolution of two women's teams. Naturally, in those cases the courts focused on comparing how the university treated its female athletes compared to its male athletes. Here, however, the resources that Georgia Tech allocates to male versus female programs is not the issue. Rather, the key is whether Defendants denied women student-athletes the full benefits of partic-ipating in the 2022 Championships by discriminating against them based on sex.

### D. Title IX Forbids Defendants From Allowing Men to Steal Women's Opportunities and Invade Women's Spaces

The Board Defendants all but say they are aware the NCAA's policies violate Title IX, stating they are "generally sympathetic to Plaintiffs' views as a policy mat-ter," Doc. 100-1 at 1, while saying *they* did not have "notice" it was illegal for men to compete in women's sports because there is purportedly national disagreement on the issue. *Id.* at 20. GTAA argues similarly that it cannot be liable because Congress

has issued no "clear statement" barring trans-identifying men from "participating in female athletics events." Doc. 102-1 at 20. The NCAA does not address the merits of Title IX at all.

Title IX has always protected women from men who want to take their opportunities and invade their spaces. The law was never unclear in this regard; all Defendants had notice of this fundamental requirement. Any confusion on this issue now is not the result of Congress failing to speak or failing to put any party on notice but is caused instead by an ideology that claims men should be able to compete against women and use their locker rooms if they suppress testosterone and self-identify as women.[4] *See* SAC ¶ 13. Furthermore, to the extent there is confusion on this issue in U.S. sports the NCAA and its member institutions are entirely responsible for opening the door to men competing in women's college sports. The NCAA adopted its misguided, anti-science, and anti-women policies in 2011 long before most, if not all, domestic sports bodies. SAC ¶¶ 197–268, 315–325, 328, 408. The NCAA and Georgia Defendants cannot escape Title IX liability because they voluntarily chose to disregard Title IX and for a decade-and-a-half purposefully sowed seeds of confusion regarding eligibility in women's sports.

---

[4] Plaintiffs do not here take issue with medical treatments for gender dysphoria. Rather, Plaintiffs start with the irrefutable scientific fact that a man cannot change his sex through surgery, testosterone suppression, or any other means.

### 1. Title IX Forbids Discrimination Based on "Sex"

Forty-five years ago, in 1979 the Supreme Court recognized a private right of action to seek monetary damages and injunctive relief for violations of Title IX. *Cannon*, 441 U.S. at 709; *see also Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60 (1992). "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Title IX equalizes opportunities for women by extending its protections based on "sex." 20 U.S.C. § 1681(a). It forbids treating women worse than men.

"Sex" in Title IX does not mean gender identity. *Adams*, 57 F.4th at 813–14 ("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX."); *Alabama, et al. v. U.S. Sec. of Educ., et al*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("sex" in Title IX is "biological sex and not gender identity" (cleaned up)). "Sex" means the physiological or "biological distinctions between male and female." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020). In other words, Title IX is gender blind—it does not take subjective considerations of the gender a person identifies with into account, nor presumes that sex could ever be mutable. However a person identifies, Title IX is focused solely on biology.

### 2. Title IX Guarantees Equal Opportunity for Women in Relation to Men

Title IX protects female students "from being 'excluded from participation in'

or 'denied the benefits of' any 'education program or activity.'" *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). The "[p]hysical differences" between the sexes are "enduring." *VMI*, 518 U.S. at 533. Thus, Title IX not only *permits* sex-based distinctions, but *requires* them where necessary to ensure equal opportunity.

For women to have "equal opportunity" in athletic competition, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Equal opportunity in theory doesn't count. "[T]he mere opportunity for girls to try out" for a team is not enough if they cannot realistically make the roster because of competition from men. *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). Nor is the mere chance to participate on a team enough if women cannot realistically win scholarships or "enjoy the thrill of victory" in sports where males dominate based on sex-linked advantages. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). Title IX's promise of equal opportunity means nothing if institutions ignore biology to permit a man to take a woman's place.

In sport, the enduring physical differences between men and women trend in a single direction. In each NCAA sport, males enjoy significant athletic performance advantages rooted in male biology. SAC ¶¶ 34–37, 270–314. Therefore, where collegiate sports are sex-separated due to enduring physical differences (i.e., male

advantages in size, strength, speed and performance) that separation must be maintained. Men cannot take women's places on women's teams.

The law agrees with the facts alleged here. Due to the "average physiological differences" between the sexes, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). Most "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds*.

### 3. Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination

Sex discrimination includes a federal funding recipient's deliberate indifference towards any conduct that deprives women of equal educational opportunity. *E.g.*, *Jackson*, 544 U.S. at 182 ("deliberate indifference constituted intentional discrimination on the basis of sex"); *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274, 290–291 (1998) (deliberate indifference to sexual harassment); *Davis*, 526 U.S. at 642 (deliberate indifference to hostile educational environment).

Deliberate indifference occurs when the environment the funding recipient controls "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 650–51, *rev'g* 120 F.3d 1390 (11th Cir. 1997)

32

(en banc); *accord Davis*, 120 F.3d at 1412 (Barkett, J. dissenting) (Title IX forbids "intentional discrimination which exposes one sex to disadvantageous terms or conditions to which members of the other sex are not exposed").

The Board Defendants argue that "it does not appear that either the Supreme Court or the Eleventh Circuit has approved of an idleness claim beyond claims involving sexual harassment." Doc. 100-1 at 19. But Title IX sex discrimination takes many forms, not just "severe, pervasive, and objectively offensive" student-on-student sexual harassment the U.S. Supreme Court addressed in *Davis*. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183; *accord N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) ("if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (cleaned up)). A plaintiff need only establish that her environment "effectively denied [her] equal access to an institution's resources and opportunities," and the school was deliberately indifferent to that fact. *Davis*, 526 U.S. at 650–51; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (acts that bar "meaningful access" to a desired benefit).

A recipient's duty not to be deliberately indifferent to sex discrimination is heightened where "the recipient retains substantial control" over the environment where the discrimination occurs. *Davis*, 526 U.S. at 646. In facilities which the

school controls, its power "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* (cleaned up).

Title IX sex discrimination may, therefore, simply refer to any act which diminish(es) a female's use or enjoyment of a particular resource, school location, or opportunity to which females are entitled access, such as a locker room or an athletic field. Where the recipient was aware of the circumstances, which Plaintiffs have alleged here, a recipient's refusal to act to prevent loss of women's opportunities arising from a man's intrusion "fly[s] in the face of Title IX's core principles" and will subject the recipient to claims for monetary damages. *Id.* at 651.

### 4.    Equal, Separate and Private Showers and Locker Rooms

There is a constitutional privacy interest "to shield one's body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd*., 516 F.3d 489, 494, 496 (6th Cir. 2008) (citation omitted). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. Accordingly, Title IX mandates women must have "separate" and "comparable" locker rooms. 34 C.F.R. § 106.33. Permitting men to use women's locker rooms is incongruent with Title IX. Students do not have equal educational benefits if forced to shower or share private spaces with the opposite sex.

Plaintiffs allege that because Thomas was permitted in their locker room

without their knowledge, they unwillingly exposed their bodies to him and unwillingly saw his male genitalia. SAC ¶¶ 496–497, 506. The Georgia Defendants and GTAA followed the NCAA's lead and participated in these violations as they controlled their facilities jointly with the NCAA during the 2022 Championships. SAC ¶¶ 420–423, 807.

These alleged circumstances constitute sex discrimination under Title IX. Even if Plaintiffs' experience in the Georgia Tech locker rooms in 2022 may not be *per se* sexual harassment, it was sufficiently analogous. However one characterizes Plaintiffs' unwelcome and hostile experience, it is "encompass[ed within the] diverse forms of intentional sex discrimination" recognized by the Supreme Court. *Jackson*, 544 U.S. at 183; *see also* 85 Fed. Reg. 30026, 30036 (May 19, 2020) (codified at 34 C.F.R. § 106.30) (defining "sexual harassment" as "conduct on the basis of sex" that is "[u]nwelcome conduct that a reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education"). Plaintiffs also allege violations of 34 C.F.R. § 106.33 which requires "separate" locker rooms for women. SAC ¶¶ 436, 449–518.

### 5.    Title IX Has Clearly Prohibited Men from Taking Women's Opportunities Since Its Inception

GTAA argues that despite Title IX's clear prohibition on sex discrimination for the past four decades, Congress has not issued a "clear statement" that men competing in women's sports is sex discrimination or that athletic associations like

GTAA have a duty to prevent sex discrimination toward athletes who use their facilities. GTAA argues that "under the Spending Clause's clear-statement rule, recipients of federal funding must have clear and explicit notice of any obligations attached to that funding." Doc. 102-1 at 24. It says it had "no notice" that Title IX precluded trans-identifying men from competing in women's sports, that "hosting an NCAA event where the NCAA determined the eligibility criteria could expose them to liability," or that Title IX athletics-related regulations extended to "athletes at other institutions" who used their facilities. *Id.* at 24–25. These arguments ignore the plain meaning of Title IX. GTAA is wrong to say Title IX does not clearly prohibit men competing against women in women's collegiate athletics. Congress does not need to provide "definitive guidance" for the plain terms of Title IX to apply.

