IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*,<br><br>    *Defendants*. | Civil Action No.<br>1:24-cv-1109-TRJ |

**DEFENDANT GEORGIA TECH ATHLETIC ASSOCIATION INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

In its Motion to Dismiss, the Georgia Tech Athletic Association, Inc. (GTAA) argued that Plaintiffs' claims against it are procedurally and substantively flawed and must be dismissed in their entirety. First, Plaintiffs' claims against GTAA are clearly time-barred under the two-year statute of limitations for Title IX and §1983 claims. The NCAA championship at issue occurred in March 2022, but GTAA was not added as a defendant until October 2024. Plaintiffs admit their delay stemmed from lack of knowledge about GTAA's involvement, not a mistake, which precludes relation back under Federal Rule of Civil Procedure 15(c).

Second, GTAA argued Plaintiffs lack standing under Article III because their alleged injuries are not traceable to GTAA. GTAA followed NCAA policies on

1

eligibility and had no authority to modify them; Plaintiffs' grievances target the NCAA's Transgender Eligibility Policies, not GTAA.

Third, Plaintiffs' Title IX claims against GTAA fail as a matter of law. GTAA does not receive federal funding, a requirement for Title IX liability. Even if Title IX applied, GTAA's compliance obligations are limited to Georgia Tech student-athletes, and Plaintiffs are not Georgia Tech students. Additionally, conflicting guidance on Title IX's application to transgender athletes precludes liability under the Spending Clause, which requires clear notice of obligations.

Finally, Plaintiffs' Equal Protection claims fail because GTAA is a private entity, not a state actor. Even if deemed a state actor, GTAA is shielded by Eleventh Amendment immunity.

GTAA files this Response to address the bulk of Plaintiffs' arguments raised in their Opposition and to reaffirm that dismissal of Plaintiffs' claims is warranted under the applicable law and facts.

### I.   Plaintiffs' Claims Against GTAA Are Time-Barred and Do Not Satisfy Rule 15(c)'s Relation-Back Requirements

As argued in GTAA's Motion to Dismiss, Plaintiffs' claims against GTAA should be dismissed because Plaintiffs failed to satisfy **their** burden to demonstrate satisfaction of the requirements for relation back under Rule 15(c) of the Federal Rules of Civil Procedure. *Tolston v. City of Atlanta, Georgia*, 723 F.Supp.3d 1263,

1291 (N.D. Ga March 14, 2024). Specifically, Plaintiffs did not demonstrate that GTAA had notice of the lawsuit within Rule 4(m)'s 90-day service period, which ended on June 12, 2024. Additionally, the amendment to include GTAA did not correct a "mistake" concerning identity as required under Rule 15(c)(1)(C). Instead, as Plaintiffs conceded in their Motion for Leave to add GTAA, Plaintiffs' delay stemmed from a lack of knowledge about GTAA's role, which courts in the Eleventh Circuit consistently distinguish from a correctable mistake.

Regarding the latter, GTAA will remind the Court of Plaintiffs' explanation, as articulated in Plaintiffs' Brief in Support of Motion for Leave to File Second Amended Complaint, for why they sought leave to add GTAA as a defendant in September 2024: "Plaintiffs only recently discovered GTAA is a Georgia not-for-profit corporation that contracted with the NCAA to 'host' the 2022 NCAA Division I Women's Swimming and Diving National Championships (the "2022 NCAA Championships")."[1] Specifically, according to Plaintiffs, "[i]t was not until on or about August 27, 2024, that Plaintiffs learned through documents obtained during a Georgia Senate hearing that GTAA, not Georgia Tech, had signed the event hosting agreement for the 2022 NCAA Championships."[2] According to Plaintiffs, "The discovery of the document identifying GTAA as having signed the event hosting

---

[1] ECF No. 88, Attachment 1 at page 2 (September 23, 2024)
[2] ECF No. 108 at page 74 (December 20, 2024).

3

agreement with the NCAA **led to further inquiry and to the subsequent discovery by counsel** for the Plaintiffs that, pursuant to both the NCAA's and GTAA's bylaws, Georgia Tech University has ceded control of some, or all, of its athletics program to GTAA."[3]

GTAA's existence as a Georgia not-for-profit corporation, though, is a matter of public record. Plaintiffs could have easily discovered this information through a simple Google search or a search of the Georgia Secretary of State's database, both of which reveal GTAA's legal status **and** its role in Georgia Tech's athletics program. Plaintiffs' assertion that they only "recently discovered" GTAA's contractual involvement with the NCAA further strains credulity, as the hosting agreement cited by Plaintiffs was not concealed or obscure but rather a document maintained by Georgia Tech and obtainable under Georgia's Open Records Act (O.C.G.A. § 50-18-70). Such records, by their nature, are routinely disclosed upon request and would have included the hosting agreement identifying GTAA as a party. Plaintiffs' failure to utilize this statutory mechanism at any earlier time demonstrates their lack of diligence in conducting a reasonable investigation into the entities involved in the events underlying their claims.

