UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RILEY GAINES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:24-cv-01109-TRJ |
| v. | ) | |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

**<u>NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

I.     THE SPECULATIVE ALLEGATIONS OF PROSPECTIVE INJURY FAIL TO ESTABLISH STANDING FOR INJUNCTIVE RELIEF ........................ 2

II.    NCAA IS NOT A STATE ACTOR SUBJECT TO SECTION 1983 .............. 4

III.   PLAINTIFFS FAIL TO SHOW THEY CAN PURSUE SECTION 1983 BODILY PRIVACY CLAIMS AGAINST THE NCAA ................................ 8

IV.    PLAINTIFFS FAILED TO SHOW THAT TITLE IX APPLIES TO THE NCAA AS ALLEGED ................................................................... 10

       A.    The NCAA is Not a Recipient of Indirect Federal Funding .............. 10

       B.    Plaintiffs' Ceding Control Theory Fails ............................................. 12

V.     PLAINTIFFS DO NOT AND CANNOT DEFEND THEIR INSUFFICIENT DOE ALLEGATIONS .................................................. 14

VI.    CONCLUSION ............................................................................... 15

CERTIFICATE OF COMPLIANCE                                          17

CERTIFICATE OF SERVICE                                             18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Brannum v. Overton Cnty. Sch. Bd.*,
    516 F.3d 489 (6th Cir. 2008) ...............................................................8

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
    531 U.S. 288 (2001).................................................................6, 7, 8

*Castle v. Cobb Cnty.*,
    2023 U.S. App. LEXIS 13627 (11th Cir. June 2, 2023)...................................14

*Clapper v. Amnesty Int'l, USA*,
    568 U.S. 398 (2013).................................................................2, 3

*Communities for Equity v. Mich. High Sch. Athletic Ass'n*,
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ...............................................13

*Cureton v. NCAA*,
    198 F.3d 107 (3d Cir. 1999) ...........................................................12, 13

*Dean v. Barber*,
    951 F.2d 1210 (11th Cir. 1992) ......................................................14

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018) ...........................................................9

*Fortner v. Thomas*,
    983 F.2d 1024 (11th Cir. 1993) ......................................................9

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
    78 F.4th 622 (4th Cir. 2023) ..........................................................2, 3

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................................4

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).................................................................3

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) (en banc) ............................................3

*NCAA v. Smith*,
    525 U.S. 459 (1999) (*Smith I*)............................................................................1, 10

*NCAA v. Tarkanian*,
    488 U.S. 179 (1988)................................................................................passim

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ...............................................................................8

*Powell v. Barrett*,
    541 F.3d 1298 (11th Cir. 2008) .............................................................................9

*Quad Int'l, Inc. v. Doe*,
    2013 WL 718448 (S.D. Ala. Jan. 7, 2013) ........................................................15

*Sanders v. Miller Cnty. Sch. Dist.*,
    2024 U.S. Dist. LEXIS 147043 (M.D. Ga. Aug. 16, 2024) ...............................11

*Smith v. NCAA*,
    266 F.3d 152 (3d Cir. 2001) (*Smith II*)..............................................1, 7, 11, 12

*United States v. Virginia (VMI)*,
    518 U.S. 515 (1996)................................................................................................9

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995)..............................................................................................10

*Vielma v. Gruler*,
    347 F. Supp. 3d 1122 (M.D. Fla. 2018), *aff'd on other grounds*, 808 F.
    App'x. 872 (11th Cir. 2020) ...............................................................................15

*Williams v. Bd. of Regents*,
    477 F.3d 1282 (11th Cir. 2007) ..........................................................................13

**RULES**

Rule 12(b)(6)..........................................................................................................11

The NCAA anchored its motion to dismiss in governing Supreme Court cases and persuasive Circuit progeny. *NCAA v. Tarkanian*, 488 U.S. 179 (1988), held that the NCAA is not a State actor and does not control State actors when it establishes rules that universities choose to follow. *NCAA v. Smith*, 525 U.S. 459 (1999) (*Smith I*), set the default principle that an indirect financial benefit from federal funds without more does not subject the NCAA to Title IX. And on remand, the Third Circuit harmonized *Smith I* with *Tarkanian* and confirmed that (1) the NCAA is not subject to Title IX under a "ceding control" theory, and (2) the NCAA cannot be subject to Title IX under an indirect benefit theory because it does not effectively control, and is distinct from, its federal funding recipient members. *Smith v. NCAA*, 266 F.3d 152 (3d Cir. 2001) (*Smith II*).

