# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| RILEY GAINES, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01109-TRJ |
| | ) | |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................................ ii

I.    CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF.................1

II.   RECENT DEVELOPMENTS DO NOT MOOT PROSPECTIVE RELIEF
      OR ELIMINATE STANDING ...............................................3

      A.    Terms of the NCAA's New Policy and Its Defects ..............................5

            1.    The New Policy Inadequately Defines "Male" and "Female" ...6

            2.    The New TEP Continues to Give Women's Opportunities to
                  Men, as Demonstrated by the Experience of Track Athlete A....9

            3.    Plaintiffs' Request for Declaratory and Prospective Injunctive
                  Relief from the NCAA's TEP Is Not Moot ...............................11

            4.    Plaintiffs Have Standing for Declaratory and Prospective
                  Injunctive Relief..........................................................14

      B.    Georgia's Gaines Act.......................................................15

            1.    The Terms of the Gaines Act....................................................15

            2.    The Gaines Act Does Not Moot the Need for Prospective Relief
                  ....................................................................................16

      C.    Resolution Agreement Involving UPenn Does Not Moot this Case...18

III.  THE SUPREME COURT'S RECENT DECISIONS ........................18

      A.    *Skrmetti*'s Holding and Reasoning.......................................19

      B.    *Skrmetti* Severely Undermines Defendants' Qualified Immunity and
            Lack of Clear Statement Arguments ...................................20

IV.   THE NCAA IS SUBJECT TO TITLE IX ..........................................22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ........................................................................... 21, 22

*B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*,
  98 F.4th 542 (4th Cir. 2024) ................................................................................21

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020) ................................................................................... 18, 20

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004).............................................................................14

*Calagaz v. Calhoon*,
  309 F.2d 248 (5th Cir. 1962)..................................................................................25

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
  115 F. 4th 1266 (11th Cir. 2024)................................................................... passim

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ...............................................................................................15

*D.P. by A.B. v. Mukwonago Area Sch. Dist.*,
  No. 23-2568, 2025 WL 1794428 (7th Cir. June 30, 2025)....................................22

*Dep't of Educ. v. Louisiana*,
  144 S. Ct. 2507 (Aug. 16, 2024)..................................................................... 20, 21

*Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*,
  868 F.3d 1248 (11th Cir. 2017)................................................................................3

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000) ..............................................................................................3, 4

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)...................................................................................21

*Grove City College v. Bell*,
465 U.S. 555 (1984) ...............................................................24

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) ..............................................21

*Lightfoot v. D.C.*,
2007 WL 1087474 (D.D.C. Apr. 10, 2007) ............................23

*Little v. Hecox*,
No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) ................21

*Nat'l Collegiate Athletic Ass'n v. Smith*,
525 U.S. 459 (1999) ...............................................................24

*Ne. Fla. Ch. of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656, (1993) ..............................................................15

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ...............................................................15

*Shays v. F.E.C.*,
414 F.3d 76 (D.C. Cir. 2005) .................................................15

*Underwriters at Lloyd's, London v. Osting-Schwinn*,
613 F.3d 1079 (11th Cir. 2010) ....................................... 24, 25

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025)......................................... 18, 19, 20

*W. Virginia v. B. P. J.*,
No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) ................22

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017)................................................22

**Statutes**

20 U.S.C. § 1687(4) ....................................................................24

N.J. Stat. Ann. § 26:8-40.12(b) & (c) (2024).............................8

O.C.G.A. § 20-3-16(a) ...............................................................16

O.C.G.A. § 20-3-15(2)................................................................16

O.C.G.A. §§ 20-3-16(a)(4) .........................................................15

O.C.G.A. §§ 20-3-15(5) .............................................................16

O.C.G.A §§ 20-3-15, -16 ...........................................................15

Pub. L. No. 100-259, § 2(1), 102 Stat. 28, 28 (1988)................................24

Tenn. Code Ann. § 68-33-101(b) ................................................19

**Rules**

Federal Rule of Civil Procedure 1 ..............................................23

Federal Rule of Civil Procedure 17(b)(3)(A) ................................5, 25

**Other Authorities**

EO No. 14201 ............................................................. 5, 6, 22

EO No. 14168 ...........................................................................5

S. Rep. No. 100-64.....................................................................24

Plaintiffs respectfully submit this Supplemental Brief in response to the Court's Order asking Plaintiffs to address "whether any claims are mooted or otherwise impacted by" (1) the NCAA's change to its transgender eligibility policies (TEP), (2) a June 30, 2025, Resolution Agreement between the Department of Education (DoE) and University of Pennsylvania (UPenn), and (3) the Riley Gaines Act signed into Georgia law on April 28, 2025 (the "Gaines Act"). Doc. 126 at 1. Plaintiffs also address "other developments" that directly impact the precedential value of several cases cited by Defendants, explain how these developments strengthen Plaintiffs' case that Title IX covers the NCAA, and ask the Court to consider the Civil Rights Restoration Act (CRRA) as further support for Title IX coverage.

