IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

RILEY GAINES, *et al.*

     *Plaintiffs*,

v.

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION, *et al.*,

     *Defendants*.

Civil Action No.
1:24-cv-1109-TRJ

**DEFENDANT GEORGIA TECH ATHLETIC ASSOCIATION, INC.'S
REPLY TO PLAINTIFFS' SUPPLEMENTAL BRIEF**

Defendant Georgia Tech Athletic Association, Inc. ("GTAA") submits this Reply to Plaintiffs' Supplemental Brief. Plaintiffs still cannot show a live case or controversy involving GTAA. Their claims remain barred for multiple independent reasons—untimeliness, lack of standing, inapplicability of Title IX, and absence of state action—none of which is cured by the developments they discuss. Those developments—the NCAA's revised Transgender Eligibility Policy ("TEP"), Georgia's "Gaines Act," and recent court rulings—eliminate any reasonable prospect of recurrence and confirm GTAA's role in 2022 was, and remains, legally insignificant. All events GTAA hosts for Georgia Tech must comply with Georgia Tech's binding legal obligations, including the Gaines Act. GTAA also cannot make

1

or override NCAA eligibility rules and has no authority to redress Plaintiffs' alleged injuries. The law, the facts, and the record foreclose any basis for prospective relief against GTAA, and the Court should dismiss all claims against it with prejudice.

## I.    Plaintiffs' Claims for Prospective Relief Against GTAA Are Moot.

Plaintiffs primarily seek declaratory and injunctive relief preventing future violations of their rights in athletic competitions.[1] As to GTAA, however, there is no reasonable likelihood of any future violation. The NCAA championship that gave rise to Plaintiffs' claims was a one-time event that concluded long ago. Since that 2022 event, the governing landscape has changed in critical ways that further eliminate any ongoing controversy involving GTAA.

First, in April 2025, Georgia enacted the "Riley Gaines Act of 2025."[2] In relevant part, the Gaines Act defines "sex," "male," and "female" in biological terms and prohibits any Georgia college or university from hosting or participating in intercollegiate competitions that permit a male to compete on a team designated for females or to use female-designated restrooms, locker rooms, or similar facilities.[3] By its plain terms, this law squarely forbids the very scenario about which Plaintiffs

---

[1] *See Generally*, Corrected Second Amended Complaint ¶¶ 852–854, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. Oct. 23, 2024), ECF No. 94.
[2] Riley Gaines Act of 2025, Georgia Senate Bill 1 (S.B. 1), amending O.C.G.A. § 20-2-315, enacted by the Georgia General Assembly on February 27, 2025; signed by Governor Brian Kemp on April 28, 2025; in force as of July 1, 2025.
[3] *Id*.

complain – a biologically male athlete competing in a women's college championship in Georgia or sharing women's locker rooms at the event. Should Georgia Tech ever host another women's championship, state law now mandates that only biological females compete and use female facilities.

Plaintiffs grudgingly acknowledge that the Gaines Act is "a welcome development in Georgia," yet they argue it "does not moot the need for prospective relief" because Defendants have not shown permanent, voluntary cessation of the challenged conduct.[4] This argument rings hollow. Unlike a discretionary policy change, the Gaines Act is binding state law – a product of the Georgia legislature's deliberate decision to permanently forbid male participation in women's collegiate sports in Georgia. Compliance is not optional. Plaintiffs offer nothing beyond speculation to suggest that Georgia's public universities (or anyone else) will defy the Gaines Act.[5]

Plaintiffs correctly observe that the Gaines Act does not, by its terms, apply directly to GTAA, instead placing compliance obligations on Georgia's public colleges and universities and their official governing bodies. From that premise, they

---

[4] Pls.' Suppl. Br. at 16, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. July 21, 2025), ECF No. 130.
[5] GTAA also adopts and incorporates by reference the arguments set forth in the State Defendants' August 11, 2025 filing regarding the Gaines Act's effect on mootness, to the extent applicable to events at Georgia Tech facilities. Those arguments further confirm that Plaintiffs' speculative concerns are insufficient under governing mootness principles.

suggest GTAA must remain in the case because it is not obligated to comply.[6] That argument ignores both the legal and practical realities of GTAA's role. GTAA operates solely in connection with Georgia Tech's athletics program in the sense that it coordinates with Institute officials on athletic events held at Georgia Tech facilities. For purposes of the Gaines Act, Georgia Tech—as the covered entity—is directly bound by state law, and GTAA's role in any such event is necessarily subject to Georgia Tech's legal obligations.[7] This operational reality means GTAA cannot, in practice, host, sponsor, or participate in any Georgia Tech athletic event in a way that would violate the Act.[8] Plaintiffs' suggestion that GTAA might ignore these prohibitions is wholly speculative. It disregards the governance structure of Georgia Tech athletics and the immediate consequences that any noncompliance would have for Georgia Tech—and, by extension, GTAA.

