UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RILEY GAINES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:24-cv-01109-TRJ |
| v. | ) | |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

## NCAA'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.    INTRODUCTION ........................................................................1

II.    ARGUMENT..............................................................................5

    A.    The Court Should Grant the NCAA's Motion to Dismiss....................6

        1.    Recent Developments Only Strengthen the Conclusion that the NCAA is Not Subject to Title IX ................................................6

        2.    The Court Should Reject Plaintiffs' Untimely New Argument About the CRRA ........................................................................9

    B.    Plaintiffs' Requests for Declaratory and Prospective Injunctive Relief Against the NCAA Are Moot ............................................................12

        1.    All Prospective Claims Against the NCAA Are Now Moot for the Only Two Plaintiffs Who Have Preserved Standing Arguments ........................................................................12

        2.    The NCAA Abandoning the Prior Policy that was the Subject of the SAC Also Moots Claims Against the NCAA for Declaratory and Injunctive Relief ........................................................15

III.    CONCLUSION...........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.F. Officer v. Austin*,
  No. 5:22-cv-00009-TES, 2024 U.S. Dist. LEXIS 186465 (M.D.
  Ga. Oct. 11, 2024)..............................................................................................21

*Alpha Iota Omega Christian Fraternity v. Moeser*,
  No. 1:04CV00765, 2006 U.S. Dist. LEXIS 28065 (M.D.N.C. May
  4, 2006) .....................................................................................................21, 22

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013)..............................................................................16, 23, 24

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Ass'n, Inc.*,
  115 F.4th 1266 (11th Cir. 2024) .........................................................................16

*Clapper v. Amnesty Int'l, USA*,
  568 U.S. 398 (2013)..............................................................................................24

*Cureton v. NCAA*,
  198 F.3d 107 (3d Cir. 1999) ...........................................................................7, 8

*F.R. v. Gonsoulin*,
  No. 20-10992, 2021 U.S. App. LEXIS 28294 (11th Cir. Sept. 20,
  2021) ..................................................................................................13, 14, 15

*FBI v. Fikre*,
  601 U.S. 234 (2024)...........................................................................16, 17, 23

*Friedman v. Schiano*,
  777 F. App'x 324 (11th Cir. 2019) ....................................................................9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)..........................................................................................16

*Gimple v. Saver LLC*,
  No. 6:21-cv-1888-PGB-DCI, 2022 U.S. Dist. LEXIS 135213
  (M.D. Fla. Apr. 21, 2022) ....................................................................17, 18, 19

*Grove City College v. Bell*,
  465 U.S. 555 (1984) ................................................................................10

*Lightfoot v. D.C.*,
  No. 01-1484, 2007 WL 1087474 (D.D.C. Apr. 10, 2007) ...................................9

*Lussier v. Dugger*,
  904 F.2d 661 (11th Cir. 1990) ...................................................................10

*McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'r*,
  650 F. App'x. 703 (11th Cir. 2016) .............................................................10

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) (en banc) ......................................................14

*Nat'l Advert. Co. v. City of Miami*,
  402 F.3d 1329 (11th Cir. 2005) ............................................................14, 17

*NCAA v. Smith*,
  525 U.S. 459 (1999) (*Smith I*)..............................................................3, 10

*NCAA v. Tarkanian*,
  488 U.S. 179 (1988)....................................................................................3

*Owens v. Metro. Life Ins. Co.*,
  323 F.R.D. 411 (N.D. Ga. Sept. 29, 2017) .................................................9, 10

*Princeton Univ. v. Schmid*,
  455 U.S. 100 (1982)..................................................................................15

*Pritchard v. Fla. High Sch. Ath. Ass'n*,
  No. 2:19-cv-94-FtM-29MRM, 2019 U.S. Dist. LEXIS 128261
  (M.D. Fla. Aug. 1, 2019) ...........................................................................13

*Regalado v. Dir., Ctr. for Disease Control*,
  No. 22-12265, 2023 U.S. App. LEXIS 1059 (11th Cir. Jan. 18,
  2023) ......................................................................................................21

*S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*,
  583 F.3d 750 (11th Cir. 2009) ...................................................................13

*Sheely v. MRI Radiology Network, P.A.*,
  505 F.3d 1173 (11th Cir. 2007) ................................................16, 17, 19, 20

iii

*Smith v. NCAA,*
  266 F.3d 152 (3d Cir. 2001) (*Smith II*) ................................................................... 3

*Underwriters at Lloyd's, London v. Osting-Schwinn,*
  613 F.3d 1079 (11th Cir. 2010) ........................................................................ 11

*United States v. Wylie,*
  730 F.2d 1401 (11th Cir. 1984) ........................................................................ 14

**Statutes**

29 U.S.C. § 794 ................................................................................................. 11

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat.
  28 (1988) ......................................................................................... *passim*

