IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RILEY GAINES, *et al.*,

    Plaintiffs,

      v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, *et al.*,

    Defendants.

CIVIL ACTION NO.
1:24-cv-01109-TRJ

**ORDER**

Presently before the Court are three motions to dismiss the Second Amended Complaint (Doc. 94) filed by the State Defendants[1] (Doc. 100), the Georgia Tech Athletic Association ("GTAA") (Doc. 102), and the National Collegiate Athletic Association ("NCAA") (Doc. 103). For the reasons stated below, the State Defendants' and GTAA's motions are **GRANTED**, and the NCAA's motion is **GRANTED IN PART and DENIED IN PART**.

---

[1] The State Defendants are the Board of Regents of the University System of Georgia, the University System of Georgia, Georgia Tech, the University of North Georgia, Ángel Cabrerra, Doug Aldridge, Tom Bradbury, Richard "Tim" Evans, W. Allen Gudenrath, Erin Hames, Bárbara Rivera Holmes, Samuel D. Holmes, C. Thomas Hopkins, Jr., MD, James M. Hull, Cade Joiner, Patrick C. Jones, C. Everett Kennedy, III, Sarah-Elizabeth Langford, Rachel B. Little, Lowery Houston May, Jose R. Perez, Neil L. Pruitt, Jr., Harold Reynolds, Sahin Shailendra, T. Dallas Smith, Mat Swift, James K. Syfan III, Don L. Waters, and John Does 27–50. (Doc. 94 at ¶¶ 81–121).

## Background[2]

This action arises out of the NCAA's policies in effect between 2022 and 2025 which governed the eligibility and participation of transgender student-athletes. Plaintiffs allege these policies violated Title IX of the Education Amendments of 1972 ("Title IX") and the Fourteenth Amendment. Plaintiffs allege the State Defendants and GTAA, in addition to the NCAA, violated the Constitution and Title IX by agreeing to host the 2022 NCAA Division I Women's Swimming and Diving Championships (the "2022 Championships") at Georgia Tech's McAuley Aquatic Center, during which a transgender student-athlete competed and utilized the locker rooms.

Each of the nineteen Plaintiffs is a biologically female, current or former NCAA athlete. Of the nineteen, nine have current or potential eligibility for NCAA competitions:

- Nanea Merryman has three years of remaining eligibility.

- Ainsley Erzen and Ellis Fox have two years of remaining eligibility.

- Elizabeth "Carter" Satterfield, Kaitlin "Katie" Blankinship, Kate Pearson, Julianna Morrow, and Halle Schart have one year of remaining eligibility.

- Brooke Slusser does not have current remaining eligibility, but she is seeking "additional NCAA eligibility due to disruption from competing with" a transgender student.

(Doc. 130 at 6 n.1). The remaining ten Plaintiffs are former NCAA athletes: Lillian "Lily" Mullens, Susanna Price, Caroline Hill, Riley Gaines, Reka Gyorgy, Kylee Alons, Kaitlynn Wheeler, Ellie Eades, Grace Countie, and Swimmer A. (*Id.*)

---

[2] All factual allegations are taken from Plaintiffs' Corrected Second Amended Complaint (Doc. 94) unless otherwise noted.

The NCAA is an unincorporated association that administers collegiate athletics to more than 1,100 of its member colleges and universities. NCAA members are primarily institutions that receive federal funds and are thus subject to Title IX. The NCAA requires its members to submit to its rules and regulations, including the rules under which athletic contests between members will be played and the venues at which competitions will be held. The NCAA also regulates and organizes competitions like the 2022 Championships. On February 10, 2022, the NCAA announced its Transgender Participation Policy that was in effect during the events alleged in this case. The policy provided that, to be eligible to compete, transgender athletes must demonstrate a serum testosterone level below the maximum allowable limit for the sport within four weeks of the championship to compete.

GTAA is a nonprofit organization that promotes Georgia Tech's athletics programs. In 2022, GTAA, on behalf of Georgia Tech, entered into an agreement with the NCAA to host the 2022 Championships at the Georgia Tech Aquatic Center. Pursuant to the hosting agreement with the NCAA, the NCAA would operate and control the facilities, including the locker rooms, during the event. Because each public university in Georgia is governed by the Board of Regents of the University System of Georgia, the Members of the Board of Regents—alongside Georgia Tech, GTAA, and their respective officials—were required to permit the NCAA to implement its policies at the event. At the March 2022 Championships, pursuant to the NCAA's eligibility policies, a transgender student-athlete, Lia Thomas, competed in several events and used the locker room, showers, and restrooms.

