UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-01109-TRJ |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. UNDISPUTED MATERIAL FACTS ..... 3
A. Formation of a "Grand Alliance" ..... 3
B. The CARE Research Funding Contracts ..... 6
1. The DoD's Funding ..... 8
2. The NCAA's Funding ..... 9
C. Oversight and Control of the CARE Studies ..... 9
III. ARGUMENT ..... 11
A. The NCAA Did Not Directly Receive Federal Funds ..... 11
1. Receipt of Federal Funds is Required for Title IX Coverage ..... 11
2. The NCAA Did Not Directly Receive Federal Funds Through the Grand Alliance Research Collaboration ..... 17
B. Alleged Benefits from Federal Funding Are Insufficient ..... 17
C. The NCAA Did Not Indirectly Receive Federal Funds Through the Grand Alliance Research Collaboration ..... 18
1. The NCAA Received No Earmarked Federal Funds Through a Mere Conduit ..... 18
IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES


**Page(s)**

**CASES**

*Barnes v. Gorman*,
536 U.S. 181 (2002)....................11

*Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*,
96 F.4th 707 (4th Cir. 2024)....................11

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979)....................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................7

*Chem Serv. v. Env't Monitoring Sys. Lab'y-Cincinnati*,
12 F.3d 1256 (3d Cir. 1993)....................5

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)....................13, 14, 25

*Cureton v. NCAA*,
198 F.3d 107 (3d Cir. 1999)....................24

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)....................11, 25

*Dep't of Transp. v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986)....................passim

*Fitzgerald v. Barnstable Sch. Comm.*,
555 U.S. 246 (2009)....................1, 11, 14

*Gaines v. NCAA*,
2025 U.S. Dist. LEXIS 196879 (N.D. Ga. Sept. 25, 2025)....................1

*Gallardo v. Dudek*,
963 F.3d 1167 (11th Cir. 2020)....................24

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)....................11, 13, 24, 25

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)....................24

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984)....................passim

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)....................25

*Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*,
134 F. Supp. 2d 965 (N.D. Ill. 2001)....................14

*Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*,
121 F.4th 855 (11th Cir. 2024)....................24

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1980)....................12, 25

*Rowinsky v. Bryan Indep. Sch. Dist.*,
80 F.3d 1006 (5th Cir. 1996)....................12

*Shortz v. City of Plantation*,
344 F.3d 1161 (11th Cir. 2003)....................14, 25

*Smith v. NCAA*,
525 U.S. 459 (1999)....................passim

*Smith v. NCAA ("Smith II")*,
266 F.3d 152 (3d Cir. 2001)....................passim

*United States v. Butler*,
297 U.S. 1 (1935)....................12

*Williams v. Bd. of Regents*,
477 F.3d 1282 (11th Cir. 2007)....................3, 23

**STATUTES**

15 U.S.C. § 3710a....................5

Title IX, Education Amendments of 1972, 20 U.S.C. § 1681(a)....................passim

**OTHER AUTHORITIES**

U.S. Const., Art. I, §8, cl. 1 ........................................................................ passim

## I. INTRODUCTION

The NCAA received "not a single penny" from the federal government through the Grand Alliance, and that undisputed material fact is dispositive, entitling the NCAA to summary judgment. *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986) (entities not receiving federal funds not subject to federal restrictions).

After dismissing all claims against the NCAA other than Title IX claims, the Court ordered limited discovery on "the sole issue of whether the NCAA is a federal funding recipient through its [Grand Alliance] partnership with the Department of Defense." Dkt. 136 at 28, *Gaines v. NCAA*, 2025 U.S. Dist. LEXIS 196879, at **40-41 (N.D. Ga. Sept. 25, 2025). That focus was appropriate because Title IX limits coverage to educational programs or activities "receiving Federal financial assistance." 20 U.S.C. § 1681(a); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions and programs that receive federal funds."). Despite conducting extensive discovery, Plaintiffs cannot show that the NCAA received *any* federal funds from the Department of Defense ("DoD") through the Grand Alliance. The Court should now grant summary judgment for the NCAA on the remaining Title IX claims and dismiss those claims with prejudice, ending this case once and for all.

