IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RILEY GAINES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*,<br><br>Defendants. | CIVIL ACTION NO.<br>1:24-cv-01109-TRJ |

## ORDER

On February 9, 2026, after a limited discovery period, the National Collegiate Athletic Association ("NCAA") filed a motion for summary judgment as to Plaintiffs' remaining Title IX claims. (Doc. 157). The NCAA argues it is not covered by Title IX's restrictions because, despite its collaboration with the United States Department of Defense, it did not receive money from the federal government. After a review of the record, the Court agrees.

## BACKGROUND

This action arises out of the NCAA's policies, in effect between 2022 and 2024, which governed the eligibility and participation of transgender student-athletes. (Doc. 94 at ¶¶ 239, 244, 265). Plaintiffs—each of whom are biologically female NCAA athletes—allege the NCAA's policies violated Title IX of the Education Amendments of 1972 ("Title IX") at the 2022 NCAA Division I Women's Swimming and Diving Championships, where a transgender student-athlete competed and utilized the women's locker rooms. (*Id.* at ¶¶ 450–518; Doc. 130 at 6 n.1).

On September 25, 2025, the Court dismissed all claims against the NCAA, except Plaintiffs' Title IX claims because Plaintiffs plausibly "allege[d] that the NCAA runs educational programs or activities receiving direct or indirect financial assistance." (Doc. 136 at 18, 27–28) ("[I]f any part of the NCAA received federal assistance, all NCAA operations would be subject to Title IX."). Specifically, Plaintiffs alleged that the NCAA received financial assistance through the NCAA's concussion research partnership with the United States Department of Defense (the "DoD"). (Doc. 94 at ¶¶ 158–76). Based on these allegations, in its September 25, 2025 Order, the Court ordered limited discovery on "the sole issue of whether the NCAA is a federal funding recipient." (Doc. 139 at 27–28). During that limited discovery period, the parties uncovered the following:

In March 2013, at a National Football League event, Dr. Brian Hainline, the Chief Medical Officer of the NCAA, met Dr. Dallas Hack, the Director of the Combat Casualty Care Research Program of the U.S. Army Medical Research and Materiel Command. (Doc. 145 at 33–34; Doc. 149 at 14, 19). Dr. Hack proposed the idea that the DoD and the NCAA had a mutual interest in understanding concussions—the DoD for military servicemen and women, and the NCAA for student-athletes—and could combine efforts to study brain injuries. (Doc. 145 at 34–35; Doc. 149 at 28). Dr. Hainline agreed, and the two began exploring whether the NCAA, "on behalf of its member schools could . . . work[ ] with the [DoD] on behalf of the military servicemen and women to conduct a study to understand the natural history of concussions." (*Id.*; Doc. 145 at 34). After conducting research and meeting with experts in the field, Dr.

Hainline and Dr. Hack determined $30 million was necessary to fund a concussion study, and that the NCAA and the DoD would split the costs, each contributing $15 million. (Doc. 145 at 38–41, 123).

On May 30, 2014, the NCAA and the DoD executed a Cooperative Research and Development Agreement ("CRADA") that "set forth the terms and conditions by which" the NCAA and the DoD agreed "to share . . . certain proprietary information to facilitate their discussions of . . . research and investment strategies, and research findings, in support of their exploration of . . . programs and projects for possible collaboration." (Doc. 145-11 at 1). The CRADA further provided that the NCAA and the DoD "intend that this joint venture will serve to enhance and accelerate research of . . . concussive brain injuries." (*Id.*) The CRADA provided that it was

> entered into under the authority of 15 U.S.C. § 3710a, which allows Federal laboratories to enter into agreements with non-Federal parties under which the Government, through its . . . resources with or without reimbursement (but not funds to non-Federal parties) and the non-Federal parties provide funds . . . or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory.

(*Id.*) The NCAA and the DoD renewed and modified the CRADA in subsequent years. (Doc. 146-11; Doc. 146-26; Doc. 145 at 183). The NCAA and the DoD called their collaboration the "Grand Alliance." (Doc. 149 at 38).

As part of the Grand Alliance, three researchers from three universities were chosen as the Principal Investigators for the Concussion Assessment, Research and Education ("CARE") Consortium to study the "effects of concussion and head impact exposure"—Dr. Thomas McAllister of Indiana University ("IU"), Dr. Steven Broglio

of the University of Michigan ("UM"), and Dr. Michael McCrea of the Medical College of Wisconsin ("MCW"). (Doc. 147 at 14, 31, 131). The NCAA and the DoD each entered separate contracts with IU, UM, and MCW to facilitate concussion research. (*Id.* at 15; Doc. 145-14; Doc. 157-6). These contracts provided that IU would be the Administrative and Operations Core and receive the study's funding from the NCAA and the DoD, from "two separate funds flow streams." (Doc. 145-14 at 6–7; Doc. 157-6 at 6, 9; Doc 147 at 18, 113–14). IU effectively served as a "pass-through entity" responsible for budgeting, tracking monies, and reporting to the NCAA and the DoD, separately, on how their dollars were spent. (Doc. 147 at 55–56; Doc. 157-6 at 2).