"[C]onflicting interpretations" of Title IX are, likewise, not an escape hatch for the Defendants. *Id.* at 25. Before the NCAA adopted the TEP and before the 2022 NCAA Championships, it was well-settled that Title IX protects women vis-à-vis men based on biological sex alone by awarding damages when women's right to equal opportunities is disregarded. *See, e.g.*, *Jackson, supra* (2005) *Franklin, supra* (1992); *Gebser, supra* (1998); *Davis, supra* (1999). Likewise, the U.S. Department of Education (DoE) and numerous Title IX cases before 2022 specifically applied Title IX to protect women's equal opportunities in scholastic sport based on

biological sex.[5] Moreover, neither the Supreme Court nor the Eleventh Circuit has ever held that "sex" under Title IX means gender identity.[6]

The law did not become recently unsettled. Indeed, a district court in Connecticut has found that girls required to compete against trans-identifying boys in high school girls' sports *during 2017-2019* stated a claim for sex discrimination in violation of Title IX. *Soule Connecticut Ass'n of Sch.*, No. 3:20-CV-00201(RNC), 2024 WL 4680533, at *11 (D. Conn. Nov. 5, 2024) (holding "failure to provide [women athletes] with sex-separated competition" states a Title IX claim).

That Title IX protects equal opportunities in women's sports for women has always been clear. However, over the past decade-and-a-half, beginning in 2011 the NCAA purposefully and precipitously chose to promote radical and unscientific transgender eligibility policies and to claim, without evidence, that men can fairly and safely, and in compliance with Title IX, compete against women in sports if they merely suppress testosterone and self-identify as women. *See* SAC ¶¶ 13, 328, 408. The NCAA has since at least 2011, when the NCAA first authorized men to compete in women's college sports, been actively engaged in an anti-science, ideological,

---

[5] 34 C.F.R. § 106.41(c) ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes"); *Neal*, 198 F.3d at 773; *Horner*, 43 F.3d at 272; *Clark*, 695 F.2d at 1131; *Yellow Springs*, 647 F.2d at 657; *Cape*, 563 F.2d at 795; *Williams*, 998 F.2d at 175.

[6] *See Adams*, 57 F.4th at 817 ("equating 'sex' to 'gender identity' or 'transgender status'" implausibly undermines "the validity of sex-separated sports teams").

disinformation campaign designed to change the U.S. sports landscape and undermine the Title IX rights of women in sports. SAC ¶¶ 205–268, 328. But now that the NCAA's radical policies have led to lawsuits, the NCAA and member institutions are seeking to rewrite history and shift the blame for their own decision to fully embrace anti-science gender ideology.

Beginning in 2016 the NCAA Board of Governors vocally and regularly threatened its members and state governments that the NCAA would withdraw collegiate national championship hosting opportunities if NCAA member institutions and States did not bend the knee to the NCAA's gender ideology crusade. *See* SAC, ¶¶ 216-238. The history laid out in the SAC, of the NCAA actively seeking to intervene in state policymaking on the issue of trans-identifying men competing in women's sports, demonstrates the NCAA has long been the Pied Piper on this issue in the U.S., not the courts or other sports organizations as the NCAA, Georgia Defendants, and GTAA now deceptively claim.

GTAA cites the newly revised DoE Title IX Rule (effective Aug. 30, 2024) in support of their qualified immunity argument, contending that Rule is "consistent with the NCAA's [TEP]." Doc. 102-1 at 21–23. However, seven district courts and three circuit courts of appeal have preliminarily enjoined enforcement of the DoE

Rule because it is inconsistent with the clear meaning of Title IX.[7] The only outlier court was the Northern District of Alabama, and in that case the Eleventh Circuit enjoined enforcement of the Rule pending appeal.[8] In fact, all nine Supreme Court Justices accept that the plaintiffs challenging the DoE Rule "were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly redefines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024).

---

[7] *See Tennessee v. Cardona,* No. 24-5588, 2024 WL 3453880 (6th Cir. Jul. 17, 2024) (denying DoE's motion for a partial stay of the district court's preliminary injunction that enjoined enforcement in Tennessee, Kentucky, Ohio, Indiana, Virginia, & W. Virginia)*; Louisiana v. DOE,* No. 24-30399, 2024 WL 3452887 (5th Cir. Jul. 17, 2024) (denying motion for partial stay of district court's injunction that enjoined enforcement in Louisiana, Mississippi, Montana, & Idaho)*; Oklahoma v. Cardona,* No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. Jul. 31, 2024) (enjoining enforcement in Oklahoma)*; Arkansas v. DOE,* No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (enjoining enforcement in Arkansas, Missouri, Iowa, Nebraska, N. Dakota, & S. Dakota)*; Carroll Indep. Sch. Dist. v. DOE,* No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. Jul. 11, 2024) (partially enjoining enforcement in a specific school district)*; Texas v. United States,* No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. Jul. 11, 2024) (enjoining enforcement against individual plaintiffs and state of Texas)*; Kansas v. DOE,* No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. Jul. 2, 2024) (enjoining enforcement in Kansas, Alaska, Utah, Wyoming, and in specific schools)*; Tennessee v. Cardona,* No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. Jun. 17, 2024) (enjoining enforcement in Tennessee, Kentucky, Ohio, Indiana, Virginia, & West Virginia)*; Louisiana v. DOE,* No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. Jun. 13, 2024) (enjoining enforcement in Louisiana, Mississippi, Montana, & Idaho)*.*
[8] *Alabama v. U.S. Sec. of Edu.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) (enjoining enforcement in Alabama, Florida, Georgia & S. Carolina).

The blizzard of decisions enjoining the DoE Rule, with which the NCAA TEP is consonant, confirms that the TEP is rooted in ideology—not any ambiguity about Congress's clear statement that Title IX guaranteed equal opportunity for women. The Eleventh Circuit's holding in *Adams*, 57 F.4th at 812, confirmed that the DoE Rule is an aberration, not settled law that calls into question Congress's clear statement about what Title IX requires.

### 6.    The Georgia Defendants Had Notice That Deliberate Indifference to Men Stealing Women's Opportunities Violates Title IX

The Board Defendants argue the "SAC does not allege conduct on the part of the [Board] Defendants that demonstrates deliberate indifference to alleged discrimination by the NCAA" because "[t]he SAC does not allege that [Board] Defendants received actual notice that Plaintiffs deemed the NCAA's conduct actionable." Doc. 100-1 at 19–20 & n.12. The Board Defendants further argue that they could not have had constructive notice that the NCAA's conduct violated Title IX—whatever their personal policy views—in the light of the national disagreement on the issue, as the SAC acknowledges. (SAC ¶¶ 47–48; Doc. 36-1.)" Doc. 100-1 at 20 n.12.

For the same reasons that GTAA is wrong that Title IX provides no "clear statement" supporting Plaintiffs' claims in this case, the Board Defendants are wrong that they did not have notice that turning over their facilities (whether through GTAA or otherwise) to the NCAA to engage in sex discrimination would constitute

deliberate indifference to that discrimination. *See supra* at 36–37.

No reasonable university could conclude that a fully developed male athlete could compete against women and use their locker room without violating Title IX. Plaintiffs recognize that strong cultural forces driven by anti-science ideology may have weakened the Georgia Defendants' will to resist the NCAA's TEP and refuse to allow its facilities to be used for sex discrimination. But as explained above, Title IX is clear enough. Unwillingness to enforce federal law does not provide an exemption from it.

### E.    Plaintiffs Adequately Allege the NCAA Is a State Actor

The NCAA argues it was not a state actor under Counts: II (Title IX), III (Equal Protection), and IV (14th Amendment Bodily Privacy). Doc. 103-1 at 15–21. However, resolving the NCAA's status as a § 1983 state actor requires more than simply applying the result in *Tarkanian*. Plaintiffs' allegations are different.

First, the NCAA is a state actor because the NCAA and public institutions in every State in the nation work together in a joint, symbiotic, intertwined relationship to create a national product of collegiate athletics. The NCAA regulates and enforces college athletic competition, generally, and NCAA Championships, in particular, while public schools control the facilities at which competitions occur and construct their respective teams using the NCAA's eligibility rules, annually receiving millions of dollars in revenues and institutional brand value from the national product

the NCAA regulates. This is joint action under the state action doctrine.

Second, as explained below, *see infra* at 48, even were the NCAA not a state actor based on its nationwide conduct, it is a state actor in relation to its conduct of the 2022 National Championships in league with the Georgia Defendants.