---

[3] *Id.* (emphasis added).

In sum, the fact that Plaintiffs waited until September 2024 to seek leave to add GTAA as a defendant, despite the public availability of the relevant information, undermines their assertion that this delay resulted from a genuine "mistake" rather than inattention. Indeed, had Plaintiffs exercised due diligence in the initial stages of their investigation, they would have identified GTAA as a potentially involved party long before filing their original or first amended complaint.

Rather than promptly identifying all necessary parties through reasonable inquiry, Plaintiffs spent inordinate amounts of time focused on drafting an unnecessarily long and verbose complaint. Courts disfavor amendments based on "newly discovered" information that was, in fact, readily available to a party exercising reasonable diligence. Plaintiffs' delay in adding GTAA is a direct consequence of their own choices, not any concealment or misrepresentation by GTAA or any other party.

In *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003), the 11th Circuit explicitly held that a plaintiff's lack of knowledge regarding a party's identity does not qualify as a "mistake" under Rule 15(c)(3). *Id*. at 1103 ("Because [plaintiff's] lack of knowledge was not an error, a misnomer, or a misidentification, his amendment does not come within Rule 15(c)(3)(B). While we have stated that 'we read the word 'mistake' in Rule 15(c) liberally,' we do not read the word 'mistake'

to mean 'lack of knowledge.'"). Here, **in Plaintiffs' own words**, Plaintiffs' justification for adding GTAA stems from newly discovered information about GTAA's role (information they could have discovered much sooner with even a modicum of due diligence), which reflects a lack of prior knowledge, not an error or misidentification.

Plaintiffs argue that their case is more like *Kuehn v. Cadle Co.*, 335 F. App'x 827 (11th Cir. 2009). However, aside from the fact that *Kuehn* is an unpublished and non-binding Eleventh Circuit decision which carries limited persuasive value[4] compared to *Wayne v. Jarvis*, the case is easily distinguishable. Unlike the plaintiff in *Kuehn*, Plaintiffs in this case have conceded that they added GTAA only after "recently discovering GTAA is a Georgia not-for-profit corporation that contracted with the NCAA." This admission demonstrates that their failure to name GTAA initially was due to a lack of prior knowledge, not a mistake. Such a distinction undermines any support *Kuehn* might provide.

In conclusion, Plaintiffs failed to satisfy their Rule 15(c) burden and their claims against GTAA are untimely and should be dismissed with prejudice.

## II. Plaintiffs' Title IX Claims Against GTAA Are Deficient For Several Reasons

---

[4] 11th Cir. R. 36-2.

GTAA made three substantive arguments in its Motion to Dismiss detailing why Plaintiffs' Title IX claims against it should be dismissed:

### A. Plaintiffs' Title IX Claims Against GTAA Fail for Lack of Allegations Regarding Federal Funding or Substantial Support from Georgia Tech

First, Plaintiffs failed to allege that GTAA received federal funds or substantial funding from Georgia Tech, a requirement for Title IX applicability pursuant to the 11th Circuit's decision in *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th 2007).  In response, Plaintiffs contend:

> GTAA's argument rests on a misunderstanding of *Williams* where the plaintiff alleged that UGA had 'ceded control over one of it (sic) programs, the athletic department,' to UGAA 'and provided extensive funding.' The focus in *Williams* was not on the amount of funding provided by UGA, but that UGA had turned over control of its athletic activities to UGAA.[5]

GTAA fully understands the *Williams* decision. Its Motion did not focus "on the amount of funding provided by UGA," but rather highlighted that "Plaintiffs' Second Amended Complaint is devoid of any allegation that GTAA receives **any** funding, much less extensive funding, from Georgia Tech."  In *Williams*, the 11th Circuit found that the University of Georgia Athletics Association was a "Title IX Funding Recipient" because the plaintiff "alleged that UGA, a funding recipient, has

---

[5] ECF No. 108 at page 37 (December 20, 2024).

ceded control over one of its programs, the athletic department, to UGAA **and provided extensive funding to UGAA**." *Id*. at 1294 (emphasis added).

Put simply, Plaintiffs understandably want to ignore the latter point, but the 11th Circuit explicitly required both the ceding of control over a program **and the provision of extensive funding** to establish Title IX applicability. Here, nowhere in Plaintiffs' 202-page lawsuit is there a single allegation that GTAA received federal funding or any funding, much less extensive funding, from Georgia Tech. For that reason standing alone, Plaintiffs' Title IX claims against it must be dismissed.