Those decades-old authorities—which dictate dismissal here—have not been overruled or distinguished. The potential carve-outs from that controlling law do not apply here because (1) Plaintiffs' factual allegations are insufficient to invoke any carve-outs, and (2) Plaintiffs concede the reasons they do not apply. Ultimately, Plaintiffs' attempt to sue both the NCAA and federally funded State actors under Title IX and Section 1983 creates a dispositive contrast showing, on these allegations, that the State defendants are subject to both laws and the NCAA is not. Plaintiffs' insufficient allegations regarding the NCAA cannot be cured through amendment. The Court should dismiss the claims against the NCAA with prejudice.

1

I.    **THE SPECULATIVE ALLEGATIONS OF PROSPECTIVE INJURY FAIL TO ESTABLISH STANDING FOR INJUNCTIVE RELIEF**

Faced with the NCAA's arguments that no plaintiff sufficiently alleges a future harm to have standing for injunctive relief, the Opposition offers plaintiff-specific responses for only Track Athlete A and Brooke Slusser. Doc. 108 at 61-63. Both responses fail.

Track Athlete A relies on the bare assertion that she "will compete against [RIT athlete Sadie] Schreiner next year." Opp. at 62. But that does not satisfy the requirement to show a "substantial" and "certainly impending" future injury. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Plaintiffs fail to address *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 631 (4th Cir. 2023), which dismissed claims that "depend[ed] on a speculative fear" arising out of a transgender policy.  As in that case, "determining whether [Track Athlete A] will ever sustain an injury" from a transgender policy "requires a chain of . . . future events to occur." *Id.* Here, (1) Track Athlete A and Schreiner must both choose to and be able to participate next season in interscholastic sports and in the same events; (2) their respective teams and they must both attend the same competition or meet; (3) they must both compete at that meet in the same race; (4) Track Athlete A must lose to Schreiner. As with the "speculative chain of possibilities" in *John & Jane Parents*, "on these allegations, any determination on the likelihood of those events occurring requires guesswork as to both" athletes' decisions and athletic

2

performances, which precludes Article III standing for Track Athlete A. *Id*.

Plaintiffs also travel into a speculative universe by trying to ground Plaintiff Slusser's standing on a potential judicial remedy, which Plaintiffs themselves signal is uncertain. *See* Doc. 108 at 63 ("[R]elief to which Slusser *may* be entitled *could* include an additional year or more of NCAA eligibility."). Plaintiffs concede that Slusser has exhausted her NCAA eligibility. SAC ¶¶ 65, 645, 699. Another year of eligibility for Slusser is not certainly impending, especially where the SAC does not seek that remedy. Just as this court cannot "create jurisdiction by embellishing a deficient allegation of injury," *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc), so it cannot create jurisdiction for Slusser's claims by relying on its own hypothetical remedy.

Lacking any certainly impending future harm for any Plaintiffs with future eligibility, the Opposition offers two vague and insufficient "injuries" not tied to any Plaintiff: 1) informational injury; and 2) emotional and dignitary injury. Doc. 108 at 64-66. Neither of those are certainly impending under *Clapper* because each is dependent on the speculation that eligible Plaintiffs will compete against a transgender athlete in the future—precisely the missing allegations that cause the standing problem in the first place. Plaintiffs' reliance on *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010), is misplaced because the farmer plaintiffs there proved concrete future costs "even if their crops are not actually infected with

the Roundup ready gene." Here, however, Plaintiffs alleged no certainly impending future harm absent competing with or against transgender athletes. To the extent that Plaintiffs' allegations of impending informational and dignitary/emotional harm are untethered to a substantial likelihood of future transgender competition, they are barred by the Supreme Court's "generalized-grievance cases" that refused Article III standing for plaintiffs who express an inchoate fear of environmental policies and practices but allege "no distinctive concrete harm." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 576 (1992).