## I.    CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF

Eight Plaintiffs have current NCAA eligibility, and another seeks additional eligibility.[1] The relief they all seek is broader than a request to rescind a specific policy. They ask that the Court permanently enjoin Defendants from allowing men[2] to compete against women in college athletics where such competition deprives

---

[1] Nanea Merryman is a rising junior with three years of remaining eligibility. Ainsley Erzen and Ellis Fox are rising juniors with two years of remaining eligibility. Elizabeth "Carter" Satterfield, Kaitlin "Katie" Blankenship, Kate Pearson, Julianna Morrow, and Halle Schart are rising seniors with one year of eligibility remaining. Brooke Slusser seeks additional NCAA eligibility due to disruption from competing with a trans-identifying male. Doc. 108 at 75.

[2] As used herein, the terms "men" and "women" and all similar terms refer solely to biological sex without regard to gender identity.

women of equal opportunity. The Second Amended Complaint (SAC), Doc. 94, requests a permanent injunction

- "requiring the NCAA to prevent men from competing on women's teams," SAC ¶ 725;

- "permanently enjoining the NCAA from adopting or enforcing any rules which permit biological males to compete against women in intercollegiate competitions," *id.* ¶ 845;

- enjoining the Georgia Defendants and GTAA "from implementing any aspects of the NCAA's eligibility policies which violate or have caused violations of Title IX or Equal Protection," *id.* ¶ 851;

- enjoining all Defendants from "enforcing or implementing the NCAA's eligibility rules that are in conflict with Title IX and/or the U.S. Constitution," *id.* at Prayer ¶ 6(a);

- "[r]equiring the NCAA to render invalid and reassign" all awards and placements awarded to men in women's sports, *id.* at Prayer ¶6(c);

- "[r]equiring the NCAA to render ineligible any male who competed in women's events or on a women's team pursuant to rules of the Association which the Court finds are unlawful," *id.* at Prayer ¶ 6(b); and

- requiring "sex verification testing by the NCAA," *id.* at Prayer ¶ 6(g).

Plaintiffs' requests for declaratory relief mirror their broad request for injunctive relief that focuses on full compliance with Title IX and the Fourteenth Amendment, not just recission of one policy. The SAC requests a declaration that

- "the NCAA, GTAA, the Board of Regents (or one or more of the their constituent parts) threaten to or are reasonably likely to violate Title IX," *id.* at Prayer ¶ 3; and

- "the NCAA, GTAA, and the Georgia Individual Defendants threaten to or are reasonably likely to violate the Fourteenth Amendment to the U.S. Constitution in the future unless they are enjoined from doing so," *id.* at Prayer ¶ 4.

The SAC is focused on substance, not form. Title IX and the Fourteenth Amendment

categorically prohibit men from competing against women when such deprives women of equal opportunity. That is the result Plaintiffs are asking the Court to award through declaratory and prospective injunctive relief.

## II.    RECENT DEVELOPMENTS DO NOT MOOT PROSPECTIVE RE-LIEF OR ELIMINATE STANDING

Recent developments do not moot Plaintiffs' requests for declaratory and prospective injunctive relief or eliminate standing as they do not grant the relief Plaintiffs are seeking. The Eleventh Circuit recently held that "[a] defendant's voluntary conduct may moot a case only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F. 4th 1266, 1284 (11th Cir. 2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000)); *accord Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc). This is a "stringent" standard. *Cambridge Christian,* 115 F. 4th at 1284. The Eleventh Circuit considers three factors, whether: (1) "the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction;" (2) "the decision to end the challenged conduct was 'unambiguous' and can be "fairly viewed as being 'permanent and complete';" and (3) the defendant "has consistently maintained its commitment to the new policy." *Id.* at 1284–85 (quoting *Flanigan's*, 868 F.3d at 1257).

The NCAA has not rescinded its policy but only changed it in response to an

Executive Order that can itself be changed at any President's direction. The NCAA's TEP still effectively permits trans-identifying men to compete on women's teams and use women's locker rooms and does not adopt sex-verification screening. It also has glaring enforcement defects and disregards the supremacy of federal law, inviting public and federally funded institutions to defer to state laws that would undermine equal opportunities for women. Even if the Court disagrees and finds no daylight between the requested relief and the NCAA's new TEP, Plaintiffs can still show a "'reasonable expectation' (or 'substantial likelihood') that the [NCAA] will 're-verse course' and reinstate the repealed policy if the lawsuit is terminated." *Cambridge Christian*, 115 F. 4th at 1284 (cleaned up). Also, UPenn's resolution with DoE has no impact on any party. And despite passage of the Gaines Act, the Georgia Defendants have conspicuously failed to state *they* will comply with its requirements going forward and have not disclosed their policy for ensuring compliance with this new law or even explained the rough contours of any such policy or if it exists. Thus, these developments do not remove the credible threat that Defendants will continue to fail to uphold the obvious requirements of Title IX and the Fourteenth Amendment that, as alleged in the SAC, Defendants have violated with impunity. [3]

---

[3] None of the recent developments impacts any claim for consequential or nominal damages or attorneys' fees. *Cambridge Christian*, 115 F.4th at 1286 (claim for nominal damages persisted after injunctive and declaratory relief was moot); *Laidlaw*, 528 U.S. at 197 (Stevens, J., concurring) (same).