Plaintiffs invoke *Friends of the Earth, Inc. v. Laidlaw*[9] to contend that voluntary cessation rarely moots a case.[10] But *Laidlaw*'s standard is met here. In

---

[6] Pls.' Suppl. Br. at 16, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. July 21, 2025), ECF No. 130.

[7] See O.C.G.A. §§ 20-3-15(3), (4), (5), 20-3-16(a)–(b).

[8] *See Generally*, Corrected Second Amended Complaint ¶ 84, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. Oct. 23, 2024), ECF No. 94 (alleging GTAA is a separate legal entity operating Georgia Tech athletics).

[9] *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000).

[10] Pls.' Suppl. Br. at 3-4, Gaines v. Nat'l Collegiate Athletic Ass'n, No. 1:24-cv-01109-TRJ (N.D. Ga. July 28, 2025), ECF No. 130.

*Cambridge Christian School, Inc. v. Florida High School Athletic Ass'n, Inc.*[11], the Eleventh Circuit — quoting *Laidlaw* — held that a case is moot when a legislative change is the product of substantial deliberation, is unambiguous, and is complete, because such a change eliminates any reasonable expectation of recurrence.[12] The Gaines Act fits squarely within that framework: it is binding state law, enacted through substantial deliberation, and leaves no discretion for Georgia Tech or GTAA to permit the challenged conduct. Under *Laidlaw* as applied in *Cambridge Christian*, Plaintiffs' prospective claims against GTAA are moot.

Plaintiffs fault Defendants for not issuing new "corresponding polic[ies]" or entering a consent decree to signal compliance.[13] But under *Cambridge Christian School*, those theatrics are unnecessary when the change is "unambiguous," "permanent," and "complete."[14] The Gaines Act is all three: it is a final legislative enactment, adopted after substantial deliberation, it leaves no discretion for covered entities to permit the complained-of conduct, and GTAA's operational dependence on a covered entity ensures that compliance is not optional. This legal and practical

---

[11] 115 F.4th 1266 (11th Cir. 2024)
[12] *Id*. at 1284–85.
[13] Pls.' Suppl. Br. at 16 – 17, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. July 28, 2025), ECF No. 130.
[14] *Cambridge Christian, supra,* 115 F.4th at1284–85.

reality forecloses any "reasonable expectation" of recurrence[15] and thus moots Plaintiffs' claims for prospective relief against GTAA.

Second, in addition to Georgia's law, the NCAA itself has materially altered its transgender participation policy.[16] In substance, the NCAA's revised policy now aligns far more closely with a biology-based approach to sex distinctions, resolving the bulk of the issues Plaintiffs had with the prior policy. This NCAA policy change further undermines any claim of a live controversy involving GTAA. GTAA does not make NCAA rules. Thus, when the NCAA's governing policy changed in 2025, GTAA's role necessarily changed with it. In short, the new TEP materially reduces the likelihood that an athlete like Lia Thomas would be permitted to compete in a future NCAA women's championship at all. Plaintiffs speculate that the updated policy has "defects" or loopholes (such as the potential to change one's birth certificate) and cite an example of a "Track Athlete A" who allegedly continued competing despite the new rules.[17] Even accepting Plaintiffs' account, these assertions do not show any ongoing wrongdoing by **GTAA**. At most, they question the NCAA's commitment or the efficacy of enforcement by other institutions. But GTAA has no control over how other schools or the NCAA apply the policy. **The**

---

[15] *Id.*
[16] Pls.' Suppl. Br. at 6, *Gaines v. Nat'l Collegiate Athletic Ass'n, No.* 1:24-cv-01109-TRJ (N.D. Ga. July 28, 2025), ECF No. 130.
[17] *Id.* at 9 -11.