The Riley Gaines Act of 2025, O.C.G.A. §§ 20-3-15 - 20-3-16 ...................... *passim*

**Other Authorities**

Executive Order 14168 ........................................................................... 2, 3

Executive Order 14201 ................................................................................. 2

iv

## I.    INTRODUCTION

In March 2024, a group of "current or former, collegiate, female, student-athletes" led by University of Kentucky swimmer Riley Gaines filed this lawsuit to end the participation of transgender women in women's intercollegiate sports competitions. (Dkt. 1 ¶ 4). The gravamen of Plaintiffs' challenge against the NCAA was that it "issue[d] and enforce[d] eligibility rules in collegiate sport which undermine the foundational principle of equal treatment for women upon which Title IX rests, providing an excuse for Title IX covered institutions to violate federal law." (*Id.* ¶ 6). Over the next seven months, two amended complaints added plaintiffs and allegations, but did not change the core challenge to the NCAA's conduct of having "Transgender Eligibility Policies [that] were intentionally designed and are purposefully implemented and enforced by the NCAA to give NCAA member institutions to which Title IX applies an excuse for violating Title IX by allowing men to compete on women's teams in intercollegiate sports." (Dkt. 94 ¶ 5).

Much has changed since Plaintiffs filed their Corrected Second Amended Complaint (SAC) on October 23, 2024. On January 20, 2025, Donald Trump became President after a campaign highlighting his interest in banning transgender women

from competition in women's sports.[1] That same day, President Trump issued Executive Order (EO) 14168 declaring only "two sexes, male and female, [which] are not changeable." (Ex. A). Two weeks later, he issued EO 14201, which declared "the policy of the United States to oppose male competitive participation in women's sports." (Ex. B). The next day, the NCAA adopted a new participation policy for transgender athletes that "limits competition in women's sports to student athletes assigned female at birth only." (Ex. C). The White House confirmed that "[t]he NCAA and other athletic leagues have removed men from women's competition." (Ex. D). Plaintiffs here stipulate that the NCAA "changed [its policy] in response to an Executive Order." (Dkt. 130, "Supp. Br.," at 3-4). They do not contend that the NCAA adopted a new policy in response to this lawsuit, and they concede that after the policy change, transgender athletes "no longer competed" in intercollegiate sports. (Dkt. 130-19 ¶ 24).

In April 2025, the Riley Gaines Act was signed into Georgia law defining "sex," "male," and "female" in purely biological terms and barring the Georgia Defendants here from permitting a male, as defined, to "[p]articipate in any intercollegiate competition in this state on any team that is designated as female."

---

[1] *See, e.g.*, Will Graves, *Donald Trump Said He Wants to Ban Trans Athletes from Competing. The Reality is More Nuanced*, The Associated Press (Dec. 18, 2024), https://www.ap.org/news-highlights/spotlights/2024/donald-trump-said-he-wants-to-ban-trans-athletes-from-competing-the-reality-is-more-nuanced/.

(Supp. Br. at 15). And in June 2025, the University of Pennsylvania entered into a Resolution Agreement with the federal government in which it resolved findings of noncompliance with Title IX by stating that it would not allow "male students" (defined consistently with EO 14168) on its teams and specifying that "Title IX applies irrespective of current or future policies from sporting or scholastic governing bodies." (Ex. E).

Through all those significant developments, however, two things have not changed, as made clear by long-standing Supreme Court and circuit authority: (1) the NCAA is not subject to Title IX because it does not receive federal funding and its members have not ceded control of their sports programs; and (2) the NCAA is not subject to the Fourteenth Amendment because it is not a state actor. (*See* Dkt. 103-1 and 111 (citing *NCAA v. Tarkanian*, 488 U.S. 179 (1988); *NCAA v. Smith*, 525 U.S. 459 (1999) (*Smith I*); and *Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) (*Smith II*)). The recent developments are aligned with and reinforce those authorities by showing that the NCAA's member schools continue to control decisions about whom to roster on a women's intercollegiate team.

Plaintiffs' supplemental brief does not change the fact that the Court should dismiss all claims against the NCAA, and that no amendment can cure the SAC. Through this brief, the NCAA presents two additional issues in response to Plaintiffs' most recent filing. First, the Court should reject, on procedural grounds,

Plaintiffs' untimely attempt to misuse its supplemental brief to inject a new argument about the Civil Rights Restoration Act (CRRA) that they could have made (but did not make) in their several prior briefs—and which is also wrong substantively and was recently rejected by a federal judge in a similar case litigated by their counsel. And it should also ignore Plaintiffs' attempt to workshop new allegations, not present in the operative complaint, regarding the NCAA's February 6, 2025 Transgender Student-Athlete Participation Policy.