On January 20, 2025, President Donald Trump issued Executive Order No. 14168 titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. (Doc. 130 at 10). The Executive Order stated that "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." (*Id.*) It also provided that "'gender identity' 'reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.'" (*Id.*) On February 5, 2025, President Trump issued another Executive Order, No. 14201, titled *Keeping Men Out of Women's Sports*, which provided that "[i]t shall . . . be the policy of the United States to oppose male competitive participation in women's sports." (*Id.*)

On February 6, 2025, to "update the Association's participation policy for transgender student-athletes following the Trump administration's executive order," the NCAA adopted a new policy, titled "Participation Policy for Transgender Student-Athletes," which abandoned prior testosterone-based testing and certification requirements and instead provided:

  a. <u>Student-athlete assigned male at birth.</u>

  i. Competition. A student-athlete assigned male at birth may not compete on a women's team; and

  ii. Practice. A student-athlete assigned male at birth may practice on the team consistent with their gender identity and receive all other benefits applicable to student-athletes who are otherwise eligible for practice.

(*Id.* at 11).

On April 28, 2025, Georgia Governor Brian Kemp signed the Riley Gaines Act, O.C.G.A. § 20-3-15, *et seq.*, into law, which prohibits Georgia colleges and universities from participating in competitions where biologically male athletes are permitted to compete against biologically female athletes. (Doc. 130 at 20). Specifically, the Riley Gaines Act provides:

> (4) No covered entity shall host, sponsor, or participate in any intercollegiate competition in this state that permits a male to:
>
> > (A) Participate in any intercollegiate competition in this state on any team that is designated as female; or
> >
> > (B) Use any multiple occupancy restroom or changing area or sleeping quarters designated for use by females in conjunction with such competition.

(*Id.*) It further requires "governing bodies" to "adopt such policies, rules, and regulations as necessary to ensure" compliance with the Act "for all intercollegiate competitions involving covered entities in [Georgia]." (*Id.*)

## LEGAL STANDARDS

Federal courts are "courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Accordingly, we have a 'special obligation to satisfy ourselves of our own jurisdiction' before proceeding to the merits of [a case]." *Gardner v. Mutz*, 962 F.3d 1329, 1336 (11th Cir. 2020) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998), *abrogated on other grounds by Riley v. Bondi*, 145 S. Ct. 2190 (2025)) (citation modified). The most fundamental limits on federal judicial power are contained in Article III of the Constitution, "which grants federal courts jurisdiction only over enumerated categories of 'Cases' and

'Controversies.'" *Id.* (citing U.S. Const. art. III, § 2). The case-or-controversy requirement is comprised of four parts: (1) standing, (2) ripeness, (3) mootness, and (4) the political question doctrine. *Id.* (citing *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1312 (11th Cir. 2011)). Here, both standing and mootness are at issue, and the Court must consider both threshold questions before considering the merits. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("For a court to pronounce upon the merits when it has no jurisdiction to do so, is for a court to act ultra vires." (citation modified)).

### A. Standing

The "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004) (citation omitted). An injury in fact is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Id.* "An interest unrelated to injury in fact is insufficient to give a plaintiff standing." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772 (2000). Thus, "a plaintiff without an injury in fact lacks Article III standing, and the federal courts do not have jurisdiction over his or her complaint." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

Because standing is jurisdictional, a dismissal for lack of standing is equivalent to a dismissal for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1),

is not a judgment on the merits, and is entered without prejudice. *Id.* A defendant can move to dismiss a complaint for lack of standing by either facial or factual attack. *Id.* "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citation modified). By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony. *Id.* A plaintiff must establish standing as to each form of relief sought separately. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

## B. Mootness

Federal courts have no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). So, a case must be dismissed "if an event occurs while a case is pending . . . that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party." *Church of Scientology*, 506 U.S. at 12 (citing *Mills*, 159 U.S. at 653). A case becomes moot when "it can be said with assurance that 'there is no reasonable

expectation' that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631. Where the "event" purportedly mooting the case is a new law, courts must "'stop, look, and listen' to determine the impact of changes in the law," because a "superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000) (quoting *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992)).

### C. Rule 12(b)(6)

Defendants also argue that the Second Amended Complaint must be dismissed for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a claim will survive a motion to dismiss if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, at the motion to dismiss stage, "all well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted).

DISCUSSION

Plaintiffs allege six claims in the Second Amended Complaint: (1) Title IX claim for injunctive, declaratory, and damages relief against the NCAA and the State Defendants; (2) Title IX claim for injunctive, declaratory, and damages relief against the NCAA and GTAA; (3) Equal Protection claim for injunctive, declaratory, and damages relief against the NCAA and the State Defendants; (4) bodily privacy claim against the NCAA and the State Defendants; (5) Title IX claim seeking prospective relief against the NCAA; and (6) Equal Protection claim seeking prospective relief against the State Defendants.