Plaintiffs repeatedly alleged in the Second Amended Complaint ("SAC") that the Grand Alliance was a "partnership" to insinuate without specific factual allegations that the NCAA received federal funds. (Dkt. 94, ¶¶ 165-67, 176). But the undisputed evidence shows that the alleged partnership was a collaboration in which the NCAA and the DoD each made separate, individual commitments to fund research at various educational institutions for a public purpose and memorialized their respective funding commitments and specific invoicing protocols in separate contracts. The only direct recipient of federal funds was Indiana University ("IU"), which used some of those funds to pay several intended indirect recipients of federal funds, including the Medical College of Wisconsin ("MCW") and the University of Michigan ("UM"). To be clear: the NCAA and the DoD were both granting their own funds to non-party universities, and there was no commingling of the separate NCAA and DoD funding and no joint account from which Grand Alliance participants were paid. The contracts and agreements produced in discovery confirm the DoD never intended for the NCAA to receive federal funding through the Grand Alliance. And the NCAA never did.

Without evidence that the NCAA received federal money, Plaintiffs cannot create Title IX coverage with alternative theories. The U.S. Supreme Court has definitively rejected the argument that a non-recipient of federal funds can be subject to regulation merely by benefitting from the results of federal funds given to others.

*See Smith v. NCAA*, 525 U.S. 459, 468 (1999) ("*Smith I*") ("Title IX coverage is not triggered when an entity merely benefits from federal funding."); *Paralyzed Veterans*, 477 U.S. at 607 ("The statute covers those who receive the aid, ***but does not extend as far as those who benefit from it***." (emphasis added)). Nor can Plaintiffs rely on any "control" theory in *Smith v. NCAA ("Smith II")*, 266 F.3d 152 (3d Cir. 2001), because: (1) that Third Circuit decision does not bind this Court; (2) Plaintiffs have no evidence that the NCAA controlled any federal funding recipient; (3) the U.S. Supreme Court has never approved control as "sufficient to make an entity a funding recipient," *Williams v. Bd. of Regents*, 477 F.3d 1282, 1294 (11th Cir. 2007); and (4) any theory of Title IX coverage other than via receipt of federal funds is unconstitutional under the Spending Clause, U.S. Const., Art. I, §8, cl. 1.

Applying the binding legal authority in *Smith I* and *Paralyzed Veterans*, the undisputed material facts demonstrate that the NCAA is not "a federal funding recipient through its [Grand Alliance] partnership with the Department of Defense." The Court should grant summary judgment for the NCAA on all remaining claims.

## II. UNDISPUTED MATERIAL FACTS

### A. Formation of a "Grand Alliance"

In March 2013, Dr. Dallas Hack, then the Director of the Combat Casualty Care Research Program of the U.S. Army Medical Research and Materiel Command, attended an event where he introduced himself to Dr. Brian Hainline, then the Chief

Medical Officer at the NCAA. (SMF 2; Dkt. 149, Hack Dep. at 14:2-8, 19:16-20:2; Dkt. 145, Hainline Dep. at 34:5-13, 35:20-36:3). Dr. Hack thought the NCAA and the DoD had a mutual interest in financing research of the long-term consequences of concussion in student-athletes, a population more easily studied than military personnel (who are similarly exposed to concussion risk). (SMF 3; Hack Dep. at 20:3-21:11; Hainline Dep. at 34:14-35:12). After visiting schools already conducting concussion research and meeting with experts in the field, Drs. Hack and Hainline determined that approximately $30 million would be needed to begin a concussion study. (SMF 4; Hack Dep. at 21:6-23:4, 25:1-26:22, 27:21-28:7, 31:6-21; Hainline Dep. at 33:12-25, 35:13-40:11). Drs. Hack and Hainline reached an understanding that the NCAA and DoD would split the cost, with each providing $15 million. (SMF 5; Hainline Dep. at 38:23-40:11, 123:2-23).

The NCAA had no control over the DoD's funding. (SMF 6; Hack Dep. at 301:6-17). Dr. Hack obtained approval from his leadership, the Assistant Secretary of Defense, to provide funding of $5 million to the research institutions for the first year, with anticipated renewals for two more years, totaling $15 million. (SMF 7; Hack Dep. at 28:8-29:11, 30:9-32:9). Dr. Hainline separately obtained approval from the NCAA's Board of Governors to provide $15 million to fund a three-year study by the research institutions. (SMF 8; Hainline Dep. at 38:18-39:9, 40:22-41:6).