The DoD awarded its funds to IU through a federal grant process, known as a Broad Agency Announcement, where the DoD advertised a public call for proposals for research on a topic and selected a submitted proposal. (Doc. 127 at 127–29). IU also executed sub-award agreements with UM and MCW to facilitate their receipt of federal funds, as well as a sub-award agreement with Datalys Center, which managed data collection for the study. (Doc. 147 at 54). IU was responsible for the disbursement of federal funds to each sub-awardee. (*Id.*) On the other hand, the NCAA's funding was controlled by its separate contracts with IU, UM, and MCW. (Doc. 146-29 at 4). IU, UM, and MCW then executed sub-contracts with various site schools for their work, which ultimately received a portion of the NCAA funds (i.e., funds were passed from the NCAA, to IU, to UM and MCW, to the various site schools). (*Id.*; Doc. 147-19; Doc. 147 at 114).

As for oversight and control of the CARE studies, the Principal Investigators

(Dr. Broglio, Dr. McAllister, and Dr. McCrea) were responsible for managing the studies on a "day-to-day basis," in addition to leading the Operating Committee. (Doc. 147 at 297; Doc. 145-14 at 54–55). The Operating Committee was responsible for "develop[ing] budgets for Executive Committee review and approval, [and] review[ing] and approv[ing] funding distributions." (Doc. 145-14 at 54). The Executive Committee, which was comprised of one representative from each sponsor (the NCAA, the DoD, and the National Institute of Health ("NIH")), was responsible for "provid[ing] broad oversight and direction of Grand Alliance research priorities and objectives . . . fiscal management, and budgetary proposals from the Operating Committee." (*Id.*)

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The

moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## DISCUSSION

The NCAA argues that it is entitled to judgment as a matter of law on Plaintiffs' remaining Title IX claims because the undisputed evidence establishes that the NCAA is not a recipient of federal funds. (Doc. 157-1 at 6). In response, Plaintiffs argue that a genuine issue of material fact remains as to whether the NCAA received federal funds from the DoD through the Grand Alliance. (Doc. 174 at 9–26). Specifically, Plaintiffs argue that the NCAA: (1) indirectly received the DoD's funds, and (2) exercised control over the DoD's funds. (*Id.*)

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a). The Civil Rights Restoration Act of 1987 defines a "program or activity" to include "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A). Thus, "if any part of the NCAA received federal assistance, all NCAA operations would be subject to Title IX." *Nat'l Collegiate Athletic Ass'n v. Smith,* 525 U.S. 459, 466 (1999) ("*Smith I*").

Here, there is no evidence that the NCAA received federal financial assistance from the DoD. Instead, the NCAA and the DoD each made separate, independent payments to IU to fund the CARE studies. (Doc. 146-29 at 4; Doc. 157-6). Dr. McAllister testified that "there were two separate funds flow streams, one issuing from the [DoD] and the other issuing from the NCAA." (Doc. 147 at 18). The following chart illustrates the flow of funds from the DoD and the NCAA, respectively, to the CARE studies:




(Doc. 157-1 at 14). These two distinct funding streams were memorialized by the NCAA and the DoD's individual contracts with IU, as well as the CRADA between the NCAA and the DoD. (Doc. 157-6 at 2 (showing MCW received federal funds as a "subrecipient" of federal funds which passed through IU); Doc. 146-29 at 4 (describing separate funding sources to IU, including the NCAA's $10 million contribution, and

a separate "amount up to $25 million from the DoD, pursuant to MTEC Research Project Award Agreement . . . by and between Advanced Technology International and Indiana University"); Doc. 145-11). Specifically, the May 30, 2014 CRADA explicitly provided that 15 U.S.C. § 3710a "allows Federal laboratories to enter into agreements with non-Federal parties under which the Government, [provides] its . . . resources with or without reimbursement (but not funds to non-Federal parties)." (Doc. 145-11 at 1).