### 1.   *Tarkanian* **Is Not Dispositive**

The NCAA's status as a state actor does not turn solely on whether "the [Board] Defendants' voluntary[ily] deci[ded] to comply with NCAA policies." Doc. 103-1 at 18. That may have been the fact pattern of *NCAA v. Tarkanian*, 488 U.S. 179 (1988), but it is not the only fact pattern under which the NCAA could be a state actor. Whether a private entity is a state actor under § 1983 is "necessarily [a] fact-bound inquiry" that "var[ies] with the circumstances." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982) (reversing grant of dismissal); *accord Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) ("true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required").

*Tarkanian* addressed the narrow circumstance of whether a state university's "actions in compliance with the NCAA rules and recommendations [in relation to the employment discipline of a single coach] turned the NCAA's conduct into state action." *Tarkanian,* 488 U.S. at 193. The NCAA enforced its rules by recommending the University of Nevada, Las Vegas (UNLV) discipline its head basketball coach, and UNLV subsequently complied. The Supreme Court found only that UNLV

42

retained authority to apply NCAA sanctions to its own coach, and that UNLV's decision to do so did not transform the NCAA into a state actor.

As the Court later said, the facts in *Tarkanian* reflected that the NCAA was then a "collective membership" of "several hundred member institutions, most of them having no connection with Nevada." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). Thus, the Court found the NCAA was not "the surrogate *for the one State*," *i.e.*, Nevada. *Id.* (emphasis added). *Tarkanian* therefore did not resolve the issue of whether when *adopting* eligibility rules and/or *conducting national championships* or when actively conducting a nationwide campaign to open women's scholastics sports to trans-identifying male competitors, the NCAA is a surrogate for public universities in every State who bargain with it to deliver the product of national collegiate athletics.

The NCAA ignores the holding and analysis of *Brentwood*, which is far more analogous to the facts here than *Tarkanian*. In *Brentwood*, the Supreme Court held that when there is "pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness," then an athletic association engages in state action. *Brentwood*, 531 U.S. at 298. *See also Lugar*, 457 U.S. at 937 (finding joint action when "[private entity] has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State"); *Nat'l Broad. Co. v. Commc'ns*

43

*Workers of Am.*, AFL-CIO, 860 F.2d 1022, 1027 (11th Cir. 1988) ("To charge a private party with state action . . . the governmental body and private party must be intertwined in a 'symbiotic relationship.'" (citations omitted)).

The Court in *Brentwood* found pervasive entwinement because the Association was comprised of "members" who are "public schools," scholastic athletics "play an integral part in the public education of" the state institutions, and the member schools "adopt and enforce the rules that make the system work." *Brentwood Acad.*, 531 U.S. at 299. That many of the Association's members were private schools did not preclude finding pervasive entwinement. *Id.*

### 2. State Universities Delegated to the NCAA the Authority to Re-Define Women's Sports Nationally

The NCAA attempts to distinguish *Brentwood* by arguing that "its policies and actions are independent of any particular state" and that it's connection with various states or any state are "too insubstantial." Doc. 103-1 at 20 (citing cases). It says the SAC alleges only that "the [Board] Defendants adopted NCAA policies and acted in accordance with NCAA policies in public buildings," which is insufficient under *Brentwood*. *Id*. at 17. This argument simply misreads the relationship between the NCAA and its public university members alleged in the SAC.

The SAC alleges that the NCAA has a symbiotic, entwined relationship with its member institutions – including hundreds of public universities – that produces what the SAC refers to as NCAA college athletics. *See supra* at 1–5. The SAC also

alleges that the NCAA had a symbiotic, entwined relationship with the Georgia De-
fendants for purposes of hosting the 2022 Championships. *See supra* at 4–7. These
allegations are on all fours with the *Brentwood* factors for establishing pervasive
entwinement. These facts were not considered by the Supreme Court in *Tarkanian*.
No further allegations are required to state a § 1983 claim against the NCAA under
Federal Rule 8(a)(2).

The NCAA's argument that it is not a state actor fundamentally ignores the
"necessarily fact-bound inquiry" of the state action doctrine. *Lugar*, 457 U.S. at 939.
The NCAA relies upon its interpretation of NCAA documents rather than the facts
alleged by the Plaintiffs. Regardless of what the NCAA's governing documents say
about NCAA member institutions retaining authority and control, the SAC alleges
that this is not how the NCAA works in fact. Moreover, the NCAA's own governing
documents state that it "conducts" all NCAA championships. SAC ¶ 135. And the
SAC alleges that the NCAA Board of Governors used the NCAA Championships as
the lever to try to change scholastic sports eligibility rules in every state in the coun-
try. SAC ¶¶ 216–238. If the NCAA disagrees, it may produce evidence to the con-
trary in discovery.

It is also legally irrelevant that NCAA public school members include private
universities in their national athletics enterprise. As the Supreme Court said in *Brent-
wood*, 531 U.S. at 300, the NCAA does not lose authority delegated by state entities

45

merely because private entities associate with it, too. All that is necessary is that the NCAA be a "willful participant," not the exclusive participant, "in joint activity with the State or its agents" such that the two are pervasively entwined. *Brentwood*, 531 U.S. at 296–298 (citing *Lugar*, 457 U.S. at 931).

These alleged facts are not implausible legal conclusions. NCAA members ceded authority to the NCAA to define the parameters of national collegiate athletics as part of the bargain for the NCAA creating "a coherent collegiate sports product," SAC ¶ 146, and in exchange for the NCAA member institutions' right to an annual revenue share and increased value to their own institutional brands and multipurpose athletic conferences. SAC ¶¶ 149, 153. Thus, it is entirely plausible that the delegation of authority to define the nature and parameters of women's college sports nationally was part of the *quid* for at least 600,000,000 *quos*. The NCAA does not attempt to address these allegations in its analysis. *See* Doc. 103-1 at 15–21. But it is the epitome of the NCAA 'insinuat[ing] itself into a position of interdependence" with public universities. *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1278–79 (11th Cir. 2003).

The Board Defendants do not argue it is implausible the NCAA controls material aspects of their athletic activities. They concede this, stating "[Board Defendants] control neither the NCAA nor its policies any more than Plaintiffs do," Doc. 100-1 at 1, the NCAA created, mandated, and enforced the TEP, Doc. 100-1 at 2,

and "only the NCAA purportedly excluded or denied Plaintiffs from the opportunity to compete against only women athletes." Doc. 100-1 at 18.

This case does not present the narrow circumstances addressed in *Tarkanian* concerning NCAA "rules and recommendations" that a single State university decided to enforce against a single university employee. Rather, it is about how the NCAA controls key aspects of college sports nationally that allowed it to change the meaning of "equal athletic opportunity" for women's sports in public universities and federally funded schools throughout the country. The authority to do so was delegated by NCAA member institutions, including hundreds of public universities across the nation. Through its TEP, the NCAA altered the very nature of women's sports across the college landscape and for all of the nation's major public colleges and universities by including men on women's teams.

The NCAA argues that "the [Board] Defendants' voluntary decision to comply with NCAA policies is insufficient to convert the NCAA into a state actor." Doc. 103-1 at 18 (citing cases). But that is not what the SAC alleges. The SAC alleges a fundamentally symbiotic, entwined relationship in which the NCAA and its member institutions, of which a substantial percentage are public universities, work together to present the national and monopolistic product of intercollegiate athletic competition. SAC ¶¶ 133–157. Due to the NCAA's grip on big-college sports, large public universities have no practical choice but to offer an intercollegiate athletics

47

program through the NCAA and to comply with NCAA rules, including the TEP.

### 3. State Universities Delegate to the NCAA the Authority to Run NCAA National Championships

Even if the Court finds that NCAA is not engaged in joint action with its public member institutions, generally, the SAC nonetheless plausibly alleges that the NCAA was engaged in joint action with the Georgia Defendants with respect to the 2022 NCAA Championships and McAuley Aquatic Center, specifically. *See supra* at 4–7. The NCAA's own governing documents state that it "conduct[s]" all NCAA championships. SAC ¶ 135. In 2022, it worked hand-in-glove with the Georgia Defendants who delegated operational control over their facility so the NCAA could conduct the event according to the TEP. SAC ¶¶ 419–425.

These allegations of operational control over a specific event at a public institution are far more specific than the general regulatory and enforcement authority discussed in *Tarkanian*. Under these facts, *Brentwood* controls and warrants denial of the NCAA's motion on state action grounds.

### F. Plaintiffs Alleged State Action by GTAA and the Individual Board Defendants

GTAA summarily argues that "GTAA is a private entity and not a state actor. For that reason alone, these claims against GTAA must be dismissed." Doc. 102-1 at 25–26. This argument cites one case and was not developed. It is waived on that

48

basis. *See, e.g., Noureddine v. Aronsky*, 2008 WL 11399648 * 4, n.8 (S.D. Fla. Jan. 29, 2008).

Waiver aside, the above discussion of *Brentwood* supports the conclusion that GTAA maintains a sufficiently symbiotic and entwined relationship with Georgia Tech, which no one disputes is a state entity. GTAA ran Tech's athletic program, purporting to act on its behalf. While discovery will provide greater detail on the nature of this relationship, the SAC sufficiently alleges that GTAA is a state actor.