### B. Any Athletics Title IX Compliance Obligations GTAA May Have Are Limited to Georgia Tech Students and Do Not Extend to Individuals at Other Institutions

In its Motion to Dismiss, GTAA argued that Plaintiffs' claim—that GTAA has athletics-related Title IX obligations to individuals other than Georgia Tech students—lacks precedent and conflicts with Title IX's regulations, guidance documents, and relevant case law. Rather, Title IX's athletics-related compliance obligations are unique and Georgia Tech's compliance obligations in this regard are directed solely toward its own students and ensuring that they have equal opportunities and benefits in sports, as mandated by 34 C.F.R. § 106.41.

Plaintiffs' response reflects a fundamental misunderstanding of Title IX, its history, and the distinct nature of its athletics-related compliance obligations. For instance, Plaintiffs argue that GTAA's position "is foreclosed by the plain language

8

of Title IX, which expressly prohibits 'discrimination [on the basis of sex] under any education program or activity receiving Federal financial assistance.'"[6] However, this assertion flies in the face of their broader argument that Title IX not only allows but requires institutions to exclude all men from certain events. Again, it suggests that Plaintiffs simply do not understand the unique Title IX athletics framework.

For clarity, sex-segregated sports are an **exception** to Title IX's prohibition on sex discrimination. See 34 CFR 106.41 (a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and **no recipient shall provide any such athletics separately on such basis**") (emphasis added) and 34 CFR 106.41 (b) ("Notwithstanding the requirements of paragraph (a) of this section . . . .").

The above-referenced regulation was promulgated in 1975 after Congress enacted the Javits Amendment[7] to address questions about how Title IX should specifically apply to intercollegiate athletics. The Department of Health, Education, and Welfare[8], responded by creating a unique regulatory framework for Title IX

---

[6] ECF No. 108 at page 26 (December 20, 2024), *citing* 20 U.S.C. § 1681(a).
[7] Section 844 of the Education Amendments of 1974, Pub. L. No. 93-380, 88 Stat. 484, 612 (1974).
[8] HEW was the predecessor to the Department of Education.

compliance in intercollegiate athletics. It has two prongs: one for athletics scholarships[9] and another for how schools can ensure that they are providing "equal opportunity" within their athletics programs. Regarding the latter, 34 C.F.R. § 106.41(c) states that athletic programs "shall provide equal athletic opportunity for members of both sexes" and then lists ten factors for consideration "[i]n determining whether equal opportunities are available."

Those provisions are the limits of what Title IX requires of institutions with respect to athletics and, as discussed in GTAA's original Brief, those obligations extend solely to an institution's **own athletes**. For instance, the regulation specifies factors such as access to coaching, academic tutoring, practice facilities, and equipment—each tied directly to the institution's responsibility toward its own student-athletes.

Interpreting these obligations as extending beyond an institution's own students is not supported by a single case, and it would also be inconsistent with the purpose and text of 34 C.F.R. § 106.41(c). For example, it would be impractical and unworkable for institutions to provide "equal athletic opportunity" to athletes at other schools under factors such as "travel and per diem allowance" or "assignment and compensation of coaches." These are operational matters inherently linked to an

---

[9] 34 C.F.R. § 106.37(c)(1).

institution's direct relationship with its own students. Expanding these obligations to cover athletes from other institutions would create significant compliance ambiguity, operational burdens, and potential conflicts with the autonomy of other institutions. It is also not supported by a single source of precedent.

Moreover, such an expansion would undermine the carefully constructed framework that limits each institution's obligations to its own educational programs and activities. The regulation's language—focusing on the selection of sports, resources, and opportunities within the institution—further underscores that compliance is institution-specific, ensuring equity for its own student-athletes rather than creating a sprawling and untenable compliance structure across multiple institutions.

In short, any interpretation that imposes Title IX athletics compliance obligations on institutions regarding student-athletes at other schools would not only contravene the regulation's text and intent but would also jeopardize the clarity and practicality of Title IX's application. To the extent GTAA has any Title IX compliance obligations (which it does not), those obligations are to Georgia Tech students and Georgia Tech student athletes, none of whom are Plaintiffs here.

### C. Ambiguity in Title IX Obligations and the Need for Clarity Regarding Transgender Athlete Participation

Finally, GTAA noted that under the Spending Clause, Title IX liability requires clear, unambiguous notice of obligations tied to federal funding. Not only is GTAA not a recipient of federal funding, GTAA detailed in its original Brief that in the lead-up to the 2022 NCAA Championships, guidance from federal agencies and courts on Title IX's application to transgender athletes was ambiguous and often conflicting. This confusing history is buffeted by subsequent events.

As Plaintiffs' counsel is aware, in *Slusser v. Mountain West Conference*, 2024 WL 4876221 (D. Co. November 25, 2024), plaintiffs sought emergency relief under Title IX to challenge the Mountain West Conference's Transgender Participation Policy. They requested the court invalidate provisions penalizing teams for refusing to compete against San Jose State University due to the inclusion of a transgender athlete on its women's volleyball team and sought to prohibit her participation, arguing she was biologically male and ineligible for women's competition.