## II. NCAA IS NOT A STATE ACTOR SUBJECT TO SECTION 1983

Contrary to Plaintiffs' assertion, Doc. 108 at 42, *Tarkanian is* dispositive of the Section 1983 claims (and, as discussed below, of Title IX coverage under a ceding control theory). Plaintiffs do not put any daylight between the present case and *Tarkanian*, which held that the NCAA, as a private entity, was not a state actor on allegations that it "adopted rules . . . governing the conduct of the intercollegiate athletic programs of its members," each of which "agrees to abide by and to enforce such rules." 488 U.S. at 183. Plaintiffs try to dismiss *Tarkanian* as reflecting that "the NCAA was then a 'collective membership' of 'several hundred member institutions,'" Doc. 108 at 43, as if that circumstance has since changed. Per Plaintiffs' own allegations, it has not. SAC ¶ 128. Their assertion that hundreds or thousands of member institutions delegated policymaking authority to the NCAA

mirrors the insufficient allegations in *Tarkanian*. *See* 488 U.S. at 192 ("[Plaintiff] claims specifically that UNLV delegated its own functions to the NCAA . . . .").

Consistent with their similar allegations, Plaintiffs make arguments about the NCAA—sometimes in identical language—that the Supreme Court rejected in *Tarkanian*. For example, Plaintiffs argue, "Due to the NCAA's grip on big-college sports, large public universities have ***no practical choice*** but to offer an intercollegiate athletics program through the NCAA and to comply with NCAA rules, including the TEP." Doc. 108 at 47-48 (emphasis added). The Plaintiff in *Tarkanian* similarly "argue[d] that the power of the NCAA is so great that the UNLV had ***no practical alternative*** to compliance with its demands." 488 U.S. at 198 (emphasis added). But *Tarkanian* found that UNLV did have alternatives: it "could have retained Tarkanian and risked additional sanctions, perhaps even expulsion from the NCAA, or it could have withdrawn voluntarily from the Association." *Id.* at 198. Here, Plaintiffs bring themselves under *Tarkanian* by similarly admitting that the Georgia Defendants "could have refused to join in and prevented [the alleged violations], particularly those involving the use of their own facilities." Doc. 108 at 56-57.[1]

---

[1] Even if the Georgia Defendants had no choice, that does not create Section 1983 liability for the NCAA. *Tarkanian* held that "it does not follow that such a [monopolistic] private party is therefore acting under color of state law." *NCAA v. Tarkanian*, 488 U.S. 179, 198-99 (1988) (citation omitted).

In their rush to impose liability, Plaintiffs fail to address bedrock Section 1983 principles, such as the "dichotomy between state action . . . and private conduct, against which the [Fourteenth] Amendment affords no shield, no matter how unfair that conduct may be." *Tarkanian*, 488 U.S. at 191 (citation omitted). They also neglect the Section 1983 requirement that "the conduct at issue must have occurred under color of state law; thus, liability attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity." *Id.* (internal quotation marks and citations omitted). Indeed, the phrase, "color of state law," which undergirded the controlling result in *Tarkanian*, does not appear in the Opposition.

Plaintiffs cannot avoid *Tarkanian* by arguing that the NCAA's policymaking here is different because it relates to nationwide rules and national championships. Just the opposite. That argument underscores that, as alleged, the NCAA's policies considered hundreds of member institutions on a national scale and were "independent of any particular State." *Tarkanian*, 488 U.S. at 193. The Opposition brings this case within that holding by claiming that "the NCAA is a surrogate for public universities in every State." Doc. 108 at 43.

Plaintiffs' heavy reliance on *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), is mystifying and wrong. *Brentwood* explicitly distinguished the NCAA from the State athletic association in

6

that case and confirmed *Tarkanian*'s holding the NCAA is not a state actor because "the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law." *Id.* at 297. *Brentwood* did not relax the standards set by the Supreme Court and did not hold that a bare notion of "entwinement" or cooperation is sufficient to withstand dismissal. 531 U.S. 288. Indeed, Plaintiffs disregard the full analysis in *Brentwood,* offering only the repeated use of the partial phrase, "pervasive entwinement," omitting the words, "of state school officials in the structure of the [athletic] association." *Compare* Doc. 108 at 44 *with* 531 U.S. at 290. Plaintiffs also ignore the Third Circuit's careful application of *Brentwood* as supporting a holding that the NCAA does <u>not</u> control its members. *Smith II*, 266 F.3d at 158-60.