**A.      Terms of the NCAA's New Policy and Its Defects**

On January 20, 2025, President Donald J. Trump issued Executive Order ("EO") No. 14168 titled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* stating that, "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." EO No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025). This Order defined "women," "woman," "girls," "girl," "female," "men," "man," "boys," "boy" and "male" in biological terms and recognized that "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.*

On February 5, 2025, President Trump issued EO No. 14201 titled *Keeping Men Out of Women's Sports* which incorporated the definitions of male and female in EO No. 14168 and stated that "[i]t shall … be the policy of the United States to oppose male competitive participation in women's sports." EO No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025). This Order directed the Secretary of Education to "take all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972." *Id.*

On February 6, 2025, the NCAA praised the President's EO No. 14201 and purported to "update the Association's participation policy for transgender student-athletes *following the Trump administration's executive order*" "effective immediately." Layton Declaration Exhibit (Ex.) 1 (emphasis added). But the new NCAA rule did not track President Trump's EO as the NCAA's press release promised.

### 1.    The New Policy Inadequately Defines "Male" and "Female"

Instead, the new NCAA TEP, referred to by the NCAA as its *Participation Policy for Transgender Student-Athletes*, Ex. 2, has simplified the path for trans-identifying men to participate and compete on NCAA women's teams, deprived women of separate women's locker rooms, and eliminated any effective means of protecting women against men competing in women's sports. The new NCAA TEP abandons the NCAA's prior testosterone-based standard for trans-identifying male eligibility as well as certification and testing requirements, and states:

a.    <u>Student-athlete assigned male at birth</u>.
   i.    Competition. A student-athlete assigned male at birth may not compete on a women's team; and
   ii.    Practice. A student-athlete assigned male at birth *may practice on the team consistent with their gender identity and receive all other benefits applicable to student-athletes who are otherwise eligible for practice.*

Ex. 2 at 1 (emphasis added). While clause (i) above might appear promising for women at first glance, that promise is materially undermined by the details.

The new NCAA TEP fails to define "women" or "men" based on biological facts, which opens the door to numerous administrability problems. Instead, the new

6

NCAA TEP uses the meaningless and inaccurate term "sex-assigned at birth" and defines this term as "[t]he male or female designation doctors assign to infants at birth, which is marked on their birth records." Ex. 2 at 1.

The new TEP does not contain an effective method of defining and administrating eligibility for women's teams that will ensure compliance with Title IX or the Constitution. Instead, the revised TEP relies on amendable birth records rather than immutable biology and science. Unlike the NCAA's drug testing policies, which subject student-athletes to "year-round testing," Ex. 3, at 5 *NCAA Drug Testing Manual*, the new policy omits any reliable process for ascertaining student-athlete sex. By defining "sex assigned at birth" as the designation that is "marked on their birth records," by failing to define "woman," "female," "man," or "male" on the basis of biology, and by failing to apply any reliable, objective, and biologically-based standard for determining sex – such as sex screening[4] – the new NCAA TEP will allow men to compete on women's teams in college sports if men simply amend their birth certificate to reflect a female gender identity rather than their sex.

The NCAA will argue that its policy anticipates this, stating "students

---

[4] Sex screening relying on chromosomes and an active SRY gene is non-invasive and relatively inexpensive. It requires only a sample of saliva, does not require an invasive physical exam, and is being used by sport organizations such as World Boxing and World Athletics. *See* Ex. 12, *World Boxing testing policy*; Ex. 13, *World Athletics article*. Far more intrusive tests are routinely administered under the NCAA's sports drug testing program. *See* Ex. 3, *NCAA Drug Testing Manual* § 6.3.3 (requiring urine sample provision be fully observed by a doping control officer).

assigned male at birth may not compete on a women's team with amended birth certificates or other forms of ID." Ex. 2 at 2. First, this provision was an afterthought and not the result of substantial deliberation. It did not appear in the original February 6, 2025, policy but was added sometime after March 24, 2025.[5] Second, men who wish to compete on women's teams can easily change their birth certificates. At least twenty-six (26) states and the District of Columbia allow a person to change the sex marker on their birth records through administrative procedures permitted by state law. *See* Ex. 4 at 4, *Movement Advancement Project, Identity Document Laws and Policies.* In at least fourteen (14) of those states, no medical documentation whatsoever is necessary. *Id.* Whatever sex may have been noted on original birth records will not typically be reflected on any available birth record if it is changed through a state-sanctioned process. *See e.g.*, N.J. Stat. Ann. § 26:8-40.12(b) & (c) (2024) ("The amended certificate of birth … ***shall not be marked as amended***. … [The State registrar] … shall enter the amended certificate in his local record and place his original copy of the original certificate under seal." (Emphasis added)).

Further complicating meaningful enforcement is the policy's directive to member institutions that "local [and] state … legislation … supersedes the rules of the NCAA." Ex. 2 at 1. Thus, the NCAA's new policy does not end the challenged

---

[5] *Compare Slusser, et al. v. Mountain West Conference, et al.*, No. 1:24-cv-03155-SKC, ECF No. 78-4 (D. Colo. March 24, 2025) *and* Ex. 15 *with* Ex. 2.

conduct in states that protect trans-identifying men at the expense of women's equal opportunities because the NCAA invites member institutions to rely upon state law to thwart their Title IX obligations to protect women's equal opportunities.