salient point for this Reply is that **the combination of the NCAA's new policy**
**and Georgia's Gaines Act makes it extraordinarily improbable that Plaintiffs**
**will ever again encounter the complained-of conditions at an event hosted by**
**GTAA.** The alleged injury – a biological male competing in women's events and
using women's facilities – is simply not capable of repetition in the context of
Georgia Tech-hosted competitions, absent outright lawbreaking by a covered
institution (which obviously cannot be presumed).[18]

In sum, changes in law and policy have mooted Plaintiffs' prospective claims
against GTAA. There is no longer any "live" dispute about what GTAA may do in
some hypothetical future event. An injunction against GTAA would have no
practical effect given that GTAA is neither inclined nor permitted to allow the feared
conduct. Under Article III's mootness doctrine, when "subsequent events make it
absolutely clear that the allegedly wrongful behavior could not reasonably be
expected to recur," the claim for injunctive relief becomes moot.[19] That is precisely
the situation here.

## II.    Plaintiffs Lack Article III Standing to Seek Injunctive Relief from GTAA.

---

[18] *See generally*, *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004)
(recognizing rebuttable presumption that government actors will not resume challenged conduct
once it has ceased).
[19] *Friends of the Earth, Inc.*, *supra*, 528 U.S. at 189.

Even if their claims were not moot, Plaintiffs still must establish standing to pursue injunctive or declaratory relief against GTAA. This they cannot do. To have standing, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief.[20] Plaintiffs again fall short on each element with respect to GTAA.

First, Plaintiffs cannot demonstrate a concrete and imminent threat of future injury at the hands of GTAA. Plaintiffs emphasize that eight of them currently have NCAA eligibility remaining (and another hopes to obtain additional eligibility). But the mere fact that some Plaintiffs *could* compete again in NCAA events does not mean they face a real and immediate risk of encountering GTAA in a harmful context. None of the Plaintiffs allege they are students at Georgia Tech or will compete at Georgia Tech's facilities. Their remaining eligibility could just as easily be spent in competitions hosted by other schools, in other states, where GTAA has no presence. GTAA's only involvement in this saga was serving as the local host for a 2022 NCAA championship. Article III requires more than speculation; it demands a "certainly impending" injury.[21] This lack of an imminent injury specific to GTAA deprives Plaintiffs of standing for prospective relief.

---

[20] *Friends of the Earth*, *supra*, 528 U.S. at 180–81.
[21] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that allegations of possible future injury do not satisfy Article III; injury must be "certainly impending").

Second, any future injury is not traceable to GTAA's actions. Plaintiffs' grievance stems from NCAA policies that allowed a transgender swimmer to compete in the women's championship—policies set and enforced by the NCAA, not GTAA.[22] GTAA did nothing except host the event. Notably, Plaintiffs themselves acknowledge that GTAA followed NCAA policies on eligibility and had no authority to modify them.[23] Thus, the athlete's participation was caused by the NCAA's then-effective policy, not by GTAA. The same is true going forward: decisions about eligibility rest with the NCAA and the governing bodies of participating schools—now constrained by Georgia's Gaines Act where applicable—within the framework of law, not with GTAA.  If a plaintiff in the future confronts a transgender competitor at an NCAA-sanctioned event, that situation will be attributable to NCAA's policy (or the host institution's actions), not to GTAA. GTAA has **no power** to allow or disallow athletes independent of those overarching rules. Because Plaintiffs' alleged injuries stem from policies and decisions outside of GTAA's control, their injuries are not "fairly traceable" to GTAA's conduct – a fatal standing defect.

---

[22] Corrected Second Amended Complaint ¶¶ 239–243, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. Oct. 23, 2024), ECF No. 94.
[23] *Id*. at ¶¶ 425–429, ECF No. 94; Pls.' Suppl. Br. at 27, ECF No. 130.

Third, and relatedly, Plaintiffs cannot show that an injunction or declaratory judgment against GTAA would likely redress their injuries. The injunctive relief Plaintiffs seek is an order "permanently enjoin[ing] Defendants from allowing men to compete against women in college athletics. . . ."[24] Even if such an injunction were issued specifically against GTAA, it would accomplish nothing. GTAA on its own cannot enforce a nationwide policy for collegiate athletics. An order binding GTAA would at most prevent Georgia Tech from hosting or participating in competitions with transgender females – which is precisely what Georgia's Gaines Act already ensures. Meanwhile, the NCAA and other institutions not before the Court as part of GTAA would remain free to conduct competitions elsewhere under whatever rules they choose (subject to other legal constraints). In other words, an injunction against GTAA would not prevent the NCAA or other schools from allowing transgender athletes in women's events outside of Georgia, nor would it vacate any past results or records.[25] Plaintiffs' fear that women's sports will be compromised by transgender participation cannot be redressed by targeting GTAA,

---

[24] Pls.' Suppl. Br. at 1, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. July 28, 2025), ECF No. 130.