But even if the law were changed to allow claims against the NCAA under Title IX and Section 1983, the Court would now need to dismiss as moot all prospective claims against the NCAA for declaratory and injunctive relief for two reasons. First, the passage of time has mooted the prospective claims of the only two Plaintiffs who did not waive their standing arguments, Caroline Hill ("Hill") (formerly known as Track Athlete A) and Brooke Slusser ("Slusser"), because neither has any remaining collegiate sports eligibility.[2] Second, even if any Plaintiff still had a prospective claim against the NCAA, it was mooted by President Trump's EOs and the NCAA's new policy for transgender participation in NCAA

---

[2] Plaintiffs note that eight Plaintiffs are rising juniors or seniors with remaining eligibility (Supp. Br. at 1 n.1), but in response to the NCAA's Motion to Dismiss their claims for lack of standing, none of those Plaintiffs argued that they would face any certainly impending future harm related to competing against a transgender student-athlete. By failing to rebut the NCAA's standing arguments, these Plaintiffs acknowledged their lack of standing to seek prospective injunctive relief.

competition. The NCAA's Board of Governors changed the former transgender eligibility policy at the core of Plaintiffs' complaints and did so because of President Trump's EOs (as Plaintiffs stipulate), not to manipulate this Court's jurisdiction.[3] The challenged conduct of having a policy that permits transgender women to compete in women's sports has ended and is not reasonably expected to recur because the NCAA has adopted a new policy that bars transgender women from intercollegiate competition, and the EOs that were the undisputed reason for the new policy are not reasonably expected to change, if at all, before 2029. Any potential change after that is speculative and not imminent, and thus would not provide standing even if Plaintiffs had alleged anything about the new policy in the SAC, which they did not.

The Court should dismiss all claims against the NCAA for failure to state a claim under Rule 12(b)(6) and dismiss all prospective claims for declaratory and injunctive relief as moot under Rule 12(b)(1).

## II.    ARGUMENT

The Court instructed the parties to file supplemental briefing regarding whether any claims are mooted or otherwise impacted by the NCAA's February 6, 2025 change in its Participation Policy, the Resolution Agreement between the

---

[3] Under its plain language, Title IX does not apply to the NCAA. The fact that the Board of Governors adopted a new policy that is consistent with the EOs does not and cannot lead to a conclusion that the NCAA is legally bound by Title IX.

University of Pennsylvania and the Department of Education, and the Riley Gaines Act of 2025. (Dkt. 126). None of those developments impact the conclusion that the NCAA is not subject to Title IX or Section 1983. They only reinforce that the NCAA did *not* control its member schools' athletic programs such that it would be subject to Title IX liability. (Section A.1). Plaintiffs' belated argument for Title IX liability under the CRRA is procedurally improper and substantively wrong. (Section A.2). Even if any claim could stand against the NCAA, the recent developments render Plaintiffs' claims for prospective relief moot in two ways: the passage of time and the lapse in eligibility for the two Plaintiffs who made standing arguments beyond generalized grievances (Section B.1), and the cessation of the policy that Plaintiffs' allegations challenge (Section B.2).

## A.    The Court Should Grant the NCAA's Motion to Dismiss

### 1.    Recent Developments Only Strengthen the Conclusion that the NCAA is Not Subject to Title IX

Plaintiffs do not allege that the NCAA is a direct recipient of any federal funds, and the NCAA showed in its Motion to Dismiss briefing that Plaintiffs' allegations are insufficient to extend Title IX to the NCAA under either of the narrow theories previously advanced by Plaintiffs. First, Plaintiffs have not alleged facts to show that any federally funded member school ceded complete operational and financial control of its entire athletic program to the NCAA. Second, the allegations about the Grand Alliance do not demonstrate that the NCAA receives government

6

money from the DoD, but rather allege only that the NCAA and DoD each separately has funded a concussion research project. Stated differently, the well-pled allegations of the SAC show that the NCAA pays money to third parties as part of the Grand Alliance, not that it receives any government funds as a result of it.

The three documents on which the Court requested supplemental briefing do not change the conclusion that the NCAA is not subject to Title IX. Instead, each further undercuts Plaintiffs' ceding control theory.

First, as shown by its plain language, the NCAA's new Participation Policy, like its prior policy, does not require any school to roster any transgender student-athlete on an athletic team. Under the new policy, a "student-athlete assigned male at birth may not compete on a women's team," but otherwise "may" participate in practice—at the discretion of the school, applying its own principles and based on its own interpretation of any applicable federal, state, and local laws. (Ex. C). The prior policy similarly allowed schools to select their own teams but required the school to establish that transgender women met certain eligibility requirements if that school decided to roster a transgender woman on a women's sports team. (Dkt. 94-2). The policies highlight that each member institution retains institutional control over its athletic programs, something courts have recognized for decades. See e.g., Cureton v. NCAA, 198 F.3d 107, 118 (3d Cir. 1999) ("[T]he NCAA

7

constitution expressly provides for the retention of institutional control over individual athletic programs.").