### A. Claims Against Doe Defendants

As a preliminary matter, Plaintiffs also include claims against unidentified John Doe Defendants 1 through 25 and Does 26 [3] through 50 which must be dismissed. Plaintiffs allege that Does 1 through 25 are "agents of the NCAA who acting under color of law undertook the actions attributed to the NCAA in this Complaint," and Does 26 through 50 are "additional members of the Board of Regents of the University System of Georgia or their agents and/or individual agents or employees of the University System of Georgia and/or agents or employees of one or more public colleges or universities in Georgia and/or agents or employees of GTAA who engaged in the conduct attributed to the 'Georgia Individual Defendants' that are described in this Complaint." (Doc. 94 at ¶¶ 118–19). Plaintiffs also state they "do

---

[3] The Second Amended Complaint refers to this second group of Doe Defendants as Does "27–50" in some paragraphs and Does "26–50" in other paragraphs. (*See, e.g.*, Doc. 94 at ¶¶ 119, 813).

not currently know, and cannot without discovery reasonably determine, the names of these individuals." (*Id.*)

"As a general matter, fictitious-party pleading is not permitted in federal court" unless the plaintiff's description of the defendant is very specific. *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). The limited exception to this rule is "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). Broad descriptions of categories of employees or personnel are insufficient because they do not allow service of process. *Richardson*, 598 F.3d at 738 (dismissing "John Doe" as a defendant when only description was that he was a guard at an institute where there were numerous guards); *Vielma v. Gruler*, 808 F. App'x 872, 880 (11th Cir. 2020) (fictitious parties are permissible only when "the plaintiff's description of the defendant is 'sufficiently clear to allow service of process'"). Plaintiffs' descriptions of Does 1 through 25 and Does 26 through 50 are insufficient to describe these individuals to allow for service of process. Therefore, Does 1 through 25 and Does 26 through 50 are **DISMISSED**.

### B. Prospective Relief Against the State Defendants and GTAA

The State Defendants and GTAA both argue that the passage of the Riley Gaines Act effectively mooted any claims seeking prospective injunctive or declaratory relief against them. The Court agrees. "'The purpose of an injunction is to prevent future violations,' so for a claim for injunctive relief to remain a live controversy there must exist some cognizable danger of recurrent violation,

something more than the mere possibility which serves to keep the case alive." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1283 (11th Cir. 2024) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). "Similarly, a claim for declaratory relief becomes moot when there is no longer 'a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*'" *Id.* (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)) (emphasis in original).

While a defendant's voluntary cessation of allegedly unlawful conduct ordinarily will not suffice to moot a case, a defendant can show mootness if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 1284 (quoting *Laidlaw*, 528 U.S. at 189). A government defendant can "often meet that burden" by formally rescinding a challenged policy because governments are "more likely than private defendants to honor a professed commitment to changed ways." *Id.* (quoting *Keohane*, 952 F.3d at 1267–68 ("the repeal of a challenged statute—or other similar pronouncement" ordinarily makes it clear that the challenged behavior cannot reasonably be expected to recur).

Once a government defendant shows a rescission of the challenged policy, through legislative or other action, "the burden shifts to the plaintiff to present evidence that its challenge has not been mooted by that" action. *Id.* (quoting *Keohane*, 952 F.3d at 1268). To make that showing, a plaintiff must show a reasonable expectation that the government will "reverse course" and "reinstate the repealed policy if the lawsuit is terminated." *Id.* As to this showing, courts consider three factors:

> (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) whether the decision to end the challenged conduct was "unambiguous" and can be "fairly viewed as being 'permanent and complete;'" and (3) "whether the government has consistently maintained its commitment to the new policy."

*Id.* at 1284–85 (quoting *Keohane*, 952 F.3d at 1268).

Here, the Riley Gaines Act, which expressly prohibits Georgia colleges and universities from hosting or participating in competitions where biologically male athletes are permitted to either compete against biologically female athletes or use female-designated restrooms and other facilities, is precisely the kind of government voluntary cessation contemplated by *Cambridge Christian*. The language of the law is clear, and it was plainly designed to prohibit exactly the conduct Plaintiffs complain of in this litigation. Neither the State Defendants nor GTAA, which acts solely on behalf of Georgia Tech (a Georgia university), are reasonably likely to ignore the unambiguous language of Georgia's new law.