The NCAA and DoD memorialized the Grand Alliance collaboration in a Cooperative Research and Development Agreement ("CRADA") as specifically authorized under 15 U.S.C. § 3710a. (SMF 9; Dkt. 145-11, Ex. 10 at 1; Hack Dep. at 42:25-43:11; Hainline Dep. at 67:17-69:11). The CRADA "set[] forth the terms and conditions by which [the NCAA and the DoD] will agree to share, as appropriate, certain proprietary information to facilitate their discussions of . . . programs and projects." (SMF 10; Ex. 10 at 1). The NCAA and DoD renewed the CRADA in subsequent years. (SMF 11; Hainline Dep. at 183:8-184:18, 222:17-223:9; Dkts. 146-11, 146-26, Exs. 40, 55). The CRADAs did not and could not involve the transfer of federal funds to the NCAA, both by their terms, (SMF 12; Ex. 10 at 1; Ex. 40 at -263; Ex. 55; Hack Dep. at 96:23-101:23)[1], and by statute, (15 U.S.C. § 3710a (barring "funds to non-Federal parties"); *Chem Serv. v. Env't Monitoring Sys. Lab'y-Cincinnati*, 12 F.3d 1256, 1258 (3d Cir. 1993) ("Congress specifically intended that a CRADA was not to be a procurement contract [or] a grant agreement.")). The CRADAs between the NCAA and the DoD were distinct from the funding agreements that the DoD and the NCAA each separately entered into

[1] Citations to exhibit page numbers are generally to the Bates numbers in an abbreviated form. *E.g.*, NCAA_Gaines_0000263 becomes -263. Where exhibits do not have Bates numbers, the page numbers are to the internal original pagination.

with research entities that received federal funds. The NCAA and DoD never entered into any contract under which the NCAA would (or could) receive any funds.

**B. The CARE Research Funding Contracts**

Dr. Thomas McAllister at IU, Dr. Steven Broglio at UM, and Dr. Michael McCrae at MCW worked together to prepare proposals for a concussion study to be funded by the NCAA and DoD. (SMF 13; Dkt. 147, McAllister Dep. at 14:23-16:20). Those researchers were chosen as the Principal Investigators for the "CARE" study of the "effects of concussion and head impact exposure." (SMF 14; McAllister Dep. at 16:4-23, 50:5-52:11; Hainline Dep. at 100:10-101:25, 152:11-21).[2]

The NCAA and the DoD respectively entered into contracts with the recipient universities to separately fund their research work. (SMF 15; McAllister Dep. at 14:13-15:16, 18:5-16 ("two separate funds flow streams")). Those contracts provided that IU would receive all of the money from each separate funding stream.

---

[2] CARE stands for Concussion Assessment, Research and Education. The study had three different phases, each of which required separate proposals, approvals, and contracts for funding (separately from the NCAA and DoD): CARE 1.0 (focusing on acute effects of concussion), CARE 2.0 (focusing on intermediate effects), and CARE-SALTOS Integrated Study (focusing on long-term effects). But the funding mechanisms for each phase were functionally the same, and the differences are not material. The NCAA also funded a "Mind Matters Education Challenge" in which it awarded nine schools funding for separate concussion-related studies, and the DoD did not provide funding.

(SMF 16; McAllister Dep. at 54:12-55:6, 68:21-69:16, 290:19-291:8, 292:3-6; Dkt. 145-14, Ex. 13 at -290; Dkt. 157-6, Ex. A to Haverty Decl. at -165).

IU was chosen as the Administrative and Operations Core to manage the study's funding and invoicing. (SMF 17; McAllister Dep. at 112:23-114:20). IU budgeted and "track[ed] the monies separately" and "reported to the NCAA . . . how their dollars were spent" and "reported to the DoD how their dollars were spent." (SMF 18; McAllister Dep. at 54:12-56:25, 299:24-301:15, 308:24-309:9). IU invoiced the DoD to receive payment under the DoD grant and IU invoiced the NCAA separately to receive payment under the NCAA agreement. (SMF 19; McAllister Dep. at 314:2-7). The NCAA had no control over whether the DoD paid IU's invoices to the DoD. (SMF 20; McAllister Dep. at 292:3-6, 303:8-13).

The NCAA received no federal funds from the DoD or any other federal governmental agency through the Grand Alliance. (SMF 1; Hack Dep. at 228:12-229:9; Dkt. 157-3, Bales Decl., ¶¶ 3, 4; Dkt. 157-4, Ex. A to Bales Decl.[3]).

[3] Internal Revenue Service Form 990, Part VIII (Statement of Revenue), line 1e, requires a non-profit organization to report "Government grants (contributions)." The NCAA reported no government grants or contributions from 2014 to 2024 (the most recently available form). Plaintiffs have no evidence that the NCAA received any government grants or contributions. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**1. The DoD's Funding**

The DoD awarded its funds to IU through a federal Broad Agency Announcement grant process, under which the DoD puts out a public call for proposals for research on a topic and selects a submitted proposal. (SMF 21; Hack Dep. at 127:9-16, 128:20-129:3). The NCAA had no control over the government's decision to approve a grant of funding to IU. (SMF 22; Hack Dep. at 301:6-25; McAllister Dep. at 309:24-310:5).