As this language suggests, this arrangement with the NCAA was not merely a matter of private contract—Congress expressly legislated for this kind of agreement and prohibited federal funds from flowing to a non-federal entity under a CRADA. Under 15 U.S.C. § 3710a, Congress authorized federal agencies to enter cooperative research and development agreements with non-federal parties for the purpose of conducting "specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31." 15 U.S.C. § 3710a(d). Under this definition of a CRADA, Congress expressly stated that these agreements are not procurement contracts, grant agreements, or cooperative agreements, as those terms are defined under 31 U.S.C. §§ 6303–6305. *Id.* Procurement, grant, and cooperative agreements are each defined as legal instruments "reflecting a relationship between the United States Government and a State, local government, or other *recipient* when the principal purpose is to"

- "acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government"—a procurement under

§ 6303

- "transfer a thing of value to the State or local government or other recipient to carry out a public purpose . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," but "substantial involvement is *not* expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement"—a grant under § 6304

- "transfer a thing of value to the State, local government, or other recipient to carry out a public purpose . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," and "substantial involvement *is* expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement"—a cooperative under § 6305

31 U.S.C. §§ 6303–6305 (emphasis added). The DoD's funds to IU and its sub-awardees, like Datalys, fell under the grant category. (Doc. 146-29 at 4 (referencing the DoD's "award" to IU, assigned Award Number W81XWH-21-9-0010; MT21001.001). Thus, if the DoD intended to provide federal funding to the NCAA, it could have used the same mechanism it used to send funds to IU.

But by law, a CRADA is not the kind of agreement with the federal government where a thing of value is acquired or transferred to a non-federal entity. In fact, a CRADA is defined as an agreement between federal laboratories and non-federal entities, where the federal government "provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (**but not funds to non-Federal parties**) and the non-Federal parties provides **funds**, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts." 15 U.S.C. § 3710a(d) (emphasis added). The statutes clearly contemplate a difference between those non-

federal entities that enter procurement, grant, and cooperative agreements, which are described as "recipients," and non-federal entities that enter CRADAs, which are described as "parties." *Compare* 31 U.S.C. §§ 6303–05 *with* 15 U.S.C. § 3710a.[1] Thus, under the plain language of the agreement between the NCAA and the DoD and by statute, the NCAA was not a "recipient" of anything from the federal government—the plain language of the CRADA and the governing statutes provide that the NCAA could not receive funding from the federal government, the federal government could not pay funds to the NCAA, and nothing of value could be acquired or transferred to the NCAA from the federal government. And, there is no evidence in the record from which a reasonable jury could conclude that the DoD violated Congress' prohibition by paying federal funds, even in an indirect way, to the NCAA.

Nonetheless, Plaintiffs rely on *Grove City College v. Bell*, 465 U.S. 555, 563 (1984) to argue that the NCAA receives funds indirectly from the DoD. (Doc. 174 at 17–19). In *Grove City*, a private college that did not directly receive federal assistance received tuition payments from students who received federal aid. *Id.* at 560. In other words, the federal funds flowed from the federal government, to the students, to the college. *Id.* The Supreme Court concluded that the college was subject to Title IX because, although the aid flowed through an intermediary (the students), the college

[1] The distinction between federal government *recipients*, like IU, and a CRADA *party*, like the NCAA, is clear from the contracts in evidence. For example, the DoD's U.S. Army Medical Research Acquisition Activity is identified as the "Federal Awarding Agency" which awarded funds to IU under Federal Award No. W81XWH1820047. (Doc. 157-6). No such "award" from the DoD to the NCAA is in evidence nor, apparently, could it be in light of the statutory prohibition on such an award under a CRADA.

was the intended recipient, and it, therefore, received federal funding, even if indirectly. *Id.* at 564–67.

Here, unlike the private college in *Grove City*, the NCAA was not the ultimate recipient of federal funds; the CARE studies were. (Doc. 147 at 18; Doc. 146-29 at 4; Doc. 157-6). While both the NCAA and the DoD paid funds to IU, which served as a pass-through entity, the CARE studies, not the NCAA, ultimately accepted the federal funds. (Doc. 157-6 at 2). And though the NCAA may have "benefited" from the DoD's contributions to the CARE studies in much the same way it benefited from its own contributions to the studies, that is not enough. As the Supreme Court later explained, "[w]hile *Grove City* stands for the proposition that Title IX coverage extends to [the government's] intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986). *Grove City* is, therefore, inapplicable.

Plaintiffs also argue that the NCAA received funds from IU by accepting reimbursements for employees' travel and lodging expenses for a 2015 CARE meeting. (Doc. 174 at 30–31; Doc. 145-28). But there is no evidence that IU used federal money to reimburse NCAA employees. And even if there was evidence of such use of federal funds by IU, IU's payments, at most, constitute compensation for losses, which is not "federal financial assistance." *Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1336–38 (11th Cir. 2005) (the relevant inquiry is the government's intent, not how the

recipient handled the federal funds and financial benefits it received). So, even if IU used the DoD's funds for reimbursement purposes, of which there is no evidence, this act alone is insufficient to transform the NCAA into a federal aid recipient. *See id.*