The Individual Board Defendants[9] argue the SAC does not link any of the Title IX and constitutional violations "to any act of any Individual [Board] Defendant," Doc. 100-1 at 25, so, Plaintiffs have failed to allege state action and cannot seek an injunction against the state officials in their official capacity. *Id.* at 24–25.

The Individual Board Defendants misunderstand that the SAC alleges that all actions taken by the Georgia Defendants were effected through the individual decisions of the Board of Regents chair, board members, and individual John Doe agents of the Georgia Defendants. SAC ¶¶ 88–121. As explained below in the section

---

[9] The individual board defendants are Ángel Cabrerra, Doug Aldridge, Tom Bradbury, Richard "Tim" Evans, W. Allen Gudenrath, Erin Hames, Bárbara Rivera Holmes, Samuel D. Holmes, C. Thomas Hopkins, Jr., MD, James M. Hull, Cade Joiner, Patrick C. Jones, C. Everett Kennedy, III, Sarah-Elizabeth Langford, Rachel B. Little, Lowery Houston May, Jose R. Perez, Neil L. Pruitt, Jr., Harold Reynolds, Sachin Shailendra, T. Dallas Smith, Mat Swift, James K. Syfan III, Don L. Waters, and John Does 25–50.

discussing traceability and redressability against the Georgia Defendants, Plaintiffs allege that the NCAA and Georgia Defendants jointly caused the Plaintiffs' injuries at the 2022 NCAA Championships and will continue to cause future harm through implementation of the TEP at future events and championships. *See Supra* at 3–7*, *16–18; *infra* at 55–61; SAC ¶ 851. The SAC sufficiently alleges state action by the Individual Board Defendants. *Brentwood*, 531 U.S. at 296–298.

### G.     Plaintiffs Have Adequately Alleged Fourteenth Amendment Equal Protection and Bodily Privacy Claims

As explained above, Plaintiffs allege that the Defendants failed to protect bodily privacy by permitting Thomas to use a locker room with female athletes. *Supra at* 9. The "fundamental rights of privacy" of all humans has been recognized by the U.S. Supreme Court since at least the 1970s. *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2 (1978); *accord Harris v. Thigpen*, 941 F.2d 1495, 1513 (11th Cir. 1991) (quoting *Houchins*, 438 U.S. 1, 5 n.2). This includes a right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). *Cf. Brannum*, 516 F.3d at 494. This right has been established for decades.

Since 1996, the Equal Protection Clause has subjected sex discrimination to intermediate scrutiny. At that time, Justice Ginsburg recognized that, "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements[.]" *VMI*, 518 U.S at

50

550 n.19. In other words, equal access to educational opportunities necessarily implies a right to bodily privacy for women from men. This applies just as much to sports locker rooms where women will be entirely unclothed as it applies to the "living arrangements" described in *VMI*. Thus, post *VMI*, it has been clearly established that failing to provide women separate locker rooms necessary to enjoy their equal access to education is unlawful sex discrimination under the Fourteenth Amendment. *See also Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011); *Adams*, 57 F.4th at 804–07. *Cf. Brannum*, 516 F.3d at 494–95.

Even prior to *VMI*, the Eleventh Circuit recognized the Fourteenth Amendment right to bodily privacy, holding "most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Fortner*, 983 F.2d at 1030 (cleaned up). Thus, as of 1993, *Fortner* made clear that state universities must protect the bodily privacy of female student-athletes in women's locker rooms.

The NCAA and the Georgia Defendants argue that the constitutional right to bodily privacy recognized for decades is "limited to circumstances where the state maintains physical custody of the individual (*e.g.*, prisons, arrestees, foster care)" Doc. 100-1 at 23, 27, and protects individuals from "unreasonable government search" in "a custodial context." Doc. 103-1 at 21–22. Not so. The custodial cases cited in Defendants' briefs vindicate privacy rights *despite* prisoners' loss of liberty.

College athletes clearly have greater privacy rights than incarcerated inmates, or even parolees. *See*, *e.g.*, *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) ("The prison cases are instructive because the constitutional rights of parolees are even more extensive than those of inmates."). The Georgia Defendants and NCAA cannot credibly argue their duty to the nation's best female college swimmers is less than what correctional officers owe to prisoners.[10]

With respect to competitive fairness and equal athletic opportunities for women, the TEP has a disparate, unequal, and discriminatory impact upon women vis-à-vis men. Moreover, the NCAA adopted the TEP knowing it would be applied to women and adversely impact them. Recently, the Supreme Court reaffirmed that any consciousness of a protected trait constitutes an equal protection violation. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023). *VMI* held that sex is a protected trait. If sex conscious policies

---

[10] The NCAA cites a Ninth Circuit case that holds "there is no Fourteenth Amendment fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020). Doc. 103-1 at 21. The case is not binding on this court. Even if it was, it addressed circumstances of a "partial state of undress" in a school restroom, *Barr*, 949 F.3d at 1225, not the facts alleged here where Plaintiffs and Thomas were fully exposed for extended periods of time. SAC ¶¶ 461, 469, 471. Moreover, the policy at issue in *Barr* still provided "alternative options and privacy protections to those who do not want to share facilities with a transgender student." *Id.* at 1226. Those alternatives were never presented to Plaintiffs before Thomas walked into the Aquatic Center locker room and proceeded to undress without warning. SAC ¶¶ 465–467, 469–471.

trigger heightened scrutiny, then sport transgender eligibility policies which involve consciousness of a student's biological sex that disadvantage women are subject to, and fail, *VMI*'s heightened scrutiny.

Finally, the Board Defendants characterize their conduct as merely "providing a venue for the NCAA to hold the 2022 Championships." Doc. 100-1 at 22. However, this is not the extent of the conduct alleged, which includes "knowingly invit[ing] the NCAA to conduct the 2022 NCAA Championships in a public facility … knowing that the NCAA intended to implement the NCAA [TEP]." SAC ¶ 807; *see also* ¶¶ 772, 820. These are plausible allegations the Court must accept for now. Factual disputes are an issue for summary judgment or trial.

### H. The Individual Board Defendants are Not Entitled to Qualified Immunity

The individual Board Defendants claim qualified immunity because they say women's entitlement to equal opportunity in athletics and privacy in locker rooms was not clearly established in March 2022. Doc. 100-1 at 21–24. This is incorrect.

#### 1. Legal Standard

There are two inquiries relevant to qualified immunity: (1) whether "the facts alleged show the officer's conduct violated a constitutional right," and (2) whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding the two-step

inquiry can be conducted in sequence best suited to the particular case); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs do not need to cite a case identical to their own to defeat qualified immunity. When "the words of a federal statute…[are] so clear and the conduct so bad th[en] case law is not needed to establish that the conduct cannot be lawful." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). The focus is "on the objective legal reasonableness of an official's acts." *Harlow*, 457 U.S. at 819. Subjective state of mind or knowledge of the law is irrelevant. *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985).

### 2. Clearly Established Law Protects Women's Competition and Bodily Privacy in Locker Rooms

As explained in response to GTAA's "clear statement" argument, it has been clearly established since the inception of Title IX that Title IX prohibits men from stealing opportunities of women in collegiate athletics and invading women's spaces. *See supra* at 35–40.

Nor do the three cases from outside the Eleventh Circuit cited by the Board Defendants unsettle Title IX's mandate of "separate" women's locker rooms. Doc. 100-1 at 23 n.13 (citing cases). *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 766 (7th Cir. 2023), is not a sports case at all but instead involved a restroom policy and a request by transgender students to "use the stalls in the locker

room to change in privacy."[11] *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), and

*B.P.J.*, 98 F.4th 542, do not discuss locker room usage. Thus, neither decision supports the idea that Title IX requirements concerning sports locker rooms changed.

Moreover, all three cases and the DoE's enjoined Rule have this in common: they rely on a novel extension of *Bostock* (which interpreted Title VII) to re-interpret Title IX, a maneuver that was expressly not reached by the majority in *Bostock* itself. *Bostock*, 590 U.S. at 681 ("none of these other laws are before us"). Clearly established law does not become unsettled in this manner.

As for the right to bodily privacy in locker rooms under the Fourteenth Amendment, as explained above, it has been well-established since at least 1993. *Fortner*, 983 F.2d at 1030.