In evaluating the likelihood of success on the Title IX claim, the court relied on the Supreme Court's decision in *Bostock v. Clayton County*[10], which interpreted discrimination "on the basis of sex" under Title VII to include discrimination against transgender individuals. Because many courts have extended this reasoning to Title

---

[10] 590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020).

IX, interpreting "sex" to include transgender status, the court concluded that Plaintiffs failed to demonstrate a likelihood of success on the merits of their Title IX claim.

Additionally, on January 14, 2025, the U.S. House of Representatives passed the "Protection of Women and Girls in Sports Act of 2025."[11]  That bill aims to finally clarify the issue by amending Title IX to define sex based on reproductive biology and genetics at birth, effectively barring transgender women and girls from competing on teams that do not align with their biological sex at birth.

Plaintiffs contend: "GTAA is wrong to say Title IX does not clearly prohibit men competing against women in women's collegiate athletics."[12] The issue, though, is whether Title IX prohibits trans-women from participating in women's collegiate sports, or as the court in *Slusser* suggested, whether Title IX actually compels institutions to allow such participation. The lack of clarity about Title IX's obligations in this regard (something Congress appears prepared to address) certainly precludes any finding of liability against GTAA for merely hosting an NCAA event, especially where it had no authority whatsoever to determine who was eligible to participate in that event.

---

[11] H.R.28 - Protection of Women and Girls in Sports Act of 2025
[12] ECF No. 108 at page 36 (December 20, 2024).

### III. Plaintiffs' Equal Protection Claims Against GTAA Fail Due to GTAA's Private Entity Status and Eleventh Amendment Immunity

Finally, Plaintiffs alleged that GTAA violated the Equal Protection Clause by disadvantaging female athletes and infringing on their bodily privacy, bringing claims under 42 U.S.C. § 1983. However, as a private entity, GTAA is not a state actor and therefore cannot be held liable under § 1983. Moreover, even if GTAA were deemed a state actor, it would be entitled to Eleventh Amendment immunity as an entity closely tied to Georgia Tech and the state. See *Braswell v. Board of Regents of University System of Ga.,* 369 F. Supp. 2d 1371 (N.D. Ga. 2005).

In bizarre fashion, Plaintiffs contend:

> GTAA summarily argues that "GTAA is a private entity and not a state actor. For that reason alone, these claims against GTAA must be dismissed." Doc. 102-1 at 25–26. This argument cites one case and was not developed. It is waived on that basis. *See, e.g., Noureddine v. Aronsky,* 2008 WL 11399648 *4, n.8 (S.D. Fla. Jan. 29, 2008).[13]

GTAA "summarily argued" it is a private entity because it is, as Plaintiffs themselves acknowledged.[14] GTAA cited "one case" in support of its argument that private entities typically cannot violate the Constitution because that case is directly

---

[13] ECF No. 108 at pages 48 – 49.
[14] ECF No. 94, Corrected Second Amended Complaint for Damages, Declaratory, Equitable, and Class Relief and Demand for Jury Trial at ¶ 84.

on point and is dispositive. While Plaintiffs' counsel may prefer to use more words than necessary, being succinct is not "waiver."

Moreover, Plaintiffs notably choose to ignore GTAA's argument that even if Plaintiffs could assert that GTAA is a state actor, GTAA is entitled to Eleventh Amendment immunity for precisely the same reasons as articulated in *Braswell*.

In sum, Plaintiffs' constitutional claims against GTAA are fundamentally flawed. As a private entity, GTAA is not a state actor and cannot be held liable under 42 U.S.C. § 1983. Even assuming *arguendo* that GTAA could be considered a state actor, it is entitled to immunity based on its close ties to Georgia Tech and the state.

## IV. Conclusion

In conclusion, Plaintiffs' claims against GTAA fail procedurally and substantively, and GTAA respectfully requests the Court dismiss Plaintiffs' claims against it with prejudice.

Dated: January 24, 2025         Respectfully submitted,

By: */s/ Scott D. Schneider*
Scott D. Schneider
4301 W. William Cannon Drive,
Suite B-150, PMB 105,
Austin, Texas 78749

**ATTORNEY FOR DEFENDANT GTAA**

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, I electronically filed the foregoing Reply with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: January 24, 2025       Respectfully submitted,

**SCHNEIDER EDUCATION AND EMPLOYMENT LAW PLLC**

By: */s/ Scott D. Schneider*
Scott D. Schneider
4301 W. William Cannon Drive,
Suite B-150, PMB 105,
Austin, Texas 78749

**ATTORNEY FOR DEFENDANT GTAA**