The result in *Brentwood* turned on a finding of "inseparability" between a "nominally private" association and the Tennessee public officials who controlled it. *See* 531 U.S. at 296, 298. That "pervasive entwinement" was embedded in the organization's "composition and workings"—it was controlled by State officials making up its board and council, its employees were treated as State employees, and it had been designated by the State as having supervisory authority over public school athletics. *Id.* at 298-300. In other words, a single State's officials controlled and performed all functions within the organization, and the organization would be

indistinguishable from the State but for the 16% of private school members. *Id.* at 299-300. Plaintiffs make no such allegations about the NCAA. Plaintiffs repeatedly place themselves under *Tarkanian*'s controlling bar to Section 1983, and the Court should dismiss Counts II, III, and IV.

## III.   PLAINTIFFS FAIL TO SHOW THEY CAN PURSUE SECTION 1983 BODILY PRIVACY CLAIMS AGAINST THE NCAA

Even if Plaintiffs could establish that the NCAA is subject to Section 1983, Plaintiffs fail to adequately address the authorities that unambiguously and persuasively root a right to bodily privacy in the Fourth Amendment, not the Fourteenth Amendment. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020) ("[T]here is no Fourteenth Amendment fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth."); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) ("[T]he constitutional right to privacy, which includes the right to shield one's body from exposure to viewing by the opposite sex, derives from the Fourth Amendment, rather than the Due Process Clause.").[2]

Plaintiffs insist on a Fourteenth Amendment "right to bodily privacy" in "sports locker rooms" used by transgender students. Doc. 108 at 51. But circuit courts have consistently held otherwise. *Parents for Privacy*, 949 F.3d at 1224

---

[2] Plaintiffs footnoted attempt to distinguish *Parents for Privacy* factually is entirely irrelevant to the fundamental constitutional question at issue. Doc. 108 at 52 n.10.

(rejecting "a privacy right to avoid any risk of being exposed briefly to opposite-sex nudity by sharing locker facilities with transgender students"); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018) ("[W]e decline to recognize such an expansive constitutional right to privacy—a right that would be violated by the presence of students [in restrooms and locker rooms] who do not share the same birth sex. Moreover, no court has ever done so.").

Plaintiffs attempt to mislead the Court about Eleventh Circuit law. Doc. 108 at 51 ("Thus, as of 1993, *Fortner* made clear that state universities must protect the bodily privacy of female student-athletes in women's locker rooms."). But *Fortner v. Thomas*, 983 F.2d 1024 (11th Cir. 1993), did not locate a right to bodily privacy in the Fourteenth Amendment, and a subsequent Eleventh Circuit decision recognized that the *Fortner* "right to bodily privacy . . . implicates the Fourth Amendment." *Powell v. Barrett*, 541 F.3d 1298, 1314 n.7 (11th Cir. 2008) (citing *Fortner*, 983 F.2d at 1026). While state universities can have Section 1983 liability for violating a Fourth Amendment right, the NCAA as a private entity cannot.

Plaintiffs' reliance on Justice Ginsburg's observations about "alterations . . . in living arrangements" does not change the analysis. Doc. 108 at 50-51 (quoting *United States v. Virginia (VMI)*, 518 U.S. 515, 550 n.19 (1996)). That footnoted language is dictum, and certainly does not create the expansive constitutional right to bodily privacy that Plaintiffs assert but that courts have rejected. Moreover, sports

locker rooms are not "living arrangements." The Supreme Court has explicitly

explained that locker rooms are not inherently private spaces and that student

athletes have a reduced expectation of privacy:

> Legitimate privacy expectations are even less with regard
> to student athletes. School sports are not for the bashful.
> They require "suiting up" before each practice or event,
> and showering and changing afterwards. Public school
> locker rooms, the usual sites for these activities, are not
> notable for the privacy they afford. . . . [S]tudents who
> voluntarily participate in school athletics have reason to
> expect intrusions upon normal rights and privileges,
> including privacy.