The new NCAA TEP's directive to schools to rely on state law rather than follow Title IX will have real-world impact because trans-identifying men will rely upon state law and the new NCAA TEP to require member institutions to allow these men to deprive women of their Title IX protections. For example, on July 15, 2025, Sadie (formerly Camden) Schreiner, a trans-identifying man, filed a lawsuit in New Jersey state court seeking to enforce New Jersey's anti-discrimination law against Princeton University for excluding him from women's track events held on May 3, 2025. Ex. 14 at 1–3.[6] Schreiner's lawsuit demonstrates the non-speculative likelihood that other men will rely on the state law escape hatch in the NCAA's new TEP to circumvent the requirements of Title IX.

### 2. The New TEP Continues to Give Women's Opportunities to Men, as Demonstrated by the Experience of Track Athlete A

In addition to the evident loopholes that fail to fully close the door to men competing in NCAA women's college sports, the new TEP expressly permits athletes

---

[6] Schreiner's biological sex is well-known. *See* SAC ¶¶ 633–638. That's why Princeton recognized he was male despite his presentation of a female birth certificate. However, the sex of trans-identifying men is frequently not publicly known. For example, Blaire Fleming lived with Plaintiff Brooke Slusser for months before Slusser discovered Fleming was male. SAC ¶¶ 647–655.

"assigned male at birth" to take away opportunities from women by allowing them to participate on women's teams and "receive all other benefits applicable to student-athletes who are otherwise eligible to practice." This means that trans-identifying men are expressly authorized to access women's locker rooms and safe spaces under the new NCAA TEP.

This defect is not merely theoretical. The NCAA's New TEP expressly allowed male athlete, Sadie Schreiner to continue to take opportunities away from Track Athlete A, a member of the women's track and field team at Rochester Institute of Technology (RIT), during the latter half of the 2025 Division III women's track and field season. Declaration of Track Athlete A ¶ 4. Schreiner, who formerly competed as a male track athlete, participated and competed on the RIT Women's Team from 2023 to 2025. *Id.* ¶ 8. RIT awarded school records to Schreiner in several events, including school records that Athlete A previously held. *Id.* ¶¶ 11–13. Schreiner took away other podium positions and placements from Athlete A and other women in competition. *See id.* ¶ 15.

Schreiner's participation took away coaching time that Athlete A and other female athletes would have received had Schreiner not participated on the team. *Id.* ¶ 18. Prior to Schreiner joining the RIT Team, Athlete A received one-on-one coaching time. *Id.* ¶ 19. After Schreiner joined the RIT Team, she received significantly less. *Id*. Schreiner's participation also had the effect of discouraging Athlete A from

competing in events that Schreiner ran because it was inherently unfair to have to compete against and lose to a man in a women's competition. *Id.* ¶¶ 20–21. In 2025, Athlete A decided to run different events, in part, to avoid competing with Schreiner so she would not have to worry about Schreiner beating her times. *Id.* ¶ 21.

After the NCAA changed its TEP in February 2025, Athlete A was not made aware of the change by her RIT coaches or any RIT staff. *Id.* ¶¶ 22–23. The only thing that changed for Schreiner was that he no longer competed on behalf of RIT. *Id.* ¶¶ 24, 26–28. He continued to

- participate in practices and receive coaching from RIT coaches, which continued to take away coaching time from Athlete A and the other RIT female athletes, *id.* ¶ 26;
- have access to and use the RIT women's locker room, making Athlete A feel uncomfortable with Schreiner's presence in the locker room so that her privacy was continuously violated, *id.* ¶ 27; and
- use the training and coaches' attention in RIT practices to train for competing in open competitions unattached to any school. *Id.* ¶ 28.

### 3. Plaintiffs' Request for Declaratory and Prospective Injunctive Relief from the NCAA's TEP Is Not Moot

The NCAA's new TEP does not moot this case because it does not prevent trans-identifying men from participating on women's teams, using women's locker rooms and competing against women. But the revised TEP is in some respects even worse because it allows men to participate on college women's teams without any androgen suppression, testosterone-based standards, or oversight whatsoever and for schools to administer the eligibility dividing line between the sexes in college sports

by doing no more than relying on easily changeable birth certificates, an insufficient safeguard for protecting women's equal opportunity in scholastic sport.

The NCAA cannot satisfy the three *Cambridge Christian* mootness factors. There has been no "change in conduct result[ing] from substantial deliberation" under the first factor. *Cambridge Christian*, 115 F. 4th at 1284. Under the second factor "the end of the challenged conduct" is not "unambiguous" or "permanent and complete." *Id.* at 1284–85. Trans-identifying men were still taking away women's opportunities and invading their private spaces after the new NCAA policy went into effect. Athlete A Decl. ¶¶ 24, 26–28. The NCAA's clarification that "students assigned male at birth may not compete on a women's team with amended birth certificates or other forms of ID," Ex. 2 at 2, was not the result of "substantial deliberation," *Cambridge Christian*, 115 F. 4th at 1284, but was an afterthought, added months after the NCAA revised the TEP. *See supra* at n.5. The NCAA has not given serious thought to how its policy will be enforced.