[25] The July 1, 2025 OCR–UPenn Resolution Agreement only underscores the redressability problem as to GTAA. The agreement requires Penn to review and restore Penn Division I women's-swimming individual records and titles to female athletes and to implement Penn-specific corrective measures; it imposes no obligations on GTAA. Thus, to the extent Plaintiffs seek "records" or similar relief, any such remedy lies with the record-holding institution (and, where applicable, the NCAA)—not GTAA. This further confirms that an injunction against GTAA would have no practical effect on Plaintiffs' asserted injuries.

a single member institution's affiliate with no rule-making authority. Because the relief sought against GTAA would be ineffectual in solving Plaintiffs' broader grievance, Plaintiffs fail the redressability requirement for standing.

### III. Plaintiffs' Reliance on *Skrmetti* and *Bostock* Is Misplaced and Does Not Create Liability for GTAA.

The Court's July 7, 2025 Order directed the parties to address only three topics. Plaintiffs nonetheless raise other issues. Out of an abundance of caution—and without conceding that these matters are within the scope of the Court's order—GTAA responds briefly to Plaintiffs' reliance on *United States v. Skrmetti*[26], pending certiorari petitions (*W. Va. v. B.P.J.*[27] and *Little v. Hecox*[28]), and *Bostock v. Clayton County*.[29] In short, Plaintiffs badly overstate the significance of these developments. Nothing in *Skrmetti*, *Bostock*, or the cert grants alters the applicable framework for mootness or standing, nor do these actions impose any new obligations or liabilities on GTAA.

To begin, *Skrmetti* has no bearing on the issues at hand. That case involved a Tennessee law prohibiting certain medical treatments for minors with gender dysphoria. The Supreme Court upheld the Sixth Circuit's decision sustaining the law

---

[26] *United States v. Skrmetti*, 603 U.S. ___, 145 S. Ct. 942 (2025)
[27] *West Virginia v. B.P.J.*, No. 24-43, --- S. Ct. ----, 2025 WL 1829164 (U.S. July 3, 2025) (mem.).
[28] *Little v. Hecox*, No. 24-38, --- S. Ct. ----, 2025 WL 1829165 (U.S. July 3, 2025) (mem.).
[29] 590 U.S. 644 (2020).

under rational-basis review. *Skrmetti* did not address Article III jurisdiction and provides no guidance on whether Plaintiffs' claims are moot or whether GTAA could be liable under Title IX or § 1983.

Moreover, Plaintiffs suggest that *Skrmetti* "undermines" Defendants' arguments about qualified immunity and the Spending Clause's "clear statement" rule.[30] That is incorrect. First, in *Skrmetti*, the Supreme Court upheld Tennessee's law restricting certain medical treatments for minors with gender dysphoria, applying rational-basis review because the Court determined the law was based on age and/or medical use, not sex. The Court then "decline[d] to address whether *Bostock's* reasoning reaches beyond the Title VII context . . . ."[31]  In other words, it remains an open question whether discrimination "because of sex" in Title IX encompasses gender identity — a question the Court is poised to consider in the coming term. This reality **undercuts** Plaintiffs' position rather than bolstering it. If anything, *Skrmetti* again confirms that the law governing transgender participation in sports was, and remains, in flux. Defendant has argued that no clearly established law required colleges and universities to exclude (or include) transgender athletes under Title IX or the Constitution, invoking the Spending Clause's clear-notice

---

[30] Pls.' Suppl. Br. at 20, *Gaines v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-01109-TRJ (N.D. Ga. July 28, 2025), ECF No. 130.
[31] *United States v. Skrmetti*, 603 U.S. ___, ___ (2025)

requirement and qualified immunity for government actors. Nothing in *Skrmetti* contradicts those defenses. It should go without saying that one cannot violate "clearly established law" when courts are divided and the Supreme Court has yet to resolve the uncertainty.