Second, the University of Pennsylvania's Resolution Agreement further demonstrates that it is not the NCAA but instead the federally funded schools, as Title IX-covered entities, that have the responsibility of complying with Title IX. In response to a finding the University of Pennsylvania did not comply with Title IX within its athletic program, the Resolution Agreement stipulated that "Title IX applies irrespective of current or future policies from sporting or scholastic governing bodies, such as the Ivy League or individual sporting bodies" and that "the University will not delegate its obligation to comply with Title IX to an external association or other entity." (Ex. E).[4]

Third, the Riley Gaines Act applies to covered entities that are defined as "local school systems, public schools, and participating private schools," and it explicitly excludes the NCAA from its reach. O.C.G.A. § 20-3-15(2), (5) (excluding from coverage "any . . . national athletic conference or athletic association"). Although the Act has no bearing on a legal interpretation of Title IX liability, it

---

[4] Plaintiffs' reference to NCAA and University of Pennsylvania press releases (Supp. Br. at 22-23) does nothing to help establish Title IX liability against the NCAA. The releases merely confirm that the NCAA sets eligibility rules for NCAA competition, which, as discussed in the NCAA's Motion to Dismiss, does not amount to schools ceding control of their athletic programs to the NCAA.

8

implicitly recognizes that—even without regulating the NCAA and without regard to any NCAA policy—Georgia can nevertheless prohibit colleges from rostering "a male" on a women's team or permitting "a male" to use a women's restroom. O.C.G.A. § 20-3-16(4).

### 2.    The Court Should Reject Plaintiffs' Untimely New Argument About the CRRA

Plaintiffs improperly diverged from the Court's direction to use their supplemental brief to address the impact of three recent developments by presenting a new Title IX coverage argument about the CRRA. (Supp. Br. at 23-25). Plaintiffs waived that previously available argument by failing to present it in their opposition to the NCAA's Motion to Dismiss. "It is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief." *Friedman v. Schiano*, 777 F. App'x 324, 332 n.13 (11th Cir. 2019) (citation omitted). If a reply brief is too late for a new argument, a court-ordered supplemental brief on a different topic is much too late.[5]

---

[5] The Court should reject Plaintiffs' attempt to analogize their misuse of the supplemental brief to a "surreply." (Supp. Br. at 23 n.9). First, they did not move the Court for leave to file a surreply. (*See* Court's Guidelines at 20 (Court must "authorize" surreplies)). Second, Plaintiffs' citation to *Lightfoot v. D.C.*, No. 01-1484, 2007 WL 1087474, at *5 (D.D.C. Apr. 10, 2007)—an unpublished, out of circuit district court decision—is inapt and unpersuasive. In the Eleventh Circuit, leave to file a surreply might be permitted only to respond to new arguments raised in a reply or to inform the court of a new decision or rule, a standard Plaintiffs have

Plaintiffs' untimely CRRA argument also fails on the merits. In a nutshell, Plaintiffs now argue for the first time that the NCAA is subject to Title IX because its federally funded member schools are "part" of the NCAA. That argument is wrong most obviously because the Supreme Court rejected it in *Smith I*. Quoting the CRRA language on which Plaintiffs here rely, *Smith I* acknowledged that "if any part of the NCAA received federal assistance, all NCAA operations would be subject to Title IX," 525 U.S. at 466, before holding that the NCAA was <u>not</u> subject to Title IX merely because its member schools received federal funds and also paid dues to the NCAA. *Id.* at 468.

Plaintiffs' new argument also ignores the CRRA's history and misinterprets its language. Congress enacted the CRRA to "overturn" *Grove City College v. Bell*, 465 U.S. 555 (1984), which had narrowly construed Title IX as applying only to a specific program within a college receiving federal funds, and not to the entire college. *Lussier v. Dugger*, 904 F.2d 661, 665 (11th Cir. 1990). The CRRA amended Title IX to restore an "institution-wide" approach and mandated an "operations"-based analysis to measuring coverage: Title IX applies to an entire institution if "any part" of the institution's "operations" receives "Federal financial assistance." *McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'r*, 650 F. App'x. 703, 705 (11th Cir.

---

not tried to meet (because they cannot meet it). *See Owens v. Metro. Life Ins. Co.*, 323 F.R.D. 411, 414 (N.D. Ga. Sept. 29, 2017).