Plaintiffs argue the following is evidence of the State Defendants' and GTAA's likelihood of ignoring the Riley Gaines Act, despite its unambiguous mandate: (1) GTAA is exempted from the Act; (2) the State Defendants have not, to Plaintiffs' knowledge, adopted policies to implement the Act; and (3) the State Defendants "stand on their Motions to Dismiss and maintain their arguments, which are fundamentally at odds with complying with the Gaines Act." (Doc. 130). None of these persuasively address the three factors discussed in *Cambridge Christian*.

First, Plaintiffs spend no time attempting to argue that GTAA will likely ignore the Riley Gaines Act—likely because such an argument would be non-factual.

GTAA acts solely on behalf of Georgia Tech's athletics programs—if Georgia Tech cannot host or participate in competitions that permit transgender athletes, GTAA necessarily cannot coordinate such events on Georgia Tech's behalf. Second, Plaintiffs fail to show how the passage of the Riley Gaines Act was merely a temporary manipulation of this Court's jurisdiction. Unlike executive branch proclamations and orders, which can be unilaterally changed with the stroke of a new executive's pen, Georgia's Riley Gaines Act was passed by the Georgia Assembly and signed into law by Georgia's governor. Nothing in the Act suggests it is a ploy to avoid this litigation, and Plaintiffs have not pointed to any evidence of such a jurisdictional manipulation. *See Cambridge Christian*, 115 F.4th at 1285.

Third, nothing in *Cambridge Christian* requires the State Defendants to show they have *also* adopted policies across the State's colleges and universities to bolster the unambiguous, permanent, and complete nature of the Riley Gaines Act itself. More to the point, the law only requires each "governing body in this state [to] adopt such policies, rules, and regulations *as necessary* to ensure" the provisions of the Act. O.C.G.A. § 30-3-16(a) (emphasis added). Such policies may or may not be necessary from one institution to the next, but the law is unequivocal on what is permissible in intercollegiate competitions and what is not.

Finally, the State Defendants' and GTAA's unwillingness to simply "enter into a consent decree with the Plaintiffs to guarantee compliance with state and federal law going forward," does not demonstrate they are not committed to the requirements of the Riley Gaines Act. Neither the State Defendants nor GTAA have advanced

substantive arguments that take a position contrary to the mandates of the Riley Gaines Act. In their motion to dismiss briefing, the State Defendants clarified that they are "generally sympathetic to Plaintiffs' views as a policy matter," and took actions to formalize that position by adopting a resolution in October 2024, months before the passage of the Riley Gaines Act, the NCAA's policy change, or President Trump's Executive Orders. Plaintiffs have not identified a case where a defendant was forced to abandon good faith defenses to show their voluntary cessation was legitimate, and the State Defendants and GTAA have carried their burden to show their commitment to the new law.

Because Plaintiffs have failed to show a reasonable expectation that the State Defendants or GTAA are likely to reverse course in the future, their claims seeking prospective injunctive and declaratory relief against the State Defendants and GTAA are mooted by Georgia's Riley Gaines Act.

## C. Damages Claims Against the State Defendants and GTAA

As for Plaintiffs' retrospective damages claims, the State Defendants and GTAA argue that Plaintiffs lack Article III standing because their alleged injuries are neither traceable to the State Defendants' or GTAA's actions nor redressable by a judgment against either Defendant.[4] The only allegations of past harm caused by the State Defendants or GTAA relate to their decision to permit the 2022 Championships to be physically housed at the Georgia Tech Aquatic Center. Neither

---

[4] Because Article III standing is a threshold jurisdictional question, the Court does not address the other arguments raised by the State Defendants and GTAA in support of dismissal.

the State Defendants nor GTAA implemented any policies regarding transgender student-athletes, nor did either Defendant take action that permitted Lia Thomas to participate in the competition. Other than a series of allegations regarding the State Defendants' and GTAA's control over the venue *prior to the competition*, Plaintiffs' allegations demonstrate that the NCAA controlled the decisions made regarding the venue and the competition during the event.

"An injury is fairly traceable to the defendant if it results from the defendant's action and is not the result of an independent action of some third party." *Baughcum v. Jackson*, 92 F.4th 1024, 1032 (11th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Likewise, an injury can be redressed by the court when a decision for the plaintiff would make it significantly more likely that he would obtain relief that directly remedies his injury. And it must be the effect of the court's judgment on the defendant, rather than some third party, that redresses the injury, whether directly or indirectly." *Id.* (citing *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019)).