The DoD's grants to IU specified that the "award contains funds for one or more subawards." (SMF 23; Dkt. 157-5, Haverty Decl., ¶ 3; Ex. A at -168). IU, as a "pass-through entity" for the federal funds, executed sub-award agreements with the UM and MCW for their receipt of a portion of the federal funds. (SMF 24; Ex. A to Haverty Decl.; McAllister Dep. at 54:12-55:6). IU also executed a sub-award agreement with Datalys Center, who managed data collection for the studies. (SMF 25; Dkt. 152, Datalys Dep. at 74:4-10, 215:15-217:2; Dkt. 153-13, Ex. 190). IU was responsible for and controlled the disbursement of federal funds to those sub-awardees. (SMF 26; McAllister Dep. at 113:2-114:20). In turn, UM and MCW, which were responsible for certain arms of the study, executed sub-tier agreements with site schools which participated in the study by conducting the testing and collecting data from student-athletes and military cadets. (SMF 27; Dkt. 151, Brooks Dep. at 67:17-68:1, 225:7-226:16; Dkt. 151-18, Ex. 145).

### 2. The NCAA's Funding

The NCAA's separate funding was controlled by its own contracts with IU, UM, and MCW, collectively. (SMF 28; Hainline Dep. at 100:14-101:3; Dkts. 145-14, 146-12, 146-29, Exs. 13, 41, 58). IU, UM, and MCW executed subcontracts with the site schools and vendors for their work, and those site schools and vendors ultimately received (through IU and through UM or MCW) a portion of the NCAA funds. (SMF 29; McAllister Dep. at 114:2-20; Brooks Dep. at 221:10-223:5; Dkt. 147-19, Ex. 73).

Below is a simplified illustration of the separate flow of funds from the DoD and the NCAA to the institutions conducting the CARE studies.




## C. Oversight and Control of the CARE Studies

The Principal Investigators ("PIs") had primary responsibility for directing and controlling the studies. (SMF 30; Hainline Dep. at 107:3-108:7). The PIs and their teams controlled and managed the studies on a "day-to-day basis." (SMF 31; McAllister Dep. at 297:15-25). They also controlled the studies by leading the Operating Committee. (SMF 32; McAllister Dep. at 297:23-25; Ex. 13 at -337-338).

The PI-led Operating Committee was in charge of developing budgets, approving funding distributions, developing the operating procedures for the studies, and selecting the site schools for participation in the study. (SMF 33; Ex. 13 at -337). The NCAA did not have representation on the Operating Committee. (SMF 34; McAllister Dep. at 298:1-4).

The Executive Committee, comprised of representatives from the funding sponsors (initially, the NCAA, DoD, and National Institute of Health) primarily received reports from the Operating Committee about the research studies, but could also review and approve material budget changes proposed by the Operating Committee. (SMF 35; Hainline Dep. at 49:18-50:25, 113:9-20, 129:16-130:9; Ex. 13 at -337). The role of the Executive Committee was to provide "broad oversight and direction." (SMF 36; Ex. 13 at -337). Other committees included a Senior Scientific Advisory Panel (scientific leaders who would "advise and report to the Operating Committee regarding research design and data collection") and a Publications Committee (which "develop[ed] procedures for publication and dissemination of findings generated by" the CARE studies). (SMF 37; Hainline Dep. at 51:20-52:22; Ex. 13 at -338; Ex. 41 at -207-209). The findings from the studies were published in publicly available peer-reviewed journals. (SMF 38; Hainline Dep. at 51:17-52:4; Brooks Dep. at 98:24-100:2).

## III. ARGUMENT

### A. The NCAA Did Not Directly Receive Federal Funds

#### 1. Receipt of Federal Funds is Required for Title IX Coverage

The NCAA, which received no federal funds, is entitled to summary judgment because Title IX explicitly limits its reach to "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The U.S. Supreme Court has interpreted that plain statutory text as meaning exactly what it says: "Title IX reaches institutions and programs that receive federal funds." *Fitzgerald*, 555 U.S. at 257; *accord Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 96 F.4th 707, 712 (4th Cir. 2024) (concluding that "the plain text of Title IX contemplates the transfer of funds from the federal government to an entity").