Plaintiffs also rely on *Smith v. National Collegiate Athletic Association*, 266 F.3d 152, 161 (3d Cir. 2001) ("*Smith II*") for the proposition that "the NCAA can be liable under Title IX if it controls an entity that receives federal financial assistance." (Doc. 174 at 29). In *Smith II*, the plaintiff alleged that the NCAA received federal financial assistance indirectly from two entities that directly received federal funding, the National Youth Sports Program ("NYSP") and the National Youth Sports Program Fund (the "Fund"). 266 F.3d at 155. Both the NYSP and the Fund were administered by the NCAA. *Id.* The *Smith II* plaintiff alleged that:

> 1) the NYSP Committee was an NCAA committee responsible for the administration of the NYSP; 2) the Council of the NCAA, the entity that directed the general policy of the NCAA during certain periods, limited the powers of the Fund's Board of Directors; 3) the Executive Director of the NCAA and the chairperson of the NYSP Committee were *ex officio* members of the Fund's Board of Directors; 4) all of the members of the Fund's Board were either employees of the NCAA or members of the NCAA's NYSP Committee; 5) the Fund had to report to the Council of the NCAA on an annual basis; 6) upon dissolution of the Fund, its assets will be distributed exclusively to the NCAA; and 7) the NCAA's Executive Director remarked that the NYSP is "one of the NCAA's best kept secrets."

*Smith II*, 266 F.3d at 161. The Third Circuit, viewing these allegations in the light most favorable to the plaintiff, determined these allegations were sufficient to state a Title IX claim because, if proven true, the NCAA, the NYSP, and the Fund were "virtually indistinct" because the NCAA "was in a position to decide whether to

'receive' federal funds." *Id.* at 162. Thus, agreeing with the NCAA's request for discovery on the issue, the Third Circuit did exactly what this Court did in its September 25, 2025 Order—it sent the parties to discovery to determine whether the plaintiff's allegations were actually supported by the evidence. *Id.* at 160.

Here, relying on *Smith II*, Plaintiffs argue that "Datalys is a captured corporation controlled by the NCAA, [because] federal funding to Datalys directly assists the NCAA." (Doc. 174 at 30). The evidence before the Court does not support this conclusion. The Court reads *Smith II* to recognize that entities like the NCAA cannot essentially launder their receipt of federal funds through entities they create and control. *Smith II* does not stand for the proposition that every company that receives federal funding necessarily binds its largest customers (which benefit from its services) to the requirements of federal Spending Clause statutes. There is no indication in the record that the NCAA controlled Datalys or its decision to accept the DoD's funds for the CARE studies, or that the NCAA "did more than indirectly benefit from federal assistance." *Smith II*, 266 F.3d at 162. Moreover, unlike the allegations in *Smith II,* there is no evidence of a plan for the NCAA to receive funding for the CARE studies (or any other funding) upon dissolution or conclusion of the studies. The fact that Datalys generates business from, and directs most of its efforts to, the NCAA is not evidence that it is "virtually indistinct" from the NCAA. And an NCAA representative's presence on the Executive Committee as one of the sponsors of the CARE studies is hardly evidence that the NCAA was "virtually indistinct" from Datalys (or any other entity involved in the CARE studies) or that it was in a position

to decide whether Datalys (or any other entity) received federal funding. While the NCAA argues that *Smith II's* test is not the proper inquiry, the Court need not make that finding here. Plaintiffs have not accomplished what *Smith II* required, so it is unhelpful.

The undisputed evidence shows that the NCAA contributed funds to a third party (IU), and the DoD separately awarded funds to the same third party to disseminate to the CARE studies.[2] (Doc. 157-6 at 2; Doc. 146-29 at 4; Doc. 147 at 18). And while it is true that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX," an entity must still actually receive the funds. *Smith I*, 525 U.S. at 468; (Doc. 174 at 5). Here, there is no evidence that the NCAA ever received, or could have received, federal funds. Thus, Plaintiffs' Title IX claims cannot proceed. *Smith I*, 525 U.S. at 468.

## CONCLUSION

For these reasons, the NCAA's Motion for Summary Judgment (Doc. 157) is **GRANTED**. The parties' remaining motions regarding the sealing of documents filed in connection with their summary judgment briefing (Docs. 172, 177, 179) are **GRANTED**. The Clerk is respectfully **DIRECTED** to **PERMANENTLY SEAL** docket entries 168-6 and 176 in its entirety, which were previously filed as provisionally sealed, and to **UNSEAL** docket entries 154, 166, 168-1 through 168-5, 168-7 through 168-28, and 170. The Clerk is further respectfully **DIRECTED** to enter judgment in

[2] Because the undisputed evidence establishes that the NCAA was not a federal funding recipient, the Court does not address the NCAA's arguments regarding the Spending Clause's notice requirement. (Doc. 157-1 at 25).

favor of the NCAA and to **CLOSE** this case.

SO ORDERED, this 28th day of September, 2026.

TIFFANY R. JOHNSON
United States District Judge