## I.     All Plaintiffs Have Standing to Seek Retrospective Relief

The Board Defendants contend Plaintiffs' Title IX and Fourteenth Amendment injuries and the threat of future injuries to them are not traceable to, or

---

[11] Restrooms, typically containing private stalls and where students do not disrobe and pull on a technical swimming suit which can leave a woman mostly unclothed for 30 minutes, are fundamentally different from swimmers locker rooms. Recent cases recognizing a right of a transgender child to use their bathroom of choice, start with the premise that **"[n]o one questions that students have a privacy interest in their body when they go to the bathroom**." *Grimm v. Gloucester County School Board*, 972 F.3d 586, 613 (4th Cir. 2020). The transgender bathroom decisions are based on the idea that bodily privacy is protected by "how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Id*. (quoting *Ex rel Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ*., 858 F.3d 1034, 1052 (7th Cir. 2017)). These decisions do not unsettle the law in this area.

redressable by, the Board Defendants. Doc. 100-1 at 13–17. GTAA says the same thing. Doc 102-1 at 11–12.[12] They argue traceability and redressability are lacking for four reasons: (1) they "did not create the NCAA's [TEP]," Doc. 100-1 at 14, (2) they did not cause Plaintiffs to compete against transgender athletes, *id.* (3) the NCAA had "operational control" of the facilities, even while conceding the SAC alleges that the Georgia Defendants "could have prevented" Thomas's use of the locker rooms *id.*, and (4) an order against only the Georgia Defendants "would neither change the NCAA's [TEP] nor prevent other NCAA member institutions from deeming transgender athletes eligible to compete . . . , nor prevent Plaintiffs from competing against such transgender athletes at NCAA events hosted outside of the State of Georgia," *Id.* at 16.[13]

The Georgia Defendants are mistaken. They are jointly liable for Title IX violations which they could have refused to join in and prevented, particularly those

---

[12] GTAA makes its argument on lack of traceability and redressability by "incorporate[ing] by reference the legal and factual arguments made by the Board Defendants regarding standing." Doc. 102-1 at 11. The incorporated discussion is 6.5 pages. Doc. 100-1 at 10–17. This Court does not permit this form of briefing, especially when doing so causes a party's brief to exceed the page limit. *Biedermann v. Ehrhart*, No. 1:20-CV-01388-JPB, 2021 WL 1061794, at *1 (N.D. Ga. Mar. 19, 2021) (citing cases). GTAA did not seek leave to exceed the page limit. *E.g.*, Docs. 99 & 107.

[13] The NCAA concedes that Plaintiffs who seek retrospective relief have standing to redress the Title IX and constitutional violations they suffered at the 2022 NCAA Women's Championships. Doc. 103-1 at 23.

involving the use of their own facilities. This is especially so if, as the NCAA argues, the NCAA does not control its members' athletic programs. Doc. 103-1 at 13–14.

### 1.    Defendants Conflate Redressability and Traceability with Legal Causation

The Georgia Defendants conflate traceability and redressability for standing purposes with evidence of legal causation on the merits. They rely on *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024), which supports Plaintiffs' standing. *Baughcum* held that three plaintiffs had standing to sue county probate judges – who engaged in ministerial acts and had no authority to change the law – over the constitutionality of a law restricting gun ownership to individuals under twenty-one. *Id*. at 1032. *Baughcum* held "[t]he plaintiffs' injuries are fairly traceable to the probate judges and redressable by an order directed to them" because the judges are "responsible for issuing licenses[.]" *Id*.; *accord Focus on the Family*, 344 F.3d at 1273 (indirect harm is still "fairly traceable" for standing purposes (citation omitted)).

The case for traceability is stronger against the Georgia Defendants than the probate judges in *Baughcum*. The Georgia Defendants had the discretion not to allow their facilities to be used to commit Title IX violations. *See* SAC ¶¶ 420–423, 450, 807. Moreover, like the probate judges who could each only issue licenses and implement Georgia's eligibility policy in a single county, the Georgia Defendants do not need to be able to address the hosting of events outside of Georgia. There is redressability through monetary damages under Title IX and against individual

Georgia Defendants under §1983 for violations at the 2022 NCAA Championships and through injunctive relief to prevent future Title IX violations in public university facilities in Georgia. Indeed, the Georgia Defendants' effort to blame the NCAA for using the Georgia Defendants' *own public facilities* and the Georgia Defendants' *own public employees* to further sex discrimination the Georgia Defendants knew would occur shows why an injunction is needed for future NCAA events they host, including the NCAA Division I Women's Swimming and Diving Championships in 2026, and SEC, ACC, and NCAA Championships in other sports. SAC ¶ 851.

### 2. Plaintiffs Have Alleged Redressable and Traceable Injury

The Georgia Defendants ignore they can control their own facilities and how they are used. The Georgia Defendants' duty was to ensure that the McAuley Aquatic Center was not used to carry out sex discrimination.

Plaintiffs have adequately alleged the Georgia Defendants' knowledge and ability to control the McAuley Aquatic Center, SAC ¶¶ 413–439, 450–457, 464–465, 513–514, 722, 807, 820–821, where Thomas competed against female competitors. Plaintiffs' allegations sufficiently state a prima facie case that Defendants were deliberately indifferent to Plaintiffs' loss of competitive opportunities, points, placements, and recognition.

That the NCAA also had operational control of the Championships did not diminish the Georgia Defendants' duty to uphold women's Title IX rights in their

facility. Both the Georgia Defendants and NCAA had "'comprehensive authority ...to prescribe and control conduct[.]'" *Davis*, 526 U.S. at 646 (quoting *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 507 (1969)). While the NCAA enjoyed operational control of the Championships, it was still the Georgia Defendants' Aquatic Center. The Georgia Defendants are culpable to the extent they gave the NCAA the operational control to discriminate against women.

The Board Defendants argue "[i]f [Board] Defendants refused to host the 2022 Championships because of the NCAA's [TEP]…the NCAA may have cancelled the 2022 Championships altogether" or "the NCAA may have transferred the event to the campus of a member institution." Doc. 100-1 at 18–19. Thus, they claim "the conduct of the named [Board] Defendants is ultimately irrelevant." *Id.* at 19.

This misses the point. Whatever might have happened in a hypothetical universe, the Georgia Defendants hosted the 2022 NCAA Championships and either intentionally permitted a man to compete against women and share their locker room or were deliberately indifferent to it. Just because other recipients could, hypothetically, have committed sex discrimination at other facilities does not excuse the Georgia Defendants from *committing* sex discrimination at theirs.

Whether the NCAA and Georgia Defendants considered alternative sites or cancelling the Championships is a question for discovery. If such discussions occurred, that would only confirm that, at a minimum, the Georgia Defendants

exercised joint control with the NCAA over whether the McAuley Aquatic Center would be used to violate Title IX. As in *Davis*, where the school was jointly liable for injuries caused by others, the Georgia Defendants can be jointly liable for injuries caused by the NCAA's TEP which they knowingly participated in implementing.

The Board Defendants argue that at best the SAC includes only "conclusory allegations of passive and secondary acts," and it was "the decisions of the NCAA" that caused Plaintiffs' harm. Doc. 100-1 at 18. But the Board Defendants do not "passively" own their facilities, and the GTAA does not passively enter into contracts for the purpose of hosting events at those facilities.

They argue that "[a]n order against only the [Board] Defendants would neither change the NCAA's Transgender Policies nor prevent other NCAA member institutions from deeming transgender athletes eligible to compete in women's divisions sports, nor prevent Plaintiffs from competing against such transgender athletes at NCAA events hosted outside of the State of Georgia." Doc. 100-1 at 16. Again, this all misstates the Plaintiffs' allegations and request for relief. Regardless of what other hypothetical institutions might have done with their facilities, Plaintiffs have alleged what the Georgia Defendants did with theirs.

GTAA argues that "without GTAA's compliance with the operational rules and policies established by the NCAA, women student athletes across the country would have been entirely deprived of the athletic opportunity to participate in the

NCAA's championship event." Doc. 102-1 at 12. This is pure speculation. It is also a tacit demand that Plaintiffs settle for co-ed NCAA championships instead of sex-separate and equal opportunities to enjoy fair competition. The entire premise of this lawsuit is that women's athletics is fundamentally altered when men are allowed to compete in those events, and that no venue owned by a federally funded institution may facilitate sex discrimination.

The Board Defendants argue that Title IX applies only when the federal funding "recipient itself" discriminates based on sex. Doc. 100-1 at 18. True. But by operating its facilities to knowingly facilitate sex discrimination, the Board Defendants and GTAA did just that.

The Board Defendants also contend their discretion to control rostering decisions and eligibility is "limited to their own student athletes," noting there is "no allegation of any future competitor attending a Georgia institution." Doc. 100-1 at 15. As discussed above, Title IX requires federal recipients or institutions exercising controlling authority over federal recipients to comply with Title IX for all who use their facilities, not just the students enrolled at their institution. *See supra* at 26–28.

### J.   Plaintiffs With Current Eligibility Have Standing to Allege Prospective and Declaratory Relief

The NCAA and Board Defendants argue there is no standing among Plaintiffs with current NCAA eligibility to seek injunctive or declaratory relief to address the ongoing enforcement of the TEP or future women's athletic events at Georgia Tech.

Doc. 100-1 at 11–14 (Board Defendants); Doc. 103-1 at 23–29 (NCAA). Essentially, the NCAA and Georgia Defendants allege these Plaintiffs have not alleged an injury-in-fact.