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995).[3] Plaintiffs attempt to

sweepingly expand the right to privacy beyond what any court has recognized is

legally wrong. The Court should dismiss Count IV as to the NCAA.

## IV. PLAINTIFFS FAILED TO SHOW THAT TITLE IX APPLIES TO THE NCAA AS ALLEGED

### A. The NCAA is Not a Recipient of Indirect Federal Funding

Plaintiffs do not dispute the NCAA receives no direct federal funding.

Doc. 108 at 11-12; *accord id.* at 13 ("Plaintiffs do not allege that the NCAA *directly*

received the federal funding."). Plaintiffs also admit the Supreme Court's rule:

alleging that the NCAA "indirectly benefits from . . . federal assistance . . . without

more, is insufficient to trigger Title IX coverage." *Id.* at 12 (quoting *Smith I*, 525

---

[3] Plaintiffs failed to alert the Court to that controlling precedent directly relevant to
their bodily privacy claim.

U.S. at 468). But the Opposition fails to show anything more than indirect benefits arising from the "'Grand Alliance' partnership with the DoD." *Id.* Plaintiffs certainly have not met *Smith II*'s high standard "to impose Title IX obligations on an entity that is not a direct recipient of federal financial assistance," which requires allegations that the NCAA "is able to control decisions made with respect to the [federal] money," especially "the most important decision [of] whether the grant money should be accepted at all." *Smith II*, 266 F.3d at 161-62. Indeed, Plaintiffs strongly deny any such pleading obligation, Doc. 108 at 14 ("But the NCAA is asking too much at this stage of the litigation."), thus leaving themselves without any legal authority for imposing Title IX coverage using an indirect funding theory.

Of course, neither the SAC nor the Opposition alleges that the NCAA controlled decisions regarding DoD money. And Plaintiffs do not get there simply by repeating "partnership" six times on one page. Doc. 108 at 14. Plaintiffs cite no authority that alleging a "partnership" is a proxy for the robust set of factual allegations of financial control and administrative overlap in *Smith II*. Plaintiffs invite the Court to bypass its Rule 12(b)(6) obligations and allow them to use discovery to correct their fatal pleading flaws. But "[t]he filing of a Complaint does not entitle Plaintiff to go on a fishing expedition in search of facts in support thereof." *Sanders v. Miller Cnty. Sch. Dist.*, 2024 U.S. Dist. LEXIS 147043, at *9

(M.D. Ga. Aug. 16, 2024)). Plaintiffs' indirect funding allegations are insufficient to impose a Title IX obligation on the NCAA.

### B.    Plaintiffs' Ceding Control Theory Fails

Plaintiffs' heavy reliance on the Third Circuit and *Smith II* suddenly evaporates when they turn to their oft-rejected argument that NCAA member schools "ceded control" of their federally funded athletic programs to the NCAA. *See* Opp. at 15-24. As the NCAA explained in its opening brief, no court has ever applied Title IX to the NCAA under a ceding control theory. *See* Doc. 103-1 at 10-11. This Court should not be the first.

Plaintiffs give this Court no good reason to depart from the careful reasoning of *Smith II*, which analyzed and harmonized *Tarkanian* **in a Title IX context** to confirm that "member institutions do not cede control of their athletic programs to the NCAA." 266 F.3d at 156 (citing *Cureton v. NCAA*, 198 F.3d 107, 117-18 (3d Cir. 1999)); *see also id.* (noting that "the NCAA's constitution expressly provides for the retention of institutional control over individual athletic programs"). Plaintiffs barely mention *Smith II* in their lengthy ceding-control discussion, except to say it is "decades-old," Doc. 108 at 19, which means it has stood the test of time and is well-established. Plaintiffs try to distinguish *Smith II* as involving athletic eligibility rules, Doc. 108 at 20-21, but that case and this both involve the same misguided basic theory: an incorrect argument that colleges "cede control" because,

as alleged, the NCAA makes rules for its members. *Smith II* held squarely that rulemaking does not amount to ceded control for Title IX coverage. Plaintiffs complain that "*Tarkanian* was a state actor case not a Title IX case," *id.* at 19, but they themselves eviscerate that distinction (and validate the Third Circuit's reliance on *Tarkanian* for Title IX) by grounding their entire Title IX ceding control section on "reasons like those supporting the NCAA's status as a state actor." *Id.* at 15.