Prospective injunctive (and declaratory) relief is also necessary to ensure that local laws do not continue to be used to give men the chance to take women's opportunities in NCAA college sports. The NCAA has not "end[ed] … the challenged conduct" when it directs member institutions to ignore the Supremacy Clause and follow local laws to override women's Title IX and/or constitutional rights. Declaratory and prospective injunctive relief that binds the NCAA will ensure that the Title

IX escape hatch written into the NCAA's new TEP is not used to circumvent Title IX at future NCAA competitions for any of the nine Plaintiffs with current or potential eligibility or for any of the class members they seek to represent.

Under the third prong, it is too early to tell if the NCAA will "maintain[] its commitment to the new policy." *Id.* at 1285. The policy change was precipitated by a change in presidential administrations, not any change of heart on the NCAA's part or any true "commitment" by the NCAA, especially when men are still participating on women's teams. The NCAA made this clear just two weeks ago on July 14, 2025, by releasing "a comprehensive visual catalog of championship sports, individual titles and school-level summaries throughout the NCAA's history." Ex. 5. The catalog conspicuously (and falsely) identifies Lia Thomas as the 2022 women's champion of the 500-meter women's freestyle, perpetuating the discrimination the NCAA authorized under its former TEP. Ex. 6 at 12 & Ex. 7. The NCAA is not "committed to the new policy" if it is not committed to undoing the legacy of its old one.

Finally, Plaintiffs' injuries are capable of repetition yet evading review. As the many circumstances described in the SAC demonstrate – and as Athlete A's experience and Schreiner's New Jersey lawsuit confirm – threats to women's equal opportunity arise unexpectedly. Athletic seasons are short, ending before protracted litigation can conclude. And, as recent events show, the NCAA can change its policy at any time. The nine Plaintiffs with remaining eligibility face the same threats that

they identified in the SAC and satisfy the capable of repetition yet evading review standard. *See Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004) ("This standard is satisfied where (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.") (cleaned up). "Past wrongs *do* constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be adverted by the issuing of an injunction." *Id*. at 1309 (emphasis added) (citation omitted). Where a party has argued for a lengthy period that its policy is lawful "and has continued to implement it even in the face of ongoing litigation," this may be considered in favor of finding a request for injunction not mooted by a change in policy. *Id*.

### 4.   Plaintiffs Have Standing for Declaratory and Prospective Injunctive Relief

Plaintiffs with remaining eligibility have standing for declaratory and prospective injunctive relief because, as the experience of Athlete A and the lawsuit filed by Schreiner demonstrate, their concerns are real that trans-identifying men will continue to participate in women's sports and accept the NCAA's invitation to rely on state law to thwart women's equal opportunity rights. *Cambridge Christian Sch.*, 115 F.4th at 1281 (declaratory and injunctive relief warranted when "controversy between the parties cannot be conjectural, hypothetical, or contingent"). "[W]hen adverse use of illegally granted opportunities appears inevitable, affected parties may

14

challenge [a defendant's] authorization of those opportunities without waiting for specific competitors to seize them." *Shays v. F.E.C.*, 414 F.3d 76, 90 (D.C. Cir. 2005). Plaintiffs are "able and ready" to compete but the NCAA's "discriminatory policy prevents [them] from doing so on an equal basis." *Ne. Fla. Ch. of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, (1993); *accord City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n. 14 (1978). A cognizable injury includes loss of a fair playing field. *Id*. Likewise, given the NCAA policy, which the Georgia Defendants follow, is insufficient, Plaintiffs have shown there remains a substantial likelihood that the Georgia Defendants will continue to allow their athletic venues to be used to deny equal opportunity for women, satisfying the *Cambridge Christian* factors.

### B.  Georgia's Gaines Act

#### 1.  The Terms of the Gaines Act

In relevant part, the Gaines Act, codified at O.C.G.A §§ 20-3-15, -16, defines the terms "sex," "male," and "female" in purely biological terms and states that

> (4) No covered entity shall host, sponsor, or participate in any intercollegiate competition in this state that permits a male to:
>
> > (A) Participate in any intercollegiate competition in this state on any team that is designated as female; or
> >
> > (B) Use any multiple occupancy restroom or changing area or sleeping quarters designated for use by females in conjunction with such competition.

O.C.G.A. §§ 20-3-16(a)(4). The Act also requires "governing bodies" of each

"covered entity"[7] to "adopt such policies, rules, and regulations as necessary to ensure" compliance with the Act "for all intercollegiate competitions involving covered entities in this state." O.C.G.A. § 20-3-16(a).

### 2. The Gaines Act Does Not Moot the Need for Prospective Relief

The Gaines Act is a welcome development in Georgia. But it says nothing about what Defendants have done. The Act plainly requires the Georgia Defendants – as "covered entities" with "governing bodies" to "adopt policies, rules, and regulations" – to implement the Act. *Id.* At this time, Plaintiffs are not aware that any such policies have been adopted. And for mootness, that's all that matters. Moreover, the Gaines Act expressly exempts the GTAA by excluding it from the definition of a "covered entity" or "governing body." O.C.G.A. §§ 20-3-15(5).