Likewise, *Bostock* obviously does not rescue Plaintiffs' case against GTAA. That decision held that firing an employee for being gay or transgender violates Title VII's prohibition on employment discrimination "because of sex."[32] But Justice Gorsuch's majority opinion expressly disclaimed deciding "bathrooms, locker rooms, or anything else of the kind,"[33] leaving untouched the question whether its reasoning applies outside the employment context. Meanwhile, as previously noted, courts and the Department of Education have reached divergent conclusions on whether Title IX requires — or prohibits — participation by transgender athletes in women's sports. That question is now squarely before the Court for resolution, underscoring that the law remains unsettled (and was certainly unsettled in 2022).

Most importantly, neither *Bostock* nor *Skrmetti* alters the two fundamental limits on GTAA's potential liability: (1) GTAA is not a Title IX funding recipient, and (2) GTAA is not a state actor subject to the Equal Protection Clause. GTAA has

---

[32] *Bostock v. Clayton County*, 590 U.S. 644, 652 (2020).
[33] *Id*. at 675.

consistently maintained that it receives no federal funds and thus cannot be sued under Title IX's private cause of action. Plaintiffs have never refuted this fact. Obviously, nothing in *Bostock* nor *Skrmetti* changes Title IX's threshold requirement that a defendant be an education program or activity receiving Federal financial assistance.[34] For the reasons previously discussed, GTAA is simply not covered by Title IX as a matter of law.

Similarly, GTAA's prior filings explained that it is a private entity distinct from the state, and thus not liable on Plaintiffs' § 1983 constitutional claims. Plaintiffs' own complaint acknowledged GTAA's private status. No subsequent legal development has transformed GTAA into a state actor. Even if one hypothesized that GTAA could be considered an arm of the state, GTAA asserted Eleventh Amendment immunity as an alternative defense, relying on binding precedent. *Skrmetti*, *Bostock*, and the cert grants have no effect on these points.

## IV.    Recent Harvard Decision Underscores GTAA's Threshold Defenses

Finally, Pursuant to N.D. Ga. Local Rule 7.1(F), GTAA respectfully brings to the Court's attention a recent decision bearing directly on Plaintiffs' Title IX claims. On July 29, 2025, the U.S. District Court for the District of Massachusetts dismissed

---

[34] See 20 U.S.C. § 1681(a).

Title IX claims against Harvard University in *Estabrook v. Ivy League Council*[35] arising from the same 2022 NCAA women's swimming championship at issue here. The plaintiffs there advanced the same "host institution" theory asserted against GTAA—that an entity can be liable under Title IX for allowing a transgender athlete to compete and use women's facilities at an NCAA event. The court rejected that theory outright, holding there is no precedent for imposing Title IX liability on a host institution under "aiding and abetting" or conspiracy-type theories for following NCAA rules.[36]

## V.    Conclusion

Plaintiffs have not carried their burden to show that GTAA should remain in this case. Their supplemental brief confirms that GTAA has no ongoing role in the alleged controversy. For all the reasons discussed above, and those previously briefed, GTAA respectfully requests that the Court dismiss all claims against GTAA with prejudice.

---

[35] *Estabrook v. Ivy League Council*, No. 25-10281-WGY, slip op. at 8–12 (D. Mass. July 29, 2025) (rejecting "host institution" Title IX liability theory).
[36] Slip op. at 8–12.

Dated: August 11, 2025                    Respectfully submitted,

                                          **SCHNEIDER EDUCATION AND
                                          EMPLOYMENT LAW PLLC**

                                          By: */s/ Scott D. Schneider*
                                          Scott D. Schneider
                                          Pro Hac Vice
                                          4301 W. William Cannon Drive
                                          Austin, Texas 78749

                                          **ATTORNEY FOR DEFENDANT
                                          GTAA**

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that Defendant's Motion to Dismiss has been prepared  with one of the font and point selections approved by the Court in Local Rule  5.1. Specifically, this document has been prepared using 14-pt Times New Roman font and type.

/s/ Scott D. Schneider

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, I electronically filed the foregoing

GTAA'S Reply with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.


Dated: August 11, 2025          Respectfully submitted,

**SCHNEIDER EDUCATION AND
EMPLOYMENT LAW PLLC**

By: */s/ Scott D. Schneider*
Scott D. Schneider
Pro Hac Vice
4301 W. William Cannon Drive,
Suite B-150, PMB 105,
Austin, Texas 78749

**ATTORNEY FOR DEFENDANT
GTAA**