2016); *see also* 29 U.S.C. § 794. Plaintiffs do not show that "any part" of the ***NCAA's*** "operations" receives federal funding and do not cite any case that would support their countertextual argument.[6]

The only court to consider Plaintiffs' novel CRRA argument has flatly rejected it. At an oral argument that took place one week before Plaintiffs filed their Supplemental Brief here, the same counsel representing Plaintiffs here offered the same CRRA argument on behalf of student-athletes in a parallel suit in the District of Massachusetts. (Ex. F (making CRRA argument); *id.* at 11 (orally presenting CRRA argument). A defendant athletic conference, the Ivy League, opposed that CRRA argument for the same reasons the NCAA opposes it here. (*Id.* at 15-18). The court dismissed the Ivy League "for the grounds raised in its brief and argued here." (*Id.* at 19; *see also Estabrook et al., v. Trustees of the University of Pennsylvania et al.*, Case No. 1:25-cv-10281-WGY (D. Mass), ECF No. 102 (dismissing The Ivy League athletic conference)).[7] To be clear: Judge Young in the District of Massachusetts rejected Plaintiffs' argument that an athletic association is covered

---

[6] The only case Plaintiffs cite to advance their unfounded CRRA argument does not apply. The *Underwriters at Lloyd's* case addressed the association-member relationship only for purposes of establishing an association's citizenship for diversity jurisdiction; it said nothing about Title IX coverage. *See Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1091 (11th Cir. 2010) (limiting Plaintiffs' quoted passage to diversity-jurisdiction context only).

[7] The court did not reach the identical argument against the NCAA because it stayed the remainder of the case pending the resolution of the *Gaines* case in this Court.

by Title IX under the CRRA amendment of the statute, declining to accept the misguided position that member institutions are "part" of the association for purposes of Title IX and the CRRA.

This Court should reject Plaintiffs' same untimely CRRA arguments here and should dismiss all claims against the NCAA based on a finding that the NCAA is not covered by Title IX or Section 1983. Accordingly, it is unnecessary for the Court to consider any of the following points regarding mootness before dismissing the NCAA from the case.

**B.    Plaintiffs' Requests for Declaratory and Prospective Injunctive Relief Against the NCAA Are Moot**

**1.    All Prospective Claims Against the NCAA Are Now Moot for the Only Two Plaintiffs Who Have Preserved Standing Arguments**

Plaintiffs' claims against the NCAA are for retrospective relief related to the 2022 Women's Swimming and Diving Championships, with one exception. The Plaintiffs with remaining athletic eligibility when they filed the SAC asserted Count V seeking prospective declaratory and injunctive relief against the then-existing NCAA policy. (SAC at p. 193). But in the Motion to Dismiss briefing, Plaintiffs made arguments about future risks of harm only for Hill (Track Athlete A) and Slusser, asserting they might potentially compete against a transgender student-athlete, thus conceding that the other Plaintiffs had only generalized grievances that did not confer Article III standing. (*See* Dkt. 108 at 62-63).

12

The NCAA showed that Plaintiffs Hill and Slusser also lacked standing to bring prospective claims (Dkt. 111 at 2-4), but now the passage of time has made any prospective claim moot because Plaintiffs admit that both do not have "remaining eligibility." (Supp. Br. at 1 n.1 (omitting both from list of eligible Plaintiffs)). Hill further revealed that her prospective claims are moot by declaring that she no longer attends her college and that, after the NCAA policy change, transgender student-athlete Sadie Schreiner no longer competed in NCAA competition. (Dkt. 130-19 ¶¶ 2, 4, 24). Where, as here, plaintiffs allege violations that no longer present a live controversy after they graduate from school, their claim must be dismissed as moot. *See F.R. v. Gonsoulin*, No. 20-10992, 2021 U.S. App. LEXIS 28294, at *4 (11th Cir. Sept. 20, 2021); *see also, e.g.*, *Pritchard v. Fla. High Sch. Ath. Ass'n*, No. 2:19-cv-94-FtM-29MRM, 2019 U.S. Dist. LEXIS 128261, at *6-7 (M.D. Fla. Aug. 1, 2019) (student's claim for declaratory relief related to student-athlete eligibility was mooted by his graduation).

Slusser cannot avoid that canon with a *post hac* request for the Court to issue a mandatory injunction requiring her college or the NCAA to grant her more athletic eligibility. First and foremost, Slusser has not requested this relief in the SAC or any other pleading. *See S.F. Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 756 (11th Cir. 2009) (rejecting "attempt[] to create jurisdiction by moving this Court to amend the request for relief"). Beyond that:

13

> By its very nature, a moot suit cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it. . . . If a lawsuit is mooted by subsequent developments, any decision a federal court might render on the merits of a case would constitute an advisory opinion.

*Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1332 (11th Cir. 2005) (internal quotation marks and citations omitted). The Court cannot create jurisdiction by issuing an injunction that supposedly cures Slusser's jurisdictional defect—basically bootstrapping itself into subject matter jurisdiction. *See United States v. Wylie*, 730 F.2d 1401, 1403 n.4 (11th Cir. 1984) (hypothetical relief and subsequent proceedings "cannot create jurisdiction over an otherwise moot case"). Further, the SAC failed to allege any facts to support the belated request (such as whether Slusser remains in school and would be rostered to her team if still eligible). Just as the Court may not create jurisdiction where none exists, it may not "create jurisdiction by embellishing a deficient allegation." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (*en banc*).