The Eleventh Circuit's decision in *Baughcum v. Jackson* is helpful. In *Baughcum*, members of a firearm rights advocacy group sued Georgia's Commissioner of Public Safety and Georgia probate judges for violating their Second Amendment rights by enforcing an age restriction on gun licensing. *Id.* at 1029–30. The Commissioner and the probate judges argued that the plaintiffs lacked standing, in part, because their injuries (being unable to obtain a license before the age of 21) was not "fairly traceable" to their actions. The Eleventh Circuit agreed only with the

15

Commissioner, finding that the plaintiffs' injury was traceable to and redressable by a judgment against the probate judges because they were "responsible for granting and denying licenses," and the district court could "order the probate judges to issue licenses to the plaintiffs and the [group's] similarly situated members despite the age limits in state law" if the claim was found to be meritorious. *Id.* at 1032.

As for the Commissioner, even despite his "statutory responsibility for designing the license application form, which lists the age requirements," the plaintiffs' injuries at issue were not traceable to the Commissioner's role in licensing—creating a form for use by the probate judges. *Id.* at 1033–34. More to the point, the Eleventh Circuit concluded the plaintiffs' "claimed injury isn't a bad form, but rather the restriction of licenses based on age itself. They cannot say that the Commissioner's form causes, even indirectly, the probate judges to deny licenses." *Id.* at 1034.

Here, the State Defendants and GTAA are more like the Commissioner in *Baughcum* than the probate judges. As to the State Defendants and GTAA, Plaintiffs' claimed injuries in this case relate solely to having to compete against and share locker rooms with Lia Thomas. The particular building being used for the competition—much like the form the probate judges used to issue licenses in *Baughcum*—is not the cause of these alleged injuries. And Plaintiffs point to no terms in the NCAA's alleged contract with GTAA or any action by the State Defendants that would tie either Defendant to the NCAA's decisions regarding which athletes were eligible to compete or which locker rooms they would be permitted to use. Because Plaintiffs' alleged injuries are not traceable to the State Defendants or

GTAA, Plaintiffs lack standing to proceed against them, and those claims must be **DISMISSED**.[5]

### D. Claims Against the NCAA

The NCAA advances several arguments in support of dismissal: (1) it does not receive federal financial assistance for purposes of Title IX liability; (2) it is not a state actor for purposes of § 1983 liability; (3) the right of bodily privacy only protects against unreasonable government searches under the Fourth Amendment; and (4) Plaintiffs lack standing for prospective relief. Because the NCAA concedes Plaintiffs have standing to assert their retrospective damages claims (Doc. 103-1 at 23), the Court will address the merits of those claims first.

1.  <u>Plaintiffs have plausibly alleged the NCAA receives federal financial assistance.</u>

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Civil Rights Restoration Act of 1987 defines a "program or activity" to include "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A). And requirements of Title IX are applicable to entities "principally engaged in the

---

[5] While the Court need not address redressability, it is also unlikely that any order by this Court prohibiting the State Defendants or GTAA from allowing use of their buildings in the future would address Plaintiffs' injuries, especially where Georgia law already prohibits such use.

business of providing education" services, § 1687(3)(A)(ii), and entities created by two or more covered entities, § 1687(4). *Nat'l Collegiate Athletic Ass'n v. Smith (Smith I)*, 525 U.S. 459, 466 (1999). So, "if any part of the NCAA received federal assistance, all NCAA operations would be subject to Title IX." *Id.* "Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Id.* at 468.

Here, Plaintiffs allege that the NCAA "runs educational programs or activities receiving direct or indirect financial assistance." (Doc. 94 at ¶¶ 750, 830). Plaintiffs focus on financial assistance through the NCAA's concussion research partnership with the Department of Defense ("DoD"). (*Id.* at ¶¶ 158–76). Plaintiffs allege that under the "partnership" with the DoD:

> [T]he NCAA provides to the DoD data regarding injuries by student-athletes and the DoD provides the NCAA funding for education and research on sport concussion injuries, the NCAA participates in the identification of NCAA member institutions that will conduct the scientific research, the DoD and NCAA ultimately receive access to the government funded research, and the NCAA uses the research to revise its educational materials, protocols and rules for student-athletes.

(*Id.* at ¶ 165). Plaintiffs allege the NCAA-DoD "Grand Alliance" has received at least $85 million in funding from the federal government, which has been touted by the NCAA as contributing to large concussion studies with 37,000 student-athletes and changes to the NCAA's rules. (*Id.* at ¶¶ 166, 169, 173). The NCAA argues that these allegations, without more specific information about whether the NCAA itself receives the funds or otherwise controls the funds, are insufficient to show it is a

recipient of federal funds. Taking all of Plaintiffs' allegations as true and construing all reasonable inferences in Plaintiffs' favor, as is required, the Court cannot agree.