The Supreme Court has always addressed Title IX coverage in terms of a "recipient of federal funds." *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) ("Thus we have held that under Title IX, which contains no express remedies, a ***recipient of federal funds*** is nevertheless subject to suit for compensatory damages." (emphasis added)); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("a ***recipient of federal funds*** may be liable in damages under Title IX" (emphasis added)); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by ***recipients of federal funds***." (emphasis added)); *Cannon v. Univ. of Chi.*, 441

U.S. 677, 729 (1979) ("Congress decided in Title IX, as it had in Title VI, to prohibit certain forms of discrimination by ***recipients of federal funds***." (emphasis added)).

The conclusion that Title IX coverage is limited to entities that actually receive federal funds into their coffers is confirmed by the nature of the Spending Clause, which is the Constitutional authority for Title IX and similar anti-discrimination statutes. *See Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1012 (5th Cir. 1996) ("The fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients."). The Spending Clause "confers upon the Congress power 'to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.'" *United States v. Butler*, 297 U.S. 1, 65 (1935) (quoting U.S. Const., Art. I, § 8, cl. 1). The Spending Clause gives Congress "power to legislate pursuant to the spending power" by "fix[ing] the terms on which it shall disburse federal money." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1980).

*Pennhurst* used the term "federal money" because Congress's Spending Clause power to tax and spend extends only to "money." *Butler*, 297 U.S. at 65 (describing Spending Clause as "intended to limit and define the granted power to raise and to expend ***money***"); *see also id.* at 66 (describing "the power of Congress to authorize expenditure of ***public moneys*** for public purposes"); *Pennhurst*, 451

U.S. at 17 (limiting Congress's power "to impose a condition on the grant of ***federal moneys***"); *Paralyzed Veterans*, 477 U.S. at 605-06 (describing "contractual nature of the receipt of ***federal moneys*** in exchange for a promise not to discriminate" (citation omitted)) (all emphases added). Thus, "federal financial assistance" in Title IX means federal "money" – and an entity must actually receive that federal money to be covered by Title IX.

The contractual nature of Spending Clause obligations also proves that coverage extends only to actual recipients of federal money. *Paralyzed Veterans*, 477 U.S. at 605-06. "Spending Clause 'statutes operate:' by 'conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts to a contract between the Government and the recipient of funds.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Gebser*, 524 U.S. at 286). The Supreme Court explained:

> Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, ***the recipients*** agree to comply with federally imposed conditions. For that reason, the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether ***the recipient*** voluntarily and knowingly accepts the terms of that contract.

*Id.* (emphases added) (citations, brackets, and quotation marks omitted).

The contractual nature of the arrangement means that a recipient of federal funds is "free to terminate its participation in the federal grant program and thus avoid the requirements of Title IX." *Id.* (citing *Grove City Coll. v. Bell*, 465 U.S. 555, 565 n.13 (1984)). But only the actual recipient would be a contracting party and thus be "in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id.* at 606. And "because the contracting party is the grant-receiving entity, a Title IX claim can only be brought against a grant recipient." *Shortz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003).

Limiting Title IX coverage to entities that receive federal money is also confirmed by the explicit statutory remedy for a Title IX violation.[4] "The statute's only express enforcement mechanism, § 1682, is an administrative procedure resulting in the withdrawal of federal funding from institutions that are not in compliance." *Fitzgerald*, 555 U.S. at 255. That administrative punishment of cutting off funding can apply only to the actual recipient of it. *See Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 970 (N.D. Ill. 2001) ("Because [defendant] is not itself a recipient of federal financial assistance, there is no action that a federal agency could take to curb its alleged noncompliance."). Thus, only an

[4] Title IX does not "expressly provide[] victims of discrimination a private right of action to sue the funding recipient in federal court." *Cummings*, 596 U.S. at 218. Instead, the Supreme Court "found an *implied* right of action." *Id.* (citation omitted).

actual recipient is subject to a private action under Title IX because the implied private right of action cannot be "broader than the Government's enforcement authority provided by § 1682." *Smith I*, 525 U.S. at 467 n.5.

The Supreme Court has rejected every attempt to enlarge the categories of potential defendants subject to Spending Clause statutes beyond actual federal funding recipients. Most applicable here, *Paralyzed Veterans* rejected "the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid." 477 U.S. at 607. Relying on the Rehabilitation Act's "federal financial assistance" statutory language that is identical to Title IX, the Court held that "the key is to identify the recipient of that assistance." *Id.* at 607.