Article III requires Plaintiffs to show harm that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Plaintiffs seeking prospective relief must allege facts showing a "substantial likelihood" of "real," "immediate," and "definite" future injury. *Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1356-57 (11th Cir. 2021). They do.

### 1.     Plaintiffs Have Adequately Alleged Competitive Injuries

The NCAA contends "no Plaintiff alleges a substantial likelihood that she will compete against a transgender woman at any certainly impending time in the future." Doc. 103-1 at 26–27. This claim is false. The SAC recites that "transgender athlete Sadie Schreiner of Rochester Institute of Technology (RIT) [is] a male," that "*Track Athlete A will compete against Schreiner next year*" and that "the *NCAA's [TEP]* have harmed Track Athlete A, causing her to lose placements and points to a male, and . . . *will continue to harm her in the future by causing her to lose competitive opportunities, points, and placements to Schreiner in the future*." SAC ¶¶ 74, 633–638 (emphasis added). These allegations show (1) past injury, and (2) that Track Athlete A will compete against Schreiner, a specifically identified trans-identifying

male, in the upcoming NCAA track and field season. They are "plausible" and more than sufficient to satisfy Rule 8 which "does not require detailed factual allegations." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (cleaned up).[14] To be clear, Count V is not limited to prospective injunctive relief, but also seeks retrospective relief, including nominal and actual damages, against the NCAA for Track Athlete A and other Plaintiffs with current NCAA eligibility. *See* SAC ¶ 846, Prayer for Relief.

The NCAA contends, "the Court will not have jurisdiction to grant [Brooke Slusser] injunctive relief because, based on Plaintiffs' allegations, she will have no eligibility and will not face that future harm within a matter of weeks." Doc. 103-1 at 28. However, relief to which Slusser may be entitled could include an additional year or more of NCAA eligibility. *See Franklin*, 503 U.S. at 61 ("Congress did not intend to limit the remedies available in a Title IX suit."). Plaintiff Slusser has alleged harm from competing alongside a male athlete in games and in practices day in and day out for two seasons such that if she establishes a Title IX violation, she could be entitled to injunctive relief requiring the NCAA to give her additional NCAA eligibility. Thus, Brooke Slusser too has adequately alleged facts that give her an interest in future application of the TEP.

---

[14] Track Athlete A is a pseudonym plaintiff due to concerns over retribution. It would not have been prudent to lay out her track schedule in the Complaint.

### 2.    Plaintiffs Have Adequately Alleged Current and Ongoing Informational Injury and Increased Safety Risks

The NCAA and its member institutions do not disclose which athletes competing in women's sports are men. *Supra* at 9 (citing SAC ¶¶ 713–53). This is an "injury in fact" suffered by all Plaintiffs who are current NCAA athletes because the NCAA is withholding information that "on [Plaintiffs'] view of the law, [Title IX] requires that [the NCAA] make public." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). Title IX does not permit the NCAA or its members to surreptitiously turn women's sports into co-ed sports. When this happens, Plaintiffs are entitled to know about it. Defendants cannot argue that Plaintiffs cannot identify enough transgender athletes competing in women's sports while at the same time enforcing policies that allow such athletes to compete surreptitiously. *See, e.g.*, SAC ¶¶ 650, 656 (noting San Jose State University never told Brooke Slusser her teammate was a trans-identifying male).

Disclosing when men compete against women is necessary for a proper assessment of risk and informed consent to participate in competition. *Cf. Akins*, 524 U.S. at 21 (recognizing information "would help them (and others to whom they would communicate it) to evaluate candidates for public office."). Beyond safety risks, refusal to make available information about men competing on women's teams also prevents women from being able to protect their rights to bodily privacy and separate women's locker rooms.

A woman participating on a men's team does not increase safety risks for men. However, allowing men to participate on women's teams does increase safety risks for women, and this increased risk is faced collectively by the entire class of women student-athletes to whom the NCAA TEP apply, which is the smallest group of injured parties that can be currently identified due to the NCAA's failure to provide information allowing women to individually measure risks. *See Jackson*, 544 U.S. at 174 (describing sex discrimination under Title IX as "differential" and "less favorable" treatment); *Peltier v. Charter Day Sch., Inc.*, 37 F. 4th 104, 129–30 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2657 (2023) ("discrimination" under Title IX "means treating an individual worse than others who are similarly situated" (cleaned up)). Therefore, Plaintiffs with current NCAA eligibility have standing to seek injunctive relief rectifying the *current* (i.e., not just prospective) information and safety disparity created by the TEP.

For purposes of its motion the NCAA must accept as true that the TEP increases safety risks for Plaintiffs Erzen (soccer), Eades (tennis), Merryman (volleyball) and other women competing in Contact and Limited-Contact Sports. SAC ¶¶ 700–25. The SAC also provides examples of males, like Blaire Fleming, playing on NCAA women's teams for years without public disclosure. SAC ¶¶ 707-11.

### 3. Plaintiffs Have Adequately Alleged Current and Ongoing Emotional and Dignitary Injuries

The Board Defendants and NCAA argue that Plaintiffs "do not allege that they

are likely to compete against any" trans-identifying male in the future. Doc. 103-1 at 27–28; *accord* 100-1 at 12. But Plaintiffs do not need to allege that they will compete against trans-identifying men in the future to suffer the emotional and dignitary harm of playing collegiate athletics under a policy that gives trans-identifying men license to take their opportunities. Courts have found that "emotional and dignitary harm" are cognizable injuries under Title IX. *Peltier*, 37 F.4th at 129; *Grimm*, 972 F.3d at 618. As with informational injuries arising from the TEP, emotional and dignitary harms arise from the TEP treating women worse than similarly situated men. *Jackson*, 544 U.S. at 174; *Peltier*, 37 F.4th at 129–30. Women suffer emotional and dignitary injuries from NCAA policies that communicate that competitive fairness and safety for women are not worth protecting to the same degree they are protected for men. *See*, *e.g.*, SAC ¶¶ 517, 560. The TEP uniquely harms women this way because men are not at a competitive or safety disadvantage if a woman tries out for the men's team.

Even if no trans-identifying male competed against any Plaintiff with remaining eligibility (and they will, as the SAC alleges), Plaintiffs would still have an injury in fact for the dignitary harm of facing the prospect they may—a prospect no male athlete needs to worry about.

### 4.    Plaintiffs Have Alleged Current Competitive Harms

The Board Defendants and NCAA also contend Plaintiffs who "*might*

someday compete against a transgender [athlete]" have not adequately alleged current harm and characterizes the Plaintiffs' level playing field and risk of injury concerns as merely "'nebulous allegations of future harm.'" Doc. 103-1 at 27–28; *accord* 100-1 at 12.

Plaintiffs' allegations are not "nebulous." Rather, Plaintiffs allege *current* competitive and safety harms. *See supra* at 7–9. That they face an increased risk of such harms *today* is traceable to the TEP. Diminished fairness and safety in NCAA women's competitions exists in all sports covered by the TEP which allows an unknown number of men with retained male advantage to compete on NCAA women's teams. SAC ¶¶ 270–418. The facts the Court must assume as true at this stage show that competitive advantages result from a massive performance gap that makes male participation on any NCAA women's team unfair and illegal under Title IX. SAC ¶¶ 270–302. Moreover, the TEP effectively bans any constructive dialogue on the topic by labeling all dissent as "transphobic." SAC ¶¶ 403–18.

Thus, participation by men in NCAA women's sports creates *current* competitive imbalances and safety risks across all NCAA women's sports. This is injury-in-fact. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010). The extent these injuries are not yet quantifiable by Plaintiffs is because the TEP does not require public monitoring of compliance, or reporting of risks to women, or encourage meaningful feedback. SAC ¶¶ 394–418. Only discovery will tell.

### 5.    Plaintiffs with Current Eligibility Have Standing to Pursue Actual and Nominal Damages

Finally, Plaintiffs bringing Count V have "standing to bring a [Title IX] claim for nominal damages even without alleging a specific injury flowing from the violations." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009). Plaintiffs must simply show that their Title IX or Fourteenth Amendment rights were violated by the TEP or its application. *Id*.

Count V is brought against the NCAA by Plaintiffs with remaining NCAA eligibility who assert a claim for damages and injunctive relief, SAC ¶¶ 831-832, seeking all proper relief in their prayer, *id.* ¶ 846, which, among other things, requests nominal and actual damages. *Id.,* Prayer for Relief ¶ 7. Therefore, Count V cannot be dismissed based on the standing ground raised by the NCAA, which goes solely to prospective injunctive relief.

The NCAA concedes the "Roanoke Swimmers allege past injury," Doc. 103-1 at 28 & n.5, and does not dispute that Track Athlete A adequately "alleges that she competed against a transgender woman [in] a past competition," Doc. 103-1 at 28, and that Brooke Slusser competed with a trans-identifying male on her team. Thus, the Roanoke Plaintiffs, Track Athlete A and Brooke Slusser are plainly entitled to seek nominal and actual damages against the NCAA.