Rather than follow the holdings about the NCAA in *Tarkanian*, *Cureton*, and *Smith II*, Plaintiffs invite the Court to err by applying cases with vastly different facts involving single-institution or single-state athletic associations. Doc. 108 at 16-19 (discussing *Williams v. Bd. of Regents*, 477 F.3d 1282 (11th Cir. 2007), and *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729 (W.D. Mich. 2000)). Those cases show only that the ceding control theory applies in different situations where there is complete operational control over athletic *programs* or state-wide athletic *associations*. *See Williams*, 477 F.3d at 1294 ("Here, [plaintiff] has alleged that UGA, a funding recipient, has ceded control over one of its *programs*, the athletic department, to UGAA and provided extensive funding to UGAA." (emphasis added)). Here, the SAC does not allege that members ceded control to the NCAA over their entire athletic *programs*. And Plaintiffs' arguments in their Opposition concede that the NCAA does not control its member institutions. Doc. 108 at 56 (arguing that the Georgia Defendants "could have refused to join in

13

and prevented" the alleged Title IX violations); *id.* at 58 (admitting that the Georgia Defendants "can control their own facilities and how they are used."); *id.* at 57 ("The Georgia Defendants had the discretion not to allow their facilities to be used to commit Title IX violations."). As a matter of law, Plaintiffs' allegations are insufficient to state a valid Title IX claim against the NCAA. And again, the Court should not allow Plaintiffs to cure their inherent pleading deficiencies through impermissible fishing expeditions.

## V.    PLAINTIFFS DO NOT AND CANNOT DEFEND THEIR INSUFFICIENT DOE ALLEGATIONS

Plaintiffs concede "fictitious party pleading is generally disfavored," and that Plaintiffs are "required" to provide "an unambiguous description of a defendant that enable service of process." Doc. 108 at 78 (quoting *Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992)). But the vague job titles and actions that Plaintiffs offer "do not give descriptions of the defendants that are specific enough to enable service of process." *Castle v. Cobb Cnty.*, 2023 U.S. App. LEXIS 13627, at *3-4 (11th Cir. June 2, 2023) (affirming fictitious-party dismissal despite plaintiffs' description of "rank and gender" and "behavior of each of the unnamed defendants").

Plaintiffs' fallback argument that the limited discovery exception is unsettled in this Circuit does not save their Doe pleadings. Even if an exception existed, Plaintiffs "failed to establish eligibility" for it by failing to "contemporaneously seek[] to ascertain the identity of the fictitious party through limited discovery."

14

*Vielma v. Gruler*, 347 F. Supp. 3d 1122, 1140 (M.D. Fla. 2018) (citation omitted), *aff'd on other grounds*, 808 F. App'x. 872 (11th Cir. 2020). The unpublished district court ruling on which Plaintiffs rely does not apply because it was limited to actions in which a plaintiff does not know the identity of any party defendant. *Quad Int'l, Inc. v. Doe*, 2013 WL 718448, at *3 (S.D. Ala. Jan. 7, 2013). Because Plaintiffs have named multiple Defendants, the Court should dismiss Doe Defendants 1-25.

## VI.    CONCLUSION

The Court should grant the Motion to Dismiss and dismiss the Second Amended Complaint with prejudice as to the NCAA and John Does 1-25.

Respectfully submitted this 24th day of January 2025.

ALSTON & BIRD LLP

*/s/ Cari K. Dawson*
Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant National Collegiate Athletic Association*

16

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that the foregoing filing has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

*/s/ Cari K. Dawson*
Cari K. Dawson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 24th day of January 2025.

*/s/ Cari K. Dawson*
Cari K. Dawson