In *Cambridge Christian*, the Florida High School Athletic Association argued that a lawsuit challenging its policy on pre-game prayer was mooted by a change in Florida law "and the athletic association's corresponding policy" which FHSAA argued "eliminated any likelihood that Cambridge Christian School will be denied the opportunity to offer a pregame prayer." *Cambridge Christian*, 115 F. 4th at 1285. Here, by contrast, the Georgia Defendants have not – to Plaintiffs' knowledge –

---

[7] "Governing" bodies are defined as "the individual or entity responsible for establishing the policies, rules, and regulations for a covered entity" but not including "any ... athletic association." O.C.G.A. §§ 20-3-15(5). "Covered entity" means "Georgia state schools and participating nonstate schools." O.C.G.A. § 20-3-15(2).

disclosed their "corresponding policy" following passage of the Gaines Act.

Thus, pursuant to *Cambridge Christian* there remains a substantial likelihood that the Georgia Defendants will continue to allow their athletic venues to be used to deny equal opportunity for women. Under the first factor, there has been no "change in conduct result[ing] from substantial deliberation." *Id.* at 1284. The Georgia Defendants rely on a changed law, but a new law does not equate to compliance, particularly here where the reciprocal federal statute was violated by these Defendants and the Defendants had nothing to do with adoption of the Gaines Act.

Without identifying any concrete change of "conduct," the Georgia Defendants have not demonstrated any conduct that is "unambiguous" or "permanent and complete" that reflects a recission of its unlawful and unconstitutional practices, under factor two, nor has it demonstrated any "commitment to the new policy," under factor three. *Id.* at 1284–85. State Defendants could easily cure this problem by entering a consent decree with the Plaintiffs to guarantee compliance with state and federal law going forward. They have not. Instead, they stand on their Motions to Dismiss and maintain their arguments, which are fundamentally at odds with complying with the Gaines Act. This does not reflect a "commitment" to protecting women's opportunities and spaces and that is "unambiguous" or "permanent and complete." It is cold comfort to Plaintiffs who could not trust the State Defendants to uphold federal law and the Constitution no matter what the NCAA said.

C.    **Resolution Agreement Involving UPenn Does Not Moot this Case**

While Ex. 11 appears to be a version of the resolution agreement between UPenn and OCR, Plaintiffs are not certain. Regardless, it does not moot any relief Plaintiffs seek here because it does not apply to any party in this case, and UPenn's agreement to change its own records does not impact NCAA records or results at the 2022 NCAA Championships. The NCAA still considers Thomas a women's NCAA Division I champion in the 500-meter freestyle. *See* Ex. 6 at 12 & Ex. 7.

## III.    THE SUPREME COURT'S RECENT DECISIONS

The Georgia Defendants and GTAA both argue in their respective Motions to Dismiss that they are not liable under Title IX and the Equal Protection Clause ("EPC") because neither clearly prohibits trans-identifying men from taking away equal opportunity for women in collegiate athletics or using women's locker rooms. Thus, they contend they have no Title IX liability under the Spending Clause's "clear-statement rule," Doc. 102-1 at 20–25, and no constitutional liability under the doctrine of qualified immunity, Doc. 100-1 at 21–24.

Recent "other developments," Doc. 126 at 1, support Plaintiffs' position that Title IX's application to women's college sports was not altered by erroneous lower court decisions that misapplied *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020), the 2020 case that extended Title VII's protections to sexual orientation and gender identity discrimination. The Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and grant of certiorari in two of the cases cited by the Georgia

Defendants confirm this. These developments show that lower court decisions cited by the Georgia Defendants relied on bad science and erroneous interpretations of the EPC and Title IX. Defendants cannot rely upon faulty out-of-circuit decisions the Court has called into question to argue for a lack of clear statement on Title IX's plain meaning or qualified immunity for their EPC violations.

### A.    *Skrmetti*'s Holding and Reasoning

*Skrmetti* held that a Tennessee law prohibiting puberty blockers and hormones for treating gender dysphoria in transgender minors did not trigger heightened scrutiny under the EPC because the state law "does not turn on sex" or "evince sex-based stereotyping" or "exclude any individuals on the basis of transgender status." 145 S. Ct. at 1831–34. Rational basis review was warranted. *Id.* The majority did not reach the issue of whether transgender status was a protected class entitled to the benefit of intermediate scrutiny. But three Justices expressly opined transgender status does not warrant heightened scrutiny. *Id.* at 1849–50 (Thomas, J. & Barrett, J., concurring); *id.* at 1855 (Alito, J., concurring in part and in the judgment).

Moreover, the Court held that Tennessee had a rational basis for prohibiting puberty blockers and gender affirming hormone therapy for minors because such treatment "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences." *Id.* at 1835 (quoting Tenn. Code Ann. § 68-33-101(b)). In support

the Court cited a recent "report commissioned by England's National Health Service . . . [that] characterized the evidence concerning the use of puberty blockers and hormones to treat transgender minors as 'remarkably weak,' concluding that there is 'no good evidence on the long-term outcomes of interventions to manage gender-related distress.'" *Id.* at 1836–37 (quoting H. Cass, *Ind. Rev. of Gender Identity Svcs. for Children and Young People: Final Report* 13 (Apr. 2024)).