The Court should ignore Plaintiffs' argument regarding the mootness exception for cases that are "capable of repetition, yet evading review," which addresses conduct that is short in duration and repetitive. (Supp. Br. at 13-14). The former NCAA transgender policy was not short in duration. The doctrine is also inapplicable because Plaintiffs fail to show "a reasonable expectation that the same complaining party will be subjected to the same action again." *Gonsoulin*, 2021 U.S.

14

App. LEXIS 28294, at *6 (citation omitted). Hill and Slusser, the only Plaintiffs who attempted to argue that they might compete against a transgender student-athlete in the future, are no longer eligible to compete and thus cannot be subjected to any repetitive alleged harm under an eligibility policy. *Id.* at *6-8 (the capable of repetition yet evading review doctrine does not apply where a student has graduated and no longer has a live dispute).

> **2.    The NCAA Abandoning the Prior Policy that was the Subject of the SAC Also Moots Claims Against the NCAA for Declaratory and Injunctive Relief**

> **a.    Plaintiffs Have Cited the Wrong Mootness Standard, which is Whether the Challenged Conduct is Reasonably Expected to Recur**

Even if Hill and Slusser still had remaining NCAA eligibility (they do not), any claims for prospective relief against the NCAA in the SAC were mooted by President Trump's EOs and the NCAA's new Transgender Participation Policy. Those claims challenged the very policy that the NCAA has now abandoned. *See Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (claims challenging the validity of a university's regulations that had been amended were moot, because the case "lost its character as a present, live controversy").

Plaintiffs cannot escape that reality by arguing that the "voluntary cessation" exception to mootness applies. (Supp. Br. at 3-14). Although Plaintiffs are correct that a defendant's voluntary cessation of a challenged practice does not

*automatically* moot a case, Plaintiffs cite the **wrong standard** for assessing when it does. The three *Cambridge Christian* factors they cite may apply only to a government actor's voluntary cessation of conduct, and not to private defendants. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ass'n, Inc.*, 115 F.4th 1266, 1284-85 (11th Cir. 2024).

Where a private actor has voluntarily ceased the challenged conduct, the Court must determine whether it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). The voluntary cessation doctrine seeks to avoid opening the door to jurisdictional gamesmanship in which "a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off; it might even repeat 'this cycle' as necessary until it achieves all of its allegedly 'unlawful ends.'" *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

The Eleventh Circuit has described at least three fact patterns to be considered when answering the question of whether the defendant is reasonably expected to "'return to his old ways.'" *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1183 (11th Cir. 2007) (quoting *Friends of the Earth*, 528 U.S. at 189). First, "courts are more likely to find that the challenged behavior is not reasonably likely to recur where it constituted an isolated incident"; clear proof is typically needed to show

abandonment of a continuing or deliberate practice. *Id.* at 1184-85. Second, courts "are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Id.* at 1186. Third, "a defendant's failure to acknowledge wrongdoing" can suggest "that cessation is motivated merely by a desire to avoid liability." *Id.* at 1187. Underpinning these considerations, the Eleventh Circuit emphasized that "[o]ur binding precedent says that 'voluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction.'" *Id.* at 1188 (quoting *Nat'l Advert. Co.*, 402 F.3d at 1333).

The *Sheely* considerations are not exhaustive or formulaic. Indeed, the Supreme Court recently refocused the voluntary cessation analysis—for both governmental and private defendants—by reemphasizing the question of whether the challenged conduct is reasonably expected to recur. *See Fikre*, 601 U.S. at 241 ("It is on that consideration alone—the potential for a defendant's future conduct— that we rest our judgment."). Where, as here, a private defendant abandons a challenged policy and adopts a contrary one to be consistent with a government executive order, there is no reasonable expectation of recurrence. *See Gimple v. Saver LLC*, No. 6:21-cv-1888-PGB-DCI, 2022 U.S. Dist. LEXIS 135213 (M.D. Fla. Apr. 21, 2022), *R.&R. adopted*, No. 6:21-cv-1888-PGB-DCI, 2022 U.S. Dist. LEXIS 135212 (M.D. Fla. July 29, 2022) (defendant met burden to show lawsuit

challenging indoor mask mandate was moot because defendant abandoned mandate and replaced it with a contrary policy in response to executive order).

### b.   The Challenged Conduct Could Not Reasonably Be Expected to Recur

The NCAA overcomes the voluntary cessation doctrine because its challenged conduct is not reasonably expected to recur. The NCAA conduct that Plaintiffs challenged was having a policy that allowed "men to compete on women's teams in intercollegiate sports." (Dkt. 94, SAC ¶ 5). Centering their allegations on the NCAA's prior policy that allowed schools to roster transgender student-athletes if they chose to do so (subject to the rule's requirements), Plaintiffs sought "an injunction enjoining the NCAA from continued enforcement of its Transgender Eligibility Policies and requiring the NCAA to prevent men from competing on women's teams." (*Id.* ¶ 725; *see also id.* ¶ 845). Plaintiffs' supplemental brief reaffirms that their case was about seeking to "enjoin Defendants from allowing men to compete against women in college athletics." (Supp. Br. at 1). The SAC contains no prospective challenge to the NCAA's conduct independent of its prior Transgender Student-Athlete Participation Policy.