In *Department of Transportation v. Paralyzed Veterans of America*, the Supreme Court distinguished between entities that indirectly *benefit* from federal funding, like commercial airlines, and those that indirectly *receive* assistance, like airport operators. 477 U.S. 597, 605 (1986). The Court held that "Congress limited the scope of § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *Id.* Applying the rationale of *Paralyzed Veterans*, the Third Circuit later held that a plaintiff sufficiently alleged that the NCAA was an indirect recipient of federal funding "by virtue of its relationship with" two youth sports programs administered by the NCAA. *Smith v. Nat'l Collegiate Athletic Ass'n (Smith II)*, 266 F.3d 152, 161–62 (3d Cir. 2001). There, the plaintiff alleged that the two sports programs were "effectively controlled" by the NCAA, the programs were made up of NCAA employees and members, the fund had to report to the NCAA, and the programs were touted by the NCAA as "the NCAA's best kept secrets." *Id.* at 161.

Here, while not directly in line with the allegations in *Smith II*, Plaintiffs' allegations, if proven, would be sufficient to bring the NCAA under the purview of Title IX. Even if the Grand Alliance is a separate legal entity from the NCAA—which is what the NCAA suggests but not what Plaintiffs allege—Plaintiffs allege that the NCAA, through the Grand Alliance, supports concussion research with DoD money, and at least some portion of federal funding was considered an "award" by the NCAA's Chief Medical Officer to fund research to "mitigate possible long-term effects of

concussion." (Doc. 94 at ¶ 170). While it is unclear whether the federal government's money ever rested in NCAA's coffers, there is at least a plausible allegation that NCAA research was either directly or indirectly funded by the DoD and that the NCAA either directly or indirectly plays a role in deciding how those funds are used. These allegations, though not as detailed in some respects, actually allege a clearer connection between the NCAA and the DoD money than that alleged in *Smith II* and more than the mere incidental benefit described in *Paralyzed Veterans*. Therefore, the NCAA's motion to dismiss Plaintiffs' Title IX claims on this basis is **DENIED.**

2.  Plaintiffs have not plausibly alleged the NCAA is a state actor.

A person whose constitutional rights have been violated may seek relief in federal court pursuant to 42 U.S.C. § 1983, "which creates a private right of action against those who violate the rights of others while acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.'" *Charles v. Johnson*, 18 F.4th 686, 693 (11th Cir. 2021). "The requirement that the deprivation be made 'under color of state law' means that the deprivation must be made by a state actor." *Id.* (citing *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982)). The Supreme Court has identified three scenarios when a private entity's conduct can be "fairly attributable" to the state:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise ("nexus/joint action test").

*Id.* at 694 (quoting *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001)) (citations omitted).

As to the NCAA, Plaintiffs do not expressly argue any of the three scenarios above. Instead, Plaintiffs argue they plausibly alleged the NCAA is a state actor because "the NCAA and public institutions in every State in the nation work together in a joint, symbiotic, intertwined relationship to create a national product of collegiate athletics." (Doc. 108 at 53). Plaintiffs' allegations that the NCAA was in a "symbiotic, intertwined relationship" with public universities explicitly tracks the ultimate holding in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). But the devil is in the details.

In *Brentwood*, a private parochial school sued the Tennessee Secondary School Athletic Association, a voluntary, non-profit organization designed to regulate interscholastic sport among public and private schools in Tennessee. The school was placed on probation and fined by the Association for violating an "undue influence" rule. 531 U.S. at 293. The school argued that the Association violated the First and Fourteenth Amendments as a state actor because its relationship with schools in the state was "symbiotic" and had a "predominantly public character." *Id.* The Supreme Court ultimately found that the Association was a state actor because 84% of its membership was made up of public schools in the state, and those public schools were "represented [in the Association] by their officials acting in their official capacity to provide an integral element of secondary public schooling." *Id.* at 299. The "entwinement" was therefore "unmistakable." *Id.* at 302.

Before the Court introduced its "entwinement" analysis, it distinguished the facts of *Brentwood* from its prior holding in *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179 (1988). *Id.* at 295–98. In *Tarkanian*, the University of Nevada, Las Vegas ("UNLV") suspended its head basketball coach for violating certain NCAA rules. *Tarkanian*, 488 U.S. at 180–81. The coach sued both UNLV and the NCAA for violating his due process rights under the Fourteenth Amendment and prevailed against both. *Id.* at 181. But the Supreme Court held that the NCAA was not a state actor and reversed. In its discussion of *Tarkanian*, the *Brentwood* Court recalled that it distinguished athletic associations consisting "entirely of institutions located within the same State, many of them public institutions created by the same sovereign," and the NCAA, which shaped its policies by "several hundred member institutions, most of them having no connection with [the State], and exhibiting no color of [State] law." *Brentwood*, 531 U.S. at 297–98. Because the NCAA in *Tarkanian* was a collective membership of schools across multiple states, its connection to one state was "too insubstantial to ground a state-action claim." *Id.* (citing *Tarkanian*, 488 U.S. at 193).