The Court began that analysis by examining "the grants of federal funds to airport operators, which clearly are federal financial assistance, to determine whether it ***fairly can be said*** that commercial airlines 'receive' these grants." *Id.* (emphasis added). Reviewing the funding statutes and regulations on which the lower court relied, the Supreme Court found that the airport operators submitted project grant proposals for airport development, and all federal funds were "strictly limited to projects that concern airports." The Court's conclusion that the airport operators were the federal funds recipients was "not difficult":

> It is not difficult to identify the recipient of federal financial assistance under these Acts: Congress has made it explicitly clear that these funds are to go to airport operators. **Not a single penny of the money** is given to

> the airlines. Thus, the recipient for purposes of § 504 is the *operator* of the airport and not its users.

*Id.* at 605 (first emphasis added). And, here, not a single penny of the DoD Grand Alliance funding is given to the NCAA.

In *Smith I*, a unanimous Supreme Court applied *Paralyzed Veterans* to reject the Third Circuit's attempt to expand Title IX coverage to the NCAA because it received dues from federally funded member institutions. 525 U.S. at 462. Highlighting the importance of actual receipt of federal funds, the Court reaffirmed the holdings of those precedents: "Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not." *Id.* at 468. And it was not enough that the NCAA received any money from its federally funded members because, "there is no allegation that NCAA members paid their dues with federal funds earmarked for that purpose." *Id.* Instead, the NCAA merely received "indirect benefits from the federal assistance afforded its members," which "is insufficient to trigger Title IX coverage." *Id.* That binding authority bars Title IX coverage based on federal funding to IU.

This Court should reject Plaintiffs' invitation to travel a road to Title IX expansion that the Supreme Court has repeatedly shut down. Plaintiffs have no evidence that the NCAA was a recipient of federal funds through the Grand Alliance

(it was not), and the Court should grant summary judgment to the NCAA on the Title IX claims (the only remaining claims) and dismiss this action with prejudice.

#### 2. The NCAA Did Not Directly Receive Federal Funds Through the Grand Alliance Research Collaboration

Plaintiffs can present no evidence that the NCAA was a direct federal funding recipient in the Grand Alliance. That is consistent with Plaintiffs' position at the pleading stage, at which they failed to dispute that the NCAA did not receive direct federal funding. (Dkt. 108 at 11). Their only response was to argue that "direct federal funding is not required for Title IX to apply." *Id.* The only evidence here is that "[n]ot a single penny" went directly to the coffers of the NCAA. *Paralyzed Veterans*, 477 U.S. at 605; (SMF 1).

### B. Alleged Benefits from Federal Funding Are Insufficient

In the absence of evidence of direct federal funding, Plaintiffs' evidence of alleged benefits to the NCAA from the Grand Alliance do not trigger Title IX coverage. *Paralyzed Veterans* unambiguously rejected an attempt to extend Spending Clause obligations beyond the direct recipients of federal funds to those that "merely benefit from" the use of the funds. 477 U.S. at 607 (rejecting argument that "federal coverage follows the aid past the recipient to those who merely benefit from the aid"); *accord Smith II*, 266 F.3d at 161 (citing *Paralyzed Veterans*). As discussed above, the Court relied on the limiting statutory language ("recipient of Federal financial assistance") and the contractual nature of Spending Clause statutes.

The Court also explained that if coverage were extended to mere beneficiaries, "the scope of the statute would be broad indeed," and "[t]he statutory 'limitation' on [the statute's] coverage would virtually disappear, a result that Congress surely did not intend." *Paralyzed Veterans*, 477 U.S. at 609.

> In almost any major federal program, Congress may intend to benefit a large class of persons, yet it may do so by funding – that is, extending federal financial assistance to – a limited class of recipients. Section 504, like Title IX in *Grove City*, ***draws the line of federal regulatory coverage between the recipient and the beneficiary***.

*Id.* at 609-10 (emphasis added).

The Supreme Court applied those limits specifically to the NCAA in *Smith I*, holding that the NCAA was not subject to Title IX merely because it receives an economic benefit (dues payments) from its member institutions that are recipients of federal funds. As the Court held, "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; ***entities that only benefit economically from federal assistance are not***." 525 U.S. at 468 (emphasis added). Thus, Plaintiffs' benefit theory for Title IX coverage fails.

### C. The NCAA Did Not Indirectly Receive Federal Funds Through the Grand Alliance Research Collaboration

#### 1. The NCAA Received No Earmarked Federal Funds Through a Mere Conduit

Plaintiffs have no evidence that the NCAA was an indirect recipient of earmarked federal funds through a mere conduit intermediary, which is the only

Supreme Court exception to direct receipt of federal funds. *See Paralyzed Veterans*, 477 U.S. at 607. That lone exception is entirely consistent with the statutory limitation of regulation to actual recipients of federal funds.