**K.    Plaintiffs Have Adequately Alleged Traceability and Redressability Against the Individual Board Defendants**

The Board Defendants argue Plaintiffs are not entitled to injunctive relief against the individual defendants because there is no "affirmative causal relationship" between the alleged wrongdoing and those individuals. Doc. 100-1 at 24–27. This argument is simply a rehash of their redressability and traceability arguments, and GTAA's argument about the inability of Plaintiffs to seek prospective relief. *Supra* at 55–68. Their argument is simply "the NCAA's actions … cannot be imputed to the Individual Defendants." Doc. 100-1 at 27.

For all the reasons that Plaintiffs have alleged traceable and redressable injury against the Georgia Defendants it has alleged the same against the Individual Board Defendants. Plaintiffs may obtain declaratory or injunctive relief against the official capacity Defendants to preclude them from enforcing the unlawful TEP at future athletic competitions. *Reed v. Goertz*, 598 U.S. 230, 234 (2023) ("the *Ex parte Young* doctrine allows suits…for declaratory or injunctive relief [under § 1983] against state officers in their official capacities").

**L.    Plaintiffs' Allegations Against GTAA Relate Back to the Filing of the Original Complaint**

Via Fed. R. Civ. P. 15(c)(1)(C), an amended complaint which "changes the party…against whom a claim is asserted" "relates back to the date of the original pleading when" three conditions are met. First, the "amendment asserts a claim or

69

defense that arose out of the conduct, transaction, or occurrence set out—or at-tempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Second, the "party to be brought in by amendment…received such notice of the action [within 90 days of filing the complaint] that it will not be prejudiced in defending on the merits." Fed. R. Civ. P. 15(c)(1)(C)(i). Third, the party within 90 days of filing the complaint "knew or should have known that the action would have been brought against it, but for a mistake in the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii).

GTAA does not dispute the first condition has been met. Instead, GTAA claims Plaintiffs have alleged insufficient facts to satisfy the remaining two condi-tions. However, GTAA's position is based on an incorrect view of the law and facts. The "notice" requirement can be met with "constructive notice." "Courts impute no-tice of the existence of a lawsuit when there is sufficient 'identity of interests' be-tween the original and new parties." *Pompey v. Lumpkin*, 321 F.Supp.2d 1254, 1263 (M.D. Ala. 2004) citing *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998). This includes situations where the "parties are so closely related in their business operations or other activities' such 'that the institution of an action against one ser-vices to provide notice of the litigation to the other." *Citizens Insurance Company of the Midwest for deWitt v. Stone*, No. 1:16-cv-56, 2016 WL 9275409, at *3 (N.D. Fla. Nov. 30, 2016) quoting *Jacobsen*, 133 F.3d at 320. Thus, courts have found that

two companies which had the "same address and…named corporate officers and directors" were sufficiently intertwined that notice was imputed to the newly named entity. *Stone*, No. 1:16-cv-56, 2016 WL 9275409, at \*3 (N.D. Fla. Nov. 30, 2016). Likewise, notice is imputed where "the added defendant was represented by the same attorneys as the original defendants." *Bagwell v. City of Atlanta*, 109 F.R.D. 290, 292 (N.D. Ga. 1985); *see also Pompey*, 321 F. Supp. 2d at 1263 ("Often 'notice may be imputed to the new party through shared counsel.'") *quoting Jacobsen*, 133 F.3d at 320.

Courts impute notice to an executive of a company to the company itself. *See Bridges v. Burnstein*, No. 1:04-cv-1022, 2005 WL 8154519, at \*3 (N.D. Ga., Aug. 9, 2005) (notice to "president" of company constituted "adequate notice" to company itself); Additionally, notice to a subsidiary can constitute adequate notice. *Itel Capital Corp. v. Cups Coal Co., Inc*., 707 F.2d 1253, 1258 (11th Cir. 1983) (individual who owned 97% of the company on notice of lawsuit). Further, "when a sheriff's office is sued, the sheriff himself shares an 'identity of interest' with his office such that notice of the suit passes interchangeably between them." *Lindley v. Taylor*, No. 2:10-cv-0141, 2015 WL 1293224, at \*6 (N.D. Ala. Mar. 23, 2015), citing *Kirk v. Cronvich*, 629 F.2d 404, 408 (5th Cir. 1980). *See also Bowden v. Wal-Mart Stores*, Inc., 124 F.Supp.2d 1228, 1241-42 (M.D. Ala. 2000) (where two legal entities had shared members of their respective board of directors, there is sufficient interrelation

to permit imputing notice and relation back).

Here, notice must be imputed to GTAA because it is closely related to the Board Defendants and Georgia Tech, and GTAA is represented by the same law firm as the Board Defendants, Robbins Alloy Belinfante Littlefield, LLC. Further, the SAC details how Board Defendants, Georgia Tech, and GTAA's leadership structures are intertwined. GTAA's board is composed entirely of Georgia Tech executives and staff including the President, Executive Vice President for Administration and Finance, plus eleven other additional Georgia Tech affiliated individuals appointed to the GTAA board by the President of Georgia Tech. SAC ¶ 85. Further GTAA's bylaws require all officers to "also…be members of Georgia Tech's administration." SAC ¶ 85.

With shared counsel and a board of directors composed entirely of Georgia Tech executives, notice may be imputed from Georgia Tech and the Board Defendants to GTAA. Plaintiffs previously named Angel Cabrera, President of Georgia Tech, who also serves on the GTAA Board of Trustees, as a defendant in his official and individual capacities. First Amended Complaint [Doc. 64] ("FAC") ¶ 88. There is no dispute Georgia Tech and Cabrera were served with a summons within 90 days of filing the complaint. Thus, GTAA's claim that the complaint does not relate back because "Plaintiffs…have not asserted any set of facts suggesting that GTAA received notice of this lawsuit within the Rule 4(m) service period" is simply incorrect.

Doc. 102-1 at 7. GTAA had ample constructive notice of the suit.

Additionally, GTAA argues that even if it had "sufficient notice," there has "been no 'mistake' concerning GTAA's identity" because "Plaintiffs' delay in naming GTAA was due to lack of knowledge, not an error in identifying the correct party." Doc. 102-1 at 7–8. However, GTAA inaccurately characterizes Plaintiffs' explanation for the delay. As outlined in Plaintiffs' Motion for Leave to Amend, Plaintiffs had a "reasonably and factually based understanding that Georgia Tech University and the NCAA were the *only* hosts of the 2022 NCAA Championships." Doc. 88 ¶ 13 (emphasis added). Plaintiffs cited articles issued by both Georgia Tech and the NCAA identifying "Georgia Tech" as the sole "host" of the NCAA Championships.[15]

Therefore, Plaintiffs alleged that "*Georgia Tech entered into an agreement with the NCAA to host* the 2022 NCAA Division I Women's Swimming and Diving Championships at the McCauley Aquatics Center, a public building, on the Georgia Tech campus." FAC ¶ 413 (emphasis added). Plaintiffs went on to allege how

---

[15] Doc. 88 ¶ 12, citing "Tech Selected to Host 2022 NCAA Swimming National Championships," April 19, 2017, *available at*: https://news.gatech.edu/taxonomy/term/5152#:~:text=The%20NCAA%20has%20announced%20Georgia,Women's%20Swimming%20and%20Diving%20Championships and "2022 NCAA Division I women's swimming and diving championships qualifying swimmers announced," March 2, 2022, *available at*:  https://www.ncaa.com/news/swimming-women/article/2022-03-02/2022-ncaa-division-i-womens-swimming-and-diving-championships-qualifying.

Georgia Tech delegated "operational control" of the Aquatics Center to the NCAA yet also was "required to take an active role in the decision-making process related to implementation of the NCAA's Transgender Eligibility Policies at the 2022 NCAA Championships." *Id*. ¶¶ 415, 419.

It was not until on or about August 27, 2024, that Plaintiffs learned through documents obtained during a Georgia Senate hearing that GTAA, not Georgia Tech, had signed the "event hosting agreement for the 2022 NCAA Championships." Doc. 88 ¶ 15. Plaintiffs explained that through subsequent discovery they learned that Georgia Tech had ceded control "of some, or all, of its athletics program to GTAA." *Id*. ¶ 16. In their SAC, they now allege that "[t]he GTAA, on behalf of Georgia Tech, entered into an agreement with the NCAA to host the 2022 NCAA Division I Women's Swimming and Diving Championships." *Compare*, SAC ¶ 419 *with* FAC ¶ 413.

"The only question under Rule 15(c)(1)(C)(ii)…is whether…[the newly added defendant] knew or should have known that, absent some mistake, the action would have been brought against him." *Krupski v. Costa Crociere S. p. A*., 560 U.S. 538, 548 (2010). A "mistake" is an "error, misconception, or misunderstanding; an erroneous belief." *Id*. (quoting Black's Law Dictionary 1092 (9th ed. 2009)). It can also include a "wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention." *Id*, at 548–49 (quoting Webster's Third New

International Dictionary 1446 (2002)). The Eleventh Circuit reads the word "mistake in Rule 15(c) liberally." *Itel Capital*, 707 F.2d at 1258, n.9.