Several cases cited by the Georgia Defendants relied on *Bostock* to erroneously extend Title IX's protections to trans-identifying men and even applied *Bostock*-like reasoning to the EPC. However, *Skrmetti* confirmed *Bostock* applies only to Title VII, stating that "[w]e have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context." *Id.* at 1834; *see also Bostock*, 590 U.S. at 681 (stating its holding does not extend "beyond Title VII"); *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024) (unanimously affirming injunctions against Title IX regulations "that newly define[] sex discrimination to include discrimination on the basis of … gender identity"). Further, at least two Justices would not extend *Bostock*'s framework to the EPC. *Skrmetti*, 145 S.Ct. at 1838 (Thomas, J., concurring); *id.* at 1859 (Alito, J., concurring).

**B.    *Skrmetti* Severely Undermines Defendants' Qualified Immunity and Lack of Clear Statement Arguments**

*Skrmetti* undermines the flawed scientific and legal foundation for the out-of-circuit cases Defendants rely on to argue they are entitled to qualified immunity for

EPC violations and that Congress has not given a clear statement on the meaning of Title IX for women's sports and locker rooms. For example, the individual Georgia Defendants argued that the caselaw "remain[ed], at best, unsettled" on whether the EPC prohibited Thomas from stealing women's places and using the women's locker rooms at the 2022 Championships, Doc. 100-1 at 23, and cited three cases in support: *Hecox v. Little*, 104 F.4th 1061, 1081 (9th Cir. 2024); *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 563 (4th Cir. 2024); and *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 773 (7th Cir. 2023). GTAA argued that "Title IX's prohibition on sex discrimination applies to transgender students and/or transgender student athletes is not clear from the text of the statute" and cited OCR's 2021 Notice of Interpretation applying *Bostock* to Title IX and *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618–19 (4th Cir. 2020) which did the same. Doc. 102-1 at 21–23.

*Skrmetti* is incompatible with *Hecox*, *B.P.J.*, *A.C. by M.C.*, *Grimm*, and the Title IX regulations which the Court previously declined to permit to come into force. *See Louisiana*, 144 S. Ct. at 2509–10. Defendants' cases did not render Title IX less clear or create a reasonable basis for either ignoring biological differences between men and women or the implications those differences have for guaranteeing equal opportunity for women in sports and their privacy rights in locker rooms.

If there is any doubt, the Court granted petitions for certiorari in *Hecox* and *B.P.J.* on July 3, 2025. *Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S.

July 3, 2025) (granting cert); *W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025) (same). And the Seventh Circuit, *sua sponte*, vacated a recent opinion relying upon *A.C. by M.C.*, and ordered the parties to brief "whether the court should overrule *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), and *A.C. v. Metropolitan School Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), in light of *Skrmetti*." *D.P. by A.B. v. Mukwonago Area Sch. Dist.*, No. 23-2568, 2025 WL 1794428, at *1 (7th Cir. June 30, 2025). Thus, no weight should be given to Defendants' non-controlling, out-of-circuit cases in conducting the Court's clear-statement and qualified immunity analysis.

## IV.    THE NCAA IS SUBJECT TO TITLE IX

Just last year, the NCAA Board of Governors voted to continue to allow males to compete in women's college sports. Ex. 16. Then, just nine months later, the day after President Trump issued EO 14201, the NCAA reversed course, "immediately"[8] changing the TEP for all 1,100 member schools and calling its' new TEP a "national standard [which] brings much needed clarity as we modernize college sports for today's student-athletes." Ex. 1. The NCAA's framing of its TEP as a "national standard" that "immediately" "applies to all student athletes" is consistent with the Plaintiffs' arguments regarding the applicability of Title IX to the NCAA.

Then on July 1, 2025, UPenn's President explained that UPenn "*must comply*

---

[8] Ex. 1 ("effective immediately"); *see also* Track Athlete A Decl. ¶ 24.

*with … NCAA eligibility rules, so our teams and student-athletes may engage in competitive intercollegiate sports*," Ex. 17 (emphasis added), and admitted UPenn's "policies during the 2021-2022 swim season … in accordance with NCAA eligibility rules at the time [*i.e.*, the TEP]" caused injuries to women, including "competitive disadvantage" and "anxiety." *Id.* These developments underscore the NCAA's control over sport eligibility rules of its members as alleged in SAC ¶¶ 128–186, 197–269, and the harms and injuries to women arising from the NCAA's TEP. They also support Title IX coverage over the NCAA under the ceding control standard, as discussed in Doc. 108 at 27–36, based on its Grand Alliance funding as explained in Doc. 108 at 23–27, and under the CRRA argument discussed below.

Finally, the SAC alleges "[t]he NCAA is an unincorporated association [that] was established by two or more entities which are covered by Title IX." SAC ¶¶ 128, 130. Based on these well-pled allegations, Plaintiffs respectfully ask the Court to apply the CRRA as an additional basis for holding the NCAA subject to Title IX. The NCAA will not be prejudiced by addressing this extension of Plaintiffs' Title IX coverage arguments now as the factual basis for it is set forth in the SAC and the Court has given the NCAA an opportunity to respond to this brief. Doc. 126.[9]

---

[9] Plaintiffs' request for consideration of this argument is analogous to a request for leave to file a surreply with a guaranteed opportunity for the NCAA to file a surreply in response. The interests of justice favor all arguments being raised and addressed on the merits. Fed. R. Civ. P. 1; *Lightfoot v. D.C.*, 2007 WL 1087474, at *5 (D.D.C. Apr. 10, 2007) (granting surreply in interest of justice).

Congress passed the CRRA to expand the definition of "program or activity" of a Title IX covered entity to include "all of the operations of … (4) any other entity which is established by two or more [colleges or universities] … any part of which is extended Federal financial assistance … ." 20 U.S.C. § 1687(4) (emphasis added), Pub. L. No. 100-259, § 2(1), 102 Stat. 28, 28 (1988). "The purpose of the [CRRA] is to reaffirm broad coverage of [Title IX's] anti-discrimination provisions." S. Rep. No. 100-64, at 4 (1987). *Grove City College v. Bell*, 465 U.S. 555 (1984), limited Title IX to "only the specific program receiving federal funding," and not the entire entity. The CCRA restored Title IX to its full breadth, *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 (1999), and under it the NCAA falls squarely within the definition of a "program or activity."

The NCAA is such a "program or activity" subject to Title IX because of its unique structure as an entity created by "two or more" colleges and universities whose constituent "part[s]" include federal funding recipients. SAC ¶¶ 128–130. The NCAA is "an unincorporated association comprised of more than 1,100 member colleges and universities[.]" *Id.* ¶ 128. NCAA members are primarily (more than 90%) institutions which receive federal funds and are subject to Title IX. *Id.* ¶ 129. Thus, most of the NCAA's "part[s]" consist of federal funding recipients.

Unincorporated associations are not technically separate "legal entities" but are no more than the sum of their individual parts. *Underwriters at Lloyd's, London*

*v. Osting-Schwinn*, 613 F.3d 1079, 1091 (11th Cir. 2010) ("An association has no legal existence as an entity separate from its members") (quoting *Calagaz v. Calhoon,* 309 F.2d 248, 251–52 (5th Cir. 1962) (internal alterations omitted)). The fact that Plaintiffs have sued the NCAA as a discrete entity under its common name does not change this fact because Federal Rule of Civil Procedure 17(b)(3)(A) expressly authorizes suits against "unincorporated associations … to enforce a substantive right existing under the United States Constitution or laws."

The NCAA cannot avoid Title IX coverage by arguing that the CRRA's definition of "part" refers only to the NCAA's administrative operations and governance arms. The phrase "any part of which is extended Federal financial assistance" is key. The "which" in this phrase does not mean only the administrative operations of the enumerated entities in sub-paragraphs (1) to (4), but the entire entity itself. Thus, "part of which" means part of the entire entity, which includes every member of an unincorporated association. Unincorporated associations, like the NCAA, are by definition the sum of their member institutions, *Underwriters*, 613 F.3d at 1091, regardless of whether they also have administrative operations run by executives and staff. Both the operations and the member institutions are "parts" within the plain meaning of Section 1687. Because many of the NCAA's "parts" receive federal funding, Title IX applies to the NCAA.

Respectfully submitted,

| | |
|---|---|
| */s/ William Bock III* | */s/ Bryan P. Tyson* |
| William Bock III, IN Atty. No. 14777-49[10] | Bryan P. Tyson, Ga. Bar No. 515411 |
| Kevin D. Koons, IN Atty. No. 27915-49[11] | Clark Hill |
| Justin R. Olson, IN Atty. No. 31450-49[12] | 800 Battery Ave SE., Suite 100 |
| Kroger Gardis & Regas, LLP | Atlanta, GA 30339 |
| 111 Monument Circle, Suite 900 | Tel: (678) 370-4377 |
| Indianapolis, IN 46204 | Fax: (678) 370-4358 |
| Tel: (317) 692-9000 | Email: btyson@clarkhill.com |
| Fax: (317) 264-6832 | |
| E-mail:     wbock@kgrlaw.com | |
| Email:      kkoons@kgrlaw.com | |
| E-mail:     jolson@kgrlaw.com | |

*ATTORNEYS FOR PLAINTIFFS*

---

[10] *Pro hac vice*

[11] *Pro hac vice*

[12] *Pro hac vice*

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I electronically filed *Plaintiffs' Supplemental Brief* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Christopher C. Marquardt
Cari K. Dawson
John E. Stephenson
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
chris.marquardt@alston.com
cari.dawson@alston.com
john.stephenson@alston.com

Scott D. Schneider
SCHNEIDER EDUCATION AND
EMPLOYMENT LAW PLLC
4301 W. William Cannon Drive
Suite B-150, PMB 105
Austin, TX 78749
scott@eduemplaw.com

Josh B. Belinfante
Vincent R. Russo
Edward A. Bedard
Anna E. Edmondson
Javier I. Pico Prats
ROBBINS ALLOY BELINFANTE
LITTLEFIELD, LLC
500 14th Street NW
Atlanta, GA 30318
jbelinfante@tobbinsfirm.com
vrusso@robbinsfirm.com
ebedard@robbinsfirm.com
aedmondson@robbinsfirm.com
jpicoprats@tobbinsfirm.com

*/s/ William Bock III*
William Bock III

*/s/ Bryan P. Tyson*
Bryan P. Tyson

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D, counsel certifies that the foregoing was prepared

in Times New Roman, 14-point font, in compliance with Local Rule 5.1C.

/s/ William Bock III
William Bock III

ATTORNEYS FOR PLAINTIFFS