Plaintiffs admit that the NCAA has abandoned that challenged policy. (Supp. Br. at 6); *see Gimple*, 2022 U.S. Dist. LEXIS 135213, at *8 (finding "that the Defendant has abandoned its allegedly illegal policy."). The NCAA replaced the challenged policy with a new one that expressly reverses the challenged provision

18

by providing that "[a] student-athlete assigned male at birth may ***not compete*** on a women's team." (Ex. C) (emphasis added). There is no dispute that the NCAA is implementing its new policy. As the NCAA announced, consistent with "the Trump administration's executive order," the "new policy limits competition in women's sports to student-athletes assigned female at birth only." (Ex. G). The White House lauded the accomplishment, recognizing that the "NCAA and other athletic leagues have removed men from women's competition." (Ex. D). And as confirmed by Track Athlete A's supplemental declaration and by a lawsuit filed in New Jersey by Sadie Schreiner, transgender student-athletes like Schreiner are no longer competing pursuant to the NCAA's new policy. (Dkt. 130-14; Dkt. 130-19 ¶ 24).

As in *Gimple*, the challenged policy here is not likely to recur because it was replaced by a contrary policy consistent with a new executive order. *See* 2022 U.S. Dist. LEXIS 135213, at *9 ("[I]t appears that Defendant abandoned its policy in response to EO 21-102 being issued—not in response to this case being filed."). Plaintiffs stipulate that the NCAA "changed it[s policy] in response to an Executive Order." (Supp. Br. at 3-4). Plaintiffs do not suggest that the NCAA changed its policy to avoid this Court's jurisdiction (or even due to a mere change of heart). Indeed, unlike in some non-moot cases, the NCAA did not pair its policy change with a motion challenging the Court's jurisdiction. *See, e.g.*, *Sheely*, 505 F.3d at 1186-87 (discussing "timing of [defendant's] new policy" and highlighting that

defendant "moved for summary judgment on the grounds of mootness just two days later"). Plaintiffs themselves make the case that there is no reasonable expectation of recurrence, agreeing that the NCAA's policy is likely to change only if the Executive Order is changed at a future president's direction. (*Id.*) It is not even imaginable, much less reasonably expected, that the NCAA would be in position to change its policy again until after President Trump leaves office in 2029, at the earliest.[8] The remote and entirely speculative possibility of another policy change, years in the future, is not enough to find that the challenged conduct is likely to recur. And of course, by then, none of the Plaintiffs will have remaining eligibility.[9]

---

[8] And there is nothing in the record, or in any document before this Court, or elsewhere, to suggest any intention of the NCAA to deviate from the new policy its Board of Governors adopted in February 2025.

[9] Certain Plaintiffs have one or two years of remaining eligibility (Supp. Br. at 1 n.1), which they cannot postpone for several years. *See* NCAA, *2025-2026 Division I Manual*, (Aug. 11, 2025), https://web3.ncaa.org/lsdbi/reports/getReport/90008 (under the NCAA "Five-Year Rule," student athletes have 5 years to compete in a maximum of four collegiate seasons of intercollegiate competition in a sport). None will have eligibility remaining in 2029.

c.     **Plaintiffs Cannot Avoid Mootness By Attempting to Morph Their Lawsuit into a Challenge to the NCAA's New Policy Barring Transgender Athletes from Competition**

In the face of mootness, Plaintiffs pivot to grievances about the NCAA's new policy, but none of those supposed "defects" are mentioned or pled in the Second Amended Complaint. (Supp. Br. at 5-11). The Eleventh Circuit does not allow such attempts to avoid mootness by morphing a case away from the pleadings via motion papers. In *Regalado v. Director, Center for Disease Control*, No. 22-12265, 2023 U.S. App. LEXIS 1059, at *4 (11th Cir. Jan. 18, 2023), the plaintiff's claim was mooted by the withdrawal of the mandate alleged to be illegal in the complaint. The court rejected the plaintiff's attempt to use a motion to dismiss opposition brief to shift his claim to a different mandate than the one discussed in the operative complaint. *Id.*   Similarly, in *A.F. Officer v. Austin*, No. 5:22-cv-00009-TES, 2024 U.S. Dist. LEXIS 186465, at *17 (M.D. Ga. Oct. 11, 2024), after plaintiffs' claims related to COVID-19 vaccines were mooted, they could not "morph their lawsuit into something" related to a broader vaccine accommodations policy, because they had not pled those allegations in their complaint. For that reason, dismissal was warranted under "the well-known pleading requirements from Federal Rule of Civil Procedure 8, *Twombly*, and *Iqbal*." *Id.*

In *Alpha Iota Omega Christian Fraternity v. Moeser*, students brought claims for declaratory judgment and injunctive relief against a university's governors

challenging the application of a non-discrimination policy under which the students were denied official recognition for their fraternity. No. 1:04CV00765, 2006 U.S. Dist. LEXIS 28065, at *3-11 (M.D.N.C. May 4, 2006). Their claims were mooted by a change in the university's non-discrimination policy, which allowed the fraternity to be recognized under the new policy. *Id.* at *16. The court found that the change in policy and implementation of it by recognizing the fraternity established that the defendants had done much more than "merely 'promise not to commit similar violations in the future'" and that there was no reasonable expectation that the same plaintiffs would be subjected to the same challenged conduct again. *Id.* (citation omitted). The plaintiffs tried to avoid mootness by contending that the policy had not been adequately changed to be constitutional, but the court held that it could not consider unasserted claims related to the new policy and could not issue an advisory opinion on the non-existent old policy. *Id.* at *26-27.

Here, too, even if the NCAA were subject to a lawsuit brought under Title IX or Section 1983 (and it is not), the Court should disregard Plaintiffs' attempt to challenge a different NCAA policy than the one discussed at length in the SAC by creating new "allegations" via supplemental briefing on a motion to dismiss. The NCAA's change in policy effectively satisfies the SAC's requested prospective injunctive relief, ending the prior policy that allegedly "permit[ted] biological males to compete against women in intercollegiate competitions." (Dkt. 94, SAC ¶ 845).

*See Fikre*, 601 U.S. at 240. The NCAA's new policy bars such competition by stating in no uncertain terms that "[a] student-athlete assigned male at birth may not compete on a women's team." (Ex. C).

In their supplemental brief—but not in any pleading—Plaintiffs misconstrue this straightforward new policy by arguing that the term "sex assigned at birth" is meaningless (despite it being a defined phrase) and by arguing without a factual basis that student-athletes could evade the policy by amending their birth certificates. The Court should not reach unpled challenges to specific language in the new policy. But even if it were to do so, this argument falls flat because the new policy, by its plain language, prohibits eligibility based on a later-in-life change to documentation. The NCAA states expressly in the policy itself that "students assigned male at birth may not compete on a women's team with amended birth certificates or other forms of ID." (Ex. C).

Nor can Plaintiffs unmoot their prospective claims by speculating that students may lie about birth certificates to evade the new policy (thus, in Plaintiffs' view, requiring an unprecedented imposition of chromosomal sex-testing by judicial decree) or that schools may follow conflicting state laws instead of the NCAA's policy. Plaintiffs have failed to plead that speculation in a pleading, and they lack standing to assert it. Again, Plaintiffs cannot avoid mootness by relying on additional theories of alleged injury "that would fail to establish standing in the first place."

*Already, LLC*, 568 U.S. at 96. None of the Plaintiffs have articulated any likelihood of imminent future injury from competing against a transgender student-athlete. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Nor could they rely on the speculation that athletes and schools might lie or disregard the NCAA's current policy, if they attempt to pursue that claim. *Id.* at 414 (declining "to endorse standing theories that rest on speculation about the decisions of independent actors"). Moreover, Plaintiffs do not explain how a school choosing to violate the NCAA's policy could result in a Title IX claim *against the NCAA*.

Finally, Plaintiffs cannot avoid mootness by turning to new assertions regarding Hill's experience practicing with a transgender teammate during her 2024-2025 season. (Supp. Br. at 9-11). Hill is the only plaintiff who might have had standing to raise this issue because only she alleged harm in the SAC related to practicing with a teammate. But that claim is now moot because she graduated and thus cannot and will not face that harm in the future. No other Plaintiff has standing because no other Plaintiff alleged in the SAC an imminent harm related to practicing with a transgender teammate. As such, while the claim fails on its face because the NCAA's new policy is permissive in allowing schools to decide whether and how to let transgender student-athletes participate in practice, the Court lacks jurisdiction to decide prospective claims related to practicing. There is simply nothing for the Court to decide on this point.

24

## III.    CONCLUSION

The Court should dismiss all claims against the NCAA for the reasons presented in the NCAA's Motion to Dismiss and its supporting briefs. Under controlling Supreme Court authority, the NCAA is not covered by Title IX or Section 1983. And even if that were not true, mootness cases dictate that the Court should dismiss all claims against the NCAA for prospective declaratory and injunctive relief.

Respectfully submitted this 11th day of August 2025.

ALSTON & BIRD LLP

*/s/ Cari K. Dawson*
Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant National Collegiate Athletic Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that the foregoing filing has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

<u>*/s/ Cari K. Dawson*</u>
Cari K. Dawson

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 11th day of August 2025.

*/s/ Cari K. Dawson*
Cari K. Dawson