Here, *Brentwood* is instructive, but not in the way advanced by Plaintiffs. *Tarkanian* clearly held the NCAA is not "entwined" with any one state like the Tennessee Association described in *Brentwood*. And Plaintiffs' novel suggestion that there is still an open question whether "the NCAA is a surrogate for public universities in every State who bargain with it to deliver the product of national collegiate athletics" is also logically precluded by *Tarkanian*. Just like Plaintiffs here,

Tarkanian argued that UNLV delegated its own functions to the NCAA, "clothing the [NCAA] with authority both to adopt rules governing UNLV's athletic programs and to enforce those rules on behalf of UNLV." *Tarkanian*, 488 U.S. at 192. And much like UNLV's decision to follow the NCAA's rules did not transform the NCAA's rulemaking into state action, *all* of the schools that participated in the 2022 Championships did not transform the NCAA policy on transgender athletes into state action. Plaintiffs' argument that the NCAA is a stand in for, effectively, every state in the country, is illogical when the Supreme Court has already determined its involvement with one state was too attenuated to constitute state action.

Plaintiffs have failed to plausibly allege the NCAA was a state actor for purposes of their § 1983 claim. Therefore, as to the NCAA, that claim must be **DISMISSED**.

> 3. <u>Plaintiffs have not plausibly alleged a violation of a right to bodily privacy.</u>

The Fourteenth Amendment's Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). The Supreme Court has recognized that "one aspect of the 'liberty' protected by the Due Process Clause is a "right of personal privacy, or a guarantee of certain areas or zones of privacy." *Carey v. Population Servs. Int'l,* 431 U.S. 678, 684 (1977). The Supreme Court has emphasized its reluctance to expand substantive due process because "guideposts for responsible decisionmaking in this

uncharted area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). At bottom, the "Due Process Clause of the Fourteenth Amendment was intended to prevent [the] government from abusing its power, or employing it as an instrument of oppression." *Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). "The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195.

Plaintiffs and the NCAA disagree as to whether the "right to bodily privacy" arises under the Fourteenth Amendment's Due Process Clause. The Eleventh Circuit has recognized that prisoners retain a constitutional "right to bodily privacy" because "most people have 'a special sense of privacy in their genitals, and involuntary exposure to them in the presence of people of the other sex may be especially demeaning and humiliating." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (quoting *Lee v. Downs*, 641 F.3d 73, 78 (2d Cir. 1992)). It follows that a person who is not in custody certainly has such a right not to have their genitals involuntarily exposed in the presence of the other sex. *Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015) ("The rights of arrestees are surely as substantial as those of inmates.").

The cases in this Circuit recognizing this right to bodily privacy do so in the context of government searches and seizures under the Fourth Amendment, and not in the broader "short list" of liberty rights protected by the Due Process Clause. *See Powell v. Barrett*, 541 F.3d 1298, 1314 n. 7 (11th Cir. 2008) (*Fortner* "concludes that

jail inmates retain a right to bodily privacy that implicates the Fourth Amendment.");
*see also Parents for Privacy v. Barr*, 949 F.3d 1210, 1223–25 (9th Cir. 2020) (collecting cases and explaining that "none establishes a Fourteenth Amendment right to privacy that protects against any risk of bodily exposure to a transgender student in school facilities."). And the Supreme Court's analysis in *Vernonia School District 47J v. Acton* expressly held that student-athletes have "a reduced expectation of privacy" which is not akin to nudity forced by state actors. 515 U.S. 646, 657 (1995) ("Public school locker rooms . . . are not notable for the privacy they afford, [and] there is 'an element of communal undress inherent in athletic participation.'").

But whether there is a fundamental due process right to bodily privacy is a question for another day. Even if there is such a right, it only forbids "the State itself to deprive individuals of life, liberty, or property without 'due process of law.'" *DeShaney*, 489 U.S. at 195. As explained above, the NCAA is not a state actor, and the Fourteenth Amendment, "by its own language, applies solely to state action." *Charles*, 18 F.4th at 693 (citations omitted). Therefore, Plaintiffs' right to bodily privacy claim against the NCAA must be **DISMISSED**. Because Plaintiffs have not plausibly alleged the NCAA violated § 1983 or the right to bodily privacy, they cannot recover against the NCAA, retrospectively or prospectively, on those claims.

4.  Prospective Relief and Limited Discovery

As to Plaintiffs' remaining Title IX claim against the NCAA, the NCAA argues that those Plaintiffs who are no longer eligible to compete lack standing to bring claims for prospective relief because there is no likelihood they will be impacted by

any future NCAA policy. Plaintiffs do not appear to dispute this point, and a long line of cases demonstrates that graduation either eliminates standing due to lack of a cognizable future injury or moots claims for prospective relief. *Compare Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284–85 (11th Cir. 2001) (student's prospective claim challenging admissions process lacked standing when student was admitted and expressed no intention to re-apply or be affected by the challenged policy), *with Pederson v. La. State Univ.,* 213 F.3d 858, 874 (5th Cir. 2000) (holding that, "[b]ecause the named plaintiffs will not benefit from a favorable ruling on the question implicating injunctive relief, . . . this question is moot as to them."); *and Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 128–29 (1975) (per curiam) (holding that a challenge to the constitutionality of certain school board rules became moot where all plaintiffs had graduated). Therefore, the Plaintiffs who have lost NCAA eligibility cannot pursue claims for prospective relief against the NCAA.

For those Plaintiffs that still have remaining NCAA eligibility, the NCAA argues that their claims for prospective relief are speculative and mooted by the NCAA's subsequent policy change. (Docs. 103-1, 135). This raises a common problem of cases where the complained of conduct stops, making future injury speculative for purposes of standing, but it is unclear whether the offending policy will reemerge. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1190 n.16 (11th Cir. 2007) (citing *Laidlaw*, 528 U.S. at 190 ("there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.")). For private actors

26

who voluntarily rescind an allegedly unlawful policy, the defendant must show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sheely*, 505 F.3d at 1189 (quoting *Laidlaw*, 528 U.S. at 189).

Here, none of the Plaintiffs will have remaining NCAA eligibility after 2028. Plaintiffs and the NCAA both agree that the NCAA's policy is connected in many ways to President Trump's Executive Orders. (Doc. 135 at 25). While it may be practically unlikely that the President will suddenly change course on this issue, that unlikeliness falls short of the "formidable, heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Sheely*, 505 F.3d at 1184. It is unclear from its briefing what the NCAA plans to do in the future, and that uncertainty is dispositive. *Id.* ("A defendant's assertion that it has no intention of reinstating the challenged practice 'does not suffice to make a case moot'") (quoting *Laidlaw*, 528 U.S. at 190). As to mootness and standing of these eligible athletes, the NCAA has not yet carried this burden.

Based on the allegations in the Second Amended Complaint, and construing all reasonable inferences in Plaintiffs' favor, the only claims remaining are Plaintiffs' Title IX claims against the NCAA. However, because the question of whether the NCAA receives funding from the Department of Defense is a close one, and could potentially be dispositive, the Court finds that limited initial discovery as to this issue is appropriate. *See Smith II*, 266 F.3d at 163 (remanding for the district court to conduct discovery "and make findings with respect to this allegation" that the NCAA was an indirect funding recipient). Therefore, the NCAA shall file an answer to

Plaintiffs' remaining Title IX claims by **October 9, 2025**. Thereafter, the parties shall have 90 days, through and including **January 7, 2026** to conduct limited discovery on the sole issue of whether the NCAA is a federal funding recipient through its partnership with the Department of Defense. Any dispositive motion as to this issue must be filed by **February 6, 2026**. If no motions are filed, the parties must submit a Joint Preliminary Report and Discovery Plan by **February 13, 2026**.

## CONCLUSION

For the reasons stated above, the State Defendants' and GTAA's motions to dismiss (Docs. 100, 102) are **GRANTED**, and Plaintiffs' claims against the State Defendants and GTAA are **DISMISSED** without prejudice. The Clerk is **DIRECTED** to terminate the State Defendants and GTAA as parties to this action. The NCAA's motion to dismiss (Doc. 103) is **GRANTED IN PART and DENIED IN PART.** Plaintiffs' § 1983, right to bodily privacy, and prospective claims by non-eligible Plaintiffs against the NCAA are **DISMISSED** with prejudice. The NCAA's motion to dismiss the remaining Title IX claims against it is **DENIED** with leave to refile after the parties conduct limited discovery.

SO ORDERED, this 25th day of September, 2025.

_____
TIFFANY R. JOHNSON
United States District Judge