In *Grove City*, the Court held that Title IX applied to a college that "accept[ed] no [federal] assistance but enroll[ed] students who receive[d] federal grants that [had to] be used for educational purposes" and who gave that "earmarked" money to the college for tuition. 465 U.S. at 558, 572. The Court held that there was no "substantive difference between direct institutional assistance and aid received by a school through students." *Id.* at 564. Focusing on the actual receipt of federal money rather than the direct or indirect manner in which it was received, the Court held that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive the checks directly from the Federal Government are subject to regulation." *Id.* As the Court later clarified, "*Grove City* stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly." *Paralyzed Veterans*, 477 U.S. at 607.

As discussed, the research studies arising from the Grand Alliance were separately funded by the DoD and the NCAA, and the separate DoD and NCAA funds were paid to IU. (SMF 15, 16). Plaintiffs cannot dispute that all federal funds through the Grand Alliance were paid to IU – and not to the NCAA. (*See id.*). None of that federal money was earmarked by the Federal Government for payment to the

NCAA. There is no evidence that the NCAA was the *intended recipient* of DoD fund. The Grand Alliance framework and constellation of separate funding contracts and agreements between the NCAA and the universities and the DoD and the universities support the opposite conclusion. IU was a conduit for federal funds *to other universities* who participated in Grand Alliance research, but it did not pass through any earmarked funds to the NCAA. (SMF 24, 26). Thus, Plaintiffs cannot meet the narrow *Grove City* indirect-funding exception. Because Plaintiffs cannot create a dispute of material fact on the NCAA's direct or indirect receipt of federal funds, the Court should grant summary judgment to the NCAA on all Title IX claims.

### 2. Title IX Does Not Apply to the NCAA Through Any Other Indirect Recipient Theory

#### a. The Supreme Court Has Rejected Other Indirect Recipient Theories

The Court should reject Plaintiffs' invitation to apply any other "indirect recipient" theory. For example, Plaintiffs may argue that NCAA became an "indirect recipient" of federal funds because the money given to the universities was "converted" into data from which the NCAA benefitted. *Paralyzed Veterans* considered and rejected a similar "attempt to avoid the straightforward conclusion that airlines are not recipients within the meaning of [the statute] by arguing that airlines are 'indirect recipients' of the aid to airports" and "contend[ing] that the money given to airports is simply converted by the airports into nonmonetary grants

to the airlines." 477 U.S. at 606. The Court held that "[t]his argument confuses intended *beneficiaries* with intended *recipients*." *Id.*

The Court also blocked an attempt to expand coverage by misusing the exception for "indirect" funding in *Grove City*. As *Paralyzed Veterans* explained, *Grove City* limited the concept of "indirect" funding to situations (unlike the one here) in which the federal government intends the federal funds to go ultimately to a different entity, and the direct recipients of federal funds are "mere conduits of the aid to its intended recipient[s]." *Id.* at 607. Thus, "indirect" is not a license to expand coverage beyond actual federal funds recipients to those who merely benefit, economically or otherwise, from the recipient's use of the federal funds. *Id.* If it were, "[t]he statutory 'limitation' on . . . coverage would virtually disappear, a result Congress surely did not intend." *Id.* at 609. Instead, the Court held, "[t]he statute covers those who receive the aid, but does not extend to those who benefit from it." *Id.* at 607. As applied to the facts of this case, IU and its sub-awardee schools are the funding recipients – the NCAA is not.

Plaintiffs also cannot rely on the assertion that "the NCAA is operating a comprehensive concussion research study in 'partnership' with the DoD" in the Grand Alliance. (Dkt. 108 at 14). The Supreme Court rejected the D.C. Circuit's similar attempt to broaden coverage because the recipient of federal funds and the

mere beneficiaries were "inextricably intertwined" in the same enterprise. *Paralyzed Veterans*, 477 U.S. at 610. A collaboration or a close relationship is not enough.

**b. Plaintiffs Cannot Satisfy Any Indirect Recipient Theory Under *Smith II***

The Court should also reject any attempt to misapply *Smith II* to the Title IX claims here. First, that Third Circuit opinion does not bind this Court. Second, *Smith II* is unpersuasive because it is at odds with statutory language, Supreme Court precedent, and the Spending Clause of the U.S. Constitution. But the Court need not reach those issues because Plaintiffs cannot even present sufficient evidence to fit this case into *Smith II.*

In *Smith II*, the plaintiffs sought remand to the District Court (after remand from the Supreme Court after *Smith I*) to amend their complaint to support the argument "that the NCAA is subject to Title IX because it receives federal financial assistance through the [National Youth Sports Program] and the [NYSP] Fund." 266 F.3d at 160.[5] The plaintiffs sought to add allegations about the close relationship between the NCAA, the NYSP, and the Fund that made the three, as the court observed, "virtually indistinct." *Id.* at 162; *see also id.* ("the NCAA is intertwined with the Fund such that it cannot be considered separate"). Based on the proposed allegations of that essential sameness, the court held that the NCAA did more than

[5] The NCAA did not oppose the plaintiffs' request to amend, *id.*, which suggests that *Smith II* is an improper advisory opinion.

"indirectly benefit . . . [instead,] it was in a position to decide whether to 'receive' federal funds and thereby accept the concomitant obligations of Title IX." *Id.*

The very different facts here do not permit application of the *Smith II* control holding.[6] Plaintiffs cannot present any evidence that the NCAA was "virtually indistinct" with Indiana University, which was the direct recipient of federal funds in the Grand Alliance, or with any other subsequent recipient of federal funds (*e.g.*, MCW and UM). Nor can Plaintiffs create a triable issue that the NCAA controlled the decision by IU or any other educational institution to receive federal funds. Indeed, *Smith II* itself held that "the NCAA is not in a position to accept or reject the federal funds paid to [its member] institutions." *Id.* at 157.

The facts here confirm that the NCAA was not in a position to accept or reject the federal funds received by educational institutions. All of the federal funds in the Grand Alliance were paid to IU. (SMF 21). IU submitted its own invoices to the DoD, and the NCAA had no input into whether DoD paid the invoice. (SMF 19-20). The NCAA also had no input into how the federal funds were passed on to indirect recipients because IU controlled that. (SMF 26). Thus, the NCAA was not in a

---

[6] The facts of this case also do not permit application of a ceding control theory from *Williams* because there is no proof that "a funding recipient[] has ceded control over one of its programs . . . to [the NCAA] and provided extensive funding to [the NCAA]." 477 F.3d at 1294.

position to accept or reject Title IX obligations, and *Smith II* does not apply to these facts.

**c. This Court lacks the authority to expand *Smith II***

This Court should also be extremely cautious in this Spending Clause case because of the well-established Constitutional limit on Congress's power, which courts cannot expand. *See Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 865 (11th Cir. 2024) ("caution[ing] against construing the statute to create other remedies" in Spending Clause cases (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002))); *Gallardo v. Dudek*, 963 F.3d 1167, 1175 (11th Cir. 2020) ("Further counseling caution in this context is the fact that the Medicaid Act is Spending Clause legislation."); *accord Cureton v. NCAA*, 198 F.3d 107, 118 (3d Cir. 1999) ("[C]aution is consistent with the Spending Clause foundation for Title VI."). *Smith II* does not apply directly here, and extending *Smith II* in this case would contravene the Supreme Court's warning to use caution in private litigation under Title IX. Because the private right of action is judicially created, courts must "examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the [Title IX] condition." *Gebser*, 524 U.S. at 287. Thus, where there is any doubt about the application of Title IX, a Court should find no coverage.

Courts are barred from developing new categories of Title IX coverage after the fact because the defendant will not have had the required clear and unambiguous notice of the potential liability. *See Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."). "[B]ecause Title IX was enacted as an exercise of Congress' powers under the Spending Clause, [citations omitted], 'private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005) (quoting *Davis*, 526 U.S. at 640); *accord Cummings*, 596 U.S. at 219 ("We therefore construe the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable.'" (quoting *Gebser*, 524 U.S. at 287)). A court is not free to determine—after the fact—that the NCAA is subject to Title IX because the NCAA would not have had unambiguous notice beforehand that it could face Title IX liability on these facts.

To reiterate, "a Title IX claim can only be brought against a grant recipient." *Shortz*, 344 F.3d at 1171. The NCAA is not a grant recipient.

## IV. CONCLUSION

The Court should grant summary judgment for the NCAA on the remaining Title IX claims.

Respectfully submitted this 9th day of February 2026.

ALSTON & BIRD LLP

*<u>/s/ Cari K. Dawson</u>*
Cari K. Dawson
Georgia Bar No. 213490
cari.dawson@alston.com
Christopher C. Marquardt
Georgia Bar No. 471150
chris.marquardt@alston.com
John E. Stephenson
Georgia Bar No. 679825
john.stephenson@alston.com

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Defendant National Collegiate Athletic Association*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D, I hereby certify that the foregoing filing has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

*/s/ Cari K. Dawson*
Cari K. Dawson

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

This 9th day of February 2026.

*/s/ Cari K. Dawson*
Cari K. Dawson