In *Krupski*, the Supreme Court reversed the Eleventh Circuit's conclusion that a plaintiff did not make a "mistake" when it failed to name the actual owner of the cruise ship, Costa Crociere, even though plaintiff knew the identity of the owner based on information printed on the cruise ticket. *Krupski*, 560 U.S. at 546. The Supreme Court held that plaintiff's "knowledge" of the true owner's existence was not dispositive of whether the plaintiff had made a "mistake." *Id*. at 548–49. A plaintiff could "misunderstand[] the roles that…[two different parties] played in the 'conduct, transaction, or occurrence' giving rise to her claim." *Id.* at 549. Choosing to "sue a different defendant based on [a] misimpression" did not "foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied." *Id.*

In concluding the owners of Costa Crociere should have known they would have been named in the lawsuit absent a "mistake" the Court noted that the plaintiff's Complaint clearly stated an "intent" to "sue the company that 'owned, operated, managed, supervised and controlled' the ship on which [plaintiff] was injured" and it "indicated (mistakenly) that Costa Cruise performed those roles." *Id*. at 554. Likewise, Plaintiffs' lawsuit here was explicitly directed at the entity that "entered into an agreement with the NCAA to host" the Swimming and Diving Championships." FAC ¶ 413. Plaintiffs mistakenly concluded that entity was Georgia Tech. The

Complaint went on to outline various responsibilities Georgia Tech had to fulfill as "host" of the championships such as identifying a "Tournament Manager" and taking "an active role in the decision-making process related to the implementation of the NCAA's Transgender Eligibility Policies." *Id*. ¶¶ 419, 422. Given GTAA's close entwinement with Georgia Tech, GTAA knew or should have known GTAA would have been named in the lawsuit "absent" a mistake by Plaintiffs about which entity had signed the agreement to host the 2022 Championships.

GTAA argues that a "lack of knowledge" about the identity of a proper party does not qualify as a "mistake." Doc. 102-1 at 7. However, the cases cited by GTAA dealt with situations where the plaintiff knew of the involvement of a particular entity but lacked knowledge of the entity's identity. Thus, in *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003), the pro se plaintiff inmate filed suit against the local sheriff as well as seven "John Doe" deputy sheriffs whose identities were unknown. The Eleventh Circuit rejected the plaintiff's attempt to name individual deputy sheriffs after the statute of limitations expired because plaintiff had not made a "mistake" about their identity. *Id*. at 1103. The Court concluded that plaintiff's "lack of knowledge regarding the identities of the individual deputies was not a mistake concerning the identity of the proper party." *Id.*

Similarly, in *Tolston v. City of Atlanta, Georgia*, 723 F. Supp. 3d 1263 (N.D.

76

Ga. 2024), the plaintiff brough a false arrest case, naming one out of two arresting officers. The plaintiff listed "five John Doe officers" as placeholders. *Id.* at 1286. When discovery later revealed the identity of the other arresting officer, the plaintiff sought to amend the complaint. *Id.* at 1290. However, the court rejected plaintiff's attempt, noting that the second arresting officer was not named merely because plaintiff "did not have his name." *Id.* at 1294. This was not a "mistake concerning the identity of the property party." *Id.* In contrast here, Plaintiffs were mistaken that not Georgia Tech, but instead GTAA, entered the event hosting agreement with the NCAA.

GTAA cites two additional cases which rejected a plaintiff's attempt to sub-stitute a named defendant for a John Doe defendant. Doc. 102-1 at 9. However, those cases are like *Tolston* and *Wayne*. In *Bloodworth v. United States*, 623 F. App'x 976, 979 (11th Cir. 2015), the pro se defendants attempt to add named defendants as a substitute for fictitious defendants was rejected as it was "made to correct the plain-tiff's lack of knowledge about whom to sue, not a mistake by the defendant in iden-tifying the proper party." Likewise, in *Jones v. Georgia Dep't of Corr.*, 763 F. App'x 906 (11th Cir. 2019), a Georgia inmate filed suit against the state department of corrections and a fictitious defendant. The inmate later sought to "substitute named officials for a fictitious defendant" which was rejected by the court. *Id.* at 907.

This case is more analogous to *Kuehn v. Cadle Co.*, 335 F. App'x 827 (11th

Cir. 2009), where a plaintiff brought a Fair Debt Collection Practices claim against a company listed on a collections letter. After the statute of limitations had run, the plaintiff learned the "letter was not sent by the company listed on the letter, but by another closely-related company." *Id*. at 830. The Eleventh Circuit affirmed the district court's decision to relate the amended complaint back to the original complaint. *Id*.

GTAA's claim that Plaintiffs "contend that GTAA was misidentified in the original lawsuit as John Doe 26" inaccurately describes Plaintiffs' motion. GTAA cites to footnote 1 of "ECF No. 94" which includes the SAC and references an "Appendix A" which includes a "Table of Contents" for the Complaint. The Motion for Leave to Amend, Doc. 88, does not have any footnotes.

### M.    Plaintiffs' Fictitious Defendant Allegations Are Sufficient

The NCAA objects to Plaintiffs' use of John Doe defendants. *See* Doc. 103-1 at 31; Doc. 100-1 at 7 n.4. While fictitious party pleading is generally disfavored, *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), unnamed defendants can be used where discovery will uncover the defendant's identity. *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). Normally "an unambiguous description of a defendant that enables service of process" is required. *Vielma v. Gruler*, 808 F. App'x 872, 880 (11th Cir. 2020). However, the Eleventh Circuit has yet to address whether the discovery exception is a standalone exception or part of the

unambiguous description requirement. *Id.* at 881; *accord Quad Int'l, Inc. v. Doe*, No. CIV.A. 12-675-N, 2013 WL 105268, at *3 (S.D. Ala. Jan. 7, 2013) (holding 11th Circuit does not foreclose discovery exception). Here, Plaintiffs unambiguously identified John Doe defendants with as much specificity as possible prior to discovery including:

- "[A]gents of the NCAA who … undertook the actions attributed to the NCAA in this Complaint … . SAC ¶ 118.

- "[A]gents or employees of one or more public colleges or universities in Georgia who engaged in the conduct attributed to the Georgia Individual Defendants that are described in this Complaint, including those individuals who directed operations and made decisions in relation to the 2022 NCAA Championships and/or who will do so … . SAC ¶ 119.

- Tournament Manager. SAC ¶¶ 428–429.

- Facility Manager. SAC ¶ 430.

- Official who told Riley Gaines they allowed Thomas into the locker room by changing it to unisex. SAC ¶¶ 501–502.

- Official who wouldn't let Gaines hold a trophy. SAC ¶¶ 583–587.

### N.    Proper State Entities

The Board Defendants argue that "a]n injunction against the Board's former members provides Plaintiffs with no relief, as they can no longer 'affect the matter in the issue in the case.'" Doc. 100-1 at 17 (quoting *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). They also note that current board members are substituted for former members that have resigned

pursuant to Fed. R. Civ. P. 25(d)(1). The Board Defendants argue that "all claims for injunctive relief against the Board's former members should be dismissed, as Plaintiffs have previously conceded but did not reflect in the SAC." *Id.*

However, under § 1983 former individual board members remain liable for damages caused by actions committed in their individual capacities. While they served, former board members directed activities of Georgia Tech and others, SAC ¶¶ 115–116, and directed the Title IX violations. SAC ¶¶ 795, 807, 809, 813, 821, 823, 850. To be clear, Plaintiffs do not seek relief against entities under § 1983. Plaintiffs seek only injunctive relief and damages under a direct Title IX claim against these entities. (Count I). All injunctive relief under § 1983 is sought against state officials in their official capacity (Count VI), and all damages under § 1983 are sought against state officials in their individual capacity (Count III & Count IV).

## III.   CONCLUSION

For the foregoing reasons, the Court should deny the motions to dismiss of the NCAA, Board Defendants, and GTAA.

Dated: December 20, 2024

Respectfully submitted,

/s/ William Bock III

William Bock III, Atty. No. 14777-49[16]
Kevin D. Koons, Atty. No. 27915-49[17]
Justin R. Olson, Atty. No. 31450-49[18]
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:     wbock@kgrlaw.com
Email:      kkoons@kgrlaw.com
E-mail:     jolson@kgrlaw.com

/s/ Bryan P. Tyson

Bryan P. Tyson, Ga. Bar No. 515411
Clark Hill
800 Battery Ave SE., Suite 100
Atlanta, GA 30339
Tel: (678) 370-4377
Fax: (678) 370-4358
Email: btyson@clarkhill.com

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), counsel certifies that the foregoing was prepared in

Times New Roman, 14-point font, in compliance with L.R. 5.1(C).

/s/ William Bock III
William Bock III

---

[16] *Pro hac vice*
[17] *Pro hac vice*
[18] *